UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

IN RE:

JOSUE CEPERO and
LETICIA CEPERO,

Debtor

Case No. 17-20358-LMI
Chapter 13
_____/

## NOTICE OF APPEAL

### I.       Identification of Appellant

1.       Name(s) of appellant(s):

Hammocks Community Association Inc., and it's President, Marglli Gallego

2.       Position of appellant in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe)

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
X Creditor
☐ Trustee
☐ Other (describe)

### II.      Subject of this Appeal

1.       Describe the judgment, order, or decree appealed from:

*Order Finding Hammocks Community Association and Marglli Gallego in Contempt* [ECF No. 328]

*Order on Sanctions* [ECF No. 339]

*Order Granting in Part Motion to Reconsider Motion to Reconsider* [ECF No. 477]

*Order on Damages* [ECF No. 480]

*Order Granting in Part Motion to Alter or Amend Judgment For Rehearing, Relief From Judgment and/or Reconsideration as to ECF 480* [ECF No. 510]

2.      State the date on which the judgment, order, or decree was entered: <u>July 19, 2021,</u>
<u>October 28, 2021</u>, <u>June 8, 2022</u>, <u>August 10, 2022</u>

## III.     Parties to this Appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: Appellant Hammocks Community Association Inc.

   Attorney: Annette C. Escobar

   14200 S.W. 232nd St.,
   Miami, Fla. 33170
   Telephone No: (305) 542-0544

2. Party: Appellant Marglli Gallego

   Attorney: Annette C. Escobar

   14200 S.W. 232nd St.,
   Miami, Fla. 33170
   Telephone No: (305) 542-0544

2. Party: Appellees Josue Cepero and Leticia Cepero

   Attorney: Michael Brooks

   8410 SW 40th Ter
   Miami, FL 33155-4148
   Office: 888-811-8989

## IV.     <u>Election for Appeal to Bankruptcy Appellate Panel</u>

   Not Applicable.

**V.**     **Signature of Appellant**

Signed: /s/ Annette C. Escobar
Attorney for Appellants
Attorney Name: Annette C. Escobar
Address: 14200 S.W. 232nd St.,
            Miami, Fla. 33170
Telephone No: (305) 542-0544

Date: August 23, 2022


*Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.*


## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, I filed a copy of this Notice of Appeal via CM/ECF.

By: /s/ Annette C. Escobar
      Annette C. Escobar

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on July 17, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

IN RE:                                                        Case Number: 17-20358-LMI
                                                             Chapter 13
JOSUE CEPERO and
LETICIA CEPERO,

_____ Debtors.     /

### ORDER FINDING HAMMOCKS COMMUNITY ASSOCIATION INC. AND MARGLLI GALLEGO IN CONTEMPT

This matter came before the Court on the *Debtors' Motion For Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019, [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego* (ECF #199) (the "2019 Contempt Motion") and *Debtors' Amended Motion for Contempt Against Hammocks Community*

*Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019 [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego* (ECF #289) (the "Amended Contempt Motion"). For the reasons more fully outlined below, the Court finds that Hammocks Community Association, Inc. (the "Association") and Marglli Gallego ("Ms. Gallego") willfully violated this Court's orders and violated the automatic stay.

### BACKGROUND FACTS AND PROCEDURAL HISTORY

The Debtors, Josue Cepero and Leticia Cepero (collectively the "Ceperos" or the "Debtors"), on the one hand, and Ms. Gallego, the president of the Association, and the Association on the other hand (collectively the "Respondents"), have had a contentious relationship for the last four or five years. It is not necessary to review the history of this bitter relationship other than to note that this Court entered two orders hoping to resolve the ongoing confrontations – *Agreed Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 4, 2018 (ECF #189) (the "2018 Contempt Order") and *Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 7, 2018 (ECF #191) (the "Additional 2018 Contempt Order" and with the 2018 Contempt Order – the "Contempt Orders").

The 2019 Contempt Motion alleged that Ms. Gallego and the Association violated the Contempt Orders with respect to a confrontation that occurred on

2

May 15, 2019 and by virtue of a tree trimming flyer that was distributed to all the members of the community in which the Ceperos live, that allegedly had attached to it a written statement that included inappropriate statements about the Ceperos. The 2019 Contempt Motion was set for an evidentiary hearing and the first day of trial took place on February 26, 2020. The second day of trial was canceled when the courts became virtual due to the COVID-19 pandemic. The parties did not want to try the case virtually, so the Court directed the parties to mediation. That was unsuccessful.

After a continued trial date was set, the Debtors filed the Amended Contempt Motion, alleging that the Association and Ms. Gallego filed a lawsuit on November 20, 2020 (the "November 2020 Lawsuit") suing Mrs. Cepero for defamation and tortious interference. When state court counsel for the Association and Ms. Gallego was advised of this bankruptcy case, he immediately dismissed the November 2020 Lawsuit. The Court allowed evidence of this November 2020 Lawsuit, as well as any defense to the allegations regarding the lawsuit, to be presented at the continued evidentiary hearing.

## **ANALYSIS**

At issue before this Court is whether the Respondents violated the Contempt Orders by virtue of the May 15, 2019 altercation, and whether the Respondents violated the Contempt Orders or the automatic stay by filing the November 2020 Lawsuit.[1]

A finding of civil contempt must be based upon clear and convincing

---

[1] The Debtors failed to present evidence either at the original evidentiary hearing or the continued evidentiary hearing to support the allegations regarding the tree trimming flyer.

evidence that a person or entity violated a prior court order to which they were subject. *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996)). "This ['clear and convincing' evidence standard] is more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Id.* (quoting *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988)). "Clear and convincing evidence" is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). To prevail on a motion for contempt, a movant must prove by clear and convincing evidence that there was a violation of a valid and lawful order; that the terms of the order were clear, definite, and unambiguous; and that the alleged violator had the ability to comply with the order. *Jove*, 92 F.3d at 1546; *In re SLK Assocs., Inc.*, 166 B.R. 985, 989 (Bankr. S.D. Fla. 1994).

**The May 15, 2019 Incident**

The Debtor husband, Mr. Cepero, testified that on May 15, 2019, he and his wife drove to The Heron of the Hammocks ("The Heron"), a community made up of a cluster of buildings in the Hammocks master community, to meet with Maria Alonso, a friend who had just been elected president of the board of The Heron. Mr. Cepero testified that while he was parked in a visitor's parking space, waiting for Ms. Alonso to be available, Ms. Gallego drove up in a car marked with the Hammocks logo and blocked him in the parking space that he had chosen.[2]

---

[2] Ms. Gallego claimed that the Debtors were near her home and that Mr. Cepero knew where she lived because he had come to her home from time to time to pick up checks. Mr. Cepero testified he did not know where Ms. Gallego lived, and he chose to park where he parked because there was an open visitor space. Jorge Matus, the Chief Security Officer for the Hammocks, testified that the Ceperos were blocking Ms. Gallego's parking area. It is not clear how Mr. Matus knew

Mr. Cepero testified that he was able to maneuver around Ms. Gallego, but as he drove around trying to leave the area, Ms. Gallego drove around and blocked his car again with the Hammocks car. Police and community security were called at that time. Who called the police when the altercation occurred are issues in dispute, but, ultimately, who called the police when the confrontation occurred is not relevant with one exception that the Court will address shortly.

Maria Alonso testified that Mr. Cepero tried to call her several times and, when he finally reached her, Mr. Cepero told Ms. Alonso that Ms. Gallego was blocking him. When Ms. Alonso got to the scene, Ms. Gallego was out of her car, at the Debtors' car, saying something and filming the Debtors in their car. According to Ms. Alonso, Ms. Gallego's car was blocking the Debtors' car. There were two Hammocks security vehicles present also.[3]

Ms. Gallego testified that the Ceperos started everything. Ms. Gallego testified she was waiting in front of her son's school to pick him up before 4:00 p.m. when she noticed that there was a car acting strangely in the pickup line at the school. The car followed her, but she did not recognize who was following her until she noticed a device by the mirror of the car that was following her, and then she noticed that the car was being driven by Mr. Cepero.

Ms. Gallego further testified that she continued driving and sped up to try to make it home faster. Ms. Gallego testified that she was so nervous she called 911 while she was driving and told the 911 operator she was being followed and

---

this, unless he was relying on what Ms. Gallego told him, since he also testified he did not know the addresses in The Heron.

[3] Counsel for the Respondents argued that the Ceperos could have backed away from where Ms. Gallego was blocking them. However, the Court does not view this as relevant.

had been followed for an hour. Ms. Gallego testified that she told her son to duck down under the seat while Ms. Gallego remained on the phone at the instruction of the 911 operator.  Ms. Gallego testified that the 911 operator told Ms. Gallego an officer had been dispatched. Eventually, when Ms. Gallego made it home, she testified she began pulling into her parking lot and suddenly the Debtors came across her parking lot and got in front of her car. Ms. Gallego testified she was terrified for her young son who was in the car and that she had a neighbor take him. Ms. Gallego also testified that the 911 operator told her to get out of the car to check the tag number of the car that was following her.

Mr. Cepero testified that he and his wife were not at the son's school, that they do not even know where the son goes to school, and that, in fact, they went to the bank to purchase a money order to make their Chapter 13 plan payment. The Ceperos introduced into evidence a time-stamped bank slip that shows that the Ceperos purchased the money order at 4:17 p.m., at a bank that was approximately a six-minute drive from The Heron and their home. It was not possible for the Ceperos to be at the son's school in the carpool line at or before 4:00 p.m., follow Ms. Gallego for an hour, or a half hour, or at all, and then still be at the bank making a transaction that completed at 4:17 p.m.

The video evidence shows that the Ceperos were driving when all of a sudden Ms. Gallego pulled up in front of them, forcing them to stop. Ms. Gallego then got out of the car and eventually approached the Ceperos' car while talking on the phone. This video evidence directly contradicts Ms. Gallego's testimony that the Ceperos were blocking her from her parking space. If the parking space was blocked, it was a consequence of where Ms. Gallego stopped her car.

The police officer who came to the scene filed a report that shows he was dispatched at 4:35 p.m. and arrived on the scene at 4:40 p.m. No other officer was on the scene.[4] When the police officer arrived, the Hammocks security officers were already on scene. This contradicts Ms. Gallego's testimony that the 911 operator told her an officer was dispatched while Ms. Gallego was driving. Moreover, according to the police report, Ms. Gallego told the officer the Ceperos had been following her for at least 30 minutes. But the Ceperos did not follow Ms. Gallego for 30 minutes, as Ms. Gallego told the police officer, or for 60 minutes, as she told the 911 operator. Both statements are clearly false because the Ceperos were at the bank at 4:17 p.m. and everyone was at the scene of the altercation by at least 4:35 p.m. when the police were dispatched.

Moreover, although Ms. Gallego claimed she called the 911 operator while she was driving her son home from school, the time stamp on the 911 call shows the call was made at 16:31:18 – 4:31 p.m., 30 minutes after Ms. Gallego testified she picked up her son at school. Based on all the other evidence in the case, it is clear Ms. Gallego called 911 after she had blocked the Ceperos' car.

The Court has reviewed all of the evidence, the testimony of the witnesses and the exhibits, including the video that was recorded at the time of the incident. The Court finds that Ms. Gallego did not call the police while she was driving the car as she claims, but, rather, Ms. Gallego called the police at 4:31 p.m. That recording makes clear that there was no previous call to the police, as Ms. Gallego testified, while she was driving home from her son's school.

---

[4] Ms. Gallego testified that there was more than one officer on the scene but there is no one else who corroborated that statement.

Finally, the video of what appears to be the second confrontation clearly shows that Ms. Gallego was blocking the Debtors, and, in fact, the video shows that Ms. Gallego deliberately pulled up in front of the Debtors' and blocked them from continuing in the direction in which they were driving. Additionally, although Ms. Gallego testified that she asked someone to take her son out of the car and into her home, the Association did not provide any corroborating testimony and there is nothing in the video that suggests the son was in the car when Ms. Gallego blocked the Debtors' car.

In sum, the Court finds that Ms. Gallego was untruthful, her testimony fabricated and contradicted by physical evidence. Consequently, the Court finds that all of Ms. Gallego's testimony should be disregarded.

Mr. Cepero testified he and his wife were at The Heron to see Maria Alonso. Maria Alonso corroborated that testimony. The Association and Ms. Gallego did not put on any evidence to contradict that testimony other than Ms. Gallego's untruthful testimony about her son's carpool line and being followed by the Ceperos.

Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.

**The November 2020 Lawsuit**

In the November 2020 Lawsuit, the Respondents sued Mrs. Cepero for a variety of acts, some of which allegedly occurred postpetition. However, the complaint clearly included allegations, and sought relief with respect to, "false

and defamatory statements over the last four years (at a minimum) about Ms. Gallego." Once advised of this bankruptcy case, state court counsel immediately dismissed the November 2020 Lawsuit.

The Respondents argue that the November 2020 Lawsuit was not prohibited by the Contempt Orders because the Contempt Orders say nothing about filing lawsuits. They also argue the Debtors never claimed the November 2020 Lawsuit was a stay violation until the Debtors filed their closing argument. Further, the Respondents argue, the filing of the November 2020 Lawsuit was not a violation of the automatic stay because (a) Ms. Gallego is not a creditor and (b) the November 2020 Lawsuit only sought relief with respect to postpetition conduct.

The Debtors counter that the November 2020 Lawsuit was clearly a violation of the Contempt Orders. The Debtors also point out that the November 2020 Lawsuit was cited as a stay violation in the *Motion to Supplement Motion for Contempt* (ECF #267), and the Amended Contempt Motion. The Court notes that while the *Joint Pretrial Stipulation* (ECF #298) did not identify whether the November 2020 Lawsuit constituted a stay violation as an issue to be tried, during the trial, Debtors' counsel repeatedly argued that the November 2020 Lawsuit was a stay violation when seeking admission of certain exhibits.

Whether the November 2020 Lawsuit was a violation of the stay or of the Contempt Orders, the parties agreed to try the issue of whether the November 2020 Lawsuit was wrongful as part of the continued evidentiary hearing. The Court agrees with the Respondents that the November 2020 Lawsuit does not

9

violate the Contempt Orders.[5]

However, the Court finds that the November 2020 Lawsuit was a knowing violation of the automatic stay. The Court does not understand the argument that Ms. Gallego is not a creditor. Perhaps Ms. Gallego did not file a claim in the bankruptcy case, but the November 2020 Lawsuit was clearly an act "to recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. §362(a)(1). While there are certain instances in which acts to recover on claims that arise postpetition are not a stay violation, the Court does not have to address those exceptions here because the November 2020 Lawsuit included relief relating to alleged prepetition claims. The Respondents argued that Ms. Gallego did not know that she could not file the November 2020 Lawsuit. However, the Respondents filed a postpetition lawsuit in 2017 against the Debtors and others, seeking similar relief for prepetition acts. That lawsuit was dismissed as to the Debtors as a violation of the automatic stay. Ms. Gallego testified she did not remember that lawsuit, but, in light of Ms. Gallego's false testimony on other issues in this case, the Court does not believe that Ms. Gallego did not remember.

Accordingly, the Court finds that the Respondents knew that they could not file any lawsuit against the Ceperos at least with respect to matters that occurred before the bankruptcy case was filed, and were on notice that filing any lawsuit while the bankruptcy case was pending might be prohibited. Thus, the Court finds the Association and Ms. Gallego willfully violated the automatic stay

---

[5] If the allegations regarding Mrs. Cepero's postpetition conduct are true, Mrs. Cepero's actions violated the Contempt Orders.

10

by filing the November 2020 Lawsuit.

## DAMAGES

The Amended Contempt Motion seeks attorney fees and reimbursement of costs (including those associated with the November 2020 Lawsuit), punitive damages, and damages for emotional distress. The Debtors did not cite any statute or common law basis for the sanctions they seek leaving it to the Court to guess why they are entitled to recovery. However, the Court specifically advised the parties that the Court would consider evidence of damages after a determination of liability, if any. Having found that the Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages. The request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support. If the Debtors intend to seek emotional damages, that claim will have to be set for evidentiary hearing, *if* the basis for damages claimed allow a claim for emotional damages.

After the damages statement is filed, which must be filed no later than 21 days from the date of entry of this order, the Association and Ms. Gallego will have 21 days to file an objection to the amounts requested, and include any arguments that the nature of damages claimed are not permitted under the theory cited by the Debtors. However, for purposes of objecting to any damages,

11

the Association and Ms. Gallego may not include objections to this Court's finding of liability. Any objections to those findings must be made through the procedurally appropriate pleading.

## CONCLUSION

Ms. Gallego needs to stay away from the Ceperos. The Ceperos need to stay away from Ms. Gallego. The Contempt Orders made clear that the Association and Ms. Gallego on the one hand, and the Ceperos on the other hand are not to talk about each other or interact with each other. While the Contempt Orders terminate upon the Ceperos obtaining their discharge, this Court urges the parties to continue to stay away from each other for so long as either of them lives in the Hammocks. If there must be some interaction, it should be only through an intermediary. The Association must take whatever steps necessary to make sure that Ms. Gallego understands her limitations and her potential liability if she violates this Court's orders again. The Ceperos must also remember their responsibilities under the Contempt Orders. This needs to stop.

# # #

Copies furnished to:
Miguel Parlade, Esq.
Michael Brooks, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on October 27, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                        CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA                      Chapter 13
CEPERO,

        Debtors.
_____/

### ORDER ON SANCTIONS AND SETTING
### <u>FURTHER EVIDENTIARY HEARING</u>

This matter came before the Court after a trial on February 26, 2020 and
February 11-12, 2021 on the *Debtors' Motion For Contempt Against Hammocks
Community Association Inc., and it's [sic] President, Marglli Gallego for Failure to
Abide by This Court's Agreed Order Dated December 3, 2019, [ECF 189] and This
Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion*

*for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego* (ECF #199) (the "2019 Contempt Motion") and *Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019 [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego* (ECF #289) (the "Amended Contempt Motion" and together with the 2019 Contempt Motion, the "Contempt Motions"). The Court finds that the Debtors are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress. The Court also finds the Debtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress. The Court finds the Debtors are not currently entitled to reimbursement of expenses because they failed to provide the required support ordered by the Court, and with respect to the attorney fees included in the request for costs, in addition to being inappropriately categorized as a cost, had no detail whatsoever.

The Court entered its ruling in favor of the Debtors on almost all of the relief requested in the Contempt Motions in its *Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt* (ECF #328) (the

"Contempt Order")[1], and directed the Debtors to submit a "specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages." The Debtors filed their *Statement of Damages on Order of Contempt* (ECF #335) (the "Damages Statement") to which the Association[2] and Ms. Gallego filed their *Objection to Debtor's [sic] Statement of Damages on Order of Contempt* (ECF #337) (the "Damages Objection").

The Debtors seek sanctions in the form of damages for the violations of this Court's Orders[3] and for violation of the automatic stay. The Debtors also seek punitive damages. The Debtors rely on 11 U.S.C. §105 for the sanctions arising from the violation of the Court's Orders and on 11 U.S.C. §362(k) for damages arising from the stay violation.

Under section 105, "the court may take any action 'necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.' 11 U.S.C. § 105(a). Thus, a court may impose sanctions if a party violates a court order or rule." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273 (11th Cir. 2009). "The purpose of civil contempt sanctions is to (1) compensate

---

[1] The Association and Ms. Gallego have appealed the Contempt Order. Nonetheless, the Court has jurisdiction to enter this Order. *See In re TLFO, LLC,* 571 B.R. 880, 891 (Bankr. S.D. Fla. 2017); *In re Sundale, Ltd.,* 2021 WL 3375815, at *1 (Bankr. S.D. Fla. 2021).

[2] Any undefined capitalized terms throughout this order will have the same definition as in the Contempt Order (ECF #328).

[3] *Agreed Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and it's [sic] President, Marglli Gallego* (ECF #189) (the "2018 Contempt Order"), and *Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and it's [sic] President, Marglli Gallego* (ECF #191) (the "Additional 2018 Contempt Order").

the complainant for losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996).

Sanctions for a stay violation under section 362(k) may be awarded when the Court finds that the stay violation was willful. If so, the Debtors are entitled to "recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. §362(k).

**Attorney Fees**

The Debtors seek sanctions in the form of attorney fees totaling $71,830.00.[4] The Association and Ms. Gallego object to the fees on a number of grounds including that there were no expert declarations attached to the Damages Statement. The Court will address this objection first. The use of expert testimony in federal court is governed by Federal Rule of Evidence 702. That rule states "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify on the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." As the Court has repeatedly advised parties who appear before her, and advised the parties in this case, the Court has 37 years of experience in the bankruptcy arena-over 20 years as a practitioner and over 15 years as a judge. The Court does not require an expert to advise the Court on the issue of the

---

[4] The Court will address the attorney fees included in "costs" when discussing the cost requests.

reasonableness of attorney fees in a bankruptcy proceeding. Therefore, that portion of the Damages Objection is overruled.

The reasonableness of the fees requested by the Debtors is measured in accordance with the criteria set forth in *Johnson v. Georgia Highway Exp.,* 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988). *In re Lyubarksy,* 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020).[5] Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.

The Court has reviewed the detailed fee statements for Mr. Brooks and for Mr. Arslanian attached to the Damages Statement. Having reviewed the statements in detail, the Court finds that Mr. Brooks' fees should be reduced to $26,977.50 and allowed as a sanction only in that amount and that Mr. Arslanian's fees should be allowed in the amount requested - $27,087.50.

---

[5] "The criteria for determining the reasonableness of the fees requested is not 11 U.S.C. §330 because the Debtors' professionals were not retained pursuant to 11 U.S.C. §327. . . . Fed. R. Bankr. P. 2016 and this Court's *Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases* are also inapplicable." *Id.*

The award of attorney fees as a sanction for violation of this Court's Orders and violation of the stay is designed to compensate the Debtors for the harm caused by the acts of the Association and Ms. Gallego. This does not mean that the Debtors are entitled to any attorney fees arising from the Debtors' relationship and dealings with the Association. Nonetheless, Mr. Brooks included in his fee request charges associated with the Debtors' alterations to their roof, front door, and driveway. None of those fees were appropriately included in his fee request.

The balance of the fee reduction is based primarily on collective excessive charges for tasks such as preparation of the closing statement and unnecessary duplication – primarily attendance at the deposition. Therefore, the Court finds that it is appropriate to sanction the Association and Ms. Gallego jointly and severally $54,065.00 with respect to the attorney fee damages.

**Costs**

The Debtors also seek $11,682.20 in costs, which include $2,500.00 for attorney fees associated with work done by Mr. Brooks' former law partner Michael Frank in 2019, $5,000.00 for attorney fees for Mr. Brooks in 2020, and $2,500.00 for work done by Guy Spiegelman, identified as "for state court case" in 2019.

In the Contempt Order the Court stated "[t]he request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support."

6

Notwithstanding those instructions, there is no support provided for any of the costs requested.  Because the costs were described, the Court will give the Debtors fourteen days to submit the support for the costs (other than the attorney fees) that are listed on Exhibit C of the Damages Statement.  The consequence of the failure to provide copies of the invoices will result in those costs being disallowed.

The Court will now turn to the attorney fees listed as costs.  These are disallowed *in toto*.  The Court was very specific regarding the detail required for any attorney fee request.  The Court understands that Mr. Brooks and his former law firm may be involved in a dispute.  However, if Mr. Brooks made a demand for that information (which he should have been requesting at least from the time the second day of trial was set), and that demand was rebuffed, Mr. Brooks had ample time to file a motion with this Court compelling his former law firm to provide the information.  Thus the $7,500.00 requested for Mr. Frank's and Mr. Brooks' time is denied.

The Court has no idea what the Guy Spiegelman fees are for, and to which "state court case" the cost statement refers.  Because there was no detail provided to allow the Court to determine whether these fees are reasonable or are even associated with the violations of the Court's Orders or the stay, this request is disallowed as well.

**<u>Emotional Distress Damages</u>**

The Debtors claim they have suffered damages arising from emotional distress for which they seek compensation. "Compensatory damages may

include emotional distress, provided the Debtor (1) suffers significant emotional distress, (2) clearly establishes the significant emotional distress, and (3) demonstrates a causal connection between that significant emotional distress and the contemptor's wrongful conduct." *In re Rhodes*, 563 B.R. 380, 388–89 (Bankr. M.D. Fla. 2017).

As the Court held in *Lyubarsky,* "[t]he Eleventh Circuit has recognized that debtors who are subjected to a stay violation are entitled to claim emotional distress damages under section 362(k). *Lodge v. Kondaur Capital Corp.,* at 1271. '[T]o recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay.' *Id. (internal citations omitted)."* *In re Lyubarsky*, 615 B.R. 924, 931 (Bankr. S.D. Fla. 2020).

The Court finds that the Debtors are entitled to an evidentiary hearing to establish whether and to what extent they have suffered damages for emotional distress arising from the violations of the Court Orders and the automatic stay. Subject to proving entitlement, these damages, if any, will be added to the fee and cost awards.

## **Punitive Damages**

The Debtors have asked for an unspecified amount of punitive damages. "Punitive sanctions are appropriate when a party acts with 'reckless or callous disregard for the law or rights of others.' *Parker v. Credit Central South, Inc.*, 634

8

Fed. Appx. at 773 (internal citations omitted)." *Lyubarsky,* 615 B.R. at 937. "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: '(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor.' *In re Harrison,* 599 B.R. 173, 182 (Bankr. N.D. Fla. 2019)." *Lyubarsky,* 615 B.R at 937-38.

The Court finds that Ms. Gallego acted recklessly and carelessly when she deliberately cut off the Debtors with her car, and then called the police with her manufactured story about the Debtors following her. The Court also finds that Ms. Gallego acted recklessly and callously when she initiated the November 2020 Lawsuit, knowing that Mrs. Cepero was still in bankruptcy, and knowing she could not sue Mrs. Cepero while she was in bankruptcy.[6] At a minimum Ms. Gallego should have advised state court counsel about the bankruptcy so that state court counsel could assess whether and to what extent relief could be sought in state court absent a stay relief order from the bankruptcy court.

The Court cannot calculate the amount of punitive damages without a further evidentiary hearing.

> In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will punish and deter." *In re Novak*, 223 B.R. 363, 368 (Bankr. M.D. Fla. 1997) (emphasis added). *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr. M.D. Ala. 2016) (awarding $50,000.00 in

---

[6] As the Court previously held, the November 2020 Lawsuit sought damages for pre-petition as well as post-petition conduct.

> punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brodgen*, 588 B.R. 625 (Bankr. M.D. Fla. 2018) (awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191 (awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

*Lyubarsky,* 615 B.R. at 938. As already noted, the Court requires an evidentiary hearing to determine whether the Debtors are entitled to damages for emotional distress (which will assist the Court in determining any appropriate multiplier *and* the amount of damages against which to apply any multiplier) and, also, as the Association and Ms. Gallego pointed out in their Damages Objection, to assess their respective ability to pay the punitive damages. Thus, the Court will determine the amount of punitive damages after the evidentiary hearing.

## **CONCLUSION**

The Court finds as follows:

a. The Debtors are entitled to sanctions to be assessed against the Association and Ms. Gallego for damages incurred in connection with the violations of this Court's Orders and violation of the automatic stay, all as detailed in the Contempt Order.

b. Sanctions in the form of attorney fees are allowed in the total amount of $54,065.00.

10

c. The Debtors will have fourteen days to produce the necessary support for the non-attorney fee costs listed in the Damages Statement or any such claims are waived.

d. The $10,000.00 in attorney fees listed as "costs" are not allowed.

e. The Court will conduct an evidentiary hearing on December 30, 2021, at 9:30 a.m. to hear evidence on emotional distress damages and the ability of Ms. Gallego and the Association to pay punitive damages.

   i. The Court has reserved one half day for this evidentiary hearing.

   ii. The hearing shall take place at United States Bankruptcy Court, 301 N. Miami Avenue, Courtroom 8, Miami, Florida.

   iii. **DISCOVERY**. All discovery must be completed not later than **seven days** before the evidentiary hearing. The time for responding to interrogatories, requests for admission or requests for production is shortened to fourteen (14) days from service of the discovery.

   iv. **WITNESS LISTS**. No later than 4:00 p.m. **four business days** before the evidentiary hearing before the evidentiary hearing, all parties must exchange and file with the Court witness lists identifying all fact and expert witnesses each party intends to call at the evidentiary hearing (other than rebuttal or impeachment witnesses).

   v. **SUBMISSION AND EXCHANGE OF EXHIBITS.** No later than 4:00 p.m. **four business days** before the evidentiary hearing, the parties must submit and exchange all exhibits pursuant to the requirements of Local Rule 9070-1.

   v. **OBJECTIONS TO EXHIBITS.** All objections to exhibits must comply with Local Rule 9070-1 and must be filed and served, so as to be received no later than 4:00 p.m. **two business days** before the evidentiary hearing. The parties must meet and confer (by telephone or video conference) to resolve, to the extent possible, any objections to exhibits. Any unresolved

objections (other than objections to relevancy) will be addressed at the beginning of the evidentiary hearing.

# # #

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on June 7, 2022.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                        CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA                      Chapter 13
CEPERO,

            Debtors.
_____/

## ORDER ON DAMAGES

This matter came before the Court on December 30, 2021 on a trial to determine whether the Debtors are entitled to damages for emotional distress and, if so, how much those damages should be (the "Damages Trial"). The Court has considered the evidence admitted at trial and the testimony of the witnesses. For the reasons outlined below, the Court finds that the Debtors are entitled to

1

some damages for emotional distress, and for punitive damages, in the amount and subject to the terms and findings of this Order.[1]

The Court previously entered an Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt (ECF #328) (the "Contempt Order") holding that the Hammocks Community Association, Inc. (the "Association") and its then President, Marglli Gallego ("Gallego") had violated (i) two prior contempt orders entered by the Court in December of 2018 (collectively the "Original Contempt Orders")[2]; and (ii) the automatic stay by virtue of an incident that occurred on May 15, 2019 (the "May Incident") and a lawsuit that was filed on November 20, 2020 (the "November 2020 Lawsuit").

The Court subsequently entered its Order on Sanctions on October 28, 2021 (ECF #339) (the "Sanctions Order") holding that the Debtors were entitled to sanctions as follows:

> *The Court finds that the Debtors are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress. The Court also finds the Debtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress.*

The Court previously awarded the Debtors $54,065.00 for attorney fees. The Court recently issued its Order Granting In Part Motion To Reconsider Motion To Reconsider awarding the Debtors an additional $4,125.00 in attorney fees, for a total of $58,190.00. This Order addresses the Debtors' request for

---

[1] The following constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52 made applicable to this contested matter pursuant Fed. R. Bankr. P. 7052.

[2] *Agreed Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #189) and *Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #191).

emotional damages and the amount of punitive damages to which the Debtors are entitled.

**Emotional Distress Damages**

In order to "recover 'actual' damages for emotional distress under §362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014).

The Debtors relied on their own testimony as well as the written reports of three professionals – Frances Pena, a licensed clinical social worker who is treating Mrs. Cepero; Dr. Oscar Pozo, a psychiatrist who is treating Mrs. Cepero, and Dr. Marjorie Caro, a psychiatrist treating Mr. Cepero.  None of the Debtors' professionals appeared to testify.

Ms. Pena first spoke with Ms. Cepero in April 2020, a little less than a year after the May Incident and saw her several times subsequent to the initial visit. Ms. Pena  outlined Mrs. Cepero's condition, including PTSD, panic attacks, unable to sleep, having nightmares, apprehensive about going out due to the homeowner's board.   Dr. Pozo first saw Mrs. Cepero in June of 2020 and saw her at least two more times during the course of the subsequent year and a half. Dr. Pozo has diagnosed Mrs. Cepero with acute stress reaction, major depressive disorder and generalized anxiety disorder.   Neither professional cites the situation with the Association and Ms. Gallego as the sole cause of Mrs. Cepero's anxiety,  but both Ms. Pena and Dr. Pozo cite the situation as a significant contributing factor to her problems.

3

Dr. Caro initially saw Mr. Cepero in October of 2018. Mr. Cepero cited as his major issues financial stressors that impacted his relationship with his wife, as well as multiple losses in the family. Among other things, Mr. Cepero had trouble sleeping. Dr. Caro prescribed a medication for Mr. Cepero's "extreme" anxiety and major depressive disorder. Mr. Cepero apparently returned in July of 2019 describing his feelings and symptoms worsening "related to issues in the place where he is living." Mr. Cepero continued to visit Dr. Caro, each time relating his symptoms to a variety of factors including "his current living situation."

The Association and Ms. Gallego relied on the testimony of Dr. Henry Storper, a board-certified psychiatrist. Dr. Storper examined both Mr. Cepero and Mrs. Cepero. Based on Dr. Storper's examination of Mr. Cepero and Dr. Storper's review of Dr. Caro's reports, Dr. Storper testified[3] that Mr. Cepero has major depressive disorder with obsessive ruminations (about the Hammocks board) and generalized anxiety disorder. Dr. Storper opined that the May Incident did not cause Mr. Cepero's problems and based on Dr. Caro's reports, that the May Incident did not cause any exacerbation of Mr. Cepero's prior symptoms. However, on cross-examination Dr. Storper acknowledged that the May Incident *could* have exacerbated Mr. Cepero's condition but he also felt that Mr. Cepero was being under-treated for his issues, and that Mr. Cepero was not being given the proper medication for his conditions.

With respect to Mrs. Cepero, Dr. Storper testified that he did not believe the May Incident caused or "materially altered" Mrs. Cepero's existing conditions,

---

[3] At the request of the Debtors, the Court admitted Dr. Storper's expert reports as well.

which he diagnosed as acute situational reaction, generalized anxiety disorder with significant obsessive ruminations (about the HOA situation) and an unspecified mood disorder. He based this opinion on a report from Mrs. Cepero's general doctor (a report not in evidence) that referenced a "recurrence" of Mrs. Cepero's anxiety[4], as well as the delay of almost one year between the May Incident and Mrs. Cepero's first visit with Ms. Pena. Nonetheless, on cross-examination Dr. Storper conceded he had no basis to find that Mrs. Cepero's problems were caused by anything other than the situation with Ms. Gallego and the Association. Indeed, in Dr. Storper's written report he writes "There are persistent obsessive ruminations about this conflict. She manifests significant paranoid persecutory ideation, in which she believes that she and her family will be harmed or possibly killed, by employees of the homeowner's association and by Ms. Gallego, in particular."

The Association and Ms. Gallego argue that the evidence shows that both Mr. and Mrs. Cepero had pre-existing issues relating to stress, and that therefore, the May Incident is not a cause of their emotional issues. The Association and Ms. Gallego also point to a long temporal gap between the May Incident and the Ceperos' next appointments with their respective professionals.

Based on the evidence the Court finds that, while Mrs. Cepero may have suffered from anxiety prior to the May Incident, the May Incident aggravated Mrs. Cepero's anxiety, to the point where she thinks everything that happens somehow is related to the conflict with the Association and Ms. Gallego,

---

[4] Mrs. Cepero did testify that in 2017 when she went to the doctor she was very sad because her father had died but she had never been diagnosed with anxiety and never took any medication until Dr. Pozo started treating her.

including a car backfiring which Mrs. Cepero somehow believed was instead, someone firing bullets at her house. Moreover, this conflict started back in 2017. Indeed, the reason the Original Contempt Orders were entered was because of these tensions.

Florida law recognizes that "aggravation of a [pre-existing] psychiatric condition may be compensable if it is the direct and proximate result" of the incident giving rise to the claim being tried. *See Deneault v. Alachua County School Board,* 555 So. 2d 909, 914 (Fla. 1st DCA 1990); *Cameron v. Supermedia, LLC,* 2016 WL 1572952, at *4 (N.D. Fla. 2016) ("[T]he aggravation of a preexisting ailment or condition may be taken into account in determining damages.").

Thus, the Court finds that while the May Incident was not the single cause of Mrs. Cepero's emotional distress, it was a significant factor, and appears to be the "straw that broke the camel's back". The Court does not find compelling the delay in going for professional help. What the Court does note is that after the May Incident, and continuing until today, Mrs. Cepero thinks every interaction with anyone having to do with the Association, and even those who are not (in the case of the car backfiring) , is meant to be a threat of some kind. Indeed, Dr. Storper noted this in his report.

Based on the foregoing, the Court finds that Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident.[5] The Debtors have proven that the May Incident not only caused Mrs. Cepero significant emotional distress, it also aggravated any emotional distress that Mrs. Cepero

---

[5] Mrs. Cepero acknowledged that she had minor distress arising from the November 2020 Lawsuit so there are no emotional damages arising from that violation.

may have already been suffering due to the prior conduct of Ms. Gallego, as condoned by the Association.

However, the evidence does not support damages for emotional distress for Mr. Cepero. The Court certainly recognizes Mr. Cepero's distress at seeing his wife's situation, and there is no doubt that his wife's distress continues to cause him stress. Nonetheless, Mr. Cepero was having "extreme" stress and anxiety long before the May Incident. It does not appear from the reports that were submitted, or the testimony, that Mr. Cepero's anxiety issues increased in any meaningful way, including treatment, although there is no question Dr. Caro noted that Mr. Cepero had increased anxiety after the May Incident.

Having proven the causal connection between Mrs. Cepero's emotional distress and the May Incident, the question then is, what should be the damages that should be awarded to Mrs. Cepero? The Debtors have requested an undifferentiated one million dollars for the emotional distress and for punitive damages. While the Court does not find that the Ceperos are entitled to one million dollars, the Court finds that it is appropriate to award Mrs. Cepero damages even though there is no evidence that Mrs. Cepero incurred any expenses associated with the treatments she has received.[6]

There is no mathematical formula to determine the damages for emotional distress. Thus the Court must consider the amount of damages based on the nature of the contempt and the stay violation, as well as how other courts have

---

[6] The Debtors' closing statement did not identify any actual damages associated with the emotional distress claim. The Court did review the evidence; it appears that the medical charges were paid by the Debtors' insurance. The Court presumes that, since the Debtors did not request any costs, that the Court's understanding of the evidence is correct.

7

measured damages for emotional distress. *See In re Lyubarsky,* 615 B.R. 924 (Bankr. S.D. Fla. 2020).

In *In re Lyubarsky,* this Court awarded $25,000 for emotional distress damages caused by egregious behavior by a creditor and its counsel. The Court finds that Ms. Gallego's conduct on May 15, 2019, coupled with her blatant lies when she testified as a witness, easily support a similar award in this case. Therefore the Court finds it is appropriate to award damages for emotional distress in the amount of $25,000.

## Punitive Damages

The calculation of punitive damages is subject to the discretion of the Court. As the Court wrote in *In re Lyubarsky*:

> Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed. Appx. at 773 (internal citations omitted). "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner. . . where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche*, 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).
>
> "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019); *In re Roche*, 361 B.R. at 624. . . .
>
> In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will *punish and deter*." *In re Novak*, 223 B.R. 363, 368 (Bankr.M.D.Fla. 1997) (emphasis added). *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr.M.D.Ala. 2016)(awarding $50,000.00 in punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brogden*, 588

> B.R. 625 (Bankr.M.D.Fla. 2018)(awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191(awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

*Lyubarksy*, 615 B.R. at 937-38.

Before awarding punitive damages, the Court must consider two additional factors. The first is whether the Association should be liable for punitive damages arising solely from Ms. Gallego's conduct. The second is whether the Association and Ms. Gallego have proven they do not have the ability to pay any punitive damages.[7]

The Association has conceded it has the ability to pay the punitive damages award but argues that it should not be responsible for punitive damages because the Debtors have not presented any evidence that the Association, as opposed to Ms. Gallego, acted in a way that would warrant punitive damages assessed against the Association.[8]

The Court agrees with the Association. In *Mercury Motors Exp., Inc. v. Smith,* 393 So. 2d 545, 549 (Fla. 1981), the Florida Supreme Court laid out the

---

[7] The burden of proof is on the person against whom punitive damages is assessed to demonstrate that he/she or it does not have the financial ability to pay. *See Johnson v. Howard,* 24 F. App'x 480, 488 (6th Cir. 2001); *In re Lyubarsky,* 615 B.R. at 928; *Rinaldi v. Aaron,* 314 So. 2d 762 (Fla. 1975).

[8] The Debtors argue that this argument is untimely and, besides, the Association bears responsibility for the acts of Ms. Gallego. The Court does not believe the argument is untimely. The Association's responsibility for actual damages related to Ms. Gallego's conduct, which the Court has already found *is* appropriate, does not automatically translate into responsibility for punitive damages associated with Ms. Gallego's conduct.

framework for an employer's liability for punitive damages arising from conduct by the employee.

> Before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be **some fault on his part.** . . . Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages.

*Id.* at 549 (emphasis added).

While Ms. Gallego was an officer of the Association, rather than an employee, there does not appear to be any reason why the analysis should be different. The Debtors did not put on evidence that would support a finding that the Association acted or did not act in way that "foreseeably contributed" to the Debtors' injuries. Therefore the Court finds that the Association is not liable for the punitive damages awarded to the Debtors.

The Court finds it is appropriate for punitive damages to be assessed against Ms. Gallego. As the Court found in the Contempt Order, Ms. Gallego intentionally violated the Original Contempt Orders. Ms. Gallego lied during the trial to determine whether the Original Contempt Orders were violated. The Court found and finds that Ms. Gallego's conduct during the May Incident, and the filing of the November 2020 Lawsuit, were willful and malicious.

Ms. Gallego did not appear at the trial. Even though her nonappearance was due to COVID[9], her criminal attorney did appear at the trial and informed

---

[9] The Debtors also did not subpoena Ms. Gallego until the night before the trial. As the Court has repeatedly admonished counsel, do not wait until the last minute to subpoena a critical

the Court that, even if his client was present, he would not allow her to answer any questions, but instead assert her Fifth Amendment right against self-incrimination.[10]  When a party seeks to assert his or her Fifth Amendment right in a civil matter, "the adverse party is entitled to an adverse inference, meaning an inference that, had the party testified, such testimony would not have been favorable to his claim or defense." *In re Neves,* 638 B.R. 220, 229 (Bankr. S.D. Fla. 2014).

However, a party may not rely solely on the adverse inference.  The adverse party "must present some evidence tending to prove its assertion that is independent of the defendant's refusal to testify." *Id.*  In this case, in addition to relying on the adverse inference, the Debtors submitted evidence that demonstrates that Ms. Gallego owns one property at the Hammocks, and a small interest in another property at the Hammocks.  Ms. Gallego, through the Association's counsel, argued in the closing argument that the Debtors did not show that either property is unencumbered, or is not exempt as Ms. Gallego's homestead.  However, that burden was on Ms. Gallego, not the Debtors, and Ms. Gallego did not present any evidence, by testimony or otherwise to prove that she does not have the ability to pay punitive damages.[11]

Although Ms. Gallego was not present, her criminal counsel appeared and advised the Court what would have happened if Ms. Gallego had appeared.

---

witness, even if the witness is a party. After all, a party is not required to show up for a trial, although, of course, there is a risk in failing to do so.

[10] At the time Ms. Gallego, according to her criminal counsel, had been charged with two felonies – an organized scheme to defraud and grand theft.

[11] The deadline to file exhibits was December 27, 2021. The Association (whose attorney was representing Ms. Gallego also) did not submit exhibits that would demonstrate Ms. Gallego's inability to pay.  Ms. Gallego did not separately submit any exhibits.

Consequently, the Court finds that it is appropriate to apply the inference to Ms. Gallego's ability or inability to pay punitive damages, and that Ms. Gallego therefore is able to pay punitive damages in some amount.

The Court finds that it is appropriate to apply a factor of one to the punitive damages. What Ms. Gallego did was reprehensible, and was part of an ongoing pattern of abuse of the Ceperos.  But the purpose of punitive damages is to punish and deter Ms. Gallego and others who might choose to abuse people through a position of influence and power. Based on Ms. Gallego's current situation, the Court finds that doubling the actual damages will be enough of a punishment and deterrent to Ms. Gallego with respect to her actions going forward.

Based on the foregoing it is ORDERED as follows:

1.    Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident in the amount of $25,000.00.  The Association and Ms. Gallego are jointly and severally liable for these damages.

2.    As separately ordered, the Ceperos are entitled to an attorney fee award in the total amount of  $58,190.00.   The Association and Ms. Gallego are jointly and severally liable for these damages.

3.    The Ceperos are entitled to punitive damages in the amount of $83,190.00, which is an amount equal to the amount of actual damages awarded to the Ceperos, for which punitive damages Ms. Gallego will be solely responsible.

4.    The Ceperos will be entitled to prepare final judgments in these amounts that can be recorded in the public records of Miami-Dade County and

otherwise, as required by Florida law, if the amounts in this order, including the attorney fees, are not paid within 30 days from the entry of this order.

## CONCLUSION

The Court is aware that the Ceperos have sold their home in the Hammocks and will be moving away. Hopefully, removing themselves from this home and the bad memories associated with this home will help them as part of the fresh start to which a, hopefully, positive conclusion to their bankruptcy case will entitle them.

###

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

***Tagged Opinion***
***Do not publish***



**ORDERED in the Southern District of Florida on August 9, 2022.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                         CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA                       Chapter 13
CEPERO,

            Debtors.

_____/


**ORDER GRANTING IN PART MOTION TO ALTER OR AMEND JUDGMENT
FOR REHEARING, RELIEF FROM JUDGMENT AND/OR
<u>RECONSIDERATION AS TO ECF 480</u>**

This matter came before the Court on July 14, 2022 (the "Hearing") on the

Debors' *Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment*

*as to ECF 480* (ECF #489) (the "Motion"). The Motion seeks reconsideration of

this Court's *Order on Damages* (ECF #480) (the "Damages Order") pursuant to

Fed. R. Civ. P. 59(e) and 60(a). The Motion argues that the Court should amend

the Damages Order for the following reasons: (1) Debtors, having already found

to be entitled to attorney's fees, are entitled to an award of fees and costs for the

trial on damages (the "Damages Trial") which fees and costs were not addressed in the Damages Order ; (2) to provide that the Association[1] is directly liable for punitive damages for the wrongful acts of its managing agent, Marglli Gallego, the President of the Association; and (3) that the Court should have used a multiplier of at least two in assessing punitive damages. The Court has reviewed the Motion, the response filed by the Association[2], and has considered the arguments of counsel at the Hearing.  For the reasons stated on the record and set forth below, the Motion is GRANTED in part and DENIED in part.

<u>Attorney's Fees and Costs</u>

The reasonableness of the fees requested by the Debtors is measured in accordance with the criteria set forth in *Johnson v. Georgia Highway Exp.,* 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988). *In re Lyubarksy,* 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020).[3] Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience,

---

[1] All capitalized terms not defined within this Order shall have the same definition as that in the Damages Order.

[2] *Hammocks Community Association, Inc. and Marglli Gallego's Memorandum in Opposition to Debtors' Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsiderations as to ECF 480 (D.E. 489)* (ECF #502).

[3] "The criteria for determining the reasonableness of the fees requested is not 11 U.S.C. §330 because the Debtors' professionals were not retained pursuant to 11 U.S.C. §327. . . . Fed. R. Bankr. P. 2016 and this Court's *Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases* are also inapplicable." *Id.*

reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.

At the Hearing, the Court acknowledged that it inadvertently failed to include the Debtors' counsel's award of attorney's fees and costs incurred in connection with the Damages Trial. The Court has reviewed the fee statements filed by Mr. Brooks and Mr. Arslanian.[4] Having reviewed the statements in detail, the Court finds that Mr. Brooks' fees should be reduced to $23,446.50[5] and that Mr. Arslanian's fees should be reduced to $18,595.00[6]. Therefore, Debtors are awarded $42,041.50 in attorney's fees for the fees incurred in connection with the Damages Trial.

The Court has also reviewed the *Debtor's Notice of Filing Receipts* (ECF #483)[7] where the Debtors seek $1,487.30 in costs. The Court awards those in full.

---

[4] *Notice of Filing Time Sheet for Michael J. Brooks on Order on Sanctions and Setting Evidentiary Hearing* (ECF #414); *Notice of Filing Time Sheet of Louis C. Arslanian on Order on Sanctions and Setting Evidentiary Hearing* (ECF #415). As the Court noted at the Hearing, in the future counsel is directed to, *at least*, attach a notice of filing rather than just uploading an otherwise unidentified time record.

[5] The Court deducted 23.5 hours ($12,925.00) from Mr. Brooks' time due to excessive billing, duplicate billing, billing for work that wasn't performed (prepare and review and revise a non-existent fee application) and block billing.

[6] The Court deducted 7.1 hours ($3,905.00) from Mr. Arslanian's time for the same reasons.

[7] Like the fee statements, Debtors' counsel merely attached the receipts; no list was provided, nor was there any request for total fees. In the future Debtors' counsel is instructed to take the time to prepare and file a proper pleading.

Punitive Damages Liability

In the Damages Order, the Court found that the Debtors were entitled to punitive damages for which Ms. Gallego was solely responsible. The Debtors argue that the Court should have relied on a direct liability theory when determining punitive damages liability with regard to the Association. Although the Debtors failed to provide any legal support for this argument prior to the entry of the Damages Order, the Court agrees with the Debtors that the Court applied an incorrect standard.

In the Damages Order, the Court relied on a vicarious liability theory found in *Mercury Motors Express, Inc. v. Smith,* 393 So. 2d 545 (Fla. 1981). The Debtors argued that the standard in *Schropp v. Eurocars*, 654 So. 2d 1158 (Fla. 1995) controls and that a corporation can be held directly liable for punitive damages based upon the acts of one of its managing agents without proof of fault of the employer. *Schropp*, 654 So. 2d 1158; *see Winn-Dixie Stores, Inc. v. Robinson,* 472 So. 2d 722, 724 (Fla. 1985) ("because this case was tried on the basis of direct corporate liability, *Mercury Motors* was not applicable. Most recently in *Bankers Multiple Line Insurance Co. v. Farish*, 464 So. 2d 530 (Fla. 1985), we expressly held that *Mercury Motors* was not intended to apply to situations where the agent primarily causing the imposition of punitive damages was the managing agent or primary owner of the corporation."). Therefore, the Association is directly liable for punitive damages based on the acts of Ms. Gallego, the then President and managing agent of the Association.

Since the Court already found the Association to be directly liable for punitive damages in its *Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt* (ECF #328), and that the Association is directly liable for punitive damages, which findings have not yet been challenged by the Association, based on *Schropp*, the Association is jointly and severally liable with Ms. Gallego for punitive damages. Therefore, the request to amend the Damages Order accordingly is granted.

Punitive Damages Multiplier

In the Damages Order, the Court applied a factor of one to the punitive damages. The Debtors contend that the punitive damages multiplier should be a factor of at least two under the circumstances because there were violations of prior contempt orders and a prior stay violation. The Debtors further argue that because the Association is directly liable, the multiplier should be increased.

At the Hearing, the Court explained that it took several factors into account when determining which multiplier was appropriate and that even though the Damages Order is amended to provide the Association is directly liable, a factor of one is still appropriate. Therefore, the request to alter the multiplier of the punitive damages award is denied.

Based on the foregoing it is ORDERED as follows:

1.     The Motion is GRANTED in part.

2.     The Damages Order is amended as follows:

a.     Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident in the amount of $25,000.00. The

Association and Ms. Gallego are jointly and severally liable for these damages

b.     The Ceperos are entitled to an attorney fee award in the total amount of $101,718.80. The Association and Ms. Gallego are jointly and severally liable for these damages.

c.     The Ceperos are entitled to punitive damages in the amount of $126,718.80, which is an amount equal to the amount of actual damages awarded to the Ceperos, for which punitive damages the Association and Ms. Gallego are jointly and severally liable.

d.     The Ceperos will be entitled to prepare final judgments in these amounts that can be recorded in the public records of Miami-Dade County and otherwise, as required by Florida law, if the amounts in this Order, including the attorney fees, are not paid within 30 days from the entry of this Order.

### 

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on June 6, 2022.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: | CASE NO. 17-20358-BKC-LMI |
| JOSUE CEPERO and LETICIA CEPERO, | Chapter 13 |
| Debtors. | |

_____/

### ORDER GRANTING IN PART MOTION TO RECONSIDER
### MOTION TO RECONSIDER

This matter came before the Court on December 30, 2021 on the Debtors'
*Motion for Rehearing on Order on Debtor's [sic] Motion for Reconsideration* (ECF
#354) (the "Rehearing Redux Motion"). For the reasons set forth below the
Rehearing Redux Motion is granted in part.

The Court previously entered its *Order Finding Hammocks Community
Association Inc. and Marglli Gallego in Contempt* (ECF #328) (the "Contempt
Order") directing the Debtors to "to file their specific request for damages, citing
the support for the damages, whether by statute or common law, and the specific

1

amount of damages requested for each category of damages. The request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support." However, in the Damages Statement (ECF #335)[1], the Debtors submitted only a flat number for the fees of its bankruptcy counsel incurred prior to September 17, 2020. Because the submission failed to satisfy the requirements of the Contempt Order, those fees were not awarded as part of the Debtors' damages. *See Order on Sanctions and Setting Further Evidentiary Hearing* (ECF #339) (the "Sanctions Order").

In response the Debtors filed their *Motion for Reconsideration* (ECF #340), arguing without reference to any rule of procedure or caselaw, that bankruptcy counsel could not get his timesheets from his prior law firm, and that the Court should take judicial notice that bankruptcy counsel did work and was entitled to those fees.  The Motion for Reconsideration was denied on December 9, 2021. *See Order on Debtor's [sic] Motion for Reconsideration* (ECF #351). At the hearing on the Motion for Reconsideration, the Court noted that even if the timesheets are no longer obtainable, that at the very least, Mr. Brooks should have attempted to *detail* as best he could from recollection the work performed in order to give the Court some basis to allow the recoupment of at least some of the requested fees despite not having the contemporaneous time records.

---

[1] Any undefined capitalized terms throughout this order will have the same definition as in the Sanctions Order (ECF #339).

2

The Debtors then filed the Rehearing Redux Motion.[2]  In the Rehearing Redux Motion the Debtors cited to Fed. R. Civ. P. 60(b) arguing excusable neglect for failing to have contemporaneous time records of the work that was performed by the predecessor firm by him and former co-counsel on behalf of the Debtors in connection with this contested matter.  The Rehearing Redux Motion also included a *little* more information on the work performed – a paragraph reciting the nature of the work that was done and counsel's hourly rate. The work, according to Debtors' counsel,

> [includes but is] not limited to, numerous meetings, phone calls, and emails to and from the debtors, receipt and review of numerous iPhone videos, ring doorbell videos, and audio tapes to determine which ones were relevant to trial, met with witnesses prior to trial with the Cepero's [sic] to determine to whom [sic] to call at trial and whom not to call as witnesses, helped the Cepero's [sic] answer interrogatories, helped the Cepero's [sic] with their request for production, receipt and review of videos and documents to respond [sic] The Hammocks Homeowners Association and Marglli Gallego request for production, numerous calls to and from opposing counsel, drafted the witness list, organized documents and videos for exhibits for trial and attended mediation with the debtors.

The Rehearing Redux Motion concluded:

> Based on the above and based on equity, it would be unfair to deny the undersigned attorney fees for work clearly performed by the undersigned prior to leaving his prior firm. Additionally, it would inequitable to the Debtors and a benefit to both the Hammocks Homeowner's Association and Marglli Gallego, to not award attorney fees because the undersigned left his prior firm which claim to no longer be in possession the contemporaneous timesheets in this case.

---

[2] While asking for reconsideration more than once isn't barred by the rules, there is no such thing as a motion for rehearing under the Federal Rules of Civil Procedure. Therefore the Court will treat the Rehearing Redux Motion as a Rule 60(b) motion of the Order on Motion for Reconsideration.

The Motion for Reconsideration was denied because the Debtors did not cite any cognizable basis for the relief sought, and no facts that would assist the Court in determining appropriate relief.

Rule 60(b) provides a list of grounds, including excusable neglect under subsection (1), upon which a party may seek relief from a final judgment, order or proceeding.

> Excusable neglect is an equitable concept "taking account of all relevant circumstances surrounding the party's omission." *Pioneer Investment Services Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Worldstar Communications Corp. v. Feltman (In re Worldwide Web Systems, Inc.)*, 328 F.3d 1291 (11th Cir. 2003). These factors include prejudice to the non-moving party, "the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395.

*In re Garcia*, 627 B.R. 923, 926 (Bankr. S.D. Fla. 2020). Excusable neglect is analyzed in the context in which it was raised. *In re Garcia*, 627 B.R. at 926-27. Accordingly, in this case, the Court must consider the Rehearing Redux Motion through the lens of Rule 60(b) in the context of reconsidering its order denying the original Motion for Reconsideration on the basis of excusable neglect. In other words, the Court must determine whether, at the time the original Motion for Reconsideration was filed, it was excusable neglect for Mr. Brooks to fail to attempt to reconstruct his time records in a sufficiently detailed manner. While the Court will not blame Mr. Brooks for the failure of his predecessor firm to maintain time records, the Court finds that it was inexcusable for Mr. Brooks to make no attempt whatsoever to reconstruct his time, or even describe with any

particularity whatsoever the nature of anything he did for these clients prior to leaving his predecessor firm.[3]

Rule 60(b)(6) contains a catch all when the movant cannot demonstrate entitlement to relief under any other subsection – relief may be granted for "any other reason that justifies relief." *See Galbert v. W. Caribbean Airways*, 715 F.3d 1290, 1294 (11th Cir. 2013). This rule is not available if any of the other grounds for relief could apply.  But relief under Rule 60(b) will not be granted if no reasonable relief can be fashioned.

The Court previously held that determination of the reasonableness of the fees sought in connection with a stay violation must be determined in accordance with the criteria set forth in *Johnson v. Georgia Highway Exp.*, 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988). *In re Lyubarksy*, 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020). Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. By his own admission, Debtors' counsel cannot provide any of this

---

[3] The Court notes that the original Damages Statement only sought $7,500.00 for fees (mislabeled costs) performed by the predecessor firm.  The Court cannot understand why it was so difficult to provide detail for those attorney fees, as was required by the Contempt Order.

information. Nor has he made any attempt other than to state in the original Motion for Reconsideration that he spent about four hours in mediation and that, at the time of mediation he estimated his fees at $45,000.00[4].

Counsel has invited the Court to determine what would be reasonable for the work described in the Rehearing Redux Motion. Counsel points the Court to *Cohen & Cohen., PA. v. Angrand,* 710 So. 2d 166 (Fla. 3d DCA 1998) in support of this proposal. However, in the *Cohen & Cohen* case, the court held that a law firm was entitled to compensation for reconstructed time records since the law firm had not kept contemporaneous time records because "the law firm prepared a *detailed* reconstruction, giving the date, activity performed, and time expended for each of the firm's activities during its five years of representation of [the former client]." *Cohen & Cohen,* 710 So. 2d at 168 (emphasis added). In this case, Debtors' counsel provided an estimated 86 hours of work consisting of a list of generalized tasks with no dates and no specific time allocation for each individual task, despite the Court's explicit criticism of the lack of detail in its original order and at the hearing on the Motion for Reconsideration. The only detailed task consists of four hours for attending a mediation.

There is no question that the Debtors were represented by counsel in connection with the initial issues, including attendance at court for various motions, and attendance at the trial. And the Court agrees that the Hammocks Community Association Inc. and Marglli Gallego should not get a windfall. Nevertheless, Debtors' counsel has failed to provide to the Court any factual

---

[4] It is unclear why, if counsel believed his fees were close to $45,000 at the time of the mediation, the Damages Statement only sought $7,500 for this time.

support, other than the four-hour mediation, and the first day of trial (in which former counsel appeared), to assess the actual time spent.  Counsel leaves it up to this Court to figure out the rest.  That isn't how it works.  And if that means that Hammocks Community Association Inc. and Marglli Gallego are receiving a windfall, that is due to counsel's lack of effort.

The trial transcript shows the first day of trial held on February 26, 2020 lasted about 3.5 hours.[5] That amount, multiplied by the $550.00 an hour equals $1,925.00. Four hours of mediation, at $550.00 an hour entitles counsel to an additional $2,200.00. This, combined with the trial time, entitles Debtors' counsel to an allowance of $4,125.00 for the work performed at the predecessor firm.  That is the amount of fees that the Court can allow the Debtors' counsel for work done by the prior firm.

Debtors' counsel had the opportunity in the Debtors' Damages Statement to request the fees for which he know seeks allowance, and in the manner the law requires, but failed to do so, and only compounded the problem in the factually inadequate subsequent submissions.  Accordingly, and only for the reasons set forth herein, the Rehearing Redux Motion is granted in part and denied in part.

# # #

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

---

[5] The first day of trial began at or about 1:42 p.m. and while the transcript does not indicate the end time, the Court went back and reviewed the recording and the trial concluded at 5:07 p.m. *See Transcript of 2/26/2020 Hearing* (ECF #255).

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*