

**ORDERED in the Southern District of Florida on December 3, 2018.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-BKC-LMI
CHAPTER 13

IN RE:
JOSUE CEPERO
and LETICIA CEPERO,
     Debtors.
_____/

**AGREED ORDER ON DEBTOR'S AMENDED MOTION FOR CONTEMPT AGAINST
HAMMOCKS COMMUNITY ASSOCIATION, INC. AND IT'S PRESIDENT,
MARGLLI GALLEGO**

THIS CAUSE having come on to be heard on the Debtors' Amended Motion for

Contempt against Hammocks Community Association, Inc., and it's President, Marglli

Gallego, [ECF 159], this Court noting agreement of parties, and based upon the record,

it is,

**ORDERED**:

1.    Without admission of guilt or finding in favor of Debtors, Hammocks

Community Association, Inc., on behalf of itself and it's President, Marglli Gallego, shall

pay to the Debtors' attorney Michael A. Frank, the amount of $3,000.00, as attorney fees

for the filing of the Amended Motion for Contempt against Hammocks Community Association, Inc., and it's President, Marglli Gallego, within 14 days from the date of this Order.  Such payment shall not be considered a sanction against Hammocks Community Association or its President, Marglli Gallego.

2.      Hammocks Community Association, Inc., and it's President, Marglli Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed.  During such time, there shall be no communication from any representative with Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, and either her individually, or her capacity of her representative of the Association, with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors.

3.      In the event the Chapter 13 Plan remains effective and approved, and such plan directs Hammocks Community Association, Inc., to accept monthly Association payments, the Association will comply with such plan.

4.      In the event Josue and Leticia Cepero remain in compliance with the Chapter 13 Plan, Debtors shall be entitled to all benefits of every other condominium association owner, including but not limited to, access to all the common areas, be entitled to vote on

all condominium matters and shall be provided with all condominium materials that are provided to other Association members.

5.      Notwithstanding Debtors rights as condominium association owners, Debtors shall refrain from any further contact with the Hammock Community Association, Inc's President, Marglli Gallego during or immediately following Association board meetings; and shall direct any formal communications with Mrs. Gallego in her capacity as the President of the Association in writing.

6.      The parties agree the communications, negotiations of this agreed order, discovery made by the parties in connection with the evidentiary hearing associated with the Motion and this Order, shall remain confidential, and shall not be disclosed with any third parties.   The uploading of this Order does not constitute a violation of the confidentiality of the agreement.

7.      A violation of any provisions herein will subject the violating party to additional sanctions by this Court after notice and a hearing.

# # #

Submitted by:
Michael J. Brooks, Esquire
10 Northwest LeJuene Road, Suite 620
Miami, FL 33126
Telephone (305) 443-4217
Facsimile (305) 443-3219
Email- Pleadings@bkclawmiami.com

Copies furnished to:
Michael J. Brooks, Esquire
Nancy Neidich, Trustee
Carlos Rodriguez, Esquire

Attorney, Michael J. Brooks, is directed to mail a conformed copy of this Order to all interested parties immediately upon receipt thereof.



**ORDERED in the Southern District of Florida on December 6, 2018.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-BKC-LMI
CHAPTER 13

IN RE:
JOSUE CEPERO
and LETICIA CEPERO,
     Debtors.
                  /

**ORDER ON DEBTOR'S AMENDED MOTION FOR CONTEMPT AGAINST
HAMMOCKS COMMUNITY ASSOCIATION, INC. AND IT'S PRESIDENT,
MARGLLI GALLEGO**

THIS CAUSE having come on to be heard for trial on November 29, 2018 at 2:30

p.m., on the Debtors' Amended Motion for Contempt against Hammocks Community

Association, Inc., and it's President, Marglli Gallego, [ECF 159], this Court, and based upon

the evidence presented at trial and based upon the record, it is,

**ORDERED**:

1.     The Court takes judicial notice of the Order entered against Marglli

Gallego against in her capacity as president of Hammocks Community Association Inc.,

dated December 4, 2018, [ECF 189].

2.      Based upon the evidence presented, specifically from the witness, Doria Wosk, and the fact that the witness provided evidence that there was a physical threat made against the co-debtor, Leticia Cepero, and to prevent any further altercations between Ms. Gallego in her individual capacity, which is an addition to the Order entered against her in her capacity as the President of Hammocks Community Association, Inc., Ms. Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed.

3      During such time, there shall be no communication from, Marglli Gallego, individually, or in her capacity as the president of the Hammocks Community Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Marglli Gallego, individually, to approach the Debtors,  to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors

4.      The request for fees and sanctions against Marglli Gallego, individually, is denied.

**# # #**

Submitted by:
Michael J. Brooks, Esquire
10 Northwest LeJuene Road, Suite 620
Miami, FL 33126
Telephone (305) 443-4217
Facsimile (305) 443-3219
Email- Pleadings@bkclawmiami.com
Copies furnished to:
Michael J. Brooks, Esquire
Nancy Neidich, Trustee
Carlos Rodriguez, Esquire
       Attorney, Michael J. Brooks, is directed to mail a conformed copy of this Order to all interested parties immediately upon receipt thereof.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-BKC-LMI
CHAPTER 13

IN RE:
JOSUE CEPERO
and LETICIA CEPERO,
     Debtors
_____/

**DEBTORS' MOTION FOR CONTEMPT AGAINST HAMMOCKS COMMUNITY ASSOCIATION INC., AND IT'S PRESIDENT, MARGLLI GALLEGO FOR FAILURE TO ABIDE BY THIS COURT'S AGREED ORDER DATED DECEMBER 3, 2019, [ECF 189] AND THIS COURT'S ORDER DATED DECEMBER 6, 2018, [ECF 191] ON THE DEBTORS' AMENDED MOTION FOR CONTEMPT AGAINST HAMMOCKS COMMUNITY ASSOCIATION INC., AND IT'S PRESIDENT, MARGLLI GALLEGO AND REQUEST  AN EVIDENTIARY HEARING**

The Debtors request that  this Honorable Court enter an Order holding Hammocks Community Association Inc., ("The Association") and it's President, Marglli Gallego, in contempt in violation of this Court's Orders, [ECF 189 and 191] and states:

1.     On August 16, 2017, the Debtors filed a voluntary petition under Chapter 13 of Title 11 of the U.S. Bankruptcy Code.

2.     One of the creditors listed in the Debtor's schedules is Hammocks Community Association Inc., who is the Debtors' Homeowner's Association on the Debtor's homestead property located at 9541 Southwest 148th Place, Miami, FL 33196.

3.     Pursuant to the Debtor's Amended Chapter 13 Plan, the Debtors arrearage and monthly payments are being paid through the plan.

4.     Pursuant to Orders entered by this Court, after evidence presented at trial;

A.     The Agreed Order on Debtor's Amended Motion for Contempt against Hammocks Community Association Inc., and it's President, Marglli Gallego, [ECF 189],

1

dated December 3, 2018 states The Hammocks Community Association, Inc., and it's President, Marglli Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed.  During such time, there shall be no communication from any representative with Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, and either her individually, or her capacity of her representative of the Association, with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors.

In the event the Chapter 13 Plan remains effective and approved, and such plan directs Hammocks Community Association, Inc., to accept monthly Association payments, the Association will comply with such plan.

In the event Josue and Leticia Cepero remain in compliance with the Chapter 13 Plan, Debtors shall be entitled to all benefits of every other condominium association owner, including but not limited to, access to all the common areas, be entitled to vote on all condominium matters and shall be provided with all condominium materials that are provided to other Association members.

Notwithstanding Debtors rights as condominium association owners, Debtors shall refrain from any further contact with the Hammock Community Association, Inc's

President, Marglli Gallego during or immediately following Association board meetings; and shall direct any formal communications with Mrs. Gallego in her capacity as the President of the Association in writing.

The parties agree the communications, negotiations of this agreed order, discovery made by the parties in connection with the evidentiary hearing associated with the Motion and this Order, shall remain confidential, and shall not be disclosed with any third parties.   The uploading of this Order does not constitute a violation of the confidentiality of the agreement.

A violation of any provisions herein will subject the violating party to additional sanctions by this Court after notice and a hearing.

B.      The Order on Debtor's Amended Motion for Contempt against Hammocks Community Association, Inc., and it's President, Marglli Gallego, [ECF 191] dated December 6, 2019 states:

The Court takes judicial notice of the Order entered against Marglli Gallego against in her capacity as president of Hammocks Community Association Inc., dated December 4, 2018, [ECF 189].

Based upon the evidence presented, specifically from the witness, Doria Wosk, and the fact that the witness provided evidence that there was a physical threat made against the co-debtor, Leticia Cepero, and to prevent any further altercations between Ms. Gallego in her individual capacity, which is an addition to the Order entered against her in her capacity as the President of Hammocks Community Association, Inc., Ms. Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed.

During such time, there shall be no communication from, Marglli Gallego,
individually, or in her capacity as the president of the Hammocks Community
Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero, the
Debtors' debts, the Debtors' creditors or any other business relationships the Debtors
may have relating to the Bankruptcy. This includes a prohibition against Marglli Gallego,
individually, to approach the Debtors,  to communicate with or about the debtors, in
person, or in writing, or with any other Association members, including but not limited
to, from communicating to anyone regarding any matter relating to the bankruptcy, the
Debtors' failure to pay maintenance payments, or any other financial matters of the
Debtors.

5.      On May 15, 2019, Marglli Gallego confronted the debtors by blocking their
car with a condominium association vehicle while they were visiting another property in
the Association.

6.      Marglli Gallego began yelling at the Debtors and called the police after
blocking the debtor's car into a parking spot with a condominium association vehicle.

7.      A police report was filed and Marglli Gallego filed a request for injunctive
relief against the Debtors claiming that the Debtors hit her with their car. Attached is a
copy of the police report and a copy of the Petition for injunctive relief filed in State
Court against *Marglli Gallego v. Josue Cepero, case number 2019-011650-FC0–04*, in
the Circuit Court of the 11th Judicial Court, in and for Miami-Dade County, Florida. There
was no claim on the police report by Ms. Gallego that she was injured in any way by my
clients.  Ultimately, on or about September 10, 2019, Ms. Gallego filed a voluntary
dismissal against the Debtors in State Court from injunctive relief.

8.      The Debtors were visiting Maria Alonso, the president of a different
condominium association when Ms. Gallego parked in a condominium Association
vehicle behind the car blocking them in.

A witness, Maria Alonso witnessed Marglli Gallego parke behind the Debtors, who were legally parked.  Ms. Gallego got out of the car and started screaming at the Debtors.  The witness, Ms. Alonso, saw the entire incident.  There was no injury to any party.  Attached to this Motion is a sworn affidavit from Maria Alonso.

9.      Additionally, sometime in mid August of 2019, the Association passed out a form to the residents of the entire Association regarding tree trimming. In this form, the Association stated "WE know that in Pelican Point there are residents spreading false rumors about the Association. Those residents are Leticia Cepero, Josue Cepero, Alicia Paz and others who are spreading these false rumors for personal reasons and gains. Their purpose is to confuse the community in a negative manner. Attached you will find a copy of the Court documents showing that there is a restraining order against the Cepero's since they attacked the board president on many occasions and the last occurrence was when they followed her to her son's school for malicious reasons with under aged children involved." Ms. Gallego also attached an arrest record of the debtor, Josue Cepero, from June 23, 1993, as well as the cover sheet for the temporary injunction for protection against stalking violence/extension. This is in direct violation of this court's orders dated December 3, 2018, [ECF 189] and December 6, 2018, [ECF 191].  Attached hereto and made a part of is the letter received by all the residents of the Association, as well as the cover sheet for the temporary injunction for protection against stalking violence/extension and the Miami-Dade criminal record for Josue Cepero, *case number F-93-020400.*

10.      The Debtors were forced to hire an attorney as State Court counsel to defend against the lawsuit filed by Ms. Gallego and the Debtors spent $2,500.00 for attorney fees.  Additionally, the debtors, specifically the co-debtor, has suffered severe emotional stress due to the fact that Ms. Gallego continues to violate these Courts Orders and harass the Debtors by slandering them i.e., criminal records, which was

dismissed within 2 weeks of arrest and saying that the Debtors attacked Ms. Gallego and minor children. The Debtors have also incurred attorney fees for the filing of this Motion, as well as costs incurred in prosecuting their case.

11.     Further, undersigned received a letter from the Trustee, Nancy Neidich, advising undersigned that the creditor, Hammocks Community Association Inc., checks are being returned to the Trustee as undeliverable.

WHEREFORE, the Debtors request this Court hold Marglli Gallego and the Hammocks Community Association Inc., in contempt for their willful violation of this Court's prior orders, [ECF 189 and 191], and requests that Marglli Gallego and The Association be sanctioned for attorney fees, reimbursement of costs, including, but not limited to, the prosecution of this matter, as well as the State Court matter, as well as punitive damages against Marglli Gallego and The Association for their wilful violation of these Court's prior Orders and for emotional distress.  The Debtors also request an Evidentiary hearing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was sent by email to Nancy Neidich, Trustee at e2c8f01@ch13herkert.com, Carlos Rodriguez, counsel for Hammocks Community at crodriguez@mellawyers.com and those set forth in the NEF, this 17th day of September 2019 and this Motion and an upcoming Notice of Hearing will be served on a separate Certificate of Service via email to those set forth in the NEF and by regular mail to Hammocks Community Association Inc., 9020 Hammocks Blvd, Miami, FL 33196-1301, Hammocks Community Association Inc., Attn: Marglli Gallego, President, 9020 Hammocks Blvd, Miami, FL 33196, Alfaro & Fernandez, P.A., Registered Agent of Hammocks Community Association Inc., 5801 Northwest 151 Street, Suite 305, Miami Lakes, FL 33014.

Law Offices of Michael J. Brooks, Michael A Frank
& Rodolfo H. De La Guardia, Jr.
Attorneys for the Debtor
Suite 620 •
10 Northwest LeJeune Road
Miami, FL 33126
Telephone (305) 443-4217
Email- Pleadings@bkclawmiami.com
By __/s/    Michael J. Brooks_____
Michael J. Brooks
Florida Bar No. 434442

<u>SWORN AFFIDAVIT</u>

State of Florida   )
        )
County of Miami-Dade  )

   Maria Alonso, being first duly sworn, deposes and says:

1. My name is Maria Alonso.

2. I am of legal age, sound mind and make these statements of my own free will.

3. I am the President of Heron at The Hammocks Condominium Association, Inc. (the "Heron Community"), which is a condominium within Hammocks Community Association, Inc. ("Hammocks").

4. The Heron Community is a private community over which the Hammocks has no right or authority.

5. The Officers and Directors of the Hammocks have no power or authority within the Heron Community property.

6. The Hammocks security personnel has no power or authority within the Heron Community property.

7. My husband, Esteban Alonso, and I own four units at the Heron Community.

8. On May 15, 2019, an incident occurred at 14921 SW 104th Street, which was documented under Miami-Dade Police Department Case No: PD190515174168.

9. On May 15, 2019, I went to the Heron Community to deliver eggs to Ms. Gail Sharp, who resides at 14859 SW 104 Street, Building 8, Apt. 103, who is also the secretary at the Heron Community, and also my tenant, Ms. Rosa Lopez, who resides in Building 3, Apt. 201. I was also picking up rent from my other tenant at Building 23, Apt 12, Mr. Guillermo Terront and Ms. Piedad Meneces.

10. Upon arriving at the Heron Community and before meeting up with Ms. Sharp, I ran into Carlos Avila, a retired Miami-Dade Police Officer from the Hammocks Station, who congratulated me on winning the Heron elections.

11. I had also told Josue and Leticia Cepero that I would be at one of my rental apartments and to contact me when they were at Heron Community so we can get together.

12. While I was speaking with Ms. Sharp, I received a telephone call from Mrs. Cepero saying that they were at the Heron Community and that Ms. Gallego had blocked them in with a Hammocks vehicle and with two other Hammocks security vehicles.

13. Mrs. Cepero told me that Ms. Gallego was preventing them from leaving the Heron Community and that they feared for their life.

14. I told Mrs. Cepero to call the police immediately.

15. I got into my vehicle and drove to where the Ceperos were being detained by Ms. Gallego and Hammocks security personnel and I called the police when I arrived.

16. When I arrived, I also saw Ms. Gallego and Hammocks security personnel, Marlo was one of them, detaining the Ceperos and the Ceperos sitting inside their vehicle unable to freely leave the Heron Community.

17. I witnessed Mr. Ceperos holding a paper to the window and showing it to Ms. Gallego, who was standing outside their vehicle.

18. I later saw that that paper was the stay away order against Ms. Gallego signed by the federal judge which prohibited Ms. Gallego from contacting or approaching the Ceperos.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Maria Alonso

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, personally appeared Maria Alonso who is personally known to me, and who executed the foregoing instrument and acknowledges that he executed said instrument for the purposes herein expressed.

Dated this 6 day of August, 2019.

My commission expires:

Witness my hand and Official Seal.

_____
Signature of Notary Public Certificate of Service

Notary Public State of Florida
Mercedes Rey Lopez
My Commission GG 187383
Expires 02/18/2022

| Agency Of Occurence | Date Written | **OFFENSE-INCIDENT REPORT** | Agency Report Number |
|---|---|---|---|
| **030** | **05/15/2019** | **MIAMI-DADE POLICE DEPARTMENT** | **PD190515174168** |

## REPORT SUMMARY (ORIGINAL)

| ☐ Law Enforcement/Exempt | ☐ Domestic Violence | ☐ Gang Related | ☐ Juvenile in Report | ☐ Juvenile Warn/Dismiss |
|---|---|---|---|---|

| Victims: 0 | Offenders: 0 | Stolen Vehicles: 0 | Offenses: 1 | Properties: 0 | SARS: NO | Drive By: NO |
|---|---|---|---|---|---|---|

## INCIDENT (14921 SW 104TH ST)

| Original Reported Date | Title or Classification | | Time Dispatched | Time Arrived | Time Completed |
|---|---|---|---|---|---|
| WED, 05/15/2019 16:33 | DISTURBANCE | | 05/15/2019 16:33 | 05/15/2019 16:40 | 05/15/2019 17:33 |

| Incident From | Incident To | District |
|---|---|---|
| WED, 05/15/2019 16:15 | WED, 05/15/2019 16:33 | HAMMOCKS |

| Incident Location | City | Zip | Grid | Area |
|---|---|---|---|---|
| 14921 SW 104TH ST | MIAMI | 33196 | 1852 | 3 |

| Business Name/Area Identifier | Location Type | Forced Entry | #Prem Ent. | Occupancy |
|---|---|---|---|---|
| | APARTMENT/CONDO | N/A | 0 | N/A |

## OFFENSES

### 777.7777(7777) MDPD MISC STATUTE

| Description | Statute | Subsection | Ordinance |
|---|---|---|---|
| MDPD MISCELLANEOUS STATUTE | 777.7777(7777) | 7777 | |

| Type | Action | NCIC/UCR | Weapons | DV |
|---|---|---|---|---|
| OTHER | N/A | 0099 | | |

## VICTIM/WITNESS

### 1 - REPORTING PERSON-GALLEGO, MARGLLI

| **1** | V/W Code | Offenses Indicator |
|---|---|---|
| | REPORTING PERSON | 777.7777(7777) |

| Name (Last, First, Middle or Business) | Synopsis of Involvement/Activity | Victim Type |
|---|---|---|
| GALLEGO, MARGLLI | OTHER ACTIVITY | ADULT |

| Address | City, State Zip  Country |
|---|---|
| 14921 SW 104TH ST   Suite/Apt: 106 | MIAMI, FLORIDA  33196  US |

| Race | Sex | Date of Birth | Age | Juvenile | Hispanic | Ethnicity |
|---|---|---|---|---|---|---|
| WHITE | FEMALE | 07/25/1981 | 37 | | YES | OTHER HISPANIC |

| Residence Type | Residence Status | Extent of Injury | Will victim prefer charges? |
|---|---|---|---|
| COUNTY | FULL YEAR | | |

| Web Site | Email Address |
|---|---|
| | |

#### Phone Numbers

| Type | Phone Number | Extension | Best time to call |
|---|---|---|---|
| CELL | 786-906-5188 | | |

### 4 - OTHER-ALONSO, MARIA D.

| **2** | V/W Code | Offenses Indicator |
|---|---|---|
| | OTHER | 777.7777(7777) |

| Name (Last, First, Middle or Business) | Synopsis of Involvement/Activity | Victim Type |
|---|---|---|
| ALONSO, MARIA D. | OTHER ACTIVITY | ADULT |

| Address | City, State Zip  Country |
|---|---|
| 11455 SW 82ND AVE | MIAMI, FLORIDA  33156  US |

| Race | Sex | Date of Birth | Age | Juvenile | Hispanic | Ethnicity |
|---|---|---|---|---|---|---|
| WHITE | FEMALE | 12/30/1960 | 58 | | YES | OTHER HISPANIC |

| Residence Type | Residence Status | Extent of Injury | Will victim prefer charges? |
|---|---|---|---|
| COUNTY | FULL YEAR | | |

| Web Site | Email Address |
|---|---|
| | |

#### Phone Numbers

| Type | Phone Number | Extension | Best time to call |
|---|---|---|---|
| CELL | 305-327-5418 | | |

| Agency Of Occurence | Date Written | OFFENSE-INCIDENT REPORT | Agency Report Number |
|---|---|---|---|
| 030 | 05/15/2019 | MIAMI-DADE POLICE DEPARTMENT | PD190515174168 |

## VICTIM/WITNESS

### 5 - OTHER-CEPERO, JOSUE

**3**

| V/W Code | Offenses Indicator |
|---|---|
| OTHER | 777.7777(7777) |

| Name (Last, First, Middle or Business) | Synopsis of Involvement/Activity | Victim Type |
|---|---|---|
| CEPERO, JOSUE | OTHER ACTIVITY | ADULT |

| Address | City, State Zip  Country |
|---|---|
| 9541 SW 148TH PL | MIAMI, FLORIDA  33196   US |

| Race | Sex | Date of Birth | Age | Juvenile | Hispanic | Ethnicity |
|---|---|---|---|---|---|---|
| WHITE | MALE | 04/11/1959 | 60 | | YES | OTHER HISPANIC |

| Residence Type | Residence Status | Extent of Injury | Will victim prefer charges? |
|---|---|---|---|
| COUNTY | FULL YEAR | | |

| Web Site | Email Address |
|---|---|
| | |

#### Phone Numbers

| Type | Phone Number | Extension | Best time to call |
|---|---|---|---|
| CELL | 305-300-0856 | | |

### 3 - OTHER-CEPERO, LETICIA

**4**

| V/W Code | Offenses Indicator |
|---|---|
| OTHER | 777.7777(7777) |

| Name (Last, First, Middle or Business) | Synopsis of Involvement/Activity | Victim Type |
|---|---|---|
| CEPERO, LETICIA | OTHER ACTIVITY | ADULT |

| Address | City, State Zip  Country |
|---|---|
| 9541 SW 148TH PL | MIAMI, FLORIDA  33196   US |

| Race | Sex | Date of Birth | Age | Juvenile | Hispanic | Ethnicity |
|---|---|---|---|---|---|---|
| WHITE | FEMALE | 05/28/1959 | 59 | | YES | OTHER HISPANIC |

| Residence Type | Residence Status | Extent of Injury | Will victim prefer charges? |
|---|---|---|---|
| COUNTY | FULL YEAR | | |

| Web Site | Email Address |
|---|---|
| | |

#### Phone Numbers

| Type | Phone Number | Extension | Best time to call |
|---|---|---|---|
| CELL | 786-863-9870 | | |

### 2 - OTHER-SHARP, GAIL

**5**

| V/W Code | Offenses Indicator |
|---|---|
| OTHER | 777.7777(7777) |

| Name (Last, First, Middle or Business) | Synopsis of Involvement/Activity | Victim Type |
|---|---|---|
| SHARP, GAIL | OTHER ACTIVITY | ADULT |

| Address | City, State Zip  Country |
|---|---|
| 14859 SW 104TH ST | MIAMI, FLORIDA  33196   US |

| Race | Sex | Date of Birth | Age | Juvenile | Hispanic | Ethnicity |
|---|---|---|---|---|---|---|
| WHITE | FEMALE | 11/30/1947 | 71 | | NO | OTHER |

| Residence Type | Residence Status | Extent of Injury | Will victim prefer charges? |
|---|---|---|---|
| COUNTY | FULL YEAR | | |

| Web Site | Email Address |
|---|---|
| | |

#### Phone Numbers

| Type | Phone Number | Extension | Best time to call |
|---|---|---|---|
| CELL | 305-408-8730 | | |

| Agency Of Occurence | Date Written | OFFENSE-INCIDENT REPORT | Agency Report Number |
|---|---|---|---|
| 030 | 05/15/2019 | MIAMI-DADE POLICE DEPARTMENT | PD190515174168 |

## VEHICLE/VESSEL/AIRCRAFT

### 1 - VEHICLE-NISSAN VERSA

**1**

| Person Code | Property Type | Status |
|---|---|---|
| Other - SHARP, GAIL | AUTO | OTHER |

| Damage | Year | Make | Model | Style |
|---|---|---|---|---|
| N/A | 2009 | NISSAN | VERSA | SEDAN, 4 DOOR |

| Tag / Doc # | Reg Year | Decal Number | Tag Type | Reg State | Reg Country |
|---|---|---|---|---|---|
| KLQS50 | 2019 | 15702336 | REGULAR | FL | UNITED STATES OF AMERICA (US |

| Vehicle ID (VIN, Hull, FAA) | Top Color | Bottom Color | Method of Theft |
|---|---|---|---|
| 3N1BC13E29L386386 | BEIGE | BEIGE | N / A |

| Estimated Value | Insurance Company | Lien Holder |
|---|---|---|
| | GEICO GENERAL INSURANCE COMPANY | |

Description

| Vessel Name | Length (Ft) | Propulsion | Hull Material | Boat Type |
|---|---|---|---|---|
| | | | | |

| Original Reporting Agency | Original Report Number | Location of Original Theft | FCIC/NCIC |
|---|---|---|---|
| | | | N/A |

| Towed by | Storage Location | Hold | Reason/Authority |
|---|---|---|---|
| | | | |

| Recovery Address | Agency | District | Grid |
|---|---|---|---|
| | | | |

| Recovery Location | Recovery code | Date Recovered | Value Recoved |
|---|---|---|---|
| | | | |

### 2 - VEHICLE-HONDA ACCORD

**2**

| Person Code | Property Type | Status |
|---|---|---|
| Other - CEPERO, JOSUE | AUTO | OTHER |

| Damage | Year | Make | Model | Style |
|---|---|---|---|---|
| N/A | 2018 | HONDA | ACCORD | SEDAN, 4 DOOR |

| Tag / Doc # | Reg Year | Decal Number | Tag Type | Reg State | Reg Country |
|---|---|---|---|---|---|
| X93EF | 2019 | 16489294 | REGULAR | FL | UNITED STATES OF AMERICA (US |

| Vehicle ID (VIN, Hull, FAA) | Top Color | Bottom Color | Method of Theft |
|---|---|---|---|
| 1HGCV1F19JA268305 | GRAY | GRAY | N / A |

| Estimated Value | Insurance Company | Lien Holder |
|---|---|---|
| | GEICO GENERAL INSURANCE COMPANY | |

Description

| Vessel Name | Length (Ft) | Propulsion | Hull Material | Boat Type |
|---|---|---|---|---|
| | | | | |

| Original Reporting Agency | Original Report Number | Location of Original Theft | FCIC/NCIC |
|---|---|---|---|
| | | | N/A |

| Towed by | Storage Location | Hold | Reason/Authority |
|---|---|---|---|
| | | | |

| Recovery Address | Agency | District | Grid |
|---|---|---|---|
| | | | |

| Recovery Location | Recovery code | Date Recovered | Value Recoved |
|---|---|---|---|
| | | | |

## OFFICERS

### Unit: H3307

**1**

| Agency Code | Badge | Title | Name | Loc Code | Role |
|---|---|---|---|---|---|
| 030 | 6658 | POLICE OFFICER | COBO, L. J. | 83 | REPORTING OFFICER |

### Supporting Officer(s)

**2**

| Agency Code | Badge | Title | Name | Loc Code | Role |
|---|---|---|---|---|---|
| 030 | 2146 | POLICE SERGEANT | JACKSON, N. A. | 07083 | REVIEWING SUPERVISOR |

| Agency Of Occurence | Date Written | OFFENSE-INCIDENT REPORT MIAMI-DADE POLICE DEPARTMENT | Agency Report Number |
|---|---|---|---|
| 030 | 05/15/2019 | | PD190515174168 |

## ADMINISTRATION

| Clearance Type CLEAR BY EXCEPTION | Clearance Date 05/17/2019 00:00 | Exception Type NOT APPLICABLE | Juvenile/Adult ADULT |
|---|---|---|---|
| Case Status CLOSED | Assignment Type ASSIGNED INFO | Referred By | Additional Forms |
| Reporting Agency MIAMI-DADE | AOA Agency | Other AOA | AOA Related Case |
| Original Case Number | | | |

## NARRATIVES

| Written By: mdpd\U306658 | NARRATIVE | Date and Time: 5/15/2019 6:26:31 PM |
|---|---|---|

I WAS DISPATCHED IN EMERGENCY MODE TO INCIDENT ADDRESS 14921 SW 104TH ST, REFERENCE A DISTURBANCE. UPON ARRIVAL CONTACT WAS MADE WITH REPORTING PERSON (GALLEGO, MARGLLI), WHO ADVISED SHE WAS FOLLOWED BY OTHER (CEPERO, JOSUE), OTHER (CEPERO, LETICIA) WHO WERE DRIVING VEHICLE 2018 HONDA ACCORD, FOR APPROXIMATELY 30 MINUTES. SHE ADVISED WHEN SHE PULLED INTO HER APARTMENT BUILDING , SHE GOT OFF THE VEHICLE AND NOTICE OTHER (ALONSO, MARIA DE LOS ANGELES) WAS ALSO THERE IN THE PARKING LOT.

REPORTING PERSON (GALLEGO, MARGLLI) BELIEVES OTHER (CEPERO, JOSUE), OTHER (CEPERO, LETICIA), OTHER (ALONSO, MARIA DE LOS ANGELES) WERE FOLLOWING HER TO DO HARM TO HER.

REPORTING PERSON (GALLEGO, MARGLLI) ALSO ADVISED OTHER (SHARP, GAIL) ARRIVED ON SCENE DRIVING VEHICLE 2009 NISSAN VERSA. REPORTING PERSON (GALLEGO, MARGLLI) ADVISED SHE WAS HIT BY OTHER (SHARP, GAIL) VEHICLE.

IT SHOULD BE NOTED REPORTING PERSON (GALLEGO, MARGLLI) HAS MULTIPLE ALTERCATIONS WITH OTHER (CEPERO, JOSUE), OTHER (CEPERO, LETICIA),OTHER (ALONSO, MARIA DE LOS ANGELES) AND OTHER (SHARP, GAIL) DUE TO THE FACT SHE IS HAMMOCKS HOA SUPERVISOR.

CONTACT WAS MADE WITH OTHER (CEPERO, JOSUE), AND OTHER (CEPERO, LETICIA), WHO ADVISED THEY WERE AT THE APARTMENT, BECAUSE THEY CAME TO SPEAK TO OTHER (ALONSO, MARIA DE LOS ANGELES). OTHER (ALONSO, MARIA DE LOS ANGELES) IS THE HOME OWNER ASSOCIATION PRESIDENT OF THE APARTMENT HERON. OTHER (CEPERO, JOSUE) ADVISED THEY WERE NOT FOLLOWING REPORTING PERSON (GALLEGO, MARGLLI).

CONTACT WAS MADE WITH OTHER (ALONSO, MARIA DE LOS ANGELES), WHO ADVISED SHE WAS THE APARTMENT SPEAKING TO HER TENANTS, AND WAITING FOR OTHER (CEPERO, JOSUE), OTHER (CEPERO, LETICIA) TO MEET WITH HER. SHE ADVISED AT NO POINT SHE WAS FOLLOWING REPORTING PERSON (GALLEGO, MARGLLI).

CONTACT WAS MADE WITH OTHER (SHARP, GAIL), WHO WAS SITTING IN HER VEHICLE. SHE STATED SHE ARRIVED TO RECORD THE INCIDENT ON HER PHONE, THAT WAS OCCURRING BETWEEN ALL PARTIES ON SCENE. OTHER (SHARP, GAIL) STATED REPORTING PERSON (GALLEGO, MARGLLI) NOTICED HER RECORDING AND CAME TO HER VEHICLE SCREAMING AT HER. WHEN OTHER (SHARP, GAIL) WAS ATTEMPTING TO LEAVING THE AREA, REPORTING PERSON (GALLEGO, MARGLLI) WOULD NOT GET OUT IN FRONT OF VEHICLE BLOCKING HER FROM LEAVING. OTHER (SHARP, GAIL) STATED THAT SHE DID NOT HIT REPORTING PERSON (GALLEGO, MARGLLI) WITH HER VEHICLE.

ALL PARTIES HAVE THE INCIDENT RECORDED ON THERE PHONES.

NO INJURIES REPORTED.

CASE CARD ISSUED.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE, COUNTY FLORIDA

DOMESTIC VIOLENCE DIVISION

CASE NO.: 19 - 14050 FC04

MARGLLI GALLEGO,

    Petitioner,

v.

JOSUE CEPERO AND ~~LETICIA CEPERO~~

    Respondent.

_____/

## VERIFIED PETITION FOR INJUNCTION FOR PROTECTION AGAINST STALKING VIOLENCE

The Petitioner, **MARGLLI GALLEGO,** by and through undersigned counsel hereby files her Verified Petition for Injunction for Protection against JOSUE CEPERO AND ~~LETICIA CEPERO~~, husband and wife,  and in support states as follows:

1. Petitioner resides at: **14921 S.W. 104 ST., Apt #106, Miami, FL 33196. Petitioner seeks an injunction for protection.**

2. Petitioner's attorney's name, address, and telephone number is: **Elbert Alfaro, 5801 NW 151 Street, Suite #305, Miami Lakes, FL 33014.**

3. Respondent resides at: 9541 SW 148 place, Miami Florida 33196.

4. **Filing Fees:** Pursuant to 784.0485 (2)(a) Florida Statutes, no filing fees may be assessed.

5. The name and address of Respondent's last known place of employment or school is: **Unknown.**

1

6. Petitioner is employed or attends school at: **Confidential**.

**(DO NOT ENTER IF PLACE OF EMPLOYMENT OR SCHOOL TO BE KEPT CONFIDENTIAL FOR SAFETY.)**

7. Physical Description of Respondent:

Date of Birth: **Unknown**                          Sex: Male

Race: **White**                                              Sex: **Female**

Height: **5 ft. 5 in.**                                    Weight: **150 lbs.**

Hair Color: **Brown**                                    Eye Color: **Brown**

Distinguishing marks or scars:

Aliases (other names) Respondent uses or has used:

Nickname(s):

8. Respondent's vehicle make, model, year, color, and tag: **Honda Accord, Grey**

9. Is Respondent in jail?: **No.**

Date of arrest: **Not applicable.**

Jail #: **Not applicable.**                          Cell #: **Not applicable.**

10. Respondent's attorney's name, address, and telephone number is: **Unknown.**

2

11. The following describes any other court cases, including family, civil, criminal, dependency, or delinquency (juvenile), where the Petitioner and Respondent are involved (include case numbers):

12. Has the Petitioner ever gotten or tried to get an Injunction for Protection against the Respondent in this or any other court? **No.**

13. Has the Respondent ever gotten or tried to get an Injunction for Protection against the Petitioner in this or any other court? **Unknown.**

14. Petitioner is a victim of stalking because Respondent has:

   a. (X) Committed Stalking;

   b. (X) Previously threated, harassed, stalked, cyberstalked, or physically abused the Petitioner;

   c. ( ) Intentionally injured or killed a family pet;

   d. ( ) Used, or has threatened to use, against Petitioner any weapons such as guns or knives;

   e. (X) A criminal history involving violence or the threat of violence, if known:

   f. ( ) Another order of protection issued against him or her previously from another jurisdiction, if known;

   g. (X) Destroyed personal property, including, but not limited to, telephones or other communication equipment, clothing, or other items belonging to the Petitioner.

15. Below is a description of the specific incidents of stalking or cyberstalking:

   a. Petitioner is the President of the Homeowner's Association known as Hammocks Community Association.

3

b. Respondents are husband and wife and reside within the community of Hammocks.

c. Petitioner and Respondent have a long standing dispute over the management of the communities.  However, in recent months, Petitioner has been victimized and fears for her safety.  Petitioner's vehicles had the tires slashed; her home has been vandalized with eggs; twice in the month of April a towed truck (that is under contract with the Respondent's association) showed up in the middle of the night to take her Petitioner's husband's truck,  but most recently, Petitioner was followed and attacked while her son was with her in the car.

d. In February 2019, Petitioner brought an action in Civil Court to force the Board of Directors for Heron Association  to hold elections for the Community of Heron and won.  Most recently, Petitioner filed a Motion to recover attorneys fees and costs under Florida Statutes as the prevailing party.  Since the action was filed, the Petitioner has been stalked and her life has been threatened.

e. Specifically, on Wednesday May 15, 2019, when petitioner was picking up her son from school, she noticed she was being followed by two vehicles. She drove back to her home and the vehicles continued to follow her.

f. The Petitioner contacted Hammocks security who was nearby, called 911 and a neighbor who took Petitioner's son to safety.  The vehicles also stopped when she stopped and Petitioner then started recording the two vehicles following her and captured Respondents accompanying Maria Alonso, in her vehicle who carrying a basket of eggs in the driver's seat. (Several employees of the Hammocks were egged in a drive by while doing work within the community; and the Petitioner's home and her vehicles have been egged on several occasions in recent months).

g. Petitioner got out of her vehicle and began to walk over to the vehicles which were parked to ask them what they were doing, and before she could ask them, the driver of one of the vehicles, stepped on the gas and hit her with the car.

h. A Police Report was issued under case number PD190515174168.

i. In the past there have been multiple incidents were authorities had to be called, however, most concerning for petitioner is the incident of May 15, 2019, as she saw the Respondents at her son's school and they followed her to home where she was cornered and subsequently

4

hit her with the vehicle.   Petitioner fears for her safety and that of her children as each incident has gotten more and more aggressive, with the last one sending her to the hospital with injuries to both her legs. Petitioner has several witnesses to the May 15, 2019 incident and would like to proceed with Injunction for Protection against Stalking Violence. In 2017 in November, the Respondents stated that they would get a gun and kill the Petitioner. This was done in front of a police officer. A police report was made.

j.   The Respondents continuously stalk the Petitioner and follow the petitioner when she picks ups her son at school. The last incident resulting in the Petitioner calling the police. Respondents' continuously harass the petitioner to force her to move from her home.

16. **Petitioner alleges the following additional information:**

a.   That the Respondent personally owns, possess, and/or is known to possess a firearm: **Unknown.**

b.   That is currently required for the Respondent to carry/use a firearm in the capacity of his/her job: **Unknown.**

c.   That the Respondent has a drug problem: **Unknown.**

d.   That the Respondent has an alcohol problem: **Unknown.**

e.   That the Respondent has a history of clinically diagnosed mental health problems: **Unknown.**

f.   Petitioner has known Respondent since (date): **Approximately 2013.**

g.   Respondent served in the U.S. military: **Unknown.**

**WHEREFORE, the Petitioner asks the Court to give an injunction (mark the appropriate section(s)):** The Petitioner asks the Court to enter an TEMPORARY INJUNCTION for protection against Respondent that will be in place from now until the scheduled hearing in this matter, which will immediately restrain Respondent from committing any acts against Petitioner, and which will provide any terms the Court deems necessary for the protection of a victim, including any injunctions or directives to law enforcement agencies.

Petitioner asks the Court to enter, after a hearing has been held on this petitioner, a FINAL JUDGMENT for the protection prohibiting Respondent from committing any acts of against the Petitioner and:

**NOTE: The Court may consider the following "ex parte" (without notice and hearing). This relief may be awarded for up to 15 days.**

a. (X) Prohibiting Respondent from going to or within 500 feet of any place Petitioner lives **14921 S.W. 104 Street, Apt. #106, Miami, FL 33196, and 9020 Hammocks Blvd, Miami, FL 330196** or to any specific place frequented regularly by Petitioner and any named family members or individuals closely associated with the Petitioner; **(IDENTIFY ALL PLACES BY NAME, ADDRESS, AND RELATIONSHIP OF PERSON ON TO PETITIONER, IF APPLICABLE.)**

b. (X) Keeping the Respondent away from contacting the current place of employment or school the Petitioner located at, **CONFIDENTIAL,** or any future place of employment or school of Petitioner in State of Florida;

c. (X) Prohibiting Respondent from contacting Petitioner by telephone, mail, by e-mail, in writing, through social media, through another person, or in any other matter;

d. (X) Ordering Respondent that he or she shall not have in his or her case, custody, possession or control any firearm;

e. (X) Prohibiting Respondent from knowingly or intentionally going to or within 100 feet of Petitioner's motor vehicle, whether or not vehicle is occupied;

f. (X) Ordering such other relief as the Court decides is needed to protect a victim of stalking, including injunctions or directives to law enforcement agencies;

6

g. (X) Continuing the relief requested in a – f above, until modified or

dissolved by the Court.

**NOTE: The Court may consider the following only with notice and hearing to the Respondent. These things may be ordered by the Court and remain in effect until modified or dissolved by the judge at either party's request, after further notice and hearing.**

h. (X) Ordering Respondent to go to a batterer's intervention program and/or other treatment
i. Other.

I UNDERSTAND THAT BY FILING THIS PETITION, I AM ASKING THE COURT TO HOLD A HEARING ON THIS PETITION, THAT BOTH THE RESPONDENT AND I WILL BE NOTIFIED OF THE HEARING, AND THAT I MUST APPEAR AT THE HEARING.

I HAVE READ EVER STATEMENT MADE IN THIS PETITION AND I DECLARE THAT EACH STATEMENT IS TRUE AND CORRECT. I UNDERSTAND THAT THE STATEMENTS MADE IN THIS PETITION ARE IN SECTION 837.011 FLORIDA STATUES, AND IF I HAVE MADE A KNOWINGLY FALSE STATEMENT, I MAY BE PROSECUTED.

_____5-21-15_____

Date

MARGLLI GALLEGO

STATE OF FLORIDA

COUNTY OF DADE

Sworn to and subscribed before me on this 21st day of May, 2019 by MARGLLI GALLEGO who is personally known to me/produced _____ as identification, and who did take an oath.

_____

NOTARY PUBLIC SIGNATURE

_____

PRINTED NOTARY

SIGNATURE

My Commission Expires

YUDANY FERNANDEZ
Notary Public – State of Florida
Commission # GG 092006
My Comm. Expires Jul 4, 2021
Bonded through National Notary Assn

7

5/21/2019

IMG-20190521-WA0004.jpg



5/21/2019                    IMG-20190521-WA0003.jpg



IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY, FLORIDA

**Marglli Gallego**
    Petitioner,

V.

**Josue Cepero**
    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

☒ DOMESTIC VIOLENCE DIVISION
☐ FAMILY DIVISION

Case No.: **2019-011650-FC-04**

**NOTICE OF RELATED CASES**

Petitioner submits this Notice of Related Cases as required by Florida Rule of Judicial Administration 2.545(d). A related case may be <u>open</u> or <u>closed</u> civil, criminal, domestic violence, juvenile delinquency, juvenile dependency, guardianship or domestic relations case. A case is "related" to this domestic/repeat/dating/sexual violence or stalking case if it involves any other same parties, children, or issues and it is pending at the time the party files a domestic/repeat/dating/sexual violence or stalking case; if it affects the Court's jurisdiction to proceed; if an order in the related case may conflict with an order on the same issued in the new case; or if an order in the new case may conflict with an order in the earlier litigation.

**[CHECK ONE ONLY]**

    ☒ There are NO related cases.

    ☐ The following are the related cases (add additional pages if necessary):

---

**RELATED CASE NO. 1**

Case Name(s): _____

Petitioner: _____

Respondent: _____

Case Num: _____ Division: _____

Type of Proceeding **[Check all that apply]**:
☐ Dissolution of Marriage   ☐ Paternity   ☐ Child Support   ☐ Juvenile Dependency/Delinquency
☐ Criminal          ☐ Guardianship   ☐ Domestic/Repeat/Sexual/Dating Injunction
☐ Other (specify)

---

**RELATED CASE NO.** _____

Case Name(s): _____

Petitioner: _____

Respondent: _____

Case Num: _____ Division: _____

Type of Proceeding [**Check all that apply**]:
- ☐ Dissolution of Marriage ☐ Paternity ☐ Child Support ☐ Juvenile Dependency/Delinquency
- ☐ Criminal ☐ Guardianship ☐ Domestic/Repeat/Sexual/Dating Injunction
- ☐ Other (specify)

---

**RELATED CASE NO. 1**

Case Name(s): _____

Petitioner: _____

Respondent: _____

Case Num: _____ Division: _____

Type of Proceeding [**Check all that apply**]:
- ☐ Dissolution of Marriage ☐ Paternity ☐ Child Support ☐ Juvenile Dependency/Delinquency
- ☐ Criminal ☐ Guardianship ☐ Domestic/Repeat/Sexual/Dating Injunction
- ☐ Other (specify)

---

**RELATED CASE NO. 1**

Case Name(s): _____

Petitioner: _____

Respondent: _____

Case Num: _____ Division: _____

Type of Proceeding [**Check all that apply**]:
- ☐ Dissolution of Marriage ☐ Paternity ☐ Child Support ☐ Juvenile Dependency/Delinquency
- ☐ Criminal ☐ Guardianship ☐ Domestic/Repeat/Sexual/Dating Injunction
- ☐ Other (specify)

---

**RELATED CASE NO. 1**

Case Name(s): _____

Petitioner: _____

Respondent: _____

Case Num: _____ Division: _____

Type of Proceeding [**Check all that apply**]:
- ☐ Dissolution of Marriage ☐ Paternity ☐ Child Support ☐ Juvenile Dependency/Delinquency
- ☐ Criminal ☐ Guardianship ☐ Domestic/Repeat/Sexual/Dating Injunction
- ☐ Other (specify)

The Petitioner acknowledges a continuing duty to inform the Court of any cases in this or any other state that could affect the current proceeding.

**I attest to the truthfulness of the claims made in this affidavit.**

Dated:  **May 21, 2019**

Signature of Party: _____

Printed Name:          **Marglli Gallego**

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY, FLORIDA

**Marglli Gallego**
    Petitioner,

V.

**Josue Cepero**
    Respondent,

_____

)  ☒  DOMESTIC VIOLENCE DIVISION
)
)
)  Case No.: **2019-011650-FC-04**
)
)
)  **PETITIONER'S MOTION FOR HEARING**
)  **ON PETITION FOR INJUNCTION FOR**
)  **PROTECTION**
)
)

I, **Marglli Gallego,** the Petitioner in the above reference case, hereby respectfully request a hearing on my Petition for Injunction for Protection Against Domestic/Repeat/Dating/Sexual Violence be set on the soonest available date. I understand that a hearing will take place after the Respondent receives notice and a copy of the Petition for Temporary Injunction I have filed.

_____
Marglli Gallego

**COPIES TO:  (Check those that apply)**

Petitioner:

☐    by  U. S. Mail

☐    by hand delivery in open court (Petitioner must acknowledge receipt in writing on the face of the original order- see below.)

Respondent:

☑    forwarded to sheriff for service

☐    by hand delivery in open court (Respondent must acknowledge receipt in writing on the face of the original order- see below.)

☐    by certified mail (may only be used when Respondent is present at the hearing and Respondent fails or refuses to acknowledge the receipt of a certified copy of this injunction.)

☑    Sheriff of Miami-Dade County
☐    State Attorney's Office
☐    Warrants Bureau
☐    Central Governmental Depository (if ordered)
☐    Department of Revenue
☐    Other: _____

Petitioner's Attorney:    ☐   by U.S. Mail
                             ☐   by hand delivery

Respondent's Attorney: ☐   by U.S. Mail
                             ☐   by hand delivery

       I CERTIFY the foregoing is a true copy of the original as it appears on file in the office of the Clerk of the Circuit Court of Miami-Dade County, Florida, and that I have furnished copies of this order as indicated above.

CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk

ID #_____

As of:  May 21, 2019

OCS Search                                                                                    https://www2.miami-dadeclerk.com/ocs/Search.as

Clerk's Home (http://www.miami-dadeclerk.com/home.asp)
Online Services (http://www.miami-dadeclerk.com/online_services.asp)
About Us (http://www.miami-dadeclerk.com/about.asp)   Contact Us (http://www.miami-dadeclerk.com/contact.asp)
My Account (https://www2.miami-dadeclerk.com/PremierServices/login.aspx)



# Miami-Dade County Civil, Family and Probate Courts Online System

⏮ Back to Search

## GALLEGO, MARGLLI VS CEPERO, JOSUE

**Local Case Number:** 2019-011650-FC-04

**Filing Date:** 05/21/2019

**State Case Number:** 132019DR011650A00104

**Case Type:** Stalking

**Consolidated Case No.:** N/A

**Judicial Section:** ND06

**Case Status:** CLOSED

---

👥 **Parties**                                    Number of Parties: 2 ➕

---

🔧 **Hearing Details**                            Number of Hearing: 3 ➕

---

🔊 **Dockets**                                    Dockets Retrieved: 41 ➖

⏏ Export to ▾

| Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|--------|------|-----------|--------------|------------|----------|

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 39 | 09/16/2019 | 31610:657 | Injunction Dismissed: Failure to Appear | Judgment | |
| | 38 | 09/16/2019 | | Memorandum of Disposition | Event | |
| | | 09/16/2019 | | DV Hearing | Hearing | |
| | 37 | 09/12/2019 | | Notice of Voluntary Dismissal | Event | |
| | 36 | 09/11/2019 | | Notice of Voluntary Dismissal | Event | |
| | 35 | 09/11/2019 | | Service Returned | Event | **SERVED ON 9/3/19** *Parties: Cepero Josue* |
| | 34 | 09/11/2019 | | Service Returned | Event | **SERVED ON 9/3/19** *Parties: Cepero Josue* |
| | 33 | 09/05/2019 | | Subpoena | Event | |
| | 31 | 08/26/2019 | | Extension of Injunction | Event | **EXPIRATION DATE FOR THIS INJUNCTION IS: 9/16/2019** *Due Date: 09/16/2019 Complete Date: Parties: Cepero Josue* |
| | 30 | 08/26/2019 | | Motion for Extension of Time | Event | **MOTION FOR CONTINUANCE WAS GRANTED** |
| | 29 | 08/26/2019 | | Motion for Continuance | Event | **RESPONDENT'S OF TRIAL** |
| | 32 | 08/22/2019 | | Notice of Unavailability/absence | Event | |

OCS Search                                                      https://www2.miami-dadeclerk.com/ocs/Search.as

| Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|--------|------|-----------|--------------|------------|----------|
| 28 | 08/20/2019 | | Extension of Injunction | Event | **EXPIRATION DATE FOR THIS INJUNCTION IS:09/09/19** *Due Date: 09/09/2019 Complete Date: Parties: Cepero Josue* |
| 27 | 08/20/2019 | | Motion for Extension of Time | Event | |
| | 08/09/2019 | | DV Hearing | Hearing | **NOH BY CLERK** |
| 26 | 08/08/2019 | | Motion for Continuance | Event | **PETITIONER'S** |
| 25 | 08/08/2019 | | Notice of Appearance | Event | **PETITIONER** |
| 24 | 08/05/2019 | | Subpoena Served | Event | |
| 23 | 06/10/2019 | | Extension of Injunction | Event | **EXPIRATION DATE FOR THIS INJUNCTION IS: 8/9/2019** *Due Date: 08/09/2019 Complete Date: Parties: Cepero Josue* |
| 22 | 06/10/2019 | | Motion for Extension of Time | Event | |
| 21 | 06/10/2019 | | Service Returned | Event | **SERVED ON 6/10/19** *Parties: Cepero Josue* |
| 20 | 06/10/2019 | | Memorandum of Disposition | Event | |
| 19 | 06/10/2019 | | Respondent's Sworn Firearm Statement | Event | |
| | 06/10/2019 | | DV Hearing | Hearing | |
| 18 | 06/04/2019 | | Notice of Unavailability/absence | Event | |

9/17/2019, 4:22 F

OCS Search                                                                    https://www2.miami-dadeclerk.com/ocs/Search.as

| Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|--------|------|-----------|--------------|------------|----------|
| 17 | 06/03/2019 | | Notice of Unavailability/absence | Event | **6/21/19-7/10/19** |
| 16 | 05/30/2019 | | Proof of Service | Event | |
| 15 | 05/30/2019 | | Notice of Unavailability/absence | Event | **6/26/19-7/10/19** |
| 14 | 05/30/2019 | | Motion for Continuance | Event | |
| 13 | 05/29/2019 | | Answer | Event | |
| 12 | 05/29/2019 | | Service Returned | Event | **SERVED ON 5/23/19** *Parties: Cepero Josue* |
| 11 | 05/29/2019 | | Notice: | Event | **JUDICIAL NOTICE OF RESPONDENT, JOSUE CEPERO** |
| 10 | 05/29/2019 | | Notice Designating Primary Email Address | Event | |
| 9 | 05/29/2019 | | Notice of Appearance | Event | **RESPONDENT** |
| 8 | 05/21/2019 | | Temporary Injunction | Event | **EXPIRATION DATE FOR THIS INJUNCTION IS:06/11/2019** *Due Date: 06/11/2019 Complete Date: Parties: Cepero Josue* |
| 7 | 05/21/2019 | | Petitioner's Motion for Hearing on Injunction | Event | *Parties: Gallego Marglli* |
| 6 | 05/21/2019 | | Notice of Related Cases | Event | |
| 5 | 05/21/2019 | | Respondent's Description Sheet | Event | *Parties: Cepero Josue* |
| 3 | 05/21/2019 | | Petition | Event | |
| 2 | 05/21/2019 | | Civil Cover | Event | |
| 1 | 05/21/2019 | | Filed at North Dade | Event | |

https://www2.miami-dadeclerk.com/ocs/Search.as

**◀◀ Back to Search**

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services (https://www2.miami-dadeclerk.com/Developers). To review the complete Miami-Dade County Disclaimer, follow this link: https://www8.miamidade.gov/global/disclaimer/disclaimer.page (https://www8.miamidade.gov/global/disclaimer/disclaimer.page)

---

Email (https://miamidadecounty.co1.qualtrics.com/SE/?SID=SV_bDvccbiqJBvQ2LH)  |

Login (/PremierServices/login.aspx?ReturnUrl=https://www2.miami-dadeclerk.com/ocs/Search.aspx)

Clerk's Home (http://www.miami-dadeclerk.com/home.asp)  |

Privacy Statement (https://www8.miamidade.gov/global/disclaimer/privacy-and-security.page)  |

Disclaimer (https://www8.miamidade.gov/global/disclaimer/disclaimer.page)  |  (http://www.miamidade.gov)

Contact Us (http://www.miami-dadeclerk.com/contact.asp)  |

About Us (http://www.miami-dadeclerk.com/about.asp)

2015 Clerk of the Courts. All Rights reserved.

Dear residents,

This letter serves to inform you that we have been trimming trees since July and on August 17 & 18 we will be trimming trees in Pelican Point. We need you to fill out the required form in order to help you and fulfill your tree trimming requests on your property. We are working in the community and all of the common areas so we only ask for your patience due to the size of the Hammocks. We are working slowly but we are tending to everyone's requests. Remember, our insurance company has not paid us anything for Hurricane Irma. We are still in court with our insurance company since The Hammocks took care of everything related to Hurricane Irma with absolutely no help from outside agencies. We did all of this and we did not raise the assessment for anyone in The Hammocks nor did we put any special assessments in place, since we had all of that money in the reserves. We know that in Pelican Point there are residents spreading false rumors about the association. Those residents are Leticia Cepero, Josue Cepero, Alicia Paz and others who are spreading these false rumors for personal reasons and gains. Their purpose is to confuse the community in a negative manner. Attached you will find a copy of the court documents showing that there is a restraining order against The Cepero's since they attacked the board president on many occasions and the last occurrence was when they followed her to her son's school for malicious reasons with under aged children involved.

Just as a reminder of the services being provided to the residents that were never offered before:

-Monthly debris pickups at your property

-New gym with twice the size as before, located at Wild Lime

-New outside gyms that were not present before

-New outside playgrounds that were not present before

-Lake treatment involving carp fish and algae removal which was never done before nor was there any correct lake maintenance. Due to this lack of maintenance of the prior years there is an accumulation of algae in the lake that we are tending to and there was also a huge amount of garbage from Hurricane Irma that we are still picking up till this day

-We have the Hammocks maintenance department constantly cutting the lake area grass due to the constant and extreme rainstorms we have been having this year

If you have any questions please feel free to contact the property manager via telephone. We will have a meeting for the residents of Pelican Point on Wednesday August 7th, 2019 at 04:30 pm. Please bring your hammocks ID or your license.

Thank you for your time and attention

Hammocks Board of Directors

lerk's Home (http://www.miami-dadeclerk.com/home.asp)
nline Services (http://www.miami-dadeclerk.com/online_services.asp)
bout Us (http://www.miami-dadeclerk.com/about.asp)
ontact Us (http://www.miami-dadeclerk.com/contact.asp)
y Account (https://www2.miami-dadeclerk.com/PremierServices/login.aspx)
y Bookmarks (http://www2.miami-dadeclerk.com/PremierServices/Bookmarks.aspx?ReturnUrl=https://www2.miami-
adeclerk.com/CJIS/CaseSearch.aspx)



# Miami-Dade County Criminal Justice Online System

◀◀ Back to Search

## Search Criteria      −

**Last Name:** CEPERO    **First Name:** JOSUE    **Sex:** Male    **Race:** White

## ☰ Cases(s) List     Total of Cases: 1

| | Case | Filed Date | Closed Date | First Charge |
|---|---|---|---|---|
| ⓘ | F-93-020400 | 06/23/1993 | 07/13/1993 | COKE/SELL/DEL/W/INT |

◀◀ Back to Search    ☰ Defendants

Criminal Justice Home (default.aspx)  |  Criminal Court Information (http://www.miami-dadeclerk.com/courts_criminal.asp)  |

Email (https://miamidadecounty.co1.qualtrics.com/SE/?SID=SV_bDvccbiqJBvQ2LH)  |

Login (/PremierServices/login.aspx?ReturnUrl=https://www2.miami-dadeclerk.com/CJIS/CaseSearch.aspx)  |

Clerk's Home (http://www.miami-dadeclerk.com/home.asp)  |

Privacy Statement (https://www8.miamidade.gov/global/disclaimer/privacy-and-security.page)  |  (http://www.miamidade.gov)

Disclaimer (https://www8.miamidade.gov/global/disclaimer/disclaimer.page)  |

Contact Us (http://www.miami-dadeclerk.com/contact.asp)  |  About Us (http://www.miami-dadeclerk.com/about.asp)

2015 Clerk of the Courts. All Rights reserved.

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

RTV 13

Case No.: **2019-011650-FC-04**

**Margili Gallego**
  Petitioner,

SERVED
DATE 6/10/19
TIME 1420
ADDRESS SERVED
    NDSC
SHERIFF OF MIAMI-DADE COUNTY
MIAMI-DADE COUNTY, FLORIDA
BY E PHILLIPS D.S.
BADGE NO. 5779

V.

**Josue Cepero**
  Respondent,

FILED
JUN 1 0 2019
CLERK OF CIRCUIT &
COUNTY COURTS

☒ DOMESTIC VIOLENCE DIVISION
☐ ORIGINAL ORDER
☒ EXTENSION

ISSUED:   June 10, 2019
EXPIRES:   **AUGUST 9, 2019**
OR UNTIL THE FINAL JUDGMENT OF
INJUNCTION FOR PROTECTION
IF ENTERED, IS SERVED
ON RESPONDENT

## TEMPORARY INJUNCTION FOR PROTECTION AGAINST STALKING VIOLENCE - EXTENSION

The Petition for Injunction for Protection Against Stalking Violence under section 784.0485, Florida Statutes, and other papers filed in this Court have been reviewed. The Court has jurisdiction of the parties and the subject matter under the laws of Florida. The term "Petitioner" as used in this injunction includes the person on whose behalf this injunction is entered.

**It is intended that this protection order meet the requirements of 18 U.S.C. §2265 and therefore intended that it be accorded full faith and credit by the court of another state or Indian tribe and enforced as if it were the order of the enforcing state or of the Indian tribe.**

### NOTICE OF HEARING

Because this Temporary Injunction for Protection Against Stalking Violence has been issued without notice to Respondent, Petitioner and Respondent are instructed that they are scheduled to appear and testify at a **fifteen minute** hearing regarding this matter on:

**August 09, 2019**   at   **11:00 AM,**

when the Court will consider whether the Court should issue a Final Judgment of Injunction for Protection Against Stalking Violence, which shall remain in effect until a date certain, or until modified or dissolved by the Court, and whether other things should be ordered. The hearing will be before the Honorable **LODY JEAN**, in the   **North Dade Justice Center located at 15555 Biscayne Boulevard, Miami FL. 33160,   Court Room 2-2.** If Petitioner and/or Respondent do not appear, this temporary injunction may be continued in force, extended, or dismissed, and/or additional orders may be granted. Children are not permitted to testify unless a motion is filed pursuant to Fla.Fam.L.R.P.12.407, and an order allowing the testimony is granted prior to the hearing.   **All witnesses and evidence, if any, must be presented at this time.**

NOTICE:   Because this is a civil case, there is no requirement that these proceedings be transcribed at public expense.   YOU ARE ADVISED THAT IN THIS COURT: Only Injunctions for Protection Against Domestic Violence Cases, filed pursuant to section 741.30 Florida Statutes, will be electronically recorded by the court. If your case is filed pursuant to chapter 784 (Repeat, Dating, or Sexual Violence), No recording is required to be made by the court. You may arrange in advance, at your

UNITED STATES BANKRUPTCY COURT
SOUTHER DISTRICT OF FLORIDA
MIAMI DIVISION

In Re:

Josue Cepero                    CASE NO.:    17-20358-LMI
Leticia Cepero                  CHAPTER 13

Debtors.
_____ /

### HAMMOCKS COMMUNITY ASSOCIATION INC. AND ITS PRESIDENT MARGLLI GALLEGO'S RESPONSE TO DEBTORS' MOTION FOR CONTEMPT AND REQUEST FOR AN EVIDENTIARY HEARING

HAMMOCKS COMMUNITY ASSOCIATION INC. ("Creditor") and its President MARGLLI GALLEGO ("President"), by and through his undersigned counsel hereby respond and move this Honorable Court to deny JOSUE CEPERO and LETICIA CEPERO's (hereinafter referred to as "Debtors") Motion for Contempt for Failure to Abide by this Court's Agreed Order Dated December 6th, 2018 and Request for an Evidentiary Hearing ("Motion"), and states:

1.      Defendant's Motion seeks to hold the Creditor and its President in Contempt of the December 6th 2019 Orders ("Orders"), for allegedly willfully violating the Court's Orders and is requesting sanctions and attorney's fees together with punitive damages against the President for the same violations.

2.      However, all of Debtors allegations fail because they are prefaced on false facts that are completely contradictory to the police reports, eye witnesses of uninterested parties and pictures and videos that would be presented at any evidentiary hearing ordered by this Court, which is welcomed by the Creditor and the President.

3.      Debtors are estopped from seeking an order for contempt of an order in which they themselves violated the Orders and willfully and maliciously sought out the President to instigate the very event they claim is in violation of the Orders.

4.      Debtors facts stated in the Motion focus solely on the allegations that the President:

    a.   confronted the Debtors by blocking their car with a condominium association vehicle while they were visiting another property in the Association,

    b.   began yelling at the Debtors and called the police after blocking their car into a parking spot, and

    c.   for passing out a form to the residents that included a reference to residents that were distributing letters with false statements to the residents of the community.

5.      What Debtors failed to mention were all of the essential facts surrounding the circumstances of their presence at the President's home residence parking lot, and Debtors seeking out and instigating the confrontation they are now seeking redress for, and the fact that the evidence (pictures) from that day show how Debtors intent was to maliciously harm the President, including the following operative facts:

    a.   On May 15th, 2019, the date of the confrontation, the President was driving home from picking up her child from school, when she noticed she was being followed by the Debtors.

    b.   She noticed it was the Debtors because she saw them pass by her car near her to take pictures of her.

    c.   She then noticed the Debtors started to follow her as she drove home.

    d.  During the drive home, she felt harassed and in danger so she called the police while driving home, and the 911 operator remained on the phone until she arrived at her residential parking lot when she was informed by the 911 operator that police were on their way.

    e.  The President also called the community security office and informed them of what was happening since she feared for her safety.

    f.  When the President attempted to enter her residential parking, she was blocked by the Debtors and the 3rd party, Maria Alonso, the affiant who submitted a false affidavit and has perpetrated a fraud on this Court.

    g.  Mrs. Alonso claims she was at the property to visit her friend, Gail Sharpe and deliver eggs, yet Ms. Sharpe appeared at the scene in her own vehicle in an effort to take pictures of the scene and intimidate the President.

    h.  Ms. Sharpe then proceeded to hit the President with her vehicle as she left the scene abruptly prior to the police arriving.

    i.  The President has documented that Mrs. Alonso and the Debtors have threatened the President on several occasions and she felt in danger for her life and health.

6.    The Presidents Affidavit verifying these facts is attached hereto as Exhibit A.

7.    The security guard who first arrived at the scene confirmed two vehicles were parked by the President's apartment and the Debtors vehicle was blocking the President from her parking space.  See the Affidavit of Jorge Matus attached hereto as Exhibit B.

8.    Mr. Matus also witnessed as Ms. Sharpe hit the President with her vehicle.

9.    Other security personnel at the scene confirmed that Ms. Alonso who claims she was at the residence to visit Ms. Sharpe, did indeed have a basket full of eggs in her

passenger seat, and that there have been various reports of eggs being thrown in the community at workers, property and board officers.  See affidavit of Marlo Urueta attached as Exhibit C.

10.     However, it is clear from the actions of the Debtors, Ms. Alonso and Ms. Sharpe herself, that the meeting at the residence was not deliver eggs to her friend, but rather to stalk the President so they could determine when she would be home, meet at her residence parking lot and vandalize the President's vehicle or residence with eggs.

11.     Pictures (some of which are attached hereto as composite Exhibit D) which shall be presented at an evidentiary hearing also show the Debtors trying to intimidate the President by presenting a copy of the letter evidencing the disparaging comments by the Debtors which were addressed in the letter presented by Debtors as evidence of violation of the Orders.

12.     The letter held by Debtors and being shown to others around the car specifically mention the President and is a direct violation of the Orders whereby Debtors are to refrain from communicating and confronting the President, are intentionally seeking her out, following her, drafting and distributing association matters involving the President to other residents.

13.     The Debtor and their cohorts stalking and attempt to harm the President failed because of the President's quick action in calling the police and security.

14.     As a consequence, and despite having an injunctive order placed on them to stay away from the President, the Debtor and their cohorts are trying to benefit from their own improprieties to give the perception that they are victims, and they take no responsibility for their intentional actions in seeking to intimidate, disparage, stalk and harm the President.

15.     The Creditor and President gladly encourage an evidentiary hearing in which evidence will be presented showing the pictures and videos from the scene, a detailed explanation of the location showing that the Debtors and their cohorts had absolutely no need to be anywhere near the President and her residence, which also further confirms their intent, and the facts will show that the parties that violated the Orders and intentionally sought out the President with their ill intent are the Debtors, who should be found in contempt and who should be sanctioned for perpetuating a false narrative that is a fraud upon this Court.

**WHEREFORE**, Plaintiff respectfully request the Court enter an order denying Defendants Motion for Contempt, or in the alternative, order an evidentiary hearing in which to present the facts in controversy, and grant Creditor any other relief this Court may deem just and proper.

I hereby verify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Respectfully Submitted,

MARIN ELJAIEK LOPEZ & MARTINEZ, P.L.
ATTORNEYS FOR CREDITOR HAMMOCKS
COMMUNITY ASSOCIATION, INC.
2601 S. BAYSHORE DRIVE, 18TH FLOOR
COCONUT GROVE, FLORIDA 33133
TELEPHONE: (305) 444-5969
FACSIMILE:  (305) 444-1939
EMAIL: CRODRIGUEZ@MELLAWYERS.COM

BY: /s/CARLOS F. RODRIGUEZ
CARLOS F. RODRIGUEZ, ESQ.
FLA. BAR. NO. 97655

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and provided by US First Class mail to Josue & Leticia Cepero, 9541 SW 148 Pl, Miami, FL 33196 and transmitted via ECF to Michael A. Frank, Esq., Nancy Neidich, Trustee, and Office of the US Trustee, on this 4th day of November, 2019.

By: <u>/s/Carlos F. Rodriguez</u>
Carlos F. Rodriguez

## AFFIDAVIT OF MARGLLI GALLEGO

Before the undersigned authority personally appeared **Marglli Gallego,** who being first duly sworn, deposes and says:

1.     My full name is Marglli Gallego.

2.     I am over the age of 18.

3.     I currently live in Heron at the Hammocks located at 14921 SW 104 Street, #106, Miami, Florida 33196.

4.     I am the president of Hammocks Community Master Association. We manage 42 communities including Heron at the Hammocks.

5.     I was a prior Board of Director for Heron at the Hammocks. I served alongside with Maria Alonso, Gail Sharpe, Ida Suarez, Roberta Winokur from 2017 to 2019.

6.     Hammocks Community Association has power and authority over Heron at the Hammocks.

7.     On May 15, 2019, the same day I had a Court Order to present evidence showing that Maria Alonso did not initiate elections for Heron on May 10, 2019, I was followed from the school my son attends, Herbert Ammons Magnet School located at 17990 SW 142 Ave, Miami, Florida 33177. The school is located seven miles from my residence.

8.     When I got out of my vehicle to pick my child up at 4:09 P.M. in front of the school entrance, a Honda Civic passed by me taking photographs. The occupants of the vehicle were Leticia and Josue Cepero. This information



EXHIBIT

A

can be confirmed with the school security system.

9.      After picking my son up, I began my way back to my house and noticed that the same Honda Accord driven by the Cepero's was still following me. I made various turns to verify their intent, and they made the same turns confirming my suspicion that they were following me.

10.     I called 911 and was asked by the operator if it was an emergency. I told her that I was being followed. I was transferred to a new line and the operator began asking my name, where I was, and where I was heading. I told her I was already arriving to my house, and she asked me for my address. I explained to the operator that I was being followed from the school by the Honda Accord. She told me that an officer was dispatched to my home address and to remain on the phone with her. She asked if I could see the vehicle's license plate and if possible, to provide it to her, to which I did.

11.     At no point did I contact Leticia Cepero or Josue Cepero.

12.     I took photos of their vehicle with my son's cell phone as I maintained contact with the 911 operator.

13.     I gave the operator the license plate number of the Golden Vehicle, which was operated by Maria Alonso since she blocked my vehicle from the right as Leticia and Josue Cepero blocked me from the left. My neighbor and Board director Judith Espejo took my son from my vehicle and took him inside the Hammocks Office.

14.     At this point the operator informed me that the officer was arriving, therefore I hung up.

15.     Marlon Urueta and Jorge Matus arrived before the Police, at the same time Gail Sharpe in her car arrived at the scene. I took photographs of her

2

and her vehicle's license plate. At this point as she was leaving, she hit me with her vehicle on my knees and quickly fled as the Police were arriving.

16. When the Police arrived, I informed them I was the individual who got in contact with 911 and the individuals on the scene were following me from my son's school.

17. I explained to the officer that they did not live in this property and I was trying to pass through the entrance in order to get to my house, but they blocked my path.

18. I continued to explain to the officer that in various occasions, Leticia and Josue Cepero have verbally assaulted me and threatened me. Likewise, Maria Alonso passed by my house several times and she said she would kill me, in addition my husband's vehicle has been stolen, and my vehicle's tires have been slashed. I placed cameras outside my home but Maria Alonso and Heron's attorney Reynaldo Castellanos, came and took the cameras down.

19. I currently have an active case against Gail Sharpe because she attacked me during a board meeting and hit me with her cell phone.

20. Leticia Cepero had in her hands a flyer which they were distributing to all unit owners stating that I was committing fraud.

MARGLLI GALLEGO

STATE OF FLORIDA

                    ss

COUNTY OF DADE

Sworn to and subscribed before me on October ___31___, 2019, by _Marglli Gallego_ who

3

produced _drivers license_ as identification. 6420 - 540 - 81 - 365 - 0

_____

Notary Public – State of Florida

_____

Notary Seal

| MARIUSKA  BRITO |
| MY COMMISSION # GG110935 |
| EXPIRES June 11, 2021 |

## AFFIDAVIT OF JORGE MATUS

Before the undersigned authority personally appeared **Jorge Matus,** who being first duly sworn, deposes and says:

1.      My full name is Jorge Matus.

2.      I am over the Age of 18 .

3.      I am employed as a security guard for Hammocks Community.

4.      I received a call about a situation developing within the Hammocks Community and immediately arrived at the scene.

5.      Upon my arrival, I observed two vehicles parked by Marglli Gallego's apartment.

6.      The first vehicle was occupied by Josue Cepero and Leticia Cepero.

7.      The second vehicle was occupied by Marglli Gallego.

8.      Marglli Gallego's vehicle was in a position that indicated that she was trying to park her vehicle in her designated parking space and Josue Cepero and Leticia Cepero's vehicle was blocking her from parking.

9.      I observed a female resident, telling Marglli Gallego that her son was now safe because she took the kid away from the scene to prevent anything from happening to him.

10.     Marglli Gallego then began asking Cepero why they were following her.

11.     Another resident, who was in a 4 door sedan, Maria Alonso began yelling at Marglli Gallego. Almost simultaneously another individual arrived in her

1



vehicle. I was later told her name is Gail Sharpe.

12.     Marglli Gallego began asking why they were recording her and this is when Gail Sharpe, the last vehicle to arrive on the scene, drove her vehicle into Marglli Gallego causing injury.

13.     The Police arrived soon after and immediately made contact with the Ceperos. Marglli Gallego approached them and said that she was the person who called the Police because she was being followed by the Ceperos.

14.     The Police officers did not wish to speak to me nor to Marglli Gallego regarding this incident.

15.     The officers never asked for Gail Sharpe's license or registration even after I told them that I saw her strike Marglli Gallego with her vehicle.

JORGE MATUS

STATE OF FLORIDA

         ss

COUNTY OF DADE

Sworn to and subscribed before me on October  31 , 2019, by  *Jorge Matus*  who produced  *drivers License*  as identification.  M326-420-76-105-0



Notary Public - State of Florida

Notary Seal

MARIUSKA BRITO
MY COMMISSION # GG110935
EXPIRE: June 11, 2021

## <u>AFFIDAVIT OF MARLO URUETA</u>

Before the undersigned authority personally appeared **Marlo Urueta**, who being first duly sworn, deposes and says:

1.    My full name is Marlo Urueta.

2.    I am over the Age of 18.

3.    I am employed as security guard for Hammocks Community Association.

4.    I was called to the scene by my supervisor Matus who was already on site responding to an incident.

5.    When I arrived, I observed a vehicle occupied by Josue Cepero and Leticia Cepero, located in front of Marglli Gallego's apartment.

6.    I recognize Josue Cepero and Leticia Cepero as homeowners from Pelican Point.

7.    The vehicle was in front of Marglli Gallego's apartment facing Marglli Gallego's vehicle.

8.    Maria Alonso was in her 4-door gold vehicle and she began yelling at Marglli Gallego who was also already present on the scene. I saw a basket full of eggs in Maria Alonso's passenger seat. This got my attention as we have reports of eggs being thrown in the community at workers, property, board officer, etc.

9.    We called the Police. Gail Sharpe who is also a member of the community arrived and we observed Gail Sharpe drive her vehicle into Marglli Gallego.

1


EXHIBIT

C

10.     The Police arrived and made initial contact with the Ceperos and then with Maria Alonso.

11.     Afterward we informed the officer that Marglli Gallego was the complainant that initially contacted the Police.

12.     The officers were denying our statements and telling us it wasn't true.

13.     The officers failed to ask Gail Sharpe for her license or any vehicle information even after we informed the officers that Gail Sharpe had struck Marglli Gallego with her vehicle. But the officers said that Marglli Gallego was in the way

14.     Marglli Gallego had visible bruises in her legs.

_____

MARLO URUETA

STATE OF FLORIDA

                ss

COUNTY OF DADE

Sworn to and subscribed before me on October _31_, 2019, by _Marlo Urueta_ who produced _drivers license_ as identification. _U630-54-64-132-0_

_____

Notary Public – State of Florida

Notary Seal

MARIUSKA BRITO
MY COMMISSION # GG110935
EXPIRES June 11, 2021

2

EXHIBIT

D







Page 1

1           UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2

3                             Case No.:  17-20358-LMI
                              Chapter 13
4

In Re:
5

JOSUE CEPERO and LETICIA CEPERO,
6

       Debtors.
7    _____/

8

9

10                    ECF # 199, 240

11                   February 26, 2020

12

13

14           The above-entitled cause came on for a

15    hearing before the HONORABLE LAUREL M. ISICOFF, one

16    of the Judges of the UNITED STATES BANKRUPTCY COURT,

17    in and for the SOUTHERN DISTRICT OF FLORIDA, at 301

18    N. Miami Avenue, Miami, Miami-Dade County, Florida,

19    on Wednesday, February 26, 2020, commencing at or

20    about 1:42 p.m., and the following proceedings were

21    had:

22

23

24           Transcribed from a digital recording by:
                 Helayne Wills, Court Reporter
25

```
 1   APPEARANCES:

 2        BROOKS FRANK AND DE LA GUARDIA, by
          MICHAEL A. FRANK, ESQ.,
 3        on behalf of the Debtors

 4
          LAW OFFICES OF MIGUEL PARLADE, P.A., by
 5        MIGUEL F. PARLADE, ESQ.,
          on behalf of the Hammocks Community Association
 6        and Marglli Gallego

 7
          ALSO PRESENT:
 8        ECRO - Electronic Court Reporting Operator
          LORENZO ESTEVA
 9        DENISE OTERO VILARINO

10
```

```
11                         INDEX
12   WITNESS              DIRECT      CROSS    REDIRECT
13   L.J. COBO
       (By Mr. Frank)      18                    21
14     (By Mr. Parlade)               19
15   MARIA ALONSO
       (By Mr. Frank)     24, 38                  50
16     (By Mr. Parlade)            32, 43
17   JOSUE CEPERO
       (By Mr. Frank)      53         60          84
18     (By Mr. Parlade)
19   JORGE MATUS
       (By Mr. Parlade)    89        108         122
20     (By Mr. Frank)
```

```
21

22

23

24

25
```

1                          **EXHIBITS**

2


3    **DEBTORS'**                                              **PAGE**

4     Nos. 9 and 10 in evidence                              9
       Nos. 13 and 14 in evidence                            9
5     No. 13 withdrawn

6


7    COMMUNITY ASSOCIATION'S
      A through E in evidence                                12
8     F in evidence                                          13
      M for identification                                   66

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  We're  going to switch now and

2    go to the Cepero matter, 17-20358.  I'll take

3    appearances from the debtors and then from the other

4    side.

5              MR. FRANK:  Michael Frank, F-R-A-N-K, on

6    behalf of the debtors, the Ceperos.

7              THE COURT:  Okay.

8              MR. PARLADE:  Miguel Parlade on behalf of

9    Hammocks Community Association and Marglli Gallego.

10             THE COURT:  All right.  I'm going to ask

11   you to spell your last name for the record.

12             MR. PARLADE:  P as in Peter, A-R-L-A-D as

13   in David, E.

14             THE COURT:  Okay.  All right.  Why don't

15   we go to the motion in limine, okay?  Have you all

16   resolved that?

17             MR. PARLADE:  No, ma'am.

18             THE COURT:  Okay.  So, Mr. Parlade, if I

19   understand it, your objection is not to the police

20   officer's testimony, it's to the extent that it's

21   become tendered as an expert testimony as to what

22   happened.

23             MR. PARLADE:  Correct, and any opinion

24   testimony given by the officer beyond the facts.

25             THE COURT:  Okay.  And, Mr. Frank, why

1    would I -- I mean, it's certainly okay to hear fact

2    testimony from the police officer, but aren't I the

3    one that has to make a determination --

4            MR. FRANK:  Yes, Judge.  We need him --

5            THE COURT:  You have to let me finish.  I

6    know you're excited, but you have to let me finish,

7    because the next thing I'm going to ask you is,

8    "Isn't it true that you were going to buy your wife

9    a $10,000 diamond ring when you leave here today?"

10           MR. FRANK:  Is that all?

11           THE COURT:  And then you said yes.  So,

12    you see, that's why you have to wait for me to

13    finish talking.

14           Okay.  So, Mr. Frank, are you suggesting

15    that someone other than me should be rendering an

16    opinion as to what occurred?

17           MR. FRANK:  No, Judge.

18           THE COURT:  Okay.  So then I assume that,

19    if I clarify what I will allow the testimony for and

20    not, you will not ask questions regarding the

21    ultimate fact, which is, "What do you think

22    happened?"

23           MR. FRANK:  No, Judge.  I need him to get

24    the police report into evidence.

25           THE COURT:  Well, I understand the police

1   report has to get into evidence.  I'm not going to

2   strike -- I'm not going to prevent the witness from

3   testifying.  I'm just agreeing, and it doesn't sound

4   like to me you disagree, that the police officer is

5   not going to render an ultimate opinion as to what

6   occurred.

7          MR. FRANK:  No, Judge.

8          THE COURT:  Mr. Parlade, do you agree that

9   that is a correct and appropriate limitation?

10          MR. PARLADE:  I do agree, Your Honor.

11          THE COURT:  Okay.  So -- I don't know

12   whether I'm granting the motion in limine.  I think

13   I may be granting it in part and denying it in part,

14   or maybe just clarifying.  Maybe they'll just be an

15   order on the motion in limine that says that the

16   debtor's counsel has clarified that the police

17   officer will be presented as a fact witness and not

18   an opinion witness.

19          How's that?  There won't be a grant, a

20   deny, just a clarification.  So you prepare the

21   order, because it's your motion.

22          MR. PARLADE:  Yes, Your Honor.

23          THE COURT:  All right.  So fact witness

24   only.

25          (Thereupon, a recess was taken, after

1   which the following proceedings were had:)

2           THE COURT:  Now we're back to Cepero.

3           Let's go through exhibits, all right?  I

4   know there's a lot of video exhibits that you both

5   are seeking -- for which you both are seeking

6   admission.  We'll get to those, but are there any

7   non-video exhibits that the two of you have and have

8   discussed?

9           MR. PARLADE:  Your Honor, going through

10  the exhibits, there's some stuff that's going to be

11  cumulative.  For example, if the police officer is

12  going to testify as to the facts of an incident, and

13  later on a police report is brought in that

14  reverberates what the testimony is, I do feel that

15  that would be cumulative evidence.

16          THE COURT:  Okay.  Well, luckily I'm not a

17  jury, so somebody can say something 12 times, and

18  other than it making me want to shoot myself, it's

19  not going to make it any more real or true.

20          Okay.  Any other -- let's go first to the

21  debtor.  So other than that concern, and that would

22  be regarding -- well, I mean -- let's first go to

23  the debtors' exhibits.

24          There's no trick question.  If there's

25  none that can be admitted without the foundation, et

1    cetera, that's fine.  I'm just trying to figure out

2    what we can and cannot do while we're waiting.

3              So, Mr. Parlade, with respect to the

4    debtors' exhibits, putting aside the videos for a

5    minute, any for which you do not have an objection

6    or -- for which you don't have an objection to

7    admission without requiring further introduction?

8              MR. PARLADE:  The only ones I have an

9    objection are Exhibit Number 11, which is a verified

10   petition for injunction, which is something not at

11   issue.  There is a docket case, a printout of a

12   docket for a case --

13             THE COURT:  I just need numbers.  So 11 is

14   the only one that's not a video for which you have

15   an objection?

16             MR. PARLADE:  Eleven, 12 and 16, as well.

17             THE COURT:  Okay.  So that means I can

18   admit 9, 10, 13, 14 and 15?  Again, it's not a trick

19   question.

20             MR. PARLADE:  Yes, Your Honor.

21             THE COURT:  Are you still seeking

22   admission of those documents, Mr. Frank?  I just

23   want to make sure.  Before I put it in my red pen,

24   9, 10 -- let's go -- all right.  Nine and 10, those

25   are okay, Mr. Parlade?

```
 1              MR. PARLADE:  Yes, Your Honor.
 2              THE COURT:  Okay.  So 9 and 10 will be
 3    admitted.
 4              (Thereupon, Debtors' Exhibit Nos. 9 and 10
 5        were admitted into evidence.)
 6              THE COURT:  And then 13, 14, are those
 7    okay?
 8              MR. PARLADE:  They're okay, Your Honor.
 9              THE COURT:  Okay.  So 13 and 14 will be
10    admitted.
11              (Thereupon, Debtors' Exhibit Nos. 13 and
12        14 were admitted into evidence.)
13              THE COURT:  And 15?  Again, not a trick
14    question.
15              MR. PARLADE:  If the foundation is laid.
16              THE COURT:  That's fine.  We'll go back
17    there.
18              (Thereupon, a recess was taken, after
19    which the following proceedings were had:)
20              THE COURT:  Okay.  For the last time, for
21    the final time, back to Cepero.
22              All right.  So did you all need to gather
23    anybody, or everybody else is witnesses and --
24              MR. FRANK:  Everyone else is --
25              THE COURT:  Are you both invoking the
```

1   rule?

2          MR. PARLADE:  Yes, Your Honor.

3          THE COURT:  Okay, fine.  That's fine.

4   Hopefully it's more comfortable out there than it is

5   in here.

6          MR. PARLADE:  It's hot.

7          THE COURT:  Because two days ago it was

8   65 degrees in here and we complained.  So now we're

9   in sauna mode.

10         Anyone in the courtroom who's

11  uncomfortable, as long as you're wearing a shirt

12  underneath, you may remove your jackets.  That

13  includes the CSOs, and your secrets are safe with

14  us.  I, of course, can't remove my robe, whatever.

15  And it's not -- I have a dress underneath, but I

16  feel like I have to keep my robe on.  I just felt

17  like I had to make that clear.

18         MR. FRANK:  With reference to Number 15,

19  Judge --

20         THE COURT:  Wait.  Let's back up.

21         We're now on the Community Association's

22  exhibits.  So, Mr. Frank, let's go -- all we're

23  doing now is talking about noncontroversial

24  exhibits.  For the non-video exhibits, what, if any,

25  exhibits submitted by the Community Association are

```
 1    not a problem, and I can admit them at this point?
 2    A couple of them look like they're the same exhibits
 3    that you have.
 4              MR. PARLADE:  All the video exhibits are
 5    the same as debtors' exhibits.
 6              THE COURT:  Oh, good.  That will certainly
 7    make it easier when we get to the part about
 8    introducing them.  Everybody agrees they're
 9    authentic, so we can skip that part, right?
10              MR. PARLADE:  I don't know --
11              THE COURT:  I'm talking about anything
12    that doesn't say "video" on it.
13              MR. FRANK:  I don't know which exhibit it
14    was, because there were two exhibit registers.  One
15    was amended.  I'm looking at the --
16              THE COURT:  I'm looking at the amended
17    exhibit register.  That's what I have.
18              MR. FRANK:  I'm looking at -- I think it's
19    H.  It's a picture of physical injuries of Marglli
20    Gallego.
21              THE COURT:  Let's start with A.  Any
22    objection to Exhibit A?
23              MR. FRANK:  Nothing on the first page.
24              THE COURT:  Nothing that you object to, or
25    nothing that you agree to?
```

1          MR. FRANK:  Nothing I object to.

2          THE COURT:  Okay.  I need you to be

3    specific.

4          So I'm going to admit A through E.  Yes?

5          MR. FRANK:  Correct.

6          THE COURT:  Okay.  It doesn't mean you

7    gentlemen can't -- I want you gentlemen to still

8    talk about these exhibits, but at least we can get

9    through the preliminary -- we can go right to the

10   discussion of the exhibit.

11          (Thereupon, Hammocks Exhibits A through E

12      were admitted into evidence.)

13          THE COURT:  Now we're on the next page.

14   So F you have an issue with.  G?  Isn't that the

15   same one as your exhibit?  No?

16          MR. FRANK:  H, the letter.

17          THE COURT:  Okay.  What is F?  Any

18   objection to F?

19          MR. FRANK:  In my book it's an affidavit

20   of Jorge Matus.

21          THE COURT:  No.  I'm looking at the

22   amended exhibit register.

23          Whoever did your exhibits, Mr. Parlade,

24   they're upside down.

25          MR. PARLADE:  I apologize.

```
 1                 THE COURT:  Once you find it let me know.

 2                 We had some folks come in.  Of course, we

 3      haven't gotten past the opening statement yet.  You

 4      might want to tell them that they don't -- they're

 5      going to be asked to leave again.

 6                 Let me know when you're ready.

 7                 MR. FRANK:  I don't have a problem with F,

 8      the pictures.  Part of F, something about an open

 9      criminal investigation --

10                 THE COURT:  I have F is pictures --

11      picture of debtors in their vehicle holding up a

12      letter.

13                 MR. FRANK:  That's fine, Judge.  F is

14      fine.

15                 (Thereupon, Hammocks Exhibit F was

16          admitted into evidence.)

17                 MR. FRANK:  G is --

18                 THE COURT:  Just tell me fine or not.

19      We're not getting into details.

20                 MR. FRANK:  I don't know what it is, so I

21      don't agree with that one.

22                 THE COURT:  Okay.  We'll get to that in a

23      minute.  We'll go back to that.

24                 H, just yes or no.

25                 MR. FRANK:  It's a picture of injuries
```

1  which --

2          THE COURT:  Yes or no, that's all.

3          MR. FRANK:  No.

4          THE COURT:  Then we just go to the

5  foundational part, which is fine.  I'm just trying

6  to save time.

7          How about I?

8          MR. FRANK:  I, the affidavit of Jorge

9  Matus, I object to.  If he's here to testify, fine.

10         THE COURT:  Okay.  And how about whatever

11 the next one is?

12         MR. FRANK:  Same thing, Marlo Urueta, if

13 he's here to testify, fine, but I don't agree with

14 that exhibit.

15         THE COURT:  Okay.  What else?

16         MR. FRANK:  Same thing as to K, the

17 affidavit of Maria Gil, same objection.

18         THE COURT:  Okay.  What else?  The rest

19 are audio files and videos?

20         MR. FRANK:  Audio, right.

21         THE COURT:  All right.  We've gone through

22 the exhibits.

23         Let's get started.  I had an opening

24 statement from Mr. Parlade, but I did not get an

25 opening statement from you, Mr. Frank.

1          MR. FRANK:  I don't know why you didn't,

2   Judge.  Maybe my paralegal did not see that portion,

3   because I know you've got a bunch of different

4   things in your order.  So I don't have an opening

5   statement.  I apologize.

6          THE COURT:  Well, are you going to make an

7   opening statement?

8          MR. FRANK:  I'll make an opening

9   statement, Judge.

10          In this case, Judge, it starts off as a he

11   said she said incident, an incident in the parking

12   lot.  One says the other one was blocking someone,

13   the other one says the other person is blocking the

14   other one.

15          It really comes down to two things.  We

16   believe that there was a violation of that court

17   order from December that said that Ms. Gallego

18   cannot approach my clients.  The evidence will show

19   that Ms. Gallego approached my clients in their car

20   in the parking lot.

21          Secondly, it was also part that you're not

22   supposed to mention anything about my clients in the

23   Hammocks.  The evidence will show that a letter went

24   out about tree trimming, and part of that letter

25   states that there are people that are spreading

1    rumors and --

2               THE COURT:  I read the letter.

3               MR. FRANK:  Those are the two issues I

4    think will show that Ms. Gallego was in contempt.

5               MR. PARLADE:  Objection, Your Honor.

6    Counsel is misstating the order of this Court.  The

7    order of this Court --

8               THE COURT:  In the microphone.

9               MR. PARLADE:  The order of this Court does

10   not prohibit any mention of the debtors within the

11   Hammocks.  That's not what's in the explicit four

12   corners of the order of this Court.  There are two

13   orders of this Court.

14               MR. FRANK:  I know you read them, because

15   the second order was culled by you to be entered

16   into, because it didn't clarify the first order.

17   One is ECF 189 and the other one is ECF 191.

18               There is no per se prohibition from

19   Hammocks from just mentioning the debtors.  That is

20   an extreme measure, and one that has not been

21   reverberated by this Court.

22               THE COURT:  All right.  The issue is going

23   to be whether the letter with -- the tree trimming

24   letter we'll call it and -- well, one, what happened

25   on May 15th.  That's one.  What happened on May

1    15th.  And the other will be the tree trimming

2    letter.

3              All right.  This is your motion,

4    Mr. Frank.  It's your burden of proof.  Please

5    proceed.  Call your first witness.

6              MR. FRANK:  I'm going to call the officer

7    first, just to get him in and out quick.

8              THE COURT:  Okay.  What is the name of the

9    officer?

10              MR. FRANK:  Officer Cobo.

11              THE COURT:  Is he here?

12              MR. FRANK:  He's here.

13              THE COURT:  Okay.  The CSO is not supposed

14    to be your bailiff.  He's just here to protect me.

15              Good afternoon, Officer Cobo.  Thank you

16    for coming in today.  You probably know the routine,

17    so please get sworn in and then we'll begin.

18    Thereupon:

19                        L.J. COBO

20    was called as a witness by the Debtors, and having

21    been first duly sworn, was examined and testified as

22    follows:

23              MR. PARLADE:  I'm waiting for it to load

24    up, Judge.

25              THE COURT:  Officer, the microphone is

1    this, so just make sure that you speak into it.

2    Please, when you answer Mr. Frank's questions, wait

3    until he finishes before you answer.  And Mr. Frank

4    is going to absolutely wait until your answer is

5    finished before he asks his next question.

6                     DIRECT EXAMINATION

7    BY MR. FRANK:

8         Q    Please state your name.

9         A    I'm Officer Cobo, Miami-Dade Police

10   Department.

11        Q    What you're looking at --

12             THE COURT:  Could you ask the witness to

13   spell his last name for the record, please?

14   BY MR. FRANK:

15        Q    Please spell your last name for the

16   record.

17        A    C-O-B-O.

18        Q    You should have a screen in front of you

19   there that shows a copy of a police report.

20        A    Yes, I do.

21             THE COURT:  What exhibit is this?

22             MR. FRANK:  This is Exhibit 11.

23             THE COURT:  All right.  My Exhibit 11 is a

24   verified petition for injunction against --

25             MR. FRANK:  I'm sorry, it's Exhibit 10.

1   That was already admitted?

2           THE COURT:  Yes.

3   BY MR. FRANK:

4      Q    I show you a copy of this police report.

5   This was prepared by you?

6      A    Yes, sir.

7           THE COURT:  Wait just a minute.  Could you

8   turn that microphone off?  It's picking up your --

9   Mr. Frank turned it off.  Okay.  I'm sorry.

10          Please continue, Mr. Frank.

11  BY MR. FRANK:

12     Q    Okay.  I'm scrolling down.  As I go down,

13  if you look at -- if you remember, there's a box

14  that asks if any injuries were reported.

15          Is that box checked?

16     A    No.

17     Q    So there were no injuries reported?

18     A    From my recollection, no, sir.

19          MR. FRANK:  Okay.  I think that's good

20  enough, Judge.  He's excused unless --

21          THE COURT:  Well, Mr. Parlade might want

22  to cross-examine him, either with respect to Exhibit

23  10 or with respect to his testimony.  Short

24  testimony, but testimony nonetheless.

25                    CROSS-EXAMINATION

1   BY MR. PARLADE:

2       Q      Officer Cobo, good afternoon.

3       A      Good afternoon, sir.

4       Q      Really quick question.  Other than what's

5   in the four corners of that report, do you yourself

6   have any knowledge or any memories of this incident

7   in question?

8       A      I have some recollection of the incident.

9       Q      Do you have knowledge if at the time of

10  the incident, any of the parties involved claimed

11  injuries?

12      A      Not injuries, but claimed they got hit by

13  a car.

14      Q      And who claimed that they got hit by a

15  car?

16      A      The reporting person, Marglli -- I don't

17  know how to pronounce the last name.

18      Q      Is it Gallego?

19      A      Yeah.

20      Q      Okay.  Why wasn't that in the report, do

21  you know?

22      A      It was noted that she claimed that she got

23  hit by a car, but evidence on scene proved that she

24  was refusing to leave -- letting the person leave

25  the scene and cut her off.  At no point the video

1    recording showed Marglli getting hit by a car.

2         Q    Did you examine her for injuries?

3         A    I asked if she wanted fire rescue and she

4    refused fire rescue.

5         Q    Did she claim she was injured, do you

6    remember?

7         A    No.

8              MR. PARLADE:  That's all, Your Honor.

9              THE COURT:  No redirect?

10                   REDIRECT EXAMINATION

11   BY MR. FRANK:

12        Q    I just want to be clear --

13             THE COURT:  You're redirecting?

14             MR. FRANK:  Yes.  The officer was asked

15   about his memories of the incident.

16             THE COURT:  Ask him.  This is evidence

17   time, not argument time.

18   BY MR. FRANK:

19        Q    You had stated that from what you saw,

20   Ms. Gallego was blocking the car of the Ceperos?

21        A    Blocking the car, of Gail Sharp, I

22   believe.

23             MR. FRANK:  No further questions.  I just

24   wanted to clarify that.  No further questions.

25             THE COURT:  Okay.  Thank you very much,

1  Officer Cobo.  Thank you for your time.

2          Officer Cobo is excused, correct?

3          MR. FRANK:  Yes.

4          THE COURT:  Thank you so much.

5          Do I have an interpreter over here also,

6  on this side?

7          MR. FRANK:  Yes.

8          THE COURT:  Can you make sure that your

9  microphone also is off.  I'm hearing -- it is off?

10 There's no green light?

11         It's fine.  We'll manage.  All right.

12         Is there a problem with the witness?  Did

13 you want to put that question on the record?  Is

14 there an issue that needs to be on the record.

15         MR. PARLADE:  Opposing counsel has listed

16 body cam on his exhibit register.  I just asked the

17 officer if they were taken off of his camera or if

18 there was another officer's camera.

19         MR. FRANK:  I'm not even moving that into

20 evidence, Judge.

21         THE COURT:  Okay.  So then I'm going to

22 put "not introduced" on the body cam, and we can

23 just take that off the to do list.

24         All right.  Who's your next witness?

25         MR. FRANK:  It's Maria Alonso.

1          THE COURT:  Oh, body cam.  So Exhibit 2,

2  you're not seeking admission of that?

3          MR. FRANK:  That is correct.

4          THE COURT:  Okay.  Maria Alonso.  Are you

5  Ms. Alonso?

6          MS. ALONSO:  I am.

7          THE COURT:  Please stand and be sworn.

8  Thereupon:

9                    MARIA ALONSO

10  was called as a witness by the Debtors, and having

11  been first duly sworn, was examined and testified as

12  follows:

13          THE COURT:  Ms. Alonso, I'm going to ask

14  you to make sure that you stay close to the

15  microphone, which is that big black thing sticking

16  in your face.

17          THE WITNESS:  Okay.

18          THE COURT:  Also, please wait until

19  Mr. Frank finishes his question before you answer.

20  Mr. Frank is going to wait until your answer is

21  complete before he asks the next question.

22          If Mr. Parlade stands up after Mr. Frank

23  asks the question, don't answer until I hear

24  Mr. Parlade's objection, and after I've ruled on it,

25  I'll either instruct you to answer or not, or I'll

Page 24

```
 1    forget and someone will remind me to tell you.

 2              THE WITNESS:  Okay.

 3              THE COURT:  And equally, when Mr. Frank --

 4    when Mr. Parlade is cross-examining you, if

 5    Mr. Frank stands up, same thing.

 6              All right.  Please proceed.

 7                      DIRECT EXAMINATION

 8    BY MR. FRANK:

 9         Q    Please state your name.

10         A    My name is Maria Alonso.

11         Q    Can you spell your last name, please?

12         A    Sure.  A-L-O-N-S-O.

13         Q    And what is your address?

14         A    8200 Southwest 115th Street, Miami,

15    Florida, 33156.

16         Q    Now, were you present at an incident on

17    May 19, 2019, in the parking lot of the Heron

18    Condominium?

19         A    Let me correct you.  May 15th.

20         Q    May 15th.  I'm sorry.

21              Were you present?

22         A    Yes, I was.

23         Q    Okay.  Can you tell me why you were there?

24         A    I was there to see Gail Sharp, and also to

25    see my tenants.
```

1    Q    Okay.  You wanted to see your tenants to

2  do what?

3    A    I wanted to collect rent, and I was there

4  to give them some eggs, because they have a sick

5  young lady.

6    Q    And what is your relationship with the

7  Ceperos?

8    A    I just know them from the association, the

9  Hammocks Association.

10    Q    Okay.  And how did it happen that all

11  three of you were at the parking lot together?

12    A    Well, I was there -- I don't know.  I got

13  there right after 4:00, and I was by Building 8.  I

14  was speaking to Gail Sharp, and we had previously --

15  I had spoken to the Ceperos a few days before and

16  that morning, because they wanted to see me, because

17  we had election at The Heron, and they wanted to

18  congratulate us.

19    Q    And that election at The Heron was for

20  what?

21    A    Was for new board members.

22    Q    Okay.  And what is your position with The

23  Heron?

24    A    I'm the president.

25         THE COURT:  I'm sorry to bother everybody

```
 1    again.  I'm going to ask the interpreters to sit in
 2    the back with the people they're interpreting for,
 3    because I'm sorry.  I'm just finding it very
 4    distracting.  Sorry.  No insult -- all the way back,
 5    both of you.  That way you can interpret to your
 6    heart's content, and I can hear without being
 7    distracted.  I'm sorry.
 8              Okay.  Ask your next question.
 9    BY MR. FRANK:
10         Q    You were present at that time, and did you
11    receive a call from the Ceperos?
12         A    Yes, I did.  I received several calls
13    while I was speaking to Gail Sharp.
14         Q    And what were the content of those
15    telephone calls?
16         A    Well, I received like two calls that I
17    wasn't answering.  I was still speaking to Gail.
18    And then they send me a text that they were being
19    blocked at The Heron.
20         Q    Did they tell you who was blocking them
21    in?
22         A    Then they called again.  I answered the
23    phone, and the Ceperos stated that they were being
24    blocked by Marglli.
25         Q    Marglli who?
```

1    A    Gallego.

2    Q    And then did you go to the scene?

3    A    Yes, I did.

4    Q    And at that scene what did you observe

5  Ms. Gallego doing?

6    A    Ms. Gallego was filming them, was saying

7  something, doing something with her hands.  In one

8  hand she had the phone and the other one she was

9  doing stuff.

10         I don't know what she was saying, because

11  I'm far away from her.  I know she's saying

12  something, but I couldn't tell you what she was

13  saying.  And she was taking pictures and filming

14  them and going all around the car.

15    Q    Now, when you say you saw her approach the

16  car and start yelling and screaming at the Ceperos,

17  what else did you see?

18    A    Well, when I got there she was already

19  right at the car, by their window, and going all

20  around the car.  As soon as she saw me getting there

21  then she came charging at me.

22    Q    Then what happened?

23    A    Then what happened was, she started

24  filming me.  She started taking pictures.  She

25  started to tell me, "Come on, and you're going to

 1   pay for it."

 2        Q    Were you there the whole time?

 3        A    I was there -- as soon as they called me,

 4   as soon as I got there, I was there the whole time,

 5   yes.

 6        Q    And you were there when the police came?

 7        A    Yes, I was.

 8        Q    So you sat back, and were you interviewed

 9   by the officer?

10        A    Yes.

11        Q    And you told him what happened?

12        A    Yes, I did.

13        Q    Just as you testified here?

14        A    Yes.  I even went to the police department

15   and I did a police report that states all of that,

16   and the time that I even got the Ceperos' calls and

17   everything.

18        Q    Hold on one second.  I'm sorry.

19             Did you see or observe any banging on the

20   car by Ms. Gallego?

21        A    I don't know about the banging on that

22   car, but I did observe the banging in the other

23   vehicle, because after I came, then right after me

24   came Gail Sharp.  Then she went charging at Gail

25   Sharp's car, and she banged Gail Sharp's car.

1    There's a video on that.

2         Q    Okay.  What cars were present from the

3    association?

4         A    There was The Hammocks logo car, and there

5    were two safety vehicles.

6         Q    And what car was Ms. Gallego driving?

7         A    She was driving The Hammocks vehicle with

8    the logo.

9         Q    It had the logo of The Hammocks on the

10   side of the vehicle?

11        A    Yes, it does.

12             THE COURT:  I've got to remind you,

13   Ms. Alonso, let Mr. Frank finish the question,

14   because the recording can't pick up two voices at

15   once.

16             THE WITNESS:  Okay.  I'm sorry.

17             THE COURT:  So I think the question was,

18   was The Hammocks logo on the car, and the answer was

19   yes; is that correct?

20             THE WITNESS:  Yes.

21             THE COURT:  All right.  Please proceed

22   with your next question.

23   BY MR. FRANK:

24        Q    How many other security vehicles were

25   there?

1      A    There was two.

2      Q    Is it usual to have three different

3  Hammocks Association vehicles driving around The

4  Heron, of which you are the president?

5      A    No.  I've never seen it.

6      Q    You've never seen that before?

7      A    No.

8      Q    Do they have any jurisdiction, meaning The

9  Hammocks Association, on The Heron property, which

10 is a separate association?

11          MR. PARLADE:  Objection, Your Honor.

12          THE COURT:  You have to say it into a

13 microphone.

14          MR. PARLADE:  I object, Your Honor.  Calls

15 for opinion testimony from the witness.

16          THE COURT:  Repeat the question,

17 Mr. Frank.

18 BY MR. FRANK:

19     Q    Is it usual for The Hammocks --

20          THE COURT:  Oh, is it usual.  I'll sustain

21 the objection.

22          MR. FRANK:  She's the president of the

23 association.

24          THE COURT:  I hear you.  You didn't lay a

25 proper foundation --

```
 1              MR. FRANK:  Okay.
 2              THE COURT:  -- to get it out of opinion
 3   testimony.
 4   BY MR. FRANK:
 5        Q    You are the president of the association,
 6   right?
 7        A    Yes.
 8        Q    You are familiar with the rules and
 9   regulations of The Heron Association?
10        A    Yes.
11        Q    Now, being as stated that way, are you
12   aware of these vehicles being all there at the same
13   time?  Has that ever happened before?
14        A    No.
15              MR. FRANK:  I have no further questions at
16   this time, Judge.
17              THE COURT:  All right.  Are you done with
18   your direct?
19              MR. FRANK:  I'm done with my direct.
20              THE COURT:  Okay.  Mr. Parlade, you may
21   cross-examine.
22              MR. FRANK:  Oh, I'm sorry, Your Honor.  I
23   do have one other question.  Excuse me.
24              THE COURT:  Not yet.  It was just a
25   teaser.
```

Page 32

1    BY MR. FRANK:

2         Q    You have a video screen right in front of

3    you here?

4         A    Yes.

5         Q    This is Exhibit 13.  Are you familiar with

6    this letter that was put out or sent by The Hammocks

7    Association?

8              You can scroll down if you want.  You can

9    use your finger.

10        A    Yes.

11        Q    And this was received by -- I take it not

12   by you, but by your tenant?

13        A    Yes.

14             MR. FRANK:  I have no further questions.

15   I'm done with direct.  Thank you, Judge.

16             And that is already admitted, as well.

17             THE COURT:  The document, Exhibit 11, is

18   in evidence.  You had already agreed to its

19   admission.

20             So cross-examination, Mr. Parlade?

21                  CROSS-EXAMINATION

22   BY MR. PARLADE:

23        Q    Good afternoon.  Just a few questions.

24             On May 15, 2019, when you arrived at the

25   scene you saw the vehicle driven by Josue and

Page 33

```
 1    Leticia Cepero, and you also saw an association
 2    vehicle given by Marglli Gallego, correct?
 3         A    Yes.
 4         Q    Other than them two, when you arrived,
 5    were the security vehicles already there, as well,
 6    or they arrived later?  They were there before you?
 7         A    Yes.
 8              THE COURT:  Mr. Frank, you need to sit
 9    down.  You're confusing, Ms. Alonso.
10              MR. FRANK:  Sorry.
11              THE COURT:  I'm sorry.  Go ahead.
12              You said the security vehicles were still
13    there -- I mean, they were there already.  Is that
14    what your testimony was?
15              THE WITNESS:  Yes.
16    BY MR. PARLADE:
17         Q    Where were they parked in relation to the
18    debtors' vehicle, the Ceperos' vehicle?  Were they
19    next to it, were they behind it, were they somewhere
20    aside?  Where were they?
21         A    One was parked behind The Hammocks logo
22    car, the white car, right behind it, and the other
23    one was on the other side.
24         Q    The Hammocks logo car, is that the one
25    that was driven by Ms. Gallego?
```

1      A     Yes.

2      Q     Was Ms. Gallego's car in front of or

3  behind the Ceperos' vehicle?

4      A     In front.

5      Q     So the other security vehicle was also in

6  front of the Ceperos' vehicle, correct?

7      A     One was behind The Hammocks logo car, and

8  one was on the other side behind over there -- their

9  car is right here and the other one is on that side.

10     Q     Okay.  What was immediately behind the

11  Ceperos' vehicle?  Was there anybody parked behind

12  the vehicle, the Ceperos' vehicle?

13     A     There's like an open area, and then

14  there's the other car, the other Hammocks car.

15     Q     Behind the vehicle, so to the rear?

16     A     There's like a distance right there.

17     Q     Okay.  So there's a distance between the

18  Cepero vehicle and the security vehicle, correct?

19     A     Yes.

20     Q     Now, you had mentioned in reference to

21  this letter, which has already been admitted as

22  Exhibit 11 -- that is Exhibit 11?

23          THE COURT:  It was 13.

24  BY MR. PARLADE:

25     Q     This includes a letter, which is Page 3,

1    that is also from The Hammocks board of directors.

2            Have you had a chance to look at that

3    letter?

4        A    Which one?

5        Q    This is Exhibit 13, the exhibit just

6    admitted by the debtors.  This is a letter from

7    Hammocks Association -- it says Hammocks board of

8    directors.  This would be Page 3 of the exhibit.  It

9    starts off saying, "Dear resident."

10       A    What was your question?

11       Q    Have you ever seen that portion of the

12   letter before?  Have you seen that page of the

13   exhibit before?

14       A    No.

15       Q    You've never seen that before?

16       A    But again, I never pay attention to all

17   the papers.

18       Q    Okay.  So as we sit here, you can't say

19   yes or no whether The Hammocks board of directors

20   sent this out to residents; is that correct?

21       A    Well, we get a lot of letters in The

22   Heron, and they say it's coming from The Heron, but

23   I don't see anybody physically taking it anywhere,

24   because I don't live there.  My tenants live there.

25   And from time to time they let me know about what

1    letters were put on there or whatever.

2         Q    Okay.  At the time of the incident on

3    May 15, 2019, you mentioned that you heard

4    Ms. Gallego taking video and pictures and saying

5    some stuff.

6              Did she ever say anything to you directly?

7         A    Yes, she did.

8         Q    Okay.  When she was talking to you

9    directly, were you outside your vehicle or inside

10   the vehicle?

11        A    Never left my vehicle.

12        Q    When she was around the debtors' vehicle,

13   were the debtors inside their vehicle or outside

14   their vehicle?

15        A    Whose vehicle?

16        Q    The Ceperos, Josue and Leticia Cepero.

17             When Josue and Leticia Cepero were there

18   on May 15, 2019, did they ever get out of their

19   vehicle while Ms. Gallego was there?

20        A    No.

21        Q    They always stayed in their vehicle?

22        A    Yes.

23        Q    Did Ms. Gallego ever try to open the

24   vehicle, or ever try to physically contact the

25   Ceperos?

1       A     No.   She never tried opening the vehicle,

2   but she was right on their window.   And they also

3   were showing a piece of paper on their window.

4               MR. PARLADE:   Your Honor, I'm just

5   renewing my objection to this exhibit.   The witness

6   said that part of the exhibit has never been seen by

7   her, so I object to the foundation as to, she says

8   she's never seen it before.

9               THE COURT:   Okay, well -- okay.   So you're

10  rescinding your non-objection to the admission?

11  Because you had agreed to the admission before.

12              MR. PARLADE:   I had agreed, but I said

13  pending the proper foundation being laid.

14  Foundation has not been laid.

15              THE COURT:   Okay.   I did not hear that.

16  I'm going to reopen direct, so that Mr. Frank can

17  try to lay a foundation with respect to Exhibit 11.

18  I'm going to unadmit it, but I need you then to look

19  back, because my question was -- because the one

20  that you did say that there was an issue regarding

21  foundation, I did not admit it.

22              So I'm not going to -- I'm going to not

23  admit now Exhibit 13, but let me back up.

24              Mr. Parlade, do you have any other

25  cross-examination for this witness?   Of course, with

Page 38

```
 1   respect to giving Mr. Frank the opportunity to try
 2   to lay a greater foundation with respect to Exhibit
 3   11, we'll go back, and then I'll allow you to
 4   cross-examine.
 5                   DIRECT EXAMINATION (continued)
 6   BY MR. FRANK:
 7        Q    Ms. Alonso --
 8        A    Yes.
 9        Q    -- from your understanding of this
10   package, this was delivered to your tenants?
11        A    Yes.
12             MR. FRANK:  I don't know how much clearer
13   that can be, Judge.  This is a composite exhibit.
14   This is what was stuck on the doors of all
15   residents.
16             I don't know how they can deny that this
17   was sent out.  It's signed by The Hammocks board of
18   directors.
19             THE COURT:  Okay.  All right.  You have to
20   stand when you address the court, Mr. Parlade.  You
21   have to speak into the microphone.
22             I will give you the opportunity to go
23   through -- to try to relay your foundation.  I know
24   you asked if the witness saw the first page.  You
25   didn't show her the balance of the exhibit.  So now
```

1  why don't you let the witness look at the rest of

2  the exhibit, and then you may ask the foundational

3  questions.

4           MR. FRANK:  Then can I go back to the

5  other question I had on cross?  He crossed --

6           THE COURT:  I understand.  I reopened

7  direct.  You need to lay the foundation for this

8  exhibit.

9           MR. FRANK:  Okay.

10           THE COURT:  Then I'm going to -- just

11  stay.  Then you can seek admission of the exhibit.

12           Now, my notes say you only objected to

13  Exhibit 15 on foundation, but I'm going to give you

14  this break, because it was just for purposes of

15  trying to speed things along.  And since the police

16  officer was not the witness through whom Mr. Frank

17  was going to try to get this exhibit, I'm going to

18  allow you this one time.

19           Mr. Frank, now Mr. Parlade has objected.

20  He wants you to lay a foundation.

21           MR. FRANK:  For this one or another one

22  also?

23           THE COURT:  For Exhibit 13.  That's this

24  letter, which you need to allow the witness to look

25  at the entire exhibit, and then you may ask your

1    foundational questions.

2    BY MR. FRANK:

3         Q    If you want to go to the beginning, you

4    can use your finger to stroll up to the beginning,

5    where it has that Hammocks logo on top.

6              THE COURT:  Just go through the entire

7    exhibit.

8    BY MR. FRANK:

9         Q    Just scroll.

10        A    If I go this way I don't see it moving.

11             THE COURT:  At some point you get to the

12   top.  Then go the other way.  That's the top.  Now

13   go the other way.  Believe it or not, you have to

14   scroll the other way to make it move.  It's very

15   confusing.

16             It's not moving now?

17             THE WITNESS:  No.

18             THE COURT:  All right.  Mr. Frank, scroll

19   for the witness, slowly.

20   BY MR. FRANK:

21        Q    I'm going to start scrolling.  This is

22   Page 1, where it starts with, "Dear Pelican Point

23   Residents."  Next page is the same Hammocks logo in

24   Spanish.

25        A    Uh-huh.

1      Q    You have to answer yes or no.

2      A    Yes.

3      Q    The next page is a letter, starting with

4   "Dear Residents."  If I scroll down, you see that

5   it's signed by Hammocks board of directors.

6      A    It says Hammocks board of directors.

7           MR. PARLADE:  Your Honor --

8           THE COURT:  What is the objection?

9           MR. PARLADE:  I object to the exhibit.

10  It's not a signed letter.

11          THE COURT:  This is just foundational

12  questions.  Go ahead.

13  BY MR. FRANK:

14     Q    Going to the next page now, which again, I

15  don't speak Spanish, but it looks like it's the same

16  letter in Spanish.  Yes or no?

17     A    Yes.

18     Q    And then the next page looks like a card

19  from the property manager.

20     A    Yes.

21     Q    Then the next page is the information

22  about the tree trimming?

23     A    Yes.

24     Q    And then attached to this, the next one is

25  a domestic violence lawsuit.

1           Do you see that?

2      A    Yes.

3      Q    And attached to that is the criminal

4  justice online system.  The next page looks like

5  it's an officer's info card.

6      A    Yes.

7      Q    That's the end of that exhibit.

8           Now, it's my understanding and you've

9  testified that this package was left at your

10 tenants' doors?

11     A    Yes.

12          MR. FRANK:  No further questions on

13 foundation, Judge.  I move to admit it in.  She's

14 identified it.

15          MR. PARLADE:  Objection, Your Honor.  It's

16 hearsay, without it being an exception.  Foundation

17 has not been laid.

18          THE COURT:  Well, it's not hearsay unless

19 it's coming in for the truth of what's -- it's just

20 a question of whether it's the letter.

21          How is your foundation?

22          MR. FRANK:  The witness has testified that

23 this package was left on her tenants' door.  Which

24 means that it was left there.

25          THE COURT:  Okay.  I'm going to allow

Page 43

1    Mr. Parlade to voir dire the witness with respect to

2    this exhibit, which is where we were before we get

3    to redirect.

4            So Mr. Parlade, go ahead and voir dire the

5    witness with respect to this exhibit, and then I'll

6    make a determination regarding admission.

7                    VOIR DIRE/CROSS-EXAMINATION

8    BY MR. PARLADE:

9        Q    Just a few minutes ago I asked you some

10   questions --

11           THE COURT:  In the microphone.

12   BY MR. PARLADE:

13       Q    Just a few minutes ago I asked you some

14   questions, and I had asked you if you had seen

15   Page 3 of the exhibit, which was a letter allegedly

16   from The Hammocks board of directors, and you said

17   you'd never seen it before.  It's possible that it

18   might have been sent, but you've never seen it

19   before.

20       A    What happens is, sometimes they send

21   packages and stuff, so, you know -- not just one

22   thing, because every month The Heron gets flyers and

23   all kinds of different documents from The Hammocks.

24   And I glance at them.  I may look at something in

25   the front, whatever, but I don't look at everything

Page 44

1    and read everything.

2        Q    So this looks like a package that might

3    have been sent to residents, correct?

4        A    The front page I do remember.

5        Q    The front page?

6        A    Yes.  And I do remember also some of the

7    pages that he showed me, like towards the end.  But

8    I usually glance at it, look at it, and just go

9    through it or whatever, and that's it.

10        Q    Okay, but you can say with certainty that

11    the first page at least was on one of those packets,

12    correct, the one --

13        A    Yes.  And I do remember other pages.

14            THE COURT:  You have to let him finish and

15    then you can answer.

16            Finish the question, Mr. Parlade, and then

17    I'm going to let Ms. Alonso answer.

18    BY MR. PARLADE:

19        Q    You can state with certainty that the

20    first page, the one that mentions tree trimming, was

21    part of the package sent to tenants and received by

22    your tenants, correct?

23        A    Yes.

24        Q    Okay.  You mentioned you remembered some

25    other pages that might have been sent in that

Page 45

1   package.

2          Which pages of the exhibit do you

3   remember?

4      A    I also remember the page that said to fill

5   out information if you wanted some tree or something

6   to -- because I looked at -- I remember that page,

7   because I just glanced through them and that's it.

8      Q    So the tree trimming, the one that says

9   "Tree Trimming," and it's a blank form, and you

10  remember the first page?

11     A    Yes.  I also remember that card

12  (unintelligible).

13     Q    I'm sorry, what?

14     A    That business card that's there I also

15  remember.

16     Q    But as we stand here today, you don't

17  recall that the letter attached in this exhibit, and

18  it says, "Dear Residents, This letter is to inform

19  that we have been trimming trees since July and

20  August 17th."

21          As you sit here today, you don't remember

22  having seen that letter in one of the packages to

23  your tenants; is that correct?

24     A    Remember, in that package, it was a thick

25  package.  I glanced and I went through whatever.

Page 46

1    Because it has nothing to do with us.

2         Q    But you stated that the tenants usually

3    get multiple packages from the association, right?

4         A    Yes.

5         Q    So usually multiple letters, it's not just

6    one packet, it's usually multiple packets, right?

7         A    Yes.

8         Q    This looks like one of those pockets?

9         A    Yes.

10        Q    A couple of the pages here look familiar?

11        A    Yes.

12        Q    But you don't remember Page 3 being sent?

13        A    No.  I don't know what page was what

14   either.

15             MR. PARLADE:  Okay.  I renew my objection,

16   Your Honor, as to this part of the exhibit.  The

17   witness has stated she has no recollection of her

18   residents receiving that.  She says the package

19   looks like something that might have been received.

20             And she has identified Page 1 and the

21   final page of the exhibit, but as to the included

22   letter, I object to the foundation of this witness.

23             THE COURT:  Okay.  Thank you.

24             All right, I'm not going to admit Exhibit

25   13.  If you can get it in through another witness,

1    that's fine, Mr. Frank, but as to this particular

2    exhibit, the foundation has not been laid.

3            You're done with your cross-examination

4    then, yes, Mr. Parlade?

5            MR. PARLADE:  Two more questions and

6    that's it.

7            THE COURT:  All right.  Go ahead.  And

8    then, Mr. Frank, you can do your redirect.  Go

9    ahead.

10   BY MR. PARLADE:

11       Q    When you arrived on May 15, 2019, and you

12   saw Ceperos and Gallego in their vehicles, you had a

13   basket of eggs next to you, correct?

14       A    I had eggs in my car.

15       Q    This is perhaps the only time I'll ask a

16   witness this.

17            Why did you have eggs in your car?

18       A    Because, like I stated about, I was going

19   to go see my tenants, and they have a sick little

20   girl.  First I went to Gail's house, dropped off

21   some eggs, and then I was going to go see my tenants

22   and drop some eggs for her.

23       Q    But you never got to see the tenants until

24   when the incident occurred?

25       A    Until after, yes.  I had already given

Page 48

1    Gail the first eggs in a separate little holder.

2         Q    Now, your tenants, in what building do

3    they live, relative to Ms. Gallego's apartment or

4    townhouse?

5         A    I have several apartments there.

6         Q    Okay.  Do you have any in the same

7    building as Ms. Gallego?

8         A    No, I don't.

9         Q    So you would have been in a different

10   building?

11        A    I was at Building 8 after arriving.

12        Q    This incident, the one on May 15th,

13   happened at what building?

14        A    It was between Buildings 1 and 2.

15        Q    Buildings 1 and 2.  Okay.

16             So it wasn't close to Building 8, you had

17   to drive there?

18        A    Yes.

19        Q    Now, you had just met Gail Sharp, you had

20   just testified, correct?

21        A    Yes.

22        Q    And then you were going to meet your

23   tenants, is that correct, after leaving Gail Sharp's

24   residence?

25        A    Depending on when I knew when the Ceperos

1    would be arriving or not.

2         Q     What do you mean?

3         A     I was to meet them there.

4         Q     Where?

5         A     At The Heron.

6         Q     Where at The Heron?

7         A     Wherever I was.  I couldn't tell them

8    where I was going to be.  I asked them to give me a

9    call.

10        Q     Okay.  But at the time you were at

11   Building 8, correct?

12        A     Yes, I was.

13        Q     And the other building from your tenant

14   would have been what building?

15        A     I have Buildings 3, 23 and 6.

16        Q     But the one you were going to right after

17   you saw Gail Sharp, where was that building?

18        A     Whichever tenant got there before one or

19   the other.

20        Q     Buildings 1 and 2, you had no --

21        A     No tenants at all.

22        Q     Which is where the incident occurred,

23   correct?

24        A     One and two.

25              MR. PARLADE:  Okay.  I have nothing

Page 50

```
 1    further, Your Honor.
 2             THE COURT:  Okay.  Redirect, Mr. Frank?
 3                  REDIRECT EXAMINATION
 4    BY MR. FRANK:
 5        Q    Ms. Alonso, you testified that when you
 6    got there it was because you received a phone call
 7    from the Ceperos, correct?
 8        A    When I got there?
 9        Q    Buildings 1 and 2, where this incident
10    happened, you were there because you got a call from
11    the Ceperos?
12        A    Yes.
13        Q    And that's when you drove over there?
14        A    Yes.
15        Q    Now, also you testified for counsel that
16    the Ceperos were blocked by The Hammocks car driven
17    by Ms. Gallego, correct?
18        A    Yes.
19        Q    Now, they had tried to get away from the
20    Gallegos, right?  They were trying to get away,
21    correct?
22             MR. PARLADE:  Objection.  Counsel is --
23             THE COURT:  You need to --
24             MR. PARLADE:  It mischaracterizes the
25    testimony.  That's not what was said.
```

1           THE COURT:  I'm going to sustain the

2  objection.

3  BY MR. FRANK:

4       Q    Okay.  After you saw the car blocked in,

5  did the Ceperos try to go around them to get away?

6       A    When I got there there was totally

7  blocked, and cars -- Marglli was out of the car.

8  She was where the Ceperos were.  The car was in the

9  way.  They couldn't get out.

10      Q    But I want you to picture this parking

11  lot.

12      A    Yeah.

13      Q    They are parked head first?

14      A    Yes.

15      Q    And Ms. Gallego's car is behind them?

16      A    Yes.

17      Q    And there are empty spaces on both sides,

18  other parking spaces there?

19      A    Yes.

20      Q    Did they try to get away through those

21  empty parking spaces?

22      A    No.

23           MR. FRANK:  That's all I have, Judge.

24           THE COURT:  All right.  Thank you.

25           Thank you, Ms. Alonso.  You may step down.

Page 52

```
 1              Are you going to be calling Ms. Alonso in
 2    your case, Mr. Parlade?
 3              MR. PARLADE:  No, Your Honor.
 4              THE COURT:  Okay.  So, Ms. Alonso, if you
 5    would like you may stay in the courtroom.  It's up
 6    to you.
 7              Mr. Frank, your next witness, please.
 8              MR. FRANK:  Mr. Cepero.
 9              THE COURT:  Do we have the chair there for
10    the translator?
11              So we're going to swear the translator in
12    first and then the witness.
13    Thereupon:
14                      MAYRA RIVERO
15    an interpreter, having been first duly sworn,
16    translated from English to Spanish and from Spanish
17    to English to the best of her ability.
18    Thereupon:
19                      JOSUE CEPERO
20    was called as a witness, and having been first duly
21    sworn, was examined and testified as follows:
22              THE COURT:  I need the translator next to
23    the microphone, not the debtor.
24              Now, it's very important that we follow
25    the rules here.  So, Mr. Frank, you need to -- and
```

Page 53

1   Mr. Parlade, when it's your turn, same rules.  No

2   long questions, because the translator needs to be

3   able to translate.  Then all the other same rules

4   apply.

5              Mr. Cepero, when you are testifying, you

6   need to speak and stop once in a while, so that the

7   translator can translate.  Okay?  Otherwise,

8   Ms. Rivero's head might explode.

9              So with that -- and, Mr. Cepero I assume,

10  Ms. Rivero, that you already explained to the

11  witness about the standing and not interrupting, et

12  cetera.

13             THE INTERPRETER:  Yes.

14             MR. FRANK:  Do you think he can get closer

15  to the mic?  I don't know if you're picking up on

16  both of those.

17             THE COURT:  So the translator is going to

18  take the microphone closer to her.  All right.  Now

19  we'll proceed.

20                    DIRECT EXAMINATION

21  BY MR. FRANK:

22      Q    Please state your name.

23      A    Josue Cepero.

24      Q    And your address?

25      A    9541 Southwest 148th Place.

Page 54

1        Q    I'm going to be asking you questions about
2    the incident that occurred in the parking lot of The
3    Heron on May 15, 2019.
4              Are you familiar with that incident?
5        A    Yes, sir.
6        Q    And you were present in that parking lot
7    with your wife?
8        A    Yes, sir.
9        Q    Why did you go to The Heron building?
10       A    We went to see Maria Alonso, the
11   president.
12       Q    And what is your relationship to
13   Ms. Alonso?
14       A    We know her from meetings from the
15   association.
16       Q    And you were going there to meet with her
17   to do what?
18       A    To congratulate her, because she's
19   reelected president of the council of owners.
20       Q    Prior to your arriving at the parking lot
21   where were you?
22       A    Wells Fargo Bank.
23       Q    And that bank is located where?
24       A    88th Street Southwest, and 137th Avenue.
25       Q    I'm going to point you to the screen

1    that's in front of you there.

2              THE COURT:  Identify the exhibit number.

3              MR. FRANK:  Yes.  This is -- I believe

4    it's -- this is marked as Exhibit 14.

5              THE COURT:  According to my notes, Exhibit

6    14 has been admitted.

7              MR. FRANK:  That is correct, Judge.  Thank

8    you.

9    BY MR. FRANK:

10        Q    I want you to look at this exhibit, and

11   why did you go to Wells Fargo Bank?

12        A    To buy a money order for the bankruptcy.

13        Q    And if you look at the Wells Fargo

14   transaction receipt, it shows a time stamp, doesn't

15   it?

16        A    Yes.

17        Q    What was that time?

18        A    4:17 in the afternoon.

19        Q    Now, what is your estimate of the time it

20   takes to drive from Wells Fargo Bank to The Heron?

21             MR. PARLADE:  Objection, Your Honor.

22             THE COURT:  What is your objection?

23             MR. PARLADE:  The question asks for an

24   opinion, and asks for speculation on behalf of the

25   witness.

1               THE COURT:  I sustain the objection on the

2    basis of speculation.  You said -- because your

3    question was, "How long do you think it takes?"  So

4    that objection is sustained.  If you have a

5    different question maybe we'll have a different

6    response.

7    BY MR. FRANK:

8         Q    How long did it take you to drive from the

9    bank to The Heron?

10        A    Six minutes.

11        Q    You are aware that there's been an

12   allegation that you drove to Ms. Gallego's son's

13   school, and followed Ms. Gallego to Heron?

14        A    Yes.

15        Q    Did you follow Ms. Gallego?

16        A    No.

17        Q    Now, let's get back to the incident

18   itself.

19             When you drove into The Heron, what did

20   you do?

21        A    I entered a guest parking.

22        Q    And you pulled into the parking space?

23        A    Yes, sir.

24        Q    And then what happened?

25        A    A minute hadn't even gone by.  There was a

Page 57

1   car with the logo of The Hammocks parked behind me

2   in the street.  She lowered the window.

3        Q    Hold on.  You said "she."

4             Who is she?

5        A    Marglli Gallego.

6        Q    Okay.  Go ahead.

7        A    When she lowered the right window I saw

8   that it was Marglli Gallego taking pictures of us

9   with the cellphone.  I told my wife, and I took the

10  decision to leave the place.

11       Q    So you tried to leave, and how did you

12  attempt to leave?

13       A    I put the car in reverse.  In a space that

14  was there on my left side I could get the car out,

15  and en route to find a place of exit so I can leave

16  from the place.

17       Q    So you backed up, went forward, backed up,

18  and then got out from the side where the parking

19  space was empty?

20       A    Yes, sir.

21       Q    Then where did you go?

22       A    Yes, sir.

23       Q    Then where did you go?

24       A    I told you, trying to find an exit to

25  leave the place.

Page 58

1        Q     So were you able to find an exit?

2        A     No, sir.

3        Q     Did Ms. Gallego or someone else block your

4   exit from the Blue Heron?

5        A     When we were trying to leave she

6   brought -- she tried again to block.

7        Q     Did she move her car to block you at

8   another location?

9        A     Yes, sir.

10       Q     And then what happened?  Did you call the

11  police?

12       A     Immediately.  4:30 p.m.

13       Q     So you called the police officer or 911,

14  whichever way you did it --

15       A     911.

16       Q     At 4:30?

17       A     Yes, sir.

18       Q     And how long did it take for the officers

19  to arrive?

20       A     Five, six minutes.

21       Q     So you drove directly from the bank to the

22  Blue Heron?

23       A     Yes, sir.

24       Q     Do you know where this school is that you

25  supposedly or allegedly followed Ms. Gallego?

Page 59

1       A      At that moment, no.

2       Q      Do you even know that she had a child?

3       A      Yes.

4       Q      And again, I'm going to ask you,

5    4:17 p.m., to the Blue Heron at 4:35.  That's 18

6    minutes.

7              So again, did you follow Ms. Gallego from

8    her son's school?

9              MR. PARLADE:  Objection.  Asked and

10   answered.

11             THE COURT:  Sustained.  You don't have to

12   answer that question.

13   BY MR. FRANK:

14      Q      Now, once the police officers arrived,

15   what happened?

16      A      Two officers arrived.  One stayed speaking

17   with her and the other came to speak with us.

18      Q      Okay.  And how long were you there

19   speaking with the police officers?

20      A      Speaking with the police, about 15, 20

21   minutes.

22      Q      How long did it take you to finally be

23   able to leave the Blue Heron?

24      A      Two hours only.

25      Q      Two hours only?

```
 1        A    Yes.

 2        Q    After the police officers left, did you

 3   leave right away?

 4        A    We left and the officers stayed there.

 5             MR. FRANK:  No further questions, Judge.

 6             THE COURT:  All right.  Any

 7   cross-examination, Mr. Parlade?

 8                   CROSS-EXAMINATION

 9   BY MR. PARLADE:

10        Q    Good afternoon, Mr. Cepero.

11        A    Good afternoon.

12        Q    I just have a few questions for you.

13   Prior to the time 4:17 p.m. --

14             THE COURT:  I know it's hard, but you've

15   got to speak into the microphone.

16             MR. PARLADE:  Sorry.

17   BY MR. PARLADE:

18        Q    Prior to 4:17 p.m., the time mentioned on

19   the exhibit of the Wells Fargo Bank that has been

20   introduced into evidence, where were you?

21        A    In the bank.

22        Q    Before you went to the bank, where were

23   you?

24        A    In my house.

25        Q    What time did you leave your house?
```

Page 61

1        A      Before 4:00.

2        Q      How much before 4:00; 3:30, 3:45?

3        A      I cannot tell you exactly.

4        Q      Was it after 3:00?

5        A      Yes, sir.

6        Q      You had left your house after 3:00,

7   correct?

8        A      After 3:30.

9        Q      And how far from your house to Wells Fargo

10   Bank?

11        A      About two and a half miles.

12        Q      What's the duration of that, in terms of

13   time?

14        A      About ten minutes.

15        Q      Prior to you leaving your house at around

16   3:30, had you gone anywhere within the span of two

17   hours?

18        A      No, sir.

19        Q      You were home all day?

20        A      Yes, sir.

21        Q      You were home all day, and at 3:30 you

22   leave for the bank -- around 3:30, correct?

23        A      More than 3:30, more or less.

24        Q      Now, you had also stated that after the

25   bank you were going to meet Ms. Alonso; is that

Page 62

1    correct?

2         A    Yes, sir.

3         Q    Had you called her and told her, "We're

4    going to meet you"?

5         A    My wife had called her.

6         Q    Okay.  And where were you meeting her?

7         A    Heron.

8         Q    Where in Heron?

9         A    When we were there in Heron we would call

10   her.

11        Q    Now, Ms. Alonso testified today that she

12   was in Building 8 when she was called by you on

13   May 15, 2019.  She also testified she had no units

14   near Buildings 1 or 2, which is around where this

15   incident occurred, correct?

16        A    We parked in front of Building 15.

17        Q    You parked in front of Building 15?

18        A    Sixteen.  I did a drawing where everything

19   is there.

20        Q    You did a drawing that's been introduced

21   into evidence?

22        A    Uh-huh.

23        Q    So you were in Building 15?  Is that by

24   Building 15?

25             THE COURT:  Sixteen.

Page 63

1    BY MR. PARLADE:

2         Q    Sixteen.  I apologize.

3         A    Sixteen.

4         Q    Does Ms. Alonso have a unit in Building

5    16?

6         A    I don't know.

7         Q    It was just a building chosen by you to

8    wait, correct?

9         A    I picked that one to wait, because there

10   was a guest parking available.

11        Q    And that just happens to be next to where

12   Marglli Gallego lives, correct?

13        A    I didn't know where Ms. Gallego lived.

14        Q    You know she has a son?

15        A    Yes.

16        Q    But you don't know where she lives?  Is

17   that what you're telling me?

18        A    I'm not familiar how Heron is distributed.

19        Q    I don't understand.  Tell me what you mean

20   by that.

21        A    How many buildings does Heron have?

22        Q    That wasn't the question I asked.

23             I had asked you, you testified that you

24   know Ms. Gallego has a son, correct?

25        A    Yes.

Page 64

1        Q    You know she's the president of the

2   association, correct?

3        A    The Council of the Hammocks Community

4   Association.  It's totally different, totally

5   different of Heron.

6        Q    By "counsel," do you mean officer?  I

7   don't know what you mean by "counsel."

8        A    No.  She's the president of all the

9   Hammocks associations.

10       Q    But you've had dealings with her for

11  years?

12       A    Since 2016.

13       Q    So before the bankruptcy, correct?

14       A    Yes, sir.

15       Q    But your testimony today is that you don't

16  know where she lives?

17       A    I did not know where she lives.

18       Q    So it was just a coincidence that you

19  ended up near where she lives?

20       A    I didn't take the chance to measure the

21  distance of where she lives.

22       Q    I'm going to show you what's marked --

23            THE COURT:  Counsel, can both of you come

24  up here for just a minute?

25            (Discussion off the record.)

1          THE COURT:  Okay.  Continue with your

2    questioning, Mr. Parlade.

3          MR. PARLADE:  Thank you, Your Honor.

4          I'm going to need a little help opening

5    the video file.

6          THE COURT:  You will all be happy to know

7    that they're already doing it in Fort Lauderdale and

8    Palm Beach.  They'll be doing it in Miami.

9    Technology exhibition on how to use technology in

10   the courtroom, and they'll be giving one CLE credit

11   for TET, which you all need for the Florida Bar.

12         Is he doing it right?  Do you want to go

13   help him?

14         I'm just happy everybody is using the

15   technology now.  This is like how many lawyers does

16   it take to play a video.

17         Which exhibit are you showing?

18         MR. PARLADE:  Exhibit M, Your Honor.

19         THE COURT:  Is this the same as your

20   exhibit?  Which video is this?  Do you have that

21   exhibit also?  I have one -- your Exhibit Number 7

22   says "Josue."

23         Is there an objection to the admission of

24   the video?  I'm just asking both of you.  I'm trying

25   to speed things along.

```
 1              MR. PARLADE:  We had no objection in the
 2   beginning.
 3              MR. FRANK:  I wasn't going to move it in,
 4   but I'd like to see it before it goes through.
 5              MR. PARLADE:  It's your exhibit.
 6              MR. FRANK:  It's your exhibit.  I'm not
 7   moving it in.
 8              MR. PARLADE:  You haven't seen it?
 9              MR. FRANK:  I haven't reviewed all the
10   exhibits since I wasn't moving it in.  I don't
11   remember specifically which one it is.
12              THE COURT:  All right.  Show the video for
13   identification purposes only.
14              (Thereupon, the said video was marked
15         as Hammocks Exhibit M for identification.)
16              THE COURT:  I'm assuming that -- what is
17   your concern regarding the video, Mr. Frank?
18              MR. FRANK:  I don't know, since I don't
19   know which video this is.  I've gone through a whole
20   bunch of different videos.
21              THE COURT:  Okay.  So I'm going to --
22   because I'm a bench trial, I'm going to allow you to
23   show the video.  If you have a concern, raise it.
24   Let's just move to that.  That's the benefit of
25   having a bench trial.
```

1              MR. PARLADE:  In the presence of the

2    witness?

3              THE COURT:  Yes.

4              MR. PARLADE:  Okay.

5              THE COURT:  It's his video, correct?

6              MR. PARLADE:  Yeah.

7              THE COURT:  Okay.  All right.  Don't you

8    have to ask the witness to identify it?

9              MR. PARLADE:  We'll have to play it so he

10   can identify it.

11             THE COURT:  Exactly.  But if the witness

12   isn't here, that would be awkward, wouldn't it?

13             MR. PARLADE:  I'm not talking about

14   dealing with objections.

15             THE COURT:  Go ahead.  So we're looking at

16   what's been marked for identification as Community

17   Association Exhibit M, like Mickey, correct?  Okay.

18             (Thereupon, the video was played.)

19             THE COURT:  Is there a certified

20   translation of this transcript?

21             There's no picture.

22             MR. PARLADE:  I apologize, Your Honor.  I

23   don't know why the video is not working.

24             THE COURT:  Is there a transcript -- the

25   thing is, if you're seeking to get in the transcript

Page 68

1   of the video, there needs to be a certified

2   translation.  If you're seeking to admit the

3   picture, then we actually need to get the picture.

4           Do you want to try it again?

5           MR. PARLADE:  I do.  I need the picture.

6           THE COURT:  I'm going to take a

7   five-minute break while you try to figure out how to

8   fix it.

9           (Thereupon, a recess was taken, after

10  which the following proceedings were had:)

11          THE COURT:  Thank you.  Please be seated.

12  Mr. Cepero, you may sit down.

13          Mr. Parlade, where are we?

14          MR. PARLADE:  Your Honor.

15  BY MR. PARLADE:

16      Q    Mr. Cepero, you have previously testified

17  you had no clue --

18          THE COURT:  Microphone.

19  BY MR. PARLADE:

20      Q    -- you had no clue where Marglli Gallego

21  lived; is that correct?

22      A    No.

23      Q    No, you didn't testify to that, or no, you

24  don't know where she lives?

25      A    I don't know where she lives.

Page 69

1        Q    You've never been to her house?

2        A    No.

3        Q    In 2016, when they gave you a check for

4   what you had done for the association, you didn't go

5   to her house to pick it up?

6        A    No.

7        Q    So in 2016, when her son had a knee

8   injury, and you had a family member who was a doctor

9   at Miami Children's that was treating her son, you

10  didn't visit her in her home, correct?

11       A    No.  She visited mine.

12       Q    She visited your house, as well?

13       A    Yes.

14       Q    And what did she do at your house?

15       A    She came the first time to speak with us

16  in relation to her election in 2016.

17       Q    That was it, she never came over for

18  dinner?

19       A    My house?

20       Q    Yes.

21       A    Twice more.

22       Q    Did you ever invite her on a friendly

23  basis to your house?

24       A    Yes.

25       Q    So suffice to say, at some point you guys

Page 70

```
 1   were friends?

 2       A    Yes.  Not friends, acquaintances.

 3       Q    But acquaintances who you invite to your

 4   house to have dinner?

 5       A    We never invited her for dinner at our

 6   house.

 7       Q    But invited to --

 8            MR. PARLADE:  Strike that.

 9   BY MR. PARLADE:

10       Q    But as acquaintances, she came to your

11   house three times, and you're stating you never went

12   to her house, correct?

13       A    Never.

14       Q    On May 15, 2019, did either you or your

15   wife take video?

16       A    I didn't.

17       Q    So if your attorney has an exhibit that

18   was introduced to this Court as a video --

19            MR. FRANK:  (Inaudible).

20            THE COURT:  None of the videos have been

21   entered into evidence, so I'm going to ask you to

22   rephrase the question, Mr. Parlade.

23            MR. PARLADE:  Okay.

24   BY MR. PARLADE:

25       Q    So if your attorney was attempting at some
```

1    point to introduce a video from your phone, you

2    would have no knowledge of that?

3         A    From my phone?

4         Q    That's correct.

5         A    There's a little video that they were

6    trying to show.

7         Q    And what was that video?

8         A    From the time that she gets in front of me

9    on the second occasion.

10        Q    What do you mean she got in front of you

11   on a second occasion?

12        A    Because the first time she tried to block

13   us when we were in the guest parking.

14        Q    She got in front of you when you were in

15   the guest parking, or did she get behind you?

16        A    She was behind me, because I parked like

17   everyone parks, with the front to the front of the

18   parking space so that you could see the tag, it's

19   visible.

20        Q    And how far was she from your car when you

21   were in that parking space?

22        A    I don't know.  I was inside the car.

23        Q    More than three feet?

24        A    Do not put words in my mouth.

25        Q    I'm not putting any words in your mouth.

Page 72

1    I'm asking you a question.

2         A     I told you already, I don't know.

3         Q     Was it more than ten feet?

4         A     I told you, I don't know.

5         Q     More than half a block?

6               MR. FRANK:  Your Honor --

7               THE COURT:  What's your objection?

8               MR. FRANK:  Asked and answered three times

9    now.  He does not know.

10              THE COURT:  I'm going to sustain the

11   objection.

12   BY MR. PARLADE:

13        Q     But her car was far enough from you that

14   you were able to get out of the parking?

15        A     In reality, I don't know how I got out.

16        Q     So you just appeared in front of the car,

17   magically appeared there, you don't know how you got

18   there?

19              THE COURT:  Mr. Parlade --

20              MR. PARLADE:  I apologize.  I'll strike

21   the question.

22   BY MR. PARLADE:

23        Q     You had testified before that you got out

24   of the parking by going to the left and moving

25   forward and repositioning the car, correct?

Page 73

1      A    Could you present all the drawings that I
2   presented?
3      Q    I'm asking the questions, and I'm asking
4   you about what you already testified to.
5           You already testified that you were in the
6   parking at Heron Bay, in front of Building 16, and
7   Ms. Gallego was parked behind you, correct?
8      A    Yes.
9      Q    You also testified that in order to get
10  out of the parking, you had to pull to your left and
11  drive forward in order to get out of the parking; is
12  that correct?
13     A    Correct.
14     Q    What was to your left when you pulled up?
15     A    To my left?
16     Q    Yes, sir.
17     A    The other parking spaces.
18     Q    And the other parking spaces were empty?
19     A    Yes, sir.
20     Q    Did you have to back up at all in order to
21  pull forward?
22     A    Correct.
23     Q    You backed up, you pulled forward, pulled
24  to your left, and you got on the street; is that
25  correct?

Page 74

1      A    Exactly.  Heading direction west.

2      Q    So there was enough space between your car

3  and Ms. Gallego's car so you could maneuver out of

4  that parking space, correct?

5      A    I don't have an answer.

6      Q    But you maneuvered out of the parking

7  space, didn't you?

8      A    I told you already.  I told you already I

9  don't know how I could get out of that parking space

10  without hitting her.

11      Q    And you also remember the video that we

12  had talked about.  Do you recall in that video if

13  your wife told you to back out and leave?

14      A    It wasn't at that moment.

15      Q    At what moment was it?

16      A    The second occasion when she tried to

17  block us.

18      Q    Because the second location she was in

19  front of you?

20      A    Correct.

21      Q    And there was nobody behind you?

22      A    At that moment two security arrived.

23      Q    At the same moment Marglli Gallego pulled

24  in front of you?

25      A    No.  Ten minutes --

1          THE COURT:  Stop.  Mr. Cepero, you have

2     chosen to use a translator, so you must wait until

3     the translator translates, even if you think you

4     understand the question.

5          Madam Translator, are you done translating

6     the question?

7          THE INTERPRETER:  Yes, ma'am.  Thank you.

8          THE COURT:  Would you like to answer now,

9     Mr. Cepero?

10          THE WITNESS:  Can you repeat the question?

11     BY MR. PARLADE:

12     Q    Yes.  When Ms. Gallego pulled in front of

13     you on what you allege is the second time she tried

14     to block you, there was nobody behind you, correct?

15     A    No.

16     Q    And it wasn't until ten minutes later that

17     you stated that security officers came in their

18     cars, correct?

19     A    Who said ten minutes after?

20     Q    You just stated a few seconds ago as you

21     were explaining it --

22     A    I didn't say ten minutes.

23     Q    Okay.  How many minutes?

24     A    Two or three minutes.

25     Q    Did you attempt to back out and leave?

Page 76

1    A    No.

2        Q    But it was at that time your wife had told

3    you to back out and leave, correct?

4        A    I decided, and I was the one that was

5    driving.  I put my car in park.  I put the lever in

6    park and called 911, because it was the second time

7    she had done this, and I cannot continue attempting

8    to escape, an attempt of blocking me in a place

9    where there could be children, people, animals, or

10   hit a car.

11            So I decided.  I called 911 and solicited

12   that an officer come so that he could finalize the

13   situation.

14       Q    So you decided to stay?

15       A    Yes.

16       Q    Had you had any idea at this point as to

17   why Marglli Gallego was there on May 15, 2019?

18       A    No.

19       Q    Was it unusual for someone just to try and

20   block you for no reason?

21       A    No.

22       Q    It's not unusual?

23       A    That they try to block me?

24       Q    Yes.

25       A    It's not strange.

1      Q     This happens to you a lot?

2      A     Me, never.

3      Q     Did you have any information as to why she

4  would be doing it that day?

5      A     Who is her?

6      Q     Ms. Gallego.

7      A     If I have some information?  No.

8      Q     So to this day, you have no clue why she

9  did that?

10     A     No.

11     Q     At any point during this incident, did you

12  get to call 911?

13     A     Yes.

14     Q     And who called, you or your wife?

15     A     Both.

16     Q     Are you aware of a video taken on your

17  wife's phone when she tried to call 911?

18     A     This is my video also, yes, in which you

19  could not open yet.

20     Q     Well, I can play it to refresh your memory

21  if need be, but if you recall, did your wife ask you

22  to call 911 or did you ask her to call 911?

23     A     When I put the car in park I told her call

24  911.

25     Q     Was there also a point in the video where

1    your wife says, "Tomorrow I'm going to call 911,

2    because we're not following her"?

3        A    That's not correct.

4        Q    I'm going to play this video, and you tell

5    me if this is the video that your wife recorded and

6    which you've heard, and whether this is the video

7    that we're talking about right now?

8              THE COURT:  What is your objection,

9    Mr. Frank?

10             MR. FRANK:  They're saying there's a

11   video, but I still haven't seen a video, I only

12   heard audio.

13             MR. PARLADE:  I'll play the audio.  I can

14   refresh his recollection with audio or video.

15             THE COURT:  Okay.  So you're only seeking

16   to play the video to refresh his recollection?

17             MR. PARLADE:  Correct, Your Honor.

18             THE COURT:  Okay.  Mr. Frank?

19             MR. FRANK:  I don't understand Spanish.  I

20   don't know how he's going to get that in.

21             THE COURT:  It's not going to come into

22   evidence.  He's using it to refresh his

23   recollection, but I'm going to direct the translator

24   to translate it, and I will state this:

25             The business of the court is conducted in

1    English.  Any exhibits that are sought to be

2    introduced for any reason must be in English.

3    Because you are only asking to use this to refresh

4    the witness' recollection, it would be Mr. Frank's

5    decision whether he wishes to have the exhibit

6    admitted.

7              MR. PARLADE:  Correct.

8              THE COURT:  Yes, Mr. Frank?

9              THE INTERPRETER:  Can he stand over here,

10   Judge, next to me?

11             THE COURT:  The translator is going to

12   translate it for the record, so it's going to be

13   into the microphone.  You can stand next to the

14   translator if you want.

15             I want to make clear that this is not --

16   this audio is not being considered as evidence.  You

17   can only use it to refresh the witness'

18   recollection.

19             MR. PARLADE:  Agreed, Your Honor.

20             THE COURT:  Actually, let me stop you.

21   You have not laid the foundation to refresh the

22   witness' recollection.  The question is, "Do you

23   remember?"  You're trying to use this to impeach

24   him.

25             MR. PARLADE:  He says he remembers the

Page 80

1    video, and I asked him, "Did you make the call, did

2    your wife make the call?"  Then I asked him, "Do you

3    remember this statement made by you," and he said,

4    "I don't remember that statement."  I said, "If I

5    play you this audio, would it help refresh your

6    memory?"

7              THE COURT:  I don't remember you asking

8    him that question.

9              MR. PARLADE:  Yes, Your Honor.

10             THE COURT:  Okay.  I'll accept your

11   representation that you asked that question.  Go

12   ahead.  Play the audio.

13             MR. PARLADE:  Hold on.  Let me start from

14   the beginning.

15             (Thereupon, audio was played)

16             THE INTERPRETER:  I'm sorry.  I cannot

17   decipher the first two or three words that he or she

18   is saying, and then I understand that she says, "I

19   am not following her."

20             MR. PARLADE:  I can hear it clearer from

21   these speakers.  I'll play it again.

22             If you can translate or not.  If not --

23             MR. FRANK:  I'm going to object.  This is

24   a problem.  Number one, the audio is hard to

25   understand, and number two, it's in Spanish.

1          THE COURT:  Okay.  It's not going to work,

2    Mr. Parlade.

3          MR. PARLADE:  One more time, please.

4          THE COURT:  If the translator can

5    translate it.  Next time --

6          THE INTERPRETER:  You can use your

7    interpreter if you want.

8          THE COURT:  Go ahead.

9          UNIDENTIFIED VOICE:  I am not behind her.

10   She's the one that's following me.

11         UNIDENTIFIED VOICE:  Call 911.

12         THE COURT:  Okay.  Now ask your question

13   again, now that the witness has listened to the

14   audio.

15   BY MR. PARLADE:

16   Q    After having heard the audio, does this

17   refresh your memory of requesting your wife call 911

18   that day?

19   A    We both called.

20   Q    And there was no conversation as to

21   calling 911 the day after, or calling 911 as to

22   who's following who?

23   A    We all heard the audio, and at no time do

24   you hear anyone saying "tomorrow."  You keep on

25   insisting and putting words in our mouth.

Page 82

1      Q    I have a different audio.

2           THE COURT:  Stop.  What audio are you

3  seeking to use?

4           MR. PARLADE:  I'm trying to lay the

5  foundation.

6           THE COURT:  You can try to lay a

7  foundation --

8           MR. PARLADE:  It's an audio provided by

9  opposing counsel through discovery, which appears to

10  be different than the one they have in their

11  exhibit.

12           THE COURT:  What are you seeking -- what

13  are you doing?  What is the audio that you're

14  seeking to use?

15           MR. PARLADE:  The audio I'm seeking to use

16  is from Leticia Cepero's phone on the date of the

17  incident, on 5-15-2019, with Mr. Cepero and Leticia

18  Cepero speaking while the incident is going on.

19           THE COURT:  And you have a transcript in

20  English?

21           MR. PARLADE:  I do not.  I'm just seeking

22  to refresh his --

23           THE COURT:  You already did that.  It

24  didn't work.

25           MR. PARLADE:  Okay.

Page 83

```
 1              THE COURT:  If you have something to
 2    impeach the witness that is something that is
 3    admissible under the Federal Rules of Evidence, then
 4    go to town.  Okay?
 5              MR. PARLADE:  Yes.
 6    BY MR. PARLADE:
 7        Q    Mr. Cepero, do you know where Herbert A.
 8    Ammons Middle School is?
 9              THE INTERPRETER:  I'm sorry.  What is the
10    name of the school?
11              MR. PARLADE:  Herbert A. Ammons Middle
12    School.
13              THE WITNESS:  No, sir.
14    BY MR. PARLADE:
15        Q    In the many times since 2016 you said
16    you've met Ms. Gallego, did you ever meet her son?
17        A    Yes.
18        Q    Do you ever speak to him?
19        A    No.
20        Q    Did your wife ever speak to him?
21        A    No, that I'm aware of.
22        Q    You never asked where he went to school?
23        A    No.
24              MR. PARLADE:  Okay.  Your Honor, nothing
25    further for this witness.
```

```
 1            THE COURT:  Okay.  Any redirect?
 2                   REDIRECT EXAMINATION
 3    BY MR. FRANK:
 4        Q    Mr. Cepero, you had stated in your
 5    testimony and under cross-examination the fact that
 6    you were blocked twice.
 7        A    Yes, sir.
 8        Q    The first time was when you were in your
 9    parking space?
10        A    Yes.
11        Q    And that you got around, because of the
12    empty parking space next to your car?
13        A    Yes, sir.
14        Q    And then you tried to leave Heron?
15        A    Correct.
16        Q    Then Ms. Gallego blocked you again on your
17    way out?
18        A    Yes, sir.
19        Q    Did you make a drawing?
20        A    Yes.
21            MR. FRANK:  If I may approach, Judge, to
22    try to refresh a recollection or to clarify.  If
23    not, it doesn't matter.
24            THE COURT:  Refresh what recollection?
25            MR. FRANK:  Of how it happened, showing
```

Page 85

```
 1    the positions of the cars and the automobiles.
 2              THE COURT:  He hadn't said he doesn't
 3    remember.
 4              MR. FRANK:  Doesn't remember what?
 5              THE COURT:  He didn't say he didn't
 6    remember.
 7              MR. FRANK:  That's fine.
 8              THE COURT:  I mean, that's what refreshing
 9    recollection is.
10    BY MR. FRANK:
11        Q    So then once she blocked you --
12    Ms. Gallego blocked you the second time, you called
13    911?
14        A    Yes.
15        Q    And waited for the police?
16        A    Correct.
17              MR. FRANK:  That's fine.  We're good.
18              THE COURT:  Nothing else?
19              MR. FRANK:  Nothing else, Judge.
20              THE COURT:  Okay.  You may step down
21    Mr. Cepero.  Thank you.
22              Your next witness.
23              MR. FRANK:  I have no witnesses.
24              THE COURT:  Do you have any additional
25    evidence for which you seek admission?  I'll go over
```

1  the documents that have been admitted in your case

2  in chief.

3        I have Exhibit 9, Exhibit 10 and Exhibit

4  14.  I refused admission of Exhibit 13.  You advised

5  that you were not introducing Exhibit 2.

6        Should I assume that you're not seeking

7  introduction of 1, 3, 4, 5, 6, 7, 8, 11, 12, 15 and

8  16?

9        MR. FRANK:  That is correct.

10        THE COURT:  Okay.  So I will mark those

11  exhibits as not being introduced.

12        Does the debtor rest?

13        MR. FRANK:  Yes, Your Honor.

14        THE COURT:  All right.  Mr. Parlade, do

15  you wish to put any witnesses on in your case in

16  chief?

17        MR. PARLADE:  Yes, Your Honor.  Just for

18  clarification --

19        THE COURT:  In the microphone, please.

20        MR. PARLADE:  Exhibit Number 13, the

21  objection was sustained?

22        THE COURT:  That was -- admission refused.

23        MR. PARLADE:  Your Honor, the Hammocks

24  Community Association would like to call Jorge Matus

25  to the stand.

1             THE COURT:  Okay.  Is Jorge Manus here?
2  That's very nice of the CSO to do that, but that is
3  my court security officer.  I do not have a bailiff.
4  So their job is to just shoot you guys if you
5  misbehave.  They're just doing this other stuff to
6  be nice.
7             Sir, if you'll please come forward to be
8  sworn in.
9             Mr. Parlade, do not forget to ask the
10 witness to spell his last name when you get to
11 questioning.
12            This witness doesn't speak English?
13            MR. MATUS:  A little but I'd prefer --
14            THE COURT:  Okay.  That's fine.  So we're
15 going to swear in the translator first.  And the
16 translator will be the one sitting next to the
17 microphone.
18 Thereupon:
19                      SUSANA COLETTI
20 an interpreter, having been first duly sworn,
21 translated from English to Spanish and from Spanish
22 to English to the best of her ability.
23            THE COURT:  Please state your name for the
24 record.
25            THE INTERPRETER:  Susana Coletti.

Page 88

1           THE COURT:  Could you spell your last name
2    for the record?
3           THE INTERPRETER:  C-O-L-E-T-T-I.
4           THE COURT:  Okay.  Thank you, Ms. Coletti.
5           Now swear in the witness.
6    Thereupon:
7                         JORGE MATUS
8    was called as a witness by the Hammocks Community
9    Association, and having been first duly sworn, was
10   examined and testified as follows:
11          THE COURT:  Now, going over the ground
12   rules, because you weren't here for the last one --
13   everybody can sit.
14          Because you have chosen to use a
15   translator, which is fine, I certainly understand.
16   I speak Spanish, but I would never testify at a
17   trial in Spanish.  I understand.
18          So you've chosen to use a translator,
19   which means, even if you are absolutely sure what
20   Mr. Parlade asked you in Spanish -- I mean, in
21   English -- or Mr. Frank when it's his turn, you must
22   wait for the translator to translate.  Got it?
23          THE WITNESS:  Yes.
24          THE COURT:  Mr. Parlade is going to give
25   the translator time to translate, so he won't ask a

1    20-minute question.  I've done that before.  And in

2    your answers, take a breath, so that the translator

3    can translates your answer.

4              THE WITNESS:  Okay.

5              THE COURT:  If you see Mr. Frank stand

6    up -- Mr. Frank, wave.  If Mr. Frank stands up,

7    please don't answer until I hear the objection.

8    When Mr. Frank is questioning you, if Mr. Parlade

9    stands up, again, wait until I hear the objection

10   before you answer.

11             Mr. Parlade, please proceed.

12                     DIRECT EXAMINATION

13   BY MR. PARLADE:

14        Q    Would you please state your name for the

15   record?

16        A    Jorge Matus.

17        Q    Would you please spell your last name?

18        A    M-A-T-U-S.

19             THE COURT:  And, Mr. Matus, it's the

20   translator who needs to be in the microphone, not

21   you.  You can relax, sit back.  Just as long as the

22   translator can hear you.

23             MR. PARLADE:  Your Honor, may I approach

24   to move the microphone to the translator?

25             THE COURT:  Yes, please.  Thank you.

1    BY MR. PARLADE:

2         Q    Mr. Matus, what is your employment?

3         A    I am the supervisor for The Hammocks

4    Community -- supervisor of security for Hammocks

5    Community.

6         Q    And how long have you been the supervisor

7    for security for The Hammocks Community?

8         A    I've been a supervisor for two years, but

9    I've worked there for four years.

10        Q    Okay.  And did you have previous

11   experience working in security before The Hammocks

12   Community?

13        A    Yes, sir.

14        Q    How long have you been in the security

15   industry?

16        A    Around 12 years.

17             THE COURT:  I'm going to ask that the

18   witness and the translator switch places, because I

19   cannot see the witness' face.  So I'm going to ask

20   you to switch places.

21             Madam Translator, just swing that

22   microphone around so you're still talking into it.

23   Don't forget the microphone.  There you go.  Thank

24   you so much.  Please continue.

25             MR. PARLADE:  Thank you, Your Honor.

```
 1   BY MR. PARLADE:

 2       Q     So you've been in the security industry

 3   for about 12 years; is that correct?

 4       A     That is correct.

 5       Q     And what type of training do you have as

 6   security?

 7       A     I have renewed my license to be able to

 8   work without carrying a firearm.  I also have my

 9   license to work carrying a firearm.  That license

10   has expired, because at the present job that I have

11   right now it's not required.  I work for another

12   industry also, but in security, as well.

13             We constantly receive training.  You have

14   batons to detain people.  Also, working with

15   people's behavior when they show frustration, and

16   different courses related to people, in this case,

17   the visitors.

18       Q     So you're trained to deal in situations

19   that deal with conflict; is that correct?

20       A     Yes.

21       Q     And you are also trained to detail the

22   incident in question?

23       A     As people that are trained in the security

24   field, those are the first training sessions that we

25   receive.  We always use the steps in order to get to
```

Page 92

1    the place to observe, and then document the events.

2         Q    Now, are you familiar with an incident

3    that happened on May 15, 2019, in The Hammocks

4    Community?

5         A    Yes, sir.

6         Q    Was this an incident with Marglli Gallego

7    and the debtors in this case, Josue Cepero and

8    Leticia Cepero?

9         A    On that day I was working, and I had to

10   respond to the call with regard to the event that

11   happened in The Hammocks Community.

12        Q    And approximately when did you receive

13   that call?

14        A    I remember that it was a Wednesday,

15   May 15th, in the afternoon.

16        Q    Approximately what time, do you know?

17        A    Working in the security field you receive

18   a number of phone calls on a daily basis, but these

19   are registered on the cellphone log.  Once the

20   situation has ended, and then we are going to

21   document the event, we look at the cell log.

22        Q    And who typically calls you when you get

23   one of these calls?

24        A    The residents from Hammocks Community.

25   There are many there.

Page 93

1     Q    Now, do all the calls get routed directly
2  through you, or would they go through various
3  security officers?

4     A    The calls go to a number that all the
5  residents know.  It's public domain, because this
6  number is published on all of the signs for public
7  safety.

8     Q    And then you get dispatched to whatever
9  the call is; is that correct?

10    A    The supervisor that is on call during that
11 shift has that number permanently.

12    Q    Which in this case it was you, correct?

13    A    It was myself on that day.

14    Q    On May 15, 2019, what was the call that
15 you received in reference to the matter we're here
16 for today?

17    A    Mrs. Marglli called over the phone.  She
18 did not identify herself.  She was nervous.  She did
19 not identify herself, and she asked me to please
20 come over to her community, because she was being
21 followed.

22    Q    And after you got this call, did you have
23 any other information given to you or was that it?

24    A    During the call she said, "I'm here
25 getting to my building," and then she said --

1              MR. FRANK:  Objection, hearsay.

2              MR. PARLADE:  Can he finish?

3              THE COURT:  Let him answer and then you

4      can object, okay?

5              Continue with your answer.

6              THE INTERPRETER:  I did not finish

7      interpreting.

8              THE WITNESS:  During the call she said

9      that she -- after she said two or three more

10     phrases, I was able to recognize the voice.

11             THE COURT:  So what's hearsay about that

12     statement?

13             MR. FRANK:  Judge, he's stating what she

14     told him.  Ms. Gallego is here.  She can testify to

15     that.  He can't testify to that.

16             THE COURT:  So you're not objecting to

17     this part of the testimony, you're objecting to the

18     first part of the testimony?

19             MR. FRANK:  I'm objecting to the part of

20     the testimony that talks about what he says she told

21     him.

22             THE COURT:  Okay.  Your response,

23     Mr. Parlade.

24             MR. PARLADE:  Your Honor, the witness just

25     testified that after hearing three or four phrases

1    from her he recognized her voice.  It's not --

2              THE COURT:  The statement before.

3    Somebody called and said, "Can you come over, I'm

4    being followed?"

5              I'm assuming that's what your objection is

6    to?

7              MR. PARLADE:  That's the previous question

8    Your Honor.  The previous answer, is that what

9    you're talking about?

10             THE COURT:  Is that your objection?

11             MR. FRANK:  He said she told him, or the

12   caller told him, before he recognized the voice.

13   Every part of that testimony is hearsay.  If he's

14   telling the Court what someone else --

15             THE COURT:  I understand what hearsay is.

16   I want to be clear which part of the testimony you

17   believe was hearsay.

18             MR. FRANK:  The part that applies to what

19   someone else told him.

20             THE COURT:  All right.  Your response,

21   Mr. Parlade.

22             MR. PARLADE:  Your Honor, in order for it

23   to be hearsay, it must be an out of court

24   declaration, in order to prove this was a matter

25   asserted.

1          The witness is not testifying as to what

2     Ms. Margllig was involved in, or the truth of the

3     matter asserted.  He was merely stating his present

4     tense impression of a call he got, in order for him

5     to do the work that he is hired to do.

6          THE COURT:  Okay.  I'm going to overrule

7     the objection.  It's coming in for what he was told

8     over the phone, not that it's true or not.

9          Go on to your next question.

10    BY MR. PARLADE:

11         Q    When were you able to respond to the call

12    you received on May 15th?

13         A    Several safety officers work in The

14    Hammocks Community, and we have divided that into

15    zones.  Then the protocol is to go to the place as

16    soon as possible, independently of who is calling.

17         Every single phone call for us is

18    important, and we have to go.  Then we find out if

19    the call is real or not.  We always investigate.

20         Q    So you prioritize the call, based on

21    whatever the call detail is?

22         A    I will repeat.  All of the phone calls are

23    important.  We have different security officers.  It

24    depends on the assigned area.  The security officers

25    will go to the place.

1      Q     How long did it take you to respond to the

2  call made by Marglli Gallego?

3      A     Less than five minutes.

4      Q     And when you arrived at the location of

5  where the incident was, who did you observe there?

6      A     I arrived at the scene.  As a supervisor I

7  have to attend to any of the assigned areas, even

8  though it's not my assigned area.

9            I was the one that was the closest.  I got

10  there first, and I was able to observe two cars that

11  had been detained.  One of them was white, and

12  Ms. Marglli was driving that car.  The other vehicle

13  was a four-door sedan, a Honda.  I don't recall the

14  tag number now, but I could identify that by one of

15  the mascots from one of the Miami universities.

16      Q     Who was driving that car?

17      A     The white one, Marglli was driving.  And

18  that car was driven by Mr. and Mrs. Cepero.

19      Q     And at the time you arrived, what was the

20  location of Ms. Gallego's car in relation to the

21  Ceperos' car?

22      A     Ms. Marglli was going the direction from

23  the east to the west, going towards her apartment

24  where she lives, facing the other vehicle, facing

25  Mr. and Mrs. Ceperos' car, a few meters away from

1    the apartment -- from Mrs. Gallego's apartment.

2         Q    How far was Ms. Gallego's vehicle from her

3    parking space?

4         A    Very close.

5         Q    Was the vehicle driven by the Ceperos

6    blocking or inhibiting the parking for Ms. Gallego's

7    unit?

8         A    That is correct.

9         Q    Was there anybody behind the vehicle

10   driven by the Ceperos?

11        A    No.  They were in total liberty to back up

12   and move.

13        Q    Okay.  What were they doing when you got

14   there?

15        A    When I arrived I started observing the

16   area.  That's part of my job.  They were inside

17   their car.  The closest person to me when I arrived

18   was Mrs. Gallego, and I asked if everything was all

19   right.

20             She tells me that she's calling the

21   police.  When I learned that the police had already

22   been notified, I did not want to get in the middle

23   of the police investigation.  As part of my job as

24   security officer I started documenting the

25   situation.  It was a cell with a video.

1      Q    Once you were taking the video, were the

2   police already present or was that prior to them

3   arriving?

4      A    Before they arrived.

5           There were several situations occurring at

6   the same time.  Mrs. Gallego was trying to get to

7   her house.  Another person approached Mrs. Gallego,

8   and I was able to hear when she told this person,

9   "Just relax, my son is safe," for her to just come

10  down, because her son was safe.

11     Q    Was her son present when you were there?

12     A    No.

13     Q    Do you know if that person was identifying

14  her child or a different child, do you know?

15     A    This person was referring to

16  Mrs. Gallego's son.

17     Q    Other than that conversation that you

18  overheard with that person remarking about

19  Ms. Gallego's son, did you recognize or hear any

20  details as to the emotional or physical condition of

21  Ms. Gallego when you arrived?

22     A    She was nervous.  She was worried for her

23  son.

24          MR. FRANK:  I'm going to object, Judge.

25  That's (inaudible).

```
 1                THE COURT:  Okay.  So which part are you
 2   objecting to?
 3                MR. FRANK:  Him saying that she was
 4   nervous.  I don't even know what that means.
 5                THE COURT:  I'm going to sustain the
 6   objection and allow you to try to establish a
 7   foundation for the opinion testimony.
 8   BY MR. PARLADE:
 9        Q    You just said she was nervous.  Do you
10   know why Ms. Gallego was nervous?
11        A    I concluded that to be for two reasons.
12        Q    Let me stop you.  I'm not asking you to
13   speculate or to guess.  Just listen to the question
14   and please answer based on your recollection.
15        A    The body language, the way she was
16   talking, she looked nervous.
17                THE COURT:  Mr. Frank.
18                MR. FRANK:  I'm going to object.  He's not
19   an expert.
20                THE COURT:  Okay.  I'm going to overrule
21   your objection.  I'll give it the weight that it
22   deserves when I make my findings.
23   BY MR. PARLADE:
24        Q    Did she at that time remark to you that
25   she was nervous, or why she was nervous?
```

1      A    Like I said before, there were several

2 situations occurring at the same time.  She was

3 asking Mr. and Mrs. Cepero why they were following

4 her.

5           Another vehicle, a Ford Escape, gold Ford

6 Escape, approached them, as well, and it was the

7 lady.  She was also arguing with her.

8      Q    Who was that lady?

9      A    The lady was Maria Alonso, the president

10 of her association.

11     Q    Okay.  And she was arguing with

12 Ms. Gallego?

13     A    Yes.

14     Q    When all this is happening, where were the

15 Ceperos?

16     A    Inside their vehicle.

17     Q    So all this is transpiring, and the

18 Ceperos never get out of their car, correct?

19     A    That is correct.

20     Q    Where is Marglli Gallego when this

21 incident is occurring?

22     A    Outside the vehicle.

23     Q    Is she stationary, is she walking about?

24     A    No.  She was moving, asking questions, and

25 calling over the phone, calling the police.

1        Q    Did at any time she try to approach or

2   open the car door of the Ceperos?

3        A    Not that I saw.

4        Q    When the police arrived, did you have any

5   communications with the police at all?

6        A    As I mentioned before, when I knew that

7   the police were going to arrive, I tried to keep

8   myself aside, not to get in the middle of the work

9   of the police.

10       Q    Did you ever mention to the police as to

11  the nature of the call you received, or that you

12  were there investigating?

13       A    In the area of the security, we constantly

14  meet police officers, of which some get in contact

15  with us and then others with the other people, and

16  then with us.  Then at the end they will ask us

17  questions.

18       Q    Was this the case in this incident?

19       A    When they arrived they talked -- there

20  were two of them, and they approached Mr. and Mrs.

21  Ceperos' vehicle.  They asked them questions.  I

22  don't know what they said.  Then Mrs. Gallego told

23  them that she was the one that had called the

24  police.

25       Q    And how long were you there, from the time

1    you arrived at the incident on May 15, 2019, until

2    the time that you left?

3        A    I was there the entire time until the

4    police finished their work and all the people left.

5        Q    And approximately how long was that?

6        A    An average of between 40 minutes --

7        Q    When you saw Maria Alonso arrive at that

8    incident, was there anything peculiar as to her

9    arrival, anything that was not of the ordinary?

10       A    Like I said before, there were several

11   situations occurring at the same time.  That was one

12   of them.  I was trying to document everything

13   through the cellphone, because another vehicle also

14   approached the place.  It was a small white car with

15   a yellow couple.  This vehicle also got to the area.

16            I want to explain the geography of the

17   area.  I don't know if there is a way.

18       Q    I have what's listed as Respondent's

19   Exhibit E.

20            THE COURT:  And Exhibit E is in evidence.

21            MR. PARLADE:  Yes.

22   BY MR. PARLADE:

23       Q    You will see on your screen it's a map of

24   Heron.

25            Can you see it?

1       A    Yes.

2       Q    You can scroll up and down, and you can

3  identify to us in terms of building numbers, what

4  you're talking about.

5            THE COURT:  I think the witness can also

6  circle -- can the witness circle, or is that no

7  longer a functionality?  Is that still a

8  functionality now.  Never mind.  We used to be able

9  to draw on the exhibits.

10           It's the very last thing on the top.  Go

11  ahead.  Don't worry if it doesn't work.  I'm

12  looking.  We're all looking.  Go ahead.

13  BY MR. PARLADE:

14      Q    Is this a map of The Heron Community?

15      A    Yes.

16      Q    And does this accurately depict The Heron

17  Community?

18      A    Yes.

19           I will add, I don't know if you could

20  observe, but when it says Southwest 103rd Terrace,

21  that is an internal street in the community of

22  Heron.  Before you approach the Building 14921,

23  there is a stop sign there.  In front of that there

24  is a small boulevard there.

25           MR. FRANK:  Since we can't circle or

Page 105

```
 1   point, I'm not --

 2            MR. PARLADE:  He can highlight.

 3            THE COURT:  He's telling the building

 4   number.

 5            THE WITNESS:  Can I continue?

 6            THE COURT:  We can't highlight.  It won't

 7   work.

 8            THE WITNESS:  Then --

 9            THE COURT:  Just try to do the building

10   numbers.

11   BY MR. PARLADE:

12       Q    Okay.  In front of the Building 14921 --

13            THE COURT:  You see that in the lower

14   left-hand corner?

15            MR. FRANK:  Yes.

16            THE COURT:  Okay.  Go ahead.

17            THE WITNESS:  That is an area -- a parking

18   area.  It does not conduct anywhere.

19            Then the white vehicle approached and

20   turned.  Mrs. Gallego was trying to take pictures

21   and a video, I don't have knowledge of which.  The

22   white vehicle hit Mrs. Gallego in her knees.  All of

23   that was happening at the same time before the

24   police arrived.

25
```

1   BY MR. PARLADE:

2        Q    Just so I can understand, next to where it

3   says Building 14921, is, I guess, a rotunda?  It's a

4   circular street?

5        A    Yes.

6        Q    And it has one ingress and one egress,

7   right?

8        A    It's an oval area.

9        Q    Where's the entrance to that particular

10  road with the parking for the Building 14921?

11       A    On 103rd Terrace, then going around the

12  oval to go back.  Then you make a left and then you

13  continue to 150th Place.

14       Q    Okay.  I see.  So there's only one

15  entrance and one exit to that parking for those

16  buildings?

17       A    In that area of the community, yes.

18       Q    In which building does Marglli Gallego

19  live?

20       A    At 14921.

21       Q    Now, we heard Josue Cepero today say he

22  was waiting by Building 16.

23            Do you know which building he's referring

24  to?

25       A    Exactly number 16, that does not

1  correspond to the area where we were investigating.

2      Q    So in this particular community, there is

3  no Building 16, correct?

4      A    Okay.  I am going to try to explain.  As I

5  said before, we are divided into zones.  I know that

6  you could observe there are many buildings.  I know

7  there is a Building Number 7, 6, 24, but by now I do

8  not recall the location and whether it does exist in

9  number 16.

10     Q    That's fine.  If you don't recall, don't

11 know that, it's perfectly fine.

12          The building numbers, do they usually

13 correspond to the last two digits of whatever the

14 entire building number is or are they different?

15     A    They're different.

16     Q    Okay.  Thank you for clarifying.

17          Now, the incident that occurred on May

18 15th, was that within the rotunda in the parking

19 next to 14921?

20     A    Yes, sir.

21     Q    Did you see any incident where Marglli

22 Gallego was parked behind the Ceperos' car as they

23 were trying to get out of the parking?

24     A    No.  Behind their car it was free.

25     Q    At any time during this incident did you

1   see Marglli Gallego try to approach or physically

2   contact either Josue Cepero or Leticia Cepero?

3        A    During the time that I was present I did

4   not see that.

5        Q    Has anyone, whether it be your employer,

6   friend or family member, ask you to change your

7   testimony or to not testify truthfully here today?

8        A    Nobody.

9             MR. PARLADE:  Nothing further.

10             THE COURT:  Okay.  Cross-examination.

11                    CROSS-EXAMINATION

12   BY MR. FRANK:

13        Q    Good afternoon, sir.

14        A    Good afternoon.

15        Q    You just testified that you don't know if

16   there's a Building 16 or not?

17        A    There are 6,000 units at The Hammocks.

18   You cannot ask me to recall the placement of a

19   specific building.

20        Q    If I were to show you a map that shows

21   Building 16 refers to the address of 14913, would

22   that refresh your memory?

23        A    Let me see if I understand the question.

24   You're asking me if I see the Building 14913, and

25   that would be Building 16?  Is that what you're

1   asking me?

2       Q    That's correct.

3       A    It would be very difficult for me to

4   answer that.

5       Q    I'm looking at this map that's in front of

6   you.  You see where it says 14913?

7       A    Yes, sir.

8       Q    If I were to show you a map that shows

9   that corresponds to Building 16, would that refresh

10  your memory?

11      A    It is logic if you show me a property with

12  the same, it would be obvious that it would be the

13  number that is there.

14          THE COURT:  Okay.  Show Mr. Parlade what

15  you would like to show the witness.

16          MR. PARLADE:  Objection, Your Honor.

17  (inaudible) his best recollection.  He may never

18  know the numbers of the buildings.

19          THE COURT:  That's not what he said.  Your

20  objection is overruled.  Show him the map.

21          And then, Mr. Parlade, you have the right

22  to determine whether you would like that map

23  admitted into evidence.

24          THE WITNESS:  What do you want me to see?

25

1   BY MR. FRANK:

2       Q    Does that refresh your recollection that

3   Building 16 is 14913?

4       A    It does not refresh my memory, no, because

5   I repeat, there are many properties for one to be

6   able to know all of them.

7       Q    You're looking at the map.

8            THE COURT:  The answer is no.  Take the

9   map back.  You also have rebuttal available to you,

10  so I guess you'll just have to wait, which by the

11  way, is not going to be today.  We're going to

12  finish this witness and then have a conversation

13  about when we finish this trial.

14           By the way, you guys know this was set for

15  one hour, right?  Didn't you guys put it on the

16  Chapter 13?  Wasn't this Chapter 13 evidentiary day?

17  Anyway, I gave you the whole afternoon, but it's

18  going to take more than the afternoon.

19           Okay, let's finish with this witness.

20  BY MR. FRANK:

21      Q    Looking at that map where it says 14913,

22  and see where it says Southwest 103rd Terrace?

23  Isn't that a line of parking spaces?

24      A    There is a street and parking spaces, as

25  well.

1      Q    And I think you testified that the only

2   way in and out is through Southwest 103rd Terrace

3   and Southwest 150th Place, correct?

4      A    I will clarify.  When I say that it is the

5   only one to go in or out, it's with regard to the

6   specific area of the parking space in front of

7   Mrs. Gallego's property.

8      Q    Now, you also testified that when you

9   arrived you viewed two automobiles in front of

10  14921, correct?

11          THE INTERPRETER:  Could you repeat, 149 --

12          MR. FRANK:  14921.

13          THE WITNESS:  Yes.  One in front of the

14  other.

15  BY MR. FRANK:

16      Q    Okay.  This is a street, correct?

17      A    No.  In that area it's parking spaces.

18      Q    But if you look at Southwest 150th Place,

19  that is a street, correct?

20      A    That is a street before the area where the

21  vehicles are.

22      Q    And you said -- let me see if I can do

23  this.

24          Were the cars front to front in that

25  parking area?

1      A     The white car was looking for a parking

2   space, and the Honda was blocking the white car.

3      Q     Okay.  So which car was closest to

4   Southwest 150th Place?

5      A     A small portion of the white car -- I am

6   going to repeat.  The white vehicle was closest to

7   its parking space than the street.

8      Q     That wasn't my question.  I asked you, out

9   of the two cars, which car was closest to Southwest

10  150th Place?

11     A     The one that was closest was the white

12  one, the rear area.

13     Q     So the white car, I assume you mean

14  Ms. Gallego's car?

15     A     Yes, sir.

16     Q     That was closest to Southwest 150th Place?

17     A     Yes.

18     Q     And Southwest 150th Place is an exit from

19  Heron, correct?

20     A     No, sir.

21     Q     Are you telling me if I head down

22  Southwest 150th Place, make a right turn down to

23  Southwest 103rd Lane, I can't get out of Heron?

24           MR. PARLADE:  Object, Your Honor, form.

25           THE COURT:  Okay.  Form is not an

1   objection at trial, but if you don't understand the

2   question, Mr. Matus, you can ask that it be

3   reexplained.

4          THE WITNESS:  Could you clarify that,

5   please?

6   BY MR. FRANK:

7      Q    Take a look at the map.

8          THE COURT:  Mr. Frank, you're getting

9   excited.

10         MR. FRANK:  It's getting late.

11         THE COURT:  I understand.

12  BY MR. FRANK:

13     Q    Look at the map and tell me, and you can,

14  I guess, use the addresses of the buildings, which

15  is the way out?

16         THE COURT:  Can the witness move the

17  little hand around or is it just you guys?

18         MR. FRANK:  Is it moving around now?

19         THE COURT:  It's moving -- mine is moving

20  around.  Is the witness' -- Madam Interpreter, is

21  there a little hand moving around?

22         THE INTERPRETER:  We're going to try.

23         THE COURT:  I'm just wondering, how are

24  you manipulating that hand?  Do you have a mouse?

25         MR. FRANK:  The last time I did this we

1   were able to circle and color.

2           THE COURT:  I want you to take the mouse

3   and draw a picture of the question you're asking the

4   witness.  Maybe that will help the witness.  You're

5   asking the witness --

6   BY MR. FRANK:

7       Q    Looking at the map, how do you get out of

8   The Heron development?

9       A    Heron has two entrances or two exits,

10  whichever you want, however you want to call it.

11      Q    How do you leave The Heron Community?

12      A    That is your option for you to use either

13  which entrance you want to use or which exit you

14  want to use.

15      Q    Okay.  Looking at the map, you've got

16  different streets laid out here.  Tell me what

17  street I take to exit the community.

18      A    I repeat, you have many options.

19      Q    Show me them all.

20           THE COURT:  I'm going to direct the

21  witness to come by the mouse.  I think this is the

22  easiest.  Yes, we all agree?  Yes.  Go around to

23  where Mr. Frank is and show us all the different

24  exits.

25           Do we all agree that's a good way to do

Page 115

1  this?

2          MR. FRANK:  Sounds good to me.

3          THE COURT:  Ms. Stone, remember to tell IT

4  we need to be able to draw pictures.  We used to be

5  able to draw pictures.

6  BY MR. FRANK:

7     Q    Show me with the hand how to get out.

8          THE COURT:  With the mouse.  Show him how

9  to use the mouse.  Okay.  There you go.  Show us all

10 the exits.

11 BY MR. FRANK:

12    Q    I'm asking for where all the exits are.

13    A    I repeat, there are many options.  Do you

14 want me to show you two or three?

15    Q    I want you to show me from here

16 (indicating) -- pick any exit and show me how to get

17 out.

18         THE COURT:  It's not showing up on the --

19         MR. PARLADE:  When he says, "from here," I

20 don't know what he's referring to.

21         MR. FRANK:  Where the hand is.  See the

22 hand?

23         THE COURT:  Just so that the record --

24 because nobody but us can see the hand.  For the

25 record, the witness has the hand starting closer to

Page 116

```
 1    Building 14919, but also in front of Building 14921.
 2              Go ahead, Mr. Matus.  Show us some ways
 3    out.
 4              THE WITNESS:  Okay.  If you, for example,
 5    leave, it's 14925, and then you take 150th Place.
 6    You could come out this way behind the building,
 7    14919, 14913, et cetera.
 8              If you continue this way you can go out
 9    the other exit.  If you are at 14921, you have to go
10    out this way behind this building.  If you are at
11    14921, you do not need to exit this area.
12              THE COURT:  Okay.
13    BY MR. FRANK:
14        Q    You stated in your testimony --
15              THE COURT:  Mr. Frank, would it be easier
16    for you to use that mic?  Is that better for you?
17    No.
18              Okay.  Just move the microphone back to
19    you.  It won't break.  If it does, you'll buy it for
20    me.
21    BY MR. FRANK:
22        Q    You stated earlier that approximately here
23    is where the two cars were, the white car and the
24    Honda, right?
25        A    Yes.
```

1      Q    And you said the closest car, the white

2   car, was --

3           THE COURT:  When she's answering for

4   him --

5   BY MR. FRANK:

6      Q    You stated that the two cars were here,

7   and the closest car was the white car, and that was

8   approximately here?

9           THE COURT:  Put the microphone next to the

10  translator now.  There you go.

11          THE WITNESS:  It's difficult for you to

12  understand me geographically of how that area is of

13  this place.  I will have --

14          THE INTERPRETER:  Could you repeat that?

15          THE WITNESS:  You will have to explain to

16  me what you're referring to when you say the

17  closest.  For example, the Building 14921, it's

18  close to the 14951.  I don't know what you're

19  referring to when you say "closest."

20          THE COURT:  Mr. Frank, turn the --

21  Mr. Matus, remember.  You don't need to be near the

22  microphone, just the interpreter.

23  BY MR. FRANK:

24     Q    You already testified that Ms. Gallego's

25  car was the closest car to Southwest 150th Place.

1   And you also testified that the way out from here is

2   to go this way and then that way, correct?

3          A    The way to get out for whom?

4          Q    For anybody.

5          A    If you don't live at 14921 you don't need

6   to be there.

7               THE COURT:  I'm going to direct you,

8   Mr. Matus, to listen to the question and to answer

9   the question.  So now I'm going to ask you the

10  question.

11              When you observed the two cars -- let's

12  take it step by step.  When you observed the two

13  cars, where were they, using the hand?  Show me on

14  the picture.  Where were they, over there, right

15  there?

16              THE WITNESS:  Here, between 14921 and the

17  oval area.

18              THE COURT:  And which direction was the

19  Ceperos' car facing?  Use the hand to show me.  And

20  which direction was Ms. Gallego's car facing?

21              THE WITNESS:  It was here.  They were

22  trying to get to their apartment.

23              THE COURT:  I don't want you to guess what

24  you think they were doing.  I want you to tell me

25  physically where the cars were.

1          Where were they and what direction were

2    they facing?

3          THE WITNESS:  Ms. Gallego, east to the

4    west, and Mr. and Mrs. Cepero, on the opposite

5    direction.

6          THE COURT:  In this picture, is 14921 to

7    the east, west, north or south of the hand?

8          THE WITNESS:  I would say to the west.

9          THE COURT:  Okay.  So Ms. Gallego's car is

10   facing away from her building?

11         THE WITNESS:  The vehicle of Mrs. Gallego

12   was facing the Building 14921.

13         THE COURT:  Okay.  And the Ceperos'

14   vehicle was facing away from the building?

15         THE WITNESS:  That is correct.

16         THE COURT:  Okay.  All right.  Any other

17   questions, Mr. Frank?

18   BY MR. FRANK:

19      Q    So the only time you saw those two

20   vehicles were where you said they were, correct?

21      A    I did not understand the question.

22         THE COURT:  Put the microphone in front of

23   the interpreter when she's speaking, please.

24         THE INTERPRETER:  The witness said he did

25   not understand the question.

Page 120

1          THE COURT:  Okay.  If you have no more

2     questions for the witness that she needs to play

3     with the mouse, we're going to put him back on the

4     stand.

5          Actually, I have one more question for the

6     witness before he sits down.  I'm sorry, but I'm the

7     trier of fact and I just need to get this done.

8          I want you to show me on this map where

9     the guest parking is for that area.  Can you show

10    me?  Use the hand.

11         THE WITNESS:  The communities are

12    different guest parking.

13         THE COURT:  Okay.  Show me where on

14    Southwest 103rd Terrace there's guest parking on

15    that street.

16         THE INTERPRETER:  What street, Your Honor?

17         THE COURT:  Southwest 103rd Terrace.

18         THE WITNESS:  I don't have knowledge of

19    the exact location, because there are many.

20         THE COURT:  You have no idea where there's

21    guest parking in that area?

22         THE WITNESS:  Not exactly, no.

23         THE COURT:  Okay.  That's fine.

24         Are you done with the map with the

25    witness?

1              MR. FRANK:  Yes, Judge.

2              THE COURT:  You may go back over there.

3              Mr. Parlade, obviously, your redirect can

4    direct my questions, as well.

5              How many more questions do you have,

6    Mr. Frank?  I'm just trying to do this for the

7    purposes of the staff.  I already said we were going

8    to be running a little late, but I don't want to

9    stay too late.  It's an imposition on their time.

10   BY MR. FRANK:

11        Q    Sir, who pays your paycheck?

12        A    Hammocks Association.

13        Q    And who is your boss?

14        A    The manager of Public Safety.

15        Q    And who is that?

16        A    Mr. Fabien (phonetic).

17        Q    That's the manager of The Hammocks

18   Association?

19        A    The manager of the Public Safety

20   Department.

21        Q    You stated that the first time you saw the

22   two cars was in front of 14921, correct?

23        A    In the area in front of 14921.

24        Q    So you weren't there when the Ceperos were

25   parked in a visitor parking space, were you?

Page 122

1      A    I said that when I arrived, the vehicle of

2  Mr. and Mrs. Cepero was in front of the vehicle of

3  Mrs. Gallego.

4      Q    So the question was, you did not see them

5  parked in the visitors' parking space, did you?

6      A    No, sir.

7           MR. FRANK:  Thank you.  I have nothing

8  further.

9           THE COURT:  Okay.  Redirect?  And of

10  course, as I said, Mr. Parlade, that will include my

11  questions for the witness, as well.

12                    REDIRECT EXAMINATION

13  BY MR. PARLADE:

14      Q    Mr. Matus, for clarity sake, does every

15  building have parking for guests and reserved?

16      A    I am going to answer the question, but I

17  would like to have some water.

18           THE COURT:  There's water right there.

19           THE WITNESS:  The Community of Hammocks,

20  local association with Heron, they have their own

21  rules and regulations.  When it comes to the parking

22  spaces, that is not being managed by the Public

23  Safety Department.  We don't have knowledge of if

24  there are assigned parking spaces for the visitors

25  or the residents.

1    BY MR. PARLADE:

2         Q    So you're not privy to that information,

3    as security supervisor for The Heron Community

4    Association, correct?

5         A    No.  I don't have knowledge of how many

6    are and what is the location.

7         Q    But if I drive in to any of the parking in

8    The Hammocks Community, am I going to find a

9    staggered number of both visitors and reserved, or

10   is there just one big parking for visitors and one

11   big parking for reserved?

12             THE COURT:  Remember, only the interpreter

13   needs to be in the microphone.  You can relax.

14             THE WITNESS:  It's usual in most of the

15   communities you have to drive around and find a

16   space that will not be assigned.

17   BY MR. PARLADE:

18        Q    And these are staggered, as I mentioned,

19   correct?

20        A    Some communities have numbers or there's

21   zones.

22        Q    That's why it's difficult for you to say

23   today exactly where the visitor parking spaces are,

24   correct?

25        A    That is correct.  There's more than 30

1   something communities, and more than -- almost 6,000

2   units.

3           MR. PARLADE:  Nothing further, Your Honor.

4           THE COURT:  No further redirect?  Okay.

5   All right.

6           Thank you so much, Mr. Matus.  You're an

7   excellent mouse person.  We're going to try to fix

8   that.  Note to Felix.

9           So we are not going to finish today,

10  because I'm not going to ask the staff to stay much

11  later.  So, Mr. Parlade, how much more for your case

12  do you have?

13          I'll just remind you what documents you

14  already have in evidence.  You already have in

15  evidence Exhibits A through E and F.  So those

16  documents are already in evidence.  A through E, and

17  F.

18          So how many more witnesses do you have?

19          MR. PARLADE:  One.

20          THE COURT:  And that's going to be

21  Ms. Gallego?

22          MR. PARLADE:  That's correct.

23          THE COURT:  All right.  And then how many

24  witnesses are you going to have on rebuttal,

25  Mr. Frank?  Understanding that you haven't heard

Page 125

1   Ms. Gallego's testimony yet, but I'm sure you have

2   an idea of what it will be.

3              MR. FRANK:  I can't imagine more than

4   Ms. Alonso and Mr. Cepero.

5              THE COURT:  Okay.  So probably two.

6              Okay.  So let me ask you, considering the

7   fact that we did have the Kendrick matter somewhat

8   weaving in and out, we've been here for let's call

9   it three hours.  Realistically, are you going to

10  need a day to finish or a half a day to finish?

11  Should I give you a day?

12             MR. PARLADE:  I don't know how long --

13             THE COURT:  Okay.  I tell you what we're

14  going to do.  Here's what we're going to do.  You

15  guys are going to talk when you get downstairs, so

16  that they can lock up the floor.  You're going to

17  try to decide between the two of you how much time

18  you realistically think you need.

19             I'll give it to you.  It's not a problem.

20  What I don't want to have happen is for this to drag

21  out six months.  That's not in anybody's best

22  interest and it's not helpful.  Decide how much time

23  you need.  Call Ms. Sanabria tomorrow.

24             Mr. Frank, I am talking to you.

25             MR. FRANK:  Sorry.

1                    THE COURT:  Call Mrs. Sanabria tomorrow,

2     tell her how much time you need.  Tell her any dates

3     within the next 30 days that your client, your

4     witnesses are not available.  And then Ms. Sanabria

5     will do her best to give you a half day or full day,

6     whatever it is that you believe that you need, as

7     soon as possible.  Of course, that will depend on

8     your schedules, as well.  All right?

9                    You need to take all of your things with

10    you, including your flash drives.  No.  Do not take

11    your flash drives.  Ms. Stone will tackle you.

12    Okay.

13                   Your witness books, you can take your

14    witness books back so they don't get lost.  I will

15    keep the exhibit binders that you gave to me.

16                   MR. FRANK:  I'll bring it back to you

17    written.

18                   THE COURT:  That would be a good idea.  I

19    will see you on the date that you all get from

20    Ms. Sanabria.

21                   Are there any questions before we

22    conclude.  Mr. Parlade?

23                   MR. PARLADE:  Will we be on time for the

24    closing?

25                   THE COURT:  I think you should plan on

```
 1   doing the closing verbally.  This is not one of

 2   these cases that has complicated legal issue.  This

 3   is really a fact driven case.  So I think you should

 4   both presume -- so maybe taking that into account,

 5   figure a full day.

 6              MR. PARLADE:  Okay.

 7              THE COURT:  And then just get back to

 8   Ms. Sanabria with dates that either or both of you

 9   are not available on a full day, or any critical

10   witness is not available.

11              Any other questions?  No?  Thank you all

12   very much.  Mr. Parlade, next time make sure that

13   you read the pre-trial order carefully.

14              MR. PARLADE:  I will, Your Honor.

15              THE COURT:  I sanctioned some lawyers a

16   hundred dollars each last time they did it.  You get

17   the one time break.

18              All right.  Court is adjourned.

19              (Thereupon, the hearing was concluded.)

20

21

22

23

24

25
```

Page 128

1                          **CERTIFICATION**

2

3     **STATE OF FLORIDA:**

4     **COUNTY  OF  DADE:**

5

6                    **I, HELAYNE F. WILLS, Shorthand**

7     **Reporter and Notary Public in and for the State of**

8     **Florida at Large, do hereby certify that the**

9     **foregoing proceedings were taken by electronic**

10    **recording at the date and place as stated in the**

11    **caption hereto on Page 1; that the foregoing**

12    **computer-aided transcription is a true record of my**

13    **stenographic notes taken from said electronic**

14    **recording.**

15                    **WITNESS my hand this 7th day of**

16    **August, 2020.**

17

18

19    _____

                           **HELAYNE F. WILLS**
20               **Court Reporter and Notary Public**
              **In and For the State of Florida at Large**
21            **Commission No:  GG123092  Expires 8/2/2021**

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:

CASE NO. 17-20358-LMI
CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/

**MOTION TO SUPPLEMENT MOTION FOR CONTEMPT**

**COMES NOW** the Debtor's by and through their undersigned counsel and files this their Motion to Supplement the Motion for Contempt and as cause therefore states as follows;

1. The Debtors filed this bankruptcy on August 16, 2017.

2. A Motion for Contempt was filed against Hammocks Community Association Inc and its President Maglli Gallego (ECF 140).

3. An Amended Motion for Contempt was filed against Hammocks Community Association Inc and its President Maglli Gallego (ECF 159).

4. After an evidentiary hearing the parties entered into an Amended Agreed Order on the Amended Motion for Contempt on December 4, 2018 (ECF 189 and ECF 191).

5. On September 17, 2019, the present Motion for Contempt was filed (ECF 199).

6. The evidentiary hearing on the present Motion for Contempt began on February 6, 2020, but was not concluded.

7. On November 30, 2020, Maglli Gallego and Hammocks Community Association Inc filed a lawsuit in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida seeking among other things monetary damages. This is the second lawsuit filed in violation of the automatic stay as well as this court's Order on Debtor's Amended Motion for Contempt (ECF 191).

8. The above mentioned complaint was filed in this court on December 9, 2020 (ECF 265).

**WHEREFORE,** the undersigned requests this Court grant this Motion to Supplement the original Motion for Contempt filed on September 17, 2019 (ECF 199), with the new lawsuit that was filed in the State Court as an additional violation of the automatic stay as well as this courts Amended Order (ECF 191).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of the **MOTION TO SUPPLEMENT MOTION FOR CONTEMPT** was sent via email to Marglli Gallego and Hammocks Community Association, INC Attorney, Miguel F. Palade,parladelaw@gmail.com and NANCY NEIDICH Chapter 13 Trustee and all those set forth in the NEF on this 21th day, of December 2020.

GBHB d/b/a BankruptcyNow
Attorneys for the Debtor
8410 SW 40th Street
Miami, FL 33155
Telephone (888)811-8989

By ___/s/_ Michael J. Brooks_____

Michael J. Brooks
Florida Bar No. 434442

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-LMI
IN RE:                                          CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/


**MOTION TO REOPEN DIRECT EXAMINATION**


**COMES NOW** the Debtor's by and through their undersigned counsel and files this their Motion to Supplement the Motion for Contempt and as cause therefore states as follows;

1. The Debtors filed this bankruptcy on August 16, 2017.

2. A Motion for Contempt was filed against Hammocks Community Association Inc and its President Maglli Gallego (ECF 140).

3. An Amended Motion for Contempt was filed against Hammocks Community Association Inc and its President Maglli Gallego (ECF 159).

4. After an evidentiary hearing the parties entered into an Amended Agreed Order on the Amended Motion for Contempt on December 4, 2018 (ECF 189 and ECF 191).

5. On September 17, 2019, the present Motion for Contempt was filed (ECF 199).

6. The evidentiary hearing on the present Motion for Contempt began on February 6, 2020, but was not concluded.

7. On November 30, 2020, Maglli Gallego and Hammocks Community Association Inc filed a lawsuit in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida seeking among other things monetary damages. This is the second lawsuit filed in violation of the Automatic Stay as well as this court's Order on Debtor's Amended Motion for Contempt (ECF 191).

8. The above mentioned complaint was filed in this court on December 9, 2020 (ECF 265).

9. It is necessary to reopen direct examination to enter into evidence the complaint filed in the State Court which was attached to the Notice of Filing (ECF 265) as well as the damages incurred by the Debtor's for the violations of the Automatic Stay and of this Courts Amend Agreed Order (ECF 191).

**WHEREFORE,** the undersigned requests this Court grant this Motion to Supplement the original Motion for Contempt filed on September 17, 2019 (ECF 199), with the new lawsuit that was filed in the State Court as an additional violation of the automatic stay as well as this courts Amended Order (ECF 191).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of the **MOTION TO REOPEN DIRECT EXAMINATION** was sent via email to Marglli Gallego and Hammocks Community Association, INC Attorney, Miguel F. Palade,parladelaw@gmail.com and NANCY NEIDICH Chapter 13 Trustee and all those set forth in the NEF on this 21th day, of December 2020.

GBHB d/b/a BankruptcyNow
Attorneys for the Debtor
8410 SW 40th Street
Miami, FL 33155
Telephone (888)811-8989

By __/s/  Michael J. Brooks_____

Michael J. Brooks
Florida Bar No. 434442

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-LMI
IN RE:                                                 CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/


## MOTION TO SUPPLEMENT WITNESS LIST


**COMES NOW** the Debtor's by and through their undersigned counsel and files this their Motion to Supplement Witness List and as cause therefore states as follows;

1. The Debtor's failed to get into evidence exhibit number 13 and it is necessary to call Diana Pico either for direct testimony to lay a foundation to allow the evidence to be admitted or as a rebuttal witness.


**WHEREFORE,** the undersigned requests this Honorable Court grant this Motion to Supplement Witness List.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of the **MOTION TO SUPPLEMENT WITNESS LIST** was sent via email to all those set forth in the NEF on this 29th day, of December 2020.

GBHB d/b/a BankruptcyNow
Attorneys for the Debtor
8410 SW 40th Street
Miami, FL 33155
Telephone (888)811-8989


By   /s/  Michael J. Brooks
        Michael J. Brooks
        Florida Bar No. 434442

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In Re:                                                    Case Number: 17-20358-LMI
                                                          Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____Debtor(s)_____/

### MARGLLI GALLEGO and HAMMOCKS COMMUNITY ASSOCIATIONS' RESPONSE TO DEBTORS' MOTION TO SUPPLEMENT MOTION FOR CONTEMPT (D.E. 267), DEBTORS' MOTION TO REOPEN DIRECT EXAMINATION (D.E. 281), and DEBTORS' MOTION TO SUPPLEMENT WITNESS LIST (D.E. 280)

COMES NOW, Marglli Gallego (hereinafter "Gallego") and Hammocks Community Association (hereinafter "Association"), by and through the undersigned, and hereby submit this Response to Debtors' Motion to Reopen Direct Examination (D.E. 281), Debtors' Motion to Supplement Witness List (D.E. 280), and Debtors' Motion to Supplement Motion for Contempt (D.E. 267) and as grounds hereby states as follows:

### I.   Statement of Facts

1.      The matter at bar concerns a Motion for Contempt filed by Debtors against Marglli Gallego and Hammocks Community Association on September 17, 2019 (D.E. 199).

2.      After discovery was conducted, this matter came before this Court on evidentiary hearing on February 6, 2020.

3.      On February 6, 2020, Debtors' counsel presented their case in chief and rested after their final witness was called.  Thereupon, the undersigned counsel began the case in chief and presented one witness before the day concluded.

4.      This Court instructed that a subsequent day would be scheduled for the undersigned to finish his case in chief and for the debtors to call rebuttal witnesses.

5.      In the interim of this scheduling, the Covid 19 pandemic disrupted life as we know it and delayed the scheduling of this matter.

6.      On December 21, 2020, this Court held a status conference and all parties agreed that it would be best to proceed via remote witness testimony in order to conclude this matter.

7.      Shortly thereafter, the parties agreed that the matter be concluded within a two-day virtual hearing to be conducted on February 11, 2021 and February 12, 2021.

8.      On December 29, 2020, Debtors filed the aforementioned motions to Reopen Direct Examination and to Supplement their Witness List.

9.      These motions pray that this court allow a new witness as well as reopening the case in chief to add evidence.

10.     On December 21, 2020, the attorney who covered the status conference for Debtors' counsel brought up to this Court that Debtors had filed a copy of a new lawsuit filed by Association against Leticia Cepero.

11.     He informed the Court, via Ore Tenus motion, that the Debtors wished to supplement their Motion for Contempt.

12.     Thereafter, the undersigned informed this Court that the lawsuit was filed erroneously and was promptly voluntarily dismissed.

13.     This Court stated on the record that the new lawsuit filed against Leticia Cepero is a "new matter" and that leave to amend the existing Motion for Contempt would not be allowed.

## II.   <u>Applicable Law</u>

14.     Federal Rule of Evidence 611 requires a trial judge to "exercise reasonable control over the mode and order" of witness interrogation and evidence presentation. *See also Fed. R. Bank. Proc. 9017.*

15.     A litigant must disclose the information and witnesses that it "may use to support its claims or defenses." *Fed. R. Civ. P. 26(a)(1)(A)(i). See also Fed. R. Bank. Proc. 7026.*

16.     "The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise." *Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 396 (4th Cir. 2014).*

17.     A party must also supplement its disclosures if it obtains new information, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Fed. R. Civ. P. 26(e)(1)(A).*

18.     "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . at trial, unless the failure was substantially justified or is harmless." *Fed. R. Civ. P. 37(c)(1).*

## III. Argument

19.     Debtors are seeking to introduce new witnesses almost one year after they completed their case in chief and after discovery has been completed.

20.     This new witness has never been disclosed/identified in discovery responses and the Association and Gallego would be prejudiced if the new witness is allowed and if Direct Examination is to be reopened.

21.     Their can be no substantial justification in waiting for almost one year after the completion of the first day of trial and for less than month before the scheduled continuation of this trial to now request the addition of a new witness/new evidence.

22.     Debtors' Counsel is attempting to reinforce their case while depriving the Association and Gallego of their procedural due process.

23.      Further, this Court already stated on December 21, 2020 that the lawsuit filed on

November 30, 2020 was a "new matter" and amending/supplementing the existing

motion at bar would not be allowed.

WHEREFORE, Debtors respectfully requests this Court order the following:

i)      Deny Debtors' Motion to Supplement Motion for Contempt (D.E. 267),

ii)     Deny Debtors' Motion to Reopen Direct Examination (D.E. 281),

iii)    Deny Debtors' Motion to Supplement Witness List (D.E. 280), and

iv)     Such other relief as the Court deems just and necessary.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below via electronic delivery on this 6th day of January 2021:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

David E. Hicks, Esq. on behalf of Creditor JPMorgan Chase Bank, N.A. tbyington@kelleykronenberg.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Steven G. Powrozek, Esq. on behalf of Creditor Wells Fargo Bank, NA. spowrozek@logs.com, LOGSECF@logs.com

Lindsey Savastano on behalf of Creditor Wells Fargo Bank, NA. LSavastano@flwlaw.com, NJackson@flwlaw.com

<u>/s/ Miguel Parlade</u>
Miguel Parlade, Esq.
Fla. Bar. 388068
Attorney for Marglli Gallego and
Hammock Community Association
P.O. Box 771747
Miami, FL  33177
(305) 235-9040

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-BKC-LMI
CHAPTER 13

IN RE:
JOSUE CEPERO
and LETICIA CEPERO,
     Debtors
_____/

**DEBTORS' AMENDED MOTION FOR CONTEMPT AGAINST HAMMOCKS COMMUNITY ASSOCIATION INC., AND IT'S PRESIDENT, MARGLLI GALLEGO FOR FAILURE TO ABIDE BY THIS COURT'S AGREED ORDER DATED DECEMBER 3, 2019, [ECF 189] AND THIS COURT'S ORDER DATED DECEMBER 6, 2018, [ECF 191] ON THE DEBTORS' AMENDED MOTION FOR CONTEMPT AGAINST HAMMOCKS COMMUNITY ASSOCIATION INC., AND IT'S PRESIDENT, MARGLLI GALLEGO**

     The Debtors request that this Honorable Court enter an Order holding Hammocks Community Association Inc., ("The Association") and it's President, Marglli Gallego, in contempt in violation of this Court's Orders, [ECF 189 and 191] and states:

     1.     On August 16, 2017, the Debtors filed a voluntary petition under Chapter 13 of Title 11 of the U.S. Bankruptcy Code.

     2.     One of the creditors listed in the Debtor's schedules is Hammocks Community Association Inc., who is the Debtors' Homeowner's Association on the Debtor's homestead property located at 9541 Southwest 148th Place, Miami, FL 33196.

     3.     Pursuant to the Debtor's Amended Chapter 13 Plan, the Debtors arrearage and monthly payments are being paid through the plan.

     4.     Pursuant to Orders entered by this Court, after evidence presented at trial;

     A.     The Agreed Order on Debtor's Amended Motion for Contempt against Hammocks Community Association Inc., and it's President, Marglli Gallego, [ECF 189],

dated December 3, 2018 states The Hammocks Community Association, Inc., and it's President, Marglli Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed.  During such time, there shall be no communication from any representative with Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, and either her individually, or her capacity of her representative of the Association, with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors.

In the event the Chapter 13 Plan remains effective and approved, and such plan directs Hammocks Community Association, Inc., to accept monthly Association payments, the Association will comply with such plan.

In the event Josue and Leticia Cepero remain in compliance with the Chapter 13 Plan, Debtors shall be entitled to all benefits of every other condominium association owner, including but not limited to, access to all the common areas, be entitled to vote on all condominium matters and shall be provided with all condominium materials that are provided to other Association members.

Notwithstanding Debtors rights as condominium association owners, Debtors shall refrain from any further contact with the Hammock Community Association, Inc's

2

President, Marglli Gallego during or immediately following Association board meetings; and shall direct any formal communications with Mrs. Gallego in her capacity as the President of the Association in writing.

The parties agree the communications, negotiations of this agreed order, discovery made by the parties in connection with the evidentiary hearing associated with the Motion and this Order, shall remain confidential, and shall not be disclosed with any third  parties.    The uploading of this Order does not constitute a violation of the confidentiality of the agreement.

A violation of any provisions herein will subject the violating party to additional sanctions by this Court after notice and a hearing.

B.      The Order on Debtor's Amended Motion for Contempt against Hammocks Community Association, Inc., and it's President, Marglli Gallego, [ECF 191] dated December 6, 2019 states:

The Court takes judicial notice of the Order entered against Marglli Gallego against in her capacity as president of Hammocks Community Association Inc., dated December 4, 2018, [ECF 189].

Based upon the evidence presented, specifically from the witness, Doria Wosk, and the fact that the witness provided evidence that there was a physical threat made against the co-debtor, Leticia Cepero, and to prevent any further altercations between Ms. Gallego in her individual capacity, which is an addition to the Order entered against her in her capacity as the President of Hammocks Community Association, Inc., Ms. Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed.

During such time, there shall be no communication from, Marglli Gallego, individually, or in her capacity as the president of the Hammocks Community Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Marglli Gallego, individually, to approach the Debtors, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors.

5.      On May 15, 2019, Marglli Gallego confronted the debtors by blocking their car with a condominium association vehicle while they were visiting another property in the Association.

6.      Marglli Gallego began yelling at the Debtors and called the police after blocking the debtor's car into a parking spot with a condominium association vehicle.

7.      A police report was filed and Marglli Gallego filed a request for injunctive relief against the Debtors claiming that the Debtors hit her with their car. Attached is a copy of the police report and a copy of the Petition for injunctive relief filed in State Court against *Marglli Gallego v. Josue Cepero, case number 2019-011650-FC0–04*, in the Circuit Court of the 11th Judicial Court, in and for Miami-Dade County, Florida. There was no claim on the police report by Ms. Gallego that she was injured in any way by my clients. Ultimately, on or about September 10, 2019, Ms. Gallego filed a voluntary dismissal against the Debtors in State Court from injunctive relief.

8.      The Debtors were visiting Maria Alonso, the president of a different condominium association when Ms. Gallego parked in a condominium Association vehicle behind the car blocking them in.

A witness, Maria Alonso witnessed Marglli Gallego parke behind the Debtors, who were legally park. Ms. Gallego got out of the car and started screaming at the Debtors. The witness, Ms. Alonso, saw the entire incident. There was no injury to any party. Attached to this Motion is a sworn affidavit from Maria Alonso.

9.     Additionally, sometime in Mid-August of 2019, the Association passed out a form to the residents of the entire Association regarding tree trimming. In this form, the Association stated "WE know that in Pelican Point there are residents spreading false rumors about the Association. Those residents are Leticia Cepero, Josue Cepero, Alicia Paz and others who are spreading these false rumors for personal reasons and gains. Their purpose is to confuse the community in a negative manner. Attached you will find a copy of the Court documents showing that there is a restraining order against the Cepero's since they attacked the board president on many occasions and the last occurrence was when they followed her to her son's school for malicious reasons with under aged children involved." Ms. Gallego also attached an arrest record of the debtor, Josue Cepero, from June 23, 1993, as well as the cover sheet for the temporary injunction for protection against stalking violence/extension. This is in direct violation of this court's orders dated December 3, 2018, [ECF 189] and December 6, 2018, [ECF 191].  Attached hereto and made a part of is the letter received by all the residents of the Association, as well as the cover sheet for the temporary injunction for protection against stalking violence/extension and the Miami-Dade criminal record for Josue Cepero, *case number F-93-020400.*

10.     The Debtors were forced to hire an attorney as State Court counsel to defend against the lawsuit filed by Ms. Gallego and the Debtors spent $2,500.00 for attorney fees and $350.00 in cost. Additionally, the debtors, specifically the co-debtor, has suffered severe emotional stress due to the fact that Ms. Gallego continues to violate these Courts Orders and harass the Debtors by slandering them i.e., criminal records, which was

5

dismissed within 2 weeks of arrest and saying that the Debtors attacked Ms. Gallego and minor children. The Debtors have also incurred attorney fees for the filing of this Motion, as well as costs incurred in prosecuting their case.

11.    Further, undersigned received a letter from the Trustee, Nancy Neidich, advising undersigned that the creditor, Hammocks Community Association Inc., checks are being returned to the Trustee as undeliverable.

12.    On or about November 20, 2020 the Debtor were served with a lawsuit against Leticia Cepero for defamation against Marglli Gallego and The Hammocks Community Association Inc. as well as tortious interference with a business relationship.

13.    The Debtors immediately contact the undersigned to notify him that they were served with the compliant. The undersigned then contacted Hilton Napoleon, II Esq., the attorney who filed the complaint on behalf of Marglli Gallego and the Hammocks Community Association Inc., to notify him that the Leticia Cepero was in bankruptcy and also advised him of the Amended Order of Contempt against the Hammock Community Association Inc. and Marglli Gallego.

14.    The undersigned was told by Mr. Napoleon that he had no knowledge of the bankruptcy or the Agreed Order for Contempt and would immediately dismiss the lawsuit against Leticia Cepero.

15.    Paragraphs 1 through 11 are exactly the same as the original Motion for Contempt. Paragraphs 12 through 15 are the additional and continued violations of the Orders at ECF 189 and 191. These allegations are additional violations of US Bankruptcy Code Section 362 and the above mentioned Orders.  It is in the interest of judicial economy, while time to hear the matter has been reserved, to consider this related matter violation of the same Orders while the Court is already considering evidence of other prior violations.  To hold otherwise, will result in another evidentiary hearing at additional time and expense which should be unnecessary, since the Court

6

is already in the middle of an evidentiary hearing.

WHEREFORE, the Debtors request this Court hold Marglli Gallego and the Hammocks Community Association Inc., in contempt for their continued willful violations of this Court's prior orders, [ECF 189 and 191], including the matter set forth in Paragraphs 12-14, and requests that Marglli Gallego and The Association be sanctioned for attorney fees, reimbursement of costs, including, but not limited to, the prosecution of this matter, as well as the State Court matters, as well as punitive damages against Marglli Gallego and The Hammocks Community Association Inc. for their willful violation of these Court's prior Orders and for emotional distress.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was sent by email to those set forth in the NEF, this 7th day of January 2021 and by regular mail to Hammocks Community Association Inc., 9020 Hammocks Blvd, Miami, FL 33196-1301, Hammocks Community Association Inc., Attn: Marglli Gallego, President, 9020 Hammocks Blvd, Miami, FL 33196, Alfaro & Fernandez, P.A., Registered Agent of Hammocks Community Association Inc., 5801 Northwest 151 Street, Suite 305, Miami Lakes, FL 33014.

> GBHB d/b/a BankruptcyNow
> Attorneys for the Debtor
> 8410 SW 40th Street
> Miami, FL 33155
> Telephone(888)811-8989
>
> By /s/ Michael J. Brooks
> Michael J. Brooks
> Florida Bar No. 434442

Page 129

1          UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF FLORIDA
2

3                              Case No.:  17-20358-LMI
                               Chapter 13
4

In Re:

5

JOSUE CEPERO and LETICIA CEPERO,

6

       Debtors.

7     _____/

8

9

10                   VOLUME II

11                 CONTINUED TRIAL

12              ECF # 199, 267, 289

13               February 11, 2021

14

15

16         The above-entitled cause came on for a

17   Zoom hearing before the HONORABLE LAUREL M. ISICOFF,

18   one of the Judges of the UNITED STATES BANKRUPTCY

19   COURT, in and for the SOUTHERN DISTRICT OF FLORIDA,

20   Miami-Dade County, on Thursday, February 11, 2021,

21   commencing at or about 9:32 a.m., and the following

22   proceedings were had:

23

24         Transcribed from a Zoom recording by:
                 Helayne Wills, Court Reporter
25

Page 130

```
 1   APPEARANCES VIA ZOOM:
 2        BANKRUPTCY NOW, by
          MICHAEL J. BROOKS, ESQ.,
 3        and
          LAW OFFICE OF LOUIS ARSLANIAN, by
 4        LOUIS ARSLANIAN, ESQ.,
          on behalf of the Debtors
 5
 6        LAW OFFICES OF MIGUEL PARLADE, P.A., by
          MIGUEL F. PARLADE, ESQ.,
 7        on behalf of the Hammocks Community Association
          and Marglli Gallego
 8
 9        JUAREGUI LAW, P.A., by
          SABINO JUAREGUI, ESQ.,
10        on behalf of Marglli Gallego
11
          ALSO PRESENT:
12        ECRO - Electronic Court Reporting Operator
          MARGLLI GALLEGO
13        JOSUE CEPERO
          LETICIA CEPERO
14        KINSELL LAMBERT, Interpreter
15                          INDEX
16   WITNESS               DIRECT     CROSS      REDIRECT
17   MARGLLI GALLEGO
       (By Mr. Parlade)     185                    254
18     (By Mr. Arslanian)              218
19
20                        EXHIBITS
21   DEBTORS'                                     PAGE
       Exhibit L                                  235
22
     RESPONDENT'S
23     No. 17                                     152
       No. 21                                     162
24
25
```

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

1            THE COURT:  All right.  Good morning,

2     everyone.  I hope everyone is doing well.

3            We're here this morning on the continued

4     trial of Cepero, 17-20358.  I'm going to make some

5     preliminary remarks.

6            I heard, Mr. Brooks, that your translator

7     is not here.  So I hope and assume that your clients

8     will hear and understand what I am saying, as I

9     understand they are in the room with you.

10            MR. BROOKS:  Yes.

11            THE COURT:  All right.  So for those of

12     you who are new to this, you need to know that this

13     hearing is being recorded by the Court.  It is only

14     allowed to be recorded by the Court.  Any other

15     recording is a violation of state law, and will also

16     subject the violator to sanctions by the Court.

17            When you speak, you will speak slowly and

18     clearly.  I will need to make sure that I can see

19     the witness at all times.  The only person who may

20     be in the room with any witness is the translator.

21     Witnesses may not be in the room with their

22     attorneys or any other person.

23            There are two reasons for this.  One is,

24     obviously, I need to make sure that there is no

25     interaction between the attorneys and their

Page 132

1    witnesses.  But more importantly, or maybe equally

2    importantly, the echo from having more than one

3    device open on Zoom in the same room will make it

4    impossible for us to go forward.

5              Please remember not to interrupt each

6    other.  Notwithstanding that, if you are going to

7    make an objection to testimony, my law clerk will

8    keep an eye on the hands.  Mr. Parlade and

9    Mr. Arslanian, you both know how to use the hand in

10   Zoom?  Then we're going to go with the old fashioned

11   gesticulating wildly.  Okay?

12             MR. PARLADE:  Yes, Your Honor.

13             THE COURT:  When the witness is sworn in,

14   I will tell the witness that they are to -- of

15   course, I believe all the witnesses are using

16   translators anyway, so that will help, but for them

17   not to answer until I've ruled on any objection,

18   which will only be if someone has raised their hand.

19             I'm assuming that's the translator that's

20   just come in?

21             THE INTERPRETER:  Yes, ma'am.

22             THE COURT:  All right.  And the

23   translator, I'm assuming, is just there to

24   facilitate your client, and that, Mr. Arslanian,

25   your clients will not be testifying today; is that

1    correct?

2            MR. ARSLANIAN:  I believe that Mr. Parlade

3    is going to be calling Mrs. Cepero.

4            THE COURT:  Then Mrs. Cepero will need to

5    be in a different room with the translator, and not

6    with her husband.  All right?

7            MR. BROOKS:  Say that again.

8            THE COURT:  Mrs. Cepero, when called to

9    testify, needs to be in a different room with the

10   translator.  She may not be in the room with either

11   her husband or with either of you.  Okay?

12           Just for the record, that was Mr. Brooks

13   speaking.

14           Please remember to say your name each time

15   you speak.  That will make it much easier for the

16   translator -- I'm sorry -- the transcriber, if the

17   hearing is transcribed.  Having said that,

18   obviously, if you are in the middle of questioning a

19   witness, you don't have to state your name every

20   time you ask a question.  I think that would drive

21   all of us crazy, and we would be doing this still in

22   three months.

23           All right.  Are any --

24           MR. BROOKS:  Your Honor, does Ms. Cepero

25   need to leave the room now?

Page 134

```
 1                 THE COURT:  When it is time for Ms. Cepero
 2    to testify, she must be in a separate room with only
 3    the translator, no one else.
 4                 MR. BROOKS:  And a lawyer.
 5                 THE COURT:  No.  The lawyer has to remain
 6    in a different room.
 7                 MR. BROOKS:  Oh, okay.
 8                 THE COURT:  Let's think about this.  If
 9    the client was on the witness stand, the lawyer
10    would not be standing next to the client in the
11    witness stand, correct?
12                 MR. BROOKS:  Correct.
13                 THE COURT:  This is the virtual
14    equivalent.  That's why you will gesticulate wildly.
15    All right?
16                 Now, we will go straight through.  There
17    will not be a break for lunch, because you all need
18    to stop at 2 o'clock.  We will take a ten minute
19    break at about 11:00 and at about 12:30.  If anybody
20    needs to take a break, no details, thank you, just
21    raise your hand.
22                 That reminds me.  Make sure all your
23    phones, other peripheral everything, are off.
24                 We will end as close to 2:00 as possible.
25    Obviously, if we're in the middle of a witness --
```

1    I'm sensitive to the fact, Mr. Brooks, that your

2    colleague needs to leave at 2:30, which is why I

3    booked the end at 2:00, so if we bleed a little bit,

4    there's time.

5              MR. BROOKS:  We appreciate that.  Thank

6    you.

7              THE COURT:  This is a reminder to the

8    witnesses, and I will ask the translator to make

9    this clear.  During those two ten-minute breaks, you

10   may not discuss your testimony with anyone, no one.

11             I see the principal, and I see,

12   Mr. Parlade, although Ms. Gallego signed up to be

13   here, she's not.  So do you have any principals that

14   are attending today?

15             MR. PARLADE:  She is here, Your Honor.

16             THE COURT:  Where is she?

17             MR. PARLADE:  She's on the sign-in that

18   says Sabino Jauregui.  I don't know why their video

19   isn't on.

20             THE COURT:  Oh, okay.  I'm sorry.  That's

21   Ms. Gallego?  All right.

22             MR. JAUREGUI:  Good morning, Your Honor.

23   Sabino Jauregui on her behalf.  I'm her personal

24   attorney.  I did hear your instructions.

25             THE COURT:  Well, I'm going to take

1    appearances for a minute.  So thank you.  I did not

2    realize that was Ms. Gallego.  She needs to -- well,

3    if she's testifying, she needs to be in a separate

4    room.  All right.

5              And any representative -- I see that

6    Mr. Alfaro is just listening.  That's fine, but

7    there can be no -- of course, you attorneys, but

8    witnesses cannot chat.  You can confer with your

9    client about the case in general, but not about

10   their testimony specifically.  And that will apply

11   not only in the two 20-minute breaks, but will, of

12   course, apply during the break until we start again

13   tomorrow.

14             So with that I'm going to take

15   appearances, and we'll start with you, Mr. Brooks.

16   Please remember, you don't need to spell your last

17   name for the record, but you do need to identify

18   your client.

19             MR. BROOKS:  My name is Michael Brooks for

20   the debtors, Mr. and Mrs. Cepero.

21             THE COURT:  All right.  Mr. Arslanian.

22             MR. ARSLANIAN:  Louis Arslanian for the

23   debtors, Mr. and Mrs. Cepero.

24             THE COURT:  All right.  And Mr. Parlade.

25             MR. PARLADE:  Good morning.  Miguel

1    Parlade on behalf of Hammocks Community -- can you

2    hear me?

3              THE COURT:  Yes.  I can hear you.

4              MR. PARLADE:  Good morning, Your Honor.

5    Miguel Parlade on behalf of Hammocks Community

6    Association and Marglli Gallego.

7              THE COURT:  All right.  And Mr. Jauregui,

8    make your appearance, please.

9              MR. JAUREGUI:  Thank you, Your Honor.

10   Good morning.  Sabino Jauregui on behalf of Marglli

11   Gallego.

12             THE COURT:  All right.  And Ms. Gallego is

13   with you, and I understand that Mr. and Mrs. Cepero

14   are in the offices with Mr. Brooks and

15   Mr. Arslanian.

16             I have here a Mario (unintelligible), but

17   I don't see that person listed, so I'm going to note

18   that they are not here.  And Maria Alonso.

19             MR. BROOKS:  She's done with her

20   testimony.

21             THE COURT:  Okay.  Say your name,

22   Mr. Brooks.

23             MR. BROOKS:  I'm sorry.  Michael Brooks

24   for the debtors.

25             Ms. Alonso testified, and she's been

1  excused.

2          THE COURT:  Okay.  And don't interrupt me

3  again.

4          MR. BROOKS:  I'm sorry.

5          THE COURT:  This is a very hard process

6  for everybody, but it gets harder if we interrupt.

7  So wait until I'm done speaking, and then you can --

8  again, I'll go with the gesticulating wildly, and

9  give you guys your homework for tomorrow to figure

10 out how to raise your little blue hand.  Okay.  All

11 right.

12          I note, as I said, that Mr. Alfaro has

13 dialed in, and he's just listening.  Okay.  All

14 right.

15          So, Mr. Brooks, you suggested that you --

16 before we get started with that, let me just -- a

17 couple of other housekeeping matters on my side, and

18 then I'll hear what you all have to say.

19          I will administer the oath.  I will do the

20 interpreter's oath, and then I will do the witness

21 oath when it is time for testimony.

22          I have all the exhibit registers and

23 binders with me, the physical ones that you all

24 submitted last year, and I will go through what was

25 admitted and what was not admitted.  I note that the

```
 1   defendants or the respondents have uploaded their

 2   exhibits electronically.  I note that the debtors

 3   have not.  That's not required.  It was invited.

 4             That means that all witnesses are supposed

 5   to have with them everything other than rebuttal

 6   or -- not rebuttal -- I'm sorry.  I guess I should

 7   have had another cup of coffee.  Any evidence that

 8   is being used -- well, for rebuttal, which will be

 9   at the end of the case, or for impeachment.

10             I want to thank my law clerk for giving me

11   the word.  That's why I have the law clerk.  Okay.

12             So I will do that.  I have created a

13   break-out room for side bars.  So if a sidebar is

14   necessary, then I will invite Mr. Parlade and

15   counsel for the Ceperos to go into side bar, if that

16   is necessary.  All right?

17             Other than that, it does not appear that

18   we have an issue regarding witnesses, because all

19   the witnesses appear to be the parties; is that

20   correct, gentlemen?  All right.

21             So Mr. Brooks, I'll start with -- yes,

22   Mr. Arslanian?

23             MR. ARSLANIAN:  We were supposed to have a

24   witness.  The witnesses right now appear to be only

25   the parties, but one of the witnesses was deposed
```

1    about a week or so ago regarding the Exhibit 13.

2    We've subpoenaed the witness.  She's not here.  We

3    have her deposition.  So we've got an issue with

4    that.

5                 THE COURT:  Okay.  When -- first of all,

6    you're going to have to move those people, the

7    Ceperos, out of your office, because I can hear the

8    translator, and I can't have that happen.  So the

9    Ceperos will have to go somewhere.  Obviously, if

10   they need to listen, you're going to have to log in

11   on Zoom on a different -- give them a different

12   account, but I can't have that happening while I'm

13   conducting court.

14                 When we get to the evidence, because we're

15   not there yet, then whatever motion you want to make

16   regarding the failure of your witness to appear,

17   you'll make that motion at that time, Mr. Arslanian.

18   All right?

19                 MR. ARSLANIAN:  Yes.

20                 THE COURT:  Any other preliminary matters

21   before I hear if Mr. Parlade has any preliminary

22   matters?  No?  Okay.

23                 For purposes of impeachment or -- for

24   purposes of impeachment, I'm presuming that

25   everybody who's planning on impeaching documents

1    knows how to screen share.  So if you don't, oh

2    well.  You won't be able to use that document for

3    impeachment.

4              All right.  So it is my understanding that

5    we are going to start -- well, first, I'm sorry.

6    Let me go through the exhibits.  And I apologize

7    that I keep turning to the side, but that's where I

8    have the exhibit notebooks.  I will try to look at

9    you all as much as possible, but I can only do as

10   much as I can do.

11             I have on the Ceperos' side that Exhibits

12   1 through 5 were not introduced, 6 through 8 were

13   not introduced, 9 and 10 were admitted, 11 and 12

14   were not introduced.  Thirteen is the exhibit we

15   need to deal with today.  Exhibit 14 was admitted,

16   and Exhibits 15 and 16 were not introduced.  So

17   that's what I have on the Ceperos' side.

18             On the respondent's side, for Ms. Gallego

19   and Hammocks, I have Exhibits A through F were

20   admitted, and we never got past that.  So that's

21   where we are.  But A through F are admitted.

22             What is Ms. Gallego holding to her ear?

23             MR. JAUREGUI:  Judge, she's holding her

24   phone.  The translator is on the phone translating.

25             THE COURT:  Oh, okay.  All right.  Well,

1    that's good.  This is how we have a good translator.

2            This is a certified translator, Counsel?

3            MR. JAUREGUI:  Yes, Your Honor.

4            THE COURT:  Okay.  All right.  So let's

5    get started.  So we can reopen -- unless what you

6    want to do, Mr. Arslanian, is wait to reopen your

7    case until your witness shows up, and then if your

8    witness doesn't show up, I assume you're going to be

9    making a motion regarding the use of the deposition,

10   to which Mr. Parlade will either agree or object.

11   So perhaps that would make sense.

12           Do you agree, Mr. Arslanian, that we

13   should wait and see if your witness shows up, and

14   let the respondents continue with their case, or --

15   oh, no, we have -- and then you'll reopen, or do you

16   want to reopen now, do the exhibits relating to the

17   amended contempt, and you'll see if your witness

18   shows up?  What do you want to do, Mr. Arslanian?

19           MR. ARSLANIAN:  I'd rather reopen now, and

20   I don't believe -- I'm going to make a motion now.

21   I'm fairly confident that it's not tardy.  We've had

22   issues with Ms. Pico, so I don't think that she's

23   going to -- I don't think any delay is going to make

24   her appear.  She's not going to appear today, so I'm

25   making a motion regarding the deposition.

1           THE COURT:  Okay.  Let's -- so,

2  Mr. Parlade, any objection?  We're going to reopen

3  the movant's case first, and then you'll finish with

4  your case in the course of direct, and your side,

5  the amended consent, those additional exhibits.

6  Okay.

7           So I did not get an amended exhibit

8  register from you, Mr. Arslanian, but I did -- or

9  did I and I missed it?  Where would that be on the

10  docket, Mr. Arslanian, if I missed it?

11           MR. ARSLANIAN:  Mr. Brooks.

12           MR. BROOKS:  We filed notice of filing.

13  Michael Brooks speaking for the debtors.  We did

14  notice of filing, and Ms. Pico's deposition is at

15  ECF 307.

16           THE COURT:  I didn't ask you that.  Just

17  please answer the questions that I ask.

18           Did you submit an amended exhibit register

19  that adds your additional proposed exhibits to the

20  exhibit register that you submitted last February?

21           MR. BROOKS:  No.

22           THE COURT:  Okay.  All right.  You will

23  need to do that.  Okay?  Because you need to have

24  the amended exhibit register submitted.  So please

25  make sure that you do that between today and

Page 144

1  tomorrow.

2           All right.  Now, the additional exhibits

3  that you filed were a notice of transcript of the

4  prior hearing, which is on the docket, so I don't

5  think we need that as an exhibit.  Then you have the

6  deposition of Ms. Pico.  We'll get to that in due

7  time.  Then we have an association letter about the

8  complaint in the docket.

9           Did you upload a bunch of other things?

10          MR. BROOKS:  We uploaded the association

11  budget, my --

12          THE COURT:  Why don't we do this?  This is

13  the problem with you failing to submit an amended

14  register.  I have no idea what of this plethora of

15  documents you wish to include as your exhibit.  So

16  why don't you walk me through the docket entry

17  number.  So right now these are just your proposed

18  exhibits.

19          MR. BROOKS:  Yes.

20          THE COURT:  And the next exhibit number

21  you have is Exhibit 17.  So what is the next exhibit

22  number that you are proposing would be Exhibit 17?

23  Give me the docket number and the description.

24          And again, right now, we're not talking

25  admission of the exhibits.  It's just about

Page 145

1    identification.

2            MR. BROOKS:  I understand.

3            THE COURT:  So, Mr. Brooks, Number 17 is

4    what?

5            MR. BROOKS:  The transcript of Diana Pico

6    at ECF 307.

7            THE COURT:  Okay.  And then what else?

8            MR. BROOKS:  ECF 304 is going to be 18.

9    That is the docket of -- what's her name --

10   Ms. Gallego, of all the cases that she has filed

11   against members of the association, as well as the

12   debtors.  That's ECF 304.

13           THE COURT:  Okay.  State court docket from

14   Gallego lawsuits.  State court docket, summary of

15   Gallego lawsuits.

16           Okay.  What's Exhibit 19?

17           MR. BROOKS:  This is going to be the

18   homeowners association budget for 2020, the approved

19   budget, at ECF 303.

20           THE COURT:  Okay.  And Exhibit 20?

21           MR. BROOKS:  Number 20 is the attorney

22   time sheet at ECF 309.

23           THE COURT:  All right.  What else?

24   Exhibit 21?

25           MR. BROOKS:  Exhibit 21 is going to be the

1    final lawsuits of the trial at ECF 294, with a

2    docket.

3              THE COURT:  All right.  So that's the

4    lawsuit that's the subject of the amended contempt

5    motion and the docket?

6              MR. BROOKS:  Correct.

7              THE COURT:  All right.  So I have Exhibit

8    17 -- I'll just go through this again to make sure

9    that we all have it.  Again, I expect that amended

10   register with all exhibits, 1 through 21, submitted

11   by the end of the day.

12             Exhibit 17 is Diana Pico's deposition.

13   That's 307.  Exhibit 18 is the state court docket

14   summary of Gallego lawsuits.  That's ECF 304.

15   Exhibit 19 is the HOA budget, ECF 303.  Exhibit 20

16   is the attorneys' time sheet, ECF 309.  Exhibit 21

17   is the Gallego lawsuit against Mrs. Cepero and the

18   docket, ECF 294.

19             Is that correct?

20             MR. BROOKS:  That's correct.

21             THE COURT:  All right.  Who's going to be

22   representing the Ceperos, in terms of presentation

23   of evidence?

24             MR. ARSLANIAN:  Mr. Arslanian.

25             THE COURT:  Okay.  All right.

Page 147

1   Mr. Arslanian, please proceed.

2            MR. ARSLANIAN:  Your Honor, at this time

3   we would ask that the -- move to admit the Pico

4   deposition, because the witness is not here.  I

5   would read from the deposition.  The whole purpose

6   of that deposition, if Your Honor will recall, was

7   to --

8            THE COURT:  I'm going to stop you.  So you

9   wish to submit the deposition as evidence, and what

10  is the evidentiary basis?

11           MR. ARSLANIAN:  She identified -- she was

12  the witness that was going to identify Number 13.

13           THE COURT:  Okay.  I'm sorry.  I apologize

14  that I wasn't clear.

15           What is the basis, the procedural basis,

16  upon which you are seeking admission of the

17  deposition in lieu of live testimony?  Unless

18  Mr. Parlade agrees, and then there's not an issue.

19           Mr. Parlade, you do not agree?

20           MR. PARLADE:  No, Your Honor.

21           THE COURT:  Okay.  So, Mr. Arslanian, what

22  is the rule on which you are relying to seek

23  admission of the Pico deposition?

24           MR. ARSLANIAN:  The witness is

25  unavailable, Judge.  She's not here.

1              THE COURT:  Okay.  And the rule of

2    evidence, Mr. Arslanian?

3              MR. ARSLANIAN:  I'm sorry, Your Honor.

4    I'm unable to provide that to you.

5              THE COURT:  Mr. Parlade?

6              MR. PARLADE:  Your Honor, I object.  They

7    have not laid the foundation (unintelligible) of

8    this evidence, and they have -- just stating that a

9    witness is unavailable does not satisfy the

10   requirement under the Federal Rules of Evidence.

11             THE COURT:  All right.  I would suggest,

12   Mr. Arslanian, that you have someone in your office

13   get you the Federal Rules of Evidence, so that you

14   have them available for the rest of the trial.

15             Okay.  Witness unavailable.

16             MR. PARLADE:  It should be 804, Your

17   Honor.

18             THE COURT:  I'm just trying to find the --

19   okay.  "The declarant is considered to be

20   unavailable as a witness --" this is Rule 804 of the

21   Federal Rules of Evidence -- "is unavailable if the

22   declarant, one, is exempted from testifying, because

23   the Court rules the privilege applies."  No.

24             "Refuses to testify about the subject

25   matter despite a court order to do so.  Testifies to

1    not remembering the subject matter.  Cannot be

2    present or testify at the trial because of death --"

3    not by the witness necessarily -- "is absent for the

4    trial, and a statement proponent has not been able

5    by process or other reasonable means to procure the

6    declarant's attendance," or that certain hearsay

7    exceptions apply.  Okay.

8              So the fact that she hasn't shown up,

9    Mr. Arslanian, does not appear to fall within Rule

10   804.  Do you have something more specific to state

11   with respect to Rule 804?

12             MR. ARSLANIAN:  The last subpart that you

13   read, Your Honor, we have subpoenaed her.  She's not

14   honoring the subpoena.  We've contacted her several

15   times to bring her here today or get her on Zoom to

16   appear today.  She has not responded, not only to

17   our request, but to honor the Court's subpoena.  So

18   maybe the marshals can bring her to testify, but,

19   you know, short of that -- that's all we have here.

20   We've done everything we can, including lawful

21   process, to bring her in.

22             THE COURT:  Okay.  All right.  Brief

23   response, Mr. Parlade.

24             MR. PARLADE:  Your Honor, in order for

25   process to be satisfied, they must ensure not only

1    that a subpoena has been issued, but has been

2    served, and a certificate of service has been issued

3    with the Court, and that attempts were made to try

4    and get the witness to comply with the subpoena.  I

5    have not heard that from the attorney.

6              THE COURT:  Okay.  Mr. Arslanian.

7              MR. BROOKS:  This is Michael Brooks,

8    Judge.

9              The subpoena is on the docket.  I don't

10   have the docket entry handy, but it should be around

11   ECF 300.

12             I've contacted her by -- or attempted to

13   contact her by e-mail and phone as late as this

14   morning.  She refuses to pick up the phone.  She has

15   the Zoom information.  It was left on her door.  The

16   subpoena was filed with the Court, and she was

17   served with the subpoena.

18             THE COURT:  Okay.  I see it.  All right.

19   It says that she was personally served on

20   February 2nd at 8:15 a.m.  That's ECF 300.

21             All right.  So I think that you've

22   established that the witness is unavailable, and so

23   subject, of course, to objection for anything other

24   than the -- regarding the content of the deposition,

25   and I know there were a lot of objections to form,

Page 151

1   although I think they were all on behalf of

2   Mr. Arslanian or Mr. Brooks.

3                  I'll allow the deposition to be used, but

4   subject, of course, to all the other rules, other

5   than hearsay.  Okay?

6                  So -- and I would just note, Counsel, that

7   when you're speaking -- yes, Mr. Parlade, go ahead.

8                  MR. PARLADE:  Your Honor, just for clarity

9   sake, I know Michael Brooks is the attorney of

10  record, and Mr. Arslanian is also helping with the

11  case.

12                 Are both attorneys for the debtors,

13  Mr. Brooks and Mr. Arslanian, going to be arguing

14  and providing impeachment for the debtors, or is it

15  just going to be one attorney?

16                 THE COURT:  Okay.  Thank you very much,

17  Mr. Parlade.  I was focusing a little bit more on

18  the evidentiary rule, but I had already asked who

19  was going to be the attorney.

20                 So, Mr. Arslanian, in the absence of

21  asking me permission to allow Mr. Brooks to respond

22  in your stead, you are to be the sole person who is

23  conducting this part of the trial.  All right?  If

24  and at such time as you and Mr. Brooks switch

25  places, then you need to advise me, and then it will

```
 1   be Mr. Brooks, and then you can only speak if

 2   Mr. Brooks asks me permission to allow you to speak.

 3   Okay?  No double teaming.

 4            MR. ARSLANIAN:  Thank you, Your Honor.

 5            MR. BROOKS:  Thank you, Your Honor.

 6            THE COURT:  It's a little harder in

 7   this -- as we're dealing with this, so thank you for

 8   reminding me.  I had actually already said that, but

 9   in any event, I didn't say it as clearly as I should

10   have.  All right.

11            So, Mr. Arslanian, the deposition is

12   admitted.  Now what?

13            MR. ARSLANIAN:  Now, based on the

14   deposition -- the witness was for the purpose of

15   laying the foundation to admit Number 13, the letter

16   that was the subject of the initial contempt motion.

17   And she testified that she received the letter.

18   It's been referred to as the tree letter, but it

19   mentioned some derogatory information about the

20   debtors.

21            THE COURT:  All right.  Can you show me

22   in -- well, let me just write down, I've now

23   admitted Exhibit 17.

24            (Thereupon, Debtor's Exhibit No. 17 was

25       admitted into evidence.)
```

1              THE COURT:  Can you show me where he

2    identified what was marked as Exhibit 13?

3              MR. ARSLANIAN:  Yes.  Beginning on Page

4    13, starting with -- at the bottom she talked of

5    receiving cases from the association.  "I received a

6    letter from the association of the pruning of trees,

7    and attached thereto was a letter that referred to

8    Josue and Leticia Cepero.

9              Then the question was asked, "I'm going to

10   show you a copy of the letter and you can let me

11   know if this is the letter you're referring to."

12             And it continues on to the next page and

13   talks about the tree removal, and her answer was,

14   "That's the letter I'm referring to."

15             "Okay.  From what I'm understanding your

16   testimony, you received this letter, you brought it

17   to Josue Cepero; is that correct?"

18             And then she says, "This letter came with

19   an additional letter attached."

20             Continuing on to Page 15, she said,

21   "Again, I received the letter and there was

22   attachment made in the name of Josue Cepero, and it

23   appeared to me to be a personal matter.  I did not

24   like it.  That's why I went and delivered it to

25   him."

1              THE COURT:  Okay.  I'm sorry if I wasn't

2    clear, Mr. Arslanian.

3              The purpose of your seeking for me to

4    consider this deposition, which I've admitted for

5    purposes of unavailability, but solely for that

6    purpose, is to identify and seek admission of

7    Exhibit 13.  So I'm going to ask you again, can you

8    show me where in this deposition you showed Ms. Pico

9    Exhibit 13, and she affirmatively identified it as

10   this letter, because the letter that I read about in

11   the deposition is just the tree trimming letter, not

12   the letter attached.

13             So where in this deposition did you show

14   Ms. Pico Exhibit 13, and she identified it as what

15   she received?

16             Because it's also not attached to the

17   transcript of the deposition that you uploaded.  So

18   show me specifically where in the depo you showed

19   her what was marked for trial as Exhibit 13, and she

20   identifies it as the letter that she's talking to

21   Mr. Parlade about, and where is that attached to the

22   transcript, or did you forget to attach it?

23             MR. ARSLANIAN:  I didn't take the

24   deposition.  Mr. Parlade did.  At that point I

25   did -- there is a point in the deposition where I

1  did show her the letter, but what I was reading to

2  you is where he was showing her the letter on the

3  screen share, and she specifically referenced not

4  just the tree portion, but the portion -- it was a

5  personal matter referencing -- the tree letter

6  doesn't mention Mr. Cepero.  The attachments to it

7  do.  And she's talking about that specifically on

8  Page 15, Lines 1 through 7.

9           THE COURT:  How do I -- I understand that

10  you're saying that the tree trimming letter that

11  Mr. Parlade showed her as the tree trimming letter

12  -- that's not the question I asked you.

13           Where in this deposition does the witness

14  identify Exhibit 13, the document for which purpose

15  you are submitting this deposition, where in this

16  deposition that you identified that exhibit, the

17  whole exhibit, for which you are seeking admission

18  here today?

19           MR. ARSLANIAN:  She does it, Your Honor,

20  by reference to Exhibit 13.  It was -- the problem

21  is, Judge, it wasn't known that she wasn't going

22  to -- she was there to satisfy the condition that

23  the Court made to allow her to be admitted and

24  reopen.  We had to provide the deposition.

25           He didn't put it into evidence.  I didn't

1  put it in, because I didn't think she wasn't going

2  to show.  But we were discussing the letter the

3  whole time during the deposition.  I can't

4  identify -- and it wasn't attached, it's not

5  attached, but --

6              THE COURT:  Okay.

7              MR. ARSLANIAN:  She's definitely

8  discussing not just the tree trimming portion of the

9  letter, but the personal portions of the letter.

10              THE COURT:  Okay.  All right.  Anything

11  else?

12              All right.  So what other exhibits do you

13  wish to seek admission of?  I've admitted this depo.

14  What other -- with respect to this deposition and

15  this portion of your presentation, what other

16  exhibit are you seeking for me to admit?

17              MR. ARSLANIAN:  Number 21.

18              THE COURT:  I'm sorry.  You're not going

19  to seek admission of Exhibit 13 then?

20              MR. ARSLANIAN:  I am seeking admission of

21  13.  I'm asking the Court to admit 13, based on the

22  deposition.

23              That was -- the whole purpose of the

24  deposition was to determine whether or not she

25  received the letter, and she specifically went

1   through the letter, and she specifically testified

2   that she got the letter and she gave it to the

3   Ceperos.

4                THE COURT:  Okay.  Mr. Arslanian, all I'm

5   asking you is, I asked you what other exhibits were

6   you seeking to have admitted, based on this

7   deposition, and you went to Exhibit 20.  So that is

8   why I asked you if you were seeking admission -- if

9   you had decided not to seek admission of Exhibit 13.

10  Now you're --

11               MR. ARSLANIAN:  Yes.

12               THE COURT:  So you are seeking admission

13  of Exhibit 13?

14               MR. ARSLANIAN:  I misunderstood your

15  question.  Your Honor asked additional, and I

16  thought something separate and apart from the

17  deposition.

18               The only document that we seek admission

19  to pursuant -- regarding this deposition of Diana

20  Pico, is only Number 13.  That's the reason why that

21  deposition was held, to lay a foundation for Number

22  13.  And Mr. Parlade had ample opportunity to

23  examine her throughout the deposition, which was

24  totally about whether or not she received Number 13

25  and all the portions thereof.  And she went through

1  each part.

2          THE COURT:  Okay.  Just to confirm, you're

3  seeking admission of Exhibit 13?

4          MR. ARSLANIAN:  Based on the deposition.

5          THE COURT:  Okay.  Mr. Parlade.

6          MR. PARLADE:  Your Honor, I object to the

7  introduction of the exhibit, based the deposition.

8  Foundation has not been laid within the actual

9  deposition.  Although I took the deposition, the

10  burden of proof is not on me.  I am not seeking to

11  introduce that, based on the deposition.  It is

12  opposing counsel's burden of proof to introduce the

13  evidence, based on the proper legal evidentiary

14  foundation.

15          The witness did not identify the whole

16  letter.  She identified the tree trimming request.

17  Moreover, in the deposition she stated that she

18  couldn't recall when she received the letter, she

19  couldn't recall the date when she got the letter,

20  she couldn't recall who gave her the letter, and she

21  didn't know who prepared the letter.

22          There has been no foundational testimony

23  given by the witness in the deposition, and opposing

24  counsel cannot overcome the burden of proof to

25  introduce this exhibit.

1          THE COURT:  Okay.  I'm going to deny

2     admission of Exhibit 13.

3          I agree with you completely,

4     Mr. Arslanian, that the purpose of the deposition

5     was not for you to lay a foundation, because as you

6     said, you didn't know that she wasn't going to show

7     up, but that being the case, I can't change the fact

8     that nowhere in this deposition did you show the

9     debtor -- I'm sorry -- did you show the witness

10    Exhibit 13 and ask her, is this -- I'm looking at

11    the deposition transcript, and I'm looking at the

12    end.  Let's see.

13          MR. ARSLANIAN:  I believe the portion of

14    the deposition where I was --

15          THE COURT:  Mr. Arslanian, do not --

16    Mr. Arslanian, stop, stop.

17          I have -- I'm looking here -- let's see.

18    I'm going to the end.  All right.  I'm looking at

19    the last page, 27.  Mr. Parlade ends, and

20    Mr. Arslanian, after Mr. Parlade asks if you might

21    have some questions, you say, "No questions."  Okay?

22          So there's no point in this deposition in

23    which you showed the witness Exhibit 13 and asked

24    her to identify it.  Therefore, you have not -- this

25    deposition does not lay the foundation for admission

1    of Exhibit 15, and I'm going to deny admission.

2            All right.  So what else did you --

3            MR. PARLADE:  Your Honor, you said Exhibit

4    15.  It's Exhibit 13.

5            THE COURT:  I thought I said Exhibit 13.

6    I'm refusing to admit Exhibit 13.

7            MR. PARLADE:  Perfect.  Thank you.

8            THE COURT:  All right.  Mr. Arslanian,

9    proceed with the balance of your proof.

10           MR. ARSLANIAN:  Your Honor, I would ask

11   that if Mr. Brooks was going to testify about time

12   spent, is Your Honor -- and Josue was going to

13   testify about the money spent, if Your Honor would

14   rather wait till the end of the case to hear that,

15   or proceed now?  I can do either one.

16           THE COURT:  I'm not sure what the purpose

17   of that testimony is.  Is that for damages?

18           MR. ARSLANIAN:  Yes, Your Honor.

19           THE COURT:  If I rule that there are

20   damages, then we'll get to the damages portion.  But

21   I will say this:  I will review attorney time.  I

22   don't need testimony as to that.  I have a procedure

23   for that.

24           But I did glance at whatever it was you

25   submitted, just because I was looking to see whether

1    an exhibit register had been uploaded, and I will

2    just make this aside so that you can amend your

3    submission, Mr. Brooks.

4              You don't get to charge either your

5    client, or the other side if you prevail, for the

6    time that you spent in filing a motion to ask that

7    today's trial end early so you could go get your flu

8    shot -- your COVID shot.  That's not chargeable to

9    anybody.  Okay?  All right.

10             But no, Mr. Arslanian.  We'll do damages

11   if we get to that part.  Either if we have time

12   tomorrow we'll do it then, or we'll set that for a

13   separate date, if I find that damages are

14   appropriate.  Okay?  So we don't have to do that

15   now.

16             What else would you like to seek admission

17   of, in terms of Exhibits 19 through 21, with respect

18   to -- I'm sorry -- 18 through 21, with respect to

19   your case in chief?

20             MR. ARSLANIAN:  At this point, only Number

21   21, which would --

22             THE COURT:  If you gentlemen wish to

23   speak, like side bar for yourselves, you should put

24   yourself on mute, because everybody else can hear

25   you.  That's up to you, but you need to know that.

1    Okay.

2              So 21 is the lawsuit, and I believe that

3    you all stipulated that that was -- that that was

4    admissible.  But, Mr. Parlade, Exhibit 21?

5              MR. PARLADE:  That's correct, Your Honor.

6    We've already stipulated to that.

7              THE COURT:  Okay.  So I'm going to admit

8    Exhibit 21.

9              (Thereupon, Debtors' Exhibit No. 21 was

10        admitted into evidence.)

11             THE COURT:  That's ECF 294.

12             MR. ARSLANIAN:  Your Honor, may we clarify

13   21?  I'm not sure it's clear.  I think with the

14   filing, with both the lawsuit and the docket sheet,

15   showing it had been dismissed.  I believe that's --

16   I'd ask that 21 be considered as a composite of the

17   complaint and the docket sheet showing dismissal.

18             THE COURT:  Right.  That was my

19   understanding.

20             Mr. Parlade, was that your understanding,

21   as well?

22             MR. PARLADE:  Yes, Your Honor.

23             THE COURT:  Okay.  All right.  So what

24   else would you like to seek admission of in your

25   case in chief, Mr. Arslanian?

1            And you can put yourself on mute if you

2   want to consult with counsel before you respond.

3   Okay?

4            MR. ARSLANIAN:  Just Number 18, as well,

5   Judge, the docket of different lawsuits that have

6   been filed.

7            THE COURT:  Okay.  Mr. Parlade?

8            MR. PARLADE:  Objection.  What's the

9   relevance of that?

10           THE COURT:  Okay.  Your response,

11  Mr. Arslanian?

12           MR. ARSLANIAN:  The relevance is that the

13  motion for contempt had to do with violating Section

14  362 of the Code by filing lawsuits.  That docket

15  shows the different lawsuits that have been filed.

16           MR. PARLADE:  With all due -- may I

17  respond, Your Honor?

18           THE COURT:  In just a minute.

19           Whatever that is, you need to either turn

20  it off or put it on a towel.

21           Okay.  I'm sorry, Mr. Arslanian.  Other

22  than the lawsuit against Ms. Cepero, which I've

23  already admitted as Exhibit 21, what would be the

24  relevance of the other lawsuits?

25           MR. ARSLANIAN:  I believe, we're going to

1   revisit -- I'm going to ask you to revisit Exhibit

2   Number 11, which is what was mentioned in the

3   motion.  That's another lawsuit by Ms. Gallego

4   against the Ceperos.

5            THE COURT:  So now you're -- okay.  Again,

6   what would be the relevance of these other cases, to

7   this case?

8            MR. ARSLANIAN:  It was the substance of

9   the motion for contempt, and it's in violation of

10   the orders that the Court previously entered, and

11   it's in violation of the stay provision.

12            THE COURT:  All these other lawsuits,

13   other than the stalking lawsuit, which I'll get to

14   in a minute, or the one that's already admitted, why

15   would the other ones be a violation?  I'm just

16   curious.

17            MR. ARSLANIAN:  I believe there's another

18   one, Case 17-027089, that was filed on 11-22-2017,

19   Involuntarily dismissed against the Ceperos on

20   December 19, 2017.  That's after the bankruptcy, as

21   well.

22            THE COURT:  I'm sorry.  I don't -- I'm

23   going to deny the admission of this exhibit, unless,

24   Mr. Parlade, you want to say something.  Go ahead.

25            MR. PARLADE:  No, Your Honor.  I believe

1   denying the exhibit is appropriate.

2          We've limited the scope of this

3   proceeding, February 26th of last year, and the

4   pre-trial stipulation states that we're only here

5   for two incidents, an incident that happened on May

6   15, 2019, and Exhibit 13, if it got admitted.

7   Exhibit 13 was not admitted.  Therefore, we're here

8   on essentially one instance, May 15, 2019, and now

9   the new Exhibit 21, which is the 2020 lawsuit with

10  the docket, that has been admitted as an exhibit.

11         THE COURT:  Okay.  All right.  So I'm

12  going to refuse admission of Exhibit 18.  Of course,

13  that has no bearing on the admission of Exhibit 21.

14         Then, Mr. Arslanian, you said now you're

15  reopening to seek admission of Exhibit 11?  Is that

16  my understanding?

17         MR. ARSLANIAN:  Yes, it is.  Yes, we are.

18         THE COURT:  Mr. Parlade, do you have

19  Exhibit 11 in front of you?

20         MR. PARLADE:  I do not.  Let me grab it

21  from the binder.

22         Okay.  I have it in front of me, Your

23  Honor.

24         THE COURT:  Okay.  So go ahead,

25  Mr. Arslanian, make your argument.  I never ruled on

1   this, because at the prior trial, or the first day

2   of trial, Mr. Frank had chosen not to seek admission

3   of this document.  But go ahead.

4              MR. ARSLANIAN:  Well, I'm not sure how or

5   why that happened, but in our amended motion, which

6   is Docket 289, we reincorporated the original motion

7   for contempt, and then added the paragraph about the

8   new lawsuits.

9              So the original motion specifically talked

10  about the incident on May 15th, and also that a

11  petition for injunctive relief was filed in Case

12  Number 2019-011650.  So, I mean, it's not like a

13  surprise document.  It's in the motion, and I

14  believe it was even attached to the motion.

15             THE COURT:  Okay.  I was responding that I

16  did not refuse admission before.  You hadn't sought

17  admission.

18             So you're saying that this incident, the

19  filing of this stalking complaint, was listed in

20  your original motion for contempt?  Is that my

21  understanding?

22             MR. ARSLANIAN:  Yes.  It's all related to

23  the -- yes.

24             THE COURT:  All right.  Just give me a

25  minute.  I thought I had it highlighted, but I

1    didn't.  So just give me one second.  Okay.  All

2    right.

3              Mr. Parlade, any objection to the

4    admission of Exhibit 11?

5              MR. PARLADE:  Yes, Your Honor.  Same

6    objection, relevance.  And number two, as I

7    mentioned on February 26th of last year, I know

8    Mr. Arslanian was not there, this Court, along with

9    counsel for the debtors at that time, specifically

10   limited the scope of this lawsuit, which is probably

11   one of the reasons it wasn't introduced.  It has no

12   bearing on the instances that are before this Court.

13             And it is -- it has no bearing on this

14   particular action, given the limited scope.

15             THE COURT:  Okay.  Give me one second to

16   look at the original stipulations.  Give me one

17   moment.

18             According to the stipulation that was

19   agreed to last year, the two issues were what

20   happened in the parking lot, you know, what happened

21   leading up to the parking lot, and then also the

22   tree trimming letter.  So those are the two matters

23   that the parties stipulated would be the subject of

24   the trial.

25             So I'll deny admission of Exhibit 11, but

1    I -- well, I'm going to refuse admission.  Okay.

2              You have -- 19 and 20 are the two other

3    documents for which you listed as potential

4    exhibits.  Twenty, of course, we'll get to if we get

5    to the damages portion, okay?

6              And then does that mean you're waiving all

7    fees prior to October?  I mean, I guess I'll have to

8    go over that at some point, if we get to that point.

9    All right.  And then 19.

10             So you're not seeking admission of 19 or

11   20; is that correct?

12             MR. ARSLANIAN:  At this time.  I mean, I'm

13   not sure I can lay the foundation for the budget

14   right now.  I mean, if Mr. Parlade wants to

15   stipulate to it, then, you know --

16             THE COURT:  Okay.  I just need you to tell

17   me what you're seeking admission of.  Forget about

18   Exhibit 20 for a minute, because we're going to do

19   that later.

20             So I need to know whether you're seeking

21   admission of Exhibit 19.  Obviously, if you're going

22   to use it for impeachment, you know, you don't do

23   that right now.  You don't even ever need to admit

24   it.

25             I just need to know -- the only question I

1    need to know, I need an answer to right now, is, are

2    you right now seeking admission of Exhibit 19?  This

3    is your case in chief that I reopened.  So are you

4    seeking admission of Exhibit 19 in your case in

5    chief, yes or no?

6              MR. ARSLANIAN:  Yes.

7              THE COURT:  Okay.  So you would like to

8    seek admission of Exhibit 19.

9              Mr. Parlade, any objection to the

10   admission of Exhibit 19?

11             MR. PARLADE:  Objection, Your Honor.

12   Number one is relevance.  Number two, foundation has

13   not been laid.

14             THE COURT:  Okay.  So, Mr. Arslanian, your

15   response regarding relevance.

16             MR. ARSLANIAN:  It is relevant, because it

17   shows a lot of money the association has, and it's

18   being used for legal expenses to fund some of these

19   lawsuits that are taking place here.

20             You know, as far as the foundation goes, I

21   mean, we'll get there.

22             THE COURT:  Well, now's the time, so the

23   admission is refused.  Okay.  All right.

24             So does that conclude your case in chief,

25   Mr. Arslanian?

1          MR. ARSLANIAN:  Other than the issues

2     about, you know, Mr. Brooks' fees and stuff like

3     that.

4          THE COURT:  All right.

5          MR. ARSLANIAN:  And they're

6     (unintelligible).

7          THE COURT:  Okay.  Well, they're not -- I

8     will -- so the record is clear for all sides, if I

9     rule that there has been sanctionable conduct, then

10    either I will reopen, for damages only, the movant's

11    case, tomorrow if we have time, and if not, we'll

12    set that at a different date.  Right now we'll focus

13    on the sanctions part.

14          All right.  So movant has rested, subject

15    to damages, Mr. Parlade, which as I said, I'll deal

16    with on another day.  So let's now go to your case.

17          When last we were together, as I said, I

18    had admitted Exhibits A through F, as in Fred, and

19    you had just -- you had concluded the testimony of

20    security guard Matus, I believe.

21          MR. PARLADE:  That's correct, Your Honor.

22          THE COURT:  All right.  So please proceed.

23    Call your next witness.

24          MR. PARLADE:  Your Honor, Hammocks

25    Community Association and Marglli Gallego hereby

1   call Marglli Gallego to the stand.

2              THE COURT:  We're going to wait for

3   Ms. Gallego's counsel to leave the room.

4              MR. PARLADE:  Thank you, Your Honor.

5              THE COURT:  Just one minute.  Okay.  We'll

6   wait until Mr. Jauregui, he gets to another room so

7   he can observe.  But I'll make some preliminary

8   comments.

9              Ms. Gallego, Mr. Parlade is going to be

10  questioning you, and if Mr. Arslanian has an

11  objection to a question, he's going to raise his

12  hand.  If you see Mr. Arslanian raise his hand,

13  don't answer the question until after I rule.

14              Now, I'm assuming that the translator is

15  watching somewhere, but I can't figure out where the

16  translator is.  So where is the translator, and how

17  is the translator hearing me?

18              THE INTERPRETER:  Yes, ma'am, I'm here.

19              THE COURT:  Oh, okay.  I need to see you,

20  because you need to take an oath.  Okay?

21              No, not Ms. Cepero's translator,

22  Ms. Gallego's translator.

23              THE INTERPRETER:  I'm sorry, ma'am.

24              THE COURT:  You can go back on mute.

25  Okay.  Great.

1           Mr. Jauregui, where is Ms. Gallego's
2    translator?
3           MR. JAUREGUI:  Judge, I've just been
4    informed that the translator is trying to get into
5    the Zoom, but is having difficulty.  She's not being
6    allowed in for some reason.  The pass code is not
7    working for her.
8           THE COURT:  All right.  Well, we'll give
9    this translator a minute, because I have to swear
10   the translator in.
11          MR. JAUREGUI:  Your Honor, with your
12   permission, may I run back into my office and try to
13   resolve the interpreter issue?
14          THE COURT:  Sure.  Absolutely.  Go ahead.
15          As a matter of fact, since we're trying to
16   do that, even though I said we were going to stop at
17   11:00 for a brief break, why don't we take a
18   ten-minute break right now, and we'll give
19   technology an opportunity.
20          MR. JAUREGUI:  Thank you, Your Honor.
21          THE COURT:  We'll take a ten-minute break
22   and we'll reconvene at -- it's 10:34.  Let's call it
23   10:45.
24          (Thereupon, a recess was taken, after
25   which the following proceedings were had:)

1    THE COURT:  Do we now have -- well, let's

2  have everybody who needs to be on camera, on camera.

3  That would mean Ms. Gallego, and where's the

4  interpreter?  We need an interpreter.

5    Mr. Parlade, looks like you're the only

6  one up.

7    MR. PARLADE:  I see Ms. Gallego.  I don't

8  see a translator, Your Honor.

9    THE COURT:  No, I don't either.  And I

10  don't see Mr. Brooks or Mr. Arslanian.  Let's wait

11  for Mr. Jauregui.

12    Ms. Gallego, we have to wait until we get

13  your interpreter.

14    MR. PARLADE:  Thank you, Judge, for your

15  understanding.

16    THE COURT:  As I said repeatedly, because

17  of the challenges relating to remote hearings, we

18  all have to be flexible, in terms of interruptions

19  and technical problems.  The other day I was

20  speaking at a conference, fortunately not in a

21  trial, and my Internet just decided that it was

22  done, just stopped working.

23    MR. PARLADE:  Oh, wow.

24    THE COURT:  All right.  So --

25    MR. PARLADE:  Did --

Page 174

1              THE COURT:  I'm sorry.  Go ahead,

2   Mr. Parlade.

3              MR. PARLADE:  I don't know if you saw it

4   yesterday, it was making the rounds.  There was a

5   hearing, I believe in Tennessee court, and the

6   attorney was using Zoom, and I guess their child was

7   using Zoom before then.  So the attorney appeared as

8   a cat on the screen and could not disable it.  It's

9   quite humorous.

10              MR. ARSLANIAN:  I saw that.

11              THE COURT:  I think everybody's seen that

12   now.  I think I saw it on my CNN news feed this

13   morning.

14              I have to be careful, because I use Zoom

15   to -- I have a book club with my first grade

16   granddaughter, and she and her friends with whom we

17   do the book club like to put on the pig faces and

18   things.  I don't know if you want the -- I've got to

19   be very careful about that.

20              All right.  So, Mr. Jauregui, do we have

21   an interpreter?

22              MR. JAUREGUI:  Judge, we secured another

23   interpreter.  She's logging in right now.

24              THE COURT:  Okay.

25              MR. JAUREGUI:  The first interpreter for

1    some reason is having great difficulty.  So we

2    just -- we rushed and got another one.  Should be a

3    matter of moments.

4              THE COURT:  Okay.  Also a certified

5    interpreter?

6              MR. JAUREGUI:  Also, Your Honor.

7              THE COURT:  Okay.  We'll wait another

8    couple of minutes.

9              I had a Chapter 11 case involving lawyers

10   from all over the country, and cats kept walking

11   into the frame.  So we just turned it into a cat

12   contest, who had the nicest cat.

13             MR. JAUREGUI:  Was there a winner?

14             THE COURT:  I think the cat from Rhode

15   Island was the much more beautiful cat.  Obviously,

16   cats are in the eyes of the beholder, right?

17             All right.  So we have Mr. and Mrs. Cepero

18   on with their translator.  We have Mr. Alfaro.

19   We're just waiting for Ms. Gallego's translator to

20   appear.

21             MR. PARLADE:  If you want while we're here

22   we can just do a quick little clerical --

23             THE COURT:  Go ahead.

24             MR. PARLADE:  -- clerical on my exhibits,

25   because there's a bunch of exhibits I'm not going to

1  be introducing, and we can mark them now if you

2  wish.

3              THE COURT:  Okay.  That's fine.  Why don't

4  we do that.  Let me get out your binder.

5              Okay.  What are the exhibits for which you

6  are not seeking introduction?

7              MR. PARLADE:  The exhibits starting with

8  H, all the way to the 911 call, so H through L, none

9  of those will be introduced.

10             THE COURT:  Okay.  Hold on.  All right.

11 So not introduced, H through L.  Okay.  All right.

12 Those have been marked as not introduced.

13             So that will leave Exhibit G, M and N; is

14 that correct?

15             MR. PARLADE:  I'm sorry.  M and N will

16 also not be introduced.

17             THE COURT:  Okay.  So now it will just be

18 Exhibit G, correct?

19             MR. PARLADE:  Correct, Your Honor.

20             THE COURT:  Yes, Mr. Arslanian?

21             MR. ARSLANIAN:  We're going to seek to use

22 L, M and N.

23             THE COURT:  They're not listed on your

24 exhibit register, so if you want to use exhibits in

25 your rebuttal case, then you'll -- when you upload

1    your amended exhibit register, if you want, you can

2    list your rebuttal exhibits at that time, and

3    Mr. Parlade can deal with those when you put on your

4    rebuttal case.

5              I'm assuming that's what you're going to

6    use them for, because you've already closed your

7    case in chief.

8              MR. ARSLANIAN:  Yes.

9              THE COURT:  Okay.

10             MR. ARSLANIAN:  Unless the Court wishes to

11   allow us to reopen to have those admitted, because

12   those were put in by the -- offered by the other

13   side.

14             THE COURT:  Mr. Arslanian, how long have

15   you been practicing law?

16             MR. ARSLANIAN:  Too long, more than 30

17   years, Your Honor.

18             THE COURT:  Okay.  Then I think you

19   probably know that you can't rely on someone else's

20   proposed exhibits in your case in chief without

21   listing them as your exhibits.  You've closed your

22   case.  If you want to file a motion to reopen you'll

23   have to do that.  If you're planning on using them

24   for impeachment, you'll make your motion at the

25   appropriate time, and I'll deal with that request at

1    the time that you make it.  All right?  And if you

2    want to use them for rebuttal, then you do that

3    properly, as well.  Okay?

4              Everybody gets the same fair shake here,

5    but I follow the Rules of Civil Procedure.

6              All right.  Mr. Jauregui, what are we

7    doing here?  I still don't see the interpreter.

8              MR. JAUREGUI:  Judge, we've sent her the

9    Zoom information.  She should be logging in any

10   minute now.  She had to basically get dressed, comb

11   her hair, and she's going to be on any second, Your

12   Honor.

13             I basically rushed and I got another

14   interpreter.  We've got her.  She should be here any

15   minute.  I apologize.  I don't know what happened

16   with the first interpreter.

17             THE COURT:  It happens, but for future

18   trials remember, just like in any trial, the

19   interpreter has to be sworn in as a witness.  So the

20   interpreter has to be on the -- well, they would be

21   in the courtroom, right, and they have to be in this

22   virtual courtroom.

23             Just like I had to explain to people who

24   have shown up at the court in shirts with no ties

25   and no jackets.  Unless that's the way you were

1  going to dress in court, that's not the way you

2  dress when you go to Zoom court, which is why I'm

3  wearing a robe.

4            Okay.  So any other -- wait a minute.  Do

5  we have a -- no.  Right now I just see --

6            MR. JAUREGUI:  I think this may be it,

7  Judge.

8            MR. PARLADE:  We have a translator here

9  we'd offer to use if you want to use the bar

10 translator, who is sitting in the office right now.

11           THE COURT:  No.  I appreciate that, but

12 we'll wait.

13           Mr. Parlade, we have only until 2 o'clock.

14 What else besides Ms. Gallego's testimony are you

15 going to be seeking to do today?

16           MR. ARSLANIAN:  I don't think he heard

17 you.

18           THE COURT:  Mr. Parlade?

19           MR. PARLADE:  I apologize.  My screen just

20 froze all of a sudden.  I didn't hear anything that

21 happened.

22           THE COURT:  I asked whether -- we can't go

23 forward -- good news, bad news.  My CRD has to

24 connect back in, so while we're waiting for the

25 translator -- we'll wait.  I don't want to say

1    anything, because there's no record right now.

2    There's no record right now, because my CRD lost

3    connection, so just wait a moment.

4            MR. JAUREGUI:  Here she is, Judge.  Thank

5    you.

6            THE COURT:  Okay.  We can't do anything

7    until the CRD reconnects, so we'll just wait.

8            THE INTERPRETER:  Good morning.  Kinsell

9    Lambert, Spanish interpreter.

10           THE COURT:  Okay.  Good morning,

11   Ms. Lambert.  Hold on.  Our courtroom deputy lost

12   connection, so we're on pause now until she can

13   rejoin.  Okay?  I'm going to turn off my video for a

14   second, because I need to take care of something.

15           All right.  My courtroom deputy is still

16   trying to reconnect, so I apologize for the

17   inconvenience.  If anybody would like to put their

18   cameras off while we wait for Ms. Sanabria to

19   reconnect us, fine.  I apologize for the delay.

20           Mr. Arslanian, I suggest you put yourself

21   on mute, unless you would like us all to hear your

22   conversations with Mr. Brooks.

23           MR. ARSLANIAN:  Sorry about that.

24           MR. BROOKS:  I mean, we're in our 50s.  We

25   don't know how to do this.

1           THE COURT:  All right.  I'll ask everybody

2    to put their cameras on.  I'll ask all parties to

3    put their cameras on, please.

4           Mr. and Mrs. Cepero, you don't need to put

5    your cameras on right now.  I'm talking about the

6    folks who are supposed to be participating.

7           All right.  We're missing Mr. Brooks and

8    Mr. Arslanian.  Here's Mr. Arslanian.  All right.

9           MR. ARSLANIAN:  Can you hear me?

10          THE COURT:  Yes, I can hear you,

11   Mr. Arslanian.

12          All right.  And again, Mr. and Mrs.

13   Cepero, you may leave the camera off if you wish.  I

14   just need to see Ms. Gallego, the translator and the

15   attorney.

16          All right.  So, Ms. Lambert, I'm going to

17   ask you to please raise your right hand.

18   Thereupon:

19                   KINSELL LAMBERT

20   an interpreter, having been first duly sworn,

21   translated from English to Spanish and from Spanish

22   to English to the best of her ability.

23          THE INTERPRETER:  I do, Your Honor.

24   Kinsell Lambert, Certification Number 15-00391.

25          THE COURT:  All right.  Thank you very

1   much.

2              All right, Ms. Gallego, please raise your

3   right hand.

4   Thereupon:

5                    MARGLLI GALLEGO

6   was called as a witness, and having been first duly

7   sworn, was examined and testified as follows:

8              THE COURT:  What I'm going to do,

9   Ms. Gallego -- you can put your hand down.

10             Just as you saw in the court when we had

11  the hearing last year -- unbelievable it's been a

12  year -- Ms. Gallego, even if you understand

13  something that I say, do not answer.  You've chosen

14  to use a translator, which is fine, and I understand

15  that, but you have to let the translator translate,

16  both to questions that are asked and your answers.

17  Okay?

18             Now, as I explained before -- I'm sorry.

19  Go ahead.

20             THE WITNESS:  Yes.

21             THE COURT:  All right.  So again,

22  Mr. Parlade, is going to be questioning you, and

23  Mr. Arslanian -- raise your hand, Mr. Arslanian --

24  will be cross-examining you.  While Mr. Parlade is

25  questioning you, if Mr. Arslanian has an objection,

Page 183

1    he's going to raise his hand.  If you see

2    Mr. Arslanian raise his hand, please wait to answer

3    until I have ruled.

4              THE WITNESS:  That's fine, yes.

5              THE COURT:  I'm hearing an echo.  Maybe,

6    Ms. Gallego, you can put yourself on mute, because

7    the translator will be translating for you.

8              THE WITNESS:  The microphone muted, yes,

9    okay.

10             THE COURT:  And, Ms. Lambert, I'm assuming

11   you can hear Ms. Gallego speak without her

12   microphone on?

13             THE INTERPRETER:  Actually, I can call her

14   and have her on the phone so that I can do that, if

15   that is okay with you, Your Honor.

16             THE COURT:  Whichever you prefer.

17   Otherwise, then we'll just leave Ms. Gallego on --

18   the echo is not coming from her anyway, so

19   Ms. Gallego, you can take yourself off mute.

20             THE INTERPRETER:  Actually, Your Honor,

21   it's been my experience that it moves a lot smoother

22   and it's a lot easier and I don't have to interrupt

23   so much if I have her on the phone, and that way I'm

24   still connected to Zoom and so is she, and that way

25   it's a little less disruptive, if that's okay with

1   you.

2              THE COURT:  Okay.  Make your phone call

3   while I ask Mr. Arslanian whether he's got two

4   devices going in his office.

5              Do you have two devices on in your office,

6   Mr. Arslanian?

7              MR. ARSLANIAN:  One in this room, and

8   there's another one in the other room where the

9   Ceperos are.

10             THE COURT:  Okay.  That's fine.  I'm just

11  trying to figure out what the echo is.  That's all.

12             MR. ARSLANIAN:  I'm by myself in an

13  office.  There's nobody around me.

14             THE COURT:  Okay.  I was just trying to

15  figure out -- oh, it went away.  Whoever fixed it,

16  thank you.  It was very distracting.

17             All right.  Ms. Lambert, do you have

18  Ms. Gallego on the phone now?

19             THE INTERPRETER:  I do, Your Honor.

20             THE COURT:  All right.  Again, when

21  Mr. Arslanian is questioning you, then if

22  Mr. Parlade raises his hand, please wait to answer

23  until I rule.

24             And then, Mr. Parlade and Mr. Arslanian,

25  again, be sensitive to the fact that we have a

Page 185

```
 1   translator.  So please remember, both of you, to

 2   allow the translator to translate, even if you

 3   understand -- actually, because Ms. Gallego is on

 4   mute, this way we can at least we can avoid that

 5   part.  Okay.  All right.

 6             So, Ms. Gallego, are you ready?  You have

 7   to unmute --

 8             THE WITNESS:  Yes.

 9             THE COURT:  All right.  Mr. Arslanian, are

10   you ready?

11             MR. ARSLANIAN:  Yes, I am, Your Honor.

12             THE COURT:  And Mr. Parlade?

13             MR. PARLADE:  Yes, Your Honor.

14             THE COURT:  All right.  Then please

15   proceed.  Okay.  Go ahead.

16                    DIRECT EXAMINATION

17   BY MR. PARLADE:

18       Q    Would you please state your name for the

19   record?

20       A    Marglli Gallego.

21             THE COURT:  Ms. Gallego, you can leave

22   yourself on mute.  The translator is going to

23   translate for you.

24             Go ahead.

25             MR. PARLADE:  Thank you, Your Honor.
```

```
 1   BY MR. PARLADE:

 2        Q    Ms. Gallego, what is your current address?

 3        A    14921 Southwest 104th Street, Miami,

 4   Florida 33196.

 5        Q    And is that within the Hammocks Community?

 6        A    Yes.

 7        Q    Who is --

 8        A    Could you tell him that I -- no, no, no.

 9   It's all right.  Never mind.

10             THE COURT:  Go ahead, Mr. Parlade.

11   BY MR. PARLADE:

12        Q    Who is your current employer?

13        A    Ruby Express.

14        Q    Okay.  Are you also an officer of the

15   Hammocks Community Association?

16        A    Yes.

17        Q    And what is your position with the

18   Hammocks Community Association?

19        A    I'm president.

20        Q    And how long have you been president of

21   the Hammocks Community Association?

22        A    Two years.

23        Q    Prior to becoming president of the

24   Hammocks Community Association, were you an officer

25   or employee of the association in some other
```

```
 1   capacity?
 2        A     I was treasurer.
 3        Q     And when were you treasurer of the
 4   Hammocks Community Association?
 5        A     Since 2015.
 6        Q     So from 2015 until approximately 2019, you
 7   were the treasurer of the Hammocks Community
 8   Association?
 9        A     Well, yes.  '18, '19.
10        Q     Okay.  Now, have you ever heard of or do
11   you know Josue and Leticia Cepero?
12        A     Yes, I know them.
13        Q     And how do you know them?
14        A     Through the association, and because on
15   several occasions I shared meals at their home.
16        Q     Okay.  When did you get to first meet
17   either Josue Cepero or Leticia Cepero?
18              THE COURT:  Wait, Mr. Parlade.
19              THE INTERPRETER:  I apologize,
20   Mr. Parlade.  There was a delayed response.
21              THE WITNESS:  And because he also did jobs
22   for the association.
23   BY MR. PARLADE:
24        Q     Approximately when did you first meet
25   either Josue Cepero or Leticia Cepero?
```

1       A     In 2015, but I don't remember the exact

2   month.

3       Q     Who did you meet in 2015?  Was it Josue

4   Cepero or Leticia Cepero?

5       A     Both.

6       Q     Now, after you met Josue and Leticia

7   Cepero in 2015, is it correct to say you were

8   already the treasurer of the association at that

9   point?

10      A     Yes.

11      Q     Okay.  And your meeting with the Ceperos,

12  would that have been connected with association

13  business or was it personal?

14      A     I'm sorry.  The first time -- can you

15  repeat the question?

16             THE COURT:  Mr. Parlade.  Mr. Parlade.

17             MR. ARSLANIAN:  He looks frozen.

18             THE COURT:  Oy vey.  Yes, this is the joy

19  of -- are you back?

20             MR. PARLADE:  I apologize, Your Honor.

21  This is probably the most frustrating process anyone

22  can go through.  I apologize.

23             THE COURT:  Okay.  Repeat your question,

24  please.

25

1   BY MR. PARLADE:

2       Q    In 2015 when you met Josue and Leticia

3   Cepero, were you already treasurer of the

4   association at that point?

5       A    Yes.

6       Q    And did either Josue Cepero or Leticia

7   Cepero conduct any work for the association while

8   you were treasurer from 2015 to 2018, 2019?

9       A    Yes.

10      Q    Okay.  And what did they do for the

11  association?

12          THE COURT:  What is your objection,

13  Mr. Arslanian?

14          MR. ARSLANIAN:  Relevance.

15          THE COURT:  I'm sorry?

16          MR. ARSLANIAN:  Relevance.

17          THE COURT:  Oh, okay.  All right.  So,

18  Mr. Parlade, what is the relevance of that?

19          MR. PARLADE:  Your Honor, this is

20  establishing background info in reference to the

21  relationship with the debtors, to the association

22  and to my client, and as to the nature of the

23  relationship.

24          THE COURT:  Okay.  I'll overrule the

25  objection for now and allow it as background.

1          Go ahead.  You may answer.

2          THE WITNESS:  Yes.  He did several jobs

3    for the association, repairs, electrical work.

4    BY MR. PARLADE:

5        Q    And did they get paid by the association?

6        A    Yes.  The association paid them.

7        Q    Okay.  Now, we're here for an incident

8    that occurred on May 15, 2019, in the actual parking

9    lot of the Hammocks Association.

10         Are you aware of this?

11       A    Of course, yes.  It took place in the

12   parking lot of my residence, where I live, Heron of

13   the Hammocks.

14       Q    Heron is H-E-R-O-N?

15       A    Yes, H-E-R-O-N.

16       Q    Okay.  We're going to go into that

17   incident in a second.

18         Prior to May 15, 2019, did you ever have a

19   run in, either with Josue or Leticia Cepero, where

20   you became aware that there was not a good

21   relationship between you two?

22       A    We had a very good relationship until

23   2016.

24       Q    What happened in 2016?

25       A    After Mr. Cepero -- well, it was after

1   Mr. Cepero was no longer given any more projects or

2   jobs for repairs, and he was upset.  He was upset,

3   because there was a fence that he wanted to repair,

4   and it was unnecessary.  The petition was denied by

5   the board, and after that they were -- they became

6   upset.

7        Q    So after this happened in 2016, the

8   relationship between the Ceperos and yourself grew

9   sour; is that correct?

10       A    That is correct.

11            THE COURT:  Did we lose him again?

12  Mr. Parlade?

13            MR. ARSLANIAN:  Your Honor, he's frozen.

14            THE COURT:  Oy vey.

15            MR. ARSLANIAN:  He's moving again.

16            THE COURT:  All right.  We've got you

17  back, Mr. Parlade.  So, Mr. Parlade, you're going to

18  have to invest in better Internet.

19            Go ahead.  Ask your next question.

20            MR. PARLADE:  I will.  Thank you, Your

21  Honor.

22            I didn't hear her answer.  Could her

23  answer be read back?

24            THE COURT:  You didn't hear the answer

25  about the fence?

Page 192

1              Wait, we lost you again, Mr. Parlade?  Can

2      you hear us?

3              MR. PARLADE:  I can hear you.

4              THE COURT:  Okay.  There's no such thing

5      as reading back, because we don't have a live court

6      reporter.  I can tell you, and I'll read what I

7      wrote in my notes, and then Ms. Gallego can let me

8      know if she thinks I have not accurately repeated

9      the answer.

10             There was a very good relationship until

11     2016, after Mr. Cepero was no longer given any more

12     projects.  He was an upset, because there was a

13     fence he wanted to repair and the board said it

14     wasn't necessary.

15             Is that accurate?

16             THE WITNESS:  Yes, that is correct.

17             THE COURT:  All right.  Ask your next

18     question, Mr. Parlade.

19     BY MR. PARLADE:

20         Q    Now, after this happened in 2016, did

21     either the association or yourself get into any

22     incidents with the Ceperos?

23             MR. PARLADE:  I'm just going to rephrase,

24     "incident."  The word should be "altercation," not

25     "incident."

1          THE WITNESS:  Yes.

2    BY MR. PARLADE:

3          Q     When was that?

4          A     Well, yes.  Physical altercation, the

5    incident was in 2019, when they followed me as I was

6    picking up my son from school, followed me to the

7    house, and then the incident occurred.

8          Q     We're going to get to that in a minute.

9                Prior to May 15, 2019, was there any other

10   incident where you were followed or you felt in

11   danger, by either Josue Cepero or Leticia Cepero?

12         A     Well, yes.  Yes, on several occasions

13   before 2019, occasions where at the board meeting I

14   was attacked by them, where they gathered outside of

15   the clubhouse, also.

16         Q     What do you mean they gathered outside the

17   clubhouse?

18         A     They were outside of the Hammocks

19   Association's office, holding up signs and claiming

20   that there was wrongdoing.

21         Q     Okay.

22         A     And they were also protesting.

23         Q     But they never followed you before,

24   correct?

25         A     Not that I was aware of.

1      Q    So tell us, on May 15, 2019, you just

2   testified that you were followed to your son's

3   school.

4           What exactly happened on that day when you

5   were followed by the Ceperos?

6      A    Okay.  So I headed out to pick up my son.

7   The pickup area for my son is only one way.  It's a

8   roundabout, a cul-de-sac, so you wait in line.

9           So when I arrived at the school I see my

10  son.  He is on school grounds, but within the --

11  he's behind the fence.  He can't see me, so I get

12  out of the car to call him over.  I open the door

13  for him to get in, and when I opened the door I see

14  that there's a car that gets out of the line.  I

15  found that to be quite strange, because most cars

16  just stay in line.

17          So once again, I thought that was pretty

18  strange, but I stood waiting to see what the car was

19  going to do, if the car was going to drive by or if

20  they were going to just stay there or keep going,

21  because I had to open the door to get into my car.

22          Quite honestly, I couldn't really see,

23  because of the sun, but the car just remained there.

24  So I drive off, and when I get to the stop sign I

25  cross over so that I can get on to 120th.  Quite

1    honestly, I wasn't really aware that I was being

2    followed at that moment.  I did notice that there

3    was a car that was following pretty close behind me.

4              So when I get to the stoplight, because

5    the light was red, I noticed that the car is still

6    behind me, but I thought it was pretty strange that

7    there was some device by the mirror, and I noticed

8    that it was a phone.  So I paid closer attention,

9    and when I did, I realized that I recognized the

10   people.

11             So when I reach 104th I turned, but I

12   made -- after that I made a lot of turns to see if I

13   was actually being followed or if it was just a

14   coincidence.  When I realized that I was being

15   followed I got nervous.  I called 911.  When I was

16   on the phone with 911 I was pretty worked up.  I was

17   pretty nervous.  It was because my son was in the

18   car with me, and he was actually pretty nervous,

19   also.

20             So I remained on the phone with 911.  I

21   told them that I was being followed.  The operator

22   asked if I knew who it was that was following me.  I

23   said I wasn't exactly sure, but I had an idea of who

24   it might be.  My son was also asking questions,

25   asking me what was going on, what was happening.  So

1   at the same time I was talking to the operator and

2   to my son.  I told my son to get down and under the

3   seat.

4           I continued driving.  I tried speeding up

5   to see if I could make it home faster.  So the

6   operator told me not to hang up, that they

7   dispatched an officer, to just remain on the phone.

8   I kept driving, I kept driving.  That span between

9   the light and getting home, there's many things that

10  I didn't really notice, you know, because so much

11  was going on.  And that's what -- I continued

12  driving.  I kept driving around and around, just to

13  see.

14          I finally made it home.  I came around to

15  my entrance, because Heron has two entrances.  I

16  came into my parking lot, and that's when they

17  came -- they were in front of me, or they came

18  across.  That's when I realized that there was

19  actually a second car behind me.

20          So at that moment, that's when the

21  operator tells me to get out of the car, because I

22  wasn't able to see the tag number, and she was

23  asking me what type of car it was, what model, the

24  tag number.  So I did as she instructed.  That's

25  when I got out of the car to check the tag number.

1          I was really, really nervous, so I guess I

2   must have been speaking loudly.  That's when my

3   neighbor came out, and Judith also came out from the

4   other building.  That's when Judith walked over.

5   She takes my child with her into the office.  And at

6   that very moment, that's when the two security

7   guards arrived.  They actually arrived before the

8   police arrived.

9          Q    Did you --

10              THE COURT:  I'm sorry.  Wait just a

11  minute, Mr. Parlade.  There may be some ambient

12  noise.  Anybody who is not one of the lawyers or the

13  translator, please make sure you're on mute.

14              Go ahead, Mr. Parlade.  Go ahead.

15  BY MR. PARLADE:

16         Q    Did you ever at a point in time prior to

17  stopping back at your house on May 15, 2019,

18  recognize the people who were following you?

19         A    The driver, yes.

20         Q    And at what point did you recognize the

21  driver on May 15th?

22         A    On 120th.

23         Q    By 120th, you're referring to 120th

24  Street?

25         A    Yes, 120th Street.

Page 198

1      Q     And who was the driver that you
2  recognized?

3      A     Josue Cepero.

4      Q     Now, other than the driver, did you
5  recognize or see any other occupants of the vehicle
6  on May 15, 2019, before the vehicles stopped or came
7  to rest close to your residence?

8      A     No, because as I mentioned, in the
9  passenger's side there was a large -- a large white
10 device recording, so I couldn't make out who the
11 passenger was.

12     Q     Okay.  Now, once you head back to your
13 house after coming back from your son's school, and
14 the 911 operator tells you to get out of the car and
15 take video of the car, did you at that time
16 recognize the occupants of that car?

17     A     Yes.

18     Q     And who were the occupants of that car?

19     A     The driver was Josue Cepero and the
20 passenger was Leticia Cepero.

21     Q     Now, we've heard from various witnesses
22 that when the incident occurred on May 15, 2019,
23 this was in the parking location immediately in
24 front of your unit within the Hammocks Community; is
25 that correct?

Page 199

```
 1              MR. ARSLANIAN:  Objection.
 2              THE COURT:  What's the objection,
 3  Mr. Arslanian?
 4              MR. ARSLANIAN:  The lawyer is testifying.
 5              THE COURT:  Okay.  So the objection is
 6  that the question is leading?
 7              MR. ARSLANIAN:  Leading and improper,
 8  based on a narrative of prior testimony.
 9              THE COURT:  Okay.  Is the objection that
10  the question is leading?
11              MR. ARSLANIAN:  Yes.
12              THE COURT:  All right.  The objection is
13  sustained.
14              Mr. Parlade, reask the question and let
15  the witness testify.
16              MR. PARLADE:  Yes, Your Honor.
17  BY MR. PARLADE:
18      Q    On May 15, 2019, after the car driven by
19  the Ceperos stopped, and you got out of your car to
20  record the tag and take video of their car, what
21  location was it where that happened?
22      A    In front of my residence.
23      Q    And by in front of your residence, in
24  terms of distance, how far was that car from your
25  front door?
```

Page 200

1        A    They were blocking my parking space, and a

2   few feet from the entrance of my home.

3        Q    Now, by "parking space," are you referring

4   to your assigned parking space in that community?

5        A    Yes, exactly.

6        Q    Now, up until that point, from the time

7   you left your son's school to the time you came to

8   the parking space in front of your residence, was

9   there ever a point where you either drove by or were

10  in close proximity to the residence of the Ceperos?

11       A    No.  It's not located anywhere near any of

12  those streets.

13       Q    Okay.  But you do know where the Ceperos

14  live, correct?

15       A    Yes.

16       Q    In the past had you been to their

17  residence?

18       A    Yes, on several occasions.

19       Q    Okay.  Now, was there any way for the

20  Ceperos to know where you lived, on May 15, 2019?

21       A    Yes, of course, yes, because Josue came to

22  my house on several occasions to pick checks up.

23       Q    When did Josue Cepero come to your house

24  to pick up checks?

25       A    It was on one occasion that he was doing a

Page 201

1   job.  It was a job on 104th, and he asked if he

2   could come by.  This was -- I don't remember exactly

3   if it was 2015 or 2016, but it was quite a while

4   ago.

5          Q    So there was only one time?

6          A    No.  It was several times.

7          Q    And in all of those times were they always

8   to pick up checks?

9          A    Yes.

10              Actually, there was another time where

11  they came by to see how my son was doing, the same

12  son that was involved in that incident on the 15th

13  of May.  They came by to see how he was doing,

14  because my son had developed a tumor on his knee,

15  and there was a long wait list to have him treated

16  by a doctor.  They have a nephew who works in the

17  orthopedic department at Miami Children's, and they

18  helped to get my son treated faster.

19         Q    So both Josue Cepero and Leticia Cepero

20  knew exactly where you lived on May 15, 2019,

21  correct?

22         A    Yes.

23         Q    Okay.  On May 15, 2019, you testified that

24  you were followed from your son's school as you were

25  picking up your son, and you had mentioned you tried

Page 202

1    driving faster to try and get to your house quicker,

2    and once you get to your house you made -- you were

3    still on the phone call with the operator, and she

4    told you to take video of the tag and of the

5    vehicles, correct?

6         A    Yes.  And the operator also instructed me

7    to give her the make, model and tag number of the

8    car, and for me to recognize the passengers or the

9    people that were in the car.

10        Q    Once you got out of the car in front of

11   your residence where you live, and you're still on

12   the phone with the operator did you ever remark to

13   the Ceperos and say, "Why are you following me?

14   What's going on?"  Did you ever try to make contact

15   with them?

16        A    I never made contact with them.  I never

17   communicated with them, because the operator

18   instructed me not to, and instructed me just to

19   gather that information that she was asking me for.

20             But aside from that, they never put their

21   windows down and they never tried to say anything to

22   me.  And when I tried recording them, they were

23   putting something up against the window so that I

24   couldn't see their face.

25        Q    Okay.  I'm going to show you a picture

1  that's already been admitted into evidence, to see

2  if you can describe what we're seeing.

3          THE COURT:  Can you please identify for

4  the record what exhibit it is, Mr. Parlade, the

5  exhibit number?

6          MR. PARLADE:  Hello?

7          THE COURT:  Mr. Parlade, you need to

8  identify the exhibit number.

9          MR. PARLADE:  I'm sorry.  I'm referring to

10 Respondent's Exhibit F.  It's identified as picture

11 of debtor's vehicle holding up letters, taken on

12 May 15, 2019.

13         THE COURT:  All right.  You're not sharing

14 the exhibit, Mr. Parlade, you're just sharing

15 your -- I guess your folder.

16         MR. PARLADE:  It's opening.  Just like my

17 Internet connection, my computer, as well, is slow.

18 Okay.  It opened.

19 BY MR. PARLADE:

20     Q    Ms. Gallego, can you see the --

21         THE COURT:  It did not open, Mr. Parlade.

22 BY MR. PARLADE:

23     Q     -- pictures on the screen --

24         THE COURT:  Mr. Parlade, why don't you

25 close out the screen and then try sharing what you

Page 204

1  opened.

2              MR. PARLADE:  Okay.  Let's try again.

3              Do you see it now?

4              THE WITNESS:  All right, yes.  I see it.

5  BY MR. PARLADE:

6       Q    Perfect.  Now can you identify -- there's

7  two photos in this exhibit.  One is a photo of them

8  holding up a letter, and the second, it looks like a

9  closeup of the letter.

10             Can you identify who took these pictures?

11      A    The pictures were taken by me, and I

12  thought it was very strange that they were holding

13  this up to the window.

14      Q    Now, what is that that they were holding

15  up to the window?

16             You can see a little bit more clearly on

17  the second photo that's now on the screen.  Some of

18  the words are visible from the letter.

19             What is that letter?

20      A    That is the letter that was sent out to --

21  well, that letter was sent out in April to all of

22  the owners at Heron.  That is a letter that states

23  that Marglli Gallego and the board members are

24  committing fraud.

25      Q    I'm going to show you what's been marked

Page 205

1   as Respondent's Exhibit G, which is identified as

2   letter from Heron board.  Hold on one second.  Okay.

3   Here we go.

4           This is listed as Exhibit G.  Is this the

5   letter that you're referring to?

6       A    Yes.

7           THE COURT:  You're not showing the debtor

8   the entire -- the witness the entire exhibit,

9   Mr. Parlade.  Unless you only wish this portion of

10  the letter to be considered by the Court, I would

11  suggest that you show the witness the entire

12  exhibit.

13          MR. PARLADE:  Yes, Your Honor.  I'm going

14  to scroll through it right now.

15  BY MR. PARLADE:

16      Q    This is the first page, and it starts

17  with, "This is an open criminal investigation

18  against Marglli Gallego," and it continues.

19          This is the second page.  It continues,

20  starting with, "Marglli Gallego has paid

21  thousands -- attorneys thousands of dollars to sue."

22  And at the end of the second page it says, "Most

23  importantly, the Heron is financially in the best

24  shape than it has been in many years.  Your Heron

25  board."

Page 206

1        Here we go to the third page, which

2    appears as Attachment 1.  This is a public record

3    request made by the Florida State Attorney's Office.

4        Here we go to what would be the fourth

5    page, and it's Attachment 2.  This is a -- it looks

6    like responses given in a separate lawsuit.

7        As we go to Page 5, it appears to be

8    translated into Spanish.  It appears that the letter

9    was sent in English, and was also attached with

10   translated pages.  Here is Page 5 and 6.  And as you

11   see, Page 6, it appears to be the same signature

12   line as the English page.  The attachments were not

13   translated and attached.  So this is the entire

14   exhibit.

15       Have you ever seen this letter before?

16       A    Yes, I've seen it.  I received it in the

17   mail, along with all of the other owners.  Not only

18   did I receive it in the mail, but then the other

19   owners sent it to me via e-mail, and the first page

20   of this letter is what Leticia and Josue Cepero put

21   up against the glass.

22       Q    Now, if we look at what is the second

23   photo of Respondent's Exhibit F, we can make out a

24   few of these paragraphs in here, correct?

25       Let me go back to Exhibit F.  Hold on a

Page 207

1    second.

2              THE COURT:  I think you have to wait to

3    share until after you open the exhibit, Mr. Parlade.

4              MR. PARLADE:  Okay.  All right.  I thought

5    I had stopped share.

6    BY MR. PARLADE:

7         Q    So here we are in Exhibit F --

8              THE COURT:  No, we are not.  That's okay.

9    I don't even know how to do a share, so you're two

10   steps ahead of me.

11             MR. PARLADE:  I apologize, Your Honor.

12   Thank you so much.

13             MR. ARSLANIAN:  We need a teenager here.

14   BY MR. PARLADE:

15        Q    Here we go.  Here's the second photo of

16   Exhibit F.  You can make out, and it looks like --

17   whose hand is that holding up that letter?

18        A    That is Leticia Cepero's hand.

19        Q    Okay.  And we can make out some of the

20   paragraphs.  It says, Marglli --" it looks like,

21   "Marglli Gallego hired a criminal attorney.  The

22   Hammocks master also hired.  Why is Marglli Gallego

23   and the Hammocks --" it looks like we can make out a

24   bunch of the paragraphs which appear on Exhibit G,

25   what we just remarked about as the letter received

1    by you, correct?

2         A    Yes, yes.

3         Q    When did --

4              THE COURT:  Mr. Parlade, we have a limited

5    amount of time, so that, what you just did, that's

6    something for me to determine if, in fact, this

7    letter is admitted into evidence, which you have not

8    yet sought.

9              I just want to make -- I just want you to

10   concentrate.  I'm going to say this to both you and

11   Mr. Arslanian.  Don't use your witnesses for

12   argument, okay?

13             MR. PARLADE:  Okay.  Thank you.

14   BY MR. PARLADE:

15        Q    And when was the letter from Heron that is

16   Respondent's Exhibit G, when was it received by you?

17        A    It was received before the Heron

18   elections.  So the elections were to take place on

19   the 10th of May, and the letter was received in

20   April.

21        Q    Okay.  So other than Ms. Cepero holding up

22   this letter on May 15, 2019, there was no other

23   communication between you or any of the Ceperos; is

24   that correct?

25        A    I have never contacted them.  They are the

1   ones that showed up at my son's school.  They are

2   the ones that at the parking lot or in the parking

3   lot held up this letter.  They're the ones that

4   contacted me.  I never contacted them.

5           MR. PARLADE:  Your Honor, Hammocks

6   Community Association, Marglli Gallego, respectfully

7   request to introduce Respondent's Exhibit G as an

8   exhibit.

9           THE COURT:  I think we lost Mr. Arslanian.

10  We're going to have to wait.  I'll ask you to stop

11  screen sharing if you don't mind.  It's taking away

12  my ability to watch the witness.  We have to wait

13  for Mr. Arslanian to get back on.

14          MR. ARSLANIAN:  I'm back on.

15          THE COURT:  Maybe between today and

16  tomorrow everyone will get better Internet.

17  Although I told you I had a problem with my

18  Internet, and my Internet got better after that.

19          I'm hoping that's Mr. Arslanian.  Yes.  He

20  found some young person, at least somebody who looks

21  young with their mask on.

22          Mr. Arslanian, we did notice you were

23  gone, but we're not quite sure if we noticed right

24  away.  So where did we lose you?

25          We need you to take off mute.  So have

1   that nice person who's helping you unmute you.

2   There we go.

3                So where did we lose you, Mr. Arslanian?

4                MR. ARSLANIAN:  We were talking about

5   Exhibit G, a paragraph or something within Exhibit

6   G, and Exhibit G itself.

7                THE COURT:  Okay.  All right.  So you

8   didn't miss anything other than me scolding

9   Mr. Parlade about using -- oh, no.  Ms. Parlade

10  asked Ms. Cepero -- I'm sorry -- Ms. Gallego if she

11  had had any communication with the Ceperos, prior to

12  that day.

13               Is that correct, Mr. Parlade?  Am I

14  remembering correctly?

15               MR. PARLADE:  No, Your Honor.  I asked her

16  if she had any -- other than them holding up the

17  letter, was there any communication between the two,

18  between the Ceperos and Ms. Gallego.

19               THE COURT:  Okay.  Then Ms. Gallego said

20  no.

21               MR. PARLADE:  Correct.

22               THE COURT:  So now, Mr. Arslanian, I think

23  you're up to speed, other than, Mr. Parlade is

24  seeking admission of Exhibit G.

25               MR. PARLADE:  Correct.

1          THE COURT:  So, Mr. Arslanian, your

2    response to the request to admit Exhibit G.

3          MR. ARSLANIAN:  I don't believe it's

4    relevant, Your Honor.

5          THE COURT:  Okay.  Because?

6          MR. ARSLANIAN:  Because we filed a motion

7    for contempt.  I don't know how that letter in any

8    way, shape or form excuses anything that we've done.

9    It may well be that -- I don't know.  It has nothing

10   to do with the issues presented here today.

11         THE COURT:  Okay.  So, Mr. Parlade, why is

12   this letter relevant?

13         MR. PARLADE:  Your Honor, the letter was

14   the only communication between the debtors and my

15   client on May 15, 2019.  As she remarked, there was

16   no communication between them.  The debtors refused

17   to put down the window.  The only thing that was

18   shown to them was a letter.

19         The letter is being shown as showing the

20   communication.  It's not being shown for the truth

21   of the matter asserted.

22         THE COURT:  Well, the objection was not

23   hearsay.  I think that Mr. Arslanian understood

24   that.  The objection was relevancy.

25         So I'm trying to understand, what is

1   relevant about the letter?

2            MR. PARLADE:  Well, it's relevant, because

3   it was the only communication the debtors tried to

4   relay to my client.  So it's the only contact, other

5   than being in front of my client's car, being

6   followed by the debtors, the only thing the debtors

7   showed to her was that letter.

8            It signifies something to them, and

9   possibly -- and showing it to them, but it relates

10  to my client's state of mind as to what she

11  apprehended from reading that letter and seeing that

12  relayed to her.

13           THE COURT:  Okay.  Final response,

14  Mr. Arslanian.

15           MR. ARSLANIAN:  I didn't hear anything

16  that established any relevance.  Her state of mind

17  because this is the entire document?  It's not

18  relevant.

19           THE COURT:  Briefly, Mr. Parlade.

20           MR. PARLADE:  It is relevant, because my

21  client has now been followed from her son's school

22  to her house.  She has no communication with the

23  debtors.  The only thing the debtors hold up is a

24  letter.

25           It is, to say the least, unusual.  It is

1  not what a reasonable person would have done at that

2  time.  And because of the fact that it's so unusual,

3  because (unintelligible) communication are even very

4  relevant.  Their actions in trying to communicate

5  with my client, and their lack thereof, are relevant

6  to this Court's fact finding mission.

7            THE COURT:  Okay.  Here's what I'm going

8  to do.  I'm going to admit it.  I don't -- it seems

9  that the relevancy is tenuous at best, but I always

10  say to people that the benefit of a bench trial is

11  that I can determine the weight and relevancy.

12            I don't necessarily disagree with

13  Mr. Arslanian, but because I'm going to give you the

14  opportunity to tie everything up, I'm going to admit

15  it, but if I give any weight to it at all, it will

16  be very clear in my ruling.  And I will -- so that,

17  Mr. Arslanian, your objection will be preserved, if

18  that turned out to have any weight.  Okay?

19            MR. PARLADE:  Yes, Your Honor.

20            THE COURT:  Okay.  Go ahead.

21  BY MR. PARLADE:

22       Q    Ms. Gallego, at any time after Ms. Cepero

23  brought up the letter that's been introduced, at any

24  time after that, did they ever try and get out of

25  the car to speak to you, or did you ever try to

Page 214

1    speak to them?

2        A    I didn't communicate with them and they

3    didn't communicate with me, because at that very

4    moment, that's when the police arrived.

5        Q    Okay.  Now, we're also here for another

6    incident that's already been admitted as an exhibit,

7    which was a lawsuit, I believe, filed by you on

8    November 30, 2020; is that correct?

9             THE INTERPRETER:  I'm sorry, Mr. Parlade.

10   Could you please repeat the year for the

11   interpreter?

12             MR. PARLADE:  2020.

13             THE INTERPRETER:  Thank you.

14             THE WITNESS:  A lawsuit that I filed in

15   November of 2020?  I don't understand the question.

16             THE COURT:  Mr. Parlade, did you freeze

17   again?

18             MR. ARSLANIAN:  Yes, he did.

19             THE COURT:  Mr. Parlade?  Still frozen.

20   Maybe we can see if the cats do any better.

21             Mr. Parlade?  Still frozen.  Well, wait.

22   I see a head moving.  He's alive.

23             Mr. Parlade, can you speak?

24             MR. ARSLANIAN:  He's not moving.

25             THE COURT:  He was moving.  I definitely

Page 215

1    saw him moving.  There he goes.  See, he's moving.

2                MR. ARSLANIAN:  He's the gray phone

3    symbol, I think.

4                THE COURT:  No, no.  I'm looking right at

5    Mr. Parlade.

6                Mr. Parlade, can you speak?  No, no.  Now

7    unmute yourself.  Mr. Parlade, unmute.  Okay, there

8    we go.

9                Now, Mr. Parlade, can you hear me?

10               MR. PARLADE:  I can hear you.

11               THE COURT:  And we can hear you.

12               So Ms. Gallego asked you, she said she did

13   not understand your question regarding the

14   November 30, 2020 lawsuit.  So see if you can help

15   your client.

16               MR. PARLADE:  Okay.  On November 30, 2020,

17   a lawsuit was filed against you by Leticia Cepero --

18               THE COURT:  Mr. Parlade, I'm sorry to

19   interrupt you, but you said a lawsuit was filed

20   against Ms. Gallego.  That's not what you meant to

21   say, is it?

22   BY MR. PARLADE:

23        Q    Oh, okay.  No.  It was a lawsuit filed by

24   you, Marglli Gallego, against Leticia Cepero, in

25   November 2020.

1              Are you aware of that?

2     A     There were several lawsuits that were

3 going to be filed for defamation against several

4 people.

5     Q     Now, was one of the people Leticia Cepero?

6     A     Yes, but the attorney withdrew that

7 lawsuit.

8     Q     Okay.  And do you know, was the

9 attorney -- I guess the attorney was Napoleon Hilton

10 (phonetic) in that case; is that correct?

11    A     Yes.

12    Q     And I believe the lawsuit was filed

13 November 30, 2020; is that correct?

14    A     I don't remember the exact date, but I do

15 know that it was near the end of 2020.

16    Q     Okay.  Now, it was immediately withdrawn,

17 correct?

18    A     Yes.

19            MR. PARLADE:  Okay.  Nothing further, Your

20 Honor.

21            THE COURT:  All right.  It's now 12:23, so

22 I'm going to suggest that notwithstanding our

23 technical interruptions, that we take our next

24 ten-minute break and come back at, I'll call it

25 12:35.  So, Ms. Gallego, stretch your legs.

1    Everybody stretch your legs.

2              Ms. Gallego, what you cannot do is discuss

3    your testimony with anybody.  Do you understand?

4    Okay.  All right.

5              So I'm going to turn off my camera and

6    turn off my microphone and we will -- I'm sorry.

7    Ms. Lambert, did you wish -- was there something to

8    be said?

9              THE WITNESS:  Yes, understood.  I'm going

10   to go to the bathroom.

11             THE COURT:  Okay.  Well, we'll strike that

12   part from the record.

13             In any event, whatever you do during this

14   ten minutes, as long as everybody comes back fully

15   clothed, it's all good.  I'll see you all at 12:35.

16             (Thereupon, a recess was taken, after

17   which the following proceedings were had:)

18             THE COURT:  Okay.  Let's make sure we have

19   everybody back.  There's Mr. Arslanian, Mr. Parlade.

20   We have the witness.  Okay.  I think we're good.

21             So, Ms. Gallego, it's now time for

22   Mr. Arslanian to cross-examine you.  Same thing.

23   Try to remember if Mr. Parlade waves his hand -- and

24   if I don't see you, Mr. Parlade, you can do what

25   Mr. Arslanian did and just say, "Your Honor."

1          Because I've got Ms. Gallego on the big

2    screen, and so it's hard for me to -- I can see you

3    all, but I'm focusing on Ms. Gallego's face.

4               MR. PARLADE:  Okay.

5               THE COURT:  So, Mr. Arslanian, are you

6    ready?

7               MR. ARSLANIAN:  Yes, I am, Your Honor.

8               THE COURT:  Ms. Gallego, are you ready?

9               THE WITNESS:  Yes, Your Honor.

10              THE COURT:  And Mr. Parlade?  Uh-oh.  He's

11   frozen again.  All right.  We'll wait.  Wait.  He

12   moved.

13              Mr. Parlade, are you back with us?

14              MR. PARLADE:  I'm back.  (unintelligible).

15              THE COURT:  All right.  Mr. Arslanian,

16   please proceed with your cross-examination.

17              MR. ARSLANIAN:  Thank you, Your Honor.

18                   CROSS-EXAMINATION

19   BY MR. ARSLANIAN:

20        Q    Ms. Gallego, the address that you gave to

21   the Court, how long have you lived at that address?

22        A    I lived there for -- well, several years.

23        Q    How long is several?

24        A    Off the top of my head, I don't remember.

25        Q    Were you living there in 2005?

Page 219

1          A     No.

2          Q     2010?

3          A     I don't remember.

4          Q     2015?

5          A     Yes.

6          Q     When did you first begin to live at that

7    address?

8          A     In '99.

9          Q     In 1999?

10         A     Yes.  No, no.  Yes, yes.  1999.

11         Q     But you didn't live there in 2000, 2005 or

12   2010?

13         A     I don't remember.

14         Q     Where else were you living between 2000

15   and 2015?

16         A     With my in-laws, when I had my children.

17         Q     Where do they live?

18         A     In Country Walk.

19         Q     Did you own the house that you testified

20   about at the beginning of your testimony, since

21   1999?

22         A     No.  That house belongs to my in-laws.

23         Q     So how do you know you were there in 2015?

24         A     Because I was living there in 2015.

25         Q     Okay.  Do you have a driver's license?

```
1        A     Yes, sir.

2        Q     What is the address listed on your

3   driver's license?

4        A     The address 14921 Southwest 104th Street,

5   Apartment 106.  And I have the driver's license

6   right here with me.

7        Q     When was it issued?

8        A     Well, I don't have the exact date.  I

9   would have to look at the driver's license, which is

10  in my purse.

11       Q     You can go in your purse and look at it,

12  because you just said you had it with you.

13            MR. PARLADE:  Objection, Your Honor.

14            THE COURT:  What is your objection,

15  Mr. Parlade?

16            MR. PARLADE:  He's providing instructions

17  to the witness, not asking a question.  And what is

18  the relevance of any of this?

19            THE COURT:  Okay.  Let's start with the

20  relevance.

21            So, Mr. Arslanian, what is the relevance

22  of the question?

23            MR. ARSLANIAN:  My understanding is that

24  there was testimony that my clients know where this

25  woman lived, because of some checks that were picked
```

1    up in 2015 at her house.  I'm trying to figure out

2    if she really lived at this place that she's talking

3    about in 2015.  She's a little bit evasive.

4              THE COURT:  Okay.

5              MR. PARLADE:  Objection to the

6    characterization, "evasive."

7              THE COURT:  Okay.  I understand.  All

8    right.

9              So, Mr. Arslanian, the debtor -- the

10   witness has said she doesn't remember.  Are you

11   asking her if there's something that would help her

12   refresh her recollection?

13             MR. ARSLANIAN:  Yes, I am.

14             THE COURT:  Okay.  And my question

15   regarding the relevancy, is the relevancy where she

16   lived, or what was the address where the checks were

17   picked up?

18             MR. ARSLANIAN:  Yes.  The relevance is, is

19   it the same place as where the incident happened, as

20   where the checks were picked up in 2015, 2016.

21             THE COURT:  Do you perhaps want to ask

22   that question instead?  I'm just asking.

23             MR. ARSLANIAN:  Okay.

24             THE COURT:  I'm just asking, or do you

25   want to ask her about refreshing her recollection?

1          I just need to understand what it is -- if

2    you're concerned regarding the relevancy --

3    Mr. Parlade is concerned about the relevancy, I

4    agree that if you have some concern regarding the

5    address consistency, then that's relevant.  But I'm

6    asking you -- I agree with Mr. Parlade.  You can't

7    tell her to go look in her purse for her driver's

8    license.

9          So I'm trying to help you.  I'll ask you

10   what you want.  Because I'm going to sustain the

11   objection as to telling the witness to go into her

12   purse.  Okay?

13          MR. ARSLANIAN:  I didn't -- I'm sorry.  I

14   didn't volunteer that, "I have my driver's license

15   right here with me."  That's what prompted me to ask

16   my next question.  I figured that she was reading

17   the address off her license as she was testifying.

18   And so I just want to know when it was issued,

19   because I --

20          THE COURT:  Okay.  So would you like to

21   ask the witness if there's something that would

22   refresh her recollection?

23          Ms. Gallego, what would help you refresh

24   your recollection about the date your driver's

25   license was issued?

```
 1              Ms. Lambert, did you ask the witness?
 2              THE INTERPRETER:  I did, Your Honor.  I'm
 3   waiting for a response.
 4              THE WITNESS:  I'm sorry.  May I look at
 5   it?  I do have it close by, and if you allow me I
 6   can take a look at it.
 7              THE COURT:  Any objection, Mr. Parlade?
 8              Uh-oh.  He froze.
 9              MR. PARLADE:  I'm here, Your Honor.
10              THE COURT:  Okay.  We thought you were
11   frozen.
12              Ms. Gallego, do you have your driver's
13   license with you?
14              THE WITNESS:  I do, Your Honor.  2013.
15              THE COURT:  Okay.  So that's your answer,
16   Mr. Arslanian.  What's your next question?
17   BY MR. ARSLANIAN:
18       Q    Just to be clear for the record, the
19   address that's listed on the driver's license that
20   was issued in 2013, is the address where you say
21   this incident happened in May of 2019?
22              THE COURT:  Thank you, Ms. Gallego, but
23   it's too far to see.  Just tell us.  Is the address
24   on your driver's license the 14921 Southwest 104th
25   Street?
```

Page 224

1           THE WITNESS:  Yes, it is.

2           THE COURT:  Okay.  All right,

3    Mr. Arslanian.  What's your next question?

4    BY MR. ARSLANIAN:

5       Q    You mentioned something about your son

6    having an issue with his knee.

7           When did that happen?

8       A    2016.  I don't remember the exact date,

9    but there are medical records at Miami Children's,

10   and it was an emergency.

11      Q    Is that before or after there were no more

12   jobs for Josue at the condominium?

13      A    It was before or after?

14      Q    I believe -- correct me if I'm wrong, but

15   after there were no more jobs, did you and Josue no

16   longer get along?

17      A    I don't have any issue with them, none at

18   all.

19      Q    Now, you mentioned in describing the

20   incident -- how far is the school from your home?

21      A    I don't know if I'm correct.  As far as

22   distance, I don't know, but I think it's maybe five,

23   eight minutes away.

24      Q    Okay.

25      A    With no traffic.

Page 225

1     Q    Was there traffic that day?

2     A    I don't remember.

3     Q    Now, you testified that you were pretty

4  worked up and nervous; is that correct?

5     A    I was nervous, yes.

6     Q    You were speaking loudly?

7     A    I don't remember, because I was so

8  nervous.

9     Q    Do you remember testifying just a few

10  minutes ago that you were speaking loudly to the 911

11  operator?

12     A    What I said was that I was nervous.  At

13  that moment -- I remember everything that was going

14  on at that moment, with my son screaming and

15  everything going on, so I was very nervous.

16     Q    Do you remember testifying just a few

17  minutes ago that you were speaking loudly?

18     A    What I said was that I was nervous, and I

19  didn't know if I might have been speaking loudly

20  because I was nervous.

21     Q    You called the 911 operator while you were

22  driving home?

23     A    Yes.

24     Q    You didn't call the 911 operator when you

25  were already in the parking lot?

1          A     No.  I was on the phone with them.

2          Q     Did you tell them that you had been

3     followed by someone for an hour?

4          A     I don't know.  I don't remember, because I

5     was so nervous.

6          Q     Was anybody following you for an hour?

7          A     I don't remember.  I was nervous, and I

8     made many, many, many turns before reaching my

9     house.

10         Q     If I was to play the 911 tape, would that

11    refresh your recollection as to whether or not you

12    told the 911 operator that you had been followed for

13    an hour?

14         A     I don't understand the question.

15         Q     Do you want me to change the question

16    again?

17         A     Could you be a bit more specific so that I

18    can understand it?

19         Q     If I was to play the 911 tape, would that

20    refresh your memory as to whether or not you told

21    the 911 operator that someone had been following you

22    for one hour?

23         A     The truth is that I don't remember.  The

24    truth is I don't remember.  I was very nervous.  My

25    son was screaming, and I drove around for a long

1    time.

2          MR. ARSLANIAN:  I move to strike as

3    nonresponsive, Your Honor.  It's a very limited

4    questioning that I'm asking.

5          THE COURT:  I'll strike it after she

6    doesn't remember, and that she was very nervous.

7    Okay?

8    BY MR. ARSLANIAN:

9      Q    Do you recall telling the police that

10   arrived at the scene that you had been followed by

11   someone for 30 minutes, or approximately 30 minutes?

12     A    I remember -- I remember when the police

13   arrived there at the parking lot, and the first

14   thing that they said was, "Did somebody call the

15   police?"

16     Q    Let me --

17         THE INTERPRETER:  I'm sorry.

18         THE COURT:  Mr. Arslanian, please let the

19   witness finish answering the question, and then you

20   may ask -- then you may speak.

21         Please, Ms. Lambert, finish with the

22   debtor's -- I'm sorry -- the witness' response.

23         THE WITNESS:  So because there were so

24   many cars there, the police had to ask.  And also,

25   the security guards were there.

1    BY MR. ARSLANIAN:

2         Q    Let me ask my question again.

3              Do you remember telling the police, yes or

4    no, that you had been followed by someone for

5    approximately 30 minutes?

6         A    What I told the police was that I had been

7    followed from my son's school -- that I was being

8    followed since I was at my son's school.  And I told

9    the officers that arrived, I told them that.

10        Q    Did you tell them specifically that you

11   were followed by someone for approximately 30

12   minutes?

13             THE COURT:  Before you respond,

14   Ms. Gallego, you need to answer the question that

15   was asked.  If you want to explain after you answer,

16   that is fine, but it calls for a yes or no answer.

17   And now this is the third time that Mr. Arslanian is

18   asking you, so please answer the question.

19             THE WITNESS:  I don't remember.  I just

20   don't remember.

21   BY MR. ARSLANIAN:

22        Q    Now, if I showed you the police report

23   that was already admitted into evidence as Exhibit

24   10, or if I read to you what was in there, would

25   that refresh your recollection?

1      A     So, I don't know exactly what police

2   report you're referring to, because it was two

3   officers, two police officers showed up.  And that's

4   why I mentioned to you before that the first thing

5   that they did when they arrived was ask if anybody

6   had called the police, because one of the police

7   officers came up to me and said to me that I had not

8   called the police.

9            THE COURT:  Mr. Arslanian, I'm going to

10   say to you the same thing I said to Mr. Parlade,

11   which may have been when you were knocked off.

12            To the extent that you already have a

13   document in evidence, and you're -- you have to ask

14   whatever questions you believe are necessary, but

15   don't use a witness to do something that you're

16   going to use in closing argument.  But in having

17   said that, if that's a question you need to ask, you

18   need to get her to read the report or whatever, the

19   police report says what it says and she says, she

20   doesn't remember.

21            Having said that, if you believe you have

22   a follow-up question or you want to show the witness

23   the police report, go right ahead.  But as I did

24   with Mr. Parlade, I said since we've only got a day

25   and a half, we want to make sure we don't use up our

Page 230

1   time when we don't need to.  Okay?

2        So go ahead, Mr. Arslanian.  What's your

3   next question?

4   BY MR. ARSLANIAN:

5        Q    What time did you go to school that day to

6   pick up your son?

7        A    I left to go pick him up, I'd say, about

8   3:40, 3:43.

9             MR. ARSLANIAN:  Now, Your Honor, at this

10  time I would like to play what was marked as Exhibit

11  L, the 911 phone call, for impeachment purpose.

12            THE COURT:  Okay.  Mr. Parlade.

13            MR. PARLADE:  Objection, Your Honor.

14  Without proper foundation, I don't know exactly why

15  or what this Exhibit L --

16            THE COURT:  You don't know what your

17  Exhibit L is?

18            MR. PARLADE:  It's my exhibit?

19            THE COURT:  Yes.  It's your Exhibit L, and

20  Mr. Arslanian would like to use it for impeachment

21  purposes.

22            MR. PARLADE:  He'd like to play the 911

23  call?  Sure.  Go for it.  No objection.

24            THE COURT:  All right.  How are you going

25  to do this, Mr. Arslanian?

```
 1              MR. ARSLANIAN:  Through screen share, I
 2    suppose.  I've got my tech here, so --
 3              THE COURT:  All right.  So just to be
 4    clear, this is Respondent's Exhibit L, marked for
 5    identification as Exhibit L, correct?
 6              MR. ARSLANIAN:  Yes.
 7              THE COURT:  All right.
 8              (Therefore, a 911 call was played that was
 9    unintelligible for transcription purposes.)
10              MR. PARLADE:  Is it over?
11              MR. ARSLANIAN:  I guess it is.
12              THE INTERPRETER:  I'm sorry, Your Honor.
13    The interpreter is having a hard time hearing the
14    recording clearly, and Ms. Gallego told me the same
15    thing.
16              THE COURT:  I'm having trouble hearing it,
17    as well.
18              MR. PARLADE:  Same here.
19              THE COURT:  Is there anything else,
20    Mr. Arslanian, that we should be looking to?
21              MR. ARSLANIAN:  At this point, no, Your
22    Honor.
23              THE COURT:  Okay.  So why don't we
24    terminate the screen share.
25              Okay.  We've played the tape.  Now what do
```

1    you want to do?

2             MR. ARSLANIAN:  Ms. Gallego -- I want to

3    ask her a question first, and then I'm going to move

4    to admit it.

5    BY MR. ARSLANIAN:

6        Q    Ms. Gallego, was that your phone call to

7    911?

8        A    I did call 911, but I can't hear that

9    recording, or at least it's not clear.  If you would

10   allow me to -- if you would allow me to hear the

11   recording and I could actually hear it, then I could

12   let you know.

13            THE INTERPRETER:  And for the record also,

14   Your Honor, I'm sorry.  Interpreter wasn't able to

15   interpret the full recording, because I couldn't

16   make out what it said, but I didn't want to

17   interrupt.

18            THE COURT:  Okay.  So since Ms. Gallego,

19   if that was, in fact, her, which I assume it is,

20   because since it was Respondent's Exhibit L, its

21   authenticity is admitted.  It was done in English,

22   so presumably Ms. Gallego understood English well

23   enough to have that conversation.

24            But having said that, it was difficult to

25   hear some of the things on the recording, but not

1    the recording itself.

2              So, Mr. Arslanian, Ms. Gallego has asked

3    if she could listen to the recording again in order

4    to confirm it was her.  If you wish to do that, that

5    is up to you.

6              MR. ARSLANIAN:  We could play it again, or

7    if she's at Mr. Parlade's office, I'm sure he could

8    play his Exhibit L.  We could go off for a minute so

9    she could hear it, his Exhibit L.

10             At this point I am going to be moving it

11   into evidence.  I don't think there is a question

12   about the authenticity or relevance or any other

13   issues.

14             THE COURT:  All right.  If it is -- so are

15   you withdrawing your question with respect to the

16   witness?  I need some guidance here, Mr. Arslanian.

17   There's an open question here.

18             MR. ARSLANIAN:  I think at this point I

19   was just trying to get her -- I thought she could

20   hear it and just say, "That was me speaking," but,

21   you know, I didn't get that answer.  I still think

22   the question notwithstanding, it should be admitted

23   into evidence, especially since the source of it

24   comes from -- it's Respondent's Exhibit L.

25             The address was the address that she

1    was -- it's her voice.

2              THE COURT:  Mr. Arslanian is requesting

3    that Exhibit L be admitted as impeachment.  Your

4    response.

5              MR. PARLADE:  Your Honor, it's already

6    been admitted as to authenticity.  I object as to

7    impeachment.

8              Number one, the quality of the audio has

9    already been stated by the person who is alleged to

10   be the declarant, was unable to be heard by her.  He

11   has not established a foundation in order to

12   introduce it as impeachment evidence.

13             THE COURT:  Those are two different

14   things.  It was your exhibit.  Therefore,

15   authenticity is established.  That is red letter

16   law, period, done.  So you can't -- just because the

17   witness could not hear it right now as well as she

18   wanted, doesn't change its authenticity.

19             So your argument is, there's no valid

20   foundation as impeachment testimony?

21             MR. PARLADE:  Correct, Your Honor.

22             THE COURT:  Your objection is overruled.

23   I'll admit Exhibit L for impeachment purposes, and

24   I'll note that it was admitted by the movant.

25             MR. ARSLANIAN:  Thank you, Your Honor.

Page 235

```
 1              (Thereupon, Respondent's Exhibit L was
 2         admitted into evidence.)
 3    BY MR. ARSLANIAN:
 4         Q    Ms. Gallego --
 5              MR. ARSLANIAN:  Are you ready, Your Honor,
 6    to proceed?  I'm sorry.
 7              THE COURT:  Go ahead.
 8              MR. ARSLANIAN:  Thank you.
 9    BY MR. ARSLANIAN:
10         Q    Ms. Gallego, did you ever claim to the
11    police or the security guards that you were being
12    blocked in by the Ceperos?
13         A    Yes.
14         Q    Isn't it true that when the cars finally
15    stopped, that your car came in front of the Ceperos
16    and blocked them?
17         A    No, because I was heading towards my
18    parking space.
19         Q    So you didn't block them?
20         A    They blocked me.
21              MR. ARSLANIAN:  Judge, at this time I
22    would like to play video that's been marked as the
23    Respondent's Exhibits N and M, that show when the
24    cars stopped, for impeachment.
25              MR. PARLADE:  I object.  The foundation
```

Page 236

1    hasn't been laid.

2              THE COURT:  I'm going to agree.

3    Mr. Arslanian, you can save those for your rebuttal

4    case.  All right?

5              MR. ARSLANIAN:  Okay.

6              THE COURT:  That's not impeachment

7    testimony.

8              Now, I will say this, before I forget.

9    Exhibit L does not exist anywhere in the universe,

10   as it were, so you're going to have to figure out

11   how to put that on the court docket, or do

12   something.  You're going to have to figure out now

13   how -- I may have it, because last year you all gave

14   me your exhibits.

15             I may have the Exhibit L.  I will let you

16   all know.  But if not, you're going to have to

17   figure out, Mr. Arslanian, how technologically to

18   get it filed.  I'll see, though, if I have it on the

19   thumb drive that you gentlemen -- well, not you,

20   Mr. Arslanian, but Mr. Parlade, I have a thumb drive

21   from you.  Perhaps those documents are on them.  I'm

22   not going to take the time now to look.

23             But as far as your request regarding the

24   videos, Mr. Arslanian, that will be for your

25   rebuttal case.

```
 1              Okay.  So what else do you have for this

 2   witness, Mr. Arslanian?

 3   BY MR. ARSLANIAN:

 4       Q    Ms. Gallego, how is it that you were able

 5   to take a picture of the license tag of the Ceperos,

 6   who were following you?

 7       A    Once the cars stopped.

 8       Q    When you were speaking with the 911

 9   operator, you were driving the car; isn't that

10   correct?

11       A    I was on the phone with the operator while

12   I was driving, but I was also on the phone with the

13   operator once I was stopped, once the car was

14   stopped, because the operator instructed me to

15   remain on the phone until the police officers

16   arrived.

17              And I took the pictures using my son's

18   cellular phone.

19       Q    Isn't it true you didn't mention your son

20   once during the 911 phone call?

21       A    I don't remember.

22       Q    All right.  Let me ask you about the

23   lawsuit that was filed, which is -- I believe now

24   they've admitted it.  I think it's 21.

25              THE COURT:  Exhibit 21.
```

1          MR. ARSLANIAN:  It is 21.  Okay.  I'm

2   sorry, Your Honor.

3   BY MR. ARSLANIAN:

4      Q    You're aware of the court orders that were

5   entered in December of 2018, regarding refraining

6   from any contact with the Ceperos; isn't that

7   correct?

8      A    I do remember the order.  I don't remember

9   the exact date of the order, but they couldn't have

10   any contact with me and I couldn't have any contact

11   with them.

12      Q    Do you remember what caused those orders

13   to be entered?

14      A    Honestly, I don't -- I don't know or I

15   don't remember the exact reason, but I do know that

16   it had something to do with bankruptcy.

17      Q    Do you remember it having anything to do

18   with calling the Ceperos thieves, and making

19   physical threats against them, and filing a lawsuit

20   in 2017?

21      A    Could you be a bit more specific?  What

22   lawsuits?

23      Q    The prior lawsuit that you had filed in

24   November of 2017 against the Ceperos for slander,

25   defamation?

Page 239

```
1        A    I do remember that there have been

2   defamation lawsuits against them, but I don't

3   remember the exact dates, or if it is that one that

4   you're referring to.  I do ask you to remember that

5   there have just been so many issues with them.

6        Q    You don't remember anything about physical

7   threats made upon Leticia Cepero by you, and that

8   led to these orders being entered by Judge Isicoff?

9             MR. PARLADE:  Objection, Your Honor.

10  Counsel is misstating testimony, and is assuming

11  facts that are not in evidence.

12            THE COURT:  I'll sustain the objection.

13            You don't have to answer that question,

14  Ms. Gallego.

15  BY MR. ARSLANIAN:

16       Q    Ms. Gallego, you know that you can't file

17  any lawsuits against Mr. and Mrs. Cepero while

18  they're in bankruptcy, don't you?

19            THE INTERPRETER:  I'm sorry.  Could you

20  repeat that, please?

21  BY MR. ARSLANIAN:

22       Q    Ms. Gallego, you're aware that you cannot

23  file any lawsuits, or the Hammocks, against the

24  Ceperos while they're in bankruptcy; isn't that

25  correct?
```

1          MR. PARLADE:  Objection, Your Honor.

2    Counsel is testifying.  He's also misquoting

3    evidence in this case.

4          THE COURT:  The objection is overruled.

5          You may answer, Ms. Gallego.

6          THE WITNESS:  So what I'm aware of is that

7    during the bankruptcy they cannot receive any

8    letters or calls mentioning the money that is owed

9    by them, or charging them -- trying to collect on

10   that money.

11   BY MR. ARSLANIAN:

12       Q    Let me ask the question again.

13          Are you aware that you or the Hammocks are

14   not allowed to file a lawsuit against either or both

15   of the Ceperos while they are in bankruptcy?

16          MR. PARLADE:  Objection.  Asked and

17   answered.

18          THE COURT:  I'm going to overrule the

19   objection, but perhaps this requires a little

20   explanation.

21          Ms. Gallego, I need to remind you again,

22   you have to answer yes or no, and then you can

23   explain.  I think you said something, that maybe

24   that's your explanation, but you did not say yes or

25   no.

1              So please answer the question whether you

2     know, or you knew, that you weren't supposed to file

3     a lawsuit against Mr. or Mrs. Cepero while they're

4     in bankruptcy.  Okay?  Yes or no.

5              THE WITNESS:  No.

6              THE COURT:  All right.  There's your

7     answer, Mr. Arslanian.  Please continue.

8              MR. ARSLANIAN:  Okay.

9     BY MR. ARSLANIAN:

10        Q    When the lawsuit that's been admitted into

11    evidence as Number 21, when you and the association

12    sued Leticia Cepero, did you tell your lawyer that

13    Leticia was in bankruptcy?

14             MR. PARLADE:  Objection.

15             THE COURT:  What's the objection?

16             MR. PARLADE:  Do not answer.  That's

17    privileged.  Any conversations between the attorney

18    and Ms. Cepero are attorney/client privilege.

19             THE COURT:  Okay.  I'll sustain the

20    objection.

21             You don't have to answer that,

22    Ms. Gallego.

23    BY MR. ARSLANIAN:

24        Q    Do you know why your lawsuit was filed,

25    Number 21?

1           MR. PARLADE:  Same objection, Your Honor.

2    It may intrude on any communications between

3    Ms. Cepero and the attorney.

4           Now, if she's doing it from knowledge

5    outside of the communications, I don't think they're

6    protected, but anything within those communications

7    are absolutely protected.

8           THE COURT:  So, Ms. Gallego, if you can

9    answer the question without disclosing conversations

10   you had with a lawyer, please answer the question.

11   Okay?

12          THE INTERPRETER:  Could you repeat the

13   question?  Because I didn't hear it, because of the

14   objection.

15          THE COURT:  Go ahead, Mr. Arslanian.

16   BY MR. ARSLANIAN:

17      Q    Why did you file the lawsuit against

18   Leticia Cepero in November of 2020 for defamation or

19   (inaudible)?

20      A    For defamation?

21      Q    Yes, for defamation.  Why did you file

22   that lawsuit, ma'am?

23      A    It's a lawsuit for defamation.

24      Q    And why did you dismiss it about 20 days

25   after it was filed?

Page 243

```
 1              MR. PARLADE:  Same objection, Your Honor.
 2   As long as she's not testifying as to privileged
 3   matters.
 4              THE COURT:  All right.  So, Ms. Gallego,
 5   you may answer as long as you do not disclose
 6   attorney/client communications.  As long as you can
 7   do so without disclosing what your lawyer said to
 8   you.
 9              THE WITNESS:  I can't go into details
10   about what I discussed with my attorney.
11              THE COURT:  Okay.
12   BY MR. ARSLANIAN:
13       Q    Did you know that the lawsuit was
14   dismissed on December 10, 2020?
15              MR. PARLADE:  Same objection, Your Honor.
16              THE COURT:  Overruled.
17              THE WITNESS:  Yes, I was aware.
18   BY MR. ARSLANIAN:
19       Q    Did you know that filing that lawsuit was
20   against federal law and bankruptcy law?
21       A    No, I did not.
22       Q    Did you know that filing that lawsuit was
23   in violation of two court orders entered by Judge
24   Isicoff back in December 2018?
25              MR. PARLADE:  Objection, Your Honor.
```

1    Asked and answered.

2              THE COURT:  Sustained.

3    BY MR. ARSLANIAN:

4         Q    Did you file any other lawsuits against

5    the Ceperos while they were in bankruptcy?

6         A    No.

7              MR. ARSLANIAN:  I didn't hear the answer.

8    Sorry.

9              THE WITNESS:  No.

10             MR. ARSLANIAN:  Okay.  One second, Your

11   Honor.

12   BY MR. ARSLANIAN:

13        Q    Do you remember filing a (inaudible)

14   lawsuit in Case Number 2017 -- for defamation

15   against the Ceperos?

16             MR. PARLADE:  Objection, relevance.

17             THE COURT:  All right.  What is the

18   relevance of that question, Mr. Arslanian?

19             MR. ARSLANIAN:  It goes to her knowledge

20   of whether filing suit against people who are in

21   bankruptcy are permitted or not.  I can lay a

22   foundation with this prior lawsuit.

23             THE COURT:  I'm going to sustain the

24   objection, absent your laying a foundation for this

25   lawsuit.  You haven't given the date of the lawsuit.

Page 245

1    So as of right now, the relevancy is not

2    established.

3              MR. ARSLANIAN:  Just for the Court to

4    note, the bankruptcy was filed, I believe, in August

5    of 2017.

6    BY MR. ARSLANIAN:

7         Q    Ms. Gallego --

8              MR. PARLADE:  Objection, Your Honor.

9    Counsel is testifying.

10             THE COURT:  Yes.  I'm looking at the

11   docket, Mr. Arslanian.  That's why I stated I

12   sustained the objection.  Lay a foundation regarding

13   your question about the 2017 lawsuit.

14   BY MR. ARSLANIAN:

15        Q    Do you recall, Ms. Gallego, filing a

16   lawsuit on November 22, 2017, Hammocks Community

17   Association, Incorporated, against Josue Cepero,

18   Leticia Cepero, Maria Alonso, Gail Sharp and Yasser

19   Martinez?

20             THE INTERPRETER:  I'm sorry, Counselor.

21   Could you please repeat the last name on the list?

22   I missed it.  Yester?

23             MR. ARSLANIAN:  Yasser, Y-A-S-S-E-R,

24   Martinez.

25             THE INTERPRETER:  Thank you.

Page 246

1        MR. PARLADE:  Your Honor, before she

2   answers, objection.  Same objection, relevance.

3   Foundation has not been established.  And it's

4   confusing, because he is interposing both

5   Ms. Gallego and the association.

6        MR. ARSLANIAN:  They're both --

7        THE COURT:  Wait, wait, wait.  I'm going

8   to overrule your objection.  If you believe that

9   your witness is confused, then you can ask her on

10  redirect.

11       MR. PARLADE:  Okay.

12       THE COURT:  All right.  Mr. Arslanian, the

13  question was, does Ms. Gallego, does she recall a

14  lawsuit filed by the association against those named

15  parties in November 2017?

16       MR. ARSLANIAN:  That's the question.

17       THE COURT:  So, Ms. Gallego, answer yes or

18  no, and then you can explain if you need an

19  explanation.  Okay?

20       THE WITNESS:  I think so, yes.

21  BY MR. ARSLANIAN:

22       Q    Do you recall dismissing that lawsuit, or

23  having the Hammocks Community Association dismiss

24  the lawsuit against Mr. and Mrs. Cepero, less than a

25  month after it was filed, on December 19, 2017?

1      A    No.

2      Q    If I showed you the docket sheet, would

3   that refresh your recollection as to when Mr. and

4   Mrs. Cepero were dismissed from the lawsuit?

5      A    You mentioned so many lawsuits.  I'm

6   confused.  You mentioned lawsuits and different

7   dates and three years ago, four years ago.  I'm

8   confused.

9      Q    Isn't it true that you dismissed the 2017

10   lawsuit that was filed in November of that year,

11   because you knew that you couldn't proceed against

12   the Ceperos while they were in bankruptcy?

13          MR. PARLADE:  Objection.  Asked and

14   answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  I don't remember.  There's

17   been so many different things.  I don't remember.

18   BY MR. ARSLANIAN:

19      Q    I'm going to show you the docket so we can

20   refresh your recollection on that.

21          MR. PARLADE:  Objection, Your Honor.

22          THE COURT:  Okay.  What's your objection?

23          MR. PARLADE:  Foundation has not been

24   laid, her recorded recollection.

25          THE COURT:  That's not what he was asking.

Page 248

1    He was asking to refresh her recollection, not a
2    recorded recollection.
3             MR. PARLADE:  I'm sorry, Your Honor.
4    Foundation has not been laid to refresh her
5    recollection.
6             THE COURT:  She said she doesn't remember.
7    That's a foundation.  Okay.
8             Mr. Arslanian, before -- and I'm not sure
9    how to do this.  I can put you both in a breakout
10   room.  You can hold up the picture, because you have
11   to show the document to Mr. Parlade if he wants to
12   see it.
13            Mr. Parlade, do you need to see the docket
14   that states the 2017 action (inaudible) Ms. Gallego.
15            MR. ARSLANIAN:  I have it here.
16            MR. PARLADE:  I haven't seen it.  That
17   would be helpful.
18            THE COURT:  No cross talk.  No cross talk.
19            Okay, so I'm going to put both of you in a
20   breakout room, and then, Mr. Arslanian, you can show
21   it to Mr. Parlade.  Okay?  So I'm going to put you
22   into breakout room two.
23            Let me see if I do this correctly.  This
24   is the first time I'm doing this, gentlemen.  If I
25   lose you, it was nice knowing you.

Page 249

```
 1              Okay.  I'm now moving you both to that
 2    breakout room.  No, no.  Wait a minute.  Well, it's
 3    okay.  It doesn't matter.  You're the only people in
 4    there.  I was going to put you in two.
 5              Oh, my gosh.  This is just too
 6    complicated.
 7              Well, you're both sent to the same room so
 8    let's see if that works.  Nope.  Well, did you get
 9    an invitation to go to those rooms?
10              MR. ARSLANIAN:  No.
11              THE COURT:  Okay.  I'm really trying here
12    guys.  Wait, I did it.  No.  Let's see if that
13    works.  No.
14              Okay, it says, "move to," but it
15    doesn't -- all right.  Never mind.  Okay.  Just show
16    the picture.  I can't get this to work.  I'm going
17    to have to practice.  All right, guys.
18              MR. PARLADE:  I can't --
19              MR. ARSLANIAN:  We can screen share it.
20              MR. PARLADE:  I'm getting the invitation
21    now.
22              THE COURT:  All right.  Go into your room.
23    Go into your room.  Work it out.
24              Mr. Parlade -- there we go.  Okay.
25              I wonder how they go back.  How do they go
```

Page 250

1   from the breakout room?  I'm told them 20 seconds,

2   so -- all right.  Let's see if they come back.

3           Oh, it says they're given 60 seconds to

4   come back.  All right.  Like I said, this is my

5   first time doing this.

6           Ms. Gallego, if you want to put your phone

7   down for a minute, if you're more comfortable.  If

8   your hand is getting tired you can do that.

9           I think they get a signal that says,

10  "Leave breakout room."  Okay.  We have Mr. Parlade

11  back.  Hopefully Mr. Arslanian came back.  He's

12  coming back.

13          MR. PARLADE:  He'll be coming back soon.

14  The room was about to close.

15          THE COURT:  Yes, he's back.  Okay.  He's

16  back.  Whoever that person is, don't leave this man

17  for too long.  He has no idea what he's doing.  I

18  don't either.

19          He's frozen.  Okay.  There we go.

20          Yes, I need him.  I need him.

21  Mr. Arslanian, you have to unmute.

22          Mr. Parlade, Mr. Arslanian has shown you

23  the document he wishes to refresh the witness'

24  recollection.  Any further objection, other than the

25  one you've already made?

Page 251

1          MR. PARLADE:  The one I've made.  It's not

2    enough that she says she can't remember.  She's got

3    to actually state on the record that an exhibit or

4    an item will refresh her recollection.  So just

5    saying that she don't remember something is not

6    foundation for a refreshed recollection.

7          THE COURT:  You're absolutely correct,

8    Mr. Parlade.  Okay.

9          So, Mr. Arslanian, if you'll ask that last

10   question, and then if -- and I should have done that

11   beforehand, but this is a great way for me to

12   practice the breakout room.

13         So, Mr. Arslanian, if you'll that.

14         MR. ARSLANIAN:  I think I did ask her that

15   question.  I asked her, "If I showed you the docket,

16   would that refresh your recollection?"  She said, "I

17   don't remember," so that's I want to show her the

18   docket.

19         THE COURT:  I'm going to allow you to show

20   her the docket.  Go ahead.  Now screen share it, or

21   let the person that knows what she's doing.

22         MR. ARSLANIAN:  Scroll down to when the

23   lawsuit was filed.

24   BY MR. ARSLANIAN:

25         Q    Ms. Gallego, as you can see, this

1    lawsuit --

2             THE COURT:  Just show Ms. Gallego the

3    information that you believe is going to potentially

4    refresh her recollection, and ask her if it

5    refreshes her recollection regarding whether she

6    dismissed -- whether she was aware that the case

7    against the Ceperos was dismissed.  Okay?

8             MR. ARSLANIAN:  This docket shows a

9    complaint filed on November 22, 2017.  Then if you

10   scroll up --

11            MR. PARLADE:  Objection.  Counsel is

12   testifying.

13            THE COURT:  Right.  Mr. Arslanian, just

14   show the witness the part of the docket you want to

15   show her, and ask her if that refreshes her

16   recollection as to whether the case was dismissed

17   against the Ceperos.

18   BY MR. ARSLANIAN:

19       Q    Does that first page there, describing the

20   case with the local case number, and then title,

21   Hammocks Community Association versus Josue Cepero,

22   et al., is that the case that we were talking about,

23   the 2017 lawsuit?

24            MR. PARLADE:  Your Honor, I don't know if

25   they're translating, but I object to the question.

Page 253

1  Again, he's not laying the foundation as to whether

2  this is refreshing the witness' recollection.

3  THE COURT:  I agree.  I'm going to

4  disallow this.  The record will stay as it stands,

5  that she does not remember, or she's not aware that

6  it was dismissed.  Take down the screen share and

7  let's move on.

8  MR. ARSLANIAN:  Can I have a moment to

9  confer with Mr. Brooks?

10  THE COURT:  Absolutely, but please put

11  yourself on mute, unless you want us all to be with

12  you.  Okay, good.  Mr. Arslanian -- okay, there you

13  go.  Okay.

14  (Discussion off the record.)

15  MR. ARSLANIAN:  I have no further

16  questions, Your Honor.

17  THE COURT:  Okay.  It's ten to 2:00.  I

18  believe the witching hour is 2:30, right,

19  Mr. Arslanian?  I said a soft 2:00.

20  Mr. Parlade, how long do you think your

21  redirect is going to take?  Will it take us past

22  2:30?  I don't want to get started if --

23  MR. PARLADE:  No way.  It's going to be

24  short.

25  THE COURT:  Okay.  All right.  Let's do

Page 254

1    redirect.

2            Ms. Gallego, so you understand, what

3    redirect means is that Mr. Parlade can ask you

4    follow-up questions relating to what Mr. Arslanian

5    asked you during his turn.  Okay?

6                    REDIRECT EXAMINATION

7    BY MR. PARLADE:

8        Q    Ms. Gallego, opposing counsel just

9    mentioned a lawsuit brought in 2017 by Hammocks

10   Association against Josue Cepero.

11           Were you aware when the actual association

12   got notice of the bankruptcy that was filed that

13   same year by the debtors?

14       A    No.  I don't know -- I don't know the

15   dates, because that actually -- it's actually the

16   accounting department that gets that.

17       Q    Now, opposing counsel also played a 911

18   call, which was played back.  I understand some of

19   it was heard, some of it was not heard, but what I

20   understood from the 911 call was, it was made at the

21   time that both yours and the Ceperos' car were

22   parked in front of your residence on May 15, 2019;

23   is that correct?

24       A    So I wasn't able to hear the call or to

25   make out what was being said on the call, but the

1    phone call was not made in front of my house.

2        Q    Did you hear when it was made?

3        A    No, I didn't hear it.

4        Q    Okay.  You had previously testified that

5    you had noticed someone following you when you went

6    to pick up your child at his school at around 3:45

7    to 3:49 on May 15, 2019, correct?

8            MR. ARSLANIAN:  Your Honor, objection.

9            THE COURT:  What is the objection?

10           MR. ARSLANIAN:  That's improper -- it's

11   not proper redirect.

12           THE COURT:  Okay.  I'm going to overrule

13   the objection.

14           THE INTERPRETER:  I'm sorry.  Could you

15   repeat the question?

16   BY MR. PARLADE:

17       Q    You had previously testified that when you

18   went to pick up your son at his school on May 15,

19   2019, at between 3:45 to 3:49 p.m., you had first

20   noticed somebody following you, correct?

21       A    I don't remember the exact time, and I

22   don't remember the exact time I made the call.

23           THE INTERPRETER:  I'm sorry.  Did

24   everybody here me?

25           MR. ARSLANIAN:  Yes.

```
 1              MR. PARLADE:  Everybody froze for a
 2    second.
 3              THE COURT:  I'm here.  Mr. Arslanian,
 4    you're there?
 5              MR. ARSLANIAN:  Yes.
 6              THE COURT:  We're all here.  Go ahead.
 7              THE INTERPRETER:  Did you hear my
 8    translation, Mr. Parlade?
 9              MR. PARLADE:  I did not.
10              THE INTERPRETER:  Would you like me to
11    repeat it, or would you like me to ask her again?
12              MR. PARLADE:  Just repeat it for me,
13    please.
14              THE INTERPRETER:  "I don't remember the
15    exact time, and I don't remember the exact time of
16    the call."
17    BY MR. PARLADE:
18        Q    But do you remember the time you went to
19    pick up your son?
20              THE COURT:  What's the objection,
21    Mr. Brooks -- I mean, Mr. Arslanian?
22              MR. ARSLANIAN:  It was asked and answered.
23    I already asked her that question and we got the
24    answer.
25              THE COURT:  I'm going to sustain the
```

1    objection.  You don't have to answer the question,

2    Ms. Gallego.

3              And, Mr. Arslanian, the fact that you may

4    have asked a question does not preclude it being

5    asked on redirect, okay?

6              All right.  Mr. Parlade.

7    BY MR. PARLADE:

8        Q    Would it be safe to say that you went to

9    pick up your son on May 15, 2019, before 4:00 p.m.?

10       A    Yes.

11       Q    Okay.  Now, from what we've seen, and it

12   has been admitted as Debtor's Exhibit 11, there is

13   an incident report, and that incident report states

14   that the officers arrived at 4:40 p.m.; is that

15   correct?

16       A    I don't have the report.

17       Q    Would it surprise you if the officers

18   arrived after 4:30 p.m. on the day of the incident?

19       A    No.

20       Q    Okay.  So almost an hour transpired from

21   the time you went to pick up your son to the time

22   the actual police arrived in front of your -- at

23   your house on May 15, 2019; is that correct?

24              MR. ARSLANIAN:  Objection, Judge.

25              THE COURT:  What's the objection, sir?

1            MR. ARSLANIAN:  First of all, even if it's

2   redirect, you can't lead.

3            MR. PARLADE:  Leading is --

4            THE COURT:  Mr. Parlade, stop.  You made

5   it sound like you had more to say, Mr. Arslanian, so

6   finish what you were saying first.

7            MR. ARSLANIAN:  It mischaracterizes her

8   testimony already about an hour.

9            THE COURT:  I'm going to sustain the

10  objection.  One, Mr. Parlade, you cannot lead on

11  redirect, and number two, you're absolutely

12  mischaracterizing the witness' testimony, unless you

13  were trying to get her to change her testimony.

14           MR. PARLADE:  I'm not trying to get her to

15  change her testimony, Your Honor.

16           THE COURT:  Okay.  Then you are

17  mischaracterizing the testimony.

18           MR. PARLADE:  Thank you.  I'll withdraw

19  that question, Your Honor.

20           THE COURT:  I also want to note for the

21  record that you identified the police incident

22  report as Exhibit 11, but that is a document that --

23  I can speak English, sorry -- an exhibit that was

24  refused admission.  The incident report is actually

25  Exhibit 10.  I just wanted to correct the record.

1              MR. PARLADE:  My apologies.

2              THE COURT:  All right.  Mr. Parlade, do

3     you have any other redirect that you wish to ask the

4     witness?

5              MR. PARLADE:  Nothing further, Your Honor.

6              THE COURT:  Okay.  All right.

7     Ms. Gallego, believe it or not, your testimony is

8     done.  Don't hang up the phone, because we're not

9     done yet today.  We're almost done.

10             Ladies and gentlemen, we are not going to

11    start another witness today, so let's talk about

12    tomorrow.

13             Mr. Parlade, other than the Ceperos or --

14    was it both Ceperos or just one Cepero, I don't

15    remember, on your witness list?

16             MR. PARLADE:  I'm not going to be calling

17    either one of them, Your Honor.

18             THE COURT:  Oh, okay.  All right.  So what

19    do you have left in your case in chief?

20             MR. PARLADE:  That's it.  I'm done.  I can

21    rest.

22             THE COURT:  Okay.  So you're resting.  So

23    then tomorrow, Mr. Arslanian, we'll start with your

24    rebuttal case, okay?

25             Now, you already told me that you wish to

Page 260

1    introduce -- I'm sorry -- M and N that were

2    submitted as exhibits, but not introduced by the

3    respondent.  So I'm going to -- I have more court

4    this afternoon.  When I'm done I'm going to look at

5    the drive that Mr. Parlade gave me last year, okay,

6    and I will see if I have Exhibit H -- I'm sorry.

7                  MR. ARSLANIAN:  M and N.

8                  THE COURT:  Exhibit L, which I admitted

9    today, but it was a little difficult to hear, not

10   impossible, but parts of it were, and then M and N.

11                  I will let you gentlemen know.  I will

12   have my courtroom deputy e-mail you both so that you

13   know whether I have it on my flash drive.  Okay?

14   That doesn't mean I'm going to be the one sharing

15   it.  Today I did the breakout room.  That's probably

16   it for me for this trial.  That's about as exciting

17   as I can get.  All right?  So we'll figure something

18   out.

19                  So tomorrow -- but, Mr. Arslanian, you

20   will not go home tonight without uploading your

21   amended exhibit register, which includes,

22   irrespective of whether I admitted them or not, all

23   your new exhibits that you identified, or that

24   Mr. Brooks identified this morning, as well as your

25   Exhibit L, the M and the N.  Okay?

1          MR. ARSLANIAN:  Yes.  With regard to M, at

2   the prior hearing, the first hearing, on Page 67 I

3   can see where Mr. Parlade tried to play that video,

4   and I don't know what happened.  It was a recess and

5   it didn't get played, but I think the Court may have

6   it.

7          MR. BROOKS:  Judge, Michael Brooks.  We're

8   going to upload everything from scratch.  So you

9   don't have to go through your drive.  I'll make sure

10  that it's attached to the exhibit register.

11         THE COURT:  Okay.  Then let me hear from

12  Mr. Parlade.  Yes, Mr. Parlade?

13         MR. PARLADE:  Judge, my client is going to

14  be here tomorrow, but do I still have to have a

15  translator on Zoom, considering I'm not going to

16  have her testify anymore?  Can she just have a

17  translator on the phone?  Is that okay?

18         THE COURT:  Absolutely.

19         MR. PARLADE:  Thank you.

20         THE COURT:  Although I do want to

21  commend -- although I couldn't hear what the debtor

22  was -- I'm sorry, I keep saying debtor, I

23  apologize -- the witness was saying, Ms. Lambert did

24  a great job.

25         Ms. Lambert, you wish to say something?

1              THE INTERPRETER:  If I may ask,

2  Mr. Parlade, I mean, I don't know if it's going to

3  be me interpreting for you tomorrow or someone else,

4  but if I could just request, I mean, if it is me, I

5  will keep myself muted and I won't interrupt at all,

6  but I can hear a lot better when I am on Zoom and on

7  the phone.

8              MR. PARLADE:  Oh, okay.

9              THE INTERPRETER:  That way I can hear

10  everything that everyone is saying, and then I can

11  just interpret for her.  I promise that I will keep

12  my mute on the entire time.

13              MR. PARLADE:  Perfect.  Whatever makes it

14  easier for you.  Thank you so much.

15              THE COURT:  So, Mr. Arslanian, anything

16  else from you before tomorrow?

17              MR. ARSLANIAN:  (Inaudible).

18              THE COURT:  I'm sorry, Mr. Arslanian.  You

19  broke up, so I didn't realize you were speaking.

20              MR. ARSLANIAN:  I was just saying that

21  hopefully we will get done rather quickly tomorrow.

22  It looks like there's not much left to do, but, you

23  know, I thank the Court for this whole thing,

24  because it's like pulling teeth how slow it goes.

25  But we did pretty good, I thought.

Page 263

1            THE COURT:  It is not the best way, but

2   I'm very grateful, and I've said this to many

3   people, I'm very grateful that we all are in a

4   business or profession and have the technology that

5   makes it possible for the Court to do its work even

6   though we can't be together.

7            So I appreciate everybody's patience.  I

8   know that Mr. Parlade is going to go out immediately

9   and upgrade his Internet.  I wish you all a good

10   afternoon.  Stay safe, stay well.  And,

11   Mr. Arslanian, I hope that you and Mr. Brooks

12   doesn't suffer too much when you get your shots this

13   afternoon.

14            I think we're starting at 9:30 again; is

15   that correct?  Okay.  I'll see you all at 9:30

16   tomorrow morning.

17            MR. PARLADE:  Is it the same link or will

18   we be receiving a different link?

19            THE COURT:  No, you'll use the same link

20   to sign in again in the morning.

21            MR. PARLADE:  Perfect.

22            THE COURT:  You all take care and stay

23   safe.

24            (Thereupon, the hearing was adjourned.)

25

Page 264

**CERTIFICATION**

STATE OF FLORIDA:

COUNTY  OF  DADE:


         I, HELAYNE F. WILLS, Shorthand
Reporter and Notary Public in and for the State of
Florida at Large, do hereby certify that the
foregoing proceedings were taken by electronic
recording at the date and place as stated in the
caption hereto on Page 1; that the foregoing
computer-aided transcription is a true record of my
stenographic notes taken from said electronic
recording.

        WITNESS my hand this 22nd day of
February, 2021.


         _____
            HELAYNE F. WILLS
         Court Reporter and Notary Public
       In and For the State of Florida at Large
       Commission No:  GG123092  Expires 8/2/2021

Page 265

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  17-20358-LMI
Chapter 13

In Re:

JOSUE CEPERO and LETICIA CEPERO,

    Debtors.
_____/

VOLUME III

CONTINUED TRIAL

ECF # 199, 267, 289, 310

February 12, 2021

    The above-entitled cause came on for a
Zoom hearing before the HONORABLE LAUREL M. ISICOFF,
one of the Judges of the UNITED STATES BANKRUPTCY
COURT, in and for the SOUTHERN DISTRICT OF FLORIDA,
Miami-Dade County, on Friday, February 12, 2021,
commencing at or about 9:32 a.m., and the following
proceedings were had:

    Transcribed from a Zoom recording by:
        Helayne Wills, Court Reporter

Page 266

1   APPEARANCES VIA ZOOM:

2       BANKRUPTCY NOW, by
        MICHAEL J. BROOKS, ESQ.,
3       and
        LAW OFFICE OF LOUIS ARSLANIAN, by
4       LOUIS ARSLANIAN, ESQ.,
        on behalf of the Debtors
5
6       LAW OFFICES OF MIGUEL PARLADE, P.A., by
        MIGUEL F. PARLADE, ESQ.,
7       on behalf of the Hammocks Community Association
        and Marglli Gallego
8
9       JUAREGUI LAW, P.A., by
        SABINO JUAREGUI, ESQ.,
10      on behalf of Marglli Gallego
11
        ALSO PRESENT:
12      ECRO - Electronic Court Reporting Operator
        JOSUE CEPERO
13      LETICIA CEPERO
        ANNA DANTON (phonetic)
14      KINSELL LAMBERT, Interpreter
15
16                      EXHIBITS
17
18  DEBTORS'                                    PAGE
19   No. 25                                     298
     No. 26                                     296
20
21
22
23
24
25

1          THE COURT:  All right.  Good morning,

2    everybody.  Happy Friday.

3          MR. PARLADE:  Good morning, Your Honor.

4          MR. BROOKS:  Good morning.

5          THE COURT:  We're here on the continuing

6    trial in the Josue and Leticia Cepero matter on the

7    motion for contempt as amended.

8          I'm going to remind everyone to please

9    keep yourselves on mute when you are not speaking,

10   and to take yourself off mute when you are speaking.

11   Also, please remember to speak slowly and clearly

12   when you speak, and to the extent possible, identify

13   yourself each time that you speak, so that the

14   transcript can accurately reflect who is speaking at

15   any particular time.

16          For those of you who are going to be using

17   a translator today for testimony, remember that the

18   witness and the translator can be together, but

19   there can be no one else in the room with the

20   witness.  I think everything else we went over

21   yesterday.

22          I do see that we have someone named Anna

23   Danton (phonetic), who is not on mute.  I do not

24   know who Ms. Danton is, but she needs to put herself

25   on mute.

1         And so I'm going to go ahead and take

2    appearances.  So we'll start with Mr. Brooks and

3    Mr. Arslanian.  Gentlemen, please make your

4    appearances.

5              MR. BROOKS:  Michael Brooks for Josue and

6    Leticia Cepero.

7              THE COURT:  Your video is breaking up.

8    Are you -- I'm sorry.  Your video is breaking up and

9    your audio is breaking up.  Your video and audio are

10   breaking up.

11             Are you in the same place you were

12   yesterday?  Are you using the same --

13             MR. BROOKS:  Yes.

14             THE COURT:  Are you using the same device

15   that you used yesterday?

16             While you try to work out your connection,

17   I'll take Mr. Parlade's appearance, and then we'll

18   go back to you, Mr. Brooks.

19             Mr. Parlade.

20             MR. PARLADE:  Good morning, Your Honor.

21   Miguel Parlade on behalf of Hammocks Community

22   Association, and Marglli Gallego.

23             THE COURT:  All right.  Mr. Jauregui, if

24   you'd like to make your appearance.

25             MR. JAUREGUI:  Yes.  Good morning, Your

```
 1    Honor.  Sabino Jauregui on behalf of Marglli

 2    Gallego.

 3              THE COURT:  Okay.  And I note that -- we

 4    lost them, so we'll wait for them to reconnect.

 5              Mr. Parlade, did you go somewhere else

 6    today that has a better connection?

 7              MR. PARLADE:  A much better connection.

 8    I'm home, but it's a much better Internet

 9    connection.  So no more problems, hopefully.

10              THE COURT:  Well, not for you, but we

11    didn't want to not have problems today, so now we'll

12    have Mr. Brooks and Mr. Arslanian provide the

13    Internet problem.  Oh, well.

14              MR. PARLADE:  Never a dull moment, Your

15    Honor.

16              THE COURT:  At least I can see

17    everybody -- well, those who are making appearances,

18    I can see everybody's faces, but the lawyer with the

19    cat filter has really gotten a lot of people, given

20    them a little lighthearted entertainment.

21              All right.  We have them back.  Let's see

22    how it's working now.  I'm now showing connection to

23    audio, so let's see how that works.

24              All right.  Mr. Brooks, do you want to

25    try?  No.  They just got kicked off again.
```

1          Shall we try again?  Mr. Brooks, please

2    make your appearance.

3          MR. BROOKS:  Hopefully.  Michael Brooks,

4    for the debtors (inaudible).  One second.  We're

5    getting --

6          THE COURT:  Maybe you should go into a

7    different place with better Internet connection.

8    Wherever Mr. Arslanian was in the morning yesterday,

9    it seemed to have a better connection than where you

10   are now.

11         MR. ARSLANIAN:  We're in the same --

12         THE COURT:  Okay.  Well, let's take a

13   brief recess before we finish taking appearances.

14   I'll check back in five minutes and see if you're

15   connected.

16         MR. BROOKS:  Thank you.

17         (Thereupon, a recess was taken, after

18   which the following proceedings were had:)

19         THE COURT:  Okay.  We've got Mr. Parlade.

20   All right.  Mr. Brooks, please make your appearance.

21         MR. BROOKS:  Michael Brooks for the

22   debtors, Josue and Leticia Cepero, B-R-O-O-K-S.

23         THE COURT:  All right.  And Mr. Arslanian.

24         MR. ARSLANIAN:  Good morning, Your Honor.

25   May it please the Court.  My name is Louis

Page 271

1    Arslanian, A-R-S-L-A-N-I-A-N, for the debtors.

2              THE COURT:  All right.  We're here for day

3    two of the evidentiary hearing.  I received the

4    amended exhibit register.  Thank you, Mr. Brooks.

5    I've also reviewed a motion for reconsideration, so

6    we will take that motion first, and then we'll move

7    on.  All right?

8              So go ahead Mr. -- who's going to argue

9    it, Mr. Brooks or Mr. Arslanian?

10             MR. BROOKS:  Well, Mr. Arslanian is going

11   to argue it, but I have one -- we could not -- we

12   were unable to attach the exhibits to the exhibit

13   register, but I do have a thumb drive that I can

14   drop off at the court.

15             THE COURT:  I have the thumb drive from

16   last year.  Unfortunately, I didn't have the

17   attachment that I needed for my laptop in order to

18   access the exhibit.  You can drop it off with the

19   court, but there's no one there.

20             MR. BROOKS:  Okay.  I'll leave it at the

21   front.  Okay.  Mr. Arslanian is going to argue.

22             THE COURT:  Also, I did want to note for

23   the record before we go to the argument, that in

24   addition to those from whom I have now taken

25   appearance, I have listed a Mario Beovides

1  (phonetic), but I don't see a Mario Beovides.  And I

2  have Maria Alonso and Albert Alfaro, and then an

3  Anna Danton.  I assume all of those are on listen

4  only.  Okay.  All right.

5          So, Mr. Arslanian, I've reviewed the

6  motion to reconsider, but go ahead and highlight

7  whatever you wish me to -- whatever you wish to

8  highlight.  But I have reviewed it.  I actually read

9  it twice.  So go ahead.

10         MR. ARSLANIAN:  Okay.  Well, I'm not going

11  to -- if you read it, I don't want to reiterate

12  what's in there.  I just want to make sure that -- I

13  think this is a serious matter that's the key

14  component to the motion, and I don't think that

15  (inaudible).

16         I'm concerned that it's going to die on

17  the vine, because A, they agreed to its submission

18  to begin with.  B, we took a deposition, and I'm

19  pretty sure that that witness did identify the part

20  of the letter -- not just the tree part, that

21  they're going to prune the trees, but the part that

22  spoke in a derogatory nature about our clients.

23  That's the part of the motion.

24         If we're going to die, the witness, we

25  subpoenaed her.  I mean, we can't just --

1   something's got to be done to allow this.  I really

2   think that in light of Exhibit 11 that was

3   apparently stipulated to not be part of the

4   proceeding, I'm stuck with that stipulation, but I

5   think they should be stuck with their admission that

6   13 was admissible.  That's it.

7            I wrote -- I worked on that motion last

8   night, and then I had to do a writ of cert after

9   that for another case.  So that's everything I need

10  to say.

11           THE COURT:  All right.  Mr. Parlade.

12           MR. PARLADE:  Good morning, Your Honor.

13           Your Honor, first let me approach as to

14  what they're saying about the admission of the

15  exhibit from last year, and the subsequent striking

16  of that exhibit during the trial.  As you know, a

17  motion for reconsideration is governed by Federal

18  Rule of Civil Procedure 59.  They have ten days from

19  the date of the order of this Court striking the

20  exhibit in order to petition the Court to reconsider

21  its motion.  We are now a year after, far, far

22  beyond the ten days.

23           Further, pursuant to Federal Rule of Civil

24  Procedure 59, they have a number of listed

25  exceptions as to which they can try to petition the

1    jurisdiction of this Court from consideration.  I am

2    unsure of which one they're proceeding under, but

3    the fact that opposing counsel thinks they are

4    pretty sure that the witness admitted that the

5    entirety of the exhibit was shown to them or

6    understood by them or recognized by them, is not

7    supported by anything in the transcript.  It is

8    merely the testimony of counsel.

9              I just -- I'm briefly reading this motion

10   too.  Again, it was filed at 10 o'clock last night.

11   I apologize.  So as we are talking I'm briefing

12   through it.  But this is one of those motions

13   procedurally, it is not proper procedure and should

14   be denied as a matter of law.

15             THE COURT:  Okay.  Any brief response,

16   Mr. Arslanian?

17             MR. ARSLANIAN:  It's not a Rule 59 motion,

18   Judge.  The Judge can reconsider anything.  This is

19   not a -- it's not a judgment.

20             The ruling to admit or not admit evidence

21   or any other rulings that have been made, rulings

22   that were made yesterday, are not the judgment.

23   They're not the subject of Rule 59 or Rule 50.

24             THE COURT:  Okay.  Anything else?

25             MR. ARSLANIAN:  I stand on what's written

Page 275

1    in the motion.  I know the Court looked at it.

2              THE COURT:  Okay.  Let me go first to what

3    happened last year.  As I normally do, although I

4    didn't do it this time, meaning yesterday, I

5    normally ask the parties ahead of time if there are

6    any exhibits for which they do not have an

7    objection.

8              And it's not done -- I'm not talking about

9    a pre-trial stipulation.  I'm talking about just at

10   the beginning of the trial on that day, is there

11   anything that anybody is not objecting to, so we can

12   just move through those.  Okay?

13             And you are right.  Exhibit 13 was one of

14   the exhibits that Mr. Parlade said he did not have

15   an objection to.  However -- and that was that day.

16   So in other words, had Mr. Parlade not made that

17   statement on that day, nothing changed.  There was

18   no witness that was excused after that agreement.

19   Nothing changed.

20             So then when we got to that portion of the

21   trial, and of course, you've read the transcript,

22   Mr. Parlade rescinded.  And you are correct.  My

23   recollection was correct, that Mr. Parlade did not

24   cite foundation with respect to that particular

25   exhibit.

1        But having said that, and the stipulation

2   regarding that exhibit not having occurred

3   pre-trial, so that there would be prejudice, and

4   under those circumstances, I would have done exactly

5   what I did for purposes of this time, where I

6   granted your motion to reopen -- I asked Mr. Frank

7   to go ahead and put on the foundational -- the

8   foundation necessary as to admit the exhibit, and he

9   was unable to meet that obligation.

10       I gave you the opportunity to fix that

11  problem.  I gave Mr. Parlade the opportunity to take

12  a deposition for the purpose of determining the

13  knowledge, et cetera.  That was what Mr. Parlade was

14  doing.

15       As far as the deposition transcript is

16  concerned, that deposition transcript says, and I'm

17  paraphrasing, the following:  I got the tree

18  trimming letter, okay, and there was something else

19  attached.  There was something about Josue and

20  Leticia, and I didn't think it was right.

21       Again, I'm paraphrasing.

22       There is nothing in the transcript to

23  indicate that that letter, the other stuff I'll call

24  it, using a technical legal term, was attached to

25  what was shown to the witness.  In fact, it is clear

1    from the transcript that there was nothing attached,

2    other than the tree trimming letter.  So -- and I'm

3    not even sure it's that tree trimming letter,

4    because there's -- it was not marked as an exhibit

5    for the deposition.

6              So I have no way of knowing what tree

7    trimming letter was showed to this witness.  I can

8    assume that it was the tree trimming letter that was

9    attached.  The fact that you chose, Mr. Arslanian,

10   not to show the witness as a part of Composite

11   Exhibit 13, or just show her that part behind the

12   tree trimming letter, is this the letter that you

13   say was attached?  You did nothing.  You did not ask

14   the question.

15             So sure.  The witness talked about there

16   being another thing attached, but I have no idea

17   what that was.  I have no way of knowing whether

18   that was the material that is attached to your

19   proposed Exhibit 13.  And so there's no basis to do

20   that.

21             Now, although you did not include it in

22   the relief that you titled your motion, at the end

23   you say that I should do something.  So what did --

24   I hear you, but I'm sorry, Mr. Arslanian.  I don't

25   practice law anymore, and I am not your associate

1    and I am not your law partner.

2            If you wanted me to issue an order

3    yesterday compelling the witness to appear today, I

4    would have absolutely issued that order immediately.

5    But you did not ask me.  I asked you did you want us

6    to wait to see if she would show up, or do anything

7    else.  I believe those were my exact words, and you

8    said no, you wanted to proceed.  And I allowed you

9    to admit the deposition, but it didn't get you

10   anywhere, because you had not done what you needed

11   to do.

12           So I hear you, Mr. Arslanian, and I agree

13   with you with respect to that case, that that's a

14   critical document, but that's where we find

15   ourselves.  If there's additional relief that you

16   believe that you wish, that you believe you're

17   entitled to, notwithstanding where we are in the

18   trial, then I expect you to seek that relief

19   appropriately.

20           Now, let me go back to Exhibit 11.  When I

21   discussed the stipulation or addressed the

22   stipulation yesterday, it had nothing do with

23   Exhibit 11, per se.  It is when the parties

24   stipulated ahead of time what was going to be at

25   issue for the motion for contempt, the two issues

Page 279

1   were, the entire incident in the parking lot on May

2   15th, and the tree trimming letter.

3          That had nothing to do with Exhibit 11,

4   per se, other than the fact that Exhibit 11 became

5   maybe presumably irrelevant.  I don't know why

6   Mr. Frank decided not to seek admission of Exhibit

7   11, but I do know that the filing of that -- I guess

8   it's a request for a domestic violence injunction,

9   for whatever reason, Mr. Frank chose not to -- did

10  not seek to have that document admitted with respect

11  to the two items that the parties stipulated were

12  those that were of issue.  So I'm going to deny your

13  motion to reconsider.

14         I don't disagree that Rule 59 does not

15  necessarily apply.  There is -- you know, there's a

16  lot of academic articles, comments in case law, that

17  there is really no motion to reconsider in Federal

18  Court.  But Federal Judges use -- I think it's

19  Rule -- I want to say 52, could be 58.  I don't

20  remember the rule as we're sitting here right now,

21  but there is a rule that the judges rely on.

22         But be that as it may, I'm going to skip

23  over the procedural, and I've answered your

24  substantive issue.

25         MR. ARSLANIAN:  Your Honor --

1            THE COURT:  Go ahead, Mr. Arslanian.  You

2    want to say something?

3            MR. ARSLANIAN:  Yes.  At the end of the

4    motion we ask, in the alternative, we asked the

5    Court to have the marshals pick up the witness and

6    compel her to testify.  I've heard the Court -- I've

7    heard the law.  I'm not sure whether or not we

8    mentioned that or not, and I can't say for sure that

9    I did, but we're asking for it now, and my

10   understanding is from your ruling, that if I would

11   have asked for that yesterday it would have been

12   granted.

13            So if I'm asking for it last night and now

14   today, it's hopeful that that can be granted,

15   because I think that would -- I mean, we proceeded

16   with the deposition, because we thought that would

17   get the thing done, but apparently it didn't.  We

18   weren't talking about anything else, other than that

19   13.  She had it in her hand.  I gave it to her.  She

20   had it with her, and Mr. Parlade had it in his hand

21   during the deposition.  But I understand it's not

22   perfectly clear, even though the deposition was

23   solely taken about Exhibit 13.

24            THE COURT:  Well then, I guess,

25   Mr. Arslanian, you should have done your job at the

1   deposition and you failed to do it.  Now --

2           MR. ARSLANIAN:  Your Honor --

3           THE COURT:  I'm done talking about the

4   deposition.  You blew it, you're problem.

5           MR. ARSLANIAN:  Okay.

6           THE COURT:  Now, with respect to the

7   witness, I don't just send marshals out to pick

8   people up, all right?  There is a procedure that you

9   have to use.  If you wish me to issue an order to

10  show cause why the marshals should not go pick her

11  up for failing to comply with a subpoena, then ask

12  for it.  And make sure she is served with that.

13          If you had done that yesterday, then we

14  could have gotten her today.  There's no time to do

15  it today, and then you'll have to deal with asking

16  to reopen the evidence again.  When you ask for

17  that, I will consider it, because you've already

18  closed your case in chief.

19          You know, as I said before, Mr. Arslanian,

20  I'm not your law partner and I'm not your associate,

21  but I will tell you that I am not just going to send

22  marshals out, because you threw away, at the end of

23  an order for relief, that you want the marshals to

24  go get her.  There is a procedure you have to

25  follow.  You have to give her notice.

1          So if you want me to issue an order to

2    show cause why she should not be picked up by the

3    marshals to appear in court and honor her subpoena,

4    then you have to prepare that and you have to serve

5    it on her personally.  Then she will be on notice

6    that if she doesn't show up, she will have a U.S.

7    Marshal at her door.  But we don't just go send out

8    marshals to pick people up.  That's not the way it

9    works.

10          And I hope to God you never have to have

11   that experience, but let me tell you something.  I

12   have had someone brought into my chambers -- I mean,

13   my courtroom, in foot cuffs and handcuffs, twice.

14   It is a horrifying experience, and that's why we

15   have procedures in place to make sure that that's

16   the last resort, not the first resort.

17          So as I said, Mr. Arslanian, you finish

18   with your rebuttal, and then if you wish to try to

19   reopen the evidence and bring the witness in, then I

20   will deal with those issues when you ask for them

21   properly.  But I'm going to deny the motion that you

22   filed, without prejudice to your filing other

23   procedural motions.

24          Now, would you like to put on a rebuttal

25   case?

1             MR. ARSLANIAN:  Yes, I would, Your Honor,
2     very briefly.
3             THE COURT:  Well, you don't have to be
4     brief.  We've got all day.  Not that I want it to
5     take all day, but you have all day.
6             THE INTERPRETER:  Your Honor, I'm sorry to
7     interrupt.  If I may.  This is the interpreter.  I
8     know I promised Mr. Parlade that I would not
9     interrupt today.  I am so sorry.
10            I'm having a difficult time hearing
11    Mr. Arslanian.  There's like an echo.  I'm making
12    out I'd say about 95 percent of what he says, but
13    I'm worried about that five percent that I might not
14    catch.  It's like an echo.  I don't know if he's
15    using two devices or -- I don't know.  I'm just
16    having a difficult time hearing him.
17            THE COURT:  Okay.  The Court has no
18    problem hearing him, so it's probably your device.
19    So I can't tell you what to do.
20            THE INTERPRETER:  No problem, Your Honor.
21    I will work with it.
22            THE COURT:  Okay.  In any event, I'm
23    sorry.  I know how annoying that is.  All right.
24            So, Mr. Arslanian, why don't you proceed
25    with your rebuttal, please?

Page 284

1          MR. ARSLANIAN:  I would like to play for

2     the Court what has been marked on our amended

3     exhibit register as Number 23, which is Respondent's

4     Exhibit N, a video.

5          THE COURT:  Okay.  Hopefully we'll all be

6     able to see it.  Go ahead.  This is marked on your

7     exhibit register as -- this is M like in "Mickey" or

8     N like in "noun"?

9          MR. ARSLANIAN:  N like "noun."

10          THE COURT:  Okay.  So this is your Exhibit

11     23.  Okay.

12          Mr. Parlade, this is your exhibit, so

13     authenticity is established.  And I believe that

14     yesterday you said you would not have an objection

15     to these exhibits; is that correct?  Am I

16     remembering correctly?

17          You have to unmute.

18          MR. PARLADE:  Judge, I have no problem as

19     to its authenticity.  However, the foundation has

20     not been laid for a video to be played.

21          As is recognized by the Federal Rules of

22     Civil Procedure, rebuttal evidence is new evidence

23     that's contradictory, but both allegations made by

24     the opposing counsel's case in chief, none of that

25     has been established prior to playing this video.

Page 285

1    So I have no idea why he wants to play it.

2              THE COURT:  Okay.  All right.  So,

3    Mr. Arslanian, why don't you give an introduction as

4    to why you're seeking the admission of Exhibit M --

5    N.  I'm sorry.

6              And I hear you, Mr. Parlade, but I

7    disagree that it has to be new evidence.  It can be

8    old evidence that just needs to be something with

9    regard to the case in chief.

10             So, Mr. Arslanian, if you'll just lay a

11   brief foundation why you believe Exhibit N, as in

12   "noun," is appropriate rebuttal evidence.  So a

13   brief introduction.

14             MR. ARSLANIAN:  Sure.  Because the

15   respondent, Ms. Gallego, testified that she was

16   being followed by the Ceperos.  The video shows

17   otherwise.

18             THE COURT:  Okay.

19             MR. ARSLANIAN:  There was also testimony

20   that the Ceperos not only followed her, but blocked

21   her.  The video shows otherwise.  It shows the cars

22   driving, and it shows Ms. Gallego blocking and

23   obstructing the path of the Ceperos.  So it's

24   rebuttal of what she testified to.  It's visible and

25   it shows this.

1              THE COURT:  Okay.  So it's a contradiction

2    of Ms. Gallego's testimony of yesterday?

3              MR. ARSLANIAN:  Correct.

4              THE COURT:  Okay.  I'm going to overrule

5    your objection, Mr. Parlade.  Go ahead,

6    Mr. Brooks -- I mean, Mr. Arslanian, or whatever.

7              Hopefully it's something bigger than that,

8    because I can't see anything.

9              UNIDENTIFIED VOICE:  I'm sorry.  Let me

10   see if I could open it up.  Hold on.

11             Could you see it better like this?

12             THE COURT:  Yes.  Mr. Parlade, can you see

13   it?  Yes, Mr. Parlade?

14             MR. PARLADE:  Yes, Your Honor.

15             THE COURT:  Okay.  Go ahead.  Push the

16   button.

17             (Thereupon, a video was played).

18             THE COURT:  Okay.  All right.  I'm going

19   to ask that it be shown again.

20             (Thereupon, the video was replayed).

21             THE COURT:  Okay.  Thank you.  Okay.

22             MR. ARSLANIAN:  Next I have what's been

23   marked as, or listed on our amended exhibit

24   register, Number 22.  Respondent's video Exhibit M.

25   It is a continuation of another video, what we just

1   saw, but a little further in time.

2            THE COURT:  All right.  Mr. Parlade?

3            MR. PARLADE:  Further in time before or

4   after?

5            MR. ARSLANIAN:  It was after.

6            MR. PARLADE:  Okay.  That's what I'm

7   asking.

8            MR. ARSLANIAN:  Right after the white

9   vehicle stopped in front of the gray vehicle.

10           MR. PARLADE:  So the same objection, Your

11  Honor.  The original video was intended to show that

12  they weren't being followed -- that they weren't

13  following or they weren't blocking anybody.  What

14  exactly would the relevance of the after video have

15  to do with rebutting any prior testimony put on in

16  my case in chief?

17           THE COURT:  Okay.  I'm going to overrule

18  your objection, Mr. Parlade.  I hear you, but I'm

19  going to -- again, the beauty of having a judge be

20  the trier of fact is, if I don't think it's

21  relevant, then I'm not going to rely on it.

22           I overrule your objection.

23           MR. PARLADE:  I appreciate it.

24           THE COURT:  If you could make sure,

25  Mr. Arslanian, that your technology person does the

1    same thing as she did last time, that will make it

2    easier for all of us.

3              Okay.  Mr. Parlade, can you see the video?

4              MR. PARLADE:  I can see it, Your Honor.

5              THE COURT:  I can see it, as well, so

6    please proceed, Mr. Arslanian, or assistant person.

7              (Thereupon, a video was played.)

8              MR. PARLADE:  Your Honor --

9              THE COURT:  What is it, Mr. Parlade?

10             MR. PARLADE:  I object.  There appears to

11   be dialogue going on that's in Spanish, that hadn't

12   been translated for this Court.  If the video is

13   stipulated to be played in its entirety, I believe

14   this should have been translated and provided to

15   this Court, at least so we'll know what they're

16   saying.

17             THE COURT:  Okay.  I'm going to disregard

18   the audio, because you're right.  It's not in -- and

19   even though I can understand it, because I speak

20   Spanish, I'm disregarding the audio.

21             MR. PARLADE:  Thank you.

22             THE COURT:  All right.  Continue playing.

23   I don't think it stopped.

24             UNIDENTIFIED VOICE:  It's done.

25             THE COURT:  Go ahead and just play it

1    again.

2            Okay.  All right.  Thank you.

3            MR. ARSLANIAN:  I feel like I'm naked if I

4    don't have the technical person next to me.

5            THE COURT:  Well, I'm just going to let

6    that one go.

7            Okay.  Mr. Arslanian, what else did you

8    wish to accomplish this morning, with respect to

9    your rebuttal case?

10           MR. ARSLANIAN:  The only other document

11   that I would ask the Court to view and admit as

12   rebuttal is what's been listed as -- from the

13   amended exhibit register as Number 25 and 26.  Those

14   are -- we got into it yesterday, but that is the

15   November 2017 lawsuit in the docket, showing that as

16   to the Ceperos, it was voluntarily dismissed

17   approximately a month after it was filed.

18             This is in relation to -- because I want

19   to establish relevance, and why it's rebuttal -- is

20   that this is part of what led to the initial orders.

21   And it was at that time, and there was some

22   testimony about, and I asked Ms. Gallego about her

23   knowledge of whether she knew that she couldn't file

24   lawsuits against the debtors while they were in

25   bankruptcy.

1          And it was not clear from her testimony.

2   She wasn't sure.  She thought that she could do it.

3   I want to show that because there was -- the amended

4   motion now has the 2020 lawsuit.  She knew that the

5   2020 lawsuit couldn't be filed.  I want to show the

6   2017 lawsuit, and her voluntary dismissal quickly,

7   as her prior knowledge that she wasn't allowed to

8   file lawsuits against the debtors while they were in

9   bankruptcy.

10          THE COURT:  I'm assuming you're not saying

11  "her," you're saying "they," correct?

12          MR. ARSLANIAN:  Yes.

13          THE COURT:  You did not put docket numbers

14  with these.  I'm not going to sit here and go

15  through the docket and try to figure out what

16  exhibits you're trying to seek admission of.

17          What docket numbers are they?

18          MR. BROOKS:  It's a state court lawsuit,

19  and the docket sheet for the state court lawsuit,

20  showing the complaint being filed and the dismissal

21  thereof.  And that was in Case Number 2017-027089.

22          THE COURT:  Mr. Arslanian, what I'm saying

23  is, I don't have these exhibits.  So I presume that

24  you want me to look at something that was filed on

25  the court docket, my court docket.  You need to tell

Page 291

1    me -- I can't just admit a document that I can't

2    see.

3              So I'm assuming, and I vaguely recall from

4    yesterday, that they were on my computer screen.  So

5    they must be somewhere on my Bankruptcy Court

6    docket.  Where are these exhibits on my Bankruptcy

7    Court docket, or did you attach them to something

8    that you filed last night that I did not notice?

9              (Inaudible).

10             MR. ARSLANIAN:  304 is the docket.  That's

11   2017?

12             UNIDENTIFIED SPEAKER:  They didn't file

13   the 2017.

14             MR. ARSLANIAN:  Okay.  There's not a

15   previous -- there is not one filing in the

16   Bankruptcy Court, other than the one that we

17   attempted last night, Number 312, where we could

18   only list the exhibits.

19             My technical person knows how to open all

20   these things.  Somehow she just could not.  She

21   showed me.  We could not attach the PDF, the video.

22   We couldn't attach anything to the filing.  We would

23   have, but it wouldn't take it.

24             THE COURT:  I can't consider an exhibit

25   that I don't have in front of me, but I am

Page 292

1    absolutely positive that I looked at that document

2    yesterday.  I just don't know where it is on the

3    Bankruptcy Court docket.

4           So I'm going to give you -- I'm going to

5    take a five-minute break for you to look through

6    these documents, but I cannot admit a document that

7    I do not have in front of me.  All right?  So we're

8    going to take another five-minute break so that you

9    can find where these are on the docket, and then

10   I'll come back and address your request to have them

11   admitted.

12          Mr. Parlade, that will give you time to

13   determine whether and to what extent you're going to

14   object to the admission of those documents.  Okay?

15          MR. PARLADE:  Judge, just to refresh the

16   Court's memory, those weren't filed on the docket.

17   Those were shown on the screen yesterday by

18   Mr. Arslanian.  They were never filed on the docket

19   or listed previously as an exhibit.  This is one of

20   his last minute, on the eve of trial exhibits, just

21   like the past, one, two, three, four, five exhibits.

22   Literally the eve of trial they're trying to add

23   another exhibit.

24          And I understand your Court, Your Honor,

25   in giving some leeway to the debtors, but it has now

1    become more than frustrating for myself and for my

2    clients to have all these exhibits, to have not been

3    filed with the Court, have not been docketed, have

4    not been previously listed as exhibits, all of a

5    sudden to appear on the eve of trial as a surprise

6    and as an attempt to get a leg up on the opposing

7    counsel.

8              THE COURT:  Okay.  Mr. Parlade, let me

9    address that.  One, you have no surprise with

10   respect to the movant using your exhibits that you

11   sought not to introduce.

12             MR. PARLADE:  It's not my exhibit.

13             THE COURT:  I'm talking about the videos

14   and the audio.

15             MR. PARLADE:  I'm not talking about those

16   at all.

17             THE COURT:  Okay.  With respect to

18   rebuttal exhibits, as you know well, parties are not

19   required to list either rebuttal or impeachment

20   documents on their exhibit registers.

21             Now, having said that, I'm still saying

22   I'm sure as heck not admitting a document that I

23   don't have -- I don't see.  And you're right.  Now

24   I'm remembering.  There was a screen share.

25             So we're going to take the five minutes,

Page 294

1    and Mr. Arslanian, you're going to upload on the

2    docket the PDF, or I'm not admitting them, because I

3    can't do that.  We're taking a five-minute break.

4    When we come back we'll deal with them.

5              MR. ARSLANIAN:  Thank you.

6              (Thereupon, a recess was taken, after

7    which the following proceedings were had:)

8              THE COURT:  Mr. Brooks or Mr. Arslanian.

9              MR. ARSLANIAN:  Yes, Your Honor.

10             THE COURT:  All right.  I have checked.

11   Those documents are still not on the docket.

12             MR. ARSLANIAN:  I believe she's uploading

13   them right now.  I just saw her --

14             THE COURT:  Well, I don't understand why

15   they weren't uploaded when you intended to use them

16   as exhibits.  Now my law clerk has reminded me,

17   however, that Mr. Parlade, you are the one that did

18   the screen share of the 2017 lawsuit yesterday, no?

19             MR. ARSLANIAN:  No, I did.  I definitely

20   did it.  And again, when we filed our amended

21   exhibit register last night, 312, we attempted to

22   attach all these documents, including 25 and 26.

23   The lawsuit and the lawsuit docket we're doing a

24   notice of filing right now.

25             None of these documents could be attached.

Page 295

1   That's why we had to just file the list.  I can't

2   explain how that happened, Judge.  I just -- I

3   can't.

4             THE COURT:  Well, I -- all right.  In

5   order to move things along, I want you to do a

6   screen share of your proposed Exhibit 25.  All

7   right?  Then, Mr. Parlade, I will hear any

8   objections.

9             MR. PARLADE:  Thank you.

10             THE COURT:  And by the way, Mr. Arslanian,

11   this is the first, last and only time that I'm going

12   to give you this break, okay?  I expect you in the

13   future to comply with the (inaudible).  Go ahead.

14             MR. ARSLANIAN:  Yes, Your Honor.  I need

15   to get my person to open them up.  I'm trying to

16   upload them to the Court, so I'm going to bring them

17   back here so she can screen share them.  Give me one

18   second, please.  I'm sorry.

19             THE COURT:  That's your Exhibit Number 26;

20   is that correct, Mr. Arslanian?

21             MR. ARSLANIAN:  Yes, Your Honor.

22             Judge, as you can see on this screen

23   share, the second entry, the complaint, is filed on

24   November 22, 2017.  And then if we scroll up a

25   little bit you can see -- you don't even have to

Page 296

1   scroll up.  You can see entry December 18, voluntary

2   dismissal, parties Cepero, Josue Cepero, Leticia.

3                THE COURT:  Okay.  So you're seeking

4   admission of Exhibit 26.

5                Mr. Parlade, your response.

6                MR. PARLADE:  Your Honor, the foundation

7   has not been laid as to rebuttal evidence and its

8   presentation.  Opposing counsel just testified that

9   when he asked Ms. Gallego about the 2017 exhibit,

10  she had no knowledge as to when it was filed, as to

11  when it was dismissed.  Even under redirect when I

12  asked her, "Do you know when you got notice of the

13  bankruptcy," she had no knowledge of it.

14               So I don't see how this rebuts the case in

15  chief by my client.  There has been no declarations

16  with reference to this lawsuit, and this is improper

17  rebuttal evidence.

18               THE COURT:  Okay.  I'm going to overrule

19  your objection.  There are two respondents in this

20  matter, Ms. Gallego and Hammock.  So I'm going to

21  allow it.  I'll admit Exhibit 26, assuming that it

22  makes it on to the docket.  If it doesn't, then I'll

23  strike the admission.

24               (Thereupon, Debtors' Exhibit No. 26 was

25          admitted into evidence.)

```
 1              THE COURT:  All right.  Any other exhibits

 2   for which you seek admission, Mr. Arslanian?

 3              MR. ARSLANIAN:  I'm sorry, Your Honor.

 4   Could you repeat that?

 5              THE COURT:  Are there any other exhibits

 6   for which you seek admission?

 7              MR. ARSLANIAN:  No.

 8              THE COURT:  So just the docket?

 9              MR. ARSLANIAN:  Well, I would also like

10   the lawsuit, 25.

11              THE COURT:  All right.  Then put it up on

12   the screen.

13              MR. ARSLANIAN:  That's the complaint

14   that's listed in the docket, Case Number

15   2017-027089, Hammocks Association versus Cepero,

16   Josue, Leticia, Maria Alonso, Gail Sharp and Yasser

17   Martinez.

18              THE COURT:  All right.  Mr. Parlade, your

19   objection?

20              MR. PARLADE:  How is this relevant

21   rebuttal evidence?

22              THE COURT:  I'm going to overrule your

23   objection.  I'm assuming it's the same objection as

24   you raised to the docket, and I'm going to overrule

25   the objection for the same reasons.  I'm going to
```

Page 298

```
 1   allow it to be admitted.  It rebuts the argument
 2   regarding knowledge.  So that's 25 that's admitted.
 3                (Thereupon, Debtors' Exhibit No. 25 was
 4        admitted into evidence.)
 5                THE COURT:  All right.  Anything else,
 6   Mr. Arslanian?
 7                MR. ARSLANIAN:  No, Your Honor.  That's
 8   it.  I'm finished with rebuttal.
 9                THE COURT:  All right.  Then I will mark
10   27 not introduced.  And again, if those documents
11   are not on the docket by the end of the day today
12   I'm going to strike them.
13                MR. BROOKS:  Judge, Michael Brooks.  I'm
14   trying to download these documents, but there's
15   apparently a problem with ECF downloading it.  It
16   says it's either too busy, which I doubt, or there's
17   a problem with ECF.  So I will call the clerk to
18   find out what's going on.
19                THE COURT:  Whatever.
20                MR. BROOKS:  Okay.
21                THE COURT:  Okay.  So the movant rests,
22   Mr. Arslanian, subject to whatever you may or may
23   not file regarding Pico?
24                MR. ARSLANIAN:  Yes.  And I think we're
25   going to let that be.
```

1          THE COURT:  All right.  If you do choose

2     to do that, you need to do that no later than

3     Tuesday.  I'm not saying Monday, because Monday is a

4     holiday.

5          The reason I'm giving you that deadline is

6     because I'm going to ask each of you to prepare your

7     closing arguments in writing, citing the record

8     evidence that support your particular position.  But

9     I obviously don't want you to do that -- and I'm not

10    saying, Mr. Arslanian, if you file, and think that

11    I'm going to rule in your favor.  I'm not saying

12    that.

13         I'm just saying I don't want anybody to

14    spend their weekend starting to work on this if we

15    first have to deal with that issue.  Okay?  I'm not

16    pre-judging it.  I'm just --

17         MR. ARSLANIAN:  I understand.

18         THE COURT:  Okay.  So, Mr. Parlade, how

19    long would you need to prepare your closing

20    argument, which will include your record citations,

21    plus any memorandum of law that you -- you know, any

22    law that you want included?

23         MR. PARLADE:  Your Honor, respectfully, I

24    need -- since we're looking at during the week, I

25    need at least a week.

1           THE COURT:  Okay.  Well, I'm much more

2    generous than that.  Okay.  All right.

3           Mr. Arslanian, for you?

4           MR. ARSLANIAN:  Whatever the Court says is

5    fine with me.

6           THE COURT:  Here's what I'm going to do.

7    You're going to file whatever you're going to file

8    by Tuesday, if you're going to file it.  Otherwise,

9    two weeks from Tuesday -- well, I'm assuming you all

10   have to order the transcript from yesterday and

11   today.  Although today there's no real transcript

12   from today.  It's just the admission of documents.

13   So you'll have to order the transcript, because I

14   will not accept the submissions without record

15   citations.

16          So I'll give you, Mr. Arslanian, two weeks

17   -- and I'll ask you all to order that transcript

18   now.  Mr. Arslanian, I'll give you two weeks from

19   when the transcript is ready to file your written

20   closing with arguments about the law.

21          Then, Mr. Parlade, I will give you two

22   weeks after that to file your written response.

23   Okay?

24          And then, Mr. Arslanian, you'll have a

25   week to file your final argument.  That gives you

1   approximately five weeks from the time (inaudible).

2          I will obviously write down my

3   impressions, and I will also be going into the

4   office on Wednesday.  I will bring the thumb drive

5   with me, the thumb drive that Mr. Parlade gave to me

6   last year.  I will let you all know if that thumb

7   drive has the Exhibit L, M and N on it.  If it

8   doesn't, then I'll notify you that those have to be

9   provided in some way otherwise.

10          Mr. Parlade, because you provided the

11   thumb drive to me, what I'm going to do is just,

12   based on my memory of the audio recording yesterday

13   and what I've seen here today, which is actually why

14   I wanted to see it twice, because I want to make

15   sure that the video -- and I'm not saying that you

16   didn't, Mr. Arslanian.  I just want to make sure

17   that what I have on that thumb drive matches what I

18   saw.  Okay?  If there's a problem I'm let you both

19   know.

20          And you, Mr. Jauregui, if you want to

21   know -- I'm sure Mr. Parlade is able to tell you

22   what's going on, unless you make him mad, and then

23   he's not going to tell you.

24          Okay.  All right.  So, any questions,

25   Mr. Parlade?

1           MR. PARLADE:  Just for clarification, Your

2    Honor.  Mr. Arslanian will prepare his closing

3    arguments two weeks after the transcript of the

4    proceedings yesterday are available.  I will then

5    proceed, after receipt of Mr. Arslanian's closing

6    argument, to give a response closing argument, and I

7    have two weeks deadline after that time.  After

8    Mr. Arslanian receives my response closing argument,

9    he will have one week to file a rebuttal closing

10   argument.

11           Is that correct, Your Honor?

12           THE COURT:  That is correct.  And I'll

13   direct the ordering of the transcript today, and

14   then, Mr. Arslanian, you'll have until the end of

15   the day Tuesday to determine, and if so, file,

16   whatever you wish to file regarding Pico.  If

17   something is not on docket by Tuesday afternoon,

18   then I'll assume that you've decided to not go

19   forward with respect to the relief that we discussed

20   earlier today.  Okay?

21           MR. ARSLANIAN:  Yes, Your Honor.

22           THE COURT:  Okay.  All right.  Is there

23   anything else?  Do you have any other questions,

24   Mr. Arslanian?

25           MR. ARSLANIAN:  No, Your Honor.

1           THE COURT:  Okay.  I hope you're

2  comfortable.  We are still in court.  I don't make

3  you guys stand up, and I will tell you, there are

4  some judges, as weird as I find this, that are

5  requiring lawyers to stand up when they appear

6  before them, which to me is like, what do you do,

7  lift the laptop, or does everybody look at your

8  stomach?  I'm not really quite sure what happens

9  with that.

10          No, no.  You're okay, Mr. Arslanian.

11  Please stay seated.

12          Gentlemen, Ms. Gallego, Ms. Lambert,

13  everybody who's listening, I hope you all have a

14  good and safe weekend, and that we're all able to be

15  together again soon.

16          MR. PARLADE:  Thank you, Judge.

17          THE COURT:  Thank you.  Have a good day.

18          MR. ARSLANIAN:  Thank you.

19          (Thereupon, the hearing was concluded.)

20

21

22

23

24

25

Page 304

CERTIFICATION

1

2

3      STATE OF FLORIDA:

4      COUNTY  OF  DADE:

5

6              I, HELAYNE F. WILLS, Shorthand

7      Reporter and Notary Public in and for the State of

8      Florida at Large, do hereby certify that the

9      foregoing proceedings were taken by electronic

10     recording at the date and place as stated in the

11     caption hereto on Page 1; that the foregoing

12     computer-aided transcription is a true record of my

13     stenographic notes taken from said electronic

14     recording.

15              WITNESS my hand this 22nd day of

16     February, 2021.

17

18

19     _____

                    HELAYNE F. WILLS
20          Court Reporter and Notary Public
          In and For the State of Florida at Large
21        Commission No:  GG123092  Expires 8/2/2021

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-LMI

IN RE:                                             CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/

**DEBTORS' CLOSING ARGUMENT ON AMENDED MOTION FOR CONTEMPT**

Debtors JOSUE and LETICIA CEPERO, by and through the undersigned counsel,
hereby submit their Closing Argument, and state:

**OVERVIEW**

As detailed herein, the evidence clearly demonstrated that Respondents, Marglli
Gallego ("Gallego") and Hammocks Community Association, Inc. ("Hammocks"),
committed the acts that are the subject of this contempt matter:

1) filing a lawsuit in Circuit Court against Leticia Cepero, with knowledge that filing said
lawsuit was not permitted and in violation of the bankruptcy stay provisions; and

2) improperly initiating contact with the Debtors on May 15, 2019, and blocking the
Debtors' vehicle with vehicles owned by Gallego and Hammocks, in violation of stay
away Orders previously entered by this Court.

1

Additionally, and worse, the evidence conclusively demonstrated that Respondents submitted testimony that was false and known to be false in an attempt to avoid the contempt charges.  Gallego's entire description of the events of May 15, 2019, that the Cepero's went her son's school, followed her and her son for nearly an hour, and then blocked her from parking at her home (all of which caused her to be nervous and in fear)  is outrageously false, absolutely impossible and belied by:

a) a Wells Fargo Bank transaction receipt (Ex. 14) date-stamped May 15, 2019 and time-stamped 4:17 PM (*See also* T. 54-55) conclusively establishing that the Debtors were at the Bank during the precise time-frame Gallego falsely alleges that Debtors came to her son's school and began to follow Gallego's vehicle;

b) video evidence (Exs. M/22 and N/23) clearly showing Gallego's vehicle pulling in front of obstructing the Cepero's vehicle at the critical moment when the two vehicles came to a stop, and showing that Gallego casually exited her vehicle; and

c) audio evidence (Ex. L/24), Gallego's 911 call to the police convincingly showing that: (i) Gallego was anything but nervous; (ii) the police did not instruct her to shoot video of the car allegedly following her; and (iii) Gallego, in complete contradiction to her fictional account of being followed and blocked in, stated: "María Alonso...Que se jodan, yo no me quito. [Maria Alonso...Screw them.  I'm not going anywhere.]"

Other evidentiary items demonstrated the falsity in Gallego's story.  For example, while telling the 911 operator that she had been followed for "like one hour" (Ex. L/24)[1], Gallego told the police on the scene that she had been followed for just "30 minutes." Ex. 10.  Further, while alleging that she called the police in road traffic while traveling back from school before entering the Hammocks' property, the evidence indicates that Gallego first called Hammocks' security from the Hammocks' property, and that the 911

---

[1]  Debtors' Exhibits 22, 23 and 24, in consecutive order, were formerly Respondents' Exhibits M, N and L.  At the time the 911 audio tape was admitted into evidence (T. 235), it was admitted as Exhibit L.  For clarity, Debtors will cite to these Exhibits by the number/letter (*e.g.* Ex. L/24 – the 911 audio).

call to the police was made at 4:31 PM while she was on the Hammocks' property.  *See* T. 92-93; 98 (Hammocks' security guard); T. 194 (Gallego); and Ex. L/24.

As to the other matter that is the subject of this contempt proceeding - Respondents' filing of another lawsuit on November 30, 2020 against Leticia Cepero for alleged defamatory statements directed against Respondents, a lawsuit Respondents voluntarily dismissed weeks later (Ex. 21) - Gallego's testimony that she did not know she was precluded from suing the Ceperos while they were in bankruptcy (T. 241-243) is belied by Exhibits 25 and 26 – a 2017 suit filed by Hammocks on November 22, 2017 against both Josue and Leticia Cepero **after** the Ceperos filed this bankruptcy case, alleging the **exact defamatory statements** by the Ceperos directed against Respondents as alleged in Exhibit 21, the November 30, 2020 lawsuit.

In the November, 2017 lawsuit, Ex. 25 at 3-4, ¶¶19-20, the plaintiff Hammocks alleged that Leticia Cepero and Josue Cepero had made "untrue statements regarding Ms. Gallego," that she was "corrupt," and "stealing and misappropriating funds from the Hammocks association."  The plaintiff in that 2020 case sought money damages against the Debtor's. The evidence clearly shows that these claims against the Cepero's were voluntarily dismissed, **only** as to the Cepero's while proceeding against the other named defendants, on December 19, 2017.  Ex. 26.  Yet, three years later, on November 30, 2020, both Respondents filed the new lawsuit (Ex. 21) and alleged the same exact matters previously alleged in Ex. 25.  *See* Ex. 21, the new lawsuit, at 6, ¶37ii; and at 8, ¶45ii where Respondents allege that: "[Hammocks] is allowing Ms. Gallego to misappropriate and steal funds."   The new lawsuit also sought money damages against the Debtor's.

3

That the 2017 lawsuit was dismissed voluntarily and quickly, **only** as to the Cepero's, but not the other named defendants, demonstrates that Respondents were fully aware of the fact that they could not file suit against the Ceperos, which is exactly what they did in November of 2020.   In admitting Exs. 25 and 26, the Court even opined: "It rebuts the argument regarding knowledge."  T. 298.

The totality of the evidence shows that Respondents: (a) committed the acts that are the subject of this contempt proceeding; (b) offered false and knowingly false testimony to oppose the contempt charges; and (c) have absolutely no respect or regard for the rights of the Debtor's, the law and the lawful Orders entered by this Court.

I.  RESPONDENT GALLEGO VIOLATED THE STAY-AWAY ORDERS BY CLEAR AND CONVINCING EVIDENCE, AND RESPONDENTS OFFERED KNOWINGLY FALSE EVIDENCE TO REBUT THE CHARGES.

The evidence showed that after the Ceperos were at Wells Fargo Bank at 4:17 PM on May 15, 2019 (Ex. 14) and were going to visit Maria Alonso on Hammocks' property, Gallego improperly followed the Ceperos on the Hammocks' property, first blocked the Ceperos' vehicle in a parking spot, and she began filming the Cepero's.  T. 57-58; 84.  Then, after they were able maneuver out of the parking spot and drive away, Gallego pulled in front of the Ceperos' vehicle and obstructed their attempts to exit the area.  *Id.*; Exs. M/22 and N/23.  This prompted the Cepero's to call the police.  T. 59; 75-76.  Within minutes, vehicles belonging to Hammocks pulled behind the Ceperos vehicle, while calling the police, and the Ceperos' were completely blocked from leaving for a period of nearly 2 hours.  *Id.*

That the Ceperos' were blocked in by Gallego's vehicle and Hammocks' security vehicles was confirmed by eye witness Maria Alonso.  T. 26-29, describing how the

Ceperos had called her and advised her that Gallego had blocked them; coming to the scene and seeing the Ceperos' vehicle blocked by the various vehicles and that Gallego was filming the Ceperos and making threats to Alonso ("Come on. You are going to pay for it").

Even if the testimony of the Ceperos' and Maria Alonso are viewed as "self-serving," the story presented by Gallego to rebut the allegations – that the Ceperos' went to the school of Gallego's son and followed her back to the Hammocks property – is pure fiction.  Further, based on key items of evidence – videos, audio tapes and documentary evidence – Gallego's entire story is absolutely, not virtually, impossible.

A.  Gallego's version of the events is impossible and replete with claims that are false and known to be false.

Gallego's testimony on direct details a series of events which could not have possibly occurred.  Gallego claims that she left at around 3:40 or 3:43 to pick her son up at his school which is 5-8 minutes from her home.  T. 224; 230.  She vividly describes how, as her son was getting into her vehicle, she noticed a vehicle come out of the line of vehicles at the school pick-up lane.  T. 194.  Then, the car coming out the line followed her.  T. 194-195.  As she was driving home, when she reached "104th," she became nervous and called 911.  T. 195.  Gallego testified that while she was on the phone with the 911 operator, her son was asking questions; and, that Gallego was speaking to her son and the 911 operator "at the same time."  T. 195-196.

Then, Gallego began "speeding up" to get home "faster," and "kept driving around and around."  T. 196.  According to Gallego, the 911 operator gave her specific instructions which Gallego followed:

So at that moment, **that's when the operator tells me to get out of the car**, because I wasn't able to see the tag number, and she was asking me what type of car it was, what model, the tag number. **So I did as she instructed**. That's when I got out of the car to check the tag number.  T. 196 [Emphasis added].

At this particular moment, while still on the phone with the 911 operator, and doing as instructed by the 911 operator, Ms. Gallego testified that she was "**really, really nervous**," and "**must have been speaking loudly**."  T. 197.

Pausing from Gallego's narrative momentarily, this testimony is ridiculously false and belied by the audio tape of the 911 phone call.  Ex. L/24.  No such instructions were given; and, a review of the audio tape reveals that Gallego sounded calm and collected during the entire 911 phone, never once speaking loudly.  Also, not once could Gallego be heard speaking to her son.  *Id.*

Next, in the critical time-frame of the events, Gallego claims that she stopped to give her son to a neighbor, "[a]nd at that very moment, that's when the two security guards arrived."  T. 197.  Gallego explains that the security guards "actually arrived **before** the police arrived."  *Id.* [Emphasis added].

She then goes on to explain that the vehicle following her on 120th Street was being driven by Josue Cepero.  Gallego, continuing on direct, reiterated that the police instructed her to get video of the make, model and tag of the vehicle that was following her.  T. 201-202.  Gallego concludes by claiming that she never said anything to the Ceperos', but shot video as the police had instructed her to do.  T. 202.

Additionally, and of great significance, Respondent Hammocks' security guard Jorge Matus testified that the Ceperos maneuvered their vehicle so as to block Gallego from parking in front of Gallego's home at 14921 SW 104 Street.  *See*  T. 111-112.

6

And, Gallego testified emphatically to the Court that the Ceperos had blocked her from parking in front of **her home**:

> Q Okay. Now, we're here for an incident that occurred on May 15, 2019, in the actual parking lot of **the Hammocks Association**.  Are you aware of this?
>
> A Of course, yes. It took place in **the parking lot of my residence, where I live**, Heron of **the Hammocks**.  T. 190 [Emphasis added].
>
> *****
>
> Q On May 15, 2019, after the car driven by the Ceperos stopped, and you got out of your car to record the tag and take video of their car, what location was it where that happened?
>
> A **In front of my residence**.
>
> Q And by in front of your residence, in terms of distance, how far was that car from your front door?
>
> A They were blocking **my parking space**, and a few feet from the entrance of **my home**.  T. 199-200.

Gallego and her counsel went through great efforts to show: a) 14921 SW 104 Street was where Gallego lived (T. 186); and b) that the Ceperos knew that this was her home address.  *See* T.  200:

> Q Okay. Now, was there any way for the Ceperos to know where you lived, on May 15, 2019?
>
> A Yes, of course, yes, **because Josue came to my house on several occasions to pick checks up**.  [Emphasis added].

This entire version of events is completely false, known to be false, and contradicted by videos, the audio tape of the 911 call and other documents.  Further, the evidence shows that Gallego claimed to the police that 14921 SW 104 Street was **not** her home, and that she did **not** live at the Hammocks.  Ex. L/24 (*see* below).

> (1)   The 911 audio (Ex. L) demonstrates that Gallego's version is outrageously false, and shows that Gallego lied to the Court and even lied to the police.

7

At no time during this phone call was Gallego instructed to stop and take video of the people who were following her.  Ex. L/24.  To the contrary, the 911 operator expressly asked: "Are you able to get away from them right now?"  *Id.*  As common sense would dictate, the police would not ask a person being followed to stop and take video or photos, but would ask the person if they could get away.

 Gallego, during the phone call, did lie to the police as to where she lived (or she lied to the Court).  Gallego, **driving a white vehicle with the "Hammocks" name on it** (*See* Exs. M/22 and N/23), claimed: "**I don't live in Hammocks**."  Ex. L/24.  And, Gallego expressly told the 911 operator that: "I stopped here.  The address is **14921 SW 104 Street, apartment Heron on the Hammocks**."  *Id.* [Emphasis added].

This address is, of course, as documented above, the address Ms. Gallego claimed as her home address.  *See* T. 186; 220 (Gallego's testimony stating her address).  Yet, when asked by the 911 operator: "[s]o you're in **your** apartment complex right now?," Ms. Gallego responded:

> **No, no, no**, I'm in my... in Hammocks car **because I'm the president**. So, I'm making the inspection and these people is following me and recording me, and they almost...He tried to hit me in the car. Ex. L/24.  [Emphasis added].

Curiously, at the outset of cross examination, Gallego was evasive regarding her address, and whether she actually lived at 14921 SW 104 Street.  T. 218-223. Ultimately, she testified to the Court that this was her address.  T. 223.  Yet, to the 911 operator, that same address was not in her apartment complex, and she did **not** live in Hammocks, even though she was the President of Hammocks.  Either her statements to the police are lies; or, her testimony to the Court is a lie concerning her address.

Additionally, the tape shows that Gallego told the police that she had been followed for "like an hour." Ex. L/24.    This is impossible, even under the best case scenario of the time-frame advanced by Gallego.   The police report (Ex.10) states that Gallego told the police she had been followed for 30 minutes.   Further, the Ceperos were at a Wells Fargo Bank at 4:17 PM (Ex. 14); and, Gallego called the police at 4:31 PM.  This statement to the police was bold-faced lie.

Exhibit L/24 and other testimony indicates that Gallego further lied to the Court when testifying that she called the police **while being followed in traffic**, not in the Hammocks parking lot.  *See* T. 195-196.   This is totally false.   Gallego told the 911 operator: "Now **I called the security** and the security for the house **are here, too**."  Ex. L/24.  Obviously, Hammocks' security had to have been **previously** called for Gallego to say that, and for the Hammocks' security vehicles to already be on the scene.

Further, according to Hammocks' security, Gallego first called security **after she had reached the Hammocks' parking lot**, and then called the police.  *See* T. 93:

> Mrs. Marglli called over the phone. She did not identify herself. She was nervous. She did not identify herself, and **she asked me to please come over to her community**, because she was being followed.  [Emphasis added].

*See* also T. 98, when security arrived after being called, Gallego told security that she was calling the police.

Additionally, Ex. L/24 clearly demonstrates that any contention that Gallego was nervous or speaking loudly is completely false.  Her tone of voice is matter-of-fact and calm.  This is not the voice of a person in any fear.  A review of Ex. M/22, showing Gallego on the phone while exiting her vehicle just after blocking the path of the Ceperos vehicle, shows her to be anything by nervous or under any stress.

9

Finally, and of most significance, her last statement on Ex. L/24 demonstrates that the entire claim by Gallego and the security of Hammocks that the Ceperos were blocking Ms. Gallego is false and known to be false.  Ms. Gallego, unaware that she was still on the call with the 911 operator, after a long pause, stated:

María Alonso...Que se jodan, yo no me quito. [Maria Alonso...Screw them.  I'm not going anywhere.] Ex. L/24.

Clearly, Gallego, in front of the Ceperos' vehicle, and the Hammocks' security vehicles, behind the Ceperos' vehicle, had trapped and blocked in the Ceperos.  And, Gallego was not going to let them out.  Further, the "mystery" of who blocked whom is conclusively "solved" by Exs. M/22 and N/23.

(2)  Exhibits M/22 and N/23 show that Gallego blocked the Ceperos, and show that the Ceperos were not following Gallego.

It is one thing for the parties to each say that one blocked the other, and vice-versa.  However, the videos do not lie.  The white vehicle driven by Gallego drove in front of and blocked the path of the Ceperos causing their vehicle to come to a stop.  Ex. N/23.  Additionally, this video clearly shows that the Ceperos were not following Gallego, as she emphatically claimed.  *Id.*

(3)  Exhibit 14, the bank record time-stamped 4:17 PM, conclusively demonstrates that Gallego's story is false and known to be false.

That the Ceperos were in the line at the school of Gallego's son, at a time near or before 4:00 PM, and then began to follow Gallego after she picked up her son, and continued to follow Gallego until 4:31 (when the police were called) cannot possibly be true for any number of reasons as set forth above.  Further, Gallego's entire story cannot possibly be true where, as documented by Ex. 14, the Ceperos were at Wells

10

Fargo Bank obtaining a money order to pay the trustee.   It is impossible that the Ceperos could be in two places at the same time.

B.  Gallego's actions are in contempt of the two Orders (Doc 189 and Doc 191) previously entered by the Court based on Gallego's prior misconduct.

Both Orders previously entered by the Court contain clear and unambiguous language prohibiting Gallego from having any sort of contact with the Debtors.   The initial Order is directed against Hammocks and Gallego in her capacity as President of Hammocks.   Doc. 189.   The second Order is directed against Gallego in her individual capacity.   Doc. 191.   The latter Order notes a physical threat by Gallego to Leticia Cepero and precludes any and all contact by Gallego with either of the Debtors:

2.  Based upon the evidence presented, specifically from the witness, Doria Wosk, and the fact that the witness provided evidence of a physical threat made against co-debtor Leticia Cepero, and **to prevent further altercations** between Ms. Gallego in her individual capacity, which is in addition to the Order entered against her in her capacity as President of the Hammocks Community Association, Inc., **Ms. Gallego shall refrain from any further contact with Debtors**, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed.  Doc. 191 [Emphasis added].

The Court could not have been clearer. There is no ambiguity and no "wiggle room" for Gallego who admitted that she was aware that she could not have any contact with the Debtors.  *See* T. at 238:

Q You're aware of the court orders that were entered in December of 2018, regarding refraining from any contact with the Ceperos; isn't that correct?

A I do remember the order. I don't remember the exact date of the order, but they couldn't have any contact with me **and I couldn't have any contact with them**. [Emphasis added].

II.  RESPONDENTS KNEW THAT THE NEW LAWSUIT IN NOVEMBER OF 2020, ALLEGING THE SAME MATTERS AS PREVIOUSLY ALLEGED IN 2017 LAWSUIT THAT WAS VOLUNTARY DISMISSED AS TO DEBTORS WAS NOT PERMITTED.

11

Gallego testified that she did not know that she was precluded from suing the Debtors due to their bankruptcy.  T. 239-241.  However, the record evidence shows that Respondent Hammocks filed a lawsuit in November of 2017, after the Debtors had filed their bankruptcy petition.  Exs. 25 and 26.  The 2017 lawsuit was filed on November 22, 2017 against five defendants, including the Debtors.  Ex. 25.  The 2017 lawsuit was voluntarily dismissed, **only** as to the Debtors, on December 19, 2017.  Ex. 26, entry 12/19/17.  However, said lawsuit continued against the other 3 defendants.  *Id.*

The November, 2017 lawsuit, quickly voluntarily dismissed, contained the same allegations as the new lawsuit filed by both Respondents.  *See and compare* Ex. 25 at 3-4, ¶¶19-20 (plaintiff Hammocks alleged that Leticia Cepero and Josue Cepero had made "untrue statements regarding Ms. Gallego," that she was "corrupt," and "stealing and misappropriating funds from the Hammocks association.") with Ex. 21, the new lawsuit, at 6, ¶37ii; and at 8, ¶45ii (Respondents allege that "[Hammocks] is allowing Ms. Gallego to misappropriate and steal funds.").

The evidence clearly shows that the reason the 2017 lawsuit was dismissed voluntarily and quickly, **only** as to the Ceperos, but **not** the other named defendants, is because Respondents were fully aware of the fact that they could not file suit against the Ceperos while they were Debtors in bankruptcy.  There is no other reason and no other reasonable inference from these facts.  In admitting Exs. 25 and 26, the Court even opined: "It rebuts the argument regarding knowledge."  T. 298.  The evidence clearly shows that the November 2020 lawsuit (Ex. 21) violates the automatic stay provisions of U.S. Bankruptcy Code Section 362 in place during the Debtors'

bankruptcy.   Under the facts, Respondents claim that they did not know they were precluded from filing Exhibit 21 is baseless and contempt is proper.

Additionally, the timing the November 2020 lawsuit demonstrate an utter lack of respect for the legal process.   **Respondents had the audacity and wherewithal, while a contempt hearing was pending, to commit further contemptuous acts**.

III.   THE EVIDENCE CLEARLY DEMONSTRATES THAT RESPONDENTS HAVE NO REGARD FOR THE RIGHTS OF THE DEBTORS, THE LAW OR THE ORDERS ENTERED BY THIS COURT; AND, THE ACTS AT ISSUE WILL CONTINUE WITHOUT APPROPRIATE SANCTIONS.

Respondents in carrying out the aforementioned acts have shown conduct that is willful and contumacious.   There was a reason why the Court entered two Orders back in December of 2018 – because Gallego had made threats to Leticia Cepero and to prevent any further controversies.   However, just five months after those two Orders were entered, on May 15, 2019, Gallego again made improper contact with the Debtors. The warnings from the Court did not suffice.

Then, while the Court was taking evidence on the contempt, Respondents, through Gallego, decided to file another lawsuit against the Debtors.   This, too, shows a lack of respect for the law and the rights of the Debtors.   Respondents knew full well that this new lawsuit was improper and in violation of U.S. Bankruptcy Code §362.

**CONCLUSION**

The Debtors met their burden to prove that: 1) Gallego's actions May 15, 2019 were in direct violation of the Courts Orders (Docs 189 and 191); and 2) the 2020 lawsuit, filed while the contempt hearing was pending, violated U.S Bankruptcy Code §362 and the said Orders which precluded any "contact with" or "communication with" the Debtors.   Further, as thoroughly documented herein, Respondents presented false

13

and knowingly false evidence to the Court in an attempt to avoid contempt.  Finally, the evidence shows that Respondents' conduct is willful and contumacious, and carried out in reckless disregard of the law and Orders of this Court.

Unless Respondents are held liable and directed to pay damages, costs and attorney's fees and punitive damages, this improper conduct will continue.  Again, after being found to have made physical threats and precluded from having any contact thereafter by Orders entered in December, 2018, Gallego committed the acts just 5 months later in May, 2019.  And, the new lawsuit was filed while this contempt proceeding was pending, resulting in the Court permitting Debtors to amend the motion.

Thus, for all the reasons advanced above, the Debtors request that the Court enter an Order finding in contempt for their improper actions.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of the **DEBTORS' CLOSING ARGUMENT ON AMENDED MOTION FOR CONTEMPT** was sent via email to Marglli Gallego and Hammocks Community Association, INC Attorney, Miguel F. Palade,parladelaw@gmail.com and NANCY NEIDICH Chapter 13 Trustee and all those set forth in the NEF on this 8th day, of March.

GBHB d/b/a BankruptcyNow
Attorneys for the Debtor
8410 SW 40th Street
Miami, FL 33155
Telephone (888)811-8989

By   /s/   Michael J. Brooks

Michael J. Brooks
Florida Bar No. 434442

By   /s/ Louis C. Arslanian

Louis C. Arslanian
Florida Bar No. 801925

15

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                                          Case Number: 17-20358-LMI
                                                                Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____Debtor(s)_____/

**RESPONDENTS', HAMMOCKS COMMUNITY ASSOCIATION INC. AND**
**MARGLLI GALLEGO, CLOSING ARGUMENT ON DEBTOR'S AMENDED**
**MOTION FOR CONTEMPT**

Respondents, HAMMOCKS COMMUNITY ASSOCIATION INC. and MARGLLI

GALLEGO, hereby submit their Closing Argument and Incorporated Memorandum of Law pursuant

to this Court's Order Setting Briefing Schedule for Closing Arguments (ECF 324), and further states:

1.  At issue before this Court are whether the Respondents violated the Agreed Order on

    Debtor's Amended Motion for Contempt against Hammocks Community Association, Inc.,

    and it President, Marglli Gallego dated December 4, 2018 (ECF 189) and the Order on

    Debtor's Amended Motion for Contempt against Hammocks Community Association, Inc.

    and its President, Marglli Gallego dated December 7, 2018 (ECF 191)(hereafter the

    "Contempt Orders") during an incident in front of Respondent, Marglli Gallego's home on

    May 15, 2019, and whether Respondents violated the Orders by filing a state lawsuit on

    November 30, 2020.[1]

2.  A finding of civil contempt must be based upon clear and convincing evidence that a person

    or entity violated a prior court order to which they were subject to. In re Cantin (Bankr. S.D.

    Fla. 2019)(citing Jove Eng'g v. I.R.S., 92 F.3d 1539, 1545-46 (11th Cir. 1996)).   To prevail,

    a movant must prove by clear and convincing evidence that there was a violation of a valid

---

[1] Although Debtors raise the argument in their closing argument that the filing of the lawsuit is a violation of the bankruptcy stay provisions, the pleadings do not reflect this relief sought.  See, Debtors Amended Motion for Contempt (ECF 289) and Joint Stipulation of Uncontested Facts (ECF 298)

and lawful order, that the terms of the order were clear, definite and unambiguous; and whether the alleged violator had the ability to comply with Page 34 the order.  See, In re Cantin (Bankr. S.D. Fla. 2019); Jove Eng'g v. I.R.S., 92 F.3d 1539, 1545-46 (11th Cir. 1996), and In re SLK Associates, Inc., 166 B.R. 985 (Bankr. S.D. Fla. 1994).  In order to meet the burden of proof for clear and convincing evidence, a movant must demonstrate that the evidence being presented is "highly" probable such that it places the fact finder with an "abiding conviction" that the truth of the facts asserted are highly probable.  See, Proctor & Gamble Co. v. Teva Pharms. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009); and Shire Dev. LLC v. Watson Pharms., Inc. (S.D. Fla. 2013).

3.  The Debtors have not presented clear and convincing evidence that the Respondents have violated this Courts afore-mentioned orders.  The relevant portions of this Court's Contempt Orders are as follows:

"Notwithstanding Debtors rights as condominium association owners, Debtors shall refrain from any further contact with the Hammock Community Association, Inc's President, Marglli Gallego during or immediately followingAssociation board meetings; and shall direct any formal communications with Mrs. Gallego in her capacity as the President of the Association in writing."(ECF 189)

"Ms. Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed. During such time, there shall be no communication from, Marglli Gallego, individually, or in her capacity as the president of the Hammocks Community Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Marglli Gallego, individually, to approach the Debtors, to communicate with or about the debtors, in person, or in writing, or with any

other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors."(ECF 191)

"Hammocks Community Association, Inc., and it's President, Marglli Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed. During such time, there shall be no communication from any representative with Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, and either her individually, or her capacity of her representative of the Association, with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors." (ECF 189).

## THE INCIDENT ON MAY 15, 2019

4.  On May 15, 2019, as Marglli Gallego was waiting in front of her son's school to pick him up before 4:00 PM, she noticed that there was a car acting strangely in the pickup line at the school.  (Tr.  at 194:9 – 194:16) and (Tr. at 257:8 to 257:9).  This car ends up following her, but she did not recognize that she was being followed until she noticed a device by the mirror of the car that was following her, and then she noticed that the car was being driven by Josue Cepero.  (Tr.  at 195:1 – 195:10) and (Tr.  at 197:20 – 198:3).  She stated that she continued driving and sped up to try to make it home faster.  (Tr.  at 196:4 – 196:13).  Eventually, when she made it home, she began pulling into her parking lot and suddenly the debtors came

across her parking lot and got in front of her car.  (Tr.  at 195:14 – 195:18).    At no time

during the incident did Mrs. Gallego attempt to make contact or communicate with the

Debtors.  (Tr.  at 195:16 – 195:19).  At one point, Mrs. Gallego pulled out her phone to

record what was going on and she stated that the Debtors "never put their windows down and

they never tried to say anything to me.  And when I tried recording them, they were putting

something up against the window so the I couldn't see their face." (Tr.  at 202:16 – 195:24).

5.   At 4:40 PM, the police arrived at the location in front of Marglli Gallego's house.  (Debtors'

Ex. No. 10) The photo of the Debtors in their car holding up the letter and the actual letter

itself have been admitted as Respondent's Exhibit F and G.  The timing of this contact

between the Debtors and Marglli Gallego was no coincidence.  The letter was received by

Marglli Gallego some time in April 2019, before elections were to be held by the Heron by

the Bay Association on or around May 15, 2019.  (Tr.  at 195:1 – 195:10); See, also Exhibit

G, page 2, "If you follow Marglli Gallego's directions on how to prevent an honest election,

you will be part of her campaign to ruin the Heron physically and financially.  Complete the

ballot yourself and mail it immediately.  It will reach the management company in three

days."  The evidence demonstrates that Marglli Gallego may have been targeted by the

Debtors in relation to the elections process in the Heron Association.

6.   During their case in chief, the Debtors called Officer L.J. Cobo who was present at the

incident on May 15, 2019.  Officer L.J. Cobo was asked by Debtors' attorney Michael Frank,

"You had stated that from what you saw, Ms. Gallego was blocking the car of the Ceperos?"

and Officer Cobo responded, "Blocking the car of Gail Sharp, I believe."  (Tr. at 21:19 –

21:22).

7.   Maria Alonso, the President of Heron Association, was asked if during the incident the

Debtors ever got out of their car while Ms. Gallego was present, and she responded "No."

(Tr. at 36:17 – 36:20).  When she was asked if Ms. Gallego every tried to open the vehicle

belonging to the Debtors or tried to physically contact the Debtors, she also responded "No." (Tr. at 36:23 – 37:1). While Ms. Alonso never testified that she observed Ms. Gallego's car blocking the Debtors' car.

8. Upon further examination, Maria Alonso stated that she was going to meet the Ceperos somewhere at the Heron, wherever she was "going to be" and that she "couldn't tell them where I was going to be.". (Tr. at 49:3 – 49:8). She said the incident on May 15, 2019 happened between Building 1 and 2, but that she was at building 8 when she was called by the Debtors. (Tr. at 48:11 – 48:14). Upon further examination, Maria Alonso admitted that she had no tenants in either building 1 or building 2. (Tr. at 49:20 – 49:24).

9. Under direct examination, Josue Cepero stated that on May 15, 2019 he had gone to the "Heron Building" to see Maria Alonso and that he had just come from Wells Fargo Bank located approximately six minutes from the building at the Heron. (Tr. at 54:9 – 54:10) and (Tr. at 56:8 – 56:10). Under cross examination, when the Josue Cepero was asked how he arrived at the location where he was parked, he responded that he had just chosen that location at random "because there was a guest parking available." (Tr. at 63:7 – 63:10). He then went on to say that he did not know where Marglli Gallego lives but admitted he has had dealings with her since 2016. (Tr. at 63:11 – 63:13) and (Tr. at 64:10 – 64:12). Under direct examination, Marglli Gallego stated that Josue Cepero had been to her house on several occasion in either 2015 or 2016 to pick up checks for work he had performed for the association. (Tr. at 200:19 – 201:22). Josue Cepero stated that on May 15, 2019, Marglli Gallego tried to block him twice. (Tr. at 71:10 – 71:13). He said the first time he was "blocked"; he was in a parking space and maneuvered the car and got out of the parking space. (Tr. at 72:23– 72:25). However, he said that he couldn't identify how far Marglli Gallego's car was from his. (Tr. at 71:20– 71:22). Absent from Mr. Cepero's testimony is any indication that Marglli Cepero tried to physically approach and/or contact the debtors on

May 15, 2019.

10. Jorge Matus, a supervisor of security for the Hammocks Community, testified that he was called by Marglli Gallego on May 15, 2019 because Ms. Gallego believed she was being followed. (Tr. at 97:22– 98:4) and (Tr. at 98:5– 98:8).  He also stated the Ms. Gallego was just a few meters from the parking space to her own unit and that the Ceperos were blocking the parking unit to Ms. Gallego's unit.  (Tr. at 93:14– 93:21).

11. Mr. Matus also stated that the Debtors' car was not blocked from behind by anybody, and that they could have backed up and moved the car.  (Tr. at 98:9– 98:12).  This fact was corroborated by Josue Cepero who testified under oath that he made the conscious decision to place his car in "park" and stay rather than attempt to leave.  (Tr. at 76:4– 76:15).

12. Other than the Debtors and Marglli Gallego, there were no eyewitnesses that observed the incident on May 15, 2019.  All witnesses, other than the Debtors and Marglli Gallego, arrived after the incident had already taken place.  Debtors' Exhibit 22 (Respondents Ex. M) is a phone video taken by the Debtors on May 15, 2019 that show the vehicles already at rest.  In it, the Debtor, Leticia Cepero, states, "we are not following her" ("Nosotros no seguimos detras de ella").  (Debtors Ex. No. 22/Respondent Ex. M at 00:10 – 00:13).

13.  Debtor's Exhibit 23 (Respondents Ex. N) is also a phone video taken by the Debtors on May 15, 2019 that shows the Debtors taking a phone video while driving.  During the video, Debtor, Leticia Cepero, remarks to Josue Cepero after she is instructed by him to call 911, "tomorrow I'm going to call them and tell them that I wasn't following her, she was the one that got in." ("mañana lo voy a decir.  Yo no ando detrás de ella.  Ella fue que se metió."). (Debtors Ex. No. 23/Respondent Ex. N at 00:10 – 00:13).  The video itself starts with the Debtors apparently taking video of themselves driving and culminates when the Debtors (who are driving on the left side of the road) stop with the car driven by Marglli Gallego in front of them.  (Debtors Ex. No. 23/Respondent Ex. N. 23).  The video also shows Marglli

Gallego driving while on her phone looking ahead while the Debtors approach from the "wrong" side of the road and both vehicles intersect.

14. The evidence does not clearly or convincingly demonstrate that Respondents violated the Orders of this Court, nor does it clearly or convincingly demonstrate that the Respondents initiated contact with the Debtors on May 15, 2019.  The evidence shows an interaction between the Debtors and Respondent, Marglli Gallego, on May 15, 2019; but testimony from Jorge Cepero and Marglli Gallego, as well as the Exhibits submitted for evidence in this case by all parties, demonstrate that all parties stayed away from each other after their vehicles came to rest in close proximity to each other in the Heron parking lot on May 15, 2019 at some time after 4 pm.

## THE LAWSUIT FILED IN NOVEMBER 2020

15. As stated by the U.S. Court of Appeals for the Ninth Circuit, "'knowledge of the applicability of the injunction must be proved as a matter of fact and may not be inferred simply because the creditor knew of the bankruptcy proceeding.'..."  In re Dickerson, 597 B.R. 101 (Bankr. W.D. Wash. 2019)(citing Lorenzen v. Taggart (In re Taggart), 888 F.3d 438 at 443 (9th Cir. 2018)).  There is nothing in the actual language of the orders nor of their history that denote a proscription against filing a lawsuit against the debtors by respondents.

16. Debtors have not provided any evidence to demonstrate that this Court's Contempt Orders provided a bar to any legal action by the Respondents.  The Contempt Orders barred contact between the Respondents and Debtors and certain communications regarding the bankruptcy and financial situation of the Debtors.  (ECF 189 and ECF 191).

17. The Contempt Orders did not contain any prohibition as to legal actions by "clear, definite and unambiguous" terms.    See, In re Cantin (Bankr. S.D. Fla. 2019); Jove Eng'g v. I.R.S., 92 F.3d 1539, 1545-46 (11th Cir. 1996), and In re SLK Associates, Inc., 166 B.R. 985 (Bankr. S.D. Fla. 1994).

18. Debtors did not seek relief pursuant to 11 U.S.C. § 362 (Although, it is mentioned in Debtors' closing argument but not reflected in the pleadings or pre-trial stipulation. (ECF 289, ECF 298, and ECF 324).

19. However, even if a 11 U.S.C. § 362 violation was properly pled, the facts show that Marglli Gallego is not a creditor in this case and not subject to the automatic stay (See, Schedules E and D/F of Debtors' Petition ECF No. 1 and Debtors' Ex. No. 21). As this Court is aware, the automatic stay does not apply to non-creditors absent special circumstances. See, In re Prairie Trunk Railway, 112 B.R. 924, 930 (Bankr.N.D.Ill.1990); and Nadler v. John Knox Vill. (In re Triad Constr. Co.), 545 B.R. 597 (Bankr. W.D. Mo. 2016).

20. Further, the complaint filed on November 2020 states causes of actions by Respondents against the Debtor, Leticia Cepero, to collect on postpetition debts for claims arising from statements made between 2018 and 2020. (See, Pages 3-5, Para. 19 and Pages 7-8, Para. 45 of Debtors' Exhibit 21). This would put these claims outside the purview of 11 U.S.C. § 362 because of the fact that this case was filed by Debtors on August 17, 2017. As noted by the Bankruptcy Court for the Middle District of Florida, 11 U.S.C. 362 (a) imposes a stay of actions relating to the collection of prepetition debts. See, In re Sciarrino, Case No. 9:11-bk-05881-FMD (Bankr. M.D. Fla. 2013)(The Court also noted that some postpetition actions may be stayed if they seek to collect funds/property from the bankruptcy estate.)

21. There was no evidence offered by Debtors' counsel that the causes of action stated in Debtors' Exhibit No. 21 were in any way pre-petition claims that would indicate a 11 U.S.C. § 362 violation, nor was there any evidence presented regarding the Complaint as a prohibited collection of post-petition claims from the bankruptcy estate.

22. Debtors' counsel merely asked, "Are you aware that you or the Hammocks are not allowed to file a lawsuit against either or both of the Ceperos while there are in bankruptcy?" (Tr. at 240:13 – 240:15). Whereby Marglli Cepero responded "No." (Tr. at 241:5).

## **CONCLUSION**

23. For the aforementioned reasons, Repondents respectfully request that this Court find that

   Debtors have not proven their case by clear and convincing evidence and deny the sought-

   after relief.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below:

Via electronic delivery on this 22nd day of March 2021 to:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

Via electronic delivery on this 6th day of April 2021 to:

David E. Hicks, Esq. on behalf of Creditor JPMorgan Chase Bank, N.A. tbyington@kelleykronenberg.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Steven G. Powrozek, Esq. on behalf of Creditor Wells Fargo Bank, NA.
spowrozek@logs.com, LOGSECF@logs.com

Lindsey Savastano on behalf of Creditor Wells Fargo Bank, NA.
LSavastano@flwlaw.com, NJackson@flwlaw.com

/s/ Miguel Parlade
Miguel Parlade, Esq.
Fla. Bar. 388068
Attorney for Marglli Gallego and
Hammock Community Association
P.O. Box 771747
Miami, FL  33177
(305) 235-9040

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-BKC-LMI
CHAPTER 13

IN RE:

JOSUE CEPERO
LETICIA CEPERO
      Debtor(s)
_____/

### DEBTORS' REPLY TO RESPONDENTS' CLOSING ARGUMENT ON DEBTORS' AMENDED MOTION FOR CONTEMPT

Debtors, JOSUE CEPERO and LETICIA CEPERO, hereby file this Reply to Respondents' Closing Argument pursuant to the Court's Order Setting Briefing Schedule for Closing Arguments (ECF 324), and states:

### SUMMARY OF REPLY

Debtors did prove by clear and convincing evidence that on May 15, 2019, Respondents violated the unambiguous terms of the "stay away" provisions of Court's Orders (ECF 189 and 191) previously finding Respondents in contempt.  The evidence was clear and convincing for the simple reason that Respondents' version of the events, as detailed in Debtors Closing Argument, is beyond belief and impossible under the evidence presented to the Court.  To this end, regarding the impossibility of Gallego's story as to what occurred – including the fact that Respondents were at a bank at 4:17 PM, and the police were called 14 minutes later 4:31 PM – Respondents offer absolutely nothing in the Response to even attempt to rebut the impossibility of

Gallego's version.   In fact, detailed below, Respondents offer nothing whatsoever in response to the critical evidentiary items cited to by Debtors.

Regarding the lawsuit filed in November 2020, contentions that §362 was not "mentioned in the pleadings or pre-trial stipulation" (Response at ¶18) are completely false.   *See* Amended Motion for Contempt (ECF 289) at 6, ¶¶12-14, describing the defamation lawsuit that was filed and how Hilton Napoleon, the attorney who filed the lawsuit immediately withdrew the lawsuit upon learning that Leticia Cepero was in bankruptcy and of the prior Orders of contempt; and ¶15 specifically stating the allegations regarding the filing this lawsuit are "additional violations of US Bankruptcy Code Section 362 and the above-mentioned Orders."   Respondents' arguments, claiming that the November 2020 defamation lawsuit was proper as a post-petition matter by a non-creditor (Response at ¶¶19-21) are baseless and fly in the face of the undisputed evidence that: 1) the lawsuit was immediately dismissed when the attorney learned of the pending bankruptcy and contempt orders;[1] and 2) a November 2017 lawsuit against both Debtors and three other defendants presenting identical allegations was also immediately dismissed only as to the Debtors; and 3) The Hammocks Community Association Inc., a creditor in the bankruptcy case and subject to the prior Orders of this Court (ECF 198 and 191), was also a Plaintiff in the 2020 lawsuit.

In other words, according to the Respondents, both lawsuits were proper; but, both proper lawsuits were immediately dismissed.  As in the case regarding the May 15, 2019 incident, Respondents chose to avoid and not respond to the matters presented in

---

[1]  If, as argued, the lawsuit was proper, then why was it immediately dismissed?

Debtors' Closing Argument regarding Respondents' alleged lack of knowledge that the November 2020 lawsuit violated §362.

I.  Respondents failed to even attempt to respond to critical evidentiary items showing that Respondent's version of the May 15, 2019 incident was impossible and incredible.

In ¶4 of the Response, Gallego clings to the story that while picking up her son from school "before 4:00 PM," Debtors began to follow her; however, <u>Respondents fail to even mention or attempt to rebut Ex.14</u>, a bank receipt, date-stamped May 15, 2019 and time-stamped <u>4:17 PM</u> (*See also* T. 54-55) conclusively establishing that the Debtors were at the Bank during the precise time-frame Gallego falsely alleges that Debtors came to her son's school and began to follow her vehicle.

In addition to avoiding this critical evidence debunking Gallego's story, Respondents also avoided and refused to even mention any of the following items, all of which, prove by clear and convincing evidence that Gallego's story is untrue:

1)  Exhibits M/22 and N/23 conclusively show Gallego's white vehicle obstruct Debtors vehicle by driving in front of Debtors and preventing their movement;

2) Exhibit L/24 proved that Ms. Gallego said: "María Alonso...Que se jodan, yo no me quito. [Maria Alonso...Screw them.  I'm not going anywhere.];"[2]

3) Exhibits L/24 and M/23 (Ms. Gallego casually leaving her vehicle while talking on the phone) demonstrate that Ms. Gallego was not nervous, as contended; and, that her son was nowhere to be found (unless he was left alone in the white vehicle);

4)  the testimony and other evidence showed that Ms. Gallego called security first, and that she did not call the police while in traffic (*See* Debtors' Closing Argument at 8, citing to Exhibit L/24 and T. 93; 98; and 195-196);

---

[2]  If, as contended, Debtors blocked in Gallego, why would Gallego say this?

3

5)  based on Exhibit 14, Ms. Gallego could not have been followed by Debtors for one hour (Exhibit L/24) or even 30 minutes (police report, Exhibit 10);

6)   testimony that the police instructed Ms. Gallego to take pictures or record video of the Debtors was false and belied by Exhibit L/24; and

7) despite emphatically claiming to the Court that she lived at 14921 SW 104th Street, she was equally emphatic to the 911 o'perater claiming that she did not live at this address.

These undisputed evidentiary items conclusively establish that: a) Ms. Gallego's version of the events is impossible and incredible; and b) Ms. Gallego's testimony about the events is replete with misrepresentations and false statements.  Based thereon, however the evidentiary threshold as described by Respondents, Debtors met that threshold.  Where there is substantial and competent evidence that Ms. Gallego blocked the Debtors, first in a parking spot, and then a second on the roads within the community that is corroborated by a video showing Ms. Gallego obstruct the path of Debtors presented; and, all that is offered in response is a version of events that is impossible, incredible and filled with false testimony contradicted by undisputed evidence, the clear and convincing threshold must certainly be met.

A.   None of the matters in the Response rebut the conclusion that Debtors proved a violation of the prior stay-away Orders entered "to prevent future altercations."

Without mentioning any of the critical matters listed above, Respondents set forth a summary of certain evidence and argument thereon.  However, none of this evidence rebuts the conclusion that Ms. Gallego made prohibited contact with Debtors and obstructed their movement in direct violation of the prior Orders; and, the arguments

presented upon this evidence are without merit.    For example, Respondents write, regarding the evidence and argument thereon, that:

> Josue Cepero stated that on May 15, 2019, Marglli Gallego tried to block him twice.  (Tr. at 71:10 – 71:13).  He said the first time he was "blocked"; he was in a parking space and maneuvered the car and got out of the parking space.  (Tr. at 72:23– 72:25).  However, he said that he couldn't identify how far Marglli Gallego's car was from his.  (Tr. at 71:20– 71:22).  <u>Absent from Mr. Cepero's testimony is any indication that Marglli Cepero tried to physically approach and/or contact the debtors on May 15, 2019</u>.  Response at ¶9. [Emphasis added].

This argument seems to be a theme of the Respondents.  *See* Response at ¶4: "At no time during the incident did Mrs. Gallego attempt to make contact or communicate with the Debtors."  The idea that no violation would occur if Ms. Gallego blocked in the Debtors twice, but did not communicate with them is absurd.  Further, Ms. Gallego could not possibly block Debtors with "approaching" the Debtors.

The broad and unambiguous language of the two prior Orders at issue clearly included a prohibition of this type of conduct, especially where the stated purpose of the prohibition was "<u>to prevent further altercations</u>" between Ms. Gallego and the Debtors.  *See* Order (ECF 191 at 2, ¶2).  Respondents' argument that this type of conduct does not violate the Orders is baseless.  An "altercation" of the precise type sought to be prevented by the Court did, in fact, occur on May 15, 2019.

Respondents' reliance upon statements made in Exhibit N/23 (Response at ¶13) is misplaced and improper.  First, when the two videos were introduced into evidence, during rebuttal, for the purpose of rebutting the claim by Ms. Gallego that Debtors were following her and blocked her in, Respondents contended that the audio portions on the videos were irrelevant.  *See* T. 288.  The Court agreed stating that the audio was going

to be disregarded.   Further, the statement, as translated, is entirely consistent with Debtors' allegations – they did not follow Ms. Gallego; rather, she followed them.

Similarly, that Debtors held a letter (admitted as Exhibit F) to cover their faces after Ms. Gallego, while allegedly not making any contact with Debtors, blocked them and got close enough to their faces to photograph them (Response at ¶5) does and cannot possibly disprove the violation.   That Exhibit F, as opposed to a towel or a newspaper, was used to cover their faces cannot possible alter the outcome that an obvious violation by Ms. Gallego of the stay-away provisions were violated.   Nor can this alter the conclusions that Ms. Gallego's version of events of impossible and incredible; or that Ms. Gallego presented numerous instances of false statements) contradicted by undisputed evidence (*e.g.* I was followed by Debtors for "like on hour").

Finally, whatever the testimony of the police officer or others, Exhibit N/23 shows Ms. Gallego obstructing and blocking the Debtors.   Nothing in ¶¶4-13 alters the fact that the evidence showed that Debtors were blocked twice, and that Debtors could not have possibly followed Ms. Gallego from the school as claimed.   And, Respondents' contention that, even if the blocking was true, no violation occurred because "all parties stayed away from each other" (Response at ¶14) is without merit.   Contempt, under the circumstances where the Court forbade any type of contact to prevent future altercations, cannot be avoided by providing false statements about what occurred followed by a portrayal of the events as a mere "interaction."   *Id.*   Even if all that occurred was an "interaction," which it was not, this is exactly what the Court prohibited.

II. Respondents' argument that the November 2020 lawsuit is proper and not violative of either §362 or the prior Orders is without merit.

As noted in the Summary, if the Respondents' position is somehow correct (that the November 2020 lawsuit is proper), it would illogically follow that Respondents filed two proper defamation lawsuits, one in November 2017 and the other in November 2020, yet immediately dismissed both lawsuits.  Curiously, the November 2017 was immediately dismissed, <u>only as to the Debtors</u>, but not the other three named Defendants.  *See* Exhibit 25, Complaint of 2017 lawsuit at 1, listing five named Defendants, including Debtors; and Exhibit 26, Docket Sheet of 2017 lawsuit, entry dated December 19, 2017 – Respondents voluntarily dismissed the Debtors.

As alleged in the Amended Motion (ECF 289), and apparently not disputed, once the lawyer that filed the lawsuit for Respondents was notified of the Debtors' bankruptcy and the prior Orders of contempt, the November 2020 lawsuit was immediately dismissed by Respondents.  If, as contended, the November 2020 lawsuit was proper, it would only follow that the November 2017 lawsuit (filed post-petition) was also proper.  The Respondents' argument then begs the question: why were both lawsuits, allegedly proper in all respects, immediately dismissed as to the Debtors?

It is clear in this jurisdiction that a creditor cannot take property of the estate without relief from stay.  It is also clear that a non-creditor cannot take property of the estate without relief from stay.  *In re: Kolenda*, 212 B.R. 851 (W.D. Mich. 1997).  Income or assets of the Debtor's necessary to fund the chapter 13 plan are property of the estate.  The "Wherefore" clause of the 2020 lawsuit seeks damages against the Debtors.  If successful in that case, the Plaintiffs could attempt to garnish wages or levy against the Debtors which would make it impossible for the Debtors to complete their plan payments.

Additionally, the Order on Contempt specifically states: "Ms. Gallego shall refrain from any further contact with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed. During such time, there shall be no communication from, Marglli Gallego, individually, or in her capacity as the president of the Hammocks Community Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy. This includes a prohibition against Marglli Gallego, individually, to approach the Debtors, to communicate with or about the debtors, in person, or in writing, or with any other Association members, including but not limited to, from communicating to anyone regarding any matter relating to the bankruptcy, the Debtors' failure to pay maintenance payments, or any other financial matters of the Debtors."(ECF 191).

A lawsuit against the Debtors is a communication with or about the debtors, in person or in writing or with any other Association members contemplated by the Order. Also, the language in the Order specifically excludes the Respondents defense that Marglli Gallego was a non-creditor in this case not subjection to the jurisdiction of this Court.  She made herself subject to the jurisdiction of this Court by her prior behavior. Therefore, none of the case law cited by the Respondent is relevant in this case.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of the **DEBTORS' REPLY TO RESPONDENTS' CLOSING ARGUMENT ON DEBTORS' AMENDED MOTION FOR CONTEMPT** was sent via email to Marglli Gallego and Hammocks Community Association, INC Attorney, Miguel F. Palade,parladelaw@gmail.com and NANCY NEIDICH Chapter 13 Trustee and all those set forth in the NEF on this 6th day, of April 2021.

GBHB d/b/a BankruptcyNow
Attorneys for the Debtor
8410 SW 40th Street
Miami, FL 33155
Telephone (888)811-8989

By   /s/   Michael J. Brooks
    Michael J. Brooks
    Florida Bar No. 434442

9

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on July 17, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

IN RE:                                                    Case Number: 17-20358-LMI
                                                          Chapter 13
JOSUE CEPERO and
LETICIA CEPERO,

_____ Debtors.    /

### ORDER FINDING HAMMOCKS COMMUNITY ASSOCIATION INC. AND MARGLLI GALLEGO IN CONTEMPT

This matter came before the Court on the *Debtors' Motion For Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019, [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego* (ECF #199) (the "2019 Contempt Motion") and *Debtors' Amended Motion for Contempt Against Hammocks Community*

*Association Inc., and it's President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019 [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's President, Marglli Gallego* (ECF #289) (the "Amended Contempt Motion"). For the reasons more fully outlined below, the Court finds that Hammocks Community Association, Inc. (the "Association") and Marglli Gallego ("Ms. Gallego") willfully violated this Court's orders and violated the automatic stay.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

The Debtors, Josue Cepero and Leticia Cepero (collectively the "Ceperos" or the "Debtors"), on the one hand, and Ms. Gallego, the president of the Association, and the Association on the other hand (collectively the "Respondents"), have had a contentious relationship for the last four or five years.  It is not necessary to review the history of this bitter relationship other than to note that this Court entered two orders hoping to resolve the ongoing confrontations – *Agreed Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 4, 2018 (ECF #189) (the "2018 Contempt Order") and *Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and its President, Marglli Gallego* dated December 7, 2018 (ECF #191) (the "Additional 2018 Contempt Order" and with the 2018 Contempt Order – the "Contempt Orders").

The 2019 Contempt Motion alleged that Ms. Gallego and the Association violated the Contempt Orders with respect to a confrontation that occurred on

May 15, 2019 and by virtue of a tree trimming flyer that was distributed to all the members of the community in which the Ceperos live, that allegedly had attached to it a written statement that included inappropriate statements about the Ceperos.  The 2019 Contempt Motion was set for an evidentiary hearing and the first day of trial took place on February 26, 2020.  The second day of trial was canceled when the courts became virtual due to the COVID-19 pandemic. The parties did not want to try the case virtually, so the Court directed the parties to mediation. That was unsuccessful.

After a continued trial date was set, the Debtors filed the Amended Contempt Motion, alleging that the Association and Ms. Gallego filed a lawsuit on November 20, 2020 (the "November 2020 Lawsuit") suing Mrs. Cepero for defamation and tortious interference. When state court counsel for the Association and Ms. Gallego was advised of this bankruptcy case, he immediately dismissed the November 2020 Lawsuit. The Court allowed evidence of this November 2020 Lawsuit, as well as any defense to the allegations regarding the lawsuit, to be presented at the continued evidentiary hearing.

## **ANALYSIS**

At issue before this Court is whether the Respondents violated the Contempt Orders by virtue of the May 15, 2019 altercation, and whether the Respondents violated the Contempt Orders or the automatic stay by filing the November 2020 Lawsuit.[1]

A finding of civil contempt must be based upon clear and convincing

---

[1] The Debtors failed to present evidence either at the original evidentiary hearing or the continued evidentiary hearing to support the allegations regarding the tree trimming flyer.

3

evidence that a person or entity violated a prior court order to which they were subject. *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996)). "This ['clear and convincing' evidence standard] is more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Id.* (quoting *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988)). "Clear and convincing evidence" is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). To prevail on a motion for contempt, a movant must prove by clear and convincing evidence that there was a violation of a valid and lawful order; that the terms of the order were clear, definite, and unambiguous; and that the alleged violator had the ability to comply with the order. *Jove*, 92 F.3d at 1546; *In re SLK Assocs., Inc.*, 166 B.R. 985, 989 (Bankr. S.D. Fla. 1994).

**The May 15, 2019 Incident**

The Debtor husband, Mr. Cepero, testified that on May 15, 2019, he and his wife drove to The Heron of the Hammocks ("The Heron"), a community made up of a cluster of buildings in the Hammocks master community, to meet with Maria Alonso, a friend who had just been elected president of the board of The Heron. Mr. Cepero testified that while he was parked in a visitor's parking space, waiting for Ms. Alonso to be available, Ms. Gallego drove up in a car marked with the Hammocks logo and blocked him in the parking space that he had chosen.[2]

---

[2] Ms. Gallego claimed that the Debtors were near her home and that Mr. Cepero knew where she lived because he had come to her home from time to time to pick up checks. Mr. Cepero testified he did not know where Ms. Gallego lived, and he chose to park where he parked because there was an open visitor space. Jorge Matus, the Chief Security Officer for the Hammocks, testified that the Ceperos were blocking Ms. Gallego's parking area. It is not clear how Mr. Matus knew

4

Mr. Cepero testified that he was able to maneuver around Ms. Gallego, but as he drove around trying to leave the area, Ms. Gallego drove around and blocked his car again with the Hammocks car. Police and community security were called at that time. Who called the police when the altercation occurred are issues in dispute, but, ultimately, who called the police when the confrontation occurred is not relevant with one exception that the Court will address shortly.

Maria Alonso testified that Mr. Cepero tried to call her several times and, when he finally reached her, Mr. Cepero told Ms. Alonso that Ms. Gallego was blocking him. When Ms. Alonso got to the scene, Ms. Gallego was out of her car, at the Debtors' car, saying something and filming the Debtors in their car. According to Ms. Alonso, Ms. Gallego's car was blocking the Debtors' car. There were two Hammocks security vehicles present also.[3]

Ms. Gallego testified that the Ceperos started everything. Ms. Gallego testified she was waiting in front of her son's school to pick him up before 4:00 p.m. when she noticed that there was a car acting strangely in the pickup line at the school. The car followed her, but she did not recognize who was following her until she noticed a device by the mirror of the car that was following her, and then she noticed that the car was being driven by Mr. Cepero.

Ms. Gallego further testified that she continued driving and sped up to try to make it home faster. Ms. Gallego testified that she was so nervous she called 911 while she was driving and told the 911 operator she was being followed and

---

this, unless he was relying on what Ms. Gallego told him, since he also testified he did not know the addresses in The Heron.

[3] Counsel for the Respondents argued that the Ceperos could have backed away from where Ms. Gallego was blocking them. However, the Court does not view this as relevant.

had been followed for an hour. Ms. Gallego testified that she told her son to duck down under the seat while Ms. Gallego remained on the phone at the instruction of the 911 operator.  Ms. Gallego testified that the 911 operator told Ms. Gallego an officer had been dispatched. Eventually, when Ms. Gallego made it home, she testified she began pulling into her parking lot and suddenly the Debtors came across her parking lot and got in front of her car. Ms. Gallego testified she was terrified for her young son who was in the car and that she had a neighbor take him. Ms. Gallego also testified that the 911 operator told her to get out of the car to check the tag number of the car that was following her.

Mr. Cepero testified that he and his wife were not at the son's school, that they do not even know where the son goes to school, and that, in fact, they went to the bank to purchase a money order to make their Chapter 13 plan payment. The Ceperos introduced into evidence a time-stamped bank slip that shows that the Ceperos purchased the money order at 4:17 p.m., at a bank that was approximately a six-minute drive from The Heron and their home. It was not possible for the Ceperos to be at the son's school in the carpool line at or before 4:00 p.m., follow Ms. Gallego for an hour, or a half hour, or at all, and then still be at the bank making a transaction that completed at 4:17 p.m.

The video evidence shows that the Ceperos were driving when all of a sudden Ms. Gallego pulled up in front of them, forcing them to stop. Ms. Gallego then got out of the car and eventually approached the Ceperos' car while talking on the phone. This video evidence directly contradicts Ms. Gallego's testimony that the Ceperos were blocking her from her parking space. If the parking space was blocked, it was a consequence of where Ms. Gallego stopped her car.

The police officer who came to the scene filed a report that shows he was dispatched at 4:35 p.m. and arrived on the scene at 4:40 p.m.  No other officer was on the scene.[4]  When the police officer arrived, the Hammocks security officers were already on scene.  This contradicts Ms. Gallego's testimony that the 911 operator told her an officer was dispatched while Ms. Gallego was driving. Moreover, according to the police report, Ms. Gallego told the officer the Ceperos had been following her for at least 30 minutes. But the Ceperos did not follow Ms. Gallego for 30 minutes, as Ms. Gallego told the police officer, or for 60 minutes, as she told the 911 operator. Both statements are clearly false because the Ceperos were at the bank at 4:17 p.m. and everyone was at the scene of the altercation by at least 4:35 p.m. when the police were dispatched.

Moreover, although Ms. Gallego claimed she called the 911 operator while she was driving her son home from school, the time stamp on the 911 call shows the call was made at 16:31:18 – 4:31 p.m., 30 minutes after Ms. Gallego testified she picked up her son at school. Based on all the other evidence in the case, it is clear Ms. Gallego called 911 after she had blocked the Ceperos' car.

The Court has reviewed all of the evidence, the testimony of the witnesses and the exhibits, including the video that was recorded at the time of the incident.  The Court finds that Ms. Gallego did not call the police while she was driving the car as she claims, but, rather, Ms. Gallego called the police at 4:31 p.m.  That recording makes clear that there was no previous call to the police, as Ms. Gallego testified, while she was driving home from her son's school.

---

[4] Ms. Gallego testified that there was more than one officer on the scene but there is no one else who corroborated that statement.

Finally, the video of what appears to be the second confrontation clearly shows that Ms. Gallego was blocking the Debtors, and, in fact, the video shows that Ms. Gallego deliberately pulled up in front of the Debtors' and blocked them from continuing in the direction in which they were driving. Additionally, although Ms. Gallego testified that she asked someone to take her son out of the car and into her home, the Association did not provide any corroborating testimony and there is nothing in the video that suggests the son was in the car when Ms. Gallego blocked the Debtors' car.

In sum, the Court finds that Ms. Gallego was untruthful, her testimony fabricated and contradicted by physical evidence. Consequently, the Court finds that all of Ms. Gallego's testimony should be disregarded.

Mr. Cepero testified he and his wife were at The Heron to see Maria Alonso. Maria Alonso corroborated that testimony. The Association and Ms. Gallego did not put on any evidence to contradict that testimony other than Ms. Gallego's untruthful testimony about her son's carpool line and being followed by the Ceperos.

Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.

**The November 2020 Lawsuit**

In the November 2020 Lawsuit, the Respondents sued Mrs. Cepero for a variety of acts, some of which allegedly occurred postpetition. However, the complaint clearly included allegations, and sought relief with respect to, "false

and defamatory statements over the last four years (at a minimum) about Ms. Gallego." Once advised of this bankruptcy case, state court counsel immediately dismissed the November 2020 Lawsuit.

The Respondents argue that the November 2020 Lawsuit was not prohibited by the Contempt Orders because the Contempt Orders say nothing about filing lawsuits. They also argue the Debtors never claimed the November 2020 Lawsuit was a stay violation until the Debtors filed their closing argument. Further, the Respondents argue, the filing of the November 2020 Lawsuit was not a violation of the automatic stay because (a) Ms. Gallego is not a creditor and (b) the November 2020 Lawsuit only sought relief with respect to postpetition conduct.

The Debtors counter that the November 2020 Lawsuit was clearly a violation of the Contempt Orders.  The Debtors also point out that the November 2020 Lawsuit was cited as a stay violation in the *Motion to Supplement Motion for Contempt* (ECF #267), and the Amended Contempt Motion. The Court notes that while the *Joint Pretrial Stipulation* (ECF #298) did not identify whether the November 2020 Lawsuit constituted a stay violation as an issue to be tried, during the trial, Debtors' counsel repeatedly argued that the November 2020 Lawsuit was a stay violation when seeking admission of certain exhibits.

Whether the November 2020 Lawsuit was a violation of the stay or of the Contempt Orders, the parties agreed to try the issue of whether the November 2020 Lawsuit was wrongful as part of the continued evidentiary hearing.  The Court agrees with the Respondents that the November 2020 Lawsuit does not

violate the Contempt Orders.[5]

However, the Court finds that the November 2020 Lawsuit was a knowing violation of the automatic stay. The Court does not understand the argument that Ms. Gallego is not a creditor. Perhaps Ms. Gallego did not file a claim in the bankruptcy case, but the November 2020 Lawsuit was clearly an act "to recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. §362(a)(1). While there are certain instances in which acts to recover on claims that arise postpetition are not a stay violation, the Court does not have to address those exceptions here because the November 2020 Lawsuit included relief relating to alleged prepetition claims. The Respondents argued that Ms. Gallego did not know that she could not file the November 2020 Lawsuit. However, the Respondents filed a postpetition lawsuit in 2017 against the Debtors and others, seeking similar relief for prepetition acts. That lawsuit was dismissed as to the Debtors as a violation of the automatic stay. Ms. Gallego testified she did not remember that lawsuit, but, in light of Ms. Gallego's false testimony on other issues in this case, the Court does not believe that Ms. Gallego did not remember.

Accordingly, the Court finds that the Respondents knew that they could not file any lawsuit against the Ceperos at least with respect to matters that occurred before the bankruptcy case was filed, and were on notice that filing any lawsuit while the bankruptcy case was pending might be prohibited. Thus, the Court finds the Association and Ms. Gallego willfully violated the automatic stay

---

[5] If the allegations regarding Mrs. Cepero's postpetition conduct are true, Mrs. Cepero's actions violated the Contempt Orders.

by filing the November 2020 Lawsuit.

## DAMAGES

The Amended Contempt Motion seeks attorney fees and reimbursement of costs (including those associated with the November 2020 Lawsuit), punitive damages, and damages for emotional distress. The Debtors did not cite any statute or common law basis for the sanctions they seek leaving it to the Court to guess why they are entitled to recovery. However, the Court specifically advised the parties that the Court would consider evidence of damages after a determination of liability, if any. Having found that the Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages.  The request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support.  If the Debtors intend to seek emotional damages, that claim will have to be set for evidentiary hearing, *if* the basis for damages claimed allow a claim for emotional damages.

After the damages statement is filed, which must be filed no later than 21 days from the date of entry of this order, the Association and Ms. Gallego will have 21 days to file an objection to the amounts requested, and include any arguments that the nature of damages claimed are not permitted under the theory cited by the Debtors.  However, for purposes of objecting to any damages,

the Association and Ms. Gallego may not include objections to this Court's finding of liability.  Any objections to those findings must be made through the procedurally appropriate pleading.

## **CONCLUSION**

Ms. Gallego needs to stay away from the Ceperos. The Ceperos need to stay away from Ms. Gallego. The Contempt Orders made clear that the Association and Ms. Gallego on the one hand, and the Ceperos on the other hand are not to talk about each other or interact with each other.  While the Contempt Orders terminate upon the Ceperos obtaining their discharge, this Court urges the parties to continue to stay away from each other for so long as either of them lives in the Hammocks. If there must be some interaction, it should be only through an intermediary. The Association must take whatever steps necessary to make sure that Ms. Gallego understands her limitations and her potential liability if she violates this Court's orders again. The Ceperos must also remember their responsibilities under the Contempt Orders. This needs to stop.

# # #

Copies furnished to:
Miguel Parlade, Esq.
Michael Brooks, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on October 27, 2021.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                    CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA              Chapter 13
CEPERO,

　　　　　Debtors.
_____/

**ORDER ON SANCTIONS AND SETTING**
**<u>FURTHER EVIDENTIARY HEARING</u>**

　　　　　This matter came before the Court after a trial on February 26, 2020 and

February 11-12, 2021 on the *Debtors' Motion For Contempt Against Hammocks*

*Community Association Inc., and it's [sic] President, Marglli Gallego for Failure to*

*Abide by This Court's Agreed Order Dated December 3, 2019, [ECF 189] and This*

*Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion*

*for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego* (ECF #199) (the "2019 Contempt Motion") and *Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego for Failure to Abide by This Court's Agreed Order Dated December 3, 2019 [ECF 189] and This Court's Order Dated December 6, 2018, [ECF 191] on the Debtors' Amended Motion for Contempt Against Hammocks Community Association Inc., and it's [sic] President, Marglli Gallego* (ECF #289) (the "Amended Contempt Motion" and together with the 2019 Contempt Motion, the "Contempt Motions"). The Court finds that the Debtors are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress. The Court also finds the Debtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress. The Court finds the Debtors are not currently entitled to reimbursement of expenses because they failed to provide the required support ordered by the Court, and with respect to the attorney fees included in the request for costs, in addition to being inappropriately categorized as a cost, had no detail whatsoever.

The Court entered its ruling in favor of the Debtors on almost all of the relief requested in the Contempt Motions in its *Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt* (ECF #328) (the

CASE NO. 17-20358-BKC-LMI

"Contempt Order")[1], and directed the Debtors to submit a "specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages." The Debtors filed their *Statement of Damages on Order of Contempt* (ECF #335) (the "Damages Statement") to which the Association[2] and Ms. Gallego filed their *Objection to Debtor's [sic] Statement of Damages on Order of Contempt* (ECF #337) (the "Damages Objection").

The Debtors seek sanctions in the form of damages for the violations of this Court's Orders[3] and for violation of the automatic stay. The Debtors also seek punitive damages. The Debtors rely on 11 U.S.C. §105 for the sanctions arising from the violation of the Court's Orders and on 11 U.S.C. §362(k) for damages arising from the stay violation.

Under section 105, "the court may take any action 'necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.' 11 U.S.C. § 105(a). Thus, a court may impose sanctions if a party violates a court order or rule." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1273 (11th Cir. 2009). "The purpose of civil contempt sanctions is to (1) compensate

---

[1] The Association and Ms. Gallego have appealed the Contempt Order. Nonetheless, the Court has jurisdiction to enter this Order. *See In re TLFO, LLC,* 571 B.R. 880, 891 (Bankr. S.D. Fla. 2017); *In re Sundale, Ltd.,* 2021 WL 3375815, at *1 (Bankr. S.D. Fla. 2021).

[2] Any undefined capitalized terms throughout this order will have the same definition as in the Contempt Order (ECF #328).

[3] *Agreed Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and it's [sic] President, Marglli Gallego* (ECF #189) (the "2018 Contempt Order"), and *Order on Debtor's [sic] Amended Motion for Contempt against Hammocks Community Association, Inc. and it's [sic] President, Marglli Gallego* (ECF #191) (the "Additional 2018 Contempt Order").

3

the complainant for losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996).

Sanctions for a stay violation under section 362(k) may be awarded when the Court finds that the stay violation was willful. If so, the Debtors are entitled to "recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. §362(k).

**Attorney Fees**

The Debtors seek sanctions in the form of attorney fees totaling $71,830.00.[4] The Association and Ms. Gallego object to the fees on a number of grounds including that there were no expert declarations attached to the Damages Statement. The Court will address this objection first. The use of expert testimony in federal court is governed by Federal Rule of Evidence 702. That rule states "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify on the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." As the Court has repeatedly advised parties who appear before her, and advised the parties in this case, the Court has 37 years of experience in the bankruptcy arena-over 20 years as a practitioner and over 15 years as a judge. The Court does not require an expert to advise the Court on the issue of the

---

[4] The Court will address the attorney fees included in "costs" when discussing the cost requests.

reasonableness of attorney fees in a bankruptcy proceeding.  Therefore, that portion of the Damages Objection is overruled.

The reasonableness of the fees requested by the Debtors is measured in accordance with the criteria set forth in *Johnson v. Georgia Highway Exp.,* 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988). *In re Lyubarksy,* 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020).[5]  Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and  (xii) awards in similar cases.

The Court has reviewed the detailed fee statements for Mr. Brooks and for Mr. Arslanian attached to the Damages Statement.  Having reviewed the statements in detail, the Court finds that Mr. Brooks' fees should be reduced to $26,977.50 and allowed as a sanction only in that amount and that Mr. Arslanian's fees should be allowed in the amount requested - $27,087.50.

---

[5] "The criteria for determining the reasonableness of the fees requested is not 11 U.S.C. §330 because the Debtors' professionals were not retained pursuant to 11 U.S.C. §327. . . . Fed. R. Bankr. P. 2016 and this Court's *Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases* are also inapplicable." *Id.*

The award of attorney fees as a sanction for violation of this Court's Orders and violation of the stay is designed to compensate the Debtors for the harm caused by the acts of the Association and Ms. Gallego.  This does not mean that the Debtors are entitled to any attorney fees arising from the Debtors' relationship and dealings with the Association.   Nonetheless, Mr. Brooks included in his fee request charges associated with the Debtors' alterations to their roof, front door, and driveway.   None of those fees were appropriately included in his fee request.

The balance of the fee reduction is based primarily on collective excessive charges for tasks such as preparation of the closing statement and unnecessary duplication – primarily attendance at the deposition.  Therefore, the Court finds that it is appropriate to sanction the Association and Ms. Gallego jointly and severally $54,065.00 with respect to the attorney fee damages.

**<u>Costs</u>**

The Debtors also seek $11,682.20 in costs, which include $2,500.00 for attorney fees associated with work done by Mr. Brooks' former law partner Michael Frank in 2019, $5,000.00 for attorney fees for Mr. Brooks in 2020, and $2,500.00 for work done by Guy Spiegelman, identified as "for state court case" in 2019.

In the Contempt Order the Court stated "[t]he request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support."

Notwithstanding those instructions, there is no support provided for any of the costs requested.   Because the costs were described, the Court will give the Debtors fourteen days to submit the support for the costs (other than the attorney fees) that are listed on Exhibit C of the Damages Statement.   The consequence of the failure to provide copies of the invoices will result in those costs being disallowed.

The Court will now turn to the attorney fees listed as costs.   These are disallowed *in toto*.   The Court was very specific regarding the detail required for any attorney fee request.   The Court understands that Mr. Brooks and his former law firm may be involved in a dispute.   However, if Mr. Brooks made a demand for that information (which he should have been requesting at least from the time the second day of trial was set), and that demand was rebuffed, Mr. Brooks had ample time to file a motion with this Court compelling his former law firm to provide the information.   Thus the $7,500.00 requested for Mr. Frank's and Mr. Brooks' time is denied.

The Court has no idea what the Guy Spiegelman fees are for, and to which "state court case" the cost statement refers.   Because there was no detail provided to allow the Court to determine whether these fees are reasonable or are even associated with the violations of the Court's Orders or the stay, this request is disallowed as well.

## **Emotional Distress Damages**

The Debtors claim they have suffered damages arising from emotional distress for which they seek compensation. "Compensatory damages may

include emotional distress, provided the Debtor (1) suffers significant emotional distress, (2) clearly establishes the significant emotional distress, and (3) demonstrates a causal connection between that significant emotional distress and the contemptor's wrongful conduct." *In re Rhodes*, 563 B.R. 380, 388–89 (Bankr. M.D. Fla. 2017).

As the Court held in *Lyubarsky,* "[t]he Eleventh Circuit has recognized that debtors who are subjected to a stay violation are entitled to claim emotional distress damages under section 362(k). *Lodge v. Kondaur Capital Corp.,* at 1271. '[T]o recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay.' *Id. (internal citations omitted)." In re Lyubarsky*, 615 B.R. 924, 931 (Bankr. S.D. Fla. 2020).

The Court finds that the Debtors are entitled to an evidentiary hearing to establish whether and to what extent they have suffered damages for emotional distress arising from the violations of the Court Orders and the automatic stay. Subject to proving entitlement, these damages, if any, will be added to the fee and cost awards.

## Punitive Damages

The Debtors have asked for an unspecified amount of punitive damages. "Punitive sanctions are appropriate when a party acts with 'reckless or callous disregard for the law or rights of others.' *Parker v. Credit Central South, Inc.*, 634

Fed. Appx. at 773 (internal citations omitted)." *Lyubarsky,* 615 B.R. at 937. "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: '(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor.' *In re Harrison,* 599 B.R. 173, 182 (Bankr. N.D. Fla. 2019)." *Lyubarsky,* 615 B.R at 937-38.

The Court finds that Ms. Gallego acted recklessly and carelessly when she deliberately cut off the Debtors with her car, and then called the police with her manufactured story about the Debtors following her.  The Court also finds that Ms. Gallego acted recklessly and callously when she initiated the November 2020 Lawsuit, knowing that Mrs. Cepero was still in bankruptcy, and knowing she could not sue Mrs. Cepero while she was in bankruptcy.[6] At a minimum Ms. Gallego should have advised state court counsel about the bankruptcy so that state court counsel could assess whether and to what extent relief could be sought in state court absent a stay relief order from the bankruptcy court.

The Court cannot calculate the amount of punitive damages without a further evidentiary hearing.

> In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will punish and deter." *In re Novak*, 223 B.R. 363, 368 (Bankr. M.D. Fla. 1997) (emphasis added).  *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr. M.D. Ala. 2016) (awarding $50,000.00 in

---

[6] As the Court previously held, the November 2020 Lawsuit sought damages for pre-petition as well as post-petition conduct.

CASE NO. 17-20358-BKC-LMI

> punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brodgen*, 588 B.R. 625 (Bankr. M.D. Fla. 2018) (awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191 (awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

*Lyubarsky,* 615 B.R. at 938. As already noted, the Court requires an evidentiary hearing to determine whether the Debtors are entitled to damages for emotional distress (which will assist the Court in determining any appropriate multiplier *and* the amount of damages against which to apply any multiplier) and, also, as the Association and Ms. Gallego pointed out in their Damages Objection, to assess their respective ability to pay the punitive damages. Thus, the Court will determine the amount of punitive damages after the evidentiary hearing.

## **CONCLUSION**

The Court finds as follows:

a. The Debtors are entitled to sanctions to be assessed against the Association and Ms. Gallego for damages incurred in connection with the violations of this Court's Orders and violation of the automatic stay, all as detailed in the Contempt Order.

b. Sanctions in the form of attorney fees are allowed in the total amount of $54,065.00.

c. The Debtors will have fourteen days to produce the necessary support for the non-attorney fee costs listed in the Damages Statement or any such claims are waived.

d. The $10,000.00 in attorney fees listed as "costs" are not allowed.

e. The Court will conduct an evidentiary hearing on December 30, 2021, at 9:30 a.m. to hear evidence on emotional distress damages and the ability of Ms. Gallego and the Association to pay punitive damages.

    i. The Court has reserved one half day for this evidentiary hearing.

    ii. The hearing shall take place at United States Bankruptcy Court, 301 N. Miami Avenue, Courtroom 8, Miami, Florida.

    iii. **<u>DISCOVERY</u>**.  All discovery must be completed not later than **<u>seven days</u>** before the evidentiary hearing. The time for responding to interrogatories, requests for admission or requests for production is shortened to fourteen (14) days from service of the discovery.

    iv. **<u>WITNESS LISTS</u>**.  No later than 4:00 p.m. **four business days** before the evidentiary hearing before the evidentiary hearing, all parties must exchange and file with the Court witness lists identifying all fact and expert witnesses each party intends to call at the evidentiary hearing (other than rebuttal or impeachment witnesses).

    v. **<u>SUBMISSION AND EXCHANGE OF EXHIBITS.</u>** No later than 4:00 p.m. **four business days** before the evidentiary hearing, the parties must submit and exchange all exhibits pursuant to the requirements of Local Rule 9070-1.

    v. **<u>OBJECTIONS TO EXHIBITS.</u>** All objections to exhibits must comply with Local Rule 9070-1 and must be filed and served, so as to be received no later than 4:00 p.m. **two business days** before the evidentiary hearing.  The parties must meet and confer (by telephone or video conference) to resolve, to the extent possible, any objections to exhibits. Any unresolved

CASE NO. 17-20358-BKC-LMI

objections (other than objections to relevancy) will be addressed at the beginning of the evidentiary hearing.

# # #

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:                                                    CASE NO.:17-20358-LMI

JOSUE CEPERO AND LETICIA CEPERO              CHAPTER 13

      Debtor.

_____/

## MOTION FOR RECONSIDERATION

**COME NOW** the Debtors by and through their undersigned counsel and files this **MOTION FOR RECONSIDERATION** and as cause therefore states as follows;

1. On October 28, 2021, this court entered an Order on Sanctions and Setting Further Evidentiary Hearing, [ECF 339].

2. As part of this Order, the court allocated attorney fees for Michael Brooks in the amount of $26,977.50.

3. The court on page 7 of the Order disallows any attorney fees for work that was not itemized in the attorney timex sheet prior to the order granting Mr. Brooks to substitute counsel for the prior law firm, [ECF 258]. The court stated that Mr. Brooks should have filed a motion to compel to provide Mr. Brooks with the timesheets for work performed prior to taking over the case from Mr. Frank.

4. The undersigned contacted Mr. Frank's office and was told that Mr. Brooks' timesheets were not in the file and could not be located. It can not be denied, however, that services were provided prior to the Order substituting counsel.

5. The undersigned met with and spoke to the debtors' numerous times regarding the original motion for contempt and reviewed hours of documentation and videos. Some were relevant, and some were not. Mr. Brooks met with witnesses and potential witnesses, prepared for trial (1st hearing), and attended mediation which lasted approximately 4 hours.

6. The court can take judicial notice of the above and award a reasonable attorney fee for the work of the undersigned performed prior to solely taking over the case. Prior mediation, the undersigned informed counsel for Ms. Gallego, and the Association Mr. Parlade, that he had already incurred in excess of $45,000.00 in fees.

7. Obviously, since this court does not have a timesheet before it and cannot make a determination of which of those fees are reasonable and necessary, and the undersigned cannot rely on previous statements and memory to request a specific amount in attorney fees, this court must use its own discretion in determining what amount, if any, is reasonable compensation for Mr. Brooks for the work performed.

8. However, because the undersigned is unable to produce a timesheet for work that was performed prior to leaving his former law firm, does not mean that Ms. Gallego and the Association should benefit. There are obviously attorney fees that have been

earned and no reasonable person could say that undersigned counsel is not entitled to those fees.

**WHEREFORE** the Debtor requests this Honorable Court to grant the debtors **MOTION FOR RECONSIDERATION** and take judicial notice that attorney fees were earned prior to the transfer of representation solely to the undersigned and an award an amount this court deems just reasonable and necessary and proper.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1 (A) and that a true and correct copy of this **MOTION FOR RECONSIDERATION** was set forth in the NEF, this 29th day of October 2021.

Law Office of Michael J. Brooks, P.A
Attorney for the Debtor
8410 S.W 40th Street
Miami, FL 33155
Telephone (954)-859-6661

By: _____/s/_____
        Michael J. Brooks, Esq
        Florida Bar No. 434442

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                                  Case Number: 17-20358-LMI
                                                        Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____ Debtor(s)_____/

**HAMMOCKS COMMUNITY ASSOCIATION, INC. and MARGLLI GALLEGO'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**RECONSIDERATION (ECF 340)**

     Respondents, Hammocks Community Association, Inc. and Marglli Gallego, hereby file their Memorandum in Opposition to Defendant's Motion for Reconsideration (ECF 340) and in support thereof state:

1. On July 17, 2021, this Court entered an Order finding Respondents in contempt for violating its Orders dated December 3, 2018, and December 6, 2018 (ECF 189 and ECF 191, respectively); and on Debtor's Amended Motion for Contempt (ECF 289).  *(ECF 328).*

2. Based on the foregoing, on October 28, 2021 this Court entered an Order on Sanctions and Setting Evidentiary Hearing (ECF 339) which stated that attorneys fees to Michael Brooks' prior law firm were disallowed and the Court quoted its July 17, 2021 order, "[t]he request for attorney fees and reimbursement of costs must include the appropriate detail of services, billing rate, services performed (redacted, as needed to protect attorney-client or work-product communications), and the costs must include any necessary support."

3. Debtor's attorneys provided no details of the aforementioned attorney's fees and this Court property disallowed them.

4. On November 01, 2021, Debtors' attorney filed a Motion for Reconsideration asking the

Court to take "judicial notice" of the records he cannot produce. *See, Paragraph 6 of ECF 340.*

5.  Then Debtor's attorney makes an argument that it is unfair that due to his inability to locate the records that Hammocks Community Association, Inc. and Marglli Gallego are "benefitting". *See Paragraph 8 of ECF 340.*

6.  "Reconsideration of a court's previous order is an extraordinary remedy and, thus, is a power which should be used sparingly." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc., 869 F. Supp. 2d 1336, 1348 (M.D. Fla. 2012) (citing Am. Ass'n of People With Disabilities v. Hood, 278 F. Supp. 2d 1337, 1339 (M.D. Fla. 2003)).*

7.  A movant seeking that a Court reconsider a prior order must 'set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" *Asokan v. Am. Gen. Life Ins. Co., 302 F. Supp. 3d 1303, 1310 (M.D. Fla. 2017).*

8.  Movants have not submitted any new facts or law in support of their motion for reconsideration, they merely stated that this Court should take "judicial notice" of the hours worked by Mr. Brooks' prior firm without presenting any evidence or detail thereof.

9.  Pursuant to Fed. R. Evid. 201 (b), "the court may judicially notice a fact that is not subject to reasonable dispute because it: i) is generally known within the trial court's territorial jurisdiction; or ii) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

10. Evidence that was never presented regarding a law firm's billing records do not fall within those types of evidence allowable under Fed. R. Evid. 201 (b).

WHEREFORE, Respondents Hammocks Community Association and Marglli Gallego

respectfully request that this Court deny Debtors' Motion for Reconsideration.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below via electronic delivery on this 19th day of November 2021:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

David E. Hicks, Esq. on behalf of Creditor JPMorgan Chase Bank, N.A. tbyington@kelleykronenberg.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Steven G. Powrozek, Esq. on behalf of Creditor Wells Fargo Bank, NA. spowrozek@logs.com, LOGSECF@logs.com

Lindsey Savastano on behalf of Creditor Wells Fargo Bank, NA. LSavastano@flwlaw.com, NJackson@flwlaw.com

/s/ Miguel Parlade
Miguel Parlade, Esq.
Fla. Bar. 388068
Attorney for Marglli Gallego and
Hammocks Community Association
P.O. Box 771747
Miami, FL  33177
(305) 235-9040
parladelaw@gmail.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-LMI
IN RE:                                                CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/


**WITNESS LIST FOR REMOTE TRIAL**


**COMES NOW** the Debtor's by and through their undersigned counsel and files this Witness List for Remote Trial:

**A. Witness List:**
   1. Josue Cepero, Debtor
   2. Leticia Cepero, Debtor
   3. Marglli Gallego, President of Association
   4. Dr. Oscar Danilo Pozo
   5. Dr. Marjorie Caro
   6. Frances Pena, LCSW
   7. Jesus Cue, comptroller of the Association
   8. Dr. Henry Storper, M.D
   9. Any witnesses called by The Hammocks Community Association or Marglli Gallego.

**B. Matter(s) on which the remote witness will provide testimony**
   1.Josue Cepero's will testify as to his emotional distress caused from the Hammocks Community Association, Inc., and Marglli Gallego's actions causing the entry of the order on the amended motion for contempt.

   2.Leticia Cepero will testify as to her emotional distress caused from the Hammocks Community Association, Inc., and Marglli Gallego's actions causing the entry of the Order on the amended Motion for Contempt.

   3. Marglli Gallego will testify as to her assets and income.

4. Dr. Oscar Danilo Pozo will testify regarding as to the examination of Leticia Cepero in relation to her emotional distress caused from the Hammocks Community Association, Inc., and Marglli Gallego's actions causing the entry of the order on the amended motion for contempt.

5. Dr. Marjorie Caro will testify as to the examination of Josue Cepero in relation to his emotional distress caused from the Hammocks Community Association, Inc., and Marglli Gallego's actions causing the entry pf the order on the amended motion for contempt.

6. Frances Pena, LCSW, will testify as to the examination of Leticia Cepero in relation to her emotional distress caused from the Hammocks Community Association, Inc., and Marglli Gallego's actions causing the entry of the order on the amended motion for contempt.

7. The person with the most knowledge of the assets and finances of the Hammocks Community Association Inc., as identified in the answers to interrogatories as the Association's comptroller, Jesus Cue, who will testify as to the assets of the Hammocks Community Association Inc., as well as their income.

8. Dr. Henry Storper will testify as to his examination of the Debtor's.

9. Any witnesses called by The Hammocks Community Association, Inc., or Marglli Gallego.  These witnesses, if any, will be called as rebuttal witnesses.

**C. The city, state and country where the remote witness will be located while testifying.**

All Witnesses will be located, if available, at the same location, Miami, FL US.

- Frances Pena, 15160 S.W 136 St, Miami, FL, U.S, 33196.

- Dr. Oscar Danilo Pozo, 11880 S.W 40 St, Miami, FL, U.S, 33175.

- Dr. Marjorie Caro, 5860 W Flagler St, Miami, FL, U.S, 33144.

- Josue Cepero and Leticia Cepero, 2298 S. Dixie Highway, Miami, FL 33126, U.S.
- Marglli Gallego location is unknown.

- Dr. Henry Storper, M.D location is unknown.

- Jesus Cue, Comptroller, location is unknown.

- Any witnesses called by The Hammocks Community Association or Marglli Gallego, location is unknown.

**D. The type of place from which the remote witness will testify.**
- Josue Cepero and Leticia Cepero will be located at Debtors attorney's office.

- Frances Pena, 15160 S.W 136 St, Miami, FL, 33196.

- Dr. Oscar Danilo Pozo, 11880 S.W 40 St, Miami, FL33175.

- Dr. Marjorie Caro, 5860 W Flagler St, Miami, FL 33144

- Marglli Gallego location is unknown.

- Dr. Henry Storper, M.D location is unknown.

- Jesus Cue, Comptroller, location is unknown.

- Any witnesses called by The Hammocks Community Association or Marglli Gallego, location is unknown.

**E. Whether anyone will be in the room with the remote witness during the testimony.**
No one will be in the room during testimony

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the **WITNESS LIST FOR REMOTE TRIAL** was sent to those set forth in the NEF on this 22nd of December, 2021.

Law Office of Michael J. Brooks, Esq
Attorneys for the Debtors
8410 SW 40th Street
Miami, FL 33155
Telephone 954-859-6661

By: /s/    Michael J. Brooks
Michael J. Brooks
Florida Bar No. 434442

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA** www.flsb.uscourts.gov

In re:                                                    Case No. 17-20358-BKC-LMI
                                                          Chapter 13

JOSUE CEPERO and
LETICIA CEPERO
_____/

**EXHIBIT
REGISTER**

Exhibits Submitted on behalf of:

[  ] Plaintiff [  ] Defendant [  ] Debtor [X] Respondents

Date of Hearing/Trial: December 30, 2021

Type of Hearing/Trial: Evidentiary hearing on Emotional Distress/Punitive Damages (ECF 339)

SUBMITTED BY:  Miguel Parlade, Esquire

      P.O. Box 771747

      Miami, FL  33177

      (Tel.) 305-235-9040

| Exhibit Number/Letter | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| 1 | Debtor's Answers to Interrogatories | | | |
| 2 | Any Exhibits introduced by Debtors | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05/20/2020)                                                      Page | 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:

JOSUE CEPERO and                          CASE NO. 17-20358-LMI
LETICIA CEPERO                            CHAPTER 13

             Debtors.                    AMENDED ANSWERS TO THIRD
                                          SET OF  INTERROGATORIES

_____/

PROPOUNDING PARTY: HAMMOCKS COMMUNITY ASSOCIATION, INC.

RESPONDING PARTY: JOSUE AND LETICIA CEPERO

      Pursuant to Fed. R. Civ. P. 33, 34, and 36, made applicable to this proceeding pursuant to

Rules 7033,7034, 7036 and 9014 of the Fed. R. Bankr. P., and the Order on Sanctions and

Setting Further Evidentiary Hearing (D.E 339); Hammocks Community Association Inc.

(hereafter "Association") hereby requests that Debtors, Josue Cepero and Leticia Cepero,

prepare and file answers, separately and fully, in writing and under oath, to these discovery

requests and serve a copy of such answers upon attorneys for the Association by November 18,

2021 as instructed by paragraph iii of this Court's Order on Sanctions and Setting Further

Evidentiary Hearing.

**<u>DEFINITIONS</u>**

    1.  As used herein, please note the terms "you", "your', "Association" refers

to Hammocks Community Association Inc. or any afflicted or other individual or company

owned or in partnership with the Association and collectively.

    2.  As used herein, the term "person" means any natural person, individual,

proprietorship, corporation, association, organization, joint venture, firm, other business

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

enterprise, government body, group of natural persons, or other entity.

3.   As used herein, please note the term "Association" refers to Hammocks Community Association, Inc.

4.   As used herein, please note the term "Heron" refers to Heron at the Hammocks Condominium Association, Inc.

5.   As used herein, please note the term "Motion for Contempt" refers to "Debtor's Motion for Contempt against Hammocks Community Association, Inc., and its President, Marglli Gallego, for failure to abide by this Court's Agreed Order dated December 3, 2018 (ECF 191) on the Debtor's Amended Motion for Contempt against Hammocks Community Association, Inc., and it's President, Marglli Gallego and request an evidentiary hearing" (D.E 199).

6.   As used herein, the term "person" means any natural person, individual, proprietorship, partnership, corporations, association, organization, joint venture, firm, other business enterprise, government body, group of natural persons, or other entity.

7.   As used herein, the term "relates to" or relating to" means referring to, concerning, documenting, responding to, containing, regarding, discussing, documenting, describing, reflecting, analyzing, constituting, disclosing, employing, defining, stating, explaining, summarizing, or in any way pertaining to.

8.   As used herein, the terms "and" as well as "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of each of these requests any information which otherwise, might be construed to be outside the scope of any request.

9.   The use of the singular form of any word includes the plural, and the use of the plural includes the singular.

IN RE: JOSUE CEPERO AND LETICIA CEPERO
BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)

## <u>INSTRUCTIONS</u>

1.    These requests are directed towards all information that is available to you, including information contained in your records and documents or within information and documents within your custody and/ or control. [All answers to each request for admission shall specifically admit or deny each individual statement or set forth in detail in reasons why the statement cannot be admitted or denied.] Not in ours.

2.    Pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, these interrogatories are continuing so as to require the filling of subsequent answers promptly in the event that answering party, by or through any of their agents, counsel or other representatives, learn additional facts relevant to answers not set forth in their answers to these Interrogatories or discover that any information given in an answer or answers is erroneous.

3.    Each interrogatory is to be answered separately and as completely as possible. The veracity (truth) of the answers must be attested to by the person answering. The fact that investigation is continuing or that discovery is not complete does not excuse failure to answer each interrogatory as fully as possible. The omission of any name, fact, or other item of information from an answer shall be deemed a representation that such name, fact, or other item is not known to the answering party, his agents, counsel, or other representatives at the time the answers to these Interrogatories are served.

4.    Where an Interrogatory contains a general question or questions, followed by a specific question or questions, the specific question or questions are to be read and interpreted as requesting additional information, not as limiting the general question or questions.

5.    With respect to each Interrogatory, identify each and every document prepared by, or in

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

the possession, custody, or control of you or any of your officers, agents, or employees that relates to or refers to the subject matter of the Interrogatory in questions.

6.   Whenever information is requested in one of the following Interrogatories or subparts thereof that you previously furnished in answer to another Interrogatory herein, such information need not be restated. It will be sufficient for you to identify the previous answer containing the information requested.

7.   Whenever an Interrogatory calls for information that is not available to you in the form requested but which is available in another form or can be obtained at least in part from other date in your possession, so state and either (i) supply the information requested in the form in which it is available or (ii) supply data from which the information requested can be obtained.

8.   If you claim a privilege with respect to information pertaining to any document that you are asked to identify or describe in these Interrogatories, furnish a list signed by counsel giving the following information with respect to each such document:

a.   The title of the document;

b.   The nature of the document. e.g., interoffice memorandum, correspondence, report, etc.

c.   The identity of the sender and the identity of the recipient(s) of the document;

d.   A statement of basis upon which the privilege is claimed and a summary of the subject matter of the document in sufficient detail to permit the Court to rule on the propriety of the claim of privilege; and

e.   The paragraph number of the Interrogatory to which the document is responsive or otherwise pertains.

9.   Interrogatories calling for numerical or chronological information shall be deemed, to the

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

extent that precise figures or dates are not known, to call for estimates. In each instance that an estimate is given, identify it as such together with the source of information upon which you base the estimate.

## ANSWERS TO INTERROGATORIES

1. What is your name and address of the person answering these interrogatories, and if applicable, the person's official position or relationship with the party to whom the interrogatories are directed?

   - Josue Cepero and Leticia Cepero, 20205 S.W 14th Ct, Miami, FL 33189.

2. Identify each and every person that you may call or intend to call as a witness to testify concerning the matters relating to your claim for emotional distress and punitive damages.

   - Frances Pena, LCSW.

   - Dr. Marjorie Caro, Psychiatrist.

   - Oscar Danilo Pozo, LCSW.

   - Josue Cepero, and Leticia Cepero.

   - Marglli Gallego

   - The person at the Hammocks Association who has the most knowledge of the finances of the Hammocks Association.

3. For each witness identified in Interrogatory No. 2, identify:

a) His/ her current occupation, address, and telephone number;

   - Frances Pena, LCSW, 15160 S.W 136 St, Miami, FL, 33196, 305-975-4049.

   - Dr. Oscar Danilo Pozo, Psychiatrist,11880 S.W 40 St, Miami, FL33175, 305-554-0808.

   - Dr. Marjorie Caro, Psychiatrist, 5860 W Flagler St, Miami, FL 33144, 305-264-7808.

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

- Josue Cepero, disabled, and Leticia Cepero, unemployed, 20205 S.W 14 Ct, Miami, FL 33189.

b) The subject matter upon which he/she is expected to testify; and

- Dr. Marjorie Caro is expected to testify that Josue Cepero has significant anxiety due to the financial stress that caused him to file bankruptcy and because of the problems he has been having with his wife due to struggles because of the conflict with the Association and Marglli Gallego.

- Frances Pena, LCSW, is expected to testify that Leticia Cepero has major anxiety and depression due to her conflict with the Association and their representatives.

- Oscar Danilo Pozo is expected to testify that Leticia Cepero is under enormous stress due to the conflict with the Association and Marglli Gallego. Oscar Danilo Pozo will discuss Ms. Cepero's disorders and the medication she is taking.

c) The relationship of that person to the debtor(s).

- Medical professionals.

4. Describe in detail how Josue Cepero suffered significant emotional distress as a result of the incident that occurred on May 15, 2019, as alleged in the Debtor's Motion for Contempt.

- Josue Cepero saw Dr. Marjorie Caro, a psychiatrist, starting on October 3, 2018. He sought help for financial issues and intimacy problems with his wife. Although Mr. Cepero saw Dr. Caro six times; The Association was only mentioned in the medical records at their last appointment on February 25, 2020. Dr. Caro no longer accepted Mr. Cepero insurance so he stopped going to see Dr. Caro on February 25, 2020.

5. Describe in detail how Leticia Cepero suffered significant emotional distress as a result

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

of the incident that occurred on May 15, 2019, as alleged in the Debtor's Motion for

Contempt.

- Leticia Cepero saw Oscar Danilo Pozo, a psychiatrist, starting on June 23, 2020. Dr.

  Pozo determined at that time Ms. Cepero was suffering from acute stress reaction,

  major depression disorder, recurrent sever without psychotic features and general

  anxiety disorder. He prescribed several medications for these symptoms and her sleep

  disorder. She was diagnosed with Covid-19 in April 2020 which added to her stress.

  Ms. Cepero was again seen August 3, 2021 and was diagnosed with PTSD,

  unspecified anxiety disorder, unspecified and major depressive disorder, unspecified.

  The prescriptions were refilled.

6. Describe in detail how Leticia Cepero suffered significant emotional distress as a result

   of the incident that occurred when Marglli Gallego filed a lawsuit against Leticia Cepero

   during November 2020.

- Increase in anxiety but spoke with Attorney Michael Brooks and felt relieved.

7. List the names and business addresses of each physician, psychologist and/or psychiatrist

   who has treated or examined you, and each medical facility where you have received any

   treatment or examination for the injuries you claim to have suffered as a result of the

   emotional distress described in Interrogatory number 4; and state as to each the date of

   treatment or examination and the injury or condition for which were examined or treated.

- Dr. Marjorie Caro, psychiatrist, 5860 W Flagler St, Miami, FL 33144 treated Josue

  Cepero the following dates: July 30, 2018, August 27, 2019, October 3, 2018,

  October 4, 2019, November 12, 2019, February 25, 2020.

8. List the names and business addresses of each physician, psychologist and/or psychiatrist

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

who has treated or examined you, and each medical facility where you have received any

treatment or examination for the injuries you claim to have suffered as a result of the

emotional distress described in Interrogatory number 5; and state as to each the date of

treatment or examination and the injury or condition for which were examined or treated.

- Jillian Brito, ARNP, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on March 8, 2017.

- Indira Toriac, ARNP, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on March 29, 2017.

- Reinaldo Hernandez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on April 20, 2017.

- Beatriz Ruiz, ARNP, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on May 8, 2017.

- Emelio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on June 13, 2017.

- Emelio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on July 14, 2017.

- Emilio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on September 20, 2017.

- Emelio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on November 16, 2017.

- Emilio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on April 3, 2019.

- Emelio Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on November 9, 2019.

- Reinaldo Hernandez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on April 8, 2020.

- Reinaldo Hernandez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on April 23, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on May 25, 2020.

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

- Oscar Danilo Pozo, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on June 23, 2020.

- Daniela Ibarra, APRN, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on August 3, 2020.

- Belkis Aguila, APRN, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on October 15, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on November 2, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on November 3, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on November 6, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on November 10, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on December 6, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on December 19, 2020.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on January 2, 2021.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on January 23, 2021.

- Oscar Danilo Poszo, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on February 19, 2021.

- Reinaldo Hernandez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on February 24, 2021.

- Aimee Gonzalez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on April 21, 2021.

- Belkis Aguila, APRN, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on May 6, 2021.

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on May 22, 2021.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on June 15, 2021.

- Frances Pena, LCSW, 15160 SW 136 ST, Miami, FL 33196 treated Leticia on July 23, 2021.

- Oscar Danilo Pozo, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on August 3, 2021.

- Diana Arguedas, APRN, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL 33183 treated Leticia Cepero on October 29, 2021.

9. List the names and business addresses of each physician, psychologist and/or psychiatrist who has treated or examined you, and each medical facility where you have received any treatment or examination for the injuries you claim to have suffered as a result of the emotional distress described in Interrogatory number 6; and state as to each the date of treatment or examination and the injury or condition for which were examined or treated.

- None.

10. List the names and business addresses of all physician, psychiatrists, psychologists, medical facilities, or other health care providers by whom or at which Leticia Cepero has been examined or treated from January 1, 2015, to the present; and state as to each the dates of treatment.

- Dr. George Sanchez. 7500 S.W 87th Ave, #200, Miami, FL 33173.

- Dr. Daniel Gelrud, 9408 S.W 87th Ave, #200, Miami, FL 33176, (305)-913-0666.

- Dr. Abilio Cuello, 8950 N. Kendall Dr., #504, Miami, FL 33176, (305)-274-2030.

- Reinaldo Hernandez, MD, Sanitas Medical Center, 7135 S.W 117th Ave, Miami, FL (844)-665-4827.

11. List the names and business addresses of each physician, psychiatrists, psychologists,

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

medical facilities, or other health care providers by whom or at which Josue Cepero has

been examined or treated from January 1, 2015, to the present; and state as to each the

dates of treatment.

- Dr. Gabriel Suarez, 15955 S.W 96 St, #200, Miami, Florida 33196, (786)-467-3140.

- Dr. Rubin Gonzalez, 11780 S.W 89th St, Miami, FL 33186, 305-260-9803.


12.  List the names and addresses of all persons who believed or known by you, your agents,

or your attorneys to have any knowledge your claim for emotional distress.

- Josue Cepero and Leticia Cepero, 20205 S.W 14th Ct, Miami, FL 33189.

- Josue Cepero, Jr., 20205 S.W 14th Ct, Miami, FL 33189.

13. Do you intend to call any expert witnesses at the trial of this case? If so, state as to each

such witness the name and business address of the witness, the witness's qualifications as

an expert, the subject matter upon which the witness is expected to testify, the substance

of the facts and opinion to which the witness is expected to testify and a summary of the

grounds for each opinion.

- Dr. Frances Pena, LCSW, 15160 S.W 136 St, Miami, FL 33196, 305-975-4049

- Dr. Marjorie Caro, Doctor, 5860 W Flagler St, Miami, FL 33144, 305-264-7808.

- Oscar Danilo Pozo, LCSW, 15160 SW 136 St, Miami, FL 33196, 305-554-0808.

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

Dated: November 19, 2021

_____
**Josue Cepero**

_____
**Leticia Cepero**

LAW OFFICES OF MICHAEL J. BROOKS, ESQ
Attorney for the Debtors
8410 S.W 40th St
Miami, Florida 33155
Telephone: (954)859-6661

By:_____/s/_____
Michael J. Brooks, ESQ
FL BAR NO.:434442

**<u>AFFIDAVIT</u>**

STATE OF FLORIDA            )
COUNTY OF MIAMI-DADE    )

I HERBY CERTIFY that the foregoing AFFIDAVIT was acknowledged before this,_____ day of _____, 2021, ( Josue Cepero and Leticia Cepero,) who is personally known to me or who has produced _____, as identification and who duly did take an oath.

_____
NOTARY PUBLIC

My Commission Expire:

**IN RE: JOSUE CEPERO AND LETICIA CEPERO**
**BANKTUPTCY CASE NO. 17-20358-LMI (CHAPTER 13)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                          Case Number: 17-20358-LMI
                                                Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____ Debtor(s) _____/

**HAMMOCKS COMMUNITY ASSOCIATION, INC. and MARGLLI GALLEGO'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR REHEARING**
**ON ORDER ON DEBTOR'S MOTION FOR RECONSIDERATION (ECF 354)**

Respondents, Hammocks Community Association, Inc. and Marglli Gallego, hereby file

their Memorandum in Opposition to Defendant's Motion for Rehearing on Order on Debtor's

Motion for Reconsideration and in support thereof state:

*1.* On December 9, 2021 this Court denied Debtors' Motion for Reconsideration on the

issue of attorney's fees incurred prior to the Debtors obtaining their current counsel (ECF

351).

2. On December 13, 2021, Debtors filed a Motion for Rehearing on Order on Debtor's

Motion for Reconsideration (ECF 354).

3. While ordinarily a motion for rehearing would not call for a response unless ordered by

the Court, Fed. R. Bankr. P. 8022, the motion states that the Debtors proceeding under "Rule

60".

4. Fed. R. Civ. P. 60 states that for relief from a judgment or order a moving party must

demonstrate, "mistake, inadvertence, surprise, or excusable neglect;  newly discovered

evidence that, with reasonable diligence, could not have been discovered in time to move for

a new trial under Rule 59(b); fraud; misrepresentation, or misconduct by an opposing party;

the judgment is void; the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or any other reason that justifies relief."

5.      Debtors' motion fails to allege the existence of any of the requirements of Fed. R. Civ. P. 60 to justify relief from a judgment or order.

6.      In fact, Debtors' attorney states that no new evidence exists and that no evidence of the prior work can be found and now wishes to estimate the work performed.  (See, Para. 2 of ECF 354)("The timesheets cannot be found and therefore, the undersigned will describe the work performed below").

7.      This is insufficient to satisfy the requirements of Fed. R. Civ. P. 60 and for this Court to grant the relief requested.

        WHEREFORE, Respondents Hammocks Community Association and Marglli Gallego respectfully request that this Court deny Debtors' Motion for Rehearing.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below via electronic delivery on this 24th day of December 2021:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

                                    /s/ Miguel Parlade
                                    Miguel Parlade, Esq.
                                    Fla. Bar. 388068
                                    Attorney for Marglli Gallego and
                                    Hammocks Community Association
                                    P.O. Box 771747
                                    Miami, FL  33177
                                    (305) 235-9040
                                    parladelaw@gmail.com

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                  Case No. 17-20358-LMI
                                                        Chapter 13

Josue Cepero and Leticia Cepero

                                                        Adv. No.

     Plaintiff

     vs.

     Defendant
_____/

## SUPPLEMENTAL EXHIBIT

Exhibits Submitted on behalf of:   ☐ Plaintiff   ☐ Defendant   ☒ Debtor   ☐ Other: _____

Submitted By:   Michael J. Brooks, Esq, 8410 S.W 40th Street, Miami, FL33155, 954-859-6661
                (name, address, and phone number)

Date of Hearing/Trial:   December 30, 2021   Type of Hearing/Trial:   Trial

| Exhibit Number | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| 1 | The shooting recording. | | | |
| 2 | The hedge getting pulled out recording. | | | |
| 3 | A lady knocking on the door and leaving. | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05Josue Cepero and Leticia Cepero /20/2020)

**[EXHIBIT REGISTER CONTINUATION PAGE]**

| Exhibit Number | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05/20/2020)

# PLEASE CLICK TO VIEW SUPPLEMENTAL EXHIBIT 1

# PLEASE CLICK TO VIEW SUPPLEMENTAL EXHIBIT 2

# PLEASE CLICK TO VIEW SUPPLEMENTAL EXHIBIT 3

1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION

3                          Case No.:  17-20358-LMI
                           Chapter 13
4    In Re:

5    JOSUE CEPERO and LETECIA CEPERO,

6         Debtor.
     _____/

7

8

9                     VOLUME IV

10

            ECF # 335, 354, 378, 380

11

12              December 30, 2021

13          The above-entitled cause came on for a

14   Zoom hearing before the Honorable LAUREL M. ISICOFF,

15   Chief Judge, in the UNITED STATES BANKRUPTCY COURT,

16   in and for the SOUTHERN DISTRICT OF FLORIDA,

17   remotely via Zoom Video Conference, on Thursday,

18   December 30, 2021, commencing at or about 9:30 a.m.,

19   and the following proceedings were had:

20

21

22

23          Transcribed from a digital recording by:
                 Helayne Wills, Court Reporter

24

25

Page 306

```
1    APPEARANCES VIA ZOOM VIDEO CONFERENCE:

2         BANKRUPTCY NOW, by
          MICHAEL J. BROOKS, ESQ.,
3         and
          LAW OFFICE OF LOUIS ARSLANIAN, by
4         LOUIS ARSLANIAN, ESQ.,
          and
5         ACE LAW, P.A., by
          ANNETTE E. ESCOBAR, ESQ.
6         on behalf of the Debtors

7
          LAW OFFICE OF MIGUEL PARLADE, P.A., by
8         MIGUEL F. PARLADE, ESQ.,
          on behalf of Hammocks Community Association and
9         Marglli Gallego

10
          ALFARO & FERNANDEZ, P.A., by
11        ELBERT R. ALFERO, ESQ.,
          on behalf of Monica Ghilardi

12
13        ALSO PRESENT VIA ZOOM VIDEO CONFERENCE:
          ECRO:   Electronic Court Reporting Operator
14        LETICIA CEPERO
          JOSUE CEPERO
15        JESUS CUE
          HENRY STORPER
16        MARIO BEOVIDES, Interpreter
          LUCILLE GRENET, Interpreter
17
18
19
20
21
22
23
24
25
```

Page 307

1                        INDEX
2

3

4   WITNESSES              DIRECT      CROSS      RED.
5   JESUS CUE
      (By Mr. Arslanian)     334                   360
6     (By Mr. Parlade)                  353
7   LETECIA CEPERO
      (By Mr. Arslanian)     368
8     (By Mr. Parlade)                  386
9   HENRY STORPER
      (By Mr. Parlade)       440
10    (By Mr. Arslanian)                463
11  JOSUE CEPERO
      (By Mr. Arslanian)     487
12    (By Mr. Parlade)                  490
13                       EXHIBITS
14

    DEBTORS' IN EVIDENCE                         PAGE
15   No.  1                                      330
     No.  2                                      372
16   No.  3                                      473
     No.  4                                      373
17   No.  6                                      319
     No.  7                                      351
18   No.  8                                      341
     No.  9                                      343
19   No. 11                                      346
     No. 16                                      482
20   No. 17                                      482
21

22  ASSOCIATION'S IN EVIDENCE
     No. 1                                       320
23

24

25

1            THE COURT:  We're going to start the

2    hearing now.  Just a few reminders.  One, please

3    keep your phones -- your videos on mute when you are

4    not speaking.  And when you are speaking, please

5    remember to unmute.

6            Please also remember that this is a

7    recorded proceeding.  Any recording by anyone other

8    than the Court is a violation of Florida law.  It is

9    a felony, and in addition, will subject the violator

10   to sanctions.

11           I am hearing an echo, so please double

12   check to make sure you do not have electrical

13   devices on.  Mr. Cue and Mr. Parlade, I see you are

14   not muted, so please mute yourself.

15           Please remember, do not interrupt each

16   other.  I will give everyone an opportunity to

17   respond.  So we will take turns.  When it is time

18   for Mr. and Mrs. Cepero and other witnesses to

19   testify, we will go over the rules regarding

20   objections, et cetera.

21           So with that we'll get started, and I will

22   take appearances.  We'll start with Mr. Brooks,

23   although that doesn't look like Mr. Brooks.  Go

24   ahead and unmute and make your appearance.

25           MR. ARSLANIAN:  Good morning, Your Honor.

1    May it please the Court.  I'm Louis Arslanian on

2    behalf of the debtors, Josue and Leticia Cepero.

3              THE COURT:  All right.  Thank you

4    Mr. Arslanian.  You definitely look more like

5    yourself than like Mr. Brooks.

6              Mr. Parlade, please make your appearance.

7              MR. PARLADE:  Good morning, Your Honor.

8    Miguel Parlade on behalf of the respondents,

9    Hammocks Community Association and Marglli Gallego.

10             THE COURT:  All right.  Is there anyone

11   else who wishes to make an appearance?

12             Mr. Alfaro, go ahead and make your

13   appearance.

14             MR. ALFARO:  Yes.  Good morning, Your

15   Honor.  Elbert Alfaro on behalf of the association,

16   on behalf of Monica Ghilardi.  She received a

17   subpoena yesterday.  She's the president of the

18   board.  However, she has COVID.

19             THE COURT:  Okay.

20             MS. ESCOBAR:  Good morning, Your Honor.

21   Annette Escobar on behalf of -- I'm counsel for the

22   Hammocks association and Marglli Gallego.

23             THE COURT:  Okay.  Thank you, Ms. Escobar.

24             Anyone else wish to make an appearance?

25             MR. CUE:  Good morning, Your Honor.  My

Page 310

1   name is Jesus Cue.  I'm the controller of Hammocks

2   Community Association.

3           THE COURT:  Okay.  Thank you very much.

4           All right.  We're here this morning on the

5   evidentiary hearing on the debtor's statement of

6   damages.  We also have a few other motions set,

7   including motions in limine, motion to strike expert

8   report, and the motion to reconsider.

9           So, Mr. Arslanian, did you want to make

10  any preliminary comments before I turn to

11  Mr. Parlade for his pre-trial motions?

12          MR. ARSLANIAN:  Not at this time.  I

13  assume that we're going to do those three motions

14  before we start.

15          THE COURT:  Yes.

16          MR. ARSLANIAN:  Okay.

17          THE COURT:  All right.  Mr. Parlade, let's

18  go first to your motion in limine.  You definitely

19  need to unmute.

20          MR. PARLADE:  Sorry about that.  I was so

21  looking forward to a live hearing today, and then

22  everything changed and we're back -- I guess to this

23  point now.

24          In any case, this is the respondents'

25  motion in limine.  I have cited various matters in

1    the motion in limine and the motion to strike expert

2    witnesses.  I believe many of these matters have

3    been resolved.  I have spoken to Mr. Brooks

4    yesterday, and I believe we have an agreement.

5              They are not offering any expert testimony

6    or any testimony by any of the physicians listed, so

7    I believe that matter has been disposed of.

8              MR. ARSLANIAN:  That is correct.

9              THE COURT:  Okay.  Thank you,

10   Mr. Arslanian, but again, I appreciate your

11   interjection, but I would have asked you after

12   Mr. Parlade was done, because the problem is, as

13   I've said before, the recording can't pick up two

14   people speaking at once.  But thank you for your

15   affirmation.  I appreciate your enthusiasm.

16             Okay.  Mr. Parlade, please continue.  So

17   no expert testimony is being offered.  That might

18   explain why I don't have any doctors on the Zoom.

19             What else did you want to tell me,

20   Mr. Parlade, before I turn to Mr. Arslanian for

21   anything else he would wish to say with respect to

22   your presentation?

23             MR. PARLADE:  The only thing we also wish

24   to limit, Your Honor, is no material events or

25   materials.  This is a hearing limited to

Page 312

```
 1   determination of damages for emotional distress and

 2   punitive damages.  That is the limitation placed by

 3   this Court in its trial order.

 4            There is what was called a tree letter

 5   that was listed as an exhibit to the debtor's

 6   exhibit list.  I've spoken to Mr. Arslanian this

 7   morning, and I believe he also agreed that that

 8   exhibit should be stricken.

 9            Lastly, we respectfully request that this

10   Court exclude any character evidence or evidence of

11   other times or acts as prohibited by the Federal

12   Rules of Evidence.

13            THE COURT:  All right.  Well, I'm going to

14   ask Mr. Arslanian in a minute regarding the tree

15   letter exhibit.

16            With respect to the final point,

17   Mr. Parlade, obviously, this is not a criminal

18   trial, and so the rules regarding prior acts are

19   somewhat different under the Federal Rules of

20   Evidence.  But if and as that testimony or that

21   evidence is presented, I will consider that

22   objection in time.  In other words, it's more

23   difficult to react to that objection in a vacuum.

24            MR. PARLADE:  Yes, Your Honor.

25            THE COURT:  So we'll do that as we get to
```

1    each thing.

2              So, Mr. Arslanian, I'll ask you to advise

3    with respect to the tree letter exhibit, if you have

4    anything to add, or you agree with Mr. Parlade's

5    understanding of your -- with respect to that

6    exhibit.

7              MR. ARSLANIAN:  What Mr. Parlade said is

8    correct.  Mr. Brooks -- that's been agreed to, yes.

9    That's being dropped.

10             THE COURT:  Okay.  So does that resolve,

11   Mr. Parlade, your entire motion in limine?

12             MR. PARLADE:  Yes, Your Honor.  Also,

13   there's an agreement between counsel on the motion

14   to strike the expert witnesses.

15             THE COURT:  Okay.  All right.  Then I'm

16   going to ask you to prepare orders with respect to

17   each of those motions consistent with your

18   presentation.  Share them with Mr. Arslanian before

19   you upload them.

20             MR. PARLADE:  Yes, Judge.

21             THE COURT:  Hold on.  I'm writing my

22   notes.

23             Just so that you gentlemen -- ladies and

24   gentlemen -- so nice to have -- never mind.  I'm not

25   supposed to make comments regarding attorneys, but

Page 314

1   it's always nice to have another woman.

2            In any event, I'm here in the courtroom by

3   itself.  My courtroom deputy is at home.  My law

4   clerk is at home.  I came in in case there was any

5   technical difficulties, just to make sure.  But it's

6   true.  I also was looking forward to seeing you all

7   in person, but unfortunately, the present

8   circumstances make it unsafe.

9            My son got COVID last week.  Now he's

10  fine.  He tested negative yesterday.  He'd been

11  fully vaccinated.  He wasn't very sick, but, you

12  know, we just can't take chances, because all of us

13  have people in our circle that are either

14  unvaccinated, because they can't be, young children,

15  grandchildren, or older people who are

16  immunocompromised, and we don't want to take any

17  chances with them.

18            All right.  So, Mr. Arslanian, the last

19  motion before we get to the trial is the motion to

20  reconsider, and I will save you some time and just

21  let you know that I reviewed the motion to

22  reconsider the motion to reconsider, which frankly,

23  had I seen it before it was set for hearing, I would

24  have denied it without a hearing.  I haven't altered

25  my reasons for denying the motion to reconsider, and

Page 315

1    there's nothing in the motion to reconsider the

2    motion to reconsider that would change my mind.

3              Having said that, if and at such time as

4    that ruling is appealable, then I'm sure that you

5    will include that in the appeal.

6              So, Mr. Arslanian, did you have any

7    questions with respect to that?

8              MR. ARSLANIAN:  I don't have any

9    questions.  If I could just briefly state something

10   for the record on that.

11             THE COURT:  Go ahead.

12             MR. ARSLANIAN:  My position is that if

13   Mr. Brooks intentionally not kept contemporaneous

14   records, he could still submit reconstructed

15   records, and under the circumstances, where he -- I

16   think that the order denying those fees said that he

17   could have requested those records from his prior

18   law firm.

19             The Rule 60 basis is that excusable

20   neglect in that, if he did fail to do that, it was a

21   futile act anyway, because he finally did do it and

22   those records were gone.  So I think that the

23   association is getting a windfall, where I believe

24   in the law they have a case that basically says that

25   reconstructed records are permissible.

1          It's 710 So.2d 166, Cohen & Cohen, P.A.

2    versus Angrand.  It's cited by two or three other

3    courts, including the Middle District of Florida,

4    and basically holds that where attorneys have not

5    kept contemporaneous time records, it is permissible

6    for reconstruction of time being prepared.

7          Mr. Brooks did not do that.  He did keep

8    those records.  It's just that his prior law firm

9    either misplaced them, intentionally or whatever.

10   They're lost.  That's the reason why these fees are

11   being denied, and I believe that there is a legal

12   basis to award those fees, and I believe that Rule

13   60, we have -- there is excusable neglect.  Even if

14   there wasn't excusable neglect, he's allowed to

15   reconstruct the record.

16          THE COURT:  I don't want to spend a lot of

17   time on this, because I want to get to the

18   evidentiary hearing, but I want to make the

19   following observation:  I don't disagree with

20   anything that you just said, Mr. Arslanian, with

21   respect to the ability to reconstruct records.  I

22   don't disagree with that.

23          Part of the basis of my ruling last time

24   was that Mr. Brooks did not make any effort to do

25   that at all when he submitted his original

1   submission, regardless of the fact that I had made

2   very clear what was required.  That was the basis

3   for the denial of the original motion to reconsider,

4   that no effort was made to comply with my express

5   instructions at all, not even on the motion to

6   reconsider.

7            So now on the motion to reconsider the

8   motion to reconsider, that's the first time and that

9   was the basis.  So I don't disagree with you,

10  Mr. Arslanian, but I'm not persuaded by the

11  argument.  Having said that, let's see how today

12  goes, okay?

13           So with respect to the tree letter --

14  let's go to the evidence.  And the Court will take

15  care of that order.

16           With respect to the tree letter, which is

17  Exhibit 5, that's not going to be introduced.  So we

18  have that.

19           So now, Mr. Arslanian, let's go to the

20  balance of your exhibits, 1 through 12, minus 5.

21  Have you and Mr. Parlade come to any agreement with

22  respect to the admissibility of any of these

23  exhibits?

24           MR. ARSLANIAN:  Yes, we have.  First of

25  all, Number 12 is also withdrawn.

1          THE COURT:  Okay.  So that's not

2    introduced.  Okay.

3          MR. ARSLANIAN:  And I believe that Number

4    6, there is no objection, the proposed budget of the

5    Hammocks Community Association, and I believe that

6    there is no objection is to 2, 3 and 4.

7          THE COURT:  Okay.

8          MR. ARSLANIAN:  We have for 2 and 4 -- for

9    2 and 4 we have the records.  We have the custodian

10   of records affidavit from each of the doctors, and

11   we have the records attached.  We did a notice of

12   intent to rely.

13         THE COURT:  Okay.  So you have -- the

14   question was just whether you and Mr. Parlade had an

15   express agreement with respect to the admission of

16   any of these exhibits.  So you're saying that you

17   and Mr. Parlade have expressly agreed that 2, 3, 4

18   and 6 are admissible?

19         MR. ARSLANIAN:  That is my understanding.

20         MR. PARLADE:  That's incorrect.  Your

21   Honor, I --

22         THE COURT:  Well, that's fine.  We don't

23   have to go any further than that right now.

24         So, Mr. Parlade, let me skip over you for

25   a minute then.

1          MR. PARLADE:  Thank you.

2          THE COURT:  Are there any exhibits that

3    are proposed by the plaintiff to which you do not

4    object?

5          MR. PARLADE:  Your Honor, we don't object

6    to admitting Number 6, which is the Hammocks

7    Community proposed budget.

8          THE COURT:  Okay.  So that will be

9    admitted.

10          (Thereupon, Debtors' Exhibit No. 6 was

11       admitted into evidence.)

12          THE COURT:  What else?

13          MR. PARLADE:  And that is it, Your Honor.

14    I've spoken to counsel in reference to 2, 3 and 4,

15    and I said we got two declarations as to business

16    records, but we still would require and request that

17    counsel lay the foundation for the introduction of

18    these records, as they are more hearsay, unless

19    there's an exception, and that must be demonstrated

20    by counsel laying the foundation.

21          THE COURT:  Okay.  Let's go to your

22    exhibits -- your one exhibit.  It's the debtor's

23    answers to interrogatories.

24          Mr. Arslanian, do you have an objection to

25    the admission of Exhibit 1?

1          MR. ARSLANIAN:  I do not.

2          THE COURT:  Okay.  So Exhibit 1 for the

3    association will be admitted.

4          (Thereupon, Association's Exhibit No. 1

5       was admitted into evidence.)

6          THE COURT:  Okay.  Let's go back now to

7    your supplemental exhibit.  Mr. Arslanian, I could

8    not open any of the exhibits.  So I guess they're

9    video exhibits, but I could not open any of them on

10   the docket.

11         So, Mr. Parlade, do you have an objection

12   to the admission of any of 1, 2 and 3?

13         MR. PARLADE:  Yes, Judge.  If you can't

14   open it, they can't be introduced as an exhibit.  I

15   initially talked to Mr. Brooks when they were

16   uploaded.  I told him I couldn't open them either.

17   He sent me three videos via e-mail.  I don't know if

18   they're the same, but I would request that they at

19   least be executable by the Court, and be able to be

20   played to be presented as an exhibit.

21         THE COURT:  Okay.  We'll get back to that

22   in a minute.  I'm going to mark these --

23   Mr. Arslanian, on your supplemental exhibit, Exhibit

24   1 is going to be renumbered Exhibit 13, Exhibit 2 is

25   going to be renumbered Exhibit 14, and Number 3 will

1    be remarked -- renumbered Exhibit 15.  Because you

2    can't have two Exhibit 1s, two Exhibit 2s, two

3    Exhibit 3s.

4              As far as the introduction of the videos,

5    we'll take them as they come, in terms of the screen

6    share, because I don't know how else we're going to

7    be able to do that, and then you'll have to hand

8    deliver with a courier or something.  Because the

9    clerk's office is open, the actual video, since

10   Mr. Parlade did have a chance to see them in advance

11   of the trial, and I don't need to.

12             All right.  So, Mr. Arslanian, let's go

13   back, and you can begin the presentation of your

14   case.  I don't know if you have an opening

15   statement, and then we'll get to the presentation of

16   your evidence.  Okay?

17             MR. ARSLANIAN:  Yes.  Before I begin my

18   presentation, my understanding is that there's two

19   IME reports that are being submitted into evidence,

20   as well.

21             THE COURT:  I'm sorry.  Two what?

22             MR. ARSLANIAN:  IME reports.

23             THE COURT:  What are IME reports?

24             MR. ARSLANIAN:  Independent medical

25   examination reports were provided to me.

1            MR. PARLADE:  I believe he's referring to

2    the reports prepared by my expert pursuant to

3    Federal Rules of Evidence 26.  As you know, the

4    disclosure of the experts, their opinions and the

5    facts which the expert bases their opinion must be

6    disclosed prior to testimony of the expert.

7            My expert is on standby.  As this Court is

8    aware, experts, unfortunately, are paid on an hourly

9    basis.  So he's on standby and he will be

10   testifying.  Those reports are inadmissible hearsay

11   in terms of federal law, and he's going to give his

12   verbal testimony today.

13           THE COURT:  Okay.  Well, they're not

14   inadmissible hearsay.  They are hearsay, and they're

15   admissible if no party objects.  But they're not

16   listed as exhibits on your register.

17           MR. PARLADE:  Correct.

18           THE COURT:  Okay.

19           MR. PARLADE:  As a matter of housekeeping,

20   Your Honor, I need to tell the expert when he will

21   be testifying, so he's not on standby for half a

22   day.  Would it be okay with this Court and opposing

23   counsel if we set a time for him, and possibly see

24   him out of order so we can have that testimony

25   heard?

1            THE COURT:  Mr. Arslanian?

2            MR. ARSLANIAN:  I don't have a problem.

3   How long are we going today?  I don't even --

4            THE COURT:  We're going as long as it

5   takes, but if we're not done before lunchtime, then

6   we'll have to take a break, because I have to issue

7   an oral ruling after lunch in another case.

8            MR. ARSLANIAN:  Do you want to set a

9   particular time, Miguel?

10           MR. PARLADE:  I'm sorry?

11           MR. ARSLANIAN:  Do you want to set a

12  particular time?  I don't have a problem.

13           MR. PARLADE:  Can we have him on first,

14  maybe at 10:30?  Is that okay?

15           THE COURT:  You can do it whenever you

16  want, but I'm assuming that we need to -- that's

17  fine.  All right.  10:30.  If that's okay with

18  Mr. Arslanian, that's okay with me.

19           MR. PARLADE:  Thank you, Judge.

20           THE COURT:  So, Mr. Arslanian, let's go

21  forward.  Did you wish to start with your witnesses

22  first, or what do you want to do?

23           MR. ARSLANIAN:  I would like to offer

24  Exhibits 2 and 4 into evidence, notwithstanding any

25  objection.  These are business records, and there's

1      a business records exception.  We have the custodian

2      of the records affidavit.  I don't see any basis to

3      exclude them, Numbers 2 and 4.

4                  MR. PARLADE:  Objection, Your Honor.

5      Foundation has not been laid.

6                  THE COURT:  All right.  So we have a

7      business record, and you have no objection on the

8      basis that it's a business record, Mr. Parlade, but

9      that it's relevant?  I'm trying to understand.

10                 MR. PARLADE:  Correct.  They're medical

11     records, so they have to lay the foundation with

12     their clients, its admissibility.

13                 I don't know for what purpose it's being

14     admitted.  It's not enough to just say something is

15     a medical record and it's admitted into evidence.

16     Foundation must be laid.

17                 THE COURT:  All right.  I'm a little

18     concerned.  I see both witnesses together, which is

19     fine, but they're also talking to somebody.  So I'm

20     going to ask Mr. Arslanian, where are your clients

21     located at this time, and who is the person with

22     them right now?

23                 MR. ARSLANIAN:  They are located in the

24     same building, but in a different office, a

25     different room that I'm in.  Just like we did at the

Page 325

```
 1    last hearing or whatever it was.  They are with a
 2    translator.  That's probably who they're speaking
 3    with.
 4              THE COURT:  Okay.  All right.  I saw that
 5    Mr. Cepero had a phone in front of him.  That phone
 6    needs to be -- any electronic device other than what
 7    is being used to convey the testimony needs to be
 8    turned off.
 9              THE INTERPRETER:  Judge, can you hear me?
10              THE COURT:  Yes, I can.  I can't read what
11    that says.  So you're a certified court interpreter.
12    Please identify your name for the record.
13              THE INTERPRETER:  Mario Beovides.
14              THE COURT:  And, Mr. Beovides, can you
15    please spell your name for the record?
16              THE INTERPRETER:  Sure.  Mario is
17    M-A-R-I-O, and Beovides is B as in boy, E-O-V as in
18    Victor I-D as in David E-S.
19              THE COURT:  Okay.  Thank you,
20    Mr. Beovides.  All right.
21              So what I'm going to do is -- I'm trying
22    to see whether I have my oath up here.  Okay, good.
23              Mr. Arslanian, I don't disagree with
24    Mr. Parlade that you at least have to lay a
25    foundation as to the relevancy of the business
```

1    records.

2              MR. ARSLANIAN:  Okay.

3              THE COURT:  Which witness do you want to

4    swear in?

5              MR. ARSLANIAN:  At this point I'll deal

6    with those afterwards.  I would have loved to have

7    started with Ms. Gallego, and apparently she's not

8    here.  I think Miguel said that he can get her

9    later.  Let's start with Jesus Cue.

10             THE COURT:  Okay.  First off, there's no

11   first names here.  We're in court.  We're a little

12   informal, but I'm going to ask the translator to

13   mute until we started taking testimony.

14             So did you subpoena Ms. Gallego to be here

15   today?

16             MR. ARSLANIAN:  Yes.

17             THE COURT:  Mr. Parlade, did I

18   misunderstand?  Did Mr. Alfaro say Ms. Gallego is

19   the person who has COVID?

20             MR. PARLADE:  Ms. Gallego does have COVID.

21   Mr. Alfaro is here for, I think, the president.  Is

22   it the president, Mr. Alfaro?

23             MR. ALFARO:  Yes, the president, Monica

24   Ghilardi.

25             THE COURT:  Okay.  And Ms. Gallego is

1  sick?

2          MR. PARLADE:  I spoke to her yesterday and

3  she was getting COVID tested last night.  That's my

4  last conversation with her.  She did sound sick on

5  the phone.  She said she has COVID.  She was at the

6  COVID testing, Your Honor.  She is sick, but she

7  never mentioned she received a subpoena, or received

8  a subpoena by opposing counsel.

9          In addition, I don't know why they would

10 have subpoenaed the president of the association,

11 Monica Ghilardi.  She is not a witness on the

12 witness list, and has not been presented as a

13 witness, so I'm not sure why they subpoenaed her.

14 I'd love to hear from opposing counsel on why.

15         THE COURT:  Okay.  Mr. Arslanian, with

16 respect to Ms. Ghilardi --

17         MR. ARSLANIAN:  Gallego.

18         THE COURT:  No, not Gallego.  The

19 president of the association.  Is her name on your

20 witness list?  Is Mr. Parlade confused?

21         MR. ARSLANIAN:  She is not on the witness

22 list.  That was an intent in serving to get the

23 person with the most knowledge of the association.

24 There was some difficulty with the service of that.

25         Mr. Cue is here, so I don't think there's

1   a problem with that.  Ms. Gallego is a respondent.

2   She's a party to this action, and we subpoenaed her.

3                THE COURT:  I understand.  You subpoenaed

4   her and she's not here.  So her failure to appear

5   and her failure to seek to be excused is something

6   that you have the right to proceed on procedurally.

7   So whatever it is that you choose to do with respect

8   to her failure to appear, you'll argue that at the

9   appropriate time.

10               She's not here and you subpoenaed her.

11  That's a problem for her.

12               MR. ARSLANIAN:  I move that she be held in

13  contempt for failing to appear.

14               THE COURT:  Okay.  I will deal with that

15  after the fact, but in terms of any evidentiary or

16  other issues to which you are entitled, if any, for

17  her failure to appear, notwithstanding the subpoena

18  and not asking to be excused, we'll deal with that

19  as appropriate.

20               MR. ARSLANIAN:  Well, because there was an

21  objection to Number 1, there are two deeds from the

22  public record that show title of two real properties

23  at the Hammocks titled in her name.  I move that

24  they be admitted in.  I was going to ask her to, you

25  know -- I don't even know the basis for the

```
 1   objection.  They're public records and they're

 2   deeds.

 3            I ask that Number 1 be admitted, now that

 4   she's not here to identify that she owns these two

 5   properties.

 6            MR. PARLADE:  Judge --

 7            THE COURT:  Mr. Parlade, I know you do not

 8   need -- you don't represent Ms. Gallego, so what

 9   would be your position with respect to the deeds?

10            MR. PARLADE:  Is something happening?

11            THE COURT:  I believe Mr. Arslanian is

12   going to screen share.  You should have given us a

13   little warning first.

14            MR. ARSLANIAN:  I'm sorry.

15            MR. PARLADE:  I thought my computer was

16   broken.

17            Judge, these have never been -- I don't

18   know what warranty deeds they're referring to.

19   They've never -- neither have been submitted to

20   discovery nor listed in the exhibit list.

21            THE COURT:  What do you mean?

22            MR. PARLADE:  I've never gotten a copy of

23   a subpoena, I've never gotten a copy of the return

24   of service for the subpoena.

25            If you want I can try to get Ms. Gallego
```

1    on the line, and then try and have her appear on

2    Zoom, but I don't have anything from opposing

3    counsel showing a subpoena, showing return of

4    service, or these exhibits.

5              THE COURT:  The exhibits are on the

6    exhibit register that was submitted timely.  So what

7    would be the basis of your objection, Mr. Parlade?

8    Putting aside Ms. Gallego not appearing right now,

9    what would be the basis of your objection to the

10   admission of the deeds?

11             MR. PARLADE:  If Exhibit 1 is the exhibit,

12   if they're in the composite exhibit, then no

13   objection.  They're public records, and I have no

14   objection.

15             THE COURT:  Then I will admit -- is that a

16   composite exhibit, Mr. Arslanian?

17             MR. ARSLANIAN:  Yes.  It's a composite

18   exhibit of two deeds, two different properties

19   titled in the name of Marglli Gallego.

20             THE COURT:  All right.  Then I'm going to

21   admit them, but in the future, I would appreciate

22   that composite exhibit would be identified as such,

23   or that the deeds be separately listed.  Okay?  And

24   I'll note that they're a composite.

25             (Thereupon, Debtors' Composite Exhibit No.

1          1 was admitted into evidence.)

2               MR. PARLADE:  Can you please take down the

3     screen share?  I can't --

4               MR. ARSLANIAN:  I'll take it down.

5               THE COURT:  So with respect to

6     Ms. Gallego's nonappearance, Mr. Parlade, if you

7     want to text her or something.

8               In the meantime, Mr. Arslanian, when you

9     file your motion for contempt or seek whatever other

10    evidentiary presumptions to which you might be

11    entitled, you can attach a copy of the subpoena to

12    satisfy any concerns that Mr. Parlade has in that

13    regard, okay?

14              MR. ARSLANIAN:  I will.  At this point I

15    will call Mr. Cue as a witness.

16              THE COURT:  All right.  So, Mr. Cue, I'm

17    going to ask you to go on camera.  Okay, there you

18    are.

19              Mr. Cue, before I administer the oath, I

20    want to make sure that you have no electronics that

21    are open, other than the computer that you are

22    looking at.  If you have a cell phone, please turn

23    it off.  If you have an iPad, turn it off.

24              MR. CUE:  Your Honor, I'm on the phone

25    doing the Zoom, but that's about it.

1          THE COURT:  So you're doing Zoom on your

2   phone?

3          MR. CUE:  Yes, ma'am.

4          THE COURT:  Well, definitely don't turn

5   your phone off then.  All right.

6          Then, Mr. Cue, I'm going to swear you in,

7   and then we'll talk about some logistics.  So please

8   raise your right hand.

9   Thereupon:

10                      JESUS CUE

11  was called as a witness by the Debtors, and having

12  been first duly sworn, was examined and testified as

13  follows:

14          THE COURT:  All right.  You are going to

15  be questioned by Mr. Arslanian.  If Mr. Parlade has

16  an objection -- Mr. Parlade, are you paying

17  attention?

18          MR. PARLADE:  Yes, Judge.

19          THE COURT:  If Mr. Parlade has an

20  objection, he can't stand up, because you won't

21  notice.  So he's going to do this.  And if you see

22  Mr. Parlade doing this, don't answer the question.

23          MR. CUE:  I don't see Mr. Parlade.

24          THE COURT:  You don't see Mr. Parlade?

25          MR. CUE:  No.

1           THE COURT:  Oh, dear.  Mr. Parlade, then
2    you're going to have to say "objection" and
3    gesticulate wildly.  I'll see the gesticulating or
4    my law clerk will.  And we'll just manage.  We just
5    have to manage.
6           All right.  Mr. Arslanian, you will wait
7    until Mr. Cue fully answers the question before you
8    ask your next question.
9           And Mr. Cue, there's an echo on your
10   phone.  I guess you don't have any way of dealing
11   with that.
12          Mr. Cue, you will wait until Mr. Arslanian
13   is done asking his question before you answer, even
14   if you are absolutely positive that you know what
15   the question is.  Okay?  Understood?
16          THE WITNESS:  Understood.
17          THE COURT:  Okay.  You've got to stop
18   walking, too.
19          MR. CUE:  I was just closing the door to
20   my office.
21          THE COURT:  Oh, okay.  Thank you.
22          All right.  Mr. Arslanian, if you'll go
23   ahead, you may proceed.
24          MR. ARSLANIAN:  Thank you, Your Honor.
25                  DIRECT EXAMINATION

```
 1   BY MR. ARSLANIAN:
 2        Q    Mr. Cue, could you please state your full
 3   name and address for the record?
 4        A    My full name is Jesus Cue, and my full
 5   address is 123 Romano Avenue, Coral Gables, Florida,
 6   33134.
 7        Q    And it is my understanding that you are
 8   the person with the most knowledge regarding the
 9   financial affairs of the Hammocks Community
10   Association; is that correct?
11        A    Yes.  The current financial information.
12   I came aboard roughly two and a half, three years
13   ago.  From that point on I could answer any
14   questions.
15        Q    Okay.  So you're on the board?
16        A    No, I'm not.
17        Q    What is your position in relation to the
18   Hammocks Community Association?
19        A    I'm a comptroller, accounting consultant
20   for Hammocks Community Association.
21             MR. ARSLANIAN:  I'm going to bring up,
22   Your Honor, and screen share Exhibit 6, the document
23   that was already agreed to be admitted, the proposed
24   budgets of the Hammocks Community Association.
25             THE COURT:  All right.  Exhibit 6 is
```

Page 335

1    already admitted, so proceed.  Go ahead.  Do the

2    screen share.  Thank you for the warning.

3    BY MR. ARSLANIAN:

4        Q    Mr. Cue, are you familiar with this

5    document, which was admitted into evidence as Number

6    6, the proposed budget of Hammocks Community

7    Association, Inc.?

8        A    Yes.  It's a proposed budget, yes.

9        Q    Okay.  And you see that for 2020, the

10   association had a budget of approximately

11   $4,255,000?

12       A    Yes.

13       Q    And you see that for the following year,

14   2021, the budget -- the proposed budget was

15   $4,279,000, approximately?

16       A    Yes.

17       Q    Now, how many units are there at the

18   Hammocks Association?

19       A    I believe roughly -- and it's not an exact

20   number, but it's around 6,500 units.

21       Q    6,500 units?

22       A    Yes.

23       Q    So the 6,500 unit owners pay in

24   maintenance fees the approximately $4.2 million

25   budgets for 2020 and 2021?

Page 336

1      A    Yes.

2      Q    And is it fair to say --

3      A    Not only assessment.  If you see the

4  breakdown of the revenues, the different items of

5  revenues are taken into account.  The assessment

6  only accounts for 3,745,928.

7      Q    And because of that there's other income

8  available to the association that meets this budget;

9  is that correct?

10     A    Yes.

11     Q    Okay.  So if I scroll down to the

12  different operating expenses, let's just say legal

13  general, one year it was $200,000, the next year it

14  was $175,000.

15          These items change year to year?

16     A    Yes, they do.

17     Q    And that affects the overall budget?

18     A    Yes, they do.

19     Q    So is it fair to say that as the items

20  change, the budget changes and the maintenance

21  charges change, so that the budget is met?  Is that

22  fair?

23     A    No.  The main assessment is a fixed

24  amount.  That is what the owners pay.  In order to

25  change that, the board has to agree and so forth and

1  so on.  The assessment is a fixed number.

2      Q    Put it this way:  At the end of the day,

3  the budget is $4,279,000.  The board collects enough

4  maintenance to make sure that that budget is met; is

5  that correct?

6      A    Technically, yes.

7      Q    Okay.

8      A    Remember, this is a budget.  This is not

9  actual numbers.  These are estimates that are put

10  together, based on prior history and prior

11  information.  It doesn't necessarily mean that they

12  are actual numbers.

13      Q    Okay, but let me ask you this:  If all of

14  the different operating expenses increase by let's

15  say 5 percent across the board, the budget is

16  increased by that amount; is that correct?

17      A    It is increased or it's adjusted, or some

18  of the service would have to come down.  The numbers

19  would have to be resolved, but the amount that comes

20  in as an assessment is a fixed number.

21      Q    Okay.  Let me show you what I'm going to

22  screen share, Exhibit Number -- what's been marked

23  as Exhibit Number 8, please.

24          Now, does the association own various

25  units at the Hammocks Community?

1      A    Up to that point, I'm aware in a general

2  sense that the association owns several properties.

3  I don't know the specifics.  That's basically

4  handled by our collection attorney, Yudany

5  Fernandez.  And I don't have the details as to that

6  matter.

7      Q    Well, I'm showing you a printout from the

8  Office of the Property Appraiser, showing a list of

9  25, 30 units that are all owned by -- listing the

10  owner as Hammocks Community Association, Inc.; is

11  that correct?

12      A    I see the list.  I'm on the phone, and I

13  see a list of properties, yes, I do.

14      Q    Okay.  And you don't have any doubt that

15  Hammocks Community Association, Inc., owns several

16  units?

17      A    Like I said, it owns several units, but I

18  don't know the specific unit or the specific amount

19  of units.

20      Q    But you're supposed to be the person with

21  the most knowledge of the assets and the finances

22  of --

23      A    Like I said, I came aboard three years

24  ago, and I've been organizing and establishing

25  internal controls.  Some of the matters that I defer

Page 339

1   them to the aspect, like in this case Yudany, the

2   attorney that takes care of those matters.

3        Q    Okay.

4             MR. ARSLANIAN:  Judge, at this time I

5   would ask that Exhibit 8 be admitted into evidence.

6             THE COURT:  Mr. Parlade?

7             MR. PARLADE:  Objection, Your Honor.  The

8   foundation has not been established.  The witness

9   has stated he has no knowledge of this.

10            And I also object to the question

11  characterizing this witness as the person with the

12  most knowledge of the corporation.  He has not been

13  designated as such, and neither has the association

14  subpoenaed anybody in the association with that

15  knowledge.  So it's a two part objection.

16            THE COURT:  All right.  So let's start

17  with the first.  The first was -- because I was

18  getting caught up in the second part.

19            So the objection to the exhibit itself is

20  what?

21            MR. PARLADE:  Foundation has not been

22  laid, Your Honor.  The witness has stated he has no

23  knowledge of this.

24            THE COURT:  Okay.  And that's the basis

25  for the objection?

1            MR. PARLADE:  It's to its admission as an

2    exhibit, yes.

3            THE COURT:  Okay.  That this particular

4    witness has stated he's not aware of which

5    properties are owned by the Hammocks?

6            MR. PARLADE:  Correct.  So foundation has

7    not been laid.

8            THE COURT:  Okay.  And then you made a

9    general objection with respect to the

10   characterization of Mr. Cue as the Rule 36 witness.

11   You say that he was never designated as such?

12           MR. PARLADE:  Correct.  He is a

13   representative of the association, and has never

14   been designated as the person with the most

15   knowledge as to what Mr. Arslanian is referring to.

16   I don't know what --

17           MR. ARSLANIAN:  I stand corrected on that.

18   He's listed as the comptroller.  I stand corrected.

19           MR. PARLADE:  Thank you.

20           THE COURT:  All right.  With respect to

21   the initial -- the objection to the exhibit itself,

22   Mr. Arslanian, your response.

23           MR. ARSLANIAN:  He did testify that he

24   knows that the association owns several units.  This

25   is an official printout from the Office of the

1    Property Appraiser, a reliable source, the same

2    source where I got the deeds for Ms. Gallego.

3            THE COURT:  Okay.  Anything else,

4    Mr. Parlade?

5            MR. PARLADE:  No, Judge.

6            THE COURT:  Okay.  I'm going to overrule

7    the objection on the basis upon which it was made.

8    Since that's the basis upon which it was made, I

9    will admit Exhibit 8.

10           (Thereupon, Debtors' Exhibit No. 8 was

11       admitted into evidence.)

12           MR. ARSLANIAN:  At this time I'm going to

13   screen share Exhibit 9.

14   BY MR. ARSLANIAN:

15       Q    Mr. Cue, as was shown in the budgets,

16   Exhibit 6, there are accounts receivable due and

17   owing to the association; is that correct?

18       A    Yes, it is.

19       Q    I'm going to show you a document -- I'm

20   sorry.

21           MR. ARSLANIAN:  Is this 8?  I'm sorry,

22   Your Honor.

23           Can you pull up Number 10?

24           THE COURT:  You referenced Exhibit 9.  Are

25   you seeking to ask questions on Exhibit 9 or Exhibit

Page 342

```
 1   10?

 2              MR. ARSLANIAN:  Let me ask on Number 9

 3   first.

 4   BY MR. ARSLANIAN:

 5        Q    Is this accounts receivable of moneys owed

 6   from all these unit owners?

 7        A    Yes.  This is an aging, a (unintelligible)

 8   report, as of December 15, 2021.

 9        Q    Okay.  And I'll go all the way down to the

10   bottom.

11              THE COURT:  I'm leaning over, because my

12   exhibit display is on (unintelligible) screen, so I

13   don't want you to think that I'm doing something

14   else.  I'm just trying to get close enough to this

15   exhibit to actually read it.

16   BY MR. ARSLANIAN:

17        Q    The bottom line it shows approximately

18   $812,711 in receivables; is that correct?

19        A    Hold on.  I'm getting to it.  Give me a

20   minute.

21              Yes, $812,711.43 of receivables, of which

22   $672,299.92 is over 90 days past due, and if you see

23   the listing, the remarks to the side where it says

24   "Alfaro" and "Fernandez," those are items that are

25   in collection.
```

1      Q      Okay.

2      A      So more than half of the receivables are

3  basically in collection.

4      Q      Okay.

5            MR. ARSLANIAN:  At this time I would ask

6  that Exhibit 9 be admitted into evidence.

7            THE COURT:  Mr. Parlade?

8            MR. PARLADE:  No objection, Your Honor.

9            THE COURT:  All right.  Exhibit 9 is

10  admitted.

11            (Thereupon, Debtors' Exhibit No. 9 was

12      admitted into evidence.)

13            MR. ARSLANIAN:  At this time I'm going to

14  ask to screen share Exhibit 10.

15  BY MR. ARSLANIAN:

16      Q      Now, I just want to -- Mr. Cue, let me

17  show you this document.  I'm just going to ask you a

18  question.

19            Is this a printout of other accounts

20  receivables due to the association?

21      A      Hold on a second.  That doesn't -- I don't

22  have that report with me.  Hold on a second.  Give

23  me a minute to see what that report is.

24            I'm not familiar with that report at this

25  moment.  The last payment for --

1            THE COURT:  Stop moving it, Mr. Arslanian,

2   so he can look at it.

3            THE WITNESS:  I'm not familiar with that

4   report.

5   BY MR. ARSLANIAN:

6       Q    Okay.

7       A    I am not familiar with that report.

8       Q    You've never seen it before; is that

9   correct?

10      A    I would have to see more detail.  I don't

11  know if it's possible that you could e-mail it to me

12  so that I could see the detail.  In the shared

13  screen I don't recognize that report.

14      Q    Let me just scroll down to the bottom, and

15  let me just see if you maybe recognize the bottom

16  part of it.  I'm sorry.  It looks like it's

17  foreclosure cases for the Hammocks.

18            Is that --

19      A    I'm definitely not familiar with this

20  report.  It is dated -- the transaction dated 2014,

21  way before my time.  I'm really not familiar with

22  this report.

23      Q    Are you familiar with a company called

24  Axiom Resources?

25      A    I heard of Axiom Resources.  If I'm not

1    mistaken, that was a company that was contracted a

2    long time ago.  I don't know the specific year when

3    that company was contracted to do collection for

4    Hammocks Community Association.

5              That's the extent -- I know there has been

6    problems with collections and so forth, but I don't

7    know the details of the whole deal.

8              MR. ARSLANIAN:  I'm going to stop the

9    share.  I'm not going to move to have this one

10   admitted, Judge.  I'm going to bring up Number 11,

11   please.

12             THE COURT:  I'm going to mark Number 10 as

13   not introduced.

14   BY MR. ARSLANIAN:

15       Q     Mr. Cue, are you familiar with the fact --

16   I'm sorry.  Strike that.  Let me start again.

17             The association -- does the association

18   own various automobiles, motor vehicles?

19       A     Yes, it does.

20       Q     Okay.  Exhibit 11 shows the registrations

21   of various motor vehicles titled in Hammocks

22   Community Association, Inc.

23       A     Yes.  I do have that information in front

24   of me, yes.

25       Q     Okay.  I don't know whether it's 15 cars,

1    18 cars, 17 cars.  Is that correct?

2         A    I don't have a list of the automobiles in

3    front of me, but I would venture it to be in that

4    neighborhood.

5              MR. ARSLANIAN:  At this time, Judge, I

6    would ask that Exhibit 11 be admitted.

7              THE COURT:  Mr. Parlade?

8              MR. PARLADE:  No objection, Your Honor.

9              THE COURT:  Okay.  Exhibit 11 is admitted.

10             (Thereupon, Debtors' Exhibit No. 11 was

11         admitted into evidence.)

12             MR. ARSLANIAN:  Thank you.

13   BY MR. ARSLANIAN:

14        Q    I'm going to pull up Exhibit Number 7 now.

15             Mr. Cue, does the association have various

16   bank accounts?

17        A    Yes, it does.

18        Q    How many, approximately?

19        A    Well, we currently operate with roughly

20   seven accounts.

21        Q    And are there any reserves kept by the

22   association?

23        A    At this moment we have no reserves.

24        Q    Is there any insurance money that's due

25   and owing to the association?

1      A     There's no insurance money.  There was a

2   Hurricane Irma claim that was settled last year, if

3   I'm not mistaken.

4      Q     How much was it settled for?

5      A     If I'm not mistaken -- I cannot give you a

6   specific number, because I don't have that

7   information in front of me, but I would venture to

8   say between 100 and $150,000.

9      Q     Okay.  And with respect to the motor

10  vehicles, when I looked at the budget -- and we can

11  go back through it -- I don't see any auto loan

12  payments for any of those vehicles.

13     A     Three of the vehicles are being financed.

14  One of the vehicles is being financed by GM

15  Financial, which is roughly -- because they were

16  purchased recently -- 16,000, 17,000, GM Financial,

17  and the two other vehicles that are being financed

18  by Allied Financial was roughly like $32,000.

19     Q     And some of the other vehicles are owned

20  outright?

21     A     They are owned outright, and they are in

22  very bad shape.  So that's why we're replacing them

23  little by little as the budget allows.

24     Q     I'm going to show you now what's been

25  marked as Exhibit 7, which is bank balances.

1              There's a bank account at SunTrust; is

2      that correct?

3          A     Hold on.  Let me --

4          Q     I'm sorry.  I'm not going to --

5          A     Yes.  There is a SunTrust -- there's three

6      accounts in SunTrust.

7          Q     Okay.

8          A     There is one account in TD Bank, there is

9      one account on BB&T, and there is one account in CIT

10     Bank.

11         Q     Okay.

12         A     Right now other balances in that account

13     are basically very small, under $5,000.

14         Q     Well, I'm showing you a record from a

15     Total Business Account.

16         A     The account that has the biggest balance,

17     $69,620.90, which is SunTrust account ending in

18     9949, that's a payroll account.  By Monday when we

19     ran payroll, that balance has decreased roughly by

20     $60,000.

21         Q     If I go further down, there's another

22     business banking account with a balance of $19,393.

23         A     Let me see that.  Yeah, that is the same

24     account.  That's SunTrust account ending in 1020.

25     That balance today is down to roughly $3,000.

1          Remember, you see the balance in the bank,

2    but you're not seeing the outstanding checks that

3    that account has, and as the checks clear that

4    balance decreases.

5          Q     Here's another account.  This one ends in

6    9949.  It has a balance of $69,620.

7          A     Yeah.  That's the one we just talked

8    about.  That is the payroll account.

9          Q     Is it, because -- let's just look at this

10   real quick.  It says Primary Business Checking,

11   9949.

12         A     Yes.

13         Q     Scroll back up.  That's the one that you

14   described as the payroll account, correct?

15         A     Yes.

16         Q     Okay.  So if I scroll back up to -- there

17   was another account that has a balance of

18   $69,204.42.  That is also business banking --

19              THE COURT:  Stop, stop, stop.  Mr. Cue,

20   you have to let Mr. Arslanian finish asking the

21   question before you answer.

22              Mr. Arslanian, finish asking the question.

23   BY MR. ARSLANIAN:

24         Q     Do you see that there are two different

25   accounts in this composite exhibit that show

1   balances of over $69,000?

2        A    Let me check.  I see one for $69,620.90,

3   that ends in 9949.  I see an account that ends in

4   3020 for $19,393.  I see an account that ends in

5   1009 for $87,014.42.  I see an account that ends in

6   4034.

7             Let me see the account that you said

8   that -- the other account that you said has $69,000,

9   please.

10       Q    I'm showing it to you right now.  It's on

11  the screen right now.  It says Total Business

12  Banking 1009, and the last entry, 12-02-21, shows as

13  the balance 69,204.42.

14       A    Are you referring to account Total

15  Business Banking 1009?  That's the account you're

16  referring to?

17       Q    Let me ask you a question.

18            THE COURT:  Mr. Arslanian, he just asked

19  you, is that the account you're referring to.

20  BY MR. ARSLANIAN:

21       Q    Yes, it is.

22       A    That account has an available balance of

23  $8,714.62.

24       Q    All right.

25       A    You're looking at an old balance.

1      Q     Okay.

2      A     The current balance of that account is

3  $8,762.

4            MR. ARSLANIAN:  At this time I would ask

5  that Exhibit 7 be admitted into evidence.

6            THE COURT:  Mr. Parlade?

7            MR. PARLADE:  No objection.

8            THE COURT:  All right.  Exhibit 7 is

9  admitted.

10           (Thereupon, Debtors' Exhibit No. 7 was

11      admitted into evidence.)

12  BY MR. ARSLANIAN:

13     Q    Now, Mr. Cue, have -- to your knowledge,

14  have the unit owners been advised of the finding of

15  contempt by the Court?

16     A    I don't understand the question.  I don't

17  know.  Could you repeat that question, be more

18  specific?

19           MR. PARLADE:  Judge, can we have this

20  document taken off the screen share, please?

21           THE COURT:  Oh, yes.  Thank you.

22           Mr. Arslanian, please.  Ask the question

23  again, Mr. Cue -- I mean Mr. Arslanian.

24  Mr. Arslanian, Mr. Cue said he didn't understand the

25  question, to please be more specific.

1   BY MR. ARSLANIAN:

2        Q    Mr. Cue, are you familiar with why we're

3   here at this hearing today?

4        A    Yes, I am, fairly familiar.  Not to the

5   details.

6        Q    Do you understand that the Court is going

7   to determine an amount of damages that the

8   association and Ms. Gallego might have to pay to the

9   debtors for contempt of court violations?

10       A    Yes.

11       Q    My question to you is, have unit owners

12  been informed of this proceeding and the contempt

13  finding by the Court?

14       A    Not that I'm aware of.

15       Q    Do you know of any steps that the

16  association has taken to make sure that there are no

17  further contempt violations by the association?

18       A    Not that I'm aware of.

19            MR. ARSLANIAN:  I have no further

20  questions at this time, Your Honor.

21            THE COURT:  All right.  Mr. Parlade,

22  cross-examination.

23            Mr. Cue, now Mr. Parlade is going to be

24  asking questions, and Mr. Arslanian would be the one

25  that would say "objection" if he has an objection,

Page 353

```
 1    okay?
 2              THE WITNESS:  Okay.
 3              THE COURT:  All right.  Go ahead,
 4    Mr. Parlade.
 5                    CROSS-EXAMINATION
 6    BY MR. PARLADE:
 7         Q    Good morning, Mr. Cue.
 8         A    Good morning.
 9         Q    Just a few questions.
10              You were shown what is Exhibit Number 6,
11    which is a proposed budget of Hammocks Community
12    Association, correct?
13         A    Yes, sir.
14         Q    And you have a direct knowledge of that
15    budget, correct?
16         A    Yes.
17         Q    And in that exhibit it is shown that the
18    association has approximately in revenues, which is
19    a combination of assessments and other revenues,
20    about 4,279,000, correct?
21         A    Yes.
22         Q    And that same document and other
23    documents, all of the expenses of the association,
24    which includes everything from vehicles to postage
25    to copies, technical support, all of that, correct?
```

1     A     Yes, sir.

2     Q     After the association pays all of its

3  necessary operating expenses, how much is left over

4  from the revenue received by unit owners?

5     A     The answer is zero, or a negative number.

6  We are a not-for-profit organization.  We don't

7  retain incomes.  We need to spend what we collect.

8  So we are not for profit.

9         Like I mentioned before, the budget is

10  basically an estimate.  The only thing that is fixed

11  is the assessment, and sometimes, like lately when

12  prices go up or the collections or receivables are

13  very difficult because of COVID and so forth, we

14  have to adjust our cash flow, adjust our expenses.

15  But the actual assessment never changes.

16     Q     Do you have knowledge as to the current

17  expenditures of 2021 for the association?

18     A     I roughly have, yes, I do.  I'm working on

19  the closing of the year and so forth, but it's been

20  a difficult year.

21     Q     Will the association have a surplus at the

22  end of the year after accounting for its operating

23  expenses?

24     A     It will not.  I could guaranty you that.

25  We are actually short.  We had to borrow some money

1   this month in order to meet some of our expenses.

2        Q     Do you know how much money was borrowed

3   this month in order to meet the expenses?

4        A     We roughly borrowed $375,000 in a

5   short-term loan that in six months -- eight months,

6   short-term loan.

7        Q     As we sit here today, do you know how much

8   is being held in association bank accounts?

9        A     I don't have -- I cannot give you an exact

10  number, but I can tell you it is under $10,000.

11       Q     Do you know if the association has

12  suffered a shortfall or has suffered any kind of

13  decrease in revenues due to homeowners paying less

14  assessments due to the COVID pandemic?

15       A     Yes.  Not less revenue.  Remember, we're

16  an accrual basis.  The revenues are the same, but

17  the collection of that receivable is what has

18  suffered.  So what has suffered is the cash flow of

19  the association.

20             Meaning, as you look at -- I don't know

21  which exhibit it is, exhibit number, but it's an

22  aging report of account receivable, which has an

23  outstanding account receivable of $812,000, where

24  roughly $673,000 are in collection.

25       Q     So --

1      A     And out of that, only $102,000 is current.

2  We call it current.  Today is December 30th.  That

3  line should be zero.  Everything should be

4  collected.  So yes, we have a very difficult time

5  collecting.

6      Q     What is the approximate collection rate of

7  these accounts receivables or accounts that are

8  coming in collection?

9      A     Well, if you look at the report you see

10 there, I mean, collections -- I don't have the

11 statistics, but roughly we're collecting between 60

12 and 75 percent of the receivables.  As of today you

13 have $812,000 of receivables, and you have 673,000

14 in collection, which -- so 82 percent of my

15 receivables today is in collection.

16     Q     And --

17     A     If you refer to that report, that exhibit,

18 you'll see on the side, the right-hand side, Alfaro

19 and Fernandez, which is the collections collecting

20 attorney.  You'll see the amounts are very

21 significant.

22     Q     We've also been shown Debtors' Exhibit

23 Number 8, which is a list of properties that are

24 under the association's name, correct?

25     A     Yes.

1          Q    As you are aware, do you know if those

2    properties have mortgages or any other type of lien

3    or --

4          A    I think that --

5               THE COURT:  Mr. Cue, wait until

6    Mr. Parlade is done with his question.

7               THE WITNESS:  Okay.  I'm sorry, Your

8    Honor.

9               THE COURT:  Go ahead, Mr. Parlade.  Please

10   finish the question.

11   BY MR. PARLADE:

12         Q    Do you know if any of the properties on

13   that list have any kind of lien mortgage or any type

14   of debt attached to it at all?

15         A    I would have to refer you to Yudany

16   Fernandez, because I don't have that detail.

17         Q    As you sit here today, if the association

18   were to incur debt in excess of the amount contained

19   in the bank accounts, how would the association pay

20   for it?

21         A    The only way that the association --

22   there's no way the association could pay

23   immediately.  They would have to resolve some of the

24   expenses and decrease some of the expenses that we

25   currently incur in order to make a cash flow for

1   that.

2           As it is, that cash flow is very, very --

3   I mean, very tight.  That $350,000 that we borrowed

4   this month, we have to pay that weekly at a rate of

5   $8,500 a week.  It's very difficult.  Unless

6   collections are very good in January, we're going

7   through a very tough time.

8       Q    (Inaudible) increase the expenditures,

9   would additional assessments be required of the

10  Hammocks Community Association?

11      A    It would have to be that that would be up

12  to the board.  I cannot really answer you that

13  question.  The board would have to meet and

14  determine if they want to do a special assessment or

15  anything of that sort.  I cannot answer you that

16  question.

17      Q    Now, opposing counsel asked you a few

18  questions, as well, in reference to the knowledge as

19  to any preventive measures or steps taken by the

20  association to ensure the matters that (inaudible)?

21      A    Correct.

22      Q    Do you have any knowledge within your

23  (inaudible) to the association to be aware of these

24  preventative measures or other policies in the

25  association, as far as what was asked of you?

1        A    This is not under my responsibilities.

2   That's why I'm not aware of any measures, because I

3   basically deal with financial matters.

4        Q    You would have no direct knowledge of

5   these -- if anything were to happen, you would have

6   no direct knowledge, correct?

7        A    Correct.

8        Q    As to the vehicles that were introduced by

9   debtors' attorney that the association owns, do you

10  know what those vehicles are worth?

11       A    I tell you that they're not worth very

12  much.  They're very high mileage, they're very old.

13            We had -- like I mentioned to the previous

14  attorney, we had to decommission three automobiles

15  last year, because it was costing more to repair

16  than to buy new ones, and we had to get three new

17  ones and finance them, which it was difficult to

18  finance.  It was at a very high rate, because the

19  credit rating of Hammocks Community Association is

20  very low.

21            MR. PARLADE:  I have no further questions,

22  Your Honor.

23            THE COURT:  All right.  Any redirect,

24  Mr. Arslanian?

25            MR. ARSLANIAN:  Yes, Your Honor, if I may.

Page 360

1          THE COURT:  Go ahead.

2          MR. ARSLANIAN:  Thank you.

3                    REDIRECT EXAMINATION

4    BY MR. ARSLANIAN:

5          Q    Mr. Cue, do you have any documentation

6    regarding the $375,000 loan that you testified to?

7          A    Yes.  I have -- I do.

8          Q    Did you bring it with you today?

9          A    No, I don't.  I have it at Hammocks

10   Community Association's office.  I don't have it in

11   my office.

12         Q    Are you an owner at Hammocks?

13         A    No, I'm not.

14         Q    You were asked about how to pay, and there

15   was some mention of a special assessment.

16              If there was a special assessment of $50

17   per unit, how much money would that raise?

18         A    First of all, that would be up to the

19   board to approve.  The community, I could definitely

20   tell you, cannot afford -- you have the numbers.

21   You have roughly 6,500 units at $50 apiece.

22         Q    So it would be over $300,000, wouldn't it?

23         A    I would say so.

24              MR. ARSLANIAN:  I have nothing further.

25              THE COURT:  All right.  Thank you,

1    Mr. Cue.  You may put your silence back on.  You are

2    done testifying.

3                 Oh, Mr. Parlade.

4                 MR. PARLADE:  Not for Mr. Cue, Your Honor.

5    Just to inform the Court that Dr. Storper is on the

6    line, and as per the Court's instructions and the

7    agreement of opposing counsel, we can hear him out

8    of order if the Court will allow.

9                 THE COURT:  Okay.  We're going to take a

10   five-minute break, and then we'll come back and have

11   your expert.

12                Is your expert the person who's appearing

13   under the name Sabino Juaregui?

14                MR. PARLADE:  No, Judge.  I believe it's

15   the one that's by phone.  My expert texted me that

16   his Internet is down, so he's appearing by phone.

17   So it should be the one that says (305)608-4968.

18                THE COURT:  Okay.  Your expert is going to

19   need to figure out how to work the video on his

20   phone.  I can't listen to testimony by phone.

21                MR. PARLADE:  Okay.

22                THE COURT:  We'll take a five-minute break

23   and see what your expert can do.  Since Mr. Cue

24   managed -- it's a little limiting, but since Mr. Cue

25   managed, we'll have to try to do it that way.

1           Five-minute break.  Mr. Cue, you can put

2    yourself on mute and we'll take a five-minute break.

3           Just remember, for anybody that's on Zoom,

4    if you don't put yourselves on mute, you will

5    continue to be recorded, because the court recording

6    machine is running.  So no attorney/client privilege

7    communications without turning your mute buttons on.

8           Okay.  Five minutes.

9           (Thereupon, a recess was taken, after

10   which the following proceedings were had:)

11          THE COURT:  All right.  So while we wait

12   for Mr. Arslanian to rejoin us, Mr. Parlade, I do

13   not see your expert back on yet.  What are we going

14   to be doing?  You can unmute.

15          MR. PARLADE:  Judge, I don't see him on

16   here either.  I told him to download the Zoom app on

17   his phone and connect.  If you want we'll proceed

18   with Mr. Arslanian's case until such time as the

19   expert connects, and hopefully we can resolve it at

20   that time.  I don't anticipate long testimony from

21   him.

22          THE COURT:  Okay.  All right.

23   Mr. Juaregui, can you tell me who you are?

24          MR. JUAREGUI:  Yes, Your Honor.

25          THE COURT:  Good morning.

1        MR. JUAREGUI:  I didn't want interrupt

2    earlier.  Good morning.

3        I represent Marglli Gallego.  I'm her

4    criminal attorney, Judge.  I'm here just observing.

5    I did hear Mr. Parlade earlier about my client being

6    very ill, and she is.  I spoke to her yesterday.

7    She did not sound well.  I spoke to her again this

8    morning.  That is the reason she's not online.

9        When I spoke to her she said that if Your

10   Honor really needs to see her she'll get online so

11   you can see her make whatever determination you want

12   to make, but she is very ill.

13       Now, I am hearing about a subpoena.  I was

14   not aware she had been served with a subpoena so if

15   there's proof of service of that subpoena I'd like

16   to know that, because I was not notified that she

17   was subpoenaed to be here this morning, Your Honor.

18       THE COURT:  Okay.  All right.

19   Mr. Arslanian, Mr. Juaregui -- did I say that

20   correctly?

21       MR. JUAREGUI:  Yes, thank you, Your Honor.

22       THE COURT:  Mr. Juaregui is Ms. Gallego's

23   criminal counsel.  So if you would later today send

24   Mr. Juaregui a subpoena, and then, the subpoena, if

25   in fact that it has been the case, Mr. Juaregui,

1    then I assume you will be filing some kind of

2    emergency motion to excuse your client's compliance.

3                  MR. JUAREGUI:  Correct, Judge.  Because --

4    I'm sorry.  I didn't mean to interrupt, Judge.

5                  She does have an open felony case.  She's

6    currently being charged in Miami-Dade County with

7    two felonies, one an organized scheme to defraud,

8    and one a grand theft.  So of course, I would not

9    allow her to testify under any circumstances at this

10   hearing, and she would be pleading the Fifth.

11                 THE COURT:  Okay.  Well, that's helpful to

12   know anyway.  So may I make a note of that for the

13   record, then, Mr. Juaregui?

14                 MR. JUAREGUI:  Yes, Judge, for the

15   purposes of her invoking the Fifth Amendment, yes.

16                 MR. ARSLANIAN:  In order to comply, Judge,

17   can I just have Mr. Juaregui provide me his e-mail

18   address so that we can --

19                 THE COURT:  How about this, so that we

20   don't take up any more time.  Mr. Juaregui, you are

21   a member of the Florida Bar, right?

22                 MR. JUAREGUI:  Yes, Your Honor.

23                 THE COURT:  All right.  Mr. Arslanian,

24   have your assistant write down the spelling, and if

25   you go to flabar.org, I'm going to guaranty that

```
 1   Mr. Juaregui's e-mail is going to be right there.
 2   That's how I've been finding people.  You can't hide
 3   from me anymore, because I found flabar.org.
 4            We don't have Mr. Parlade's expert.  What
 5   I'm going to suggest, Mr. Parlade, would it be
 6   better if we just -- oh, no.  Here he goes.
 7            Doctor Alfaro, that's your expert?
 8            MR. PARLADE:  No, Judge.
 9            THE COURT:  Oh, no.  That's the lawyer.
10   Sorry, Mr. Alfaro.  Sorry.  Too many things --
11   people popping up on the screen.
12            We are going to clearly have to go into
13   the afternoon.  Would it be better just to say to
14   your guy to be available at 2:30 or 2 o'clock?
15            MR. PARLADE:  Yeah, that's fine.
16   Hopefully that will give him the opportunity to
17   resolve his Internet issues.
18            THE COURT:  Mr. Arslanian, does that make
19   more sense?
20            MR. ARSLANIAN:  Yeah, but I think that
21   time probably doesn't, because I don't have too much
22   more, and I don't know --
23            THE COURT:  Okay.  Forget I said that.
24   Have him go.  I'm just trying to accommodate
25   everybody.
```

1            MR. ARSLANIAN:  I understand.

2            THE COURT:  Mr. Arslanian, let's go to the

3    next thing you would like to do.

4            MR. ARSLANIAN:  Okay.  At this time I

5    would call Leticia Cepero.

6            THE COURT:  Okay.  Mrs. Cepero, we're

7    going to unmute, and here's what we're going to do.

8    I'm going to swear in your interpreter.

9            Not yet, not yet, not yet.  Wait, wait,

10   wait.  Un momento por favor.

11           Where did I write down the interpreter's

12   name?  Mr. Beovides.

13           THE INTERPRETER:  May I ask for one second

14   to let you know.  I have another interpreter that is

15   going to replace me, because unfortunately, my wife

16   is at Mercy Hospital.  She has a problem with

17   eating.  Just so you know, another certified

18   interpreter, her name is Lucy Grenet who is going to

19   replace me.  YYY

20           THE COURT:  Okay.  Is that happening right

21   now?  I'm so sorry to hear about your wife.

22           THE INTERPRETER:  No.

23           THE COURT:  So let's go forward with as

24   much as you can.

25           I don't need to see Mr. Beovides, I just

Page 367

1  need to hear his voice.  I need to see you,

2  Mrs. Cepero.  So move the camera a little bit.

3           I also need to see your husband.  The

4  reason is because you're in the same room, and I

5  want to make sure that you are not looking at your

6  husband when you're answering my question.

7           Put your mask back on.  No, no,

8  Mr. Cepero -- there you go.

9           Now, next, Mrs. Cepero, just like before,

10  even if you understand my question, you must let the

11  interpreter ask the question and then answer.

12           THE WITNESS:  Okay.

13           THE COURT:  And the same with

14  Mr. Arslanian and then Mr. Parlade.  Remember the

15  rules.  Wait until the interpreter finishes.  And

16  most importantly, no long dialogues.  Give the

17  interpreter time to interpret.  So shorter

18  sentences, or take a breath.

19           So now I'm going to swear in the

20  translator, and Mr. Beovides, when your substitute

21  comes -- and I hope and pray your wife feels better

22  soon --

23           THE INTERPRETER:  I do appreciate it,

24  Judge.  She will, thank God.

25

Page 368

1   Thereupon:

2                    **MARIO BEOVIDES**

3   an interpreter, having been first duly sworn,

4   translated from English to Spanish and from Spanish

5   to English to the best of his ability.

6            THE INTERPRETER:  I do, Judge.

7            THE COURT:  Now, Mrs. Cepero, raise your

8   right hand.

9   Thereupon:

10                   **LETICIA CEPERO**

11  was called as a witness by the Debtors', and having

12  been first duly sworn, was examined and testified as

13  follows:

14           THE WITNESS:  Amen, I swear.

15           THE COURT:  Mr. Arslanian, go ahead.

16           MR. ARSLANIAN:  Thank you, Your Honor.

17                   DIRECT EXAMINATION

18  BY MR. ARSLANIAN:

19       Q    Could you please state your name and

20  address for the record?

21       A    Leticia Cepero, 9541 Southwest 148th

22  Place, Miami, Florida, 33196.

23       Q    Ms. Cepero, as a result of the incident

24  that occurred on May 15, 2019, did you seek medical

25  assistance from a Dr. Pena?

1        A     My female doctor, Frances Pena, yes.

2        Q     Okay.  And she provides counseling for you

3   and services for you?

4        A     She gave me advice, counseling.

5        Q     And as a result of the incident occurring

6   on May 15, 2019, did you also seek any assistance

7   from a Dr. Pozo?

8        A     Danilo Pozo, yes.

9        Q     And what kind of doctor is he?

10       A     M.D.  He's a psychiatrist.

11       Q     And what kind of doctor is Dr. Pena?

12       A     He's a licensed clinical social worker.

13   He's a counselor of Jackson Memorial Hospital.

14              MR. ARSLANIAN:  Your Honor, at this time I

15   would ask, based on the foundation objection that

16   was laid, we admit Exhibits 2 and 4, the medical

17   reports of Frances Pena, and the progress notes from

18   Dr. Oscar Pozo.

19              THE COURT:  Let's take them one at a time.

20   Mr. Parlade, with respect to Exhibit 2.

21              MR. PARLADE:  Judge, to both exhibits,

22   Your Honor, counsel has not laid the foundation with

23   the witness as to the introduction of these

24   exhibits.

25              THE COURT:  All right.  Explain to me.

1          Mrs. Cepero, I'm going to ask the

2     interpreter to put it on mute while we have this

3     discussion.

4          So, Mr. Parlade, your objection was

5     foundation.  Mrs. Cepero has now laid the foundation

6     that she went to see Ms. Pena, which she identified

7     as doctor, but not a doctor, but a clinical social

8     worker, and Dr. Pozo.  Why is that not sufficient

9     foundation to submit the business records for

10    purposes of relevancy?

11          MR. PARLADE:  Judge, the record has not

12    been shown to the witness.  They have not been

13    visibly corroborated by the witness that these are

14    the records as to the medical treatment, and as to

15    the treatment she received with the aforementioned

16    doctor.

17          It's not enough to just say, "I went to

18    the doctor, let's submit the record."  It requires a

19    few more steps.

20          THE COURT:  Is that the basis of your

21    objection?

22          MR. PARLADE:  Yes, Judge.

23          THE COURT:  Mr. Arslanian, anything from

24    you?

25          MR. ARSLANIAN:  The client is not

1    qualified to testify about the records that were

2    kept by Francis Pena.  Frances Pena provided an

3    affidavit saying these are her business records.

4              I mean, originally the objection was,

5    maybe these are doctor's records that have nothing

6    to do with anything.  I think that I've tied why

7    they're important.  I've gotten the doctor to swear

8    that these are -- testify under oath that these are

9    her business records of her interactions with --

10             THE COURT:  So your response is that this

11   witness would not be qualified to identify the

12   business records of the treating professional, and

13   the treating professional -- we're talking about

14   Exhibit 2 right now -- has submitted an affidavit,

15   correct?

16             MR. ARSLANIAN:  Correct.

17             THE COURT:  Okay.  So, Mr. Parlade, I'll

18   let you --

19             MR. PARLADE:  Judge, as I mentioned,

20   although the doctor said these are business records,

21   we have no way to correlate what the actual witness

22   is stating, that this was her doctor, that these are

23   the records of her dates of treatment with the

24   doctor.

25             All we have is a blanket statement, "I saw

1   the doctor for treatment after the incident," and

2   that's it.  I have an affidavit from the doctor

3   saying these are business records.

4              I think at the very least, to establish

5   the exception to -- the hearsay exception, that

6   counsel should establish foundation, that these are

7   the records that pertain to these treatments that

8   the witness went to the doctor to see.

9              THE COURT:  Okay.  I'm going to overrule

10  your objection with respect to Number 2, and admit

11  Number 2.  I don't know how much more information,

12  as far as these are the business records related to

13  Mrs. Cepero's treatment that you would need.

14              (Thereupon, Debtors' Exhibit No. 2 was

15        admitted into evidence.)

16              THE COURT:  Let's go to Number 4.  So what

17  do we have for Number 4, Mr. Arslanian?

18              MR. ARSLANIAN:  Same type of medical

19  records, same affidavit.

20              THE COURT:  Where is that affidavit?

21              MR. ARSLANIAN:  Was it filed?  I'm being

22  told that it was filed yesterday.  I'm looking at

23  it, an affidavit signed by Oscar Danilo Pozo, dated

24  December 29, 2021.

25              THE COURT:  All right.  Hold on.  And the

1    attachment to the affidavit are the same documents

2    that are in Exhibit 6 -- I'm sorry, Exhibit 4?

3              MR. ARSLANIAN:  Yes, Your Honor.

4              THE COURT:  All right.  Mr. Parlade.

5              MR. PARLADE:  Judge, I've got declarations

6    from Pena.  I think I received one yesterday from

7    Pozo.  I don't have one for Marjorie Caro.

8              THE COURT:  That's not being requested for

9    admission.

10             MR. PARLADE:  So for Pena and Pozo I

11   received yesterday.

12             THE COURT:  Okay.  All right.  And that

13   was the reason why Dr. Pozo is not here today,

14   Mr. Arslanian, because he submitted the affidavit in

15   lieu of appearance?

16             MR. ARSLANIAN:  Yes.

17             THE COURT:  All right.  I'm going to

18   overrule the objection with respect to Number 4 for

19   the same reason.  If the basis is foundation,

20   Mr. Parlade, then the witness's testimony that she

21   went to see both these medical professionals is

22   sufficient to overcome that objection, and the

23   objection is overruled.

24             (Thereupon, Debtors' Exhibit No. 4 was

25       admitted into evidence.)

1             THE COURT:  Okay.  Let's go on.  I'm going

2  turn Mrs. Cepero back on.

3             MR. ARSLANIAN:  Wait, wait.  Can I ask you

4  something?  I see Mr. Storper is here.  I don't mind

5  taking him.  Depending on how long he goes, I don't

6  think I'm going to have too much more.

7             THE COURT:  Okay.  That's fine.

8  Mr. Parlade, would you like to go to Dr. Storper

9  now?

10            MR. PARLADE:  Yes, Judge, respectfully.

11            THE COURT:  Okay, great.  And I'm glad

12 Dr. Storper, yes?  Is it Dr. Storper?

13            Dr. Storper, I'm going to ask you to click

14 the thing at the bottom that says "audio" and take

15 off the red line.  If you click on it you'll be able

16 to speak and we'll be able to hear you.

17            Thank you for downloading zoom so I can

18 see you.  In the bottom left-hand corner there

19 should be a microphone.  Now you've switched the

20 picture.  You have a lovely study.

21            No, that's Mr. Alfaro.  Dr. Storper, I

22 hear you.  Okay.  (Inaudible).  I can't understand

23 what he's saying.

24            THE COURT:  We're going to put

25 Mr. Storper -- Dr. Storper on mute.  Put yourself

1   back on mute, Dr. Storper.

2           Does Dr. Storper have a separate cell

3   phone that he can dial in?

4           MR. PARLADE:  That's what we're trying to

5   coordinate right now, Judge.  He does have a

6   separate cell phone, so we're trying to set up so at

7   least the verbal part is on a separate cell phone.

8           THE COURT:  So have him put the video back

9   on mute.  Worst comes to worst you can just put

10  Dr. Storper on speaker.  Why don't we just do it

11  that way?

12          We lost Dr. Storper.  Not the camera,

13  Dr. Storper, just the video.  Put the camera back on

14  and turn off the audio.

15          This is one of the many reasons why I

16  really wanted us to be in person.

17          MR. PARLADE:  Me too, Your Honor.

18          MR. ARSLANIAN:  I still think -- with the

19  glitch, I still think we're going to get finished by

20  12:30.  I really do.  Let's just work through this

21  glitch, and I think we're going to be fine.

22          THE COURT:  The bottom line is, we have

23  all day, other than my delivering an oral ruling at

24  1:30.  Again I apologize.  I don't have control over

25  this virus.  This one, it seems to be getting the

```
 1    people that are vaccinated.

 2              So I'm going to put Dr. Storper on mute,

 3    but I can't turn his video back on.  I think I can

 4    put him on mute.  Hold on.  No.  I can ask him to

 5    start the video.  I can't mute him.

 6              Mr. Parlade, you're going to have to walk

 7    him through turning the microphone off.  We lost

 8    him -- no, there he is.

 9              MR. ARSLANIAN:  He's still there.

10              THE COURT:  In the meantime -- good.  Now

11    Dr. Storper's microphone is off, but he needs to

12    turn his video on.  Mr. Parlade, tell him to turn

13    the camera on.

14              Okay, great.  We're good.

15              MR. PARLADE:  I'm going to put the phone

16    on speaker so we can hear him by phone.

17              THE COURT:  Just try to get the phone as

18    close -- what's going to have to happen, though,

19    Mr. Parlade, you're going to have to put it on mute

20    when you're asking the question, and unmute it when

21    you're done asking the question, so we don't have an

22    echo.  Got it?

23              MR. PARLADE:  You got it, Judge.

24              THE COURT:  Oh, wait.  What happened to

25    him?
```

1              MR. PARLADE:  Oh, no.

2              THE COURT:  Oy vey.  We can't go forward,

3    because Mr. Parlade has to pay attention.

4              MR. PARLADE:  Judge, I apologize.  I

5    instructed him to drop out and log back in.  Let's

6    continue with the witnesses until we can work

7    everything out with him.

8              THE COURT:  Let's do that then.  Let's

9    unmute Mrs. Cepero, and Mr. Parlade, put yourself on

10   mute for now.  If you have someone that can help you

11   from your office, Mr. Parlade, that maybe can help

12   Dr. Storper while you focus.

13             We had already gotten in 2 and 4.

14   Mrs. Cepero, unmute.  Mr. Arslanian, continue with

15   your questioning.

16             MR. ARSLANIAN:  Thank you, Your Honor.

17   BY MR. ARSLANIAN:

18        Q    Ms. Cepero, are you preoccupied with the

19   events of May 15, 2019?

20        A    Extremely so.

21        Q    And do those events and issues with the

22   association dominate your life?

23        A    A lot.

24        Q    And are they --

25             THE INTERPRETER:  Hold on, Counselor.

1  She's crying.  She's crying.  Hold on.  Can you give

2  it a little bit of time here?

3          THE WITNESS:  I am very concerned, very

4  worried, because they fired two gunshots at me and

5  they have my --

6          THE COURT:  Wait, wait.  I'm having

7  trouble hearing the interpreter.

8          THE INTERPRETER:  She's crying, Judge.

9  She said, "The neighbor is harassing me."

10          THE WITNESS:  I was in very serious

11  condition.  I was in intensive therapy.  My

12  condition was very serious.

13          And I'm desperate to get to the board,

14  because my neighbor is cutting off my plants in my

15  garden, and they have fired two gunshots in front of

16  my house.  Demelsa (phonetic), Ghilardi's best

17  friend, and Michael has the evidence.  He has the

18  proof.

19          THE COURT:  I'm going to stop you.  I'm so

20  sorry you're upset, Mrs. Cepero, but I cannot

21  understand what the interpreter is saying.  It's

22  very important that I understand.

23          THE WITNESS:  It's been very sad.

24          THE COURT:  I'm going to back up.

25  Mr. Interpreter, I did not understand anything after

1  the neighbor is cutting down the plants, and fired

2  the gun in front of her house.  Everything after

3  that I did not hear what you said.

4          THE WITNESS:  My neighbor is a friend of

5  Monica Ghilardi, who's the president of the board.

6  They have taken photographs of my lot, Demelsa Perez

7  Trajillo (phonetic), Perez Sello (phonetic).  And

8  Ana Martinez was trying to open my lock to the door,

9  pretending that she was going to place a document.

10          I was in my office and I saw that they

11  were opening up my lock.  I thought it was my

12  husband.  I ran to the window and I saw that it was

13  Martinez that was trying to open my lock.  And there

14  are police reports, and the police told me that they

15  were going to arrest her for trespassing.

16          And they purchased five cars in the

17  security, small ones, small ones, and one of them

18  spent ten minutes in front of the door of my house.

19  This happens every day.  So I am weak.  I've been

20  affected by this.  I'm very upset.  I do not sleep,

21  because of real things.  I have not gone crazy,

22  because of the psychological help that I've been

23  receiving, and my family and friends that give me

24  their support, and psychological and psychiatric

25  treatment that I had to go ahead and have done.  I

```
 1    don't sleep at night.
 2    BY MR. ARSLANIAN:
 3         Q    Ms. Cepero, prior to --
 4              THE COURT:  Wait just a minute,
 5    Mr. Arslanian.  I think the interpreter is --
 6              THE INTERPRETER:  The last thing that she
 7    said, Judge, was, "I brought --"
 8              THE COURT:  I cannot hear you,
 9    Mr. Beovides.
10              THE INTERPRETER:  The last thing she said
11    was, "My blood platelets went down, were lower.  I
12    was in intensive therapy, because I lost almost all
13    my blood.  I suffer from the condition that is
14    called IPD.  It's urological.  When I suffer a lot
15    of stress I cannot control it.
16              THE COURT:  I'm going to let Mr. Arslanian
17    ask his next question.  I thought that the
18    interpreter was communicating with someone.
19              Mr. Arslanian, ask your next question.
20              MR. ARSLANIAN:  Thank you.
21    BY MR. ARSLANIAN:
22         Q    Ms. Cepero, prior to having any incidents
23    with the Hammocks Community Association board in
24    this case, did you have any history of any type of
25    psychological issue?
```

1      A     Not ever.

2      Q     And I know that you just talked about

3  certain things.  I'm going to ask you about those in

4  a second, but I want you to focus on the May 15,

5  2019 incident.

6      A     Okay.

7      Q     Please describe to the Judge the type of

8  feelings that resulted in the problems, if any, that

9  it caused you.

10     A     To me it has been a horrible movie, terror

11 movie.  It has completely changed my life.  I live

12 worried, thinking about what are they going to do to

13 me tomorrow.

14     Q     Now, Ms. Cepero, you mentioned something

15 about cutting a plant or hedges in your front yard

16 and cars in front of your place.

17           Did that occur before Judge Isicoff made

18 her finding of contempt or after she found contempt

19 earlier this year?

20     A     That was after the Judge found her in

21 contempt.

22     Q     Okay.  All right.  And after the May 15,

23 2019 incident, would you please tell the Court what

24 affect it has on your ability to sleep, and overall

25 in your marriage with Josue?

1          A     I do not sleep.  And I'm going to talk

2     very clearly, with respect, because I want to be

3     honest according to the subjects.

4               My marriage, intimately I have no desire

5     to do anything.  I have no motivation, nothing.

6          Q     I just have a couple of more questions for

7     you.

8               First of all, can you recall appearing

9     before a Dr. Henry Storper on December 13th, for an

10    examination by him?

11         A     I do remember that, yes, because I was in

12    very serious condition.

13         Q     And did he ask you during your examination

14    whether or not -- did he ask you if you followed

15    Marglli Gallego in the vehicle on May 15, 2019?

16              THE COURT:  Wait, stop.  What is the

17    objection, Mr. Parlade?

18              MR. PARLADE:  Hearsay, Your Honor.

19              THE COURT:  I'm sorry, what?

20              MR. PARLADE:  Hearsay.  He's asking what

21    the doctor asked her.

22              THE COURT:  I'm going to overrule the

23    objection.

24    BY MR. ARSLANIAN:

25         Q     Leticia, during that examination, did the

1   doctor ask you if you blocked Marglli Gallego's

2   vehicle?

3        A    Yes, directly.  And I admitted.

4             MR. ARSLANIAN:  I have no further

5   questions.

6             THE WITNESS:  Thank you.

7             THE COURT:  All right.  So now,

8   Ms. Cepero, it's Mr. Parlade's turn.  Same rules

9   apply.  Wait until Mr. Parlade is finished, let the

10  interpreter interpret.

11            Do you need a moment, Mrs. Cepero?

12            THE WITNESS:  Yes, a moment.

13            THE COURT:  We'll wait one second.

14            In the meantime, if you'll go on mute,

15  Mr. Interpreter, so we can -- I see that

16  Mrs. Storper is back on, so before we go to

17  cross-examination, shall we try this one more time

18  with Dr. Storper?

19            MR. PARLADE:  Let's give it a shot, Your

20  Honor.

21            THE COURT:  Mrs. Storper, thank you for

22  being your husband's technical director.  So if you

23  could put your husband in front of the camera and

24  turn the camera on.  And I hope that we can turn --

25  I don't know.  Maybe they left.

1              Do you want to call him?

2              MR. PARLADE:  Yes, Judge.  Give me one

3    second.

4              DR. STORPER:  I guess we're going to keep

5    trying things, right?

6              THE COURT:  We have audio.  No, now we

7    don't have audio.  We had audio, but we didn't have

8    video.  Now we have -- we can hear you, but we can't

9    see you.  We need the camera turned back on, please.

10             DR. STORPER:  We're doing the best we can.

11   Our Internet totally crashed, and we can't --

12             THE COURT:  Well, the good news is that we

13   can hear you clearly, but I do need --

14             DR. STORPER:  It says the video stopped.

15   I'm on safe driving mode.  We didn't do anything to

16   do that.  This is on the Zoom app.

17             THE COURT:  Are you in the car?

18             DR. STORPER:  Can you hear me?

19             THE COURT:  Are you in the car?

20             DR. STORPER:  No one can hear me now.

21   Hello.

22             THE COURT:  If they're in the car the

23   video won't work, because it's safe driving.  I know

24   this because my granddaughters try to FaceTime me in

25   the car all the time.

1           Mr. Parlade, I'm going to mute Dr. Storper

2    right now.  I see Mrs. Cepero back.  I'm going to

3    put him on mute while they get out of the car.  I'll

4    ask the interpreter to unmute and -- is the

5    interpreter back?  Maybe we're getting a new

6    interpreter.

7           Mr. Parlade, while we're waiting for the

8    interpreter, if you want to call Dr. Storper and see

9    if he's in a car, and if he is in a car, let them

10   know that the video will not work in the car, which

11   is why it says, "safe driver mode," and that they

12   need to pull over somewhere.

13           MR. PARLADE:  Okay.  Let me call him now.

14   Sorry about that, Judge.

15           THE COURT:  No, no.  It's -- one day we're

16   all going to laugh about this, God willing.

17           MR. ALFARO:  It actually said, "safe

18   driver mode"?

19           THE COURT:  That's what Dr. Storper said,

20   that it said, "safe driver mode," Mr. Alfaro.  So

21   that means -- I mean, that's what happens when my

22   granddaughters FaceTime me in the car.  For safety

23   reasons, apparently the video turns off.  Which is a

24   good thing, I must say.

25           MR. ARSLANIAN:  It also prevents me from

1    watching football games when I'm driving, I suppose.

2              THE COURT:  Thank God.

3              MR. ARSLANIAN:  It disables all that

4    stuff.

5              THE COURT:  I know that in the old days I

6    would be on 95 and see someone with a newspaper

7    propped up on the steering wheel while they were

8    driving on the highway.  Like, hello.

9              Okay, interpreter is back.  I see his

10   hands.  I'll wait until Mr. Parlade is ready.

11             Mrs. Cepero, I need you to move just a

12   little.  We're just waiting for Mr. Parlade.

13             Mr. Parlade, the witness is yours.

14             MR. PARLADE:  Thank you, Judge.

15             THE COURT:  Go ahead.

16                  CROSS-EXAMINATION

17   BY MR. PARLADE:

18        Q    Good afternoon, Ms. Cepero.

19        A    Good afternoon.

20        Q    I represent Hammocks Community

21   Association.  Ms. Cepero, I have a few questions for

22   you.

23             Your attorney had mentioned before in

24   reference to any past psychological conditions, and

25   you mentioned you never had one prior to the

Page 387

1    incident on May 15, 2019?

2         A    I never had any mental issue.  I've had a

3    lot of surgeries, but not that.

4         Q    You've never had problems with anxiety?

5         A    No.  Sometimes the surgeries cause me to

6    be a little bit concerned, because they were big

7    surgeries.  However, I have been a person that

8    emotionally has been very stable.

9         Q    You know your attorneys provided me with

10   copies of all your medical records for the past five

11   years, correct?

12        A    Yes.

13        Q    And this includes the records of Sanitas

14   Medical Center?

15        A    Yes.

16        Q    And at Sanitas Medical Center, your

17   primary physician is Dr. Reinaldo Hernandez; is that

18   correct?

19        A    Yes.

20        Q    Okay.  Now, would it surprise you if in

21   November 16, 2017, Dr. Hernandez stated that you

22   were diagnosed with anxiety?

23        A    In what year?

24        Q    2017.

25        A    In 2017 my father passed away.

1              Could you repeat the date again, please?

2      Q    This was November 16, 2017.

3      A    Imagine, my father passed away one month

4  prior.  And I was his only daughter, and to me my

5  father was the biggest thing in the world.

6      Q    So you -- unfortunately, your father died,

7  and my condolences.  I know that must have been

8  tough, but --

9      A    Very tough.  And I spoke to him and I told

10  him that I was undergoing that process of losing the

11  person, and the thing that you feel.

12      Q    So in 2017, you were suffering from

13  anxiety, correct, after your father died?

14              THE COURT:  I'm going to remind you,

15  Mrs. Cepero --

16              THE WITNESS:  Can you repeat it,

17  Counselor?

18  BY MR. PARLADE:

19      Q    In November 16, 2017, your father had

20  passed, and you were going through some anxiety; is

21  that correct?

22      A    I did not have anxiety.  I went to see

23  Reinaldo, because it was uncontrollable for me that

24  I had not been able to say good-bye to my father.

25  He died of cancer.  It was a very strong cancer.

```
 1              And when he spoke to me he started crying
 2    and he said that he was not able, he couldn't see
 3    me.  He died in Cuba at 7 o'clock in the morning
 4    from cancer.  Then when I regained a little bit of
 5    my strength I went to my doctor, Dr. Reinaldo.
 6              I did cry a lot.  I did cry a lot.  I know
 7    him.  He is from my province.  He found that I was
 8    suffering a lot.  My mother was uncontrollable,
 9    because they had been married for over 60 years.
10              MR. PARLADE:  Judge, just an objection to
11    the narrative response we were given.  I understand
12    Ms. Cepero is going through a lot, but I request the
13    Judge issue a limiting response.
14              THE COURT:  Yes.  Mrs. Cepero, I need to
15    remind you to listen to the question and answer the
16    question.  Okay?
17              THE WITNESS:  Yes, Your Honor, yes.
18              THE COURT:  Okay, Mr. Parlade, your next
19    question.
20              MR. PARLADE:  Thank you.
21    BY MR. PARLADE:
22         Q    On November 16, 2017, you went to your
23    primary physician, Dr. Hernandez, because, as you
24    just stated, you were suffering?
25         A    Yes.
```

1        Q    You were in a state of sadness; is that

2   right?

3        A    Yes.

4        Q    Were you depressed, as well?

5        A    I was going through the normal issues when

6   you lose somebody.

7        Q    And you were going through anxiety?

8        A    No.  I had sadness.

9        Q    Would it surprise you if Dr. Hernandez

10   noted in your records from November 16, 2017, that

11   you had noticed that you had -- you were suffering

12   from anxiety?

13             THE COURT:  Wait, wait.  Don't answer the

14   question.

15             Mr. Arslanian, unmute and tell me what you

16   want to tell me.

17             MR. ARSLANIAN:  Objection.  It's a hearsay

18   reference.  The document is not in evidence.  It

19   hadn't been offered in evidence.

20             THE COURT:  I'm going to overrule the

21   objection.  It's not hearsay.

22             Go ahead, Mrs. Cepero.  You can answer the

23   question.

24             THE WITNESS:  What was the question again?

25

Page 391

1    BY MR. PARLADE:

2         Q    Would it surprise you if on November 16,

3    2017, when you went to see your primary care

4    physician, Reinaldo Hernandez, if he had assessed

5    that you were suffering from anxiety?

6         A    The thing is that I have never suffered

7    from anxiety, no.

8         Q    You've never taken any anxiety medication?

9         A    No.

10        Q    Up to this date you've never taken anxiety

11   medication?

12        A    Right now I am taking medication for

13   anxiety.  Right now I'm taking anxiety medication,

14   antidepressants.

15        Q    When did you start taking that anxiety

16   medication?

17        A    I do not remember.

18        Q    Was it within the past year?

19        A    I believe it's a little bit prior.

20        Q    Could it have been last year?

21        A    It could have been, but I do not remember.

22        Q    When you were living in Cuba, did you ever

23   take anxiety medication?

24        A    Not ever.

25        Q    On April 1, 2019, do you remember seeing

1    Dr. Reinaldo Hernandez at the Sanitas Medical

2    Center?

3            THE INTERPRETER:  What was the name of the

4    medical center?

5            MR. PARLADE:  Sanitas Medical Center.

6            THE WITNESS:  I see him periodically, yes,

7    but I don't remember the date.

8    BY MR. PARLADE:

9        Q    Okay.  Do you remember if he ever

10   diagnosed you on that day with having generalized

11   anxiety disorder?

12       A    I do not remember, no.  He knew that my

13   father passed away, that my father died.

14       Q    You had told me your father died back in

15   2017.

16       A    Yes.

17       Q    So what does that have to do with your

18   visit to Dr. Hernandez in 2019?

19       A    Because of my condition, hypertension,

20   every month they do blood tests and I have to have

21   checkups.

22           THE INTERPRETER:  Judge, the other

23   interpreter just got here.  Can we take a two-minute

24   recess so she can replace me?

25           THE COURT:  Yes.

1           THE INTERPRETER:  Thank you.

2           THE COURT:  We're going to put this on

3    mute for just a moment.  Mrs. Cepero, you may not

4    discuss your testimony with anybody, okay?

5           I see we lost Dr. Storper again.  I'm

6    going to reiterate that we have the entire

7    afternoon.  If you want to schedule him for 2:00 or

8    2:30 we can do that.

9           MR. PARLADE:  I have no issues with that,

10   Judge.  I think the only issue is Mr. Arslanian

11   couldn't be here at that time, but I have no issues.

12   I'm at this Court's disposal.

13          THE COURT:  Why wouldn't you be able to be

14   here?  We have the whole day for the trial.

15          MR. ARSLANIAN:  I'll be here.  I'm dealing

16   with -- you don't know what I'm dealing with, and

17   you don't want to know.

18          I take care of a 91 and a 93 year old.  At

19   3 o'clock in the morning I was summoned to pick up

20   the 93 year old by the 91 year old.

21          THE COURT:  I understand.  Aging parents

22   can be a challenge.

23          MR. ARSLANIAN:  They live with me.

24          I'm available.  I'll be here.

25          THE COURT:  Here's what we're going to do.

Page 394

1    I'm reading a ruling into the record at 1:30.   There

2    might be some argument at the end of the reading of

3    the rule.   So that nobody is sitting around waiting

4    and listening, although I'm sure you all would be

5    fascinated by personal property and rejected

6    commercial leases, why don't we say that at 2:30 we

7    will start Dr. Storper, and by then Dr. Storper will

8    either have found somewhere with a working Internet,

9    or he will have figured out how to work the phone.

10   That's what we'll do.

11               MR. PARLADE:  I appreciate that.

12               THE COURT:  So 2:30 we'll do a Dr. Storper

13   regroup.

14               We're still waiting for the interpreter to

15   switch out, so we'll just take another couple of

16   minutes.

17               MR. PARLADE:  Did you want to break for

18   lunch before then, Your Honor?

19               THE COURT:  No.  Let's finish Mrs. Cepero.

20               MR. PARLADE:  I mean before the 1:30

21   hearing.

22               THE COURT:  Oh, yes.  We will eat lunch.

23   It is against my religion not to eat now that I'm no

24   longer a practicing attorney.  When I was a

25   practicing attorney I ate a bag of almonds and

1   apricots out in the hallway for a five-minute break.

2   I don't do that anymore.

3           MR. CUE:  Your Honor.

4           THE COURT:  Yes, sir.

5           MR. CUE:  This is Jesus Cue.

6           THE COURT:  Yes, sir.

7           MR. CUE:  I would like to ask you if I can

8   disconnect.

9           THE COURT:  That's totally up to you and

10  Mr. Parlade and Mr. Alfaro.  You're always welcome

11  to stay, but your testimony is finished, unless

12  Mr. Parlade will be calling you in his case.

13          MR. PARLADE:  Judge, I don't anticipate

14  calling him, so I have no problem.

15          THE COURT:  All right.  So, Mr. Cue, thank

16  you.  Have a wonderful rest of your day, and please

17  keep safe.  Keep your mask on when you're inside.

18          MR. CUE:  Thank you, Your Honor.  Happy

19  New Year.

20          THE COURT:  Happy New Year.

21          Do we have an interpreter switch out yet?

22          THE INTERPRETER:  Your Honor, this is

23  interpreter Lucille Grenet, a certified --

24          THE COURT:  So, Ms. Grenet, thank you.  If

25  you would please spell your name for the record.

1           THE INTERPRETER:  Yes, Your Honor.

2   L-U-C-I-L-L-E, Lucille, Grenet, G-R-E-N-E-T.

3           THE COURT:  All right.  Thank you,

4   Ms. Grenet.  I'm going to ask you to raise your

5   right hand, and I'll administer the translator's

6   oath, okay?

7           THE INTERPRETER:  I'm raising my right

8   hand, Your Honor.

9   Thereupon:

10              LUCILLE GRENET,

11  an interpreter, having been first duly sworn,

12  translated from English to Spanish and from Spanish

13  to English to the best of her ability.

14          THE COURT:  I previously swore in the

15  witness.  So, Mr. Parlade, please continue with your

16  cross-examination.

17          THE INTERPRETER:  I'm sorry, Your Honor.

18  I just stepped in, and I'm just trying to find out

19  their surnames.

20          THE COURT:  So Mr. Parlade is the attorney

21  for the homeowners association who is conducting a

22  cross-examination of Mrs. Cepero.

23          THE INTERPRETER:  Cepero.  Got it.

24          THE COURT:  And Mr. Arslanian is the

25  attorney representing Mrs. Cepero, and he just

```
 1   concluded his direct examination.
 2             So, Mr. Parlade, if you'll continue with
 3   your cross.
 4             MR. ALFARO:  Your Honor, if I may ask a
 5   question.  You stated that -- basically --
 6             THE COURT:  For the record, this is
 7   Mr. Alfaro speaking.
 8             Yes, Mr. Alfaro, what is it?
 9             MR. ALFARO:  My client got served
10   yesterday, but I heard that she was not on the
11   witness list.  Do you anticipate her being served --
12   I mean being -- because you said you were excused,
13   that we didn't have to be here.
14             THE COURT:  I was talking to Mr. Cue.
15   Mr. Arslanian, if Ms. Ghilardi was not on your --
16   Ghilardi, that was her name, yes?
17             MR. ALFARO:  Yes.
18             THE COURT:  Mr. Arslanian, where are we
19   going with that?
20             MR. ARSLANIAN:  I don't intend to call
21   her.  I think that she was served as part of the
22   issue with getting the comptroller to make sure that
23   someone was here from the association to testify to
24   the matters.  I don't intend to call her.
25             MR. ALFARO:  She was the one served
```

1   yesterday, not Ms. Gallego.

2            MR. ARSLANIAN:  Ms. Gallego was served,

3   also.

4            THE COURT:  We're not going to spend any

5   more time on this.  Mr. Alfaro, it's up to you

6   whether you want to stay or you want to leave.

7   That's totally your call.

8            MR. ALFARO:  Thank you.

9            THE COURT:  All right.  Thank you, but

10  please put yourself on mute.

11           Okay, Mr. Parlade, please continue with

12  your cross-examination.

13           MR. PARLADE:  Thank you.

14  BY MR. PARLADE:

15       Q    Ms. Cepero, just a few minutes ago before

16  we took a break I had asked you about your visit

17  April 2019 with your primary care physician,

18  Reinaldo Hernandez, and I asked, would it surprise

19  you that he diagnosed you with generalized anxiety

20  disorder on that date, and you answered --

21       A    I do remember having told him everything

22  that was going on at the Hammocks, and it was on

23  that day that he referred me out to the

24  psychiatrist, because he said that I was just going

25  through way too much torment, and that I needed

Page 399

1    help.  And he also prescribed two medications for me

2    to take.

3              It's not easy to remember, but I do go

4    there periodically.  I do remember.

5         Q    And this would have been prior to the

6    incident in May 2019 with Marglli Gallego in the

7    parking lot of the Hammocks, correct?

8         A    That took place in May of 2019, because

9    there were way too many events that had taken place.

10   I couldn't take it anymore.

11        Q    I don't understand.  Are you saying there

12   are other events prior to May 2019 with the Hammocks

13   Community Association?

14        A    Yes, many.  That's why we're here in this

15   court, in a bankruptcy.

16        Q    How far back did these events with the

17   Hammocks Community Association start?

18        A    Three to four months after Marglli Gallego

19   took over the association.

20        Q    Do you remember what year that was?

21        A    Four to five years.  Well, I don't really

22   know.  Either 2014 or 2015.  I don't know.  She had

23   held about three to four meetings, and it was there

24   where she attacked me.

25        Q    What do you mean she attacked you?

1          A     Verbally, you see, because she told me

2     that she was going to call the police on me or that

3     she was going to kill me and cut my neck.  But she

4     never did so, because she didn't have -- because she

5     said she did have someone that could do that.

6          Q     This would have been in public, or this

7     would have been a private conversation with you?

8          A     No, it was in public.  It was after we

9     concluded a meeting.

10         Q     Was she the only one that threatened you

11    at those meetings?

12         A     Well, not just me, but yes, she would

13    threaten me, because she knew that we had decided to

14    proceed to take things that she had done to -- we

15    went to the police, a group of us, and we went ahead

16    and filed a report.

17         Q     What kind of report?

18         A     We were concerned that at the Hammocks we

19    couldn't receive or get any information at the

20    meetings.  We were a large group.

21         Q     What exactly were the charges that were

22    brought against Marglli, or was it the association

23    at that time?

24         A     They didn't put any charges on them,

25    because first they hear you out, and if it merits an

Page 401

1    investigation then they open one.

2           All their people continued to go, though,

3    giving more in-depth information.  These are people

4    that I don't know.  And then the investigation was

5    opened.

6       Q    I'm asking you, why did you open an

7    investigation at that time?

8           THE INTERPRETER:  Your Honor, this is the

9    interpreter.  I would like to instruct the witness

10   that if we're using an interpreter, to not ignore

11   the presence of the interpreter, and wait for my

12   translation.

13          THE COURT:  Mrs. Cepero, before Ms. Grenet

14   got here, I did tell you that even if you

15   understand, you are not to -- you must wait for the

16   interpreter.  You can't have it both ways.

17          THE INTERPRETER:  And to listen to my

18   Spanish interpretation when I'm speaking, not what

19   she believes she heard in English.  Please, Your

20   Honor.

21          THE COURT:  Right.  This is very important

22   for your own benefit, Mrs. Cepero.  You have a

23   translator, because your English is not good.  I

24   even have business people who conduct business in

25   English, that notwithstanding that, have

Page 402

1    interpreters when they come to trial, because they

2    want to make sure that they absolutely clearly and

3    correctly understand the questions that are being

4    asked.

5           So I must remind you again to wait until

6    the interpreter has finished interpreting, and then

7    respond.  That's for your protection and your

8    benefit.  All right?

9           THE INTERPRETER:  And the question, I

10   believe was, "I am asking you why you filed a

11   report," correct, Mr. Attorney?

12          MR. PARLADE:  That's correct.

13          THE WITNESS:  Well, because they had fired

14   about 11 workers that had been working there for

15   about 20 years.  We were no longer having the

16   activities that we used to have, and we were not

17   getting the information that we should receive, not

18   holding the monthly meetings that we were also

19   having before.

20          THE COURT:  I'm going to stop you for a

21   minute.  I see that Dr. Storper is here.

22          Would you like to try one more time, and

23   is that okay with you, Mr. Arslanian, if we do that?

24          MR. ARSLANIAN:  Yes.

25          THE COURT:  Mrs. Cepero, we're going to

Page 403

1    try to get Dr. Storper done.  So again, do not

2    discuss your testimony with anyone, and we'll get

3    back to you in just a few minutes.  If you want to

4    stand up and stretch your legs, that's fine.  Just

5    no chatting about your testimony.

6              Let's try this again.  Oh, no.  What

7    happened to Dr. Storper?  He was just here.

8              MR. PARLADE:  I think he just closed the

9    lid.

10             THE COURT:  Mrs. Storper, please unclose

11   the lid.  Open the lid.  Oh, no.

12             Okay.  If this happens again, Mr. Parlade,

13   you just need to text him and say, "We'll see you at

14   2:30," because I can't keep doing this.

15             MR. PARLADE:  Your Honor, I think I'm

16   going to need psychological treatment after doing

17   this.  This is very much.  I apologize.

18             MR. ARSLANIAN:  Mr. Parlade, just text

19   him.

20             MR. PARLADE:  One minute.

21             THE COURT:  They hung up again.  Oy vey.

22   We're not getting him to come back.  2:30, that's

23   it.  Tell him do not dial back in.

24             MR. PARLADE:  I just spoke to him.  He got

25   on, but he saw my text about 2:30 and he logged off.

1   He's going to log right back on now.

2              THE COURT:  No, no, no.  Let's finish with

3   Mrs. Cepero.

4              MR. PARLADE:  Hold on.  Let me tell him

5   not to log back on.  One second.

6              THE INTERPRETER:  We're ready on this end

7   again, Your Honor.

8              THE COURT:  Thank you so much.

9              THE INTERPRETER:  You're quite welcome.

10              MR. PARLADE:  Thank you so much.

11              THE COURT:  Mr. Parlade, your next

12   question to Mrs. Cepero.

13   BY MR. PARLADE:

14     Q    So in 2014, 2015, you filed criminal

15   charges, and this was, as you have stated, because

16   you had mentioned there were a number of workers

17   that had been let go by the association, and that

18   you were not getting access to documents from the

19   association; is this correct?

20              MR. PARLADE:  Hold on a second.

21   Mr. Cepero is just passing her some notes he's

22   written on a notebook.

23              THE COURT:  No, no.  Mr. Cepero, that is

24   not permitted.  You are not permitted to --

25              THE INTERPRETER:  Your Honor, this is the

1   interpreter.  I'm going to remove this and put it
2   next to me.  Is that okay?
3              THE COURT:  Yes, thank you.
4              Mr. Cepero, I thought I was very clear.
5   You may not coach or communicate with your wife
6   while she's testifying.  This is her testimony, not
7   yours.
8              MR. CEPERO:  Yes, Your Honor.
9              MR. PARLADE:  Judge, respectfully, we'd
10  like to invoke the rule of sequestration.
11             THE COURT:  Well, he's a client, but what
12  we're going to do is, Mr. Cepero, I'm going to ask
13  you to leave the room, and you can either go and sit
14  with Mr. Arslanian or out in the hallway, but you
15  may not stay in the room with Mrs. Cepero.  Thank
16  you.
17             I guess we'll just have the interpreter
18  start again.  And that was just affirmation that
19  Mrs. Cepero said that the reason that she reported
20  Mrs. Gallego to the police was because of the
21  removal of 11 workers and not getting any
22  information.
23             Is that a correct repetition of your
24  question, Mr. Parlade?
25             MR. PARLADE:  Yes, Judge.

1              THE COURT:  Madam Interpreter, Ms. Grenet,

2    if you would repeat the question to ask Ms. Cepero

3    to confirm that that was her prior testimony, and

4    then let's move on.

5              THE WITNESS:  Yes, but at the time they

6    didn't file any of those criminal charges.  It was

7    really more like we went there to consult with them.

8              THE COURT:  Okay.  I'm going to ask,

9    Mrs. Cepero, for you to go a little bit closer to

10   the camera, or go to the left a little so I can see

11   you better.  Great.  Thank you.  Okay.  Thank you.

12             Mr. Parlade, your next question.

13   BY MR. PARLADE:

14        Q    By consult with them, by "them" do you

15   mean the police?

16        A    Well, yes, but you see, the thing is, we

17   consulted as to charges that we saw on the credit

18   card that were exaggerated amounts, and also because

19   after the hurricane, my fence had been damaged and

20   they were not repairing it.  And we knew that we had

21   had 5 million in reserves, and at this point we had

22   zero dollars.

23             THE COURT:  Okay.  I'm going to stop for a

24   second.

25             Mr. Parlade, if these questions are not

1    relevant to the emotional distress, and you're

2    trying to revisit issues raised in the contempt

3    motion, then I'm going to ask you to move on.

4    Otherwise, tie in whatever these questions are

5    relevant to the medical issues, okay?

6              MR. PARLADE:  Judge, the witness has

7    stated, and the witness's counsel has stated that

8    they suffered emotional distress as a result of the

9    incident on May of 2019.

10             THE INTERPRETER:  I'm trying to get her to

11   turn off the microphone so I can translate what you

12   said.

13             THE COURT:  Okay, good.

14             Yes, I understand that.

15             MR. PARLADE:  The witness has stated that

16   this was a relationship and instances that go far

17   beyond that, from 2014, 2015.  So I'm trying to

18   inquire, number one, as to the history of this, as

19   to the culmination and development of symptoms.

20             THE COURT:  That's fine.  I'm just

21   reminding you that it has to focus on the medical

22   issues, okay?

23             MR. PARLADE:  Yes, Judge.

24             THE COURT:  All right.  Go ahead.  Ask

25   your next question.

Page 408

1   BY MR. PARLADE:

2       Q     Now, in 2014, 2015, when, as you stated,

3   you went to the police and Marglli Gallego

4   threatened you, did you develop any real fear at

5   that time that you were going to be hurt, or did you

6   have any repercussions to yourself psychologically?

7       A     In reality, I began to get to know

8   Marglli.  I really didn't know up to what point she

9   could go, and I had no fear.

10      Q     So as you just stated, Marglli threatened

11  to cut your head off, she threatened to make you

12  disappear, because she knew people that could do it,

13  she threatened to ruin you, but you had no fear of

14  that; is that true?

15      A     No, I was not afraid at all.  Nobody would

16  ever pay attention to her.  I just thought that --

17      Q     Did she ever try to kill you?

18      A     No.

19      Q     Did she ever try to physically harm you?

20      A     Well, there was one incident where these

21  motorcyclists chased me down, but the police caught

22  them.  The thing is that I have no enemies.  Well,

23  at this time, no.

24      Q     I don't understand.  What do you mean that

25  motorcyclists chased you down?

1          A     That on 184th, when I made a left turn,

2     some Colombian motorcyclists chased myself and my

3     husband down.  But I called the police, and I

4     screamed and screamed and screamed.  A police

5     officer was traveling not far behind.

6               At the traffic light he would say to me,

7     "If you get in front of me I'm going to kill you,

8     I'm going to kill you."

9               I said out loud, "Officer, he wants to

10    kill me, officer, he's going to kill me."

11              The policeman then ordered all of us to

12    make a right-hand turn, and told us to leave and

13    detained the motorcyclists.

14         Q     Do you believe that either Marglli Gallego

15    or the association was involved with those

16    motorcyclists?

17         A     I do believe -- I called the prime police

18    officers and I told them everything, but I have no

19    proof.

20         Q     And were you psychologically impacted by

21    that incident?

22         A     No.  I wasn't the kind of person to be

23    afraid that easily.

24         Q     So no depression, no anxiety, nothing?

25         A     No, sir.

1      Q    Do you remember when that might have been,
2   that incident?

3      A    I believe it was sometime in 2015, because
4   it was recently, after a group of us had gone to the
5   police to go ahead and file the -- at that point
6   there were many of us, and by then she already knew,
7   she was aware.  Everyone took their evidence to the
8   police.  Many people went, but many of those people
9   I did not know.

10     Q    Now, to clarify, who did you believe was
11  responsible for the motorcyclists?  Was it Marglli
12  Gallego, Hammocks Community Association, or both?

13     A    At that point I thought it could be
14  Marglli Gallego, but I don't know.  I do not know.

15     Q    You also previously mentioned in testimony
16  that there were other instances where you believe
17  you were targeted, for example, when the neighbor
18  was cutting plants on your property; is that
19  correct?

20     A    I already explained that to you.

21     Q    Do you believe Marglli Gallego was behind
22  that, as well?

23          THE COURT:  Put your phone down.

24          THE WITNESS:  Yes.  And I have a letter
25  here in which the association authorizes that.

Page 411

```
 1   BY MR. PARLADE:

 2        Q    Authorizes your neighbor to cut down your

 3   tree?

 4        A    Yes.

 5        Q    And you believe the association was behind

 6   all that?

 7             THE INTERPRETER:  I'm sorry, Counsel?

 8             THE COURT:  I couldn't hear you,

 9   Mr. Parlade.  What did you just say?

10   BY MR. PARLADE:

11        Q    And you believe the association was

12   responsible for that, correct?

13        A    Well, the letter is here.

14        Q    What letter are you referring to?

15        A    I believe you have it.  It is the letter

16   that states that if I cross from here to over there,

17   that it will be considered to be vandalism, and that

18   the neighbor is being authorized to cut the plant.

19        Q    This is directed specifically at you?

20        A    It was tendered to me by the neighbor in

21   the presence of the police.  The association had

22   given it to her, had granted it to her.  Also --

23        Q    What year was this?

24             THE INTERPRETER:  I'm sorry, Counsel?

25
```

1    BY MR. PARLADE:

2          Q      What year was this?

3          A      Last year.

4          Q      You had also mentioned that someone fired

5    shots at you in front of your house; is that

6    correct?

7          A      Two shots.

8          Q      Was your house struck, were you struck?

9    What happened?

10         A      Well, it was either May 2nd or 3rd,

11   between 8:00 and 9:00 p.m.  I was sitting in my

12   office.  My husband was cleaning the hallways.

13                All of a sudden I hear these shots and I

14   scream out, "Josue, Josue," calling out to my

15   husband.

16                And it was then recorded on video when

17   this man in a van stops in front of my home and

18   shoots two shots up into the air.  And my husband

19   then said that he saw when that man stepped out of

20   the van and enters into the home of the neighbor.

21         Q      Do you believe Marglli Gallego or the

22   association was responsible for that?

23         A      I do not have any enemies.

24         Q      You don't believe they're responsible?

25         A      I don't know.

1          THE COURT:  I can't see you, Mrs. Cepero.

2          THE INTERPRETER:  The answer was, I don't

3   know.

4   BY MR. PARLADE:

5      Q     Did you report it to the police?

6      A     There's a detective assigned by the State

7   Attorney.

8      Q     And did you tell him you believed it was

9   Marglli Gallego responsible for that?

10     A     Well, I told him where the shot came from

11  and where the man went to.  I didn't involve

12  anybody.

13     Q     Were you in any way affected?  At that

14  time did you become afraid and say, "Okay, this is

15  serious, I'm going through a period of anxiety"?

16  Did you have repercussions psychologically, thinking

17  that you had been targeted?

18         THE COURT:  Madam Interpreter, finish your

19  interpretation, and then, Mrs. Cepero, do not

20  answer.  Go ahead.

21         THE WITNESS:  Yes, my anxiety increased

22  and I had panic attacks.

23         THE COURT:  Wait, wait.  Stop.  I said not

24  to answer it.

25         THE INTERPRETER:  Oh, I'm sorry.

1           THE COURT:  Okay.  I'm going to strike

2    everything after the interpretation of the question.

3           Mr. Arslanian, what is your objection?

4           MR. ARSLANIAN:  It was about five

5    questions in one question.

6           THE COURT:  So it was a compound question?

7           MR. ARSLANIAN:  That's all.

8           THE INTERPRETER:  I'm sorry, Your Honor.

9    I didn't hear your instruction, and I didn't hear

10   the objection either.  So please forgive me for

11   that.

12          THE COURT:  That's okay.

13          Mr. Arslanian, I did not understand you.

14   Did you say that's your objection, that it's a

15   compound question?

16          MR. ARSLANIAN:  Yes.

17          THE COURT:  I'm going to sustain the

18   objection, and ask you, Mr. Parlade, to break it

19   down into different sections.

20   BY MR. PARLADE:

21      Q    When that incident happened earlier this

22   year with the two shots being fired, did this affect

23   you psychologically?

24      A    Yes.  And it increased.

25      Q    Increased what?

1        A     Anxiety.

2        Q     Now, was there also an incident that

3   happened earlier this year when you mentioned

4   someone tried to open your door?

5        A     Yes.

6        Q     And was this an employee of the

7   association?

8        A     Yes.

9        Q     And this employee, had she left a paper on

10  your door?

11       A     Yes.

12       Q     And do you remember approximately when

13  that was this year?

14       A     Approximately a month and a half or two

15  months ago.  I called the police.  There is a police

16  report.

17       Q     Do you remember, other than the paper,

18  what happened after they left the paper on your

19  door?

20       A     Yes.  Well, the police read the note, and

21  about five security guards came over in the new

22  security cars that they recently purchased.  They

23  parked in front of my home.

24             There's one security guard that I know.

25  Well, I can't remember his name right now, but I do

1   know him from before.  He asked me for the paper.

2   It states that I have to paint my driveway.  They

3   said they knew that I was going to be redoing my

4   driveway in order to broadened it, to widen it.

5           So then the security guard came over.  He

6   had lots of tattoos.  I can't remember his name.  I

7   told Ana not to come into my home again.  I didn't

8   even want her in my yard.

9       Q    Who is Ana?

10      A    Ana Martinez.  She's the one that collects

11  the votes for the association.  I told her that we

12  pay for mail there, and to, as before, to send

13  everything to me by mail.

14          So this security guard, he took the paper

15  away from me, and many patrol cars came.  And all of

16  them took off scene.  Thank goodness the police was

17  able to detail what she read.

18          I called the security office and I said to

19  them, "You took the document away from me," and they

20  did not wish to return the document to me.  I said,

21  "It doesn't matter.  The police know what that paper

22  said."

23          THE COURT:  Okay, stop.

24          Mr. Parlade, your next question.

25          MR. PARLADE:  Thank you.

1  BY MR. PARLADE:

2       Q    Do you remember the person who brought

3  that notice and left it on your door?  Do you

4  remember who that was?

5       A    Ana Martinez.  I saw her through the

6  window.  And she was also trying to open my door,

7  like putting the paper there.  I could hear from my

8  office how she turned the key -- lock.

9       Q    Do you remember chasing Ms. Martinez on

10 your property?

11      A    Yes, I did.  I chased her and I said, "Do

12 not ever come into my property again.  Do not do

13 this again.  You have made me tired of this."

14      Q    As a matter of fact, you chased

15 Ms. Martinez into a tree, correct?

16      A    She got into a security guard's car and

17 left with the security guard.

18      Q    You weren't psychologically impacted when

19 Ms. Martinez put that note on your door, were you?

20      A    Everything happened so quickly.  I thought

21 it was my husband that was trying to open.

22           MR. PARLADE:  Judge, she's being

23 unresponsive.  Can you renew the limiting

24 instruction?

25           THE COURT:  Stop.

1          Mrs. Cepero, I'm going to ask you again,

2    listen to the question, answer the question.

3    Mr. Parlade has allowed you to say quite more each

4    time, but we're going to stop at 1 o'clock for a

5    break, and I would like to try to get through some

6    of your testimony.  That's not going to be helpful

7    if you don't answer the questions that you're asked,

8    okay?

9          Mr. Parlade, your next question.

10   BY MR. PARLADE:

11        Q    Were you psychologically affected by that

12   instance when they left a letter on your door, yes

13   or no?

14        A    Yes.

15        Q    Did it increase your anxiety?

16        A    Of course.  A person that has anxiety and

17   is already under treatment, event after event after

18   event.

19        Q    And as you mentioned in your testimony,

20   you can't sleep at night, correct?

21        A    I don't sleep.

22        Q    You feel it's something daily going on

23   with the association or Marglli Gallego?

24        A    I am not delusional.  All it is is that I

25   am cautious.  I know they are a danger.  I'm living

1    in reality.

2        Q    Again, Ms. Cepero my question was, you

3    previously stated you are in daily fear that you are

4    being persecuted by the association or Mrs. Gallego.

5    You said that.

6        A    Well, not that they're persecuting me, but

7    that the securities have chased me down while I've

8    been in my car, several times, several times.  About

9    a month and a half you they're calmer, they've

10   calmed down.

11       Q    This started back in 2014, 2015?

12       A    Sir, in 2015, that's when the situation

13   aggravates with the incident, when the Judge

14   declares --

15            THE INTERPRETER:  She's using a word that

16   I cannot understand, this is the interpreter, in

17   context or in contest.  I don't know.  I need her to

18   write it out.  I don't know what she's saying.

19            THE COURT:  Let's go back to the question.

20   The question was, Mr. Parlade -- go ahead and ask

21   the question.

22   BY MR. PARLADE:

23       Q    You just testified that in addition to the

24   incidents we just talked about, there's also been

25   many instances where the security for the Hammocks

Page 420

1   has chased you or followed you, correct?

2        A    A long time ago, yes.

3        Q    What I'm trying to get at is, are you

4   saying as of 2014, 2015, you also, in addition to

5   the instances we just discussed, you've also been

6   followed by security in their cars, correct?

7        A    Well, sir, it is in 2015 on forward, that

8   is when the situations get worse.  They aggravate.

9             THE COURT:  I'm going to stop for just a

10  minute.

11            Mr. Parlade, how many more questions do

12  you have?

13            MR. PARLADE:  I have about six questions,

14  Your Honor.

15            THE COURT:  We're going to stop, because I

16  need to take a break before my 1:30 hearing,

17  including getting ready for my 1:30 hearing.  We're

18  going to come back at 2:15.  By then I should be

19  done with my 1:30 matter.

20            At 2:15 we'll continue with Mrs. Cepero's

21  cross-examination.  Then we'll do redirect,

22  Mr. Arslanian, maybe after Dr. Storper, if God

23  willing, he's able to do what it is he has to do.

24            After Mrs. Cepero's testimony,

25  Mr. Arslanian, what else do you have in your case in

1  chief?

2          MR. ARSLANIAN:  Just the testimony of

3  Josue, and that's it.

4          THE COURT:  And then, Mrs. Parlade, after

5  Mr. Arslanian rests, with respect to your case in

6  chief, other than Dr. Storper, what other evidence

7  will you have?

8          MR. PARLADE:  That's it.

9          THE COURT:  All right.  So what we'll do

10  is, we're going to take a break.

11          Mrs. Cepero, this is very, very important.

12  You may not discuss your testimony with your husband

13  or with Mr. Arslanian or with anyone else.  You can

14  talk about the weather, your health, but not your

15  testimony.

16          THE WITNESS:  I'll stay in the office, but

17  I would like to speak to my attorney.

18          THE COURT:  We're going to terminate the

19  hearing.  I'm going to turn off the Zoom so you all

20  can do whatever you want until 2:15, except talk

21  about your testimony.

22          THE INTERPRETER:  Did you say, Your Honor,

23  not even with her attorney?

24          THE COURT:  Not the testimony.  She can

25  discuss the case in general, but not her testimony.

1           THE WITNESS:  I won't be speaking to

2    anybody.

3           THE COURT:  Anything else before we

4    conclude the morning?

5           MR. ARSLANIAN:  No, judge.

6           THE COURT:  Please stay safe.  Don't do

7    anything crazy during lunchtime.

8           Mr. Parlade, you get with Dr. Storper and

9    get us all in a happy place.

10          MR. PARLADE:  I'm working on it.  I

11   apologize, Your Honor.

12          THE COURT:  Look, this is what it is,

13   right?

14          I will see you all at 2:15.  If you log on

15   earlier, because it's going to be on the same Zoom

16   thing, just please remember to keep yourselves on

17   mute and your cameras off until I've concluded the

18   other matter.  But I'm going to do my best to be

19   done before 2:15.

20          Thank you very much.  That concludes the

21   morning.

22          (Thereupon, a lunch recess was taken,

23   after which the following proceedings were had:)

24          THE COURT:  Let's go back to the matter of

25   Cepero.  I see I have Mr. Arslanian, and now I have

1    Mr. Brooks.

2              So, Mr. Brooks, if you'd like to make your

3    appearance, whether it's by talking or waving or

4    both, but you need to take yourself off mute.

5              MR. BROOKS:  Good afternoon, Judge.

6    Michael Brooks for the debtors, B-R-O-O-K-S.  Nice

7    to join you.

8              THE COURT:  Okay, thank you.

9              All right.  I see Mr. Parlade,

10   Ms. Escobar.  I know Mr. Juaregui and Mr. Alfaro are

11   just listening, and Mr. Juaregui, I'm going to write

12   your name down because I forgot to do it this

13   morning.

14             Oh, there you are.  When you turn the

15   camera on you move, and then I get all confused.

16   Okay.  All right.

17             MR. JUAREGUI:  Yes, Your Honor.

18             THE COURT:  Now, I am missing the

19   witnesses.  I had turned the video off because they

20   had the video on when I had my other hearing and it

21   was distracting me.

22             MR. ARSLANIAN:  There's an assistant going

23   into the other room to try to straighten it up.

24             THE COURT:  Okay, great.  They may turn

25   their video on if they would like.  We need them to

Page 424

```
 1   do that so Mr. Parlade can finish his
 2   cross-examination, and then God willing the doctor
 3   will figure out how to do this correctly and we
 4   won't have another 20 minutes of technology hell.
 5             I'm not allowed to say that on the record.
 6   Technology challenges.  How's that?
 7             MR. BROOKS:  Do I get a credit for
 8   technology on this?
 9             THE COURT:  Were you the one doing the
10   screen sharing, Mr. Brooks?
11             MR. BROOKS:  Yes, I was.
12             THE COURT:  I didn't think so.  No.  You
13   all get credit for finding someone who knows how to
14   do the screen sharing.
15             MR. BROOKS:  Exactly.  It's 20 years
16   younger, 30 years younger.
17             THE COURT:  At least.  We're waiting for
18   the witnesses.  If you all can get -- oh, we have
19   Dr. Storper.  So maybe while we're waiting for those
20   witnesses to get connected, we'll just go to
21   Dr. Storper.  Let's just do that.
22             We've got video.  Now we just need audio.
23   Thank you, Mrs. Storper.  We just need the audio to
24   go on.
25             Dr. Storper, if you could unmute.  Okay.
```

1    Now turn the volume up so we can hear you.

2              I want to go back to when I didn't even

3    know what Zoom was.

4              MR. PARLADE:  Me too, Judge.

5              THE COURT:  We're still having trouble

6    hearing Dr. Storper.  Mrs. Storper is going to try

7    to fix it.

8              While we do that, I'm going to ask the

9    witnesses -- Mr. Brooks or somebody, if you can get

10   your witnesses to turn back on.

11             Mr. Parlade, maybe they can keep the audio

12   off, and Dr. Storper can call in on his phone with

13   the same Zoom link.

14             MR. PARLADE:  Okay.

15             THE COURT:  That ought to work.  You can

16   tell him we have a few minutes.  Wait.  I'm hearing

17   some noises, so maybe they just need to turn the

18   volume up more.

19             MR. PARLADE:  Can you say something, Fred?

20             MR. ARSLANIAN:  We're working in the other

21   room right now to get the witnesses up.

22             If you recall, at the last evidentiary

23   hearing we had, Miguel kept freezing up and we had

24   to stop the hearing.  He turned into a statue.

25             THE COURT:  I will say this:  It appears

```
 1    that all the professionals have gotten their
 2    Internet issues under control.  As I say, probably
 3    ad nauseam at this point, there should not be a
 4    lawyer in this country that doesn't have the best
 5    possible Internet speeds at their home or office at
 6    this juncture, right?
 7              MR. PARLADE:  That's very true.
 8              MR. BROOKS:  Is it possible that it's
 9    something on your end that you turned them off,
10    because they're not able to log on?
11              THE COURT:  I turned off the video, but it
12    says, "Ask to unmute and ask to start video."  So
13    they just need to turn their camera on, and they
14    need to turn their video on.
15              I see a person.  I see Mrs. Cepero.  So
16    why don't we unmute Mrs. Cepero?  I'll just confirm
17    Mrs. Cepero is still there, and do I still have --
18              THE INTERPRETER:  Ms. Cepero and I, the
19    interpreter, Ms. Grenet, are present.
20              THE COURT:  Okay, great.
21              So, Mr. Parlade, if you want to continue
22    with your cross-examination while Dr. Storper and
23    his wife try to get audio.  Go ahead.
24              MR. PARLADE:  If you would be so kind to
25    just remind the witness that they are still under
```

Page 427

1    oath that was given earlier today.

2             THE COURT:  Yes, thank you.

3             Mrs. Cepero, you are still under oath from

4    this morning.  Again, the same rules apply.  Wait

5    until the interpreter finishes interpreting, and

6    allow the interpreter to interpret your response and

7    we'll get through this, okay?

8             Remember, answer the question that you're

9    asked yes or no, and then a brief explanation.  If

10   you want to say more, then Mr. Arslanian will ask

11   you that on your redirect, okay?

12            Go ahead, Mr. Parlade.

13   BY MR. PARLADE:

14       Q    Ms. Cepero, when was the first time you

15   noticed having any type of psychological symptoms as

16   a result of your interactions either with Marglli

17   Gallego or the association?

18       A    Immediately after the incident,

19   immediately.

20       Q    What incident are you speaking about?

21       A    The one in which she closes up in the

22   herrand (phonetic).

23       Q    Are you referring to the incident of May

24   the 15th of 2019?

25       A    Yes.

1       Q    Now, that was the first time you ever felt

2  in fear or anxious?

3       A    Anxious, yes.  I saw that to be very

4  serious.

5       Q    So you were anxious, but not afraid?

6       A    How could I not be in fear of a person

7  that has no respect for anyone?

8       Q    So you were in fear?

9       A    How am I not going to be afraid of a

10  person that doesn't respect what a Judge ordered in

11  a court.

12       Q    But you weren't in fear back in 2014 and

13  2015 when Marglli Gallego allegedly said to you,

14  "I'm going to cut your head off, I'm going to make

15  you disappear, I'm going to kill you, I know people

16  who can do it;" is that correct?

17       A    Well, sir, she said that in a public

18  meeting.  As a matter of fact the meeting was being

19  recorded.  That recording still exists in my phone,

20  and no, I was not afraid of that.

21       Q    And you weren't in fear in 2015 when you

22  said you saw some Colombians on motorcycles

23  following you and telling you they were going to

24  kill you, correct?

25       A    Well, that wasn't in 2015, though, no.

Page 429

1    That was last year.  Many events.  That took place

2    last year, and yes, I was afraid and I screamed out.

3    I yelled.

4              I called 911, and it was right then that a

5    police officer was passing by.  And the police took

6    control of the situations.

7         Q    So when you testified a few minutes ago

8    that you weren't afraid, and that you believed

9    Marglli Gallego and the association were responsible

10   for these motorcyclists, that was incorrect?

11        A    But just the same, I told you that I did

12   yell out.  I screamed lots in the car, and I

13   screamed out, "Josue, Josue."  And I called --

14        Q    So when you said you weren't afraid, that

15   wasn't correct or that was correct?

16        A    Sir, I was afraid.  I called the police.

17   I called 911.

18        Q    Is it true you weren't afraid when you

19   said, back in 2014, 2015, you started being followed

20   by security guards of Hammocks throughout the

21   property?

22        A    Well, let me tell you, I can tell you who

23   these people were driving these security cars.  And

24   by the way, that was not in 2014, it was in 2015.

25   It was Santiago in car number two --

1          MR. PARLADE:  Judge, respectfully --

2          THE COURT:  I'm going to stop you,

3    Mrs. Cepero.  That's not the question.

4          What's your next question, Mr. Parlade?

5          MR. PARLADE:  She never answered that one,

6    Your Honor.  I just want to know, was she afraid.

7    She's been followed for years, she said, by the

8    association, by security guards.  Was she afraid?

9          THE WITNESS:  At first we just thought

10   they would be there for about a year, that they'd be

11   leaving, that all this would conclude.  Everybody

12   there was in contact and reporting all of the

13   incidents.

14         MR. PARLADE:  Your Honor, again,

15   respectfully --

16         THE COURT:  Yes.  Mrs. Cepero, please

17   answer the question.  Were you afraid when you were

18   being followed by the security guards, then or at

19   any time?

20         THE WITNESS:  Yes.  And I did confront

21   them.  I even have a video there of my confronting

22   them.

23         THE COURT:  Okay.  What's your next

24   question, Mr. Parlade?

25

1    BY MR. PARLADE:

2        Q    So this wasn't an isolated incident that

3    you're claiming contributed to your anxiety and your

4    fear, correct?

5            THE INTERPRETER:  I'm sorry, Counsel.

6    This is the interpreter.  I did not understand.  You

7    said this was an insulated incident or was not?

8            THE COURT:  I also did not understand your

9    question, Mr. Parlade.  So why don't you reask it in

10   a more clear manner?

11   BY MR. PARLADE:

12       Q    So this wasn't an isolated incident that

13   contributed to your fear and anxiety over the

14   situation with Marglli Gallego, correct?

15       A    My anxiety began on the 15th when I saw

16   what Marglli Gallego was capable of doing.

17       Q    What she was capable of doing was cutting

18   you off in a car in the parking lot of her house,

19   correct?

20       A    Not in her parking area.  Aside from that,

21   she didn't live there either.  We looked into that,

22   and there are witnesses.  At no time did I ever park

23   in her space.

24           THE COURT:  Okay.  We're not going there.

25   Mr. Parlade, any other questions?

1          MR. PARLADE:  You said we're not going

2     there for what you thought my next question was

3     going to be?

4          THE COURT:  I'm not going into what I've

5     already ruled or not ruled, okay?

6          MR. PARLADE:  Judge, I don't want to go

7     into that, as well.  However, she just mentioned

8     something, a statement that contradicts testimony by

9     her husband on the stand, on stating they had no

10    clue where she lived.  They had no clue where she

11    was at, and they had no clue if she was there when

12    they went there.

13         Now she's saying something different,

14    saying they had investigated where Marglli lived.

15    This possibly opens up another witness to perjury.

16         THE WITNESS:  Sir, may I answer?

17         THE COURT:  I'm going to ask a question.

18    Because I don't want to go down this bunny trail if

19    it is, in fact, a bunny trail.

20         Mrs. Cepero, when did you investigate

21    where Ms. Gallego lives?

22         THE WITNESS:  About a month ago the

23    president of the advisor to the owners, she told us

24    that she did not live there.

25         THE COURT:  Okay.  Do I understand what

1  you're saying is, you investigated after the May

2  15th incident or before the May 15th incident?

3          THE WITNESS:  No.  The thing is, I wasn't

4  the one that investigated it.  I never have known

5  where she lived.  A neighbor in the area is the one

6  that told me.

7          THE COURT:  When?

8          THE WITNESS:  Anywhere between 15 or 20

9  days ago, possibly even 25 days ago.  I don't know.

10          THE COURT:  That's enough.  Mr. Parlade,

11  do you want to continue with this line of

12  questioning or can we move on?

13          MR. PARLADE:  Let's move on, Your Honor.

14  BY MR. PARLADE:

15      Q    Is it your contention here today that you

16  suffered any injuries as a result of the lawsuit

17  that was filed in November 2020?

18      A    You mean the lawsuit that she filed?

19      Q    You mean the lawsuit by Marglli Gallego?

20      A    You mean to us?

21      Q    Yes.

22      A    At first I did get nervous, and then when

23  I spoke to Michael he explained it to me and I got

24  calm.  No problem.

25      Q    From what I understand, there were no deep

1    psychological issues that resulted therefrom,

2    correct?

3          A    Well, that's what you understand, but

4    you're not a professional nor a doctor.

5              MR. PARLADE:  Judge, I'm asking a simple

6    question.  If she knows she knows, if she doesn't

7    she doesn't, but she's not responsive.

8              THE COURT:  Ms. Cepero, two things.  One,

9    answer the question that you're asked, and number

10   two, don't argue with the lawyer.

11             THE WITNESS:  Okay.

12             THE COURT:  Ask the question again,

13   Mr. Parlade.

14             Please listen carefully, Mrs. Cepero, and

15   answer it if you know the answer.

16   BY MR. PARLADE:

17         Q    As a result of the November 2020 lawsuit

18   filed by Marglli Gallego and Hammocks Association,

19   did you undergo any changes to your psychological

20   condition that you are now claiming caused you

21   emotional distress?

22         A    The thing is, I'm not clear right now as

23   to what does the lawsuit filed in 2020 have to do

24   with?

25             MR. PARLADE:  Judge --

1              THE COURT:  Mr. Parlade, that's your

2    answer.  Just move on.

3              MR. PARLADE:  Thank you, Judge.

4    BY MR. PARLADE:

5         Q    It seems that many of the instances you

6    had occur to you were at the hands of Marglli

7    Gallego; is that correct?

8         A    Yes, I believe so.

9         Q    Is it your understanding that on May 15,

10   2019, when the incident happened, was this an

11   incident that was either approved or directed by the

12   Hammocks Community Association?

13             MR. ARSLANIAN:  Wait, wait, wait.

14   Objection.

15             THE COURT:  Let the interpreter interpret

16   the question and then I'll hear the objection.

17             So, Madam Interpreter, after you interpret

18   the question, tell Mrs. Cepero, do not answer, okay?

19             THE INTERPRETER:  Okay.

20             THE COURT:  Okay.  What is your objection,

21   Mr. Arslanian?

22             MR. ARSLANIAN:  My objection is that that

23   question goes to matters that you already ruled on

24   in your initial contempt order.  She's been found in

25   contempt, the association was found in contempt, and

1    now they're trying to go backtrack and say it was

2    only Marglli that should have been held in contempt.

3              They've got an appeal going on this issue,

4    and it has nothing to do with the emotional distress

5    issue that's being presented here today.  She was

6    the president.  She was in the car at the time.

7              MR. PARLADE:  Judge, if I may briefly

8    respond?

9              THE COURT:  Very briefly.

10             MR. PARLADE:  Judge, this is more than

11   emotional distress.  This is also a claim for

12   punitive damages.  In punitive damages, the actual

13   knowledge, and if there's any malice on the parties

14   when they committed the act is, of course, at issue

15   in determining the amount of punitive damages, if

16   issued punitive damages.

17             So it does come into play to the damages

18   part.  It has nothing to do with whom it was.

19             THE COURT:  I'm going to sustain the

20   objection and let me just be clear, however, what

21   you can ask.  If you wish to ask a question, if

22   there's any independent acts by the association

23   other than those that I have already ruled on, then

24   you're free to ask that question.

25             But with respect to the issue of

1    Mrs. Gallego, et cetera, you are free to argue in

2    your closing argument why you believe that the

3    association should not be assessed punitive damages

4    on account of the behavior of Ms. Gallego, and then

5    I'm sure Mrs. Escobar will be robustly arguing the

6    underlying vicarious liability or whatever.  I'm

7    talking off the top of my head right now, whatever

8    the arguments are to the underlying liability for

9    contempt.

10              But I agree with Mr. Arslanian that with

11   respect to that issue, that's been resolved.  So if

12   you have a question regarding any independent acts,

13   you may ask that question, but that's it.

14              MR. PARLADE:  Okay.

15   BY MR. PARLADE:

16        Q    Ms. Cepero, do you know of any independent

17   either acts or communications that would tend to

18   prove or disprove that the association sanctioned

19   the acts of Marglli Gallego on May 15, 2019?

20              THE COURT:  Okay.  Don't answer the

21   question.

22              Yes, Mr. Arslanian?

23              MR. ARSLANIAN:  Same objection.  You

24   instructed Mr. Parlade to talk about other acts.

25   He's going directly to the same acts that you

Page 438

1    already found both of them liable for.

2              THE COURT:  I'm going to overrule the

3    objection.  I don't agree that that's the correct

4    characterization of the question.

5              But to overcome any question of doubt,

6    just make sure, Mrs. Cepero, that you understand

7    that the question relates to actions other than

8    those that were directly by Ms. Gallego on May 15th.

9              MR. PARLADE:  Let me just voice my quick

10   objection.  The translation she said (speaking in

11   Spanish) --

12             THE INTERPRETER:  No, sir.  I never said

13   (speaking in Spanish).

14             MR. PARLADE:  What did you say?

15             THE INTERPRETER:  Why don't you ask your

16   question entirely again, because now I've forgotten

17   it.  But I didn't use the word "ordered."  (Speaking

18   in Spanish) possibly.

19             MR. PARLADE:  That's right.  That's the

20   word you used.

21             THE INTERPRETER:  Which is "reprimand."

22   Please repeat your question so that the interpreter,

23   myself, could translate properly.

24   BY MR. PARLADE:

25        Q    Ms. Cepero, do you know of any events,

Page 439

1    acts or communications, either before or after the

2    event on May 15, 2019, by Hammocks Community

3    Association, that would tend to either prove or

4    disprove that they approved of that incident that

5    happened?

6            THE COURT:  Okay.  That I will sustain the

7    objection.  That is not the question that I told you

8    you could ask.

9            MR. PARLADE:  I'll withdraw the question.

10   I have nothing further, Your Honor.

11           THE COURT:  All right.  Before we go to

12   redirect, I'll ask the interpreter to put Ms. Cepero

13   on mute for right now.

14           Dr. Storper, please say something.  Is

15   608-49 -- is that you, Dr. Storper?

16           DR. STORPER:  Hi.  Can you hear me?

17           THE COURT:  Yes.  Okay.

18           DR. STORPER:  I'm unmuted.  Usually the

19   only one who mutes me is my wife.

20           THE COURT:  As it always should be.  Okay.

21           So we're going to -- we all just want to

22   have a celebration here.  Okay.

23           So we're going to take Dr. Storper out of

24   turn while the technology gods are with us.

25   Mr. Parlade, I'm going to ask you to please increase

Page 440

1     the volume on your computer.  I'm having a little

2     bit of difficulty, and perhaps Dr. Storper will as

3     well.

4              Now, Mr. Parlade, I will ask you to go

5     ahead and start with Dr. Storper.

6              MR. PARLADE:  Thank you.

7                      DIRECT EXAMINATION

8     BY MR. PARLADE:

9         Q    Could you please state your name for the

10    record?

11        A    Henry Storper.

12        Q    Is it Dr. Storper?

13        A    My name is Henry Storper, Henry Michael

14    Storper.

15        Q    What is your occupation?

16        A    I'm a doctor.

17        Q    Thank you.  What is your specific

18    occupation?

19        A    I'm a physician and a board certified

20    psychiatrist.

21        Q    Okay.  And what is your educational

22    background, Dr. Storper?

23        A    Starting from where?

24        Q    Starting from 1970.

25        A    Well, okay.  I went to college at NYU, and

Page 441

1  I went to George Washington Medical School.  I got

2  an M.D.  Then I spent a year as an intern in

3  Hartford Hospital.  Then I did three years of

4  psychiatric residency at New York Hospital Cornell

5  Medical Center.

6            Then I entered the Army, where I was a

7  major in the Army stationed at Fort Bragg, where I

8  ran the general psychiatric unit for a year, and I

9  directed the substance abuse program for a year.

10           After I left the Army I came to Miami,

11  Florida, where I started a private practice, was

12  hired as director of a substance abuse program

13  called St. Luke's Center.  I left there to work at

14  the Community Mental Health Center, CHI.  After

15  being there for three years I became the medical

16  director at CHI.  I was medical director there until

17  1972, when I left to go into full-time private

18  practice.

19           In addition to the private practice, I,

20  with three other psychiatrists, started an inpatient

21  psychiatric unit at what was then Miami-Dade

22  Hospital, now is known as Jackson South.  I served

23  in various capacities in the hospital, director of

24  the psychiatric unit, director of the partial

25  hospitalization program, and I was also chief of

Page 442

1    staff for one year of the hospital.

2              Then I've been in private practice since,

3    doing outpatient psychotherapy.  I did inpatient

4    psychotherapy until right before the pandemic

5    started.  Then I had a medical legal practice, as

6    well, for a number of years.

7         Q    And what organizations are you now a

8    member of?

9         A    Now?

10        Q    Yes.

11        A    I'm just a member of the American

12   Psychiatric Association.

13        Q    Are you also a member of the Florida

14   Psychiatric Society?

15        A    I'm not sure if my membership is current.

16   I'd have to check.

17        Q    Are you an member of the American Board of

18   Psychiatry and Neurology?

19        A    Well, the American Board of Psychiatry and

20   Neurology is a certifying organization that gives

21   examinations to determine board certification.  So

22   I'm certified by that board.

23        Q    Okay.  Approximately how many cases do you

24   think you handled regarding either psychiatry or

25   anything related to that field?

1      A     How many cases in what period of time?

2      Q     I would say in your career, an

3   approximation.

4      A     I don't think anyone ever asked me that

5   question.  No one.

6            That would be hard to say.  Certainly

7   thousands and thousands of people.

8      Q     Perfect.  Thank you so much, Doctor.

9            Now, this case involves an allegation that

10  there are some individuals that underwent emotional

11  distress as a result of acts by not only the

12  association, but by an individual, Marglli Gallego.

13           What about emotional distress would

14  require the testimony of a person with your

15  qualifications?

16     A     Well, to make an assessment of what their

17  level of psychiatric illness is, what your diagnosis

18  is, to review all of their medical records, both

19  psychiatric and non-psychiatric, interview each

20  person for an appropriate amount of time, and then

21  to offer an opinion on that topic.

22     Q     Okay.  And what is about issues with

23  emotional distress that a layperson with no

24  background in this field might not be able to

25  understand?

Page 444

```
1        A    Well, emotional distress is a rather large

2   topic.  I wonder if we could be a little more

3   specific.

4             I mean, anyone can have emotional distress

5   and they don't need treatment or assessment.  It's

6   only when your emotional distress becomes

7   symptomatic and interferes with the functioning of

8   daily life, activities of daily living, work,

9   school, things like that, that they require care, if

10  they choose to get it.  Many people don't choose to

11  get help.

12            THE COURT:  Dr. Storper, I'm going to ask

13  you to move the camera -- tilt your camera just a

14  little bit forward so I can see your entire face.

15  Right now I can only see you from the nose up.

16            Okay.  I think we're doing better now.

17  Thank you.

18            THE WITNESS:  I'm sitting outside on the

19  patio to get my neighbor's Internet.

20            THE COURT:  We can see that, and we thank

21  your neighbor.

22            Go ahead, Mr. Parlade.

23            MR. PARLADE:  Thank you.

24  BY MR. PARLADE:

25        Q    Dr. Storper, do you believe your testimony
```

1  today will aid the Judge in understanding the facts

2  in this case?

3      A    Yes.

4      Q    And how so?

5      A    Well, this is a chance to have a

6  psychiatric opinion, to review the care.  The only

7  opinions that we have are the treating therapists.

8      Q    Have you examined both debtors, both Josue

9  Cepero and Leticia Cepero?

10      A    I have.

11      Q    Okay.  Now, if we can first turn to your

12  examination of Josue Cepero, if you could please

13  remark as to what you reviewed prior to examination,

14  and what the results of that examination were.

15      A    Yes.  Well, I created a report, which has

16  been provided, I believe, to all counsel and to the

17  Judge, as well as to you, about my examination.

18          I reviewed all the medical records that

19  were provided to me, and I was able to review mental

20  health records of Dr. Caro.  I did not have any

21  medical records for Dr. Suarez, his current family

22  doctor, nor with Dr. Pedro Caro, his prior family

23  doctor, who is the father of Marjorie Caro, his

24  psychiatrist.

25      Q    Doctor, the other Dr. Caro, who's the

Page 446

1    father of Marjorie Caro --

2         A    Pedro Caro.  I did not see any records

3    from him, nor do I have his current -- the current

4    records of his family doctor, who evidently is

5    prescribing some psychotropic medication for him.

6              THE COURT:  Dr. Storper, I'm going to have

7    to ask you again.  I'm sorry.  I keep losing your

8    face.  Is there any way to tilt the iPad a little

9    bit?  Are you using an iPad?

10             THE WITNESS:  No.  I'm using a laptop.

11             Is this better?

12             THE COURT:  That's much better.  Thank you

13   so much.

14             Go ahead, Mr. Parlade.

15             MR. PARLADE:  Thank you.

16   BY MR. PARLADE:

17        Q    Upon review of the records provided to you

18   by Josue Cepero's attorneys prior to your

19   examination, did you form a preliminary assessment?

20        A    No.

21        Q    Okay.  Now, upon your examination with

22   Josue Cepero, what was the result, and did you

23   arrive at an assessment or a diagnosis?

24        A    I'm not sure how much detail we want to go

25   into, but essentially I'll summarize it, which is

1   this:

2          He went to see Marjorie Caro, the

3   psychiatrist, on October the 3rd, 2018.  He denies

4   any history of prior psychiatric treatment before

5   that time.  And at that time, according to the

6   medical records provided to me, he complained of

7   multiple financial distress, including the fact that

8   his disability check was not enough to cover his

9   needs.  He was on disability because of two torn

10  rotator cuffs.

11         He reports having difficulty with his wife

12  with regard to intimate relationship, and reports

13  that he felt defeated physically and emotionally.

14  He was pessimistic about his future.  His main

15  complaint is noted as insomnia and feeling tired

16  during the day.  These symptoms have been present

17  for approximately one year prior to his examination

18  by Dr. Caro.

19         He also reported feelings of -- that he

20  reported feelings of worthlessness, helplessness and

21  rumination, with poor insight into his illness.

22         THE COURT:  I'm going to stop for a

23  minute.

24         What is it, Mr. Arslanian?

25         MR. ARSLANIAN:  I just want the record to

1    reflect that the witness is reading from a report.

2    He's not testifying.  He's been looking down and

3    reading the entire time.

4              I just want to make sure, because I intend

5    to question him regarding that report, and I intend

6    to offer them into evidence, because he is reading

7    -- he is literally reading from the report.

8              THE COURT:  Okay.  Mr. Parlade, you made

9    the decision not to -- although I will tell you

10   this:  Admitted or not, normally the expert reports

11   are listed on the exhibit register, but be that as

12   it may, I don't think you have any dispute with the

13   fact, putting aside whether Mr. Arslanian has the

14   right to put the report into evidence, you certainly

15   don't argue that Mr. Arslanian has the right to

16   cross-examine Dr. Storper with respect to his

17   report, regardless of whether Dr. Storper is reading

18   directly from the report or otherwise; isn't that

19   true?

20             MR. PARLADE:  That is true, Your Honor.

21   And I have no objection if Mr. Arslanian wants to

22   move it in as an exhibit, and they've been provided

23   the report with anticipation.  I have no problem

24   with it.

25             MR. ARSLANIAN:  The only reason why it

Page 449

1    wasn't on the exhibit register, Your Honor, is that

2    we got it on 12-23, and honestly, I thought that it

3    was on his exhibit list.  That's why I didn't have

4    any problem.

5            If there's no issue with it, we've had

6    them scanned in, and we would ask that they be

7    admitted as Exhibits 16 and 17.

8            THE COURT:  Okay.  Well, let's finish with

9    Dr. Storper, and then we'll -- but right now,

10   Dr. Storper, you were saying that in your

11   examination of Mr. Cepero, you looked at the report

12   that was prepared by Dr. Marjorie Caro; is that

13   correct?

14           THE WITNESS:  I looked at her medical

15   records, yes.

16           THE COURT:  Okay.  Mr. Parlade, do you

17   have another question?

18           MR. PARLADE:  Yes.

19   BY MR. PARLADE:

20       Q    After reviewing her medical records, did

21   that help you in the examination of Josue Cepero?

22       A    Of course, yes.

23       Q    How so, Doctor?

24       A    Do you want me to continue?

25       Q    Yes, Doctor.

1        A      All right, fine.

2               As I was saying, she noted that there were

3    no current medications ordered for him.  He was

4    prescribed clonazepam one milligram, and given a

5    prescription for 30 tablets.  Clonazepam is a mild

6    antianxiety drug.

7               He returned on July the 30th, 2019, so

8    there was quite a hiatus between visits, again

9    experiencing feelings of sadness, worthlessness,

10   despair, insomnia.  Essentially the same symptoms

11   that are noted, lack of concentration.  She also

12   noted, related to issues in the Hammocks.

13              She continued to prescribe the same

14   clonazepam for anxiety, and added mirtazapine, 7.5

15   milligrams at bedtime for depression and insomnia.

16   Mirtazapine is an extreme -- is used for depression

17   and insomnia, and she prescribed an extremely small

18   dosage of it.  The dosage range goes up to

19   60 milligrams a day.

20              He was seen again the following month, in

21   August, and he had the same symptoms.  He was not

22   able to start the medication, because the insurance

23   didn't cover that dosage strength.

24              He was seen again then in October, early

25   October of 2019, feeling worse.  He had tried the

Page 451

1  mirtazapine, stopped due to severe nausea and

2  vomiting.  He's upset about this severe illness of

3  his father.  The mirtazapine was discontinued,

4  citalopram 10 milligrams per day is started.

5  Trazodone 50 milligrams is offered at bedtime.

6  That's for sleep.  Clonazepam is continued.

7            He was next seen on --

8            THE COURT:  Dr. Storper, I'm sorry.  I

9  don't mean to stop you, but I don't -- unless,

10 Mr. Parlade, especially if Mr. Arslanian is going to

11 enter this into evidence, do we need to have this

12 kind of detail with respect to the medications for

13 Dr. Storper to render his opinion?

14            MR. PARLADE:  No, Judge, and no objection

15 as to -- I could agree to enter both of the reports

16 as an exhibit.  So if debtors' counsel wants to

17 upload them as 16 and 17, I have no objection to it.

18            THE COURT:  So Dr. Storper wrote two

19 reports?

20            MR. PARLADE:  That's correct, Your Honor.

21 One for the debtor, Josue Cepero, and one for the

22 debtor, Leticia Cepero.

23            THE COURT:  All right.  So, Dr. Storper,

24 only because of the interest of time, what --

25 Mr. Parlade, I believe you had asked Dr. Storper a

1    question.  I wasn't sure that Dr. Storper had

2    answered it yet.

3    BY MR. PARLADE:

4        Q    Doctor, after reviewing the patient's

5    medical records and the history where Dr. Caro had

6    noted problems with anxiety and depression on

7    October 2018, did you see any indication in the

8    medical records or anything presented to you as an

9    exacerbation or some increasing of those symptoms

10   subsequent to that date?

11       A    No, I did not.

12       Q    Did you provide a mental status exam of

13   Mr. Cepero?

14       A    I did, during my examination.

15       Q    And what exactly is the mental status

16   exam?

17       A    A mental status examination is a tool that

18   mental health professionals use to assess the

19   mentation of the patient, much like a family doctor

20   does a physical examination.

21       Q    And what was the result of that exam?

22       A    Well, I don't know how much detail.  I'll

23   just summarize the high points.

24            The patient was anxious but generally

25   pleasant, except when speaking about the conflict

Page 453

1  with Ms. Gallego.  Then he becomes very agitated and

2  angry and speaks at length.  It was difficult for me

3  to get him to stop.

4           There were no ideas of harm or violence to

5  himself or anyone else.  His thoughts were

6  circumstantial and tangential, and he has

7  significant obsessive ruminations when we're on the

8  topic of the current conflict between he and the

9  homeowners association, or his ruminations about the

10  welfare of his wife and how she has changed.

11           There's no evidence of auditory or visual

12  hallucinations.  There's no evidence of a thought

13  disorder.  He does present with paranoid persecutory

14  ideations, in which he feels Ms. Gallego and the

15  homeowners association is out to get him and to harm

16  him.

17           He states that he feels like he's being

18  watched and is the object of special scrutiny in his

19  environment.  He believes that neighbors have turned

20  against him, because they were fearful of the power

21  of the homeowners association, or their minds had

22  been poisoned against him.  His sensorium, which is

23  orientation to time, place and person, was generally

24  intact.

25           My diagnostic impression was major

Page 454

1  depressive disorder with obsessive ruminations and

2  generalized anxiety disorder.

3       Q    As we sit here today, is it your belief

4  that the incident that happened in May of 2019 to

5  Josue Cepero was the cause of his emotional

6  distress?

7       A    No.  What I said, my opinion is that

8  there's ample documentation in the contemporaneous

9  medical records that in his initial visit to

10 Marjorie Caro on October 3, 2018, is essentially

11 identical to the symptoms that he has continued to

12 complain of.  So there's no change as far as that

13 goes.

14          There's no increased frequency of visits,

15 there's no significant alteration in medication.

16 There's nothing to indicate any exacerbation, based

17 upon my examination and the records that I reviewed.

18      Q    Thank you, Doctor.

19          And if we could turn now to your

20 examination of Leticia Cepero.

21      A    Yes.

22      Q    Were you able to examine her medical

23 records and medical history prior to the examination

24 of Leticia Cepero?

25      A    Yes.

1    Q    And what were the results of that

2   examination of her past medical history?

3    A    Well, as far as that goes, she had an

4   extensive medical history.  Her primary care

5   physician is Reinaldo Hernandez.

6         She has been prescribed the following

7   medication:  Metoprolol, thyroid, losatan-k, HCTZ,

8   omeprazole and calcitrol.

9         She has a history of thyroid surgery, as

10  well as removal of two malignant colonic polyps.

11  She was treated for hypertension, and also reports

12  thrombocytopenia.  She also noted that she had some

13  surgery with regard to her lymph nodes.

14         Some of these I had records for and some

15  of these I just recorded what she told me.

16    Q    Were you able to examine her psychiatric

17  history prior to the exam?

18    A    Yes, I was.  I had records from the two

19  mental health professionals who were treating her.

20  She sought psychiatric help from Oscar Pozo, who's a

21  psychiatrist, on June 23, 2020, which is over a year

22  from the episode that we're talking about.  She saw

23  him again February 19, 2021, and August 3, 2021.  So

24  there's about eight months between the first visit

25  and six months between the second.

1          She'd been prescribed Effexor XR, 37.5

2    milligrams, which is a low dose of an

3    antidepressant, an antianxiety drug, klonopin, one

4    milligram twice a day, as well as melatonin in low

5    dosage.  She states that she'd been offered other

6    medications, but rejected them, as she does not

7    believe that, "medicine is good for you."  She's

8    concerned about dependency issues.  She has no prior

9    psychiatric history.

10          In addition, she saw Francis Pena, a

11   clinical social worker for ongoing psychotherapy.

12   She saw Ms. Pena in April 2020, and continued to see

13   her through July 2021.  She has been diagnosed with

14   adjustment disorder and PTDS by Ms. Pena.

15          Dr. Pozo's diagnosis was acute stress

16   reaction, major depression (inaudible) -- there's a

17   helicopter passing by.

18          Did you hear me when I said Dr. Pozo's

19   diagnosis is acute stress reaction, major depression

20   recurring, and generalized anxiety disorder?  Was

21   everyone able to hear me?

22          MR. PARLADE:  Yes.

23          THE COURT:  Yes.

24          THE WITNESS:  I just would make one point.

25   Doctor Pozo's diagnosis of major depression

1   recurrent implies a prior episode of major

2   depression, although there's no record of that in

3   Dr. Pozo's medical records that he provided to me.

4   So I'm unclear if there's a prior history of mood

5   disorder for which records are not available.

6          Should I continue?

7   BY MR. PARLADE:

8      Q    Is it significant that there has been no

9   psychiatric, no psychological treatment for over a

10  year after the incident they're complaining caused

11  emotional distress, which was May of 2019?

12     A    Yes.  I find that extremely significant.

13  That does not imply any severe or significant

14  severity of illness.

15          Someone in acute distress, they'd go back

16  to their doctor and say, "I feel terrible, I can't

17  sleep, I can't eat," whatever their symptoms happen

18  to be.  They wouldn't wait, or I don't understand

19  why somebody would wait such a long period of time

20  to get further symptom relief.

21     Q    As you reviewed the past medical history,

22  was there any doctor at all that had come to the

23  conclusion that the incident in May of 2019 was the

24  cause of the psychological or emotional distress?

25     A    No.  There was no evidence of that

1    conclusion.

2         Q    Now, based on the examination of the prior

3    medical records, you then conducted a medical status

4    exam of Leticia Cepero; is that correct?

5         A    Yes, of course.

6         Q    And what was the result of that medical

7    status exam?

8         A    Well, she was initially quite cooperative,

9    but as she began to talk her speech became very loud

10   and hyperverbal.  She becomes agitated, very

11   agitated when recounting the dispute with the HOA.

12   I asked her several times to modulate to her volume,

13   to let me speak.

14             In regard to affect, it was labile,

15   anxious, angry and irritable, as described above.

16   There's no evidence of harm to self or others.

17             With regard to her thoughts, they were

18   circumstantial and tangential, with long periods of

19   verbalization that are quite tangential to the

20   question.  Something that we have seen today in her

21   testimony.

22             It's extremely difficult for her to answer

23   questions directly without becoming hyperverbal,

24   circumstantial and tangential.  There are persistent

25   excessive ruminations about the conflict.  She

1   manifests significant paranoid persecutory

2   ideations, in which she believes that she and her

3   family would be harmed or possibly killed by

4   employees of the homeowners association, and by

5   Ms. Gallego in particular.

6           There are no auditory or visual

7   hallucinations or ideas of reference.  She's

8   concerned about suspicious items in her

9   neighborhood, such as the gunshots going off, and

10  the fact that her peacock was killed by a dog, which

11  she hints at assigning blame for, but never quite

12  completes the accusation.

13          With regard to her sensorium, attention

14  span and concentration were reduced.  She's unable

15  to abstract and do serial sevens.  But it was

16  generally okay.  Then I formed a diagnosis for her.

17       Q    And what was your diagnosis?

18       A    It was acute situational reaction,

19  generalized anxiety disorder with significant

20  obsessive ruminations, mood disorder, unspecified.

21       Q    And based on your medical -- I'm sorry --

22  mental status exam and your examination of

23  Ms. Cepero's records, do you believe the incident

24  that happened on May of 2019 exacerbated or cased

25  her present emotional condition, and causes her

Page 460

1    emotional distress?

2        A    I do not.

3        Q    I've heard twice that term you used with

4    both Josue Cepero and Leticia Cepero of obsessive

5    ruminations.

6            Could you please describe that to the

7    Court?

8        A    Obsessive ruminations are a consistent

9    preoccupation with a thought or an idea.  In the

10   case of the Ceperos, the preoccupation is that

11   they're being harmed, they're going to be harmed,

12   they're going to be injured by Ms. Gallego and the

13   homeowners association.  That's their belief, and

14   they worry about it and worry and worry and worry.

15           There's normal worry and there's extra

16   worry.  So the extra worry are characterized as

17   obsessive ruminations.  There's an unusual extra

18   preoccupation with a concern or a problem.

19       Q    Now, as we sit here today, do you believe

20   the event of May 15, 2019 caused Ms. Cepero

21   emotional distress?

22       A    I think she had an acute situational

23   reaction, but she had already had preexisting issues

24   and conflicts the same.  I think that the problem

25   with Ms. Cepero is that she had a variety of

1  symptoms which had been inadequately treated, in

2  part due to the patient's lack of cooperation with

3  accepting proper care.

4          She had a severe sleeping problem, for

5  which she refuses effective treatment, using tiny

6  dosaging of klonopin, a small dosage of melatonin,

7  which of course are inadequate to help her.

8  Therefore, she's up at night thinking, thinking,

9  thinking, ruminating, which make all of her symptoms

10  worse.

11          The other part is that I disagree with the

12  diagnosis of posttraumatic stress disorder.  That

13  she had that severe situational difficulty with the

14  other party on May 15, 2019, did not materially

15  change it.  In fact, she felt worse with the further

16  helplessness and inability to participate in

17  appropriate care.

18          She believes her life may be threatened.

19  There's no evidence of any threats to her physical

20  well-being or harm, and she has an obsessive

21  preoccupation with these events and conflicts, which

22  have come to dominate her existence and is causing

23  her significant distress.

24          I don't think the events of May 15th

25  materially altered what was clearly a preexisting

Page 462

1    condition and preexisting conflict, which had gone

2    untreated prior to that time.

3         Q    Now, just a final question.

4              Would a person who suffers from excessive

5    ruminations have problems with reference to

6    perception of events?  Would that alter perception?

7         A    The answer is, it can alter perception.

8         Q    In what way?

9         A    Well, it can make you distort the reality

10   of your existence.  If you think someone is going to

11   harm you, then you may not be very friendly to them

12   when you see them, and then, of course, they have a

13   response to that.  It can alter your behavior.  It

14   depends on the particular rumination.

15             A common rumination might be, I'm worried

16   did I lock my door, so I have to go pack and check

17   multiple times.  So that's both a rumination and a

18   compulsion.  The compulsion is the behavior, the

19   rumination is the thought.

20             MR. PARLADE:  Okay.  Thank you.  I have

21   nothing further.  Thank you, Doctor.

22             THE COURT:  Mr. Arslanian, your

23   cross-examination.

24             MR. ARSLANIAN:  Thank you, Your Honor.

25

1            CROSS-EXAMINATION

2  BY MR. ARSLANIAN:

3      Q    Dr. Storper, the labels that you applied

4  in your own analysis of each of the debtors, that's

5  as a result of their interaction with the

6  association and Ms. Gallego; isn't that correct?

7            MR. PARLADE:  Objection to form.  Vague.

8            THE COURT:  Objection to form is not an

9  objection at trial.  What is the objection?

10           MR. PARLADE:  It's vague.  The term

11 "labels" is -- he said "your labels," and that's a

12 vague terminology without specifying.  The witness

13 will not be able to determine what exactly that term

14 refers to.

15           THE COURT:  Okay.  If Dr. Storper doesn't

16 understand the question, I have complete faith, as

17 long as the question doesn't involve how Zoom works,

18 to be able to tell Mr. Arslanian that he does not.

19           I assume, Mr. Arslanian, you already know

20 Dr. Storper, so your introduction was not necessary.

21           MR. ARSLANIAN:  I'm sorry, I don't.  I

22 don't know him.

23           THE COURT:  Then why don't you introduce

24 yourself to Dr. Arslanian first -- I mean,

25 Dr. Storper, so he knows who you are.

Page 464

1    BY MR. ARSLANIAN:

2         Q    Dr. Storper, my name is Louis Arslanian.

3    I'm the attorney for the debtors, and I'll be asking

4    you some questions based on your testimony and the

5    reports that you provided to us.

6         A    Okay.

7              THE COURT:  Now ask your question, whether

8    you want to restate it in a less vague way, or just

9    reask your question, Mr. Arslanian.

10             MR. ARSLANIAN:  Okay.

11   BY MR. ARSLANIAN:

12        Q    In each report, in your testimony you

13   ascribed certain conditions to each of Josue Cepero

14   and Leticia Cepero; isn't that correct?

15        A    I used psychiatric terminology to describe

16   my interview with them, yes.

17        Q    You described -- you used that psychiatric

18   terminology to describe the condition that you

19   observed present in them; isn't that correct?

20        A    Well, I wonder if we could use a specific

21   example, because the question is a little vague to

22   me.

23        Q    You said, as far as Josue, in your report,

24   diagnostic impression, and this was the label that I

25   was talking about.  You wrote, "major depressive

```
 1   disorder with obsessive rumination, generalized

 2   anxiety disorder."

 3              Are those the conditions that you observed

 4   to be attributed to Mr. Cepero, based on your

 5   interview?

 6        A    Well, that was based on my interview and

 7   the review of all of the medical records that I

 8   received.

 9        Q    And isn't it true that those particular

10   conditions, major depressive disorder with obsessive

11   ruminations, generalized anxiety disorder, are all

12   rooted in Mr. Cepero's relationship with the board

13   and Marglli Gallego?

14        A    I couldn't disagree more.

15        Q    Okay.  It has nothing to do with the board

16   or Marglli Gallego?

17        A    You said, the question was, they were all

18   rooted in that, and the answer to that is no, I

19   don't think that.

20        Q    What are they rooted in then?

21        A    Well, he was seen by a psychiatrist in

22   May 2018, who had very clear records describing his

23   symptomatology, none of which has changed from her

24   initial evaluation throughout.  So it's rooted in

25   his primary illness that was diagnosed by Marjorie
```

Page 466

1    Caro.

2        Q    I'm going to screen share Exhibit 3, Dr.

3    Caro's records.

4            THE COURT:  What Exhibit 3?  Exhibit 3

5    is -- oh, from Dr. Caro, okay.  What's been marked

6    for identification as Exhibit 3.

7            MR. ARSLANIAN:  Correct.

8    BY MR. ARSLANIAN:

9        Q    Do you recognize this?

10           Can you see the document, sir?

11       A    Yes, I can.

12       Q    Do you recognize this as the records of

13   Dr. Caro?

14       A    Yes.

15       Q    Initial psychiatric evaluation on

16   October 3, 2018?

17       A    Yes.

18       Q    And it specifically says that he has

19   financial stressors, and he had difficulty with his

20   wife, and feels defeated physically and emotionally.

21           Now, this is before the incident on

22   May 15, 2019, correct?

23       A    Yes.

24       Q    Okay.  So then you reviewed his next

25   visit, which was on July 30, 2019, correct?

1          A     Yes.

2          Q     That's after the incident?

3          A     Yes.

4          Q     Okay.  Now, it says here, "The patient

5     came in today for a follow-up appointment.  He

6     mentioned that he has been experiencing persistent

7     and worsening feelings of sadness, worthless,

8     despair, insomnia, hopeless, helpless, abandoned,

9     lack of concentration, anorexia, related to the

10    issues in the place where he is living."

11              Is it your testimony that that history

12    that I just read is the same history of Mr. Cepero

13    prior to the May 15, 2019 incident?

14         A     Well, what added to the history, of

15    course, is the issue with where he's living, but

16    what's also important to remember, it's been nine

17    months since he visited the doctor, number one.  And

18    number two, the doctor did not treat him with

19    appropriate medication, so he couldn't possibly have

20    gotten better.  So he was getting no benefit, and

21    there was no contact evidently between he and the

22    doctor.  I'm puzzled why there was such an extensive

23    hiatus between his visits.

24              So I would not attribute those symptoms to

25    being caused by the incident with the homeowners.

1    If you're depressed and you don't feel well and you

2    have an untreated mood disorder, which he did, and

3    then something more happens, then you're going to

4    feel a little worse.  That would be normal.

5         Q    So the May event definitely exacerbated

6    his condition; isn't that correct?

7         A    Well, it could exacerbate his condition,

8    but don't forget, he wasn't being treated

9    adequately, so he has all his prior symptoms.  So

10   he's extremely vulnerable to anything that happened.

11        Q    Let me ask you something about your

12   understanding about the May 15, 2019 incident,

13   because you wrote in your report that there are

14   different versions as to what occurred.

15             Do you recall writing that in your report?

16        A    Oh, yes.  There are different versions.

17        Q    And isn't it true that you asked Mr. and

18   Mrs. Gallego why they blocked in Marglli Gallego?

19             MR. PARLADE:  Objection as to --

20             THE COURT:  Wait, wait.  What is the

21   objection, Mr. Parlade?

22             MR. PARLADE:  That's a confusing question.

23   He said wasn't it true that you had asked Mr. and

24   Mrs. Gallego as to the blocking of Marglli Gallego.

25             MR. ARSLANIAN:  Let me rephrase the

1  question.

2  BY MR. ARSLANIAN:

3       Q    Isn't it true that during each of their

4  examinations, you asked Mr. and Mrs. Cepero why they

5  blocked in Marglli Gallego?

6       A    I don't recall that.  I think they thought

7  that they were blocked in, and I asked them about

8  that.  That's my recollection.

9       Q    Do you understand that the Judge has

10 already heard the version of the association and

11 Marglli Gallego, and concluded that it was totally

12 fabricated?

13            MR. PARLADE:  Objection.

14            THE WITNESS:  I don't know a thing about

15 that.

16            THE COURT:  Okay, Dr. Storper, I'm sorry.

17 I should have made it clear.

18            If Mr. Parlade objects -- and again, we

19 don't have the benefit of seeing him stand up,

20 because how would you know he was standing up unless

21 you were staring at his belt buckle, so we have to

22 say "objection."  Mr. Parlade objected to the

23 question, so your answer is going to be struck.  Let

24 me hear what Mr. Parlade's objection is.

25            MR. PARLADE:  Beyond the scope.

1          MR. ARSLANIAN:  He's been asked all about

2   the May 15, 2019 incident.  I want to know what his

3   understanding of what it was is.

4          THE COURT:  Okay.  And how is that

5   relevant to Dr. Storper's report?

6          MR. ARSLANIAN:  Because he writes that

7   there are different versions, as if my clients'

8   version was just a version of what happened, and the

9   association has its own version, and that might be

10  reality.

11         I want to make it clear that there is only

12  one version here, and the version of the association

13  was, in fact, found to be a fabrication.

14         THE COURT:  I'm going to sustain the

15  objection in part.  If the nature of your question,

16  Mr. Arslanian, is that you want to know whether

17  Dr. Storper's opinion would be impacted by the fact

18  that I found that the Ceperos' version of events was

19  what occurred, then you may ask that question, but

20  other than that, I don't see why it matters what

21  Dr. Storper's opinion or knowledge is as to what I

22  found.

23         If you want to ask it in the context of

24  his opinion, that's one thing.  Otherwise, it's not

25  relevant.

1    BY MR. ARSLANIAN:

2        Q    Dr. Storper, would your opinion as to the

3    conclusion that you reached about the May 15, 2019

4    incident be changed if you knew that the Court has

5    already concluded that the association and Marglli

6    Gallego's version of what happened was fabricated?

7        A    Well, it would lead me to ask a number of

8    questions, which may alter my opinion or may not.

9        Q    Would your conclusions about the May 15,

10   2019 incident change if you knew that Judge Isicoff,

11   in 2018, had entered two different orders

12   prohibiting the association and Ms. Gallego from

13   having any contact with the Ceperos?

14       A    I was aware of that.

15       Q    So basically, you're aware that there are

16   orders to stay away, and that the association and

17   Ms. Gallego violated those orders, and then came to

18   court and fabricate a story that the Ceperos had

19   been following Ms. Gallego?

20       A    Is that a question?

21       Q    Yes.  Are you aware of all of that?

22       A    Well, can we ask it in parts?

23            I'm aware of the stay away order.  I'm not

24   aware of any fabrication.

25            THE COURT:  Okay.  So that's your answer,

1    Mr. Arslanian.  And Dr. Storper already answered

2    your previous question.

3              What else do you want to ask?

4              MR. ARSLANIAN:  Fair enough.

5    BY MR. ARSLANIAN:

6        Q    Now, with regards to this exacerbation by

7    the May 2019 incident, you see in Dr. Caro's report

8    it says, "Since last visit have symptoms worsened,"

9    and you found yes, they have?

10             MR. PARLADE:  Objection, Your Honor.

11             THE COURT:  What is the objection?

12             MR. PARLADE:  Counsel is characterizing

13   exacerbation, which is not a term used by the doctor

14   in his report and his testimony.  This is a

15   mischaracterization by counsel.

16             THE COURT:  Okay, noted.  Mr. Arslanian,

17   the objection is sustained.  Use a different word.

18             MR. ARSLANIAN:  I'll move on.

19             Before I take this off, I ask that -- I

20   move that Dr. Caro's medical records, Exhibit 3, be

21   admitted into evidence.

22             THE COURT:  Mr. Parlade.

23             MR. PARLADE:  Objection, Your Honor.  He

24   did not lay the foundation with the witnesses as to

25   its introduction.

1          THE COURT:  Okay.

2          MR. ARSLANIAN:  Your own witness relied on

3    it.

4          THE COURT:  Dr. Storper -- I'll ask you to

5    scroll through, Mr. Arslanian, all of Exhibit 3, so

6    Dr. Storper can look at it.

7          THE WITNESS:  All done.  Wait.  Can we go

8    back?

9          THE COURT:  Start at the beginning,

10   Mr. Arslanian.  Keep going.

11         Dr. Storper, I'm only asking Mr. Arslanian

12   to scroll through, because the question I'm going to

13   ask you, is this a report that you examined in

14   connection with the preparation of your expert

15   report?  That's all I want to know.

16         THE WITNESS:  The answer is yes.

17         THE COURT:  Then, Mr. Parlade, I'm going

18   to admit Exhibit 3 on the basis that the Federal

19   Rules of Evidence allow me to enter into evidence

20   hearsay testimony -- I'm sorry -- hearsay that was

21   relied upon by a testifying expert with respect to

22   rendering his or her opinion.  That's the basis upon

23   which I'm admitting Exhibit 3.

24         (Thereupon, Debtors' Exhibit No. 3 was

25      admitted into evidence.)

1          MR. ARSLANIAN:  Thank you, Your Honor.

2          THE COURT:  Any other questions?  Go

3    ahead.

4    BY MR. ARSLANIAN:

5          Q    Now, with regard to Leticia, you relied

6    upon the records of Dr. Pena and Dr. Pozo; isn't

7    that correct?

8          A    It's Ms. Pena, not doctor.

9          Q    Okay, I'm sorry.  Ms. Pena and Dr. Pozo?

10         A    They were part of my -- of the information

11   I need to produce an evaluation.

12         Q    And isn't it true that Leticia first

13   sought help from Dr. Pozo in June of 2020?

14         A    Yes.

15         Q    And that she saw Ms. Pena commencing in

16   April of 2020?

17         A    Yes.

18         Q    And you also noted that she has no prior

19   psychiatric history?

20         A    That's what she told me, yes.

21         Q    Well, you haven't seen any records showing

22   prior psychiatric history that you saw, right?

23         A    Well, I do have one piece of information

24   that I mentioned.  Should I mention it?

25         Q    Mention away.

1    A    Okay.  Dr. Pozo diagnosed her as major

2    depression recurrent.  So recurrent implies prior

3    episodes.

4    Q    Okay.  But that was in -- I'm sorry, but

5    that was in 2020.

6    A    Well, he saw her for the first time in

7    2020, but a recurrent episode means he must have

8    identified a prior episode.  We don't know when it

9    is.

10    Q    Did you ask Leticia about that during your

11    interview?

12    A    She said she had no prior history, so I

13    did not ask -- I asked her if she had prior history

14    and she said no.

15    Q    Okay.  On direct examination you were

16    asked specifically whether the May 15, 2019 incident

17    exacerbated Leticia's condition and you said no.  I

18    want to know what the basis is for that.

19         Let me ask you, did you see any medical

20    record of Leticia concurrent with either just prior

21    to May 15, 2019 or after May 15, 2019?

22    A    I don't have any independent recollection

23    at this time in answer to that question.  I know I

24    saw some medical records, but I don't recall

25    specifically the answer to that.

1      Q    Okay.  And you obviously didn't examine

2    Leticia in or around May of 2019, did you?

3      A    No.

4      Q    So since there's no medical record

5    available prior to May 2019, the psychiatric nature

6    regarding Leticia, nothing until April of 2020, how

7    is it that you can conclude, based on a review of

8    medical records, that the May 15, 2019 incident did

9    not exacerbate her condition?

10     A    Well, what I did was, I read the

11   depositions that were taken, and it's been noted a

12   significant amount of history of conflict between

13   the Ceperos, the HOA and Ms. Gallego.  So there's

14   quite a bit of detail of prior difficulty, number

15   one.

16          Number two, Ms. Cepero's rendering of the

17   history was, I think, a little bit exaggerated.  You

18   know, she said she was kept prisoner for many hours.

19   She couldn't get out of the car.  When, in fact, I

20   questioned her on that quite closely, she was able

21   to get out of her car, but chose not to.  I think

22   she believed that she was going to be harmed.  That

23   was her belief.

24          And so I think that if you -- I'm sorry.

25   Can I finish?

1      Q     Absolutely.  I thought you were finished.
2    I'm so sorry.
3      A     So I said, if you carry with you the
4    belief that you're living in a community in which
5    people are out to harm you, the administration is
6    out to harm you, it skews your perception of
7    reality, and makes things that might be normal to
8    most of us quite frightening or threatening.
9            I think she operated on that belief system
10   for a while, based upon the depositions that I
11   reviewed, even though there are no medical records,
12   and it was supported by Dr. Pozo's diagnosis of
13   recurrent depression.  And after all, any one of us
14   who's being in an environment where we lived where
15   we thought it was hostile to us, we would be upset.
16   It would be normal to be upset.  That's what I based
17   it on.
18     Q     Okay.  And with regards to Leticia, your
19   diagnostic impression.  These were the labels again
20   that I started with.  You found her to be in acute
21   situational reaction, generalized anxiety disorder
22   with significant obsessive rumination, mood
23   disorder, unspecified.
24           That's what I see in your report.
25     A     Yes, that's what's written.

1     Q    Isn't it true that each of those

2  conditions is solely attributable to her interaction

3  with the homeowners association and Marglli Gallego

4  and nothing else?

5     A    I don't know that.

6     Q    Well, based on your review of the

7  depositions and the medical records, did you find

8  anything else other than problems with the home

9  owners association and Marglli Gallego?

10     A    I think what I said was, the depositions

11  were full of conflict.  The examination of Leticia

12  Cepero was extremely difficult, because she had a

13  real problem answering the questions, would go on

14  long circumstantial verbalization, paragraphs and

15  paragraphs and paragraphs.  It was very hard to get

16  her to answer the question.  She had a translator.

17         I could have examined her for another

18  bunch of hours, but I thought -- I decided it was

19  hard for her to be examined.  She was very upset,

20  became extremely agitated very easily, started to

21  yell quite a bit through the exam.  It was a

22  difficult exam.  So --

23     Q    Sir, the question is a simple one.

24         THE COURT:  Excuse me, Mr. Arslanian.  Do

25  not interrupt this witness.

1          MR. ARSLANIAN:  I'm sorry.

2          THE COURT:  Finish what you were saying,

3     Dr. Storper, and then Mr. Arslanian will ask the

4     next question.

5          THE WITNESS:  So my answer is, her chronic

6     difficulties with the HOA and Ms. Gallego have had a

7     lot to do with the symptoms that she displayed.

8     BY MR. ARSLANIAN:

9          Q     But in your total review of the

10    depositions and the medical records and your

11    interview, you didn't find anything contributing to

12    these conditions, such as a bad incident in a

13    restaurant, being abused as a child, or some other

14    incident, other than interaction with the homeowners

15    association and Marglli Gallego?

16         A     Well, the answer is that there wasn't time

17    to try and get all of that information, because of a

18    lack of cooperation in answering my questions

19    directly and within a relatively -- with some

20    brevity, so that we could move on to the next

21    question.

22         She was so agitated through the exam.  I

23    did the best I could.  I didn't wish to upset her

24    any further.  I tried to be considerate of her

25    feelings.  So there was some limitations on the

Page 480

1    exam.

2              Further, there's no evidence that A causes

3    B, meaning mental health symptoms are multifactorial

4    and have many, many causes.  So, for example -- and

5    I don't know this, since you can't tell -- but

6    people who tend to overthink and overworry, when

7    they're placed in a situation of great stress, tend

8    to exacerbate -- self-exacerbate, although not their

9    choice, their symptomatology.

10             So the answer is, it's a part, but I would

11   not say it's all of it.

12        Q    Did you perform any kind of test on

13   either -- any kind of objective test on either Mr.

14   or Mrs. Cepero?

15        A    By objective test, what do you mean?

16        Q    Any kind of psychological test, like the

17   Minnesota Multiphasic Personality Inventory Test or

18   any kind of test like those?

19        A    (Inaudible).

20             THE COURT:  I'm sorry, Dr. Storper.  I

21   didn't understand your answer.

22             THE WITNESS:  Yeah, I got cut off.

23             I'm a psychiatrist.  I don't do any type

24   of psychological testing.

25

Page 481

1    BY MR. ARSLANIAN:

2        Q    And you base all your conclusions just on

3    review of medical records and an interview?

4        A    And review of the depositions.  I always

5    ask everybody to provide me all of the records that

6    are available, physical records, psychiatric

7    records, depositions, summary of legal proceedings,

8    whatever I can get.

9        Q    I want to show -- can we pull up -- I'm

10   going to pull up what we're going to submit -- it's

11   not numbered yet, but it's --

12           THE COURT:  I've already marked on your

13   supplemental exhibit register, which you're going to

14   show me a pretty copy of later -- Exhibit 16 --

15   what's going to be marked as Exhibit 16, as

16   Dr. Storper's report of Josue Cepero, and what will

17   be marked as Exhibit 17 as Dr. Storper's report of

18   Leticia Cepero.

19           So what you're showing now then is

20   Leticia?

21           MR. ARSLANIAN:  Correct.

22           THE COURT:  So it would be marked for

23   identification as Exhibit 17.

24           MR. ARSLANIAN:  Well, I ask that they both

25   be admitted.  I think there's already been no

Page 482

1    objection.

2              THE COURT:  I think that was correct.

3    Correct, Mr. Parlade?

4              MR. PARLADE:  That's correct, Your Honor.

5              THE COURT:  So Exhibits 16 and 17 are

6    admitted.

7              (Thereupon, Debtors' Exhibit Nos. 16 and

8         17 were admitted into evidence.)

9              THE COURT:  So with respect to Exhibit 17,

10   ask your question.

11   BY MR. ARSLANIAN:

12        Q    On Page 4, carrying over to Page 5, you

13   wrote, "She does have strong obsessive preoccupation

14   with these events and with these conflicts, which

15   has come to dominate her existence and is causing

16   her significant stress."

17              You wrote that, correct?

18        A    It sounds like me.  I'd like to find it.

19   What part of the report -- it sounds like near the

20   end, right?

21        Q    Near the end, bottom of Page 4, continuing

22   to the top on Page 5.

23        A    I see it.  I have it in front of me.  I

24   wrote it.

25        Q    So you believe that she has a strong

Page 483

1   obsessive preoccupation with the events, and the

2   events include the May 15, 2019 altercation; isn't

3   that correct?

4       A    That's correct.

5           MR. ARSLANIAN:  I have no further

6   questions.

7           THE COURT:  Okay.  So any redirect,

8   Mr. Parlade?

9           MR. PARLADE:  No, nothing further.

10          THE COURT:  Okay.  So, Dr. Storper, I'm

11  sure you're devastated that you're going to have to

12  sign off now, but thank you very much for your

13  patience, thank you very much for your time.  I'm

14  sorry that there were such problems getting you on.

15          The reason I'm sitting in an empty

16  courtroom is because I have experienced Internet

17  problems at my home, notwithstanding that I do have

18  the best Internet in terms of speed, et cetera, et

19  cetera.  But when Comcast or AT&T or whatever it is

20  decides that you're not going to have Internet that

21  day, then you don't have Internet that day.

22          So thank you very much for persevering,

23  and I hope you have a very happy and healthy new

24  year.

25          THE WITNESS:  Judge, can I say one thing?

```
 1              THE COURT:  Absolutely, as long as it's
 2   not related to testimony.
 3              THE WITNESS:  Not at all.  Thank you for
 4   your forbearance, and that we all stuck with it and
 5   we all worked together and it worked out.
 6              THE COURT:  That's right.  That's because
 7   Mr. Arslanian and Mr. Parlade are both consummate
 8   professionals, even though they both drive me crazy
 9   once in a while.  So happy and healthy new year.
10              THE WITNESS:  I would never imagine that
11   they would be capable of doing that.
12              THE COURT:  All right.  You take care,
13   Dr. Storper, and thank Mrs. Storper, as well.
14              MR. ARSLANIAN:  This is just living proof
15   of the adage that the 21st time can be the charm.
16              THE COURT:  All right.  I'm going to stop
17   Dr. Storper's video, and then I will also hang up
18   for him so he doesn't have to worry about that.  Oh,
19   he did it himself.
20              Now we're going to go back to
21   Mrs. Cepero's redirect.  I believe that's where we
22   were.
23              Yes, Mr. Arslanian?
24              MR. ARSLANIAN:  Can we take a brief
25   recess?
```

1            THE COURT:  Yes.  We may take a brief

2   recess.  Let's take a recess until 4:00 p.m.  Then

3   the parties -- that's six minutes instead of five --

4   and the parties will reconvene at that time.  I'm

5   going to mute the courtroom, but again, please put

6   yourselves on mute so you don't inadvertently share

7   attorney/client communications.  And remember, no

8   discussing Mrs. Cepero's testimony.

9            MR. ARSLANIAN:  Thank you, Judge.

10            (Thereupon, a recess was taken, after

11   which the following proceedings were had:)

12            THE COURT:  All right.  We're just waiting

13   for Mr. Arslanian -- we have Mr. Arslanian.  Okay.

14   Mrs. Cepero, unmute yourself.

15            MR. ARSLANIAN:  Actually, I have no cross

16   of Ms. Cepero.

17            THE COURT:  You mean no redirect?

18            MR. ARSLANIAN:  No redirect, I'm sorry, no

19   redirect.

20            THE COURT:  All right.  Never mind,

21   Mrs. Cepero.  Gracias.

22            So I'm assuming we need Mr. Cepero?

23            MR. ARSLANIAN:  And then we're going to be

24   done.

25            THE COURT:  I saw Mr. Brooks's arm and

Page 486

1   half of his ear.  If Mr. Brooks is there, if you can

2   please get Mr. Cepero so we can continue.

3              MR. ARSLANIAN:  He went to the restroom.

4   He's going into the other witness room.

5              THE COURT:  I'm going to get a tissue.

6   Somebody keeps moving my tissues.  It's very

7   annoying.  The courtroom is empty, so I don't know

8   who's moving my tissues.

9              I'm not suggesting anything, but the

10  evidence shows that the tissue box was next to my

11  law clerk's desk in the courtroom.

12             Does Mr. Cepero need the translator?

13             MR. ARSLANIAN:  Yes.  I'm not sure whether

14  he knows how to -- he's going to do it.  He's

15  unmuting himself.

16             Can you unmute yourself, Josue?

17             THE COURT:  There we go.  (Speaking in

18  Spanish).

19             All right.  The translator is already

20  sworn in.  So, Mr. Cepero, I'm going to ask you to

21  raise your right hand.

22  Thereupon:

23                    JOSUE CEPERO

24  was called as a witness, and having been first duly

25  sworn, was examined and testified as follows:

1          THE COURT:  Proceed, Mr. Arslanian.

2          MR. ARSLANIAN:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4     BY MR. ARSLANIAN:

5          Q     Could you please state your name and your

6     address for the Court?

7          A     Josue Cepero, 9541 Southwest 148th Place,

8     Miami, Florida 33196.

9          Q     Now, Mr. Cepero, I want to ask you, your

10    bankruptcy was filed in 2017.

11               At any time prior to the filing of your

12    bankruptcy, did you or your wife have any problems

13    or issues with the homeowners association or Marglli

14    Gallego?

15         A     No, sir.

16         Q     Are you aware of any threats by the

17    association or Marglli Gallego made in 2014 or 2015?

18         A     No, sir.

19         Q     Now, you observed your wife testifying

20    during today's hearing, didn't you?

21         A     Yes, sir.

22         Q     And the behavior that she exhibited during

23    her testimony, is that something that you see on a

24    normal basis?

25               THE COURT:  Let the translator finish,

1    Mr. Parlade.

2              I'm sorry, Madam Translator.  Please

3    finish.

4              Mr. Parlade, your objection?

5              MR. PARLADE:  Relevance, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Could you explain your

8    question more to me?

9              THE COURT:  Mr. Arslanian.

10   BY MR. ARSLANIAN:

11       Q    The behavior that you saw your wife

12   exhibit during her testimony, is that something that

13   you normally see from her?

14       A    At this time, yes.

15       Q    When you say "at this time," do you mean

16   in the last few months, the last year?  What is it

17   that you mean?

18       A    In the last four years.

19       Q    And prior to 2017, did she exhibit

20   behavior like she exhibited today?

21       A    No, sir.

22       Q    Please described the type of woman she was

23   before all of these problems with the association

24   and Marglli Gallego started.

25       A    Okay.  An incredible wife, mother and

```
 1   friend.  She would always receive us jolly, in a
 2   jolly manner at all times.  A very normal conduct in
 3   her activities, her relationships.  And a person
 4   that had an excellent relationship with all of her
 5   neighbors.
 6        Q    And so when Dr. Storper wrote that Leticia
 7   has a strong obsessive preoccupation with these
 8   events and with these conflicts, which has come to
 9   dominate her existence and is causing her
10   significant distress --
11             THE COURT:  Wait, wait, stop.  Madam
12   Interpreter, Mr. Arslanian had not finished the
13   question.
14             THE INTERPRETER:  I need him to break it
15   up.  I thought he had stopped.
16             THE COURT:  Remember what I said at the
17   beginning.  This is an excellent translator, but
18   even she cannot -- except she's doing a really good
19   job when I do it, because I keep forgetting.
20             If you could start again.  I apologize.
21             MR. ARSLANIAN:  I'm going to at this time
22   withdraw the question.
23   BY MR. ARSLANIAN:
24        Q    How is all of this behavior, the change in
25   behavior you just described, how has it affected you
```

1    in your marriage?

2         A    In a very negative manner, because all of

3    those problems that she has, that she reflects, that

4    she manifests, the one that is bearing the load of

5    carrying all of them is I.

6              MR. ARSLANIAN:  I have no further

7    questions, Your Honor.

8              THE COURT:  Mr. Parlade, your

9    cross-examination.

10             MR. PARLADE:  Thank you.

11                  CROSS-EXAMINATION

12   BY MR. PARLADE:

13        Q    Mr. Cepero, good afternoon.  I am Miguel

14   Parlade.  I am the attorney for Hammocks Community

15   Association and Marglli Gallego.

16        A    Good afternoon.

17        Q    Just a few questions.  You just mentioned

18   that the problems with your wife's behavior started

19   about four years ago, correct?

20        A    Give or take.

21        Q    And that prior to the bankruptcy in 2017,

22   you had no issues with either the association or

23   Marglli Gallego; is that correct?

24        A    Correct.

25        Q    So there was never an instance at an

1    association meeting where your wife and Marglli

2    Gallego got into some kind of exchange and things

3    got heated back in 2014, 2015?

4          A    No, sir.

5          Q    And you also testified that you never saw

6    your wife being threatened by Marglli Gallego prior

7    to 2017; is that correct?

8          A    Prior to 2015.

9          Q    Okay.  Now, did you witness any threats by

10   Marglli Gallego to your wife after 2015?

11         A    After 2016, or possibly in 2016.

12         Q    And that would have been prior to your

13   bankruptcy in 2017?

14         A    That is correct.

15         Q    We heard your wife testify that in 2014,

16   2015, I guess there was a police complaint against

17   Marglli Gallego and the association?

18         A    No, sir.

19         Q    You said Marglli Gallego and the

20   association?

21         A    I haven't said that.

22         Q    In 2014, 2015, was there an attempted

23   criminal proceeding against Hammocks Community

24   Association?

25         A    No, sir.  We met Marglli Gallego for the

Page 492

```
1    first time in November of 2015.

2                MR. PARLADE:  I have nothing further.

3                THE COURT:  Any redirect, Mr. Arslanian?

4                MR. ARSLANIAN:  No, Your Honor.

5                THE COURT:  All right.  Gracias,

6    Mr. Cepero.  And thank you, Madam Translator.

7                THE INTERPRETER:  Thank you, Your Honor,

8    and all of you have a wonderful and safe new year.

9                THE COURT:  Thank you.

10               Let's talk about what's going to happen

11   next.  I need two more exhibits uploaded.  Those are

12   going to be marked as Exhibits 16 and 17.  Let me go

13   over the exhibits that I have admitted, and then you

14   all will have a certain amount of time to submit

15   closing -- yes, Mr. Parlade?

16               MR. PARLADE:  Judge, I know it's within

17   your discretion.  I know we didn't get a chance to

18   do a verbal opening.

19               Would the Court be amenable to a verbal

20   closing today?

21               THE COURT:  Not today.

22               MR. PARLADE:  On any other day?

23               THE COURT:  I would be amenable to a

24   verbal closing if that's what you both want.  That's

25   fine.  But here's the problem with a verbal closing.
```

1          In order for me to make findings of fact

2    and conclusions of law I need record citations.  So

3    you can do your verbal closing, but then you're

4    still going to have to submit proposed findings of

5    fact and conclusions of law.

6          The reason that I normally say just wrap

7    it all up in a bow is because I recognize the

8    costing associated with attorney's fees, and the

9    fact that you have to prepare for a verbal closing.

10   It may be verbal, but you still have to prepare for

11   it.  Because as I said, if I'm making findings of

12   fact and conclusions of law, except in the most

13   simplest of cases, I have to have the citations for

14   the record.  And I know that in and of itself causes

15   an expense, but there's nothing I can do about that.

16         So that's up to you all, but it's not

17   really necessary, because I'm going to focus on the

18   findings of fact and conclusions of law which can be

19   wrapped up in the closing.

20         So let's go over the exhibits that I've

21   admitted.  With respect to your exhibits,

22   Mr. Parlade, it was Exhibit 1.

23              MR. PARLADE:  Correct.

24              THE COURT:  Mr. Arslanian, with respect to

25   your exhibits, we have 1, 2, 3, 4, 6, 7, 8, 9 and

Page 494

1   11.  And I have that 5, 10 and 12 were not

2   introduced.

3            Going with what is now called the

4   supplemental exhibit register, which is going to

5   just become one exhibit register, you're going to

6   resubmit a new one tomorrow or -- not tomorrow,

7   that's the holiday -- next week some time.  We all

8   know what we're talking about here.

9            I have that 13, 14 and 15, none of which I

10  have copies of anyway, were not introduced.  And 16,

11  which is Dr. Storper's report of Josue Cepero, is

12  admitted, and Exhibit Number 17, Dr. Storper's

13  report of Leticia Cepero, was admitted, both of

14  which you are going to scan and upload with that.

15            So yes, Mr. Parlade?

16            MR. PARLADE:  Obviously there's a

17  misinterpretation.  I had voiced no objection to the

18  admission of 13, 14 and 15, as long as they e-mail

19  video copies.  I have no objection to it.

20            MR. ARSLANIAN:  Oh, okay.

21            THE COURT:  That would be fine if I

22  actually had the exhibits.

23            MR. ARSLANIAN:  So then we have

24  another task of getting you --

25            THE COURT:  Here's what I'm going to

1    suggest with respect to that then.  With respect to

2    16 and 17, you'll scan those in the normal way.

3    With respect to 13, 14 and 15, with a copy to

4    Mr. Parlade, so it is not an ex parte communication,

5    either in three separate e-mails to chambers box, or

6    in one e-mail to chambers box, you can send the

7    videos.

8              I'm thinking three separate ones, and the

9    only reason is because I work for the government,

10   and the government has an awesome firewall.  So if

11   you send them in three separate ones, maybe the

12   firewall won't get too agitated, or maybe it will

13   get overstimulated.  I don't know, but I have really

14   good IT guys.

15             That can be done next Monday or Tuesday,

16   so that people don't need to worry about -- because

17   the court is going to be closed tomorrow.

18             Thank you, Mr. Parlade, for making that

19   observation.  That's what I have.

20             I also have the testimony of Dr. Storper,

21   Mr. and Mrs. Cepero.  Is there any other evidence

22   that I have omitted that has been submitted, or that

23   you wish to submit?

24             I'll start with Mr. Arslanian.

25             MR. ARSLANIAN:  No, Your Honor.

Page 496

1            THE COURT:  Mr. Parlade?

2            MR. PARLADE:  No, Your Honor.

3            THE COURT:  Okay.  Just to put you both on

4   notice, to make clear what I said this morning, I'm

5   going to take a further look at the motion to

6   reconsider.  I don't think that there's anything

7   different, but I will take a look at it one more

8   time, only because I'm being told that even though

9   nobody normally does motions to reconsider motions

10  to reconsider, I will take a look at it.  It doesn't

11  mean I'm changing my mind, but I don't want anybody

12  to be surprised if I do.

13           All right.  So with respect to -- but

14  that's neither here nor there.

15           So with respect to the closing statement,

16  I know you have to order the transcript of today's

17  hearing, so that normally takes on a non-rush basis,

18  what, three weeks?

19           My courtroom deputy said we have to stop.

20  There must be a technical problem.  Let's discuss

21  the weather or whatever it is until -- I don't know

22  why I didn't notice that.  We have a system where we

23  can communicate directly, but sometimes I don't see

24  it because I'm paying attention to the trial, which

25  is what I should be doing.

Page 497

1              (Discussion off the record.)

2              We're back.  All right.  So much for the

3    niceties.

4              It takes three weeks to get a transcript

5    on a non-rush basis.

6              Ms. Sanabria is typing again.  I want to

7    make sure she's not going to tell me to stop talking

8    again.  The good old days when we had a court

9    reporter.  Okay.  All good.

10             Three weeks, and then how long do you guys

11   need to submit your competing findings of fact and

12   conclusions of law?  Three weeks after that, two

13   weeks after that?

14             MR. PARLADE:  I would say three weeks

15   after that, just to make sure we get the transcript

16   on time.

17             MR. ARSLANIAN:  Three and three?

18             THE COURT:  We're going to do what we did

19   last time, which is, each of you will submit your

20   proposed findings of fact and conclusions of law

21   three weeks after the transcript is available.  So

22   we're going to say six weeks to give you guys

23   definitive dates.  And then you'll each have two

24   weeks, no more, to file responses to each other's

25   findings of facts and conclusions of law.

1           Don't repeat what's in your original one.

2    You can just say, "As I stated or as was stated in

3    the proposed findings of fact and conclusions of

4    law," whatever you entitle your document, "See page

5    such and such," and then just do a short sentence,

6    so you don't have to cut and paste the same law.

7    I'm hoping that will also cut down on the expenses

8    associated and the time.

9           So what I'm going to look for is, we're

10   going to set six weeks from -- let me get my

11   calendar out.  Wouldn't it be nice if then we can be

12   all in person again?  Every time I say that

13   something happens, so pretend I didn't say that.

14          I know I have tentative plans to see my

15   granddaughters, and my daughter says they have to be

16   tentative, because everything changes.

17          Let's see.  Both of you must submit your

18   closing arguments, unless extended by motion,

19   February 11th, which is a Friday.  So Friday,

20   February 11th, your written proposed findings of

21   fact and conclusions of law are due.  And then your

22   responsive pleadings to each other are due no later

23   than February 25, 2022, the two year anniversary of

24   the original trial.

25          Okay.  And that will just be on today's

1  issues, which are the emotional distress and the

2  punitive damages.  In other words, the calculation,

3  both in terms of entitlement and in terms of ability

4  to pay.

5            In terms of the multiplier, I will just

6  tell you that now that having done exhaustive

7  research on this when I entered the Lyubarsky

8  opinion, there is no mathematical multiplier.  So

9  you're welcome in your punitive damages argument to

10 argue what you believe I should exercise in

11 discretion with respect to the multiplier.

12           And I would commend both of you, if you

13 have not read it already, to read my Lyubarsky

14 opinion, so that at least you have an idea of what

15 I've previously ruled not so far in the past.  I

16 think it was in the last six months to a year on the

17 issue of damages.  Maybe that will help.

18           Any questions, Mr. Arslanian?

19           MR. ARSLANIAN:  Just one.

20           THE COURT:  Yes, sir?

21           MR. ARSLANIAN:  Attorney's fees for this

22 proceeding.

23           THE COURT:  Well, you'll put in your

24 statement of attorney's fees.  You can do that, you

25 don't have to wait for the transcript, and then

1  Mr. Parlade will have the option -- the opportunity,

2  not the option -- the opportunity to raise

3  objections to the request for attorney's fees.

4          MR. ARSLANIAN:  That's a separate thing

5  though?

6          THE COURT:  Well, it all gets folded in to

7  the damages calculation.  Submit your attorney's

8  fees and costs and do a notice of filing.  Send it

9  to Mr. Parlade.

10          Then, Mr. Parlade, you'll have the option

11  to file a written objection to the amount -- the

12  same as last time -- to the amount, hourly rate, but

13  not entitlement.  Because this is part of the

14  entire -- that will be just one more thing for

15  Ms. Escobar to put on her to do list.

16          Mr. Parlade, any questions for you?

17          MR. PARLADE:  Just for the interest of

18  priority, Judge, I don't think it was made clear by

19  debtors' counsel.  We are -- the proceedings today

20  were limited to emotional distress and punitive

21  damages.  However, it is my understanding from both

22  conversations with debtors' counsel and the

23  discovery being sought, that the emotional distress

24  claim is being limited to the May 15, 2019 incident,

25  is that correct, or are you also claiming emotional

Page 501

1   distress damages from the filing of the lawsuit in

2   2020?

3            MR. ARSLANIAN:  I think we claimed both.

4   And there was some testimony.  I would concede,

5   based on the testimony presented, that it wasn't as

6   great, but I'm not --

7            THE COURT:  How about this?  You'll both

8   refer back to my order.  That will frame the issues,

9   in terms of what the emotional damages can conclude.

10  You can argue, Mr. Parlade, what you believe they

11  include, and the evidence, because as Mr. Arslanian

12  conceded, there's not a whole lot of testimony today

13  on the November 2020 lawsuit.  And that's where we

14  are.

15           MR. PARLADE:  And lastly, the punitive

16  damages issue, I've spoken before to Mr. Brooks.

17  I'm not sure how this happened, but from my initial

18  conversations with Mr. Brooks and discovery, it was

19  conceded that his damages claim was going to be

20  sought mainly as to the association and not Gallego.

21           Is that still the case, or are you

22  proceeding in going against both --

23           THE COURT:  That's something you can have

24  a conversation with Mr. Arslanian offline.  My order

25  stands as it's written.

1          MR. PARLADE:  Okay.

2          THE COURT:  You can have a conversation

3    with Mr. Arslanian offline, but the order stands as

4    written.

5          MR. BROOKS:  I have one substantive

6    question, and that is, when do you think they're

7    going to be opening up court?  Do you have any idea?

8          THE COURT:  Well, that would have been two

9    months ago, Mr. Brooks.  I want you to know that I

10   had live court last Monday.

11         MR. BROOKS:  You're kidding.

12         THE COURT:  No.  I had people in my

13   courtroom last Monday, and then I went home and my

14   vaccinated son had COVID.  And in the meantime, as

15   you all know, and I actually mentioned this in

16   court.  I said that I probably was going to go

17   hybrid, and then, of course, I had no choice.

18         I mean, I was negative, thank God, me and

19   my husband, but as I did tell people in court last

20   Monday, we watch the numbers at the courthouse,

21   because we want to protect the members of the

22   public, as well as our own staff.  So the numbers in

23   Miami were going like this, in the Southern District

24   of Florida, like this, and last Monday, literally

25   like that.

1            MR. BROOKS:  The three of us, Mr. Parlade,

2    Mr. Arslanian and I weren't infected in the last

3    week.  We fought it, because were in close contact

4    with people.

5            THE COURT:  The thing I'm trying to say is

6    that we don't know.  South Africa says they're now

7    seeing a dropoff.  Remember in July when we all

8    thought life was normal again?  And then we thought

9    in November or early December when we thought life

10   was normal again.  And now here we are, virtual at

11   least until the end of January, and probably until

12   the numbers start going down again, again, to

13   protect the members of the public.

14            And in that regard, I'm not quite sure, so

15   I can't answer for you whether the View From the

16   Bench is going to be live or it's going to be

17   switched to virtual.  I don't know, because that's

18   beyond my pay grade.

19            MR. BROOKS:  Actually, it's actually your

20   pay grade, because you're the head.

21            THE COURT:  I'm not in charge of View From

22   the Bench.  I can choose not to show up, but I'm not

23   in charge of it.

24            MR. BROOKS:  Even when court starts, are

25   we going to be allowed to appear virtually?

1           THE COURT:  What my rule was for those

2    brief shiny moments when we thought life was normal

3    again, I was allowing virtual appearance under the

4    same circumstances that I allowed telephone

5    appearances.  In other words, not for evidentiary

6    hearings.

7           Everybody would have been here today, but

8    for COVID.  Not that we didn't enjoy the whole

9    Dr. Storper interlude, but we might have saved an

10   hour or 45 minutes otherwise.  But that was my

11   normal rule.  That's what we went back to, except

12   we're using Zoom now, either telephonic or video,

13   because it doesn't cost people money, and people

14   were complaining about the cost of CourtSolutions

15   and CourtCall.

16          There are still some judges that are using

17   CourtSolutions.  I am not.  I'm trying to do this

18   experiment to help, again, our members of the

19   public.

20          So the answer is yes, virtual appearance

21   will continue to be allowed for those matters in

22   which I allowed telephonic appearances before, which

23   is not evidentiary hearings.  I will say this,

24   though, as I've said before:  When you have a

25   complicated legal argument, it's always better to be

Page 505

1    in court, right?

2              So that's it.  Sorry I can't give you more

3    information.  Stand by.  Stay safe.  Wear your masks

4    indoors.  Don't rely solely on your vaccines to keep

5    you healthy, because apparently they are not.  They

6    just keep you out of the hospital and keep you from

7    dying, which is great news, right?

8              My son was sick for two days, and then the

9    biggest problem I had was trying to convince a 31

10   year old he shouldn't go out anywhere.

11             So please be careful and have a very happy

12   and healthy new year.  I wish all of you much --

13   many good things in the year to come.

14             (Thereupon, the hearing was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 506

1                        CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6              I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15              WITNESS my hand this 31st day of

16   January, 2022.

17

18

19   _____

                    HELAYNE F. WILLS
20            Court Reporter and Notary Public
           In and For the State of Florida at Large
21         Commission No:  HH157788  Expires 8/2/2025

22

23

24

25

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                              Case Number: 17-20358-LMI
                                                    Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____ Debtor(s)      /

### RESPONDENTS', HAMMOCKS COMMUNITY ASSOCIATION INC. AND MARGLLI GALLEGO, CLOSING ARGUMENT ON ORDER ON SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING (ECF 339)

Respondents, HAMMOCKS COMMUNITY ASSOCIATION INC. and MARGLLI

GALLEGO, hereby submit their Closing Argument and Incorporated Memorandum of Law

pursuant to this Court's Order after hearing on December 30, 2021 on this Court's Order on

Sanctions and Setting Further Hearing (ECF 339), and further states:

1.       At issue before this Court are the Debtors' claim for emotional distress damages and the

Debtors' request for punitive damages as to both Marglli Gallego and Hammocks Community Association, Inc.  *(D.E. 339).*

## I.  PROCEDURAL BACKGROUND

*2.*      On July 17, 2021, this Court entered an Order finding Respondents in contempt for violating its Orders dated December 3, 2018, and December 6, 2018 *(ECF 189 and ECF 191, respectively)*; and on Debtor's Amended Motion for Contempt *(ECF 289).  (ECF 328).*

3.      Specifically, this Court determined whether Respondents violated the aforementioned orders in reference to an event that occurred on May 15, 2019 between Marglli Gallego and Debtors in the Hammocks parking lot, and whether the filing a lawsuit by Respondents against the debtors on November 2020 also violated the contempt orders.  *(ECF 328).*

4.      This Court held that Respondents violated this Court's stay away orders (ECF 189 & 191) during the May 15, 2019 incident )("Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.")*(ECF 328, p. 8),* but that the lawsuit filed November 2020 did not violate these contempt orders.  However, this Court found that the filing of the lawsuit on November 2020 was a violation of the automatic stay.  *See, ECF 328.*

5.      This Court bifurcated the issue of damages until after a determination of liability had been made.  ("The Amended Contempt Motion seeks attorney fees and reimbursement of costs (including those associated with the November 2020 Lawsuit), punitive damages, and damages for emotional distress. The Debtors did not cite any statute or common law basis for the sanctions they seek leaving it to the Court to guess why they are entitled to recovery. However, the Court specifically advised the parties that the Court would consider evidence of

damages after a determination of liability, if any. Having found that the Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages.") *(ECF 328, p. 11).*

6.      Upon receiving and reviewing Debtors' Statement of Damages *(ECF 335)* and Respondents' Objection to the Statement of Damages *(ECF 337),* this Court entered an Order on Sanctions and Setting Further Evidentiary Hearing on October 27, 2021.  *(ECF 339).*

7.      This Court specifically found that that "[D]ebtor's are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress" *(ECF 339, p. 2).*

8.      Further, this Court also found that "[D]ebtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress."  *(ECF 339, p. 2).*

9.      This Court further stated "The Court finds that Ms. Gallego acted recklessly and carelessly when she deliberately cut off the Debtors with her car, and then called the police with her manufactured story about the Debtors following her. The Court also finds that Ms. Gallego acted recklessly and callously when she initiated the November 2020 Lawsuit, knowing that Mrs. Cepero was still in bankruptcy, and knowing she could not sue Mrs. Cepero while she was in bankruptcy. At a minimum Ms. Gallego should have advised state court counsel about the bankruptcy so that state court counsel could assess whether and to what extent relief could be sought in state court absent a stay relief order from the bankruptcy court." *(ECF 339, p. 8-9).*

10.   This Court found the Association guilty of violating its contempt orders by virtue of the fact that Mrs. Gallego was driving an association vehicle at the time of the May 15, 2019 incident. *(ECF 328, p. 6)* ("Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders.")

11.   This Court found that the November 2020 was not a violation of its contempt orders, but it was a violation of the automatic stay provisions of the Bankruptcy Code. *(ECF 339).*1

12.   The Court ordered an evidentiary hearing that was held on December 30, 2021 "to hear evidence on emotional distress damages and the ability of Ms. Gallego and the Association to pay punitive damages." *(ECF 339, p. 11)*

## II.  Findings of Fact

### A.  Respondents' Ability to Pay Punitive Damages

13.   Debtors called Jesus Cue, the comptroller of Hammocks Community Association, during the December 30, 2021 hearing. *(Tr. at 334:4 – 334:20)*

14.   Mr. Cue testified as to the resources of the Hammocks Community Association and the Association's revenues, budget, and assets. *(Tr. at 334 – 360).*

15.   Debtors counsel also attempted to call Marglli Gallego as a witness, but Mrs. Gallego's criminal counsel, Sabino Jauregui, informed this Court that Mrs. Gallego was sick with Covid 19 and that he was was unaware that she had been subpoenaed for the hearing. *(Tr. at*

---

1 Although this Court mistakenly stated that the November 2020 was "agreed" to be tried along with the May 15, 2019, the undersigned counsel objected to the November 2020 being tried as part of the May 15, 2019 lawsuit. (ECF 328, p. 9)("Whether the November 2020 Lawsuit was a violation of the stay or of the Contempt Orders, the parties agreed to try the issue of whether the November 2020 Lawsuit was wrongful as part of the continued evidentiary hearing.")  See Respondents' Response to Motion to Supplement Motion for Contempt (ECF 288) and Order Granting Motion to Reopen Direct Examination (ECF 293)(" Further, in consideration of the matter that is the subject of Debtors' Motion to Supplement Motion for Contempt – the filing of a Complaint in state court against the Debtor Leticia Cepero – the Court finds, in the interest of judicial economy, to allow Debtors to Reopen to present said matter during evidentiary hearing set for February 11, 2021 and February 12, 2021.")

*363:1-17).*[2]

**B. Emotional Distress Claims of Leticia Cepero**

16.     The Debtor, Leticia Cepero, testified as to her psychological treatment as well as her

conflict with Marglli Gallego.

*17.*     When asked if she was "[p]reoccupied with the events of May 15, 2019?" *(Tr. at 377:18-*

*19)* under direct examination by her counsel, Mrs. Cepero testified that she was very

concerned, very worried, because they fired two gunshots at me and they have my--" *(Tr. at*

*378:3-5).*

18.     She further elaborated, "I was in very serious condition.  I was in intensive therapy.  My

condition was very serious.  And I'm desperate to get to the board, because my neighbor is

cutting off my plants in my garden, and they have fired two gunshots in front of my house."

*(Tr. 378: 10-16).*

19.     Mrs. Cepero kept elaborating and said, "My neighbor is of friend of Monica Ghilardi,

who's the president of the board.  They have taken photographs of my lot.  Demelsa Perez

Trajillo (phonetic), Perez Sello (phonetic).  And Ana Martinez was trying to open my lock to

the door pretending that she was going to place a document. *(Tr.  379: 4-9).*

20.     She then went on to say that the association is watching her on daily basis and that

because of that she has been very affected, weak, and upset. *(Tr. 379:16-21).*

21.     Upon cross-examination, the Debtor stated she did not have any past psychological

conditions prior to the incident on May 15, 2019.  *(Tr. 386:23 to 387:3).*

22.     However, when asked if her physician had ever diagnosed her with anxiety on November

---

2 Subsequent hearing on Debtors Motion for Contempt and Relief (ECF 398) against Marglli Gallego for failure to appear at the December 30, 2021 hearing was denied on various grounds including the witness' sickness and the inability of Debtors' counsel to personally serve Mrs. Gallego within a reasonable time prior to the hearing.  (ECF 400).

16, 2017, Mrs. Cepero stated "I did not have anxiety.  I went to see Reinaldo, because it was uncontrollable for me that I had not been able to say good-bye to my father.  He died of cancer.  It was a very strong cancer." *(Tr. 387: 20-22 and Tr. 388:22-25).*

23.     She stated that Dr. Reinaldo "found that I was suffering a lot", and then she admitted that she was in a state of "sadness". *(Tr.389: 7-8 and Tr.390:1-8).*

24.     During cross examination, Mrs. Gallego was asked, "Ms. Cepero, just a few minutes ago before we took a break I had asked you about your visit April 2019 with your primary care physician, Reinaldo Hernandez, and I asked, would it surprise you that he diagnosed you with generalized anxiety disorder on that date, and you answered—" *(Tr. 398:15-20).*

25.     Mrs. Cepero answered, "I do remember having told everything that was going on at the Hammocks, and it was that day that he referred me out to the psychiatrist, because he said that I was just going through way too much torment, and that I needed help.  And he also prescribed two medications for me to take.  It's not easy to remember, but I do go there periodically.  I do remember." *(Tr. 398:21 to 399:4).*

26.     Mrs. Cepero then said that there were many events that had taken place prior to May 2019 with the Hammocks Association going as far back as 2014 or 2015. *(Tr. 399:11-22).*

*27.*     During Mrs. Cepero's cross-examination, Mr. Cepero was admonished by the Court for coaching or communicating with his wife while she was providing her testimony. *(Tr. 404:14 to 405:7).*

28.     Upon further cross examination Mrs. Cepero made various accusations against Marglli Gallego that include:

    a)     The accusation that in 2014 or 2015 Marglli Gallego was going to call the police on her or kill her life and cut her neck. *(Tr. 399:21 to 400:3).*  However, the Debtor

stated that she had no psychological consequences of this accusation because she "had no fear". *(Tr. 408:2-16)(See also, Tr. 428:12-20).*

b)      The accusation that in sometime in 2015 "Colombian" motorcyclists chased her on 184 Street and said, "If you get in front of me I'm going to kill you, I'm going to kill you", which she believed at the time have been under the direction of Marglli Gallego. *(Tr.409:1 to 410:14).*  However, the Debtor stated that she had no psychological consequences of this accusation because she's "not the kind of person to be afraid that easily". *(Tr. 409:20-25).*  Although later, Mrs. Cepero changes her testimony and admits she was afraid. *(Tr. 429:7-17).*

c)      The accusation that the association and Marglli Gallego directed Mrs. Cepero's neighbor to cut her trees at sometime during 2020. *(Tr.410:15 to 411:4 and Debtors' Exhibit No. 14).*

d)      The accusation that a van stopped in front of the Cepero's home and discharged gunshots that was recorded on video. *(Tr. 412:4 -20 and Debtors' Ex. No. 13).* However, the video provided by Debtors' counsel as Exhibit No. 13 does not corroborate this claim.  The video shows a van driving in the street of Debtors' residence with some background noise and no evidence of a weapon being used or discharged.

e)      The accusation that someone from the association was trying to open her door about a month and half prior to the December 30, 2021 hearing "pretending that she was going to place a document" *(Tr. 379:4-15 and Debtors' Exhibit No. 15). (See also, Tr. 415:2 to 417:21).*  The video submitted by Debtors' counsel as Exhibit No. 15 does not corroborate this claim.  It shows someone walking up to the door of a

residence and taking a picture of the front door.  It does not demonstrate that someone was trying to break into the Debtors' house as alleged by Mrs. Cepero.

    f)    The accusation that going back as far as 2015 there has been many instances where the security for the Hammocks chased or followed the Debtors.  (Tr. 419:23 – 420:8).  Debtor stated that she was afraid after being followed by the security guards in 2015. *(Tr. 429:18-430:22).*

29.    Notwithstanding the foregoing, Mrs. Cepero states that it was the event on May 15, 2019 that caused her anxiety.  *(Tr. 431:12-16)*

*30.*    The medical records offered into evidence by Debtor for Leticia Cepero do not support the assertion that the event on May 15, 2019 was the cause of the psychological or emotional distress by the Mrs. Cepero.  *(Debtors' Ex. No. 2 and  Ex. No. 4)(See also, Tr. 457:21 to 458:1)(Citing Dr. Henry Storper's review of the Debtors' past medical history that shows none of the medical professionals concluded that the May 2019 event was the cause of the psychological or emotional distress.)*

31.    In fact the earliest medical record of Leticia Cepero relating to psychological treatment is not until May 25, 2020 in an assessment by licensed clinical social worker, Francis Pena. *(Ex. No. 2, Pg. 18).*

32.    No medical testimony was offered on behalf of the Debtors.

33.    Dr. Henry Storper, the medical expert testifying on behalf of the Respondents was asked, "It is significant that there has been no psychiatric, no psychological treatment for over a year after the incident they're complaining caused emotional distress, which was May of 2019?" *(Tr. 457:8-14).*

34.    Dr. Storper replied "Yes, I find that extremely significant.  That does not imply any

severe or significant severity of illness.  Someone in acute distress, they'd go back to their doctor and say, "I feel terrible, I can't sleep, I cant eat," whatever their symptoms happen to be.  They wouldn't wait, or I don't understand why somebody would wait such a long period of time to further symptom relief." *(Tr. 457:8-20).*

35.    Dr. Storper conducted a mental status examination of Leticia Cepero and concluded that she suffered from excessive ruminations about the conflict between her and Marglli Gallego which manifested itself into significant paranoid persecutory ideations.  *(Tr. 458:24 to 459:5).*

36.    His diagnosis was that Mrs. Cepero suffered from "acute situational reaction, generalized anxiety disorder with significant obsessive ruminations, mood disorder." *(Tr. 459:17-20).*

37.    Based on his examination of Mrs. Cepero and the medical records provided, Dr. Storper did not believe that the incident of May 2019 caused her present emotional condition, exarcerbated it, or caused her emotional distress.  *(Tr. 459:21 to 460:2).*

38.    Dr. Storper believed that Mrs. Cepero's emotional problems are due to preexisting issues and conflicts, coupled with inadequate treatment and that the events of May 15, 2019 did not materially alter "what was clearly a preexisting condition and preexisting conflict." *(Tr. 460:19 to 461:3) and (Tr. 461:24 to 462:2).*

39.    He further stated that Mrs. Cepero believes her life to be at risk even though there is no evidence of any real physical threats to her well-being.  *(Tr. 461:18 -23).*

40.    Dr. Storper stated that people such as Mrs. Cepero with "excessive ruminations" suffer from altered perceptions which can distort reality. *(Tr. 462:3-14).*

41.    Leticia Cepero offered no testimony and/or evidence records to support her claim that she suffered emotional distress based on the filing of the November 2020 lawsuit.  She merely

pointed out that she got "nervous" when she saw the November 2020 lawsuit but then she spoke to "Michael" (debtor's counsel Michael Brooks) and "he explained it to me and I got calm. No problem." *(Tr. 433:15 – 24). (See also, Association's Ex. No. 1, Interrogatory Answer No. 6).*

### C. Emotional Distress Claim of Josue Cepero

42.    Dr. Henry Storper examined the medical records and conducted a mental status examination of Josue Cepero.

*43.*    The medical records offered into evidence by Debtors for Josue Cepero do not support the assertion that the event on May 15, 2019 was the cause of his psychological or emotional distress. *(Debtors' Ex. No. 3)(See also, Tr. 447:2 to 447:21 and Tr. 450:2 to 451:6)(Citing Dr. Henry Storper's review of the Debtors' past medical history that shows the Josue Cepero had only a few visits with a psychiatrist, Dr. Marjorie Caro, on October 3, 2018, July 30, 2019, August 2019, and October 2019; and that Dr. Caro noticed problems with anxiety and depression from the October 2018 visit to every other visit thereafter.) (See also, Association's Ex. No. 1, Interrogatory Answer No. 4). (See also, Debtor's Ex. No. 3).*

44.    Further, Dr. Storper noted that nothing in the records demonstrated any exacerbation or increasing of symptoms. *(Tr. 452:4 to 452:11).*

*45.*    Dr. Storper concluded that Mr. Cepero demonstrated obsessive ruminations on the conflict between the association and his wife and him, as well as persecutory ideations in which he feels Marglli Gallego and the association are out to harm him. *(Tr. 453:6 to 453:16).*

46.    Dr. Storper noted that Mr. Cepero stated that "he feels like he's being watched and is the object of special scrutiny in his environment.  He believes that neighbors have turned against

him, because they were fearful of the power of the homeowner's association, or their minds had been poisoned against him." *(Tr. 453:17 to 453:24).*

47.     Dr. Storper diagnosed Mr. Cepero with depressive disorder with obsessive ruminations and generalized anxiety disorder. *(Tr. 453:25 to 454:2).*

*48.*     Dr. Storper testified that he did not believe the May 2019 incident was the cause of Josue Cepero's emotional distress. *(Tr. 454:3 to 454:17).*

49.     Josue Cepero's testimony seemingly contradicted many aspects of his wife's testimony. He contradicted his wife's claim that Marglli Gallego threatened the Debtors in 2014 or 2015. *(Tr. 487:16-18)(See, Para. 28(a) supra).*

50.     Mr. Cepero contradicted his wife's testimony that she did not suffer any psychological conditions prior to May 15, 2019, and he went on to describe how his wife changed approximately four years ago and that prior to 2017 she was a normal wife, mother, and friend who had an "excellent relationship with all of neighbors." *(Tr. 488:11 to 489:5)(See, Para. 21 supra).*

51.     Josue Cepero offered no testimony as to any alleged psychological or emotional distress suffered by him, merely pointing out that his wife's aforementioned change of behavior has impacted his marriage in a negative manner. *(Tr. 489:24 to 490:5).*

52.     Debtors offered no evidence whatsoever to corroborate any claim that Josue Cepero suffered emotional distress as a result of the filing of the November 2020 lawsuit.

## CONCLUSIONS OF LAW

53.     Movant must prove each element of their claims by clear and convincing evidence. *See, In re Cantin (Bankr. S.D. Fla. 2019); Jove Eng'g v. I.R.S., 92 F.3d 1539, 1545-46 (11th Cir. 1996), and In re SLK Associates, Inc., 166 B.R. 985 (Bankr. S.D. Fla. 1994).*

11

54.     In order to meet the burden of proof for clear and convincing evidence, a movant must demonstrate that the evidence being presented is "highly" probable such that it places the fact finder with an "abiding conviction" that the truth of the facts asserted are highly probable. See, _Proctor & Gamble Co. v. Teva Pharms. USA, Inc._, _566 F.3d 989, 994 (Fed. Cir. 2009); and Shire Dev. LLC v. Watson Pharms., Inc. (S.D. Fla. 2013)_.

55.     As stated by the Eleventh Circuit Court of Appeals, "[T]o recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation." _Lodge v. Kondaur Capital Corp., 750 F. 3d 1263, 1271 (11th Cir. 2014); See also,  In re Lyubarsky, 615 B.R. 924, 931 (Bankr. S.D. Fla. 2020)._

56.     The medical records provided by Debtors demonstrate that they are both suffering from some degree of psychological and emotional distress relating to anxiety and other disorders, however, these records do not demonstrate any causal connection between their psychological conditions and the May 15, 2019 incident or the filing of the November 2020 law.

57.     In fact, testimony from the Debtors indicates a psychological and emotional shift that occurred via an actual or a perceived conflict stemming back to 2017.  _(Tr. 488:11 to 489:5)._

58.     Respondent's medical expert, Psychiatrist Dr. Henry Storper testified that Debtors emotional problems are due to preexisting issues and conflicts, coupled with inadequate treatment and that the events of May 15, 2019 did not materially alter "what was clearly a preexisting condition and preexisting conflict." _(Tr. 460:19 to 461:3) and (Tr. 461:24 to 462:2).  (See also, Tr. 454:3 to 454:17)._

59.   Debtors did not prove by clear and convincing evidence that their psychological conditions were causally connected to the incidents on May 15, 2019, and the filing of the lawsuit on November 2020.

60.   Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc. , 634 Fed.Appx. at 773 (11th Cir. 2015).* "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner... where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche , 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).*

61.   "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison , 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019) ; In re Roche , 361 B.R. at 624.  See also, In re Lyubarsky, 615 B.R. 924 (Bankr. S.D. Fla. 2020).*

62.   This Court has already found that "[D]ebtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress."  *(ECF 339, p. 2).*

63.   However, this Court has not ascribed the amount of punitive damages that will be attributable to each party.

64.   This Court already found that Marglli Gallego acted recklessly and carelessly by cutting off the Debtors with her car, and by filing the November 2020 lawsuit knowing the parties were in bankruptcy.  *(ECF 339, p. 8-9).*

65.     However, this Court found that Hammocks Community Association violated its contempt orders solely based on the fact that Mrs. Gallego was driving an association vehicle at the time of the May 15, 2019 incident.  *(ECF 328, p. 6)*

66.     As noted by this Courts opinion in *In re Lyubarsky,* "In determining the among of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure it will punish and deter." *In re Lyubarsky, 615 B.R. 924, 939 (Bankr. S.D. Fla. 2020)(citing In Re Novak, 223 B.R. 363, 368 (Bankr. M.D. Fla. 1997).*

67.     There was no evidence presented that the Association's involvement in either the May 15, 2019 incident or the filing of the November 2020 lawsuit were deliberate and/or or willful.  In fact, much of the evidence points to an ongoing conflict with Marglli Gallego and the Debtors.

68.     Debtors have established that Hammocks Community Association has the ability to pay punitive damages.  However, the nature of the association's conduct is not to be measured by or confused by the conduct of Marglli Gallego, which this Court has already found to have acted recklessly and carelessly.

69.     The amount of punitive damages is left to the discretion of the bankruptcy court.  *In re Lyubarsky, 615 B.R. 924, 938 (Bankr. S.D. Fla. 2020)(citing In re Lansaw, 853 F.3d 657, 670 (3rd Cir. 2017) .*

70.     For the foregoing reasons, Hammocks Community Association respectfully believes that it should not be subject of any punitive award, or that in the alternative if a punitive award is granted; it should be within the range of one and two.

71.     For assessing punitive damages against Marglli Gallego, this Court has discretion in

determining the amount of damages against her.  However, Debtors have not fulfilled their burden of proof in proving by clear and convincing evidence that Marglli Gallego has the ability to pay punitive damages.

72.     In their attempt to demonstrate the Marglli Gallego has the ability to pay punitive damages, the only evidence offered by Debtors' counsel was Exhibit No. 1.

73.     Exhibit No. 1 contains a Warranty Deed and an attached Certificate of Approval showing that Mrs. Gallego is the owner of a property located at 14851 SW 104th Street, Unit 14, Miami, FL  33196, and a quit claim deed transferring Marglli Gallego a one percent ownership right in a property located at 14921 SW 104 ST., Bldg. #1, Apt. # 106, Miami, FL 33196.

74.     No testimony or evidence was proffered in reference to the values of these properties, whether these properties were the homestead of Marglli Gallego as defined by the Florida Constitution, whether they were encumbered by mortgages, the income of Mrs. Gallego, are as to any other aspects of Mrs. Gallego's financial ability.

75.     As a result, Debtors have not met their burden of proof by clear and convincing evidence that Marglli Gallego has the ability to pay punitive damages.  Therefore, Marglli Gallego should not be assessed any punitive damages.

### 

**Submitted by:**

Miguel F. Parlade, Esq.
FBN:  0388068
Law Offices of Miguel Parlade, P.A.
Attorney for Hammocks Community Association, Inc. and Marglli Gallego
P.O. Box 771747
Miami, FL  33177
Telephone: (305) 235-9040
Email:  parladelaw@gmail.com

**Copies to:**
Miguel F. Parlade, Esq.
Michael J. Brooks, Esq.

Attorney Miguel Parlade is directed to serve a conformed copy of this Order on all interested parties immediately upon receipt hereof and to file a certificate of service.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In Re:                                          Case Number:17-20358-LMI
                                                Chapter 13
**JOSUE CEPERO AND**
**LETICIA CEPERO**


                    **Debtor(s)      /**


**DEBTORS' CLOSING ARGUMENT ON HEARING ON ORDER ON SANCTIONS AND**
**SETTING FURTHER EVIDENTIARY HEARING (ECF #339)**

        Debtors JOSUE and LETICIA CEPERO, by and through the undersigned counsel, hereby

submit their Closing Argument on Evidentiary Hearing held on December 30, 2021 on *Order on*

*Sanctions and Setting Further Evidentiary Hearing* (ECF #339), and state:

**OVERVIEW**

        In its July 19, 2021 *Order Finding Hammocks Community Association, Inc. and*

*Marglii Gallego in Contempt* (ECF #328), the Court found both Respondents in

contempt for: 1) filing a lawsuit in circuit court against Leticia Cepero, with knowledge

that filing said lawsuit was not permitted and in violation of the bankruptcy stay

provisions; and 2) improperly initiating contact with the Debtors on May 15, 2019, and

blocking the Debtors' vehicle with vehicles owned by Gallego and Hammocks, in

violation of stay away Orders previously entered by this Court.

        Thereafter, on October 27, 2021, the Court entered the *Order on Sanctions and*

*Setting Evidentiary Hearing* (ECF #339) directing an evidentiary hearing to be held on

December 30, 2021 on two issues: a) to establish Debtors' entitlement to and the extent

of damages for emotional distress arising from Respondents' contempt; and b) to

1

assess the respective ability of the Respondents to pay punitive damages to allow the Court to determine the amount of punitive damages to be awarded to the Debtors.

At the recent evidentiary hearing, as detailed fully below, the Debtors met their burden of proof to establish entitlement to damages for emotional distress based upon all of the evidence submitted, including the testimony and IME Reports of Respondents' own medical expert who concluded that Leticia Cepero "does have a strong obsessive preoccupation with **these events** [events which include the May 15, 2019 incident] and with these conflicts [with Respondents], which has come to **dominate her existence** and is **causing her significant emotional distress.**" *Debtors' Ex. 17 at 4-5* [Emphasis added]. Where Debtors were required to prove significant distress along with a causal connection between the significant emotional distress and Respondents' acts for which they were found in contempt, Debtors did so. Respondents' own expert concedes this, and this concession is amplified by records of a doctor and clinical social worker treating Leticia Cepero, as well as the testimony of both Debtors.

As detailed below, Respondents' improper acts have caused significant emotional distress to Leticia Cepero in so many ways, including but not limited to causing her to be severely deprived of the ability to sleep. Further, these acts has severely interfered with the marriage of Leticia Cepero and her husband, Josue Cepero, where Leticia Cepero is obsessed over Respondents' improper acts.

As to the ability of Respondent Hammocks to pay punitive damages, the Debtors proved Hammocks' ability to pay. More importantly, Hammocks has conceded its ability to pay punitive damages. *See* ECF #407, Respondents' closing argument, at 14, ¶68:

68. Debtors have established that Hammocks Community Association has the ability to pay punitive damages.

That Hammocks also contends, **through counsel jointly representing both Respondents**, that Hammocks should not be held responsible and punished for the acts of its President, Marglii Gallego, this matter will be separately addressed in Debtor's response to Respondents' closing argument.  Suffice it to say, this Court has already held, per ECF #328, that Hammocks is responsible for the acts of its President on May 15, 2019, and for the lawsuit both Respondents filed in 2020 in knowing violation of the automatic stay.

Based upon the fact that emotional distress establishes is truly "significant" to the extent that Leticia Cepero, who has no prior history of such distress, cannot sleep or function normally other than to be obsessed over the matters with Respondents, and where the marriage of the Ceperos has been gravely injured due to her obsession, the amount of the damage should therefore be substantial.

Further, the amount of punitive damages should also be sizeable where Respondents were previously warned and directed by the Court twice to stay away from the Debtors.  Instead of staying away, Respondents did the exact opposite and fabricated an entire tale that Debtors followed Marglii Gallego to a school where she was picking up her son – a tale, as detailed in ECF #328, that was contradicted by a bank record showing Debtors at another location at the same time, video evidence showing that Marglii Gallego, driving a Hammocks vehicle, blocked the Debtors' vehicle, and an audio tape of a 911 call where Marglii Gallego identified herself as the President of Hammocks who was on the property making inspections for Hammocks.

I.  DEBTORS PROVED ENTITLEMENT TO DAMAGES FOR EMOTIONAL DISTRESS.

Debtors are entitled to compensatory damages for emotional distress provided they suffered significant emotional distress, clearly establish significant emotional distress and demonstrate a causal connection between the significant emotional distress and contemptors' wrongful conduct. *In re Rhodes*, 563 B.R. 380, 388-89 (Bankr. M.D. Fla. 2017). Debtors met this burden.

A.   Respondents' expert conceded that Leticia Cepero sustained significant emotional distress as a direct result of the May 15, 2019 incident.

While retained to testify that May 15, 2019 incident caused no more emotional distress to Leticia Cepero than she had already sustained by prior wrongful acts of Respondents leading to the entry of the first agreed order of contempt (ECF #189) and the second order of contempt (ECF #191), his report and testimony show otherwise.

Respondents' expert, Dr. Henry Storper conceded that Leticia Cepero sustained significant emotional distress, and that there was a causal connection between her significant emotional distress and the May 15, 2019 incident:

> Q Okay. And with regards to Leticia, your diagnostic impression. These were the labels again that I started with. You found her to be in **acute situational reaction, generalized anxiety disorder with significant obsessive rumination, mood disorder, unspecified**. That's what I see in your report.
>
> A Yes, that's what's written. *Tr. 477, lines 18-25.*
>
> ***
>
> THE WITNESS: So my answer is, **her chronic difficulties with the HOA and Ms. Gallego have had a lot to do with the symptoms that she displayed**. *Tr. 479, lines 5-8.*
>
> ***
>
> THE COURT: So with respect to Exhibit 17, ask your question.
>
> BY MR. ARSLANIAN:
> Q On Page 4, carrying over to Page 5, you wrote, "**She does have strong obsessive preoccupation with these events and with these conflicts, which**

4

**has come to dominate her existence and is causing her significant stress.**" You wrote that, correct?

A It sounds like me. I'd like to find it.  What part of the report -- it sounds like near the  end, right?

Q Near the end, bottom of Page 4, continuing to the top on Page 5.

A I see it. I have it in front of me. I wrote it.

Q So you believe that she has a strong obsessive preoccupation with the events, **and the events include the May 15, 2019 altercation**; isn't that correct?

A **That's correct**.  *Tr. 482, line 9 – 483, line 4.*  [Emphasis added].

As detailed below, it is virtually impossible to separate the causal connection between the significant emotional distress Leticia Cepero sustained and the May 15, 2019 incident at issue, even if Respondents committed other wrongful acts towards her. There is no evidence in the record of any other source to Leticia Cepero's mental suffering and emotional distress other than Respondents' misconduct.

While Dr. Storper also testified that the May 15, 2019 had no effect on the emotional distress already sustained by Respondents' prior wrongful and contemptuous acts, his report and testimony clearly indicate that the May 15, 2019 **is** a source of Leticia Cepero's significant emotional distress.  Dr. Storper's conclusions are more fully analyzed later in this brief.

B.  The medical records admitted into evidence and testimony clearly evidence both significant emotional distress sustained by Leticia Cepero and a causal connection with the Respondents' contemptuous conduct including the May 15, 2019 incident.

Leticia Cepero first saw clinical social worker Frances Pena on April 11, 2020. *Debtors' Ex. 2*;  *Tr. 456, line 12*.  She first saw Dr. Oscar Danilo Pozo, a psychiatrist, on June 23, 2020.  *Debtors' Ex. 4; Tr. 455, lines 20-21*.  These medical records admitted into evidence are replete with proof that Leticia Cepero sustained significant emotional

distress as a result of the Respondents' [the contemptors] acts including the May 15, 2019 incident.

Frances Pena diagnosed Leticia Cepero with Post Traumatic Stress Disorder and Adjustment Disorder with Mixed Anxiety and Depression. *Debtors' Ex. 2, April 11, 2020 report*, further stating that Leticia Cepero had "a big problem with president of the board and her mental health has been declining since and she is not able to function;" she "appears depressed and anxious;" "crying with panic attack;" she "spoke about incidents of persecution from the board of the association;" and that she "was unable to sleep." *Id.*

The report in *Debtors' Ex. 2 of November 2, 2020* contains the same diagnostic impressions, similar statements linking her entire condition to the situation with Association and Gallego, and statements that Leticia Cepero is unable to sleep or eat. In fact, every report in *Debtors' Ex. 2* contains the same diagnostic impressions, along with statements linking her condition solely to the Association and Gallego and references to Leticia Cepero's severe anxiety, inability to function and inability to sleep.

Each Report in *Defendants' Ex. 2* also contains notations that Leticia Cepero is worried about Hammocks and Gallego continuing to come after her, as well.

Dr. Pozo diagnosed Leticia Cepero as having: Acute stress reaction; Major depressive disorder, recurrent with psychotic features; and Generalized anxiety disorder. *Debtors' Ex. 4, Report of June 23, 2020 at 3.* This Report only cites "problems with board association of her community housing" as the source of these illnesses. *Id.* This Report details insomnia of Leticia Cepero, as well. *Id.*

In *Debtors' Ex. 4, Report of August 3, 2021*, Dr. Pozo diagnosed Leticia Cepero has having: Anxiety disorder, unspecified; Major depressive disorder, single episode, moderate; and Post-traumatic stress disorder, unspecified.   In the Report, Leticia Cepero reported "persistent anxiety" that was due to "a conflictive dispute with a Board association members of her neighborhood."   *Id.*   Again, inability to sleep is mentioned, as well as panic attacks.   *Id.*   Dr. Pozo prescribed the following medications for Leticia Cepero: Effexor; Clonazepam and Melatonin.   *Debtors' Ex. 4, Report of June 23, 2020 at 3; Report of February 19, 2021 at 2*.

Regarding the effect that the May 15, 2019 incident had upon her, Leticia Cepero testified as follows:

Q And I know that you just talked about certain things. I'm going to ask you about those in a second, but I want you to focus on the May 15, 2019 incident.

A Okay.

Q Please describe to the Judge the type of feelings that resulted in the problems, if any, that it caused you.

A To me it has been a horrible movie, terror movie. It has completely changed my life. **I live worried, thinking about what are they going to do to me tomorrow**. *Tr. 381, lines 2-13.*  [Emphasis added].

\*\*\*

Q Okay. All right. And after the May 15, 2019 incident, would you please tell the Court what affect it has on your ability to sleep, and overall in your marriage with Josue?

A I do not sleep. And I'm going to talk very clearly, with respect, because I want to be honest according to the subjects.  **My marriage, intimately I have no desire to do anything. I have no motivation, nothing**.  *Tr. 381, line 22 – 382, line 5.* [Emphasis added].

The testimony of Leticia Cepero is consistent with all of the medical records on her condition.   Her marriage is ruined and her ability to function has ceased.

C.  No evidence of any prior mental health issues of Leticia Cepero.

7

In *Debtors' Ex. 4, Report of June 23, 2020 at 1*, Dr. Pozo wrote:

PAST PSYCHIATRIC HISTORY:

As far as can be determined Ms. Cepero's psychiatric history is entirely negative. There are no psychiatric hospitalizations, no prior psychiatric treatment, and no history of assaultive or suicidal behavior. There is no history of depressions, anxiety attacks, or other common psychiatric symptoms. No psychotropic drugs have ever been taken. There is no history of noncompliance with medication or treatment. The patient reports She was referred by PCP and initiated in psychotherapy on 4/4/2020 because problems related with the board association of her community housing.

Leticia Cepero testified that prior to conflict with Hammocks and Gallego, she never had any mental health issues. *Tr. 380, line 22 – 381, line 1.* Josue Cepero testified as follows, regarding her behavior changes:

Q The behavior that you saw your wife exhibit during her testimony, is that something that you normally see from her?

A At this time, yes.

Q When you say "at this time," do you mean in the last few months, the last year? What is it that you mean?

A In the last four years.

Q And prior to 2017, did she exhibit behavior like she exhibited today?

A No, sir.

Q Please described the type of woman she was before all of these problems with the association and Marglii Gallego started.

A Okay. An incredible wife, mother and friend. She would always receive us jolly, in a jolly manner at all times. A very normal conduct in her activities, her relationships. And a person that had an excellent relationship with all of her neighbors. *Tr. 488, line 11 – 489, line 5.*

Other than the word "recurrent" appearing in a medical report in 2020, Respondents' expert could not identify any medical record or document evidencing a prior history of mental health issues on the part of Leticia Cepero:

Q And isn't it true that Leticia first sought help from Dr. Pozo in June of 2020?

A Yes.

Q And that she saw Ms. Pena commencing in April of 2020?

A Yes.

Q And you also noted that she has no prior psychiatric history?

A That's what she told me, yes.

Q Well, you haven't seen any records showing prior psychiatric history that you saw, right?

A Well, I do have one piece of information that I mentioned. Should I mention it?

Q Mention away.

A Okay. Dr. Pozo diagnosed her as major depression recurrent. So recurrent implies prior episodes.

Q Okay. But that was in -- I'm sorry, but that was in 2020.

A Well, he saw her for the first time in 2020, but a recurrent episode means he must have identified a prior episode. We don't know when it is.

Q Did you ask Leticia about that during your interview?

A She said she had no prior history, so I did not ask -- I asked her if she had prior history and she said no.  *Tr. 474, line 12 – 475, line 14.*

Dr. Storper even wrote in his IME Report (*Debtors' Ex. 17 at 2)* that: "She has no psychiatric history."

D.  There is no evidence of a causal connection of Leticia Cepero's significant emotional distress to any other matter or situation, but exclusively to Respondents' wrongful and contemptuous conduct, including the May 15, 2019 incident.

Nothing in the records with Frances Pena (*Debtors' Ex. 2)* or the records of Dr. Pozo (*Debtors' Ex. 4)* indicate a source or causal connection of Leticia Cepero's significant emotional distress to any other matter other than Respondents' wrongful and

9

contemptuous conduct.  Again, Respondents' expert testified that her chronic difficulties with the HOA and Gallego have a lot to do with her symptoms (*Tr. 479, lines 5-7*); and, Leticia Cepero suffers "significant stress" from an "obsessive preoccupation" with "events" which include the May 15, 2019 incident.  *Tr. 482, line 12 – 483, line 4.*

Dr. Storper could not identify any other source of her significant stress other than the wrongful acts of Respondents.  *Tr. 479, line 5 – 483, line 4.*

E.  There is no hint or suggestion that Leticia Cepero's emotional distress is anything but "significant."

The Court observed the demeanor and state of Leticia Cepero during her testimony.  This testimony was that of someone clearly under significant emotional distress.  Respondents' expert concluded that Leticia Cepero was under "significant stress" as the result of her preoccupation with "events," including the May 15, 2019 incident -  events and conflicts with Respondents that have "come to dominate her existence and is causing her significant distress."  *Debtors' Ex. 15 at 4-5.*

Further, there has been no hint or suggestion by anyone, including Respondents' expert, that the significant stress of Leticia Cepero is feigned and/or not real.

F.  The suggestions of Dr. Storper and Respondents that the May 15, 2019 incident did not exacerbate or had no effect on Leticia Cepero because she had already been damaged by Respondents' prior wrongful and contemptuous conduct is both illogical and not supported by substantial competent evidence.

The thrust conclusion of Dr. Storper as advanced by Respondents is that the May 15, 2019 incident did not materially affect Leticia Cepero's mental condition, because she was already damaged by the Respondents' prior wrongful and contemptuous acts:

This incident was **another example of the ongoing conflict between the Ceperos and Ms. Gallego, 1-2 years prior to this episode** (*Debtors' Ex. 17 at 2*)

. . . She has had severe situational difficulties with the other parties.  The event of May 15, 2019 did not materially change it.  (*Debtors' Ex. 17 at 4*).

This fundamental conclusion is akin to an assertion that subsequent abuse by an aggressor has no effect on a victim because he or she is already damaged by the prior abuse by the same actor or actors.  Put another way, if it takes 6 or 7 blows from a hammer to drive a nail into a piece of wood, each of the 6 or 7 blows from the hammer are significant in reaching the ultimate conclusion of driving the nail into the wood.  One or two strikes from the hammer cannot be disregarded.

The entire suggestion by Respondents – we could not have caused her significant emotional distress on May 15, 2019, because we already caused her significant emotional distress by our prior contemptuous acts – is an affront to the administration of proper justice which should be summarily rejected.

Dr. Storper also testified that he believed that the May 15, 2019 did not exacerbate Leticia Cepero's condition.  *Tr. 459, line 21 – 460, line 2.*  These suggestions are illogical and without any evidentiary basis.  Since Leticia Cepero was not observed by Dr. Storper or any other psychologist or psychiatrist **prior to May 15, 2019**, Dr. Storper has no basis to make any conclusions regarding exacerbation.

Further, one is hard-pressed to imagine how a person, suffering from an obsessive fear of continued persecution, would not suffer significant emotional distress from the May 15, 2019 incident **after** a Court entered two separate Orders forbidding further contact.  This precise conduct would only serve to "fuel the fire" of Leticia Cepero's fears that Gallego and Hammocks would never leave her and her husband alone.  That a doctor would testify that Leticia Cepero suffers from unfounded paranoia

11

that the Respondents will continue to harass her, while finding that the May 15, 2019 has no effect on her is absolutely baseless and illogical.

      1.  To take Respondents' assertions to their illogical and improper ends, the Court must look to the prior history between the parties, including the Court's prior admonishments of any further contact.

In two separate Orders, ECF #189 and ECF #191, Respondents were directed to stay away from the Debtors.  These Orders were the product of a Motion for Contempt, ECF #140, and an Amended Motion for Contempt, ECF #159, based upon events occurring in 2017.  Attached to the original Motion for Contempt, ECF #140, were Affidavits detailing misconduct by Respondents including allegations that: i) Gallego was telling others that Debtors were not good people (ECF #140-3); ii) Gallego called Leticia Cepero a whore on July 9, 2017 (ECF #140-1 at 1); iii) on August 3, 2017, Gallego called Leticia Cepero a thief (ECF #140-1 at 2-3); iv) in 2017 Gallego challenged Leticia Cepero to a fist fight (ECF #140-1 at 3); and v)  Gallego said that the Ceperos were "thieves and liars" trying to defraud Hammocks.  (ECF #140-2).

According to Dr. Storper and Respondents, it is these acts, **and only these acts**, that caused Leticia Cepero significant emotional distress; but, the May 15, 2019 incident had no effect on her condition.  In other words, being called a whore and a thief, along with being challenged to a fist fight caused all of the significant emotional distress, but being followed and blocked in by Hammocks' President Marglii Gallego after the Court entered stay-away Orders, then having to face a fabricated claim that the Ceperos followed Gallego to her son's school, had no effect on her.

The Respondents' position is, just as the fabrication in the underlying proceeding, simply outrageous.

2.   Leticia Cepero's paranoia that Hammocks and Gallego will not leave her alone is based upon the acts of Respondents and Exhibits in evidence.

Dr. Storper also wrote that Leticia Cepero believes her life may be threatened, but there is no evidence of any threats to her wellbeing or harm.  *Debtors' Ex. 17 at 4.* The May 15, 2019 incident is evidence to the contrary.  The Court had twice directed Hammocks and Gallego to leave the Ceperos alone.  They did not do so.

*Debtors' Exs. 13, 14 and 15* show incidents on video, after the Court found Respondents in contempt, that serve as a basis for her feelings:  1) people knocking on her door and leaving (*Debtors Ex. 15*); 2) having the hedges and vegetation on her property cut down (*Debtors Ex. 14*); and, much worse, 3) a video showing a vehicle driving in front of the Ceperos' home, followed by the sound of two gunshots.  *Debtors' Ex. 13.*  These videos, coupled with the events of May 15, 2019, all serve to support her belief that she and her husband are not going to be left alone.

G.   Josue Cepero has also sustained compensable damages as a result of Respondents' contemptuous acts.

The medical records of Dr. Marjorie Caro, *Debtors' Ex. 3*, support a damages to Josue Cepero, as well.  While the medical records demonstrate anxiety and stress, including loss of sleep, due to "financial stressors" on October 3, 2018 (*Debtors' Ex. 3, Report of October 3, 2018*), the medical records show that his condition worsened after the May 15, 2019 incident.  *See Debtors' Ex. 3, Report of July 30, 2019* noting that symptoms since last visit had worsened, and noting that: "he has been experiencing persistent and worsening feelings of sadness, worthless, despair, insomnia, hopeless, helpless, abandoned, lack of concentration, anorexia **related to issues in the place where he is living . . .**"  [Emphasis added].

His condition worsened and the source of his worsened condition changed from financial stressors to Respondents' misconduct.   A later report notes the issue as: "patient continues with issues in his living situation and has problems with the landlord since they were reported to the police."  *Debtors' Ex. 3, Report of November 12, 2019 at 1.*  The references to the "landlord" must be reasonably construed as problems with Hammocks, the Association.

Josue Cepero was ultimately diagnosed as presenting the following medical conditions:  Anxiety disorder, unspecified; Insomnia; and Major depressive disorder, single episode, without psychotic features.  *Debtors' Ex. 3, Report of October 4, 2019 at 6.*  Like Leticia Cepero, the diagnosis supports a claim of significant emotional distress.

More importantly, in addition to whatever he has suffered personally as a result of Respondents' misconduct, Josue Cepero laid out in detail how his marriage has suffered greatly as a result of Leticia Cepero's preoccupation with issues over Respondents.  *See Tr. 488, line 11 – 489, line 5, quoted above in Section I, C above.*

In conclusion on the issue of entitlement, Debtors have met their burden of proof in establishing significant emotional distress and a causal connection between the significant emotion distress and Respondents contemptuous acts.   Further, the suggestions of Respondents that Debtors cannot be entitled to damages, because Respondents caused the damage by prior acts leading to contempt should be thoroughly rejected by the Court.

II.   DEBTORS ARE ENTITLED TO SUBSTANTIAL DAMAGES FOR THE SIGNIFICANT EMOTIONAL DISTRESS CAUSED BY RESPONDENTS.

To be clear, Debtors would have rather have been left alone in peace, as this Court twice directed Respondents to do, rather than face the events of May 15, 2019,

the protracted litigation to debunk a fabricated claim that Debtors committed wrongful conduct, and face a second improper lawsuit.  Had they been left alone in peace as this Court desired, we would not be here doing what we are doing, and the Debtors' situation would be vastly different.

Debtors are, therefore, entitled to damages in excess of $1 million. Such a demand is not unreasonable under the circumstances.  What is the value of being able to sleep comfortably in peace each night?  What is the value of losing your previously cheerful and outgoing spouse who was been converted to a person obsessed over fear of being persecuted by Respondents, a very real obsession that controls and absolutely ruins her daily life?  What is the value of having to live in fear for years without being able to function properly?  The demand is respectfully not unreasonable in light of the actual conditions that each Debtor finds themselves in as a direct and proximate result of the failure of Respondents to respect and obey two simple Orders of this Court.

As to Josue Cepero, Dr. Storper diagnoses him as having:  Major depressive disorder, with obsessive ruminations; and Generalized anxiety disorder.  *Debtors' Ex. 16 at 5.*  Dr. Caro's diagnosis of Josue Cepero is: Anxiety disorder, unspecified; Insomnia; and Major depressive disorder, single episode, without psychotic features. *Debtors' Ex. 3, Report of October 4, 2019 at 6.*

As to Leticia Cepero, Dr. Storper diagnoses her as having: Acute Situational reaction; Generalized anxiety disorder with significant obsessive ruminations; and Mood Disorder unspecified.  *Debtors' Ex. 17 at 4.*   In *Debtors' Ex. 4, Report of August 3, 2021*, Dr. Pozo diagnosed Leticia Cepero has having: Anxiety disorder, unspecified;

Major depressive disorder, single episode, moderate; and Post-traumatic stress disorder, unspecified.

These are significantly serious mental conditions on the part of both Debtors, and these conditions have caused great harm to both Debtors – harm which could have been avoided had Respondents simply followed the Orders of the Court.

III.  RESPONDENTS HAVE THE ABILITY TO PAY PUNITIVE DAMAGES.

Debtors proved that Hammocks, a very large homeowner association with approximately 6,500 units paying an annual budget of greater than $4.2 million which includes attorneys' fees, has the ability to pay punitive damages.  Hammocks owns approximately 25-30 units (*Debtors' Ex. 8*), and various motor vehicles (*Debtors' Ex. 11*).  Hammocks also owns greater than $800,000.00 in accounts receivable (*Debtors' Ex. 9*), and has various bank accounts with sizeable balances (*Debtors' Ex. 7*).

More importantly, as set forth in the Overview above, Hammocks readily admits that Debtors proved that Hammocks has the ability to pay punitive damages.  *See*  ECF #407, Respondents' closing argument, at 14, ¶68.

With respect to Marglii Gallego's ability to pay punitive damages, Debtors provided proof that she owns two units in the Hammocks community.  During the trial, one of her attorneys announced on the record that Marglii Gallego is currently facing charges for a scheme to defraud, and for grand theft, and announced that under no circumstances would she testify at this trial, but would invoke her Fifth Amendment rights:

MR. JUAREGUI: Correct, Judge. Because -- I'm sorry. I didn't mean to interrupt, Judge.   She does have an open felony case. She's currently being charged in Miami-Dade County with two felonies, one an organized scheme to defraud, and

one a grand theft. So **of course, I would not allow her to testify under any circumstances at this hearing, and she would be pleading the Fifth**.

THE COURT: Okay. Well, that's helpful to know anyway. So may I make a note of that for the record, then, Mr. Juaregui?

MR. JUAREGUI: Yes, Judge, for the purposes of her invoking the Fifth Amendment, yes. *Tr. 364,* lines 3-15. [Emphasis added].

Since Marglii Gallego was not going to testify, but would instead invoke her Fifth Amendment rights no matter what, Debtors having put forward evidence of assets belonging to her and wishing to question her regarding financial matters with Hammocks – all matters which Mr. Juaregui would not have permitted – Debtors are entitled to an adverse inference, that Marglii Gallego does have an ability to pay. *See, for example Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307 (S.D. Fla. 2018) (the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment does not preclude the inference where the privilege is claimed by a party to a civil cause).

IV.   THE PUNITIVE DAMAGES, UNDER THE CIRCUMSTANCES PRESENTED, SHOULD BE SUBSTANTIAL TO ENSURE NO FURTHER MISCONDUCT.

Hammocks has stated on the record, after improperly suggesting no punitive damages should be assessed against Hammocks, that the Court should use a multiplier "within the range of one to two."   *See*   ECF #407, Respondents' closing argument, at 14, ¶70.  Under the circumstances presented, addressed below, Debtors contend that the Court should utilize a multiplier **at a minimum** of 2 times the actual damages due to the multiple violation against the Debtors.  *See and compare In re Lyubarsky*, 615 B.R. 924 (Bankr. S.D. Fla. 2020), multiplier of two awarded for a single violation.  Here, there

are multiple violations, and multiple Orders cautioning Respondents and directing them not to commit further misconduct.

The fact that this proceeding stems from prior misconduct by Respondents leading to two separate Orders forbidding further contact strongly favors a multiplier of at least 2 to deter future misconduct standing by itself.  However, other factors are present favoring such a multiplier.  In addition to the May 15, 2019 incident, the Court was presented with the 2020 lawsuit that violated the automatic stay.  What favors a multiplier of greater than 2  is not the mere fact that the 2020 lawsuit was filed, but that a similar lawsuit was filed against the Debtors and dismissed in 2017 because of the automatic stay.

An overriding theme in this particular proceeding, as detailed mostly in Leticia Cepero's testimony and the medical records regarding her mental condition, including the IME Report of Dr. Storper, is a fear of continuation of persecution and wrongful conduct by Respondents.  A 2017 lawsuit is improperly filed against Debtors after they filed for bankruptcy, and then a 2020 lawsuit alleging many of the same claims is refiled improperly against Debtors.   Respondents commit several various improper acts directed towards Debtors in 2017, and are found in contempt in 2018 with clear directives to stop the misconduct and leave the Debtors alone.  This is followed by the May 15, 2019 incident, and a fabrication that Debtors committed misconduct.

Has the misconduct stopped, and/or will it stop?  The videos admitted into evidence as *Debtors' Exs. 13, 14 and 15*, videos evidencing a removal of plants from the property of the Ceperos, someone knocking on their door and leaving, and another video evidencing a van parking by their property and shooting off two gunshots suggest

that the misconduct has not stopped.  These videos were shot after the Court entered ECF #328 finding Respondents in contempt in July, 2021. *Tr. 381, lines 14-21.*

*Debtors' Ex. 13*, the video detecting a vehicle driving up to the Ceperos' home, followed by the sound of two gunshots is troubling, and fuels the fears that the Ceperos already possess.

Even if these videos, surely serving as a basis for the worry on the part of the Debtors, are completely disregarded by the Court as three separate coincidences having nothing to do with Respondents despite each matter depicted in the videos occurring after the Court found Respondents in contempt in July of 2021, a multiplier in excess of 2 is still justified under all of the other circumstances discussed herein.

## CONCLUSION

For all the reasons advance above Debtors have proven entitlement to damages for significant emotional distress caused by Respondents, and the damages should be substantial and in excess of $1 million.  Further, both Respondents have the ability to pay punitive damages (conceded by Hammocks), and the punitive damages should be awarded in excess of a multiplier of two so as to serve the purpose for which punitive damages are intended.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District Florida and I am in compliance with the additional qualifications to practice in this Court and that a true and correct copy of this *DEBTORS' CLOSING ARGUMENT ON HEARING ON ORDER ON SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING (ECF #339)* was sent by email to those set forth in the NEF, this 21st day of February 2022.

Law Office of Michael J. Brooks, P.A
Attorney for Debtors
8410 S.W 40th Street
Miami, FL 33155
Telephone:1(877)290-9197


By:_____/s/_____
      Michael J. Brooks, Esquire
      Florida Bar No. 434442

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                          Case Number: 17-20358-LMI
                                                Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____Debtor(s)_____/

**MARGLLI GALLEGO and HAMMOCKS COMMUNITY ASSOCIATIONS'**
**RESPONSE TO DEBTORS' CLOSING ARGUMENT ON ORDER ON**
**SANCTIONS AND SETTING FURTHER EVIDENTIARY HEARING**
**(D.E. 411)**

COMES NOW, Marglli Gallego (hereinafter "Gallego") and Hammocks Community
Association (hereinafter "Association"), by and through the undersigned, and hereby submit this
Response to Debtors' Closing Argument on Order on Sanctions and Setting Further Evidentiary
Hearing (D.E. 411), and as grounds hereby states as follows:

I.    Procedural Background

1.     On December 30, 2021 this Court held an evidentiary hearing "to hear evidence on
       emotional distress damages and the ability of Ms. Gallego and the Association to pay
       punitive damages." *(ECF 339, p. 11)*

2.     At the December 30, 2021 hearing, this Court Ordered that that all parties submit closing
       arguments by February 11, 2022 and for the responses to the closing arguments to be due
       two weeks later on February 25, 2022. *(Tr.  at 497:18 – 498:24).*

3.     On January 24, 2022, a hearing was held on Debtors' Motion for Contempt and Other
       Relief (ECF 398).  During that hearing, Debtors' counsel informed this Court that there
       were delays in obtaining the transcript for the December 30, 2021 and requested an
       additional seven days to prepare the above-mentioned closing argument.

4.     The undersigned agreed to the extension and during the hearing, this Court extended the
       deadlines for the closing argument until February 18, 2022.

5.     On March 1, 2022, Debtors' counsel filed their closing argument with this Court (ECF

411).

6.      Debtors' closing argument mischaracterizes evidence and asks the Court to make illogical deductions to overcome the fact that they have not met their burden to prove by clear and convincing evidence all the elements seeking damages for emotional distress and for attaining punitive damages.

7.      For the reasons stated in Respondents' Closing Argument and the foregoing, Respondents believe that Debtors are not entitled to damages for emotional distress or for punitive damages.

## II.   Conclusions of Fact

### A.      Emotional Distress

8.      In their closing argument, the Debtors mischaracterize testimony by falsely stating that "Respondent's expert conceded that Leticia Cepero sustained significant emotional distress as a direct result of the May 15, 2019 incident" (ECF 411, pg. 4).

9.      In an attempt to camouflage this mischaracterization, they state that "Dr. Henry Storper conceded that Leticia Cepero sustained significant emotional distress, and that there was a causal connection between her significant emotional distress and the May 15, 2019 incident."  (ECF 411, pg. 4).

10.     Dr. Storper explicitly stated when asked, "And based on your medical—I'm sorry— mental status exam and your examination of Ms. Cepero's records, do you believe the incident that happened on May of 2019 exacerbated or caused her present emotional condition, and causes her emotional distress?"  Answer "I do not."  (Tr. at 459:21 – 460:2).

11.     Further, when asked "[a]s we sit her today, do you believe the event of May 15, 2019 caused Ms. Cepero emotional distress?" Answer "I think she had an acute situational reaction, but she had already had preexisting issues and conflicts the same.  I think that

the problem with Ms. Cepero is that she had a variety of symptoms which had been inadequately treated, in part due to the patient's lack of cooperation with accepting proper care." (Tr. at 460:19 – 461:3).

12. Debtors' counsel also attempts to overcome the shortcoming of their case by hoping this Court does not notice that Josue Cepero explicitly stated that his wife's behavioral issues started four years ago, in 2017. (ECF 411, Page 8)(quoting Tr. at 488:11 – 489:5).

13. Debtors' closing argument further states that the "medical records admitted into evidence are replete with proof that Leticia Cepero sustained significant emotional distress as a result of the Respondents' (the contemptors) acts including the May 15, 2019 incident." (ECF 411, Pgs. 5-6). However, Debtors failed to cite even one sentence of the medical records that evidenced this proof. See also, Para. 30 -34 of Respondents' closing argument (ECF 407).

14. In fact, not one of the Debtors' medical providers stated that the events on May 15, 2019, nor the lawsuit of November 2020 was the cause of the psychological condition(s) of the Debtors.

15. Since the record is devoid of any evidence that the event on May 15, 2019, and/or the filing of the lawsuit on November 2020 was a direct cause of the "emotional distress" claimed by Debtors; Debtors' counsel requested that this Court infer severe emotional distress by observing the "demeanor and state of Leticia Cepero during her testimony." (ECF 411, Para. E, Page 10).

16. Debtors' counsel requested that this Court infer that Ms. Cepero is suffering from severe emotional distress from the May 15, 2019 incident because "one is hard-pressed to imagine how a person, suffering from an obsessive fear of continued persecution, would not suffer significant emotional distress from the May 15, 2019 incident after a Court entered two separate Orders forbidding further contact." (ECF 411, Page 11).

17.     When arguing that Josue Cepero also suffered severe emotional distress, Debtors' counsel also requests that this Court infer significant emotional distress from the May 15, 2019 incident even though none of the medical records come to that conclusion.  (ECF 411, Pg. 14).

18.     Debtors' boldly ask this Court to award them damages in excess of $1,000,000.00 because "[s]uch a demand is not unreasonable under the circumstances."  (ECF 411, Page 15).  It is unclear as to the legal and/or factual basis that Debtors' make this request.

19.     Debtors' argument that they are entitled to damages for emotional distress is entirely based on conjecture and illogical inferences.  It is not supported by the evidence and should be denied.

        B.      Punitive damages

20.     While it is conceded that Hammocks Community Association, Inc. does have the ability to pay punitive damages, Respondents' have made it clear that the association was not involved in the May 15, 2019 incident and had no knowledge of the incident until after it happened.  See, Respondents' closing argument (ECF 407).

21.     Debtors ask that this Court give an "adverse inference" based on Marglli Gallego's failure to testify and the statement of her criminal attorney that had she testified she would have pled the Fifth Amendment.  (ECF 411, Pg. 17).

22.     Debtors also fail to mention that Ms. Gallego had also informed the Court that she was sick with Covid and had not been served with a subpoena.  (See, ECF 400 denying Debtors' Motion for Contempt against Marglli Gallego for not appearing at trial whereby this Court censured Debtors' counsel for not having subpoenaed Ms. Gallego in a timely fashion.)

23.     Respondents believe that punitive damages are not appropriate against Hammocks

Community Association, Inc. and that a "adverse inference" against Marglli Gallego is unreasonable based upon the failure of Debtors' counsel to effectuate proper service of a subpoena prior to trial.

24. In support of their argument for punitive damages, Debtors bring up a 2017 lawsuit against the Debtors and argue that there are multiple violations by Respondents that include a subsequent 2020 lawsuit and the May 15, 2019 incident.  Debtors further cite that the videos they submitted into evidence are proof of continuing violations by Respondents.

25. One video shows the Debtors' next door neighbors cutting trees on their property with the police present, the second video shows a member of the association walking to the Debtors' door to place a letter on the door, and the third video shows a van driving by the Debtors' residence with some background noise.  (See, Debtors' Ex. 13, 14, & 15).

26. The Debtors' believe that these videos show that the association is persecuting them. (See, Debtors' Closing Argument).

27. What these videos actually demonstrate is that there is more to the situation between the debtors and the respondents than is apparently visible to the outside observer.  They demonstrate that as Dr. Storper stated that there are psychological "obsessive ruminations" by the Debtors that are affecting the relationship between the debtors and respondents.  (See Dr. Storper's testimony at Tr. At 462:4-14, Q:" Would a person who suffers from excessive ruminations have problems with reference to perception of events? Would that alter perception?  A: The Answer is, it can alter perception. Q: In what way?  A: Well, it can make you distort the reality of your existence.  If you think someone is going to harm you, then you may not be very friendly to the when you see them, and then, of course, they have a response to that.  It can alter your behavior.  It depends on the particular rumination.")

28.      As a result, the Debtors view anything that occurs to them to be a result of some far-reaching conspiracy by Marglli Gallego and/or the association.

29.      For the reasons stated in Respondents' closing argument and the foregoing, Respondents believe that punitive damages would be inappropriate in this case.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below via electronic delivery on this 10th day of March 2021:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

<u>/s/ Miguel Parlade    </u>
Miguel Parlade, Esq.
Fla. Bar. 388068
Attorney for Marglli Gallego and
Hammock Community Association
P.O. Box 771747
Miami, FL  33177
(305) 235-9040

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on June 7, 2022.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE:                                           CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA                         Chapter 13
CEPERO,

        Debtors.

_____/

### ORDER ON DAMAGES

This matter came before the Court on December 30, 2021 on a trial to determine whether the Debtors are entitled to damages for emotional distress and, if so, how much those damages should be (the "Damages Trial"). The Court has considered the evidence admitted at trial and the testimony of the witnesses. For the reasons outlined below, the Court finds that the Debtors are entitled to

1

some damages for emotional distress, and for punitive damages, in the amount and subject to the terms and findings of this Order.[1]

The Court previously entered an Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt (ECF #328) (the "Contempt Order") holding that the Hammocks Community Association, Inc. (the "Association") and its then President, Marglli Gallego ("Gallego") had violated (i) two prior contempt orders entered by the Court in December of 2018 (collectively the "Original Contempt Orders")[2]; and (ii) the automatic stay by virtue of an incident that occurred on May 15, 2019 (the "May Incident") and a lawsuit that was filed on November 20, 2020 (the "November 2020 Lawsuit").

The Court subsequently entered its Order on Sanctions on October 28, 2021 (ECF #339) (the "Sanctions Order") holding that the Debtors were entitled to sanctions as follows:

> *The Court finds that the Debtors are entitled to sanctions in the form of attorney fees in the amount set forth below, and, if their evidentiary burden is met, in the form of damages for emotional distress. The Court also finds the Debtors are entitled to some punitive damages, the amount of which the Court cannot determine until after ruling on the request for damages relating to the alleged emotional distress.*

The Court previously awarded the Debtors $54,065.00 for attorney fees. The Court recently issued its Order Granting In Part Motion To Reconsider Motion To Reconsider awarding the Debtors an additional $4,125.00 in attorney fees, for a total of $58,190.00. This Order addresses the Debtors' request for

---

[1] The following constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52 made applicable to this contested matter pursuant Fed. R. Bankr. P. 7052.

[2] *Agreed Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #189) and *Order on Debtor's* [sic] *Amended Motion for Contempt Against Hammocks Community Association, Inc. and Its' President, Marglli Gallego* (ECF #191).

emotional damages and the amount of punitive damages to which the Debtors are entitled.

**Emotional Distress Damages**

In order to "recover 'actual' damages for emotional distress under §362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014).

The Debtors relied on their own testimony as well as the written reports of three professionals – Frances Pena, a licensed clinical social worker who is treating Mrs. Cepero; Dr. Oscar Pozo, a psychiatrist who is treating Mrs. Cepero, and Dr. Marjorie Caro, a psychiatrist treating Mr. Cepero.  None of the Debtors' professionals appeared to testify.

Ms. Pena first spoke with Ms. Cepero in April 2020, a little less than a year after the May Incident and saw her several times subsequent to the initial visit. Ms. Pena  outlined Mrs. Cepero's condition, including PTSD, panic attacks, unable to sleep, having nightmares, apprehensive about going out due to the homeowner's board.   Dr. Pozo first saw Mrs. Cepero in June of 2020 and saw her at least two more times during the course of the subsequent year and a half. Dr. Pozo has diagnosed Mrs. Cepero with acute stress reaction, major depressive disorder and generalized anxiety disorder.   Neither professional cites the situation with the Association and Ms. Gallego as the sole cause of Mrs. Cepero's anxiety,  but both Ms. Pena and Dr. Pozo cite the situation as a significant contributing factor to her problems.

3

Dr. Caro initially saw Mr. Cepero in October of 2018.  Mr. Cepero cited as his major issues financial stressors that impacted his relationship with his wife, as well as multiple losses in the family.  Among other things, Mr. Cepero had trouble sleeping.  Dr. Caro prescribed a medication for Mr. Cepero's "extreme" anxiety and major depressive disorder.  Mr. Cepero apparently returned in July of 2019 describing his feelings and symptoms worsening "related to issues in the place where he is living."  Mr. Cepero continued to visit Dr. Caro, each time relating his symptoms to a variety of factors including "his current living situation."

The Association and Ms. Gallego relied on the testimony of Dr. Henry Storper, a board-certified psychiatrist.  Dr. Storper examined both Mr. Cepero and Mrs. Cepero.  Based on Dr. Storper's examination of Mr. Cepero and Dr. Storper's review of Dr. Caro's reports, Dr. Storper testified[3] that Mr. Cepero has major depressive disorder with obsessive ruminations (about the Hammocks board) and generalized anxiety disorder.   Dr. Storper opined that the May Incident did not cause Mr. Cepero's problems and based on Dr. Caro's reports, that the May Incident did not cause any exacerbation of Mr. Cepero's prior symptoms.  However, on cross-examination Dr. Storper acknowledged that the May Incident *could* have exacerbated Mr. Cepero's condition but he also felt that Mr. Cepero was being under-treated for his issues, and that Mr. Cepero was not being given the proper medication for his conditions.

With respect to Mrs. Cepero, Dr. Storper testified that he did not believe the May Incident caused or "materially altered" Mrs. Cepero's existing conditions,

---

[3] At the request of the Debtors, the Court admitted Dr. Storper's expert reports as well.

which he diagnosed as acute situational reaction, generalized anxiety disorder with significant obsessive ruminations (about the HOA situation) and an unspecified mood disorder.  He based this opinion on a report from Mrs. Cepero's general doctor (a report not in evidence) that referenced a "recurrence" of Mrs. Cepero's anxiety[4], as well as the delay of almost one year between the May Incident and Mrs. Cepero's first visit with Ms. Pena.  Nonetheless, on cross-examination Dr. Storper conceded he had no basis to find that Mrs. Cepero's problems were caused by anything other than the situation with Ms. Gallego and the Association.  Indeed, in Dr. Storper's written report he writes "There are persistent obsessive ruminations about this conflict.  She manifests significant paranoid persecutory ideation, in which she believes that she and her family will be harmed or possibly killed, by employees of the homeowner's association and by Ms. Gallego, in particular."

The Association and Ms. Gallego argue that the evidence shows that both Mr. and Mrs. Cepero had pre-existing issues relating to stress, and that therefore, the May Incident is not a cause of their emotional issues. The Association and Ms. Gallego also point to a long temporal gap between the May Incident and the Ceperos' next appointments with their respective professionals.

Based on the evidence the Court finds that, while Mrs. Cepero may have suffered from anxiety prior to the May Incident, the May Incident aggravated Mrs. Cepero's anxiety, to the point where she thinks everything that happens somehow is related to the conflict with the Association and Ms. Gallego,

---

[4] Mrs. Cepero did testify that in 2017 when she went to the doctor she was very sad because her father had died but she had never been diagnosed with anxiety and never took any medication until Dr. Pozo started treating her.

including a car backfiring which Mrs. Cepero somehow believed was instead, someone firing bullets at her house.  Moreover, this conflict started back in 2017. Indeed, the reason the Original Contempt Orders were entered was because of these tensions.

Florida law recognizes that "aggravation of a [pre-existing] psychiatric condition may be compensable if it is the direct and proximate result" of the incident giving rise to the claim being tried. *See Deneault v. Alachua County School Board,* 555 So. 2d 909, 914 (Fla. 1st DCA 1990); *Cameron v. Supermedia, LLC,* 2016 WL 1572952, at *4 (N.D. Fla. 2016) ("[T]he aggravation of a preexisting ailment or condition may be taken into account in determining damages.").

Thus, the Court finds that while the May Incident was not the single cause of Mrs. Cepero's emotional distress, it was a significant factor, and appears to be the "straw that broke the camel's back".  The Court does not find compelling the delay in going for professional help.  What the Court does note is that after the May Incident, and continuing until today, Mrs. Cepero thinks every interaction with anyone having to do with the Association, and even those who are not (in the case of the car backfiring) , is meant to be a threat of some kind.  Indeed, Dr. Storper noted this in his report.

Based on the foregoing, the Court finds that Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident.[5]  The Debtors have proven that the May Incident not only caused Mrs. Cepero significant emotional distress, it also aggravated any emotional distress that Mrs. Cepero

---

[5] Mrs. Cepero acknowledged that she had minor distress arising from the November 2020 Lawsuit so there are no emotional damages arising from that violation.

may have already been suffering due to the prior conduct of Ms. Gallego, as condoned by the Association.

However, the evidence does not support damages for emotional distress for Mr. Cepero. The Court certainly recognizes Mr. Cepero's distress at seeing his wife's situation, and there is no doubt that his wife's distress continues to cause him stress. Nonetheless, Mr. Cepero was having "extreme" stress and anxiety long before the May Incident.  It does not appear from the reports that were submitted, or the testimony, that Mr. Cepero's anxiety issues increased in any meaningful way, including treatment, although there is no question Dr. Caro noted that Mr. Cepero had increased anxiety after the May Incident.

Having proven the causal connection between Mrs. Cepero's emotional distress and the May Incident, the question then is, what should be the damages that should be awarded to Mrs. Cepero? The Debtors have requested an undifferentiated one million dollars for the emotional distress and for punitive damages.  While the Court does not find that the Ceperos are entitled to one million dollars, the Court finds that it is appropriate to award Mrs. Cepero damages even though there is no evidence that Mrs. Cepero incurred any expenses associated with the treatments she has received.[6]

There is no mathematical formula to determine the damages for emotional distress. Thus the Court must consider the amount of damages based on the nature of the contempt and the stay violation, as well as how other courts have

---

[6] The Debtors' closing statement did not identify any actual damages associated with the emotional distress claim.  The Court did review the evidence; it appears that the medical charges were paid by the Debtors' insurance. The Court presumes that, since the Debtors did not request any costs, that the Court's understanding of the evidence is correct.

measured damages for emotional distress. *See In re Lyubarsky,* 615 B.R. 924 (Bankr. S.D. Fla. 2020).

In *In re Lyubarsky,* this Court awarded $25,000 for emotional distress damages caused by egregious behavior by a creditor and its counsel. The Court finds that Ms. Gallego's conduct on May 15, 2019, coupled with her blatant lies when she testified as a witness, easily support a similar award in this case. Therefore the Court finds it is appropriate to award damages for emotional distress in the amount of $25,000.

## **Punitive Damages**

The calculation of punitive damages is subject to the discretion of the Court. As the Court wrote in *In re Lyubarsky*:

> Punitive sanctions are appropriate when a party acts with "reckless or callous disregard for the law or rights of others." *Parker v. Credit Central South, Inc.*, 634 Fed. Appx. at 773 (internal citations omitted). "The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner. . . where a violator's acts are egregious, malicious or accompanied by bad faith." *In re Roche*, 361 B.R. 615, 624 (Bankr.N.D.Ga. 2005).

> "Courts in the Eleventh Circuit have used five factors in determining whether an award of punitive damages is proper: "(1) the nature of the [defendant]'s conduct; (2) the nature and extent of the harm to the plaintiff; (3) the [defendant]'s ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Harrison*, 599 B.R. 173, 182 (Bankr.N.D.Fla. 2019); *In re Roche*, 361 B.R. at 624. . . .

> In determining the *amount* of punitive damages, "[a]n award of punitive damages should be gauged by the gravity of the offense and set at a level sufficient to insure that it will *punish and deter*." *In re Novak*, 223 B.R. 363, 368 (Bankr.M.D.Fla. 1997) (emphasis added). *See, e.g., In re Campbell*, 553 B.R. 448, 557 (Bankr.M.D.Ala. 2016)(awarding $50,000.00 in punitive damages where the Court determined "that such an amount is necessary to deter [the party] from engaging in such conduct in the future."); *In re Brodgen*, 588

> B.R. 625 (Bankr.M.D.Fla. 2018)(awarding punitive damages that doubled actual damages, exclusive of attorney's fees; the court found that even if the punitive damages were insufficient to deter future behavior, that the amount was "not insignificant"); *In re Harrison*, 599 B.R. at 191(awarding punitive damages against parties, the court multiplied actual damages by factors of 2 and 3.375 in an effort to deter future behavior). The amount of punitive damages "[is] largely left to the discretion of the bankruptcy court." *In re Lansaw*, 853 F.3d at 670.

*Lyubarksy*, 615 B.R. at 937-38.

Before awarding punitive damages, the Court must consider two additional factors. The first is whether the Association should be liable for punitive damages arising solely from Ms. Gallego's conduct. The second is whether the Association and Ms. Gallego have proven they do not have the ability to pay any punitive damages.[7]

The Association has conceded it has the ability to pay the punitive damages award but argues that it should not be responsible for punitive damages because the Debtors have not presented any evidence that the Association, as opposed to Ms. Gallego, acted in a way that would warrant punitive damages assessed against the Association.[8]

The Court agrees with the Association. In *Mercury Motors Exp., Inc. v. Smith,* 393 So. 2d 545, 549 (Fla. 1981), the Florida Supreme Court laid out the

---

[7] The burden of proof is on the person against whom punitive damages is assessed to demonstrate that he/she or it does not have the financial ability to pay. *See Johnson v. Howard,* 24 F. App'x 480, 488 (6th Cir. 2001); *In re Lyubarsky,* 615 B.R. at 928; *Rinaldi v. Aaron,* 314 So. 2d 762 (Fla. 1975).

[8] The Debtors argue that this argument is untimely and, besides, the Association bears responsibility for the acts of Ms. Gallego. The Court does not believe the argument is untimely. The Association's responsibility for actual damages related to Ms. Gallego's conduct, which the Court has already found *is* appropriate, does not automatically translate into responsibility for punitive damages associated with Ms. Gallego's conduct.

framework for an employer's liability for punitive damages arising from conduct by the employee.

> Before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be **some fault on his part.** . . . Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages.

*Id.* at 549 (emphasis added).

While Ms. Gallego was an officer of the Association, rather than an employee, there does not appear to be any reason why the analysis should be different. The Debtors did not put on evidence that would support a finding that the Association acted or did not act in way that "foreseeably contributed" to the Debtors' injuries. Therefore the Court finds that the Association is not liable for the punitive damages awarded to the Debtors.

The Court finds it is appropriate for punitive damages to be assessed against Ms. Gallego.  As the Court found in the Contempt Order, Ms. Gallego intentionally violated the Original Contempt Orders.  Ms. Gallego lied during the trial to determine whether the Original Contempt Orders were violated. The Court found and finds that Ms. Gallego's conduct during the May Incident, and the filing of the November 2020 Lawsuit, were willful and malicious.

Ms. Gallego did not appear at the trial.  Even though her nonappearance was due to COVID[9], her criminal attorney did appear at the trial and informed

---

[9] The Debtors also did not subpoena Ms. Gallego until the night before the trial. As the Court has repeatedly admonished counsel, do not wait until the last minute to subpoena a critical

the Court that, even if his client was present, he would not allow her to answer any questions, but instead assert her Fifth Amendment right against self-incrimination.[10]  When a party seeks to assert his or her Fifth Amendment right in a civil matter, "the adverse party is entitled to an adverse inference, meaning an inference that, had the party testified, such testimony would not have been favorable to his claim or defense." *In re Neves,* 638 B.R. 220, 229 (Bankr. S.D. Fla. 2014).

However, a party may not rely solely on the adverse inference.  The adverse party "must present some evidence tending to prove its assertion that is independent of the defendant's refusal to testify." *Id.*  In this case, in addition to relying on the adverse inference, the Debtors submitted evidence that demonstrates that Ms. Gallego owns one property at the Hammocks, and a small interest in another property at the Hammocks.  Ms. Gallego, through the Association's counsel, argued in the closing argument that the Debtors did not show that either property is unencumbered, or is not exempt as Ms. Gallego's homestead.  However, that burden was on Ms. Gallego, not the Debtors, and Ms. Gallego did not present any evidence, by testimony or otherwise to prove that she does not have the ability to pay punitive damages.[11]

Although Ms. Gallego was not present, her criminal counsel appeared and advised the Court what would have happened if Ms. Gallego had appeared.

---

witness, even if the witness is a party. After all, a party is not required to show up for a trial, although, of course, there is a risk in failing to do so.

[10] At the time Ms. Gallego, according to her criminal counsel, had been charged with two felonies – an organized scheme to defraud and grand theft.

[11] The deadline to file exhibits was December 27, 2021. The Association (whose attorney was representing Ms. Gallego also) did not submit exhibits that would demonstrate Ms. Gallego's inability to pay.  Ms. Gallego did not separately submit any exhibits.

Consequently, the Court finds that it is appropriate to apply the inference to Ms. Gallego's ability or inability to pay punitive damages, and that Ms. Gallego therefore is able to pay punitive damages in some amount.

The Court finds that it is appropriate to apply a factor of one to the punitive damages. What Ms. Gallego did was reprehensible, and was part of an ongoing pattern of abuse of the Ceperos.  But the purpose of punitive damages is to punish and deter Ms. Gallego and others who might choose to abuse people through a position of influence and power. Based on Ms. Gallego's current situation, the Court finds that doubling the actual damages will be enough of a punishment and deterrent to Ms. Gallego with respect to her actions going forward.

Based on the foregoing it is ORDERED as follows:

1.     Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident in the amount of $25,000.00.  The Association and Ms. Gallego are jointly and severally liable for these damages.

2.     As separately ordered, the Ceperos are entitled to an attorney fee award in the total amount of  $58,190.00.   The Association and Ms. Gallego are jointly and severally liable for these damages.

3.     The Ceperos are entitled to punitive damages in the amount of $83,190.00, which is an amount equal to the amount of actual damages awarded to the Ceperos, for which punitive damages Ms. Gallego will be solely responsible.

4.     The Ceperos will be entitled to prepare final judgments in these amounts that can be recorded in the public records of Miami-Dade County and

otherwise, as required by Florida law, if the amounts in this order, including the attorney fees, are not paid within 30 days from the entry of this order.

### CONCLUSION

The Court is aware that the Ceperos have sold their home in the Hammocks and will be moving away.  Hopefully, removing themselves from this home and the bad memories associated with this home will help them as part of the fresh start to which a, hopefully, positive conclusion to their bankruptcy case will entitle them.

### ###

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### www.flsb.uscourts.gov

In re:

Case No. 17-20358-LMI
Chapter 13

Josue Cepero and Leticia Cepero

Adv. No.

Plaintiff

vs.

Defendant

## EXHIBIT REGISTER

Exhibits Submitted on behalf of:   ☐ Plaintiff   ☐ Defendant   ☒ Debtor   ☐ Other: _____

Submitted By:   Michael J. Brooks, Esq, 8410 S.W 40th Street, Miami, FL 33155, 954-859-6661
            (name, address, and phone number)

Date of Hearing/Trial:   December 30, 2021      Type of Hearing/Trial:   Trial

| Exhibit Number | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| 1 | Deeds — Composite | A | | |
| 2 | Medical Reports from Frances Pena, LCSW | A | | |
| 3 | Medical Report from Marjorie Caro, MD, PA | A | | |
| 4 | Progress Notes from Oscar Pozo, MD | A | | |
| 5 | "Tree Letter" | | | X |
| 6 | Hammocks Community Association proposed budgets | A | | |
| 7 | Association bank statement balamces | A | | |
| 8 | Hammocks community association real property | A | | |
| 9 | Hammocks Communtiy association account recievables | A | | |
| 10 | Hammocks Community Association foreclosure | | | X |
| 11 | All vehicles owned by Hammocks Community Association | A | | |
| 12 | Answers to Interrogatories | | | X |
| | | | | |
| | | | | |

Page | 1

LF-49 (rev. 05/20/2020)

**[EXHIBIT REGISTER CONTINUATION PAGE]**

| Exhibit Number | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05/20/2020)

# UNITED STATES BANKRUPTCY
## COURT SOUTHERN DISTRICT OF
### FLORIDA www.flsb.uscourts.gov

In re:                                          Case No. 17-20358-BKC-LMI
                                                Chapter 13

JOSUE CEPERO and
LETICIA CEPERO
_____ /

## EXHIBIT
## REGISTER

Exhibits Submitted on behalf of:

[ ] Plaintiff [ ] Defendant [ ] Debtor [X] Respondents

Date of Hearing/Trial: <u>December 30, 2021</u>

Type of Hearing/Trial: <u>Evidentiary hearing on Emotional Distress/Punitive Damages (ECF 339)</u>

SUBMITTED BY:  <u>Miguel Parlade, Esquire</u>

                    P.O. Box 771747

                    Miami, FL  33177

                    (Tel.) 305-235-9040

| Exhibit Number/Letter | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| 1 | Debtor's Answers to Interrogatories | A | | |
| 2 | Any Exhibits Introduced by Debtors | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05/20/2020)                                      Page | 1

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                    Case No. 17-20358-LMI
                                                          Chapter 13

Josue Cepero and Leticia Cepero

                                                          Adv. No.
          Plaintiff

          vs.

          Defendant
_____/

## SUPPLEMENTAL EXHIBIT

Exhibits Submitted on behalf of:   ☐ Plaintiff  ☐ Defendant  ☒ Debtor  ☐ Other: _____

Submitted By:   Michael J. Brooks, Esq, 8410 S.W 40th Street, Miami, FL 33155, 954-859-6661
                          (name, address, and phone number)

Date of Hearing/Trial:   December 30, 2021   Type of Hearing/Trial:   Trial

| Exhibit Number | Description | Admitted | Refused | Not Introduced |
|---|---|---|---|---|
| 1 13 | The shooting recording. | A | | |
| 2 14 | The hedge getting pulled out recording. | A | | |
| 3 15 | A lady knocking on the door and leaving. | A | | |
| 16 | Dr. Sloper Report J. Cepero | A | | |
| 17 | Dr. Sloper Report L Cepero | A | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LF-49 (rev. 05 Josue Cepero and Leticia Cepero /20/2020)

Page | 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-20358-LMI

IN RE:                                                    CHAPTER 13

JOSUE CEPERO and
LETICIA CEPERO
        Debtor.
_____/

## MOTION TO ALTER OR AMEND JUDGMENT, FOR REHEARING, RELIEF FROM JUDGMENT AND/OR RECONSIDERATION AS TO ECF 480

**COMES NOW** the Debtors by and through their undersigned counsel and files this their Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment as to ECF 480 (entitled "Order on Damages" dated June 7, 2022), pursuant to Fed. R. Civ. P. 59(e) and 60(a), and/or for reconsideration, and as cause therefore states as follows;

1. This cause came before the court on December 30, 2021 on a trial to determine if Debtors were entitled to damages for emotional distress; the amount of such damages, if permitted; the amount of punitive damages previously awarded; and attorney's fees and costs for this particular trial, as well.

2. The Court found that Debtors were entitled to damages for emotional distress caused by the acts of the Respondents, Hammocks Community Association, Inc. ("the Association") and it's President, Marglii Gallego ("Gallego"), and awarded Debtors $25,000.00 in damages. The Court also, utilizing a multiplier of 1, set punitive damages in the amount of $83,190.00 – the $25,000.00 in damages for emotional distress, plus $58,190.00 in attorney's fees (for the prior trials in establishing contempt), multiplied by a factor of one.

1

3.   The Court found that only Gallego, but not the Association, was liable for punitive damages, relying upon a vicarious liability theory set forth by the Florida Supreme Court in *Mercury Motors Exp., Inc. v. Smith*, 393 So. 2d 545, 549 (Fla. 1981), analyzing liability of a corporation for punitive damages for the acts of a corporate <u>employee</u>, quoting:

> Before an employer may be held vicariously liable for punitive damages under the doctrine of respondent superior, there must be **some fault on his part.** . . . Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages. ECF 480 at 10 [Emphasis provided by this Court].

The Court went on to state, in concluding that only Gallego, but not the Association, should be liable for punitive damages, that:

> While Ms. Gallego was <u>an officer</u> of the Association, <u>rather than an employee,</u> <u>there does not appear any reason why the analysis should be different.</u>  The Debtors did not put on evidence that would support a finding that the Association acted or did not act in [a] way that "foreseeably contributed" to the Debtors' injuries.   Therefore the Court finds the Association not liable for punitive damages awarded to the Debtors. *Id.*  [Emphasis added].

Respectfully, this a misstatement of the law, and the Florida Supreme Court has differentiated between corporate liability for punitive damages based on the acts of **an employee** (vicarious liability per *Mercury Motors* if employer had some fault); and, "direct liability" of a corporation for punitive damages based upon the acts of, as here, one of its managing agents – Marglii Gallego, President of the Association (direct liability <u>without</u> proof of fault of the employer).  *See Schropp v. Eurocars*, 654 So. 2d 1158,  1159-1160 (Fla. 1995), expressly noting the difference between vicarious liability for acts of an employee (additional evidence of corporate fault needed) and "direct liability" for the wrongful acts of an officer (no such additional evidence needed):

A review of the case law in Florida reveals two methods have been established by which a corporation may be held liable for punitive damages: (1) vicarious liability based on the willful and malicious actions of an employee with a finding of independent negligent conduct by the corporation; or (2) <u>direct liability based on the willful and malicious actions of managing agents of the corporation</u>.  [Emphasis added].

The Florida Supreme Court then discussed the difference between the two methods, discussing *Mercury Motors*, and noting that its prior decisions involving "direct liability" for punitive damages against a corporation for acts of it managing agent are different than "vicarious liability" where punitive damages are sought against a corporation for the acts of a mere employee.  In the latter of such cases, as noted by this Court in ECF 480 at 10, evidence of wrongful conduct of the corporation is required; but in the former, no such additional evidence is required – corporate liability for punitive damages is direct for the wrongful acts of a president of a corporation.  *Id.* at 1159-1160:

Corporate Vicarious Liability for Punitive Damages

In *Mercury Motors Express, Inc. v. Smith*, 393 So. 2d 545 (Fla. 1981), an employee of Mercury Motors Express lost control of his tractor-trailer rig while acting in the scope of his employment and killed a man. The personal representative of the decedent brought suit against the employer and alleged that it was vicariously liable for the willful and wanton acts of its employee. This Court held that, although a corporate employer could be vicariously liable for punitive damages caused by the willful and wanton acts of an employee, there must be some independent fault on the part of the corporate employer. Because the plaintiff had failed to allege any independent fault on the part of Mercury Motors Express, we quashed the district court's decision that had approved an award of punitive damages in the trial court. In stating the requisite degree of fault that would subject an employer to vicarious liability for punitive damages, we stated the following rule:

Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. <u>It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages</u>.

*Id*. at 549. <u>Under this theory, a plaintiff must (a) establish that the conduct of the employee was willful and wanton **and** (b) establish some fault on the part of a corporate employer in</u>

3

order to support a claim of vicarious liability against the corporate employer for punitive damages. We emphasize that under this theory it is not necessary for the plaintiff to establish that the corporate employer acted with the same heightened culpability as the employee to allow punitive damages. It is sufficient if the plaintiff establishes ordinary negligence on the part of the corporate employer.

Corporate Direct Liability for Punitive Damages

In *Bankers Multiple Line Insurance Co. v. Farish*, 464 So. 2d 530, 533 (Fla. 1985), we discussed the second basis for corporate punitive damages liability, direct corporate liability, and expressly distinguished the vicarious liability theory set forth in *Mercury Motors*. In Bankers, the president of an insurance company, together with another managing officer of the insurer, encouraged a client of Farish to discharge Farish as the client's attorney and seek other counsel. The attorney sued the insurance company as well as the president of the insurer in his individual capacity. The jury returned a verdict in favor of the attorney against the insurer, including both compensatory and punitive damages, but found in favor of the president of the insurer and refused to award damages for his personal actions. This Court approved the award of punitive damages against the insurer because of the evidence of culpability on the part of the other corporate managing officer of the insurer apart from the actions of the president. Although we never used the specific terminology, it is apparent that the insurer was liable for punitive damages based on its own direct liability through the actions of its other managing officer and not on the basis of vicarious liability.

Shortly after our decision in *Bankers*, we again had an occasion to discuss the direct corporate liability theory for punitive damages in *Winn-Dixie Stores, Inc. v. Robinson*, 472 So. 2d 722 (Fla. 1985). In *Winn-Dixie*, the plaintiff sued for false imprisonment, malicious prosecution, and conversion when he was falsely detained and accused of shoplifting. The facts established that the plaintiff's detention and arrest were expressly approved by an assistant manager of that store. The trial court granted Winn-Dixie's motion for directed verdict on the issue of punitive damages on the basis that the store could not be held vicariously liable under the rule in Mercury Motors. The district court reversed that ruling, finding liability for punitive damages and concluding that the rule in Mercury Motors was not an issue in the case. We affirmed that portion of the district court's decision and stated:

> Most recently in *Bankers Multiple Line Insurance Co. v. Farish*, 464 So. 2d 530 (Fla. 1985), we expressly held that *Mercury Motors* was not intended to apply to situations where the agent primarily causing the imposition of punitive damages was the managing agent or primary owner of the corporation. We also hold that Mercury Motors is not applicable in the present case where the suit was tried on the theory of the direct liability of Winn-Dixie, and the jury, by special verdict, decided that Winn-Dixie should be held directly liable for punitive damages.

Debtors respectfully submit that the Florida Supreme Court has expressly differentiated corporate liability for punitive damages where the acts, as here, are caused by a managing agent

4

– in this case, the Association's President, Ms. Gallego.  Thus, Debtors respectfully submit that this Court's reliance upon *Mercury Motors*, followed by the statement that "there does not appear any reason why the analysis should be different" (ECF 480 at 10) if the wrongful acts are committed by the president of a corporation are incorrect.

Therefore, the judgment must altered or amended, in conformity with Florida law, to provide that the Association is directly liable for punitive damages since the acts serving as the basis for punitive damages were committed by the Association's President, Marglii Gallego.

3.   Since the judgment should provide for liability for punitive damages against both Gallego and the Association, the Court's analysis of ability to pay should, respectfully, be altered or amended, as well.  The Association has a far greater ability to pay, and has conceded this point.  *See ECF 480* at 9 regarding this concession.  Further, the evidence in the record presented at trial shows that the Association has a far more assets, more vast financial resources and an overall greater ability to pay punitive damages than does Ms. Gallego.  Such a new analysis would result in a greater amount of punitive damages.  The Court expressly found that a multiplier of one was adequate "[b]ased upon Ms. Gallego's current situation."  ECF 480 at 12.

4.   Additionally, regarding the amount of punitive damages, the Court relied upon *In re Lyubarsky*, 615 B.R. 924 (Bankr. S.D. Fla. 2020) (*See ECF 480* at 8-9) to calculate the amount of punitive damages based upon a multiplier of one, stating:

> The Court finds it is appropriate to apply a <u>factor of one</u> to the punitive damages.  ECF 480 at 12.

However, in *Lyubarsky*, the Court utilized a <u>factor of two</u> to assess the amount of punitive damages in a case, <u>unlike the instant case</u>, where there was only a single contempt violation and not an ongoing violation.  *See and compare Lyubarsky* at 939:

However, because there was one violation of the automatic stay, rather than an ongoing violation, I find a multiplier of 2 is appropriate.  [Emphasis added].

In the instant case, as noted in the Court's Order at issue, ECF 480 at 2, the Court has already found the Association and Gallego in contempt for violating the "Original Contempt Orders" entered in 2018; and, for filing the November 20, 2020 lawsuit in violation of the automatic stay.  ECF 480 at 2.  Debtors note that in proving contempt for violating the automatic stay, and knowledge thereof, that a prior lawsuit with similar allegations was filed, and quickly dismissed, in 2017 – a prior lawsuit also in violation of the automatic stay.

Therefore, the instant is not a case with merely one violation of the automatic stay; nor is it a case with merely one act of contempt.  The Respondents have already been found in contempt, and have already filed a prior lawsuit in violation of the stay.

The critical factor in assessing the amount of punitive damages is not merely what amount is sufficient punishment, but what amount will deter future misconduct.  *See ECF 480* at 8: "In determining the *amount* of punitive damages, '[a]n award of punitive damages should be gauged by the gravity of the offense set at a sufficient level to ensure that it will *punish and deter*." *In re Novak*, 223 B.R. 363, 368 (Bankr. M.D. Fla. 1997) [Emphasis added].

Respectfully, under the *Lyubarsky* analysis, punitive damages should be at a factor of at least two under the circumstances presented here (prior contempt Orders, and a prior stay violation and continuing violation of the original contempt Order).  Again, the Court awarded punitive damages in *Lyubarsky* at a factor of two, even though there was only one violation.

5.  Finally, the attorney's fees awarded to Debtors ($54,065.00), including the amount added after reconsideration ($4,125.00), a total of $58,190.00 (*See ECF 480* at 2), only covers fees for the contempt proceeding – but does not consider or address attorney's fees for the "Damages Trial."   On March 10, 2022, in connection with their closing argument, Debtors'

6

counsel filed two fee applications: i) ECF 414, application of Michael Brooks, Esq. for $36,371.50; and ii) ECF 415, application of Louis Arslanian, Esq. for $22,500.00. Additionally, on June 2, 2022, Debtors filed ECF 483, a Notice of Filing Receipts for costs (subpoenas and transcripts) in the amount of $1,487.50.

The Court has previously found that Debtors are entitled to attorney's fees in this proceeding, and previously awarded Debtors the attorney's fees at the contempt trials. Respectfully, perhaps through mistake, the Court failed to award or discuss attorney's fees for the Damages Trial. If the failure to award any fees for the Damages Trial was intentional, Debtors respectfully submit that they should be entitled to the fees for the Damages Trial in the same way as they were entitled to fees in the prior proceedings.

6. The matters presented herein constitute the type of errors of law for which relief may be sought and granted under Rule 59. *See Arthur v. King*, 500 F.3d 1335, 1342 (11th Cir. 2007). The matter concerning the failure to address or award attorney's fees may additionally be covered under Rule 60 as it relates to inadvertence and mistake in failing to consider this matter.

CONCLUSION

Based upon the Florida Supreme Court's decisions in *Schropp*, *Bankers* and *Winn-Dixie*, the Order on the Damages Trial should be amended or alter, upon rehearing and/or reconsideration, to provide that the Association is directly liable, as a matter of law, for punitive damages for the wrongful acts of its managing agent, Marglii Gallego, the President of the Association. Based thereon, the ability to pay of the Association, far greater than that of Gallego, should be analyzed in assessing the amount of punitive damages.

Further, where Respondents have already been found in contempt, and have also previously violated the automatic stay, Debtors are entitled to have punitive damages assessed,

under *Lyubarsky*, at a minimum of a factor of two – the factor used in *Lyubarsky* where no continuing violations were presented.

Finally, Debtors, already found to be entitled to attorney's fees, are entitled to an award of fees and costs for the Damages Trial which appear to have not been awarded to due to mistake and inadvertence.

**WHEREFORE** Debtors seek relief under Fed. R. Civ. P. 59 and Fed. R. Civ. P. 60, for rehearing and/or reconsideration which relief shall include altering and/or amending the Order on the Damages Trial, for relief from the Order on the Damages Trial in the fashion as enumerated in the Conclusion and throughout the instant Motion, and for any other relief deemed just and proper.

Dated: June 17, 2022

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States Bankruptcy Court for the Southern District Florida and I am in compliance with the additional qualifications to practice in this Court and that a true and correct copy of this *MOTION TO ALTER OR AMEND JUDGMENT, FOR REHEARING, RELIEF FROM JUDGMENT AND/OR RECONSIDERATION AS TO ECF 480* was sent by email to those set forth in the NEF, this 17th day of June 2022.

Law Office of Michael J. Brooks, P.A
Attorney for the Debtor
8410 S.W 40th Street
Miami, FL 33155
Telephone 1 (877) 290-9197
Facsimile  (954) 623-6125

By: _____/s/_____
    Michael J. Brooks, Esq
    Florida Bar No. 434442

8

bel Matrix for local noticing
3C-1
se 17-20358-LMI
uthern District of Florida
ami
d Sep 23 10:04:49 EDT 2020

Hammocks Community Association, Inc
Law Offices of Miguel Parlade, P.A.
PO Box 771747
Miami, FL 33177-0030

JPMorgan Chase Bank, N.A.
c/o Kelley Kronenberg Attorneys at Law
1511 N. Westshore Blvd., Suite 400
Tampa, FL 33607-4596

lls Fargo Bank, NA.
o Lindsey Savastano
24 North Federal Highway #360
ca Raton, FL 33431-7780

AT&T
POB 5014
Carol Stream, IL 60197-5014

Aes/nelnet
Pob 61047
Harrisburg, PA 17106-1047

hley Funding Services, LLC its successors
signs as assignee of Laboratory
rporation of America Holdings
surgent Capital Services
 Box 10587
eenville, SC 29603-0587

Aventura Hospital
POB 9060
Clearwater, FL 33758-9060

Berks Credit & Coll
900 Corporate Dr
Reading, PA 19605-3340

)CAPITAL ONE
 BOX 30285
LT LAKE CITY UT 84130-0285

Chase Auto
Po Box 901003
Ft Worth, TX 76101-2003

Comenity Bank/anntylr
Po Box 182789
Columbus, OH 43218-2789

menity Bank/limited
 Box 182789
lumbus, OH 43218-2789

Credit One Bank Na
Po Box 98875
Las Vegas, NV 89193-8875

Department Stores National Bank
c/o Quantum3 Group LLC
PO Box 657
Kirkland, WA  98083-0657

nb Bloom
11 Duke Blvd
son, OH 45040-8999

Dsnb Macys
Po Box 8218
Mason, OH 45040-8218

ECMC
PO BOX 16408
St Paul, MN 55116-0408

)US DEPARTMENT OF HOUSING AND URBAN DEVELOP
TN ROBERT ZAYAC
 MARIETTA ST SUITE 300
LANTA GA 30303-2812

Hammocks Community Association
9020 Hammocks Blvd
Miami, FL 33196-1301

Hammocks Community Association, Inc
c/o Basulto, Robbins & Associates, LLP
14160 NW 77th Court, Suite 22
Miami Lakes, FL 33016-1506

llcrest Davidson & A
5 N Glenville Dr Ste 4
chardson, TX 75081-2879

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

JPMorgan Chase Bank, N.A.
National Bankruptcy Department
P.O. Box 29505 AZ1-1191
Phoenix, AZ  85038-9505

NV Funding, LLC its successors and assigns
signee of FNBM, LLC
surgent Capital Services
 Box 10587
eenville, SC 29603-0587

Mabtc/tfc
Po Box 13306
Virginia Beach, VA 23464

Miami Dade County
200 NW 2 Ave
3rd Floor
Miami, FL 33128-1733

VIENT SOLUTIONS, LLC OBO ECMC
 BOX 16408
. PAUL, MN 55116-0408

(p)NATIONWIDE RECOVERY SERVICE
545 W INMAN ST
CLEVELAND TN 37311-1768

Navient
Po Box 9500
Wilkes Barre, PA 18773-9500

fice of the US Trustee
S.W. 1st Ave.
ite 1204
ami, FL 33130-1614

(p)PORTFOLIO RECOVERY ASSOCIATES LLC
PO BOX 41067
NORFOLK VA 23541-1067

Quantum3 Group LLC as agent for
Comenity Bank
PO Box 788
Kirkland, WA  98083-0788


antum3 Group LLC as agent for
MA Funding LLC
Box 788
rkland, WA  98083-0788

Quest Diagonistics
c/o CCS
725 Canton St
Norwood, MA 02062-2679

Santander Bank Na
865 Brook St
Rocky Hill, CT 06067-3444


uth Miami Criticare
B 431840
ami, FL 33243-1840

Special Assistant United States
Associates Area Counsel (SBSE) - Miami
PO BOX 9, Stop 8000
51 SW 1st Avenue
Miami, FL 33130-1608

Special Assistant United States
Associates Area Counsel (SBSE) -Ft. Laud
1000 S. Pine Island Road
Suite 300
Fort Lauderdale, FL 33324-3910


e Honorable Benjamin Greenberg
ited States Attorney
NE 4th Street
ami, FL 33132-2131

The Honorable Jeff Sessions
United States Attorney General
Department of Justice, Room 4400
950 Pennsylvania Avenue N.W.
Washington, DC 20530-0001

(p)TIDEWATER FINANCE COMPANY
P O BOX 13306
CHESAPEAKE VA 23325-0306


bbank/fingerhut
50 Ridgewood Road
int Cloud, MN 56303-0820

Wells Fargo
POB 10335
Des Moines, IA 50306-0335

Wells Fargo Bank, NA
c/o Lindsey Savastano
Shapiro, Fishman & Gache, LLP
2424 N. Federal Highway
Suite 360
Boca Raton, FL 33431-7701


st Kendall Hospital
B 830880
ami, FL 33283-0880

Josue Cepero
9541 SW 148 Place
Miami, FL 33196-1514

Leticia Cepero
9541 SW 148 Place
Miami, FL 33196-1514


rglli Gallego
20 Hammocks Blvd.
ami, FL 33196-1301

Michael J Brooks Esq
8410 SW 40 St
Miami, FL 33155-3200

Nancy K. Neidich
www.ch13miami.com
POB 279806
Miramar, FL 33027-9806


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


pital One
000 Capital One Dr
chmond, VA 23238

HUD
451 7th St SW
Washington, DC 20410

Internal Revenue Service
Insolvency Support Group, Unit 1
Stop 5730
7850 SW 6th Court, Room 165
Fort Lauderdale, FL 33318


tionwide Recovery Sv
Box 8005
eveland, TN 37320

Portfolio Recovery Associates, LLC
POB 41067
Norfolk VA 23541

Tidewater Finance Company
PO Box 13306
Chesapeake, VA 23325

)U.S. Department of Housing and Urban Devel
1 7th Street S.W.
shington, DC 20410

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

)Miami

(d)Hammocks Community Association, Inc.
c/o Basulto, Robbins & Associates, LLP
14160 NW 77th Court, Suite 22
Miami Lakes, FL 33016-1506

End of Label Matrix
Mailable recipients      50
Bypassed recipients       2
Total                    52

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In Re:                                                          Case Number: 17-20358-LMI
                                                               Chapter 13
JOSUE CEPERO and
LETICIA CEPERO

_____Debtor(s)_____/

**HAMMOCKS COMMUNITY ASSOCIATION, INC. and MARGLLI GALLEGO'S**
**MEMORANDUM IN OPPOSITION TO DEBTORS' MOTION TO ALTER OR AMEND**
**JUDGMENT, FOR REHEARING, RELIEF FROM JUDGMENT AND/OR**
**RECONSIDERATIONS AS TO ECF 480 (D.E. 489)**

Respondents, Hammocks Community Association, Inc. and Marglli Gallego, hereby file

their Memorandum in Opposition to Debtor's Motion to Alter or Amend Judgment, for

Rehearing, Relief from Judgment and/or Reconsideration as to ECF 480 and in support thereof

state:

1.  On December 30, 2021, this Court conducted on evidentiary hearing on damages for

    violations of this Court's stay away orders and violation of the automatic stay.

2.  Specifically, this Court adjudicated the Debtors' request for attorney's fees, emotional

    distress damages, and punitive damages as to both Marglli Gallego and Hammocks

    Community Association, Inc.  *(ECF 339)*.

3.  This Court had previously determined liability on behalf of Respondents and bifurcated the

    issue of damages.  ("The Amended Contempt Motion seeks attorney fees and reimbursement

    of costs (including those associated with the November 2020 Lawsuit), punitive damages,

    and damages for emotional distress. The Debtors did not cite any statute or common law

    basis for the sanctions they seek leaving it to the Court to guess why they are entitled to

    recovery. However, the Court specifically advised the parties that the Court would consider

    evidence of damages after a determination of liability, if any. Having found that the

Association and Ms. Gallego violated the Contempt Orders and the automatic stay, the Court will ask the Debtors to file their specific request for damages, citing the support for the damages, whether by statute or common law, and the specific amount of damages requested for each category of damages.") *(ECF 328, p. 11).*

4. On June 8, 2022, this court determined that Debtor, Leticia Cepero, was entitled to damages for emotional distress in the amount of $25,000.00 jointly and severally payable by both Respondents, attorney's fees in the amount of $58,190.00 jointly and severally payable by both Respondents, and $83,190.00 in punitive damages only as to Respondent Marglli Gallego.  (ECF 480).

5. On June 17, 2022, Debtors filed their Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsideration as to ECF 480.

6. In that motion, Debtors argue that this Court misapplied/misstated Florida law by finding that Respondent Hammocks Community Association was not liable for punitive damages, that the amount of punitive damages assessed against Defendant Marglli Gallego is insufficient, and that this Court erred by not making a determination as to additional attorney's fees rendered by Debtors' counsel for services rendered for the December 30, 2021 hearing.

7. Until the filing the aforementioned motion, Debtors have never given a legal basis for the imposition of punitive damages against Hammocks Community Association.

8. Debtors never argued, nor did they provide any evidence that Hammocks Community Association should be held liable as the principal of Marglli Gallego under the theory that they were directly liable via respondeat superior.  In fact, Debtors theory of liability was that both Marglli Gallego, as an individual, and Hammocks Community Association violated this Court's stay away orders.  (See *ECF 324).*

**THIS COURT PROPERLY DETERMINED THAT DEBTORS DID NOT PRESENT SUFFICIENT EVIDENCE TO IMPOSE PUNITIVE DAMAGES ON HAMMOCKS COMMUNITY ASSOCIATION BASED ON THE DOCTRINE OF RESPONDEAT SUPERIOR**

9.  On June 8, 2022, this Court noted that punitive damages are subject to the discretion of the Court and that they are "appropriate when a party acts with 'reckless or callous disregard or rights of others'." *In re Lyubarsky, 615 B.R. 924, 937-938 (Bankr. S.D. Fla. 2020)(citing Parker v. Credit Central South, Inc., 634 Fed. Appx. At 773). (ECF 480, page 8).*

10. In its decision this Court held that although Ms. Gallego was an "officer of the Association rather than employee," Debtors did not provide any evidence that Hammocks Community Association 'foreseeably contributed' to the Debtor's injuries. (ECF 480, Page 10).

11. In fact, this Court has previously held that a corporation can be held "directly liable" for damages, including punitive damages, for the acts of its managing agents if the evidence presented sufficiently establishes that the corporation in some manner condoned the managing agent's actions. *Rosenberg v. DVI Receivables, XIV, LLC (In Re Rosenberg), 471 B.R. 307, 313 (Bankr. S.D. Fla 2012)*("A principal who knowingly permits its agent to act in an unauthorized manner remains liable to third parties who believe in good faith that the principal consented to the agent's acts.")

12. In *Rosenberg,* Judge Cristol held that it was proper to hold U.S. Bank, N.A., as a disclosed principal, directly liable for the acts of its managing agents because at all relevant times the agents acted as agents for U.S. Bank, N.A. and the record evidence indicated that the agent consistently identified itself as the agent for U.S. Bank, N.A.. *Rosenberg v. DVI Receivables, XIV, LLC (In Re Rosenberg), 471 B.R. 307, 313 (Bankr. S.D. Fla 2012)*.

13. The Court then noted, "[a] principal who knowingly permits its agent to act in an unauthorized manner remains liable to third parties who believe in good faith that the principal consented to the agent's acts." *Rosenberg at 313.*

14. In arriving at its holding, the Court noted that it was proper to impute liability on the principal based on the acts of the managing agent because the principal allowed the agent to portray itself to the world as if it were its agent and to take actions on the principal's behalf relating to those intentional acts that led to the injury. *Rosenberg at 313.*

15. As noted by the United States District Court for the Southern District of Florida, to hold a principal liable for the intentional acts of an agent either through theories of actual or apparent agency, a petitioner must sufficiently allege those elements that establish that the agency and those elements of the underlying intentional act. *Flaherty v. Royal Caribbean Cruises, Ltd., 172 F. Supp. 3d 1348, 1352 (S.D. Fla 2016). See also, Bankers Multiple Line Ins. Co. v. Farish, 464 So. 2d 530, 532 (Fla. 1985)("It should be clear to the jury that, even though liability and punitive damages contain the common elements of willfulness, a finding of liability for compensatory damages does not dictate an award of punitive damages.")*

16. "'Apparent agency exists where the alleged principal makes a manifestation that causes a third party to reasonably believe that the alleged agent had the authority to act for the benefit of the principal, and the third party reasonably acts on such belief to his detriment." *Flaherty at 1352. (citing Fojtasek v. NCL (Bahamas) Ltd., 613 F. Supp. 2d 1351, 1357 (Sd. Fla. 2009)).*

17. This Court properly noted that although it is not necessary that the fault of an employer, independent of his agent's conduct, be willful and wanton. "'It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the

plaintiff's injury to make him vicariously liable for punitive damages'." *(ECF 480, Page 10)(citing Mercury Motors Exp., Inc. v. Smith, 393 So. 2d 545, 549 (Fla. 1981).*

18. Debtors make the unfounded assertion that a corporation should be held liable per se for all wrongful acts of a managing agent.

19. In support of their argument, Debtors state that *Bankers Multiple Line Insurance Co. v. Farish, 464 So. 2d 530, 533 (Fla. 1985)* and *Winn-Dixie Stores, Inc. v. Robinson, 472 So. 2d 722 (Fla. 1985)* stand for the proposition that a corporation is strictly liable for punitive damages for all wrongful acts of a managing agent of a corporation.

20. However, a cursory reading of *Bankers Multiple Line Insurance Co. and Winn Dixie Stores, Inc.* reveal that both cases involve tortious acts where evidence was presented that indicated that "the corporation itself committed the tort and the jury returned a verdict, finding that the corporate defendant acted with 'malice, moral turpitude, wantonness, willfulness or reckless indifference to the rights of others'." *Winn-Dixie Stores, Inc. at 724. (Winn-Dixie Stores, Inc.* dealt with a person who was falsely imprisoned and falsely accused of theft by Winn-Dixie employees and imprisoned within the store, and *Bankers Multiple Line Insurance Co.* dealt with an agent of Bankers Multiple Line Insurance Co. who communicated with a family member of a deceased accident victim and persuaded the family member to fire the attorney hired by her and to use the attorney designated by the agent of the insurance company. Eventually a judgment was obtained, and it was learned that the defendant was insured by Bankers Insurance Company.)

21. Under the direct liability theory, a principal's liability for punitive damages as codified by Florida Statute 768.72 is established if the employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct; the officers, directors, or

managers of the employer, principal, corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct; or the employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.  *"§ 768.72, Fla. Stat.  Fla. Power &amp; Light Co. v. Dominguez, 295 So.3d 1202 (Fla. App. 2019).*

22. Debtors never introduced any evidence that any of the requirements of Fla. Stat. § 768.72 were met.

23. Indeed, punitive conduct must be "so reckless or wanting in care that it constitute[s] a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b). *See also BDO Seidman, LLP v. Banco Espirito Santo Intern., 38 So. 3d 874, 876-77 (Fla. 3d DCA 2010).*

24. Debtors never alleged nor offered any evidence that Hammocks Community Association intentionally and/or willfully violated this Court's Contempt Order.  As was noted by this Court, the five factors to be considered in determining whether an award of punitive damages is proper is primarily based upon the nature of defendant's conduct.  (ECF 480 at 8)(citing *In Re Harrison, 599 B.R. 173, 182 (Bankr. N.D. Fla. 2019*).

WHEREFORE, Respondents Hammocks Community Association and Marglli Gallego respectfully request that this Court deny Debtors' Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsideration as to ECF 480.

**THIS COURT PROPERLY DETERMINED THE AMOUNT OF PUNITIVE DAMAGES**

25. In their motion Debtors argue that the punitive damages award is insufficient to deter future misconduct based on the evidence presented.

26. Rule 59(e) allows a party to file a motion to "alter or amend a judgment." Fed.R.Civ.P. 59(e).

27. However, a party "cannot use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Ortiz v. City of Miami (S.D. Fla. 2022)( citing Michael Linet, Inc. v. Vill. of Wellington, Fla., 408 F.3d 757, 763 (11th Cir. 2005)).*

28. "Furthermore, a Rule 59(e) motion is only granted where there is "newly-discovered evidence or manifest errors of law or fact." *Hamilton v. Sec'y Fla. Dep't of Corr., 793 F.3d 1261, 1266 (11th Cir. 2015) (quoting Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007)). See also, Brosky v. Secretary of Fla. Dep. of Corrections (S.D. Fla. 2022).*

29. Debtors are seeking to relitigate matters within the discretion of this Court.

WHEREFORE, Respondents Hammocks Community Association and Marglli Gallego respectfully request that this Court deny Debtors' Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsideration as to ECF 480.

**FAILURE TO INCLUDE ATTORNEY'S FEES AS PART OF THIS COURT'S ORDER**

30. On December 30, 2021, this Court conducted a hearing to determine damages for emotional distress and punitive damages.

31. At the hearing this Court ordered that attorney's fees would be allowed and directed Debtors' counsel to file a motion for payment of attorney's fees and costs.  (Tr. At 500:6 – 500:9).

32. Local Rule 7054-1 (F) states that "motions for attorney fees required under Bankruptcy Rule 7054(b)(2)(a) and requests for costs which require a separate order under subdivision (A) of this Rule shall be considered only upon motion to the court filed within 14 days after entry of judgment."  (Fed. R. Bankr. P. 9014 makes Fed. R. Bankr. P. 7054 applicable to contested matters.)

33. Debtors' counsel failed to timely file motions for attorney's fees and costs pursuant to the

local rules of this Court.

34. As a result, Debtors have not demonstrated that the failure to include these costs and fees as part of this Court's Order on Damages is "newly-discovered evidence" or a "manifest error of law or fact".

WHEREFORE, Respondents Hammocks Community Association and Marglli Gallego respectfully request that this Court deny Debtors' Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsideration as to ECF 480.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was transmitted to the parties listed below via electronic delivery on this 7th day of July 2022:

Michael J. Brooks, Esq. on behalf of Debtors; pleadings@bankruptcynow.com, mbrooks@bankruptcynow.com;brooks.michaelr100502@notify.bestcase.com

Nancy K. Neidich
e2c8f01@ch13miami.com, ecf2@ch13miami.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

                                            /s/ Miguel Parlade
                                            Miguel Parlade, Esq.
                                            Fla. Bar. 388068
                                            Attorney for Marglli Gallego and
                                            Hammocks Community Association
                                            P.O. Box 771747
                                            Miami, FL  33177
                                            (305) 235-9040
                                            parladelaw@gmail.com

*Tagged Opinion*
*Do not publish*



**ORDERED in the Southern District of Florida on August 9, 2022.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                    CASE NO. 17-20358-BKC-LMI

JOSUE CEPERO and LETICIA                  Chapter 13
CEPERO,

        Debtors.

_____/

**ORDER GRANTING IN PART MOTION TO ALTER OR AMEND JUDGMENT
FOR REHEARING, RELIEF FROM JUDGMENT AND/OR
RECONSIDERATION AS TO ECF 480**

This matter came before the Court on July 14, 2022 (the "Hearing") on the

Debors' *Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment*

*as to ECF 480* (ECF #489) (the "Motion"). The Motion seeks reconsideration of

this Court's *Order on Damages* (ECF #480) (the "Damages Order") pursuant to

Fed. R. Civ. P. 59(e) and 60(a). The Motion argues that the Court should amend

the Damages Order for the following reasons: (1) Debtors, having already found

to be entitled to attorney's fees, are entitled to an award of fees and costs for the

trial on damages (the "Damages Trial") which fees and costs were not addressed in the Damages Order ; (2) to provide that the Association[1] is directly liable for punitive damages for the wrongful acts of its managing agent, Marglli Gallego, the President of the Association; and (3) that the Court should have used a multiplier of at least two in assessing punitive damages. The Court has reviewed the Motion, the response filed by the Association[2], and has considered the arguments of counsel at the Hearing.  For the reasons stated on the record and set forth below, the Motion is GRANTED in part and DENIED in part.

<u>Attorney's Fees and Costs</u>

The reasonableness of the fees requested by the Debtors is measured in accordance with the criteria set forth in *Johnson v. Georgia Highway Exp.,* 488 F.2d 714 (5th Cir. 1974) as reaffirmed in *Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988). *In re Lyubarksy,* 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020).[3] Those factors are (i) the time and labor involved; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience,

---

[1] All capitalized terms not defined within this Order shall have the same definition as that in the Damages Order.

[2] *Hammocks Community Association, Inc. and Marglli Gallego's Memorandum in Opposition to Debtors' Motion to Alter or Amend Judgment, for Rehearing, Relief from Judgment and/or Reconsiderations as to ECF 480 (D.E. 489)* (ECF #502).

[3] "The criteria for determining the reasonableness of the fees requested is not 11 U.S.C. §330 because the Debtors' professionals were not retained pursuant to 11 U.S.C. §327. . . . Fed. R. Bankr. P. 2016 and this Court's *Guidelines for Fee Applications for Professionals in the Southern District of Florida in Bankruptcy Cases* are also inapplicable." *Id.*

reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.

At the Hearing, the Court acknowledged that it inadvertently failed to include the Debtors' counsel's award of attorney's fees and costs incurred in connection with the Damages Trial. The Court has reviewed the fee statements filed by Mr. Brooks and Mr. Arslanian.[4] Having reviewed the statements in detail, the Court finds that Mr. Brooks' fees should be reduced to $23,446.50[5] and that Mr. Arslanian's fees should be reduced to $18,595.00[6]. Therefore, Debtors are awarded $42,041.50 in attorney's fees for the fees incurred in connection with the Damages Trial.

The Court has also reviewed the *Debtor's Notice of Filing Receipts* (ECF #483)[7] where the Debtors seek $1,487.30 in costs. The Court awards those in full.

---

[4] *Notice of Filing Time Sheet for Michael J. Brooks on Order on Sanctions and Setting Evidentiary Hearing* (ECF #414); *Notice of Filing Time Sheet of Louis C. Arslanian on Order on Sanctions and Setting Evidentiary Hearing* (ECF #415). As the Court noted at the Hearing, in the future counsel is directed to, *at least*, attach a notice of filing rather than just uploading an otherwise unidentified time record.

[5] The Court deducted 23.5 hours ($12,925.00) from Mr. Brooks' time due to excessive billing, duplicate billing, billing for work that wasn't performed (prepare and review and revise a non-existent fee application) and block billing.

[6] The Court deducted 7.1 hours ($3,905.00) from Mr. Arslanian's time for the same reasons.

[7] Like the fee statements, Debtors' counsel merely attached the receipts; no list was provided, nor was there any request for total fees.  In the future Debtors' counsel is instructed to take the time to prepare and file a proper pleading.

Punitive Damages Liability

In the Damages Order, the Court found that the Debtors were entitled to punitive damages for which Ms. Gallego was solely responsible. The Debtors argue that the Court should have relied on a direct liability theory when determining punitive damages liability with regard to the Association. Although the Debtors failed to provide any legal support for this argument prior to the entry of the Damages Order, the Court agrees with the Debtors that the Court applied an incorrect standard.

In the Damages Order, the Court relied on a vicarious liability theory found in *Mercury Motors Express, Inc. v. Smith,* 393 So. 2d 545 (Fla. 1981). The Debtors argued that the standard in *Schropp v. Eurocars*, 654 So. 2d 1158 (Fla. 1995) controls and that a corporation can be held directly liable for punitive damages based upon the acts of one of its managing agents without proof of fault of the employer. *Schropp*, 654 So. 2d 1158; *see Winn-Dixie Stores, Inc. v. Robinson,* 472 So. 2d 722, 724 (Fla. 1985) ("because this case was tried on the basis of direct corporate liability, *Mercury Motors* was not applicable. Most recently in *Bankers Multiple Line Insurance Co. v. Farish*, 464 So. 2d 530 (Fla. 1985), we expressly held that *Mercury Motors* was not intended to apply to situations where the agent primarily causing the imposition of punitive damages was the managing agent or primary owner of the corporation."). Therefore, the Association is directly liable for punitive damages based on the acts of Ms. Gallego, the then President and managing agent of the Association.

Since the Court already found the Association to be directly liable for punitive damages in its *Order Finding Hammocks Community Association Inc. and Marglli Gallego in Contempt* (ECF #328), and that the Association is directly liable for punitive damages, which findings have not yet been challenged by the Association, based on *Schropp*, the Association is jointly and severally liable with Ms. Gallego for punitive damages. Therefore, the request to amend the Damages Order accordingly is granted.

Punitive Damages Multiplier

In the Damages Order, the Court applied a factor of one to the punitive damages. The Debtors contend that the punitive damages multiplier should be a factor of at least two under the circumstances because there were violations of prior contempt orders and a prior stay violation. The Debtors further argue that because the Association is directly liable, the multiplier should be increased.

At the Hearing, the Court explained that it took several factors into account when determining which multiplier was appropriate and that even though the Damages Order is amended to provide the Association is directly liable, a factor of one is still appropriate. Therefore, the request to alter the multiplier of the punitive damages award is denied.

Based on the foregoing it is ORDERED as follows:

1.     The Motion is GRANTED in part.

2.     The Damages Order is amended as follows:

        a.     Mrs. Cepero is entitled to damages for emotional distress arising from the May Incident in the amount of $25,000.00. The

Association and Ms. Gallego are jointly and severally liable for these damages

b.      The Ceperos are entitled to an attorney fee award in the total amount of $101,718.80. The Association and Ms. Gallego are jointly and severally liable for these damages.

c.      The Ceperos are entitled to punitive damages in the amount of $126,718.80, which is an amount equal to the amount of actual damages awarded to the Ceperos, for which punitive damages the Association and Ms. Gallego are jointly and severally liable.

d.      The Ceperos will be entitled to prepare final judgments in these amounts that can be recorded in the public records of Miami-Dade County and otherwise, as required by Florida law, if the amounts in this Order, including the attorney fees, are not paid within 30 days from the entry of this Order.

### 

Copies furnished to:
Michael Brooks, Esq.
Miguel Parlade, Esq.

*Attorney Brooks is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*