UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Appeal Case No. 21-cv-22821-RKA
Bankruptcy Case No. 17-20358-LMI (Chapter 13)

HAMMOCKS COMMUNITY ASSOCIATION INC.,
and MARGLLI GALLEGO,

Appellants,

v.

JOSUE CEPERO and
LETICIA CEPERO,

Appellee.

---

## <u>APPELLANTS INITIAL BRIEF</u>

---

ACE LAW, P.A.
Annette C. Escobar
Florida Bar No.: 369380
14200 S.W. 232nd St.
Miami, Fla. 33170
Telephone No: (305) 542-0544
E-Mail: aescobar@acelawfirm.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Undersigned counsel of record for Appellant Hammocks Community Association Inc. certifies that no entity or person has an ownership interest of 10% or more in Hammocks Community Association, Inc.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT OF JURISDICTION ..................................................................... 1

ISSUES PRESENTED ......................................................................................... 1

STANDARD OF REVIEW .................................................................................. 3

STATEMENT OF THE CASE ............................................................................. 4

   I.   December 2018 Contempt Orders ................................................................. 4

   II.  Contempt Motions and The First Day of Evidentiary Hearings .................... 5

   III. Amended Contempt Motion and the Lawsuits ............................................. 6

       A.   The Amended Contempt Motion .......................................................... 6

       B.   The Lawsuits ....................................................................................... 7

   IV. The                     Continued                Evidentiary

       Hearing .............................................................................................. 8

   V.   Closing Arguments ..................................................................................... 8

       A.   Debtors' Closing Argument ................................................................. 8

       B.   Appellants' Closing Argument ........................................................... 10

       C.   Debtors' Reply Closing Argument ..................................................... 11

VI. Contempt Order ....................................................................... 13

    A. The May 15, 2019 Incident .............................................. 14

    B. The 2020 Lawsuit ........................................................... 17

VI. Order on Sanctions .................................................................. 18

VIII. Order on Damages, Motion for Rehearing and Order Granting Motion as to

Punitive Damages against Hammocks ......................................... 19

SUMMARY OF THE ARGUMENT ................................................. 21

ARGUMENT.................................................................................. 23

I.   The Bankruptcy Court Erred in Finding Respondents in Contempt for

Violation of the Contempt Orders ................................................ 24

    A. Debtors did Not Demonstrate by Clear and Convincing

Evidence that the Contempt Orders were Clear, Definite and

Unambiguous in Forbidding the Conduct at Issue ............................ 24

    B. The Evidence Presented by Debtors' Does Not Establish by

Clear and Convincing Evidence that the Respondents Violated

the Contempt Orders or Was Otherwise Rebutted ............................ 29

II.  The Bankruptcy Court Erred in Finding the Hammocks in Contempt

for Violation of the Contempt Orders.......................................... 35

III. The Bankruptcy Court Erred in Holding that the filing of the November 2020 Lawsuit Violated the Automatic Stay Because it was Based on Post-Petition Conduct .................................................................38

IV. The Bankruptcy Court Erred in Awarding Punitive Damages Against Hammocks .......................................................................................40

CONCLUSION ...................................................................................44

CERTIFICATE OF SERVICE ............................................................45

CERTIFICATE OF COMPLIANCE ....................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Bill Harbert Constr. Co. v. Cortez Byrd Chips, Inc.</u>,

    169 F.3d 693 (11th Cir. 1999)..................................................................28

<u>Bonner v. City of Prichard</u>,

    661 F.2d 1206 (11th Cir. 1981)...............................................................28

<u>Bostock v. Clayton County, Georgia</u>,

    140 S. Ct. 1731 (2020)...........................................................................25

<u>CBS Inc. v. PrimeTime 24 Joint Venture</u>,

    245 F.3d 1217 (11th Cir. 2001)...............................................................25

<u>Colorado v. New Mexico</u>,

    467 U.S. 310 (1984)...............................................................................23

<u>Entente Mineral Co. v. Parker</u>,

    956 F.2d 524 (5th Cir. 1992)..................................................................37

<u>HCA Health Services of Florida, Inc. v. Byers-McPheeters</u>,

    201 So. 3d 669 (Fla. 4th DCA 2016).......................................................41

<u>In re Dolan</u>,

    550 B.R. 2016 (S.D. Fla. 2016)............................................................... 3

<u>In re Jove Engineering, Inc. v. I.R.S.</u>,

    92 F.3d 1539 (11th Cir. 1996)....................................1, 3, 23-24, 28, 38

Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,

   864 F.2d 927 (1st Cir. 1988) ................................................................................. 3

Johnson v. Esso Standard Oil Co.,

   211 F.2d 397 (5th Cir. 1954)..............................................................................36

Jordan v. Wilson,

   851 F.2d 1290 (11th Cir. 1988)...........................................................................24

Koutsouradis v. Delta Air Lines, Inc.,

   427 F.3d 1339 (11th Cir. 2005)...........................................................................42

Melford v. Kahane and Associates,

   371 F. Supp. 3d 1116 (S.D. Fla. 2019).................................................................41

Mercury Motors Exp. Inc. v Smith,

   393 So.2d 545 (Fla. 1981)....................................................................................19

Ranger Construction Industries, Inc. v. Allied World National Ass. Co.,

   2019 WL 13090449 (S.D. Fla. 2019)..................................................................41

Richmond v. United States,

   6 F.2d 143 (5th Cir. 1925)...................................................................................28

Schropp v. Crown Eurocars, Inc.,

   654 So. 2d 1158 (1995)........................................................................20, 41, 42

State of Florida v. State of Georgia,

   141 S. Ct. 1175 (2021)........................................................................................23

**Statutes**

11 U.S.C. §362(a)(1)............................................................................. 18, 38-39

28 U.S.C. § 158(a)(1) ................................................................................. 1

28 U.S.C. §§ 157....................................................................................... 1

Fla Stat. 768.72 ............................................................................... 20, 41-42

Fla. Stat. § 768.725 ..................................................................................43

**Other Authorities**

Altercation, Black's Law Dictionary (11th ed. 2019)............................................28

Communication, Black's Law Dictionary (11th ed. 2019)....................................25

https://dictionary. cambridge.org/us/dictionary/english/contact ...........................25

*https://dictionary.cambridge.org/ us/dictionary/english/approach* .......................26

*https://www.merriam-webster.com/ dictionary/approach* ...................................27

*https://www.merriam-webster.com/dictionary/altercation* ..................................28

*https://www.merriam-webster.com/dictionary/communication* ............................25

Merriam-Webster Dictionary, *https://www.merriam-*

*webster.com/dictionary/contact* ........................................................................25

*When is a Manager a Managing Agent*, Christopher Johnson and Ted Craig,

Florida Bar Journal, Vol 75, pg. 62 (2001)........................................................42

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court, Southern District of Florida (the "Bankruptcy Court"), had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. On July 17, 2021, the Bankruptcy Court entered an Order Finding Hammocks Community Association, Inc. ("Hammocks") and Marglli Gallego ("Gallego") (collectively, "Appellants") in Contempt (the "Contempt Order") and thereafter entered Orders on Sanctions, Damages, and a Motion for Rehearing. ECF339, 480, 510. On August 23, 2022, Appellants filed a timely Notice of Appeal [ECF 511].[1]

This Court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1). The Order is a final order appealable to this Court. See, e.g., In re Jove Engineering, Inc. v. I.R.S., 92 F.3d 1539 (11th Cir. 1996) (court had jurisdiction in appeal from order finding a violation of the automatic stay as a final order).

## ISSUES PRESENTED

Appellants raise four issues on appeal. First, whether the Bankruptcy Court erred in granting the Debtors' Jose Cepero ("Mr. Cepero") and Leticia Cepero ("Mrs. Cepero") (collectively, "Debtors")'s Motion for Contempt Against Hammocks and

---

[1] Unless otherwise indicated, all references in this Initial Brief to electronic filings by "[ECF __]" refer to entries on the Bankruptcy Court's docket in Case No. 17-20358-LMI. All electronic filings referenced were designated by the parties for inclusion in the record on appeal.

its President, Gallego for Failure to Abide by this Court's Agreed Order on Debtors' Amended Motion for Contempt Against Hammocks and Gallego Dated December 4, 2018 [ECF189] ("Agreed Contempt Order") and this Court's Order on Debtor's Amended Motion for Contempt Against Hammocks and, its President, Gallego Dated December 6, 2018 [ECF191] ("Gallego Contempt Order") (the Agreed Contempt Order and Gallego Contempt Order, collectively, the "Contempt Orders"), filed December 7, 2018 [ECF199] ("Contempt Motion"), and the Debtors' Amended Motion for Contempt against the Hammocks and Gallego for Failure to Abide by the court's Agreed Contempt Order [ECF189] and the court's Gallego Contempt Order [ECF191], filed on January  7, 2021 [ECF289] ("Amended Contempt Motion") (collectively, the "Contempt Motions") based on an incident that occurred on May 15, 2019?

Second, whether the Bankruptcy Court erred in granting the Debtors' Contempt Motions against the Hammocks based on an incident that occurred on May 15, 2019?

Third, whether the Bankruptcy Court erred in granting the Debtors' Amended Contempt Motion against the Appellants for violation of the automatic stay based on the filing of a lawsuit in November 2020 (the "2020 Lawsuit")?

Fourth, whether the Bankruptcy Court erred in granting Debtor's Motion To Alter Or Amend Judgement For Rehearing, Relief From Judgment And/Or

Reconsideration (DE510).   Specifically, whether the bankruptcy court erred in awarding punitive damages against the Hammocks?

### STANDARD OF REVIEW

The appellate court exercises complete and independent review over [the Bankruptcy] court's conclusions of law," and reviews findings of fact for clear error. Jove, 92 F.3d at 1545; In re Dolan, 550 B.R. 2016, 586 (S.D. Fla. 2016) ("district court reviews bankruptcy findings of fact for clear error and conclusions of law and mixed questions of law and fact de novo").   The court's findings are clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."   Jove, 92 F.3d at 1545 (internal quotations omitted).

An order "granting or denying a motion for civil contempt is reviewed for abuse of discretion. . . . A district court abuses its discretion when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support."   Id. at 1546; Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988) ("Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them").   Less deference is given to an order finding a violation of the automatic stay.   Jove, 92

3

F.3d at 1546.

## STATEMENT OF THE CASE

This case is a Chapter 13 bankruptcy proceeding filed by the Debtors in 2017. ECF199 ⫟1. Hammocks is a creditor in that bankruptcy and Gallego, during the relevant time period, was the president of the Hammocks' board of directors. Id. at ⫟ 2; ECF321 at 186:17-19.

## I. December 2018 Contempt Orders

On December 4 and December 7, 2021, the Bankruptcy Court entered two orders on the Debtor's Contempt Motions, one against both Appellants and one against Gallego alone. The conduct prohibited differed in each.

Specifically, on December 4, 2021, the Court entered the Agreed Contempt Order against Hammocks and Gallego in her capacity as president of Hammocks. The Agreed Contempt Order, "[w]ithout admission of guilt or finding in favor of Debtors," ordered Appellants to pay Debtors' attorney's fees. ECF189 ⫟ 1. The Bankruptcy Court further held as follows:

> Hammocks Community Association, Inc., and it's President, Marglli Gallego shall refrain from any further **contact** with the Debtors, Josue and Leticia Cepero, during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed. During such time, there shall be no **communication** from any representative with Hammocks Community Association, Inc., and/or it's President, Marglli Gallego, and either her individually, or her capacity of her representative of the Association, with reference to the bankruptcy filed by Josue and Leticia Cepero, the Debtors' debts, the Debtors' creditors or any other business relationships the

4

Debtors may have relating to the Bankruptcy.

Id. ⁋ 2 (emphasis added).

On December 7, 2021, the Bankruptcy Court issued a second order on the same motion directed to the prohibition of certain conduct by Gallego:

> to prevent any further altercations between Ms. Gallego in her individual capacity, . . .. Ms. Gallego shall refrain from any further **contact** with the Debtors, Josue and Leticia Cepero, during the bankruptcy, and until such time as the bankruptcy has been discharged and/or dismissed. . . . During such time, there shall be no communication from, Marglli Gallego, individually, or in her **capacity** as the president of the Hammocks Community Association Inc., with reference to the bankruptcy filed by Josue and Leticia Cepero . . .. This includes a prohibition against Marglli Gallego, individually, to **approach** the Debtors, to communicate with or about the debtors, in person, or in writing.

DE191 ⁋⁋ 2-3 (emphasis added).

## II.  <u>Contempt Motions and The First Day of Evidentiary Hearings</u>

On September 17, 2019, Debtors filed the Contempt Motion. [ECF199]. The basis of the Contempt Motion was an incident on May 15, 2019, in which the Debtors claimed that Gallego "confronted the [D]ebtors by blocking their car with a condominium association vehicle while they were visiting another property in the [Hammocks],"[2] during which Gallego allegedly yelled at the Debtors and called the police (the "Incident").  Id. at ⁋⁋ 5-6.  The Appellants responded, rejecting the

---

[2] The Contempt Motion also mentioned a lawsuit filed in 2019, after the Incident, which was not addressed during the evidentiary hearing on the Contempt Motion and is not the subject of the Contempt Order. DE199 ⁋ 7.

allegations and contending that the Debtors themselves had violated the Contempt Orders by instigating the Incident and that the security guard who first arrived at the scene of the Incident had confirmed that the Debtors' vehicle was blocking Gallego from her parking space. ECF216; Id. ¶¶3-5, 7

The Contempt Motion was set for an evidentiary hearing on February 26, 2019, for several hours.  ECF 255. During the hearing, the Debtors presented three witnesses, Mr. Como, one of the police officers that responded to the 911 calls, Id. at 17-22, Maria Alonso ("Mrs. Alonso"), one of the witnesses present after the Incident, Id. at 24-51, and Mr. Cepero, Id. at 52-85, after which they closed their case in chief. ECF255 at 86:12-13.  The Respondents presented the testimony of Jorge Matus ("Mr. Matus"), Id. at 88-124, one of the Hammocks security guards that responded to the Incident.

At the end of the day, the hearing was adjourned for another day.  Id. at 125-126. It was rescheduled for and proceeded on February 11 and 12, 2021. ECF321; ECF322.

**III.**   **Amended Contempt Motion and the Lawsuits**

    **A.**   **The Amended Contempt Motion**

In the interim, on January 7, 2021, the Debtors filed an Amended Contempt Motion, containing the same allegations as the Contempt Motion, ECF289, and adding an additional basis for holding the Appellants in contempt or in violation of

the automatic stay. Id. ¶¶ 12-15. Specifically, the Debtors' added that the Debtors had been served with a lawsuit filed by Appellants on November 20, 2020 (the "November 2020 Lawsuit"). Id. ¶ 12. In addition to the sanctions and damages requested in the Contempt Motion, the Debtors also sought damages for emotional distress. Id. at 7.

### B.   The Lawsuits

On November 22, 2017, the Hammocks filed an action against five defendants, including the Debtors, asserting claims for, in relevant part, trade slander, defamation, tortious interference with business relationship, and civil conspiracy. ECF322, Ex. 25. The basis for the claims were alleged to be statements and actions that occurred during a protest outside the Hammocks clubhouse, Id. ¶¶ 17-20, a blog promoted by the Debtors at the protest, Id. ¶¶ 21-24, and a flyer that was mailed to Hammocks residents, all of which occurred *pre-petition*. Id. ¶¶ 27-28.[3]

In November 2020, the Respondents filed an action against Mrs. Cepero asserting claims for defamation against Gallego, defamation against the Hammocks, and tortious interference with a business relationship. ECF321, Ex. 21. The foregoing claims are based on statements made by Mrs. Cepero *post-petition*

---

[3] The lawsuit was dismissed approximately a month after it was filed. The 2017 lawsuit is not the subject of the Contempt Order or any contempt motion filed by the Debtors.

7

between 2018 and 2020, specifically, statements made by Mrs. Cepero directly to other Hammocks' residents and employees and holding a sign in front of the community office defaming Gallego. <u>Id.</u> ¶¶ 19-22, 37, 45. The only statements in the Complaint that implicate *pre-petition* conduct, is a general allegation that "Ms. Cepero has made false and defamatory statements over the last four years (at a minimum) about Ms. Gallego, solely to tarnish Ms. Gallego's reputation as a trusted Board Member of Hammocks Community Association, Inc." <u>Id.</u> ¶ 18. Respondents dismissed the lawsuit two weeks after it was filed. <u>Id.</u>, Ex. 21.

## IV.   <u>The Continued Evidentiary Hearing</u>

The Evidentiary Hearing continued on February 11 and 12, 2021. ECF321; ECF322. During the continued evidentiary hearing, the Debtors' case in chief was reopened for the presentation of additional evidence, ECF321 at170:14-15, after which Appellants presented their response to Debtors' case in chief, specifically, presenting the testimony of Gallego. ECF321 at 182-258. At the end of the hearing on February 12, 2021, the parties were directed to submit their closing arguments in writing. ECF322 at 299-300.

## V.   <u>Closing Arguments</u>

### A.   <u>Debtors' Closing Argument</u>

In their closing argument, the Debtors argued that the evidence "clearly" demonstrated that Gallego and the Hammocks committed the acts of filing the 2020

Lawsuit in violation of the bankruptcy stay and "improperly initiated contact" with the Debtors during the May 2019 Incident. ECF324 at 1. The theme of their closing argument, however, was that Respondents "submitted testimony that was false and known to be false" and that "Gallego's entire description of the events on May 15, 2019 . . . [was] outrageously false, absolutely impossible, and belied by" the evidence, Id. at 2; see also Id. at 4-10, 13-14, going so far as to misstate the evidence on various occasions.[4]

Debtors argued that the only credible evidence in the record demonstrated that Gallego followed the Debtors on the Hammocks property, first blocked their vehicle while in a parking spot, then, when they drove away, pulled in front of them and obstructed their attempt to leave the area. Id. at 4-5. They contended that, unlike the usual case, this is not a he said she said situation because videos, specifically Exs. M/22 and N/23, "do not lie" and show that Gallego blocked the Debtors." ECF234 at 10.

With respect to the 2020 Lawsuit, Debtors argued that the allegations that were the subject of the 2017 Lawsuit were based on the "**exact defamatory statements**," as the 2020 Lawsuit. Id. at 3, 12 (emphasis in original). As more fully

---

[4] For example, the Debtors' go to great lengths to argue that Gallego lied and was evasive as to her home address to the police and.or to the court. ECF326 at 4; ECF324 at 8. Neither is true. Gallego twice identified her address to the 911 operator as 14921 SW 104th St. ECF322, Ex. L/24. During the evidentiary hearing, she identified the same address as that of her home. ECF321 at 186:2-3, 223:12-14.

set forth above, this is completely untrue.  Compare ECF322, Ex. 25 with ECF321

Ex. 21.  The Debtors further argued that the only "reasonable inference" from the

fact that both the 2017 and 2020 Lawsuits were dismissed shortly after they were

filed is that Appellants knew they could not file suit against the Debtors. ECF324 at

4, 12.  Based on the foregoing, they conclude that the filing of the 2020 Lawsuit was

in violation of the Contempt Orders and the automatic stay.  Id. at 12-13.

### B.   **Appellants' Closing Argument**

Appellants countered that the Debtors had not presented clear and convincing

evidence that the Appellants had violated the Contempt Orders, ECF325 ⁋ 3.   In

support thereof, Appellants cited extensively to the evidence in the record, briefly

addressing what occurred prior to Gallego arriving in the vicinity of her home, then

addressing the critical facts as to the Incident.  Id. ⁋⁋ 3-14.

Specifically, when Gallego arrived at her home, she pulled into her parking

lot and the Debtors crossed her parking lot and blocked her car, ECF321 AT 195:14-

18, after which she got down from her car to take a picture of the Debtors' license

plate and tried to record them (Mrs. Cepero held up a defamatory letter the Debtors'

sent to Hammocks' residents to block Gallego's view). ECF325 ⁋⁋ 4-5; ECF 321 at

195:24; Exs. F, G.   At no time during the entire Incident did Gallego attempt to

contact or communicate with the Debtors. ECF 325 ⁋ 4; ECF321 at 195:16-195:19.

In fact, during the evidentiary hearing, it became clear that the only witnesses

present or existing evidence as to the "blocking" of any vehicle were the Debtors and Gallego and two videos taken by the Debtors, one of which shows the Debtors driving on the wrong side of the road, around what appears to be a rotunda, after which Gallego pulled into the parking lot in front of the Debtors while on the phone, looking forward, and the other showed the cars after they were at rest.  ECF325 ¶¶ 12-13; Exs. 23/M, 22/N.  No other witness testified as to having witnessed any contact or communication during the Incident.  ECF325 ¶¶ 6-7, 9-11.

With respect to the 2020 Lawsuit, Appellants argued, amongst other things, that the causes of action asserted against Mrs. Cepero were "to collect on post-petition debts for claims arising from statements made between 2018 and 2020," Ex. 21 ¶¶ 19, 45, and that, as such, the 2020 Lawsuit and the claims asserted therein were not prohibited by the automatic stay. ECF325 ¶20.

### C.   **Debtors' Reply Closing Argument**

In their reply closing statement, the Debtors continued with the same theme, that they satisfied their burden of proving their case in support of contempt as to the May 2020 Incident because the "evidence was clear and convincing for the simple reason that Respondents' version of the events, as detailed in Debtors Closing Argument, is beyond belief and impossible under the evidence presented to the Court." ECF326 at 1.

In fact, it becomes clear for the first time in their reply that the Debtors sought

to shift the burden to Appellants, urging the Bankruptcy Court to treat the contempt proceedings as if Appellants had not responded.  Id. at 2-3.  Specifically, Debtors argued that allegedly undisputed evidentiary items that purportedly were not addressed by Appellants or were the subject of Gallego's alleged false testimony "conclusively" establish:

> a) Ms. Gallego's version of the events is impossible and incredible; and b) Ms. Gallego's testimony about the events is replete with misrepresentations and false statements. Based thereon, however the evidentiary threshold as described by Respondents, Debtors met that threshold. Where there is substantial and competent evidence that Ms. Gallego blocked the Debtors, first in a parking spot, and then a second on the roads within the community that is corroborated by a video showing Ms. Gallego obstruct the path of Debtors presented; and, all that is offered in response is a version of events that is impossible, incredible and filled with false testimony contradicted by undisputed evidence, the clear and convincing threshold must certainly be met.

Id. at 3.[5]  According to the Debtors, the evidence, particularly Ex. N/22, supports the "fact" that the Debtors were blocked twice. ECF326 at 6.

Debtors contested Gallego's argument that she did not make "contact," "communicate," or "approach" the Debtors as "absurd" because Gallego's alleged blocking of the Debtors' vehicle was a "communication" and Gallego could not

---

[5] See also ECF326 at 6 ("Contempt, under the circumstances where the Court forbade any type of contact to prevent future altercations, cannot be avoided by providing false statements about what occurred followed by a portrayal of the events as a mere 'interaction'").  "[A]ltercations" are not the subject of the Contempt Orders as forbidden conduct.

block the Debtors' without "approaching them." Id. at 5.  The Debtors further argued that the language of the Contempt Orders "clearly" prohibited the type of conduct at issue because the purpose of the Contempt Orders "was 'to prevent further altercations between [] Gallego and the Debtors" and that such an "altercation" was "of the precise type sought to be prevented by the [Bankruptcy] Court." Id.

As to the 2020 Lawsuit, the Debtors' essentially made the same argument as in the opening closing statement, contending that, the only reasonable explanation of the evidence, particularly the dismissal of both lawsuits, is that they were both in violation of the stay.  Id. at 2, 7.[6]

## VI.   Contempt Order

On July 17, 2021, the Bankruptcy Court entered the Contempt Order.  In the portion of the Contempt Order regarding "Background Facts," the court indicated that it entered the Contempt Order "hoping to resolve the ongoing confrontations" between the Debtors and Appellants.  ECF328 at 2. The court further indicated that the subject of the Contempt Motion was the May 15 "confrontation," and that the

---

[6] Debtors also argued that the 2020 Lawsuit violated the automatic stay because the Appellants sought damages in that lawsuit and that, if the lawsuit were successfully prosecuted to conclusion, "the [Appellants] could attempt to garnish wages or levy against the Debtors which would make it impossible for the Debtors to complete their plan payments." ECF326 at 7.  This contention is speculative, premature, and fails as a matter of law and fact. See also ECF325 ¶21 ("nor was there any evidence presented regarding the complaint as a prohibited collection of post-petition claim from the bankruptcy estate").

subject of the Amended Contempt Motion was the November 2020 Lawsuit. <u>Id.</u> at 2-3. The Bankruptcy Court described the issues before the court as "whether the Respondents violated the Contempt Orders by virtue of the May 15, 2019 altercation, and whether the Respondents violated the Contempt Orders or the automatic stay by filing the November 2020 Lawsuit." <u>Id.</u> at 3-4.

### A. <u>The May 15, 2019 Incident</u>

The Bankruptcy Court first summarized the testimony of the witnesses, commencing with Mr. Cepero's testimony. <u>Id.</u> at 4-5. Mr. Cepero testified that, on May 15, 2019, the Debtors drove to the Heron in the Hammocks to visit Ms. Alonso. <u>Id.</u> at 4. He further testified that, while he was parked in a visitor's parking space waiting for her, Gallego drove up in a Hammocks vehicle and blocked him in, after which he "drove around" and was able to maneuver around Gallego, but that. Gallego then drove around and blocked his vehicle again. <u>Id.</u> at 4-5. The court found that the police and Hammocks security were called at that time. <u>Id.</u> at 5.

Ms. Alonso testified that the Debtors called her to tell her Gallego was blocking them, after which she went to the scene of the Incident. <u>Id.</u> According to the court, Ms. Alonso further testified that, when she arrived, Gallego was outside of her car, by the Debtors' car, saying something and filming the Debtors. <u>Id.</u> When she arrived, there were two security vehicles present as well.

Gallego testified that the Debtors started everything by following her from her

14

son's school, where she was waiting to pick him up to take him home since before 4:00, and continued to follow her, after which she called the police.  Id. at 5-6. She further testified that, when she got to the area of her apartment, she had a neighbor take her son from the car for his safety and that, "she began pulling into her parking lot and suddenly the Debtors came across her parking lot and got in front of her car." Id. at 6.  Gallego testified that the "911 operator told her to get out of the car to check the tag number" of the Debtors' car.  Id.

Mr. Cepero testified that the Debtors' did not follow Gallego and that, during the relevant time, they were at the bank obtaining a money order, as evidenced by a time-stamped bank slip.  Id.; ECF255, Ex. 14.  The court concluded that "[i]t was not possible for the Ceperos to be at the son's school in the carpool line at or before 4:00 p.m., follow Ms. Gallego for an hour, or a half hour, or at all, and then still be at the bank making a transaction that completed at 4:17 p.m." Id.

As to the Incident on May 2019, the Order states that the video evidence showed that the Debtors "were driving when all of a sudden Ms. Gallego pulled up in front of them, forcing them to stop. Ms. Gallego then got out of the car and eventually approached the Ceperos' car while talking on the phone." Id. at 6; EC322, Ex. 22/N, 23/M.  Based on the foregoing, the Court found that "[t]his video evidence directly contradicts Ms. Gallego's testimony that the Ceperos were blocking her from her parking space. If the parking space was blocked, it was a consequence of

15

where Ms. Gallego stopped her car." Id. at 6.[7]

The police officer who responded to the 911 call filed a report that indicated the police was dispatched at 4:35 and arrived at 4:40, at which time the Hammocks security officers were already at the scene; the 911 call log shows that the call was received at 4:31.  Id. at 7, Exs. 10, 24/L.  The court found that this also contradicted Gallego's testimony that, *inter alia*, the Debtors were following her, for how long, and when she called the police.  Id.  The court concluded that "it is clear that Ms. Gallego called 911 after she had blocked the [Debtors'] car." Id.

Based on the foregoing and other evidence in the record, the Court concluded that

> Ms. Gallego did not call the police while she was driving the car as she claims, but, rather, Ms. Gallego called the police at 4:31 p.m. That recording makes clear that there was no previous call to the police, as Ms. Gallego testified, while she was driving home from her son's school. Finally, the video of what appears to be the second confrontation clearly shows that Ms. Gallego was blocking the Debtors, and, in fact, the video shows that Ms. Gallego deliberately pulled up in front of the Debtors' and blocked them from continuing in the direction in which they were driving.
>
> In sum, the Court finds that Ms. Gallego was untruthful, her testimony fabricated and contradicted by physical evidence. Consequently, the Court finds that all of Ms. Gallego's testimony should be disregarded.
>
> Mr. Cepero testified he and his wife were at The Heron to see Maria Alonso. Maria Alonso corroborated that testimony. The Association and Ms. Gallego did not put on any evidence to

---

[7] There is no video evidence of the portion of the Incident regarding Gallego's alleged blocking of the Debtors in the parking space.  See ECF322, Exs. 22/N, 23/M.

contradict that testimony other than Ms. Gallego's untruthful testimony about her son's carpool line and being followed by the Ceperos.

Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a ***violation by Ms. Gallego, and by extension, the Association, as Ms. Gallego was driving an official Hammocks vehicle, of the Contempt Orders***.

Id. at 7-8 (emphasis added).[8]   According to the court, the Contempt Orders made "clear" that the Hammocks and Gallego on the one hand, and the Ceperos on the other are not to "interact with each other." Id. at 12.

## B.    The 2020 Lawsuit

The Bankruptcy Court found that, in the 2020 Lawsuit, Respondents sued Mrs. Cepero for a variety of acts, some of which where post-petition, but that "the complaint clearly included allegations, and sought relief with respect to, 'false and defamatory statements over the last four years (at a minimum) about Ms. Gallego.'" ECF328 at 8-9.   Furthermore, while the Bankruptcy Court rejected Debtors' argument that the filing of the 2020 Lawsuit constituted contempt in violation of the

---

[8] The court also rejected the testimony in the record as to whether Gallego had her son in the car:  "Additionally, although Ms. Gallego testified that she asked someone to take her son out of the car and into her home, the Association did not provide any corroborating testimony and there is nothing in the video that suggests the son was in the car when Ms. Gallego blocked the Debtors' car." ECF328 at 8. This is inaccurate.  The videos ended just as the cars came to a stop. And, the Hammocks security guard that first arrived at the scene testified that "[a]nother person approached [] Gallego" and told Gallego, "'[j]ust relax, [your] [sic] son is safe.'" ECF99:1-16.

17

Contempt Orders, <u>Id.</u> at 9-10, it found that the "2020 Lawsuit was a knowing violation of the automatic stay," and was "clearly an act 'to recover a claim against the debtor that arose before the commencement of the case.'" <u>Id.</u> at 10 (quoting 11 U.S.C. §362(a)(1)).

The court rejected Respondents' argument that there had been no stay violation because the subject of the 2020 Lawsuit, unlike the 2017 Lawsuit, was based on post-petition conduct, ECF325 ¶20, based on a finding that "[w]hile there are certain instances in which acts to recover on claims that arise post-petition are not a stay violation, the Court does not have to address those exceptions here because the [] 2020 Lawsuit included relief relating to alleged prepetition claims." <u>Id.</u>  Based on the foregoing, the Bankruptcy Court concluded that the Respondents "knew that they could not file any lawsuit against the Ceperos at least with respect to matters that occurred before the bankruptcy case was filed, [] were on notice that filing any lawsuit while the bankruptcy case was pending might be prohibited" and thus held that "the Association and Ms. Gallego willfully violated the automatic stay by filing the [] 2020 Lawsuit." <u>Id.</u> at 10-11.

## VI.    Order on Sanctions

On October 28, 2021, the Bankruptcy Court entered an Order on Sanctions and Setting Further Evidentiary Hearing ("Sanctions Order"), ECF339, in which the court held that sanctions in the form of emotional distress and punitive damages

18

should be assessed subject to further proof at a further evidentiary hearing.

In support of its ruling on the entitlement to punitive damages, the court's sole findings were that "Ms. Gallego acted recklessly and carelessly when she deliberately cut off the Debtors with her car, and then called the polices with her manufactured story about the Debtors following her [and] that Ms. Gallego acted recklessly and callously when she initiated the November 2020 Lawsuit." ECF339 at 9. No findings or even mention of any involvement by the Hammocks was made. In fact, the sole basis for the court's finding that the Hammocks was in contempt and thus apparently was liable for punitive damages was that Gallego was driving an association vehicle at the time of the Incident. ECF328 at 6.

The court concluded that the Debtors "are entitled to some punitive damages" to be determined at a subsequent evidentiary hearing. ECF339 at 2.

## VIII. Order on Damages, Motion for Rehearing and Order Granting Motion as to Punitive Damages against Hammocks

After the further evidentiary hearing, ECF403, the bankruptcy court entered the Order on Damages. ECF480. The court held, *inter alia*, that Mrs. Cepero was entitled to $25,000 in damages for emotional distress against both Appellants and that the Debtors were entitled to punitive damages in the amount of $83,190 against Ms. Gallego. Id.

Relying on Mercury Motors Exp. Inc. v Smith, 393 So.2d 545, 549 (Fla. 1981), the court held that Hammocks was not liable for punitive damages because

there was no evidence in the record that "would support a finding that the Association acted or did not act in a way that 'foreseeably contributed' to the Debtor's injuries." ECF480 at 9-10.

Debtors moved to Alter or Amend the Judgment, for Rehearing, Relief from Judgment and/or Reconsideration.  ECF489.  Debtors argued that the court misstated the law because, pursuant to <u>Schropp v. Eurocars</u>, 654 So. 2d1158 (Fla. 1995), a corporation is directly liable for punitive damages without proof of fault for the acts of an officer. <u>Id.</u> at 2-5.  The Hammocks opposed the motion on the basis that, unlike in <u>Schropp</u>, Gallego was not acting as an agent or within the scope of her employment at the time of the Incident.  ECF502 at 3-5.  Hammocks further argued that the direct liability theory, as codified in Fla Stat. 768.72, provides that liability for punitive damages is established if the employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct or the officers, directors, or managers of the employer, principal, corporation or other legal entity knowingly condoned, ratified, or consented to such conduct. <u>Id.</u> at 5-6.

The Court held a hearing on the Motion, at the conclusion of which the court held that, based on a statement in a previous order that Gallego was driving a Hammocks car at the time of the incident, she had already held that Hammocks bore direct liability for punitive damages based on the conduct of Gallego.  ECF526 at 35-36.  The Court thereafter issued an order granting the Motion for Rehearing.

ECF510.  In relevant part, the court held that it had "already found the Association to be directly liable for punitive damages in" the Contempt Order [ECF328] "which findings have not yet been challenged by the Association, based on <u>Schropp</u>, [and] the Association is jointly and severally liable with Ms Gallego for punitive damages."  ECF510 at 5.

## <u>SUMMARY OF THE ARGUMENT</u>

The Bankruptcy Court made improper legal conclusions and erroneous findings of fact in its Contempt Order finding Appellants in contempt for violation of the Contempt Orders.  In fact, the Contempt Order suffers from numerous legal and factual defects, any one of which justifies the reversal of the Order.

First, the Bankruptcy Court erred in finding that the terminology in the Order enjoining the conduct complained of by Debtors is clear, definite and unambiguous.  In fact, Debtors failed to satisfy their burden to demonstrate by clear and convincing evidence that Respondents' alleged conduct constituted "contact" or "communication" with the Debtors.  Nor did they satisfy their burden of proving that Gallego "approached" the Debtors.  Neither of the Appellants should have been found to be in contempt for this reason alone.[9]

Second, the Bankruptcy Court erred in its findings of contempt by clear and

---

[9] Indeed, even if this Court were to agree that Gallego approached the Debtors, the Hammocks was not subject to that prohibition in the Gallego Contempt Order and thus could not be held in contempt for such conduct.

convincing evidence in light of the totality of the evidence in the record. Indeed, instead of applying the proper standard, the court essentially found contempt by erroneously weighing the evidence as though Respondents had not responded to the Contempt Motions at all. The Court erred in discounting the evidence submitted by Appellants.

Third, the Bankruptcy Court improperly held the Hammocks in contempt based on the mere fact that Gallego was driving a Hammocks vehicle at the time of the Incident. Gallego was not acting within her capacity as president of the Hammocks' board of directors at the time of the Incident, which occurred upon her return from picking up her son at school. As such, Hammocks cannot be held in contempt based on her conduct.

Fourth, the Bankruptcy Court abused its discretion in finding that the Respondents violated the automatic stay in bankruptcy by the filing of the 2020 Lawsuit. Specifically other than a general allegation in one sentence of the complaint, a cursory reading of the complaint in the 2020 Lawsuit makes it evident that the claims asserted and damages sought therein were based on post-petition conduct that is not subject to the automatic stay. No violation thereof occurred

The Bankruptcy Court also erred in finding the Hammocks jointly and severally liable for punitive damages. ECF510. Specifically, the court applied an improper standard to its determination of purported direct liability against the

Hammocks for punitive damages and, even if it applied the correct standard, it erred in finding that the standard is satisfied here.

## **ARGUMENT**

"A finding of civil contempt must be based on 'clear and convincing evidence' that a court order was violated." Jove, 92 F.3d at 1545 (internal quotations omitted). "The clear and convincing evidence standard is more exacting than the preponderance of the evidence standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." Id. (internal citations and quotations omitted). The clear and convincing standard is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are "highly probably." Colorado v. New Mexico, 467 U.S. 310, 316 (1984); see also State of Florida v. State of Georgia, 141 S. Ct. 1175, 1180 (2021) (same). "This would be true, of course, only if the material [the movant] offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence [the respondent] offered in opposition." Colorado, 467 U.S. at 316.

In turn, to obtain a finding of civil contempt for violation of a previous order of the court, the court must find that the moving party demonstrated, by clear and convincing evidence, in addition to the violation of the orders at issue, that "1) the allegedly violated order was valid and lawful, 2) the order was clear, definite and unambiguous; and 3) the alleged violator had the ability to comply with the order."

<u>Jove</u>, F.3d at 1546 (quoting <u>Jordan v. Wilson</u>, 851 F.2d 1290, 1292 n.2 (11th Cir. 1988)).

This Court should reverse the Order on appeal for the reasons more fully set forth below.

## I.   The Bankruptcy Court Erred in Finding Respondents in Contempt for <u>Violation of the Contempt Orders</u>

### A.   Debtors did Not Demonstrate by Clear and Convincing Evidence that the Contempt Orders were Clear, Definite and Unambiguous in <u>Forbidding the Conduct at Issue</u>

The Contempt Order finds the Respondents in contempt for violation of the Contempt Orders.   In relevant part, the Agreed Contempt Order prohibits the Hammocks and Gallego, in her capacity as president of the Hammocks board of directors, from making "**contact**" with the Debtors . . . during the bankruptcy and until such time as the bankruptcy has been discharged and/or dismissed" and from any "**communication** . . . with reference to the bankruptcy filed by . . . the Debtors, Debtors' debts, the Debtors' creditors or any other business relationships the Debtors may have relating to the Bankruptcy."   ECF189 at 2 (emphasis added). The Gallego Contempt Order prohibited Gallego, in her individual capacity, from any "contact" or "communication" with the Debtors and from "**approach[ing]** the Debtors, to communicate with or about the debtors, in person or in writing." ECF191 ¶¶ 2-3.

It is well established that in interpreting words used in court orders (and statutory text) the Court is to apply the plain meaning thereof, often by reference to

the meaning provided by the dictionary. See, e.g., Bostock v. Clayton County, Georgia, 140 S. Ct. 1731, 1738 (2020) (a court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment"); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1228 (11th Cir. 2001) (courts may reach results inconsistent with the plain meaning of a statute sparingly and only "if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd"); Id. at 1223 ("to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance").

As relevant to this case, "contact" is defined as, *inter alia*, "an establishing of communication with someone or an observing or receiving of a significant signal from a person or object." Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/contact*; see also https://dictionary. Cambridge English Dictionary, cambridge.org/us/dictionary/english/contact ("communication with someone, especially by speaking or writing to them regularly"). "[C]ommunication" is defined as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception" and "messages or ideas so expressed or exchanged." Communication, Black's Law Dictionary (11th ed. 2019); see also Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/communication* ("the act or process of using words,

sounds, signs, or behaviors to express or exchange information or to express your ideas, thoughts, feelings, etc., to someone else").

The Debtors have not demonstrated that the terms "contact" and "communication" clearly, definitely, and unambiguously apply to the conduct at issue. The Incident involved Gallego's alleged blocking of the Debtors' vehicle twice in the area of Gallego's home at the Hammocks and her taking pictures and video of the Debtors in their car after the cars came to a stop.   Mr. Cepero and Gallego, the only witnesses present during the entirety of the Incident,[10] both *testified that there was no contact or communication between Gallego and the Debtors during the incident.* No other clear and convincing evidence in the record supports the proposition that the Hammocks or Gallego "contacted" or "communicated" with the Debtors.  Hammocks was not prohibited for engaging in any other conduct and thus should not have been held in contempt for this reason alone.

As relevant to Ms.  Gallego, "approach" is defined as "to come near or nearer to something or someone in space, time, quality, or amount." *https://dictionary.cambridge.org/    us/dictionary/english/approach*;    see    also

---

[10] The police officer did not testify as to who blocked who on the day of the incident, nor does the police report address the incident.  ECF255, at 18-22; Id. Ex. 11. Mr. Matus' testimony similarly was that he did not observe the purported blocking by Gallego. ECF255 at 107:21-24, 121:21-25-122:1-6. Mrs. Alonso testified that she arrived after Mr, Matus. ECF255 at 27:6-14, 33:4-23, 34:11-19.

*https://www.merriam-webster.com/ dictionary/approach* ("to draw closer to" and "to come very near to : to be almost the same as").  Gallego testified that she took pictures and attempted to take video of the Debtors in their vehicle after the cars came to a stop.  ECF321 at 199:18-22, 237:14-18.  The testimony of the other witnesses is similar.  <u>See</u>, <u>e.g.</u> ECF255 at 27:6-14, 57:7-10, 105:7-24.  In corroboration, Mr. Matus testified, in response to the question "Did at any time [Gallego] try to approach or open the car door of the Ceperos?" "Not that I saw." ECF255, at102:1-3.  Similarly, in response to the question "At any time during this incident did you see []Gallego try to approach or physically contact either Josue Cepero or Leticia Cepero?," he testified "[d]uring the time that I was present I did not see that." ECF255 at 107:25-108:1-4.[11]  Gallego did not "approach" the Debtors. And, even if the Court were to find that Gallego "approached" the Debtors, the Gallego Contempt Order only prohibits Gallego, in her individual capacity, not the Hammocks, from "approaching" them.[12]

---

[11] The only evidence in the record to the contrary is Ms. Alonso's testimony. Specifically, Ms. Alonso testified, in response to the question, "when you say you saw her approach the car and start yelling and screaming at the [Debtors], what else did you see?," that "[w]ell, when I got there she was already right at the car, by their window, and going all around the car." ECF255:15-20.  It is hardly "highly probable," that Ms. Alonso's version of what occurred is accurate when contravened by the testimony of the two parties to the Incident and Mr. Matus, a third party witness to Gallego.

[12] As set forth more fully below, <u>see infra</u> Point II, Gallego was not acting within the scope of her duties as president of the Hammocks Board of Directors during the Incident.

In their closing argument, the Debtors, for the first time, contended that the court's statement in the Gallego Contempt Order that it was entering same "to prevent any further altercations between Ms. Gallego in her individual capacity" somehow broadens the scope of the prohibited conduct. No citation to authority in support of this proposition has been cited, nor does it exist. This argument is meritless.

A contempt order must be "clear, definite, and unambiguous," Jove, F.3d at 1546, on its face. The intent in entering the Order containing specific terms as to enjoined conduct is irrelevant. See, e.g., Richmond v. United States, 6 F.2d 143, 144 (5th Cir. 1925) ("the rule is, and always has been, that courts will not disregard the plain meaning of a statute in order to give effect to its presumed intent").[13] Furthermore, even if relevant, an "altercation" is defined as "[a] vehement dispute; a noisy argument." Altercation, Black's Law Dictionary (11th ed. 2019); see also *https://www.merriam-webster.com/dictionary/altercation* ("a noisy, heated, angry dispute; *also* noisy controversy). Here, other than Ms. Alfonso, who was led to testify that Gallego was screaming but that she was too far away to hear what

---

[13] Bill Harbert Constr. Co. v. Cortez Byrd Chips, Inc., 169 F.3d 693, 695 (11th Cir. 1999) (Fifth District decisions rendered prior to October 1, 1981, but not after that date, are binding precedent on the Eleventh Circuit) (citing Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

Gallego allegedly was screaming about, ECF255:10-21,[14] there is no evidence in the record that any "altercation" occurred.    Again, the evidence in the record demonstrates that there was no contact (or communication), much less a vehement dispute, noisy argument, or an altercation.  ECF255 at 36:23-25-37:1-3; ECF 321 at 202:26-24, 214-2-4, 207:17-18.

The Court should reverse the Order on appeal for this reason alone.

**B.    The Evidence Presented by Debtors' Does Not Establish by Clear and Convincing Evidence that the Respondents Violated the Contempt Orders or Was Otherwise Rebutted**

The Bankruptcy Court purports to weigh the admissible evidence in the Contempt Order on appeal in finding the Appellants in contempt.  The Debtors were required to prove by clear and convincing evidence that the Respondents engaged in conduct violative of the Contempt Orders.  The relevant evidence in the record, however, does not support the Bankruptcy Court's holding and it erred in finding the Appellants in contempt.

In support of their case in chief and rebuttal, the Debtors put forth three witnesses.  First, they presented testimony by Mr. Cobo, one of the officers that responded to the Incident. ECF255 at 17-22.  His testimony does not, however,

---

[14] Ms. Alonso never utilized the word "yelling" or "screaming" during her testimony.  Rather, counsel, apparently testifying for her, inquired "when you say you saw [Gallego] approach the car and start yelling and screaming at the [Debtors], what else did you see. ECF255:15-17; Id.  at 24-51.

29

address any of the contested facts as to the Incident.[15]

Second, Debtors presented the testimony of Ms. Alonso, the president of the Heron at the Hammocks, the community where the Incident occurred. Ms. Alonso testified that she arrived at the Heron to, *inter alia*, visit Gail Sharp, during which she got a call from the Debtors indicating that Gallego was blocking them. ECF255, at 25:12-13, 26:16-25-271-3. Upon arriving at the scene of the Incident, by which time the Hammocks security guards were already there, one parked right behind Gallego and the other parked on the other side by the Cepero's with an open space in between,[16] she claims to have observed Gallego filming the Debtors and saying something, with the phone in one hand and doing "stuff" with the other, though she could not hear what Gallego was saying. ECF255 at 27:6-14, 33:4-23, 34:11-19.[17] She testified that, at no point did Gallego try to open the door to the Debtors' vehicle or attempt to communicate with them, but that Gallego was right by their window and the Debtors were showing a paper on their window. Id. at 36:16-25-37:1-3.

---

[15] The "Incident" refers to the following conduct: "On May 15, 2019, [] Callego confronted the debtors by blocking their car with a condominium association vehicle while they were visiting another property in the [Hammocks]." ECF199 ⁋ 5; ECF289 ⁋ 5. Neither conduct prior to this Incident nor conduct after the Incident should have been considered in determining whether contempt was justified.

[16] Contrary to Ms. Alonso's testimony as to the open space behind the Debtors, Ms. Alonso later testified that the Debtors' were totally blocked. ECF255 at 34:10-14, 51:6-9. She also testified as to the alleged first blocking of the Debtors when they claim to have been in a parking space. Id. at 13-22. How she could testify as to that portion of the Incident is a mystery since she was not there at the time.

[17] Ms. Alonso attested that she also called the police. ECF199-1 ⁋ 15.

Third, the Debtors' presented the testimony of Mr. Cepero. Mr. Cepero testified that he left his home at approximately 3:30 or shortly thereafter to go to the bank. ECF255 at 55:10-18, 61:8-14, Ex. 14, 56:8-10. According to Mr. Cepero, he then immediately drove to the Heron at the Hammocks, parked in a guest parking space, and less than a minute later, Gallego blocked him in the parking spot. ECF255 at 56:17-25-57-9; 58:21-23. Then, he claims to have attempted to leave, maneuvering out of the parking spot, heading west, but that, as he was trying to leave, Gallego moved the car and blocked him again, after which he decided not to try to leave. ECF255 at 57:9-25-58:3-12, 74:74:1, 76:2-15.[18] Both he and his wife allegedly called the police at 4:30. Id. at 77:11-15, 81:16-19. The Hammocks security guards arrived two or three minutes later and the police arrived five or six minutes later. ECF at 58:18-20, 75:16-24.

The foregoing evidence does not prove by clear and convincing evidence that the Respondents made "contact" or "communicated" with the Debtors or that Gallego "approached" the Debtors.

Debtors placed much reliance on Exs. 22/N, 23/M and L. ECF324; ECF326. None, however, demonstrates by clear and convincing evidence that a violation of

---

[18] Mr. Cepero first testified that he had not taken any video during the incident, ECF25514-16, but later, when referred to a video his counsel attempted to introduce, he admitted that there was a video taken from his phone after the alleged second blocking. ECF255 at 70:25-71:1-9.

the Contempt Orders occurred.

Debtors describe Ex. 23/N as showing "the cars driving, and it shows Ms. Gallego blocking and obstructing the path of the [Debtors]." ECF322 at 285:21-23. A careful review of the video, however, does not support this description. In fact, the video shows the Debtors' driving the wrong way around the rotunda near Gallego's home, Gallego approaching from 103th Terrace,[19] towards her home, turning onto the boulevard in between and into the entrance of the rotunda where her home is located, all the time on the phone, apparently with the police.  Ex. 23/N.

With respect to Ex. 22/M, Debtors describe it as a continuation of Ex. 23/N. ECF322 at 286:25-87:1-7.  In fact, the video does not evidence who blocked who, but rather, shows the cars at rest after the second "blocking" allegedly occurred. It thus adds nothing to the other evidence in the record.

Finally, Ex. 24/L is a recording of the 911 call by Gallego (or one of her calls), commencing at 4:31[20] and ending at almost 4:38. During the call, Gallego tells the

---

[19] Mr. Matus, the Hammocks security officer, testified as to the general geography of the location of the Incident.  Specifically, he testified that, before one arrives at Gallego's apartment building, 14921, there is a street, 103rd Terrace, with a stop sign at the end, followed by a small boulevard with a parking area that does not go anywhere. ECF255 at 104:14-24-105:17-18. The only entrance to Gallego's parking space is from 103rd Terrace and the only exit is to go around the rotunda, within which the May 2020 Incident occurred, by which there are parking spaces, including Gallego's. ECF255 at 106:2-20-107:17-20, Ex. E, 111:4-17.

[20] Strangely, the recording of the 911 call appears to start with the operator stating her name.  Ex. 24/L:10-15.

operator that she was being followed for an hour and that the Debtors were in front of her. ECF322, Ex. 24/L:2:23-2:25, 2:31-2:35. Within a minute of the commencement of the call, Gallego tells the operator that she tried to move, that the Debtors followed her, and that the Debtors were now in front of her. Id.:58-1:01. The recording does not address any part of the Incident at issue.

Debtors failed to offer evidence that shows by clear and convincing evidence that the Respondents violated the Contempt Orders and the burden should not have shifted to Respondents to rebut same. But, even if it were sufficient to satisfy Debtor's burden, it was rebutted by Respondents.

Gallego testified that, on May 15, 2019, she headed out to pick up her son at 3:40 or 3:43, ECF321 at 230:5-8, waited in line at the school, and while she was picking up her son, noticed unusual activity by one of the cars in line, but then drove off. ECF321, at 194:6-24. The school was five to eight minutes from her home. Id.[21] at 224:20-23. She thereafter noticed that she was being followed while driving home and called 911. Id. at 195:11-19, 225:21-23. She made it home and drove into her parking lot, at which point the Debtors "were in front of me, or they came

---

[21] The Debtors' go to great lengths to argue that Gallego lied and was evasive as to her home office to the police and/or to the Court. ECF324 at 8. Neither is true. Gallego twice identified her address to the 911 operator as 14921 SW 104th St. ECF 322, Ex. 24/L. During the evidentiary hearing, she identified the same address as that of her home. ECF321 at 186:2-3, 223: 12-14 ("Q. Ms. Gallego, what is your current address? A. 14921 Southwest 104th Street," where she had lived since at least 2013).

across," a few feet from the entrance to her home, while she was still on the phone with the police.  Id. at 196:14-25-197:1-5.  A neighbor came out of one of the buildings and took her son to the office, at the same time as the Hammocks security guards arrived.  Id. at 197:2-7.  She then got out of the car to get the Debtors' tag number.

Mr. Matus, the supervisor of security for the Hammocks, who had been in the security business for 12 years, testified he arrived at the scene of the Incident less than five minutes after he received a call from Gallego telling him that she was being followed and was arriving at her home. ECF255 at 90:2-16; 93:17-25, 97:1-3.  He attested that, when he arrived, there were two cars, one driven by Gallego and the other by the Debtors, that Gallego's car was facing west, in the direction of her apartment, a few meters away from and facing Gallego's home, that the Debtors' vehicle was facing east, and that the Debtors were blocking Gallego's parking spot. ECF255 at 97:6-25-98:1-8, 119:1-15. Gallego stayed on the phone with the 911 operator until the police arrived.  Id. at 237:4-18.[22] Gallego testified that she did not block the Debtors, but, rather they blocked her because she was heading towards her parking spot.

---

[22] The court discounted Gallego's testimony that there were two officers that responded to the incident as uncorroborated.  ECF328 at 7 n.4; ECF321 at 229:1-3. That is inaccurate.  Mr. Cepero and Mr. Matus both also testified that two officers responded to the Incident.  See ECF255 at 59 ("Two officers arrived"), 102:19-24 ("When [the police] arrived they talked – there were two of them").

Gallego testified that she "never made contact" with the Debtors, "never communicated with them," and that the Debtors never "put their windows down and they never tried to say anything." ECF321 at 202:16-24, 214:2-4, Ex. F-G, 207:17-18.  To the contrary, Ms Cepero held up a letter to the window when Gallego tried to record them.[23]  Id.  Mr. Matus similarly attested that at no time did he observe Gallego try to approach or open the car door of the Debtors.  ECF255 at 102:1-3. He further testified that he did not see Gallego try to approach or physically contact the Debtors.  ECF255 at 108:1-4.

The Bankruptcy Court erred in finding the Debtors had satisfied their burden to prove that Respondents should be held in contempt for violation of the Contempt Orders by the Respondents.  Reversal is appropriate for this additional reason.

## II.    The Bankruptcy Court Erred in Finding the Hammocks in Contempt for Violation of the Contempt Orders

The Bankruptcy Court held both the Hammocks and Gallego in contempt for violation of the Contempt Orders based on the May 2019 Incident.  The Court held: "Based on the foregoing, the Court finds that the May 15, 2019 confrontation was a violation by Ms. Gallego, and by extension, the Association, *as Ms. Gallego was driving an official Hammocks vehicle*, of the Contempt Orders." ECF328, at 8.

---

[23] The letter being held up was one that "was sent out in April to all of the owners at Heron . . . that states that [] Gallego and the board members are committing fraud." ECF321, at 204:30-24-205:1-5, Exs. F, G.

35

Other than the fact that Gallego was driving the Hammocks vehicle, the court cited no evidence and made no other findings as to whether Gallego was acting within the scope of her position with the Hammocks. None exists. Hammocks cannot be found liable contempt based solely on Ms. Gallego's conduct during the Incident.

It is well established that an employer will not be held liable for the conduct of its employees when acting outside the scope of his employment:

> The general rule is that if an employee who is delegated to perform certain work for his employer steps or turns aside from his master's work or business to serve some purpose of his own, not connected with the employer's business, or, as it is often expressed, deviates or departs from his work to accomplish some purpose of his own not connected with his employment- goes on a 'frolic of his own'- the relation of master and servant is thereby temporarily suspended, and the master is not liable for his acts during the period of such suspension; he is then acting upon his own volition, obeying his own will, not as a servant, but as an independent person, even though he intends to and does return to his employer's business after he has accomplished the purpose of his detour from duty. The test of the employer's liability for the act of an employee who departs from the employer's business for purposes of his own is whether he was engaged in his employer's business at the time of the accident, and not whether he purposed to resume it. The employee is, so long as he is engaged in affairs of his own or is pursuing some purpose unrelated to his master's business, acting as much outside the scope of his employment as he would be were his working day ended, or his task completed, and thus his employer is relieved from liability for the consequence of any tortious conduct committed by the employee during that period, however short it may be.

Johnson v. Esso Standard Oil Co., 211 F.2d 397, 398–99 (5th Cir. 1954) (where driver, at time of collision, had made his last delivery for day, had gone home, changed his clothes, and was going hunting, driver was on mission of his own and

driver's acts could not be imputed to defendant); see also Entente Mineral Co. v. Parker, 956 F.2d 524, 528 (5th Cir. 1992) (internal quotations and citations omitted) ((it is a "well established rule that if an employee who is delegated to perform certain work for his employer steps or turns aside from his master's work or business to serve some purpose of his own, not connected with the employer's business, or, as it is often expressed, deviates or departs from his work to accomplish some purpose of his own not connected with his employment—goes on a 'frolic of his own'—the relation of master and servant is thereby temporarily suspended, and the master is not liable for his acts during the period of such suspension).

Here, Gallego testified (and the only evidence in the record supports the fact) that she drove her Hammocks vehicle to her son's school to pick him up, waited in line, picked him up, and drove him home.[24]  Before she was able to arrive at her house and deliver her son to the house, however, the Incident occurred.  Gallego thus never returned to engage in any conduct within the scope of her employment as President of the Hammocks board of directors prior to (or during) the Incident.

---

[24] While the Bankruptcy Court rejected Gallego's testimony that her son was in the car on the purported basis that there was no corroborating testimony or evidence, ECF328 at 8, it did not reject that she had gone to pick up her son at school. And, in any event, there is corroborating testimony from Mr. Matus, the first Hammocks security guard that arrived at the scene of the accident, that, after the incident, he witnessed a person approach Gallego and reassure her that her son was safe.  DE255 at 99.

This Bankruptcy Court erred in holding the Hammocks in contempt based on the May 2019 Incident and this Court thus should reverse the Order to the extent it finds the Hammocks in contempt for violation of the Contempt Orders.

### III. The Bankruptcy Court Erred in Holding that the filing of the November 2020 Lawsuit Violated the Automatic Stay Because it was Based on Post-Petition Conduct

Pursuant to 11 U.S.C. 362(a)(1) "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that *was or could have been commenced before the commencement of the case* under this title, or *to recover a claim against the debtor that arose before the commencement of the case* under this title" constitutes a violation of the automatic stay in bankruptcy. 11 U.S.C. 362(a)(1) (emphasis added).   The movant seeking to have a party held liable for violation of the automatic stay must demonstrate that a violation occurred by clear and convincing evidence. Jove, 92 F.3d at 1545.[25]

The Bankruptcy Court found that, though the 2020 Lawsuit included conduct that occurred post-petition, the complaint, in one paragraph in the general allegations, "clearly included allegations, and sought relief with respect to 'false and defamatory statements over the last four years (at a minimum) about Mrs. Gallego,"

---

[25] In this circuit, the relevant inquiry is whether the acts alleged constitute a violation of the automatic stay, irrespective of whether the alleged violating party knew or had the intent to do so. Jove, 92 F.3d at 1555.

ECF328 at 8-9.  ECF322, Ex. 21 ¶ 18.  Based thereon, the court concluded that the "2020 Lawsuit was a knowing violation of the automatic stay," and was "clearly an act 'to recover a claim against the debtor that arose before the commencement of the case,'" Id. at 10 (quoting 11 U.S.C. §362(a)(1)).  The court refused to determine whether the claims arose pre or post-petition based on the foregoing.  ECF328 at 10.

The Bankruptcy Court erred in finding that the Debtors demonstrated by clear and convincing evidence that the 2020 Lawsuit was a violation of the automatic stay. Indeed, a cursory review of the 2020 Lawsuit conclusively demonstrates that the case *could not* "have been commenced" and *did not* seek to "recover a claim against the debtor that arose" before the commencement of the Debtors' bankruptcy case.

The claims asserted in the 2020 Lawsuit are based on the following essential statement to others by Mrs. Cepero:

1. That Gallego committed election fraud in *2018 and 2020*, ECF321, Ex. 21 ¶¶ 37, 19;

2. While walking door to door, that Gallego was stealing money from the Hammocks between *2018 and 2020*, Id. ¶¶ 37, 19, 21;

3. That Gallego was a criminal, thug, drug trafficker, who was connected to a criminal or terrorist organization, Id. ¶¶ 37, 19;

4. That employees and Board Members of the Hammocks committed election fraud in *2018 and 2020*, ECF321Ex. 21 ¶45, 22;

5. That the Hammocks is allowing Gallego to misappropriate and steal funds, <u>Id.</u> ¶ 45; and that

6. That board members of the Hammocks misappropriated and stole funds for their own personal benefit, ECF321Ex. 21 ¶45.

All of this conduct ***occurred after*** the filing of the bankruptcy case in 2017 and thus does not constitute a violation of the automatic stay.

Debtors' argument that the 2017 Lawsuit contains the exact defamatory statements as those in the 2020 Lawsuit, ECF321 at 3, is simply untrue. <u>Compare</u> ECF321, Ex. 21 <u>with</u> ECF322 Ex. 25. And, the argument that, since both lawsuits were dismissed shortly after their filing, the only reasonable conclusion is that they were both dismissed as a result of Debtor's knowledge and that they both did in fact violate the automatic stay, ECF326 at 7, is not clear and convincing evidence of any violation.

The Bankruptcy Court erred in finding that the 2020 Lawsuit violated the automatic stay and reversal of the Contempt Order on appeal is appropriate.

## IV.     The **Bankruptcy Court Erred in Awarding Punitive Damages Against Hammocks**

The court erred in holding that the Hammocks is jointly and severally liable for punitive damages in the context of this case. Reversal is required for several reasons.

First, the court's reliance on <u>Schropp v. Crown Eurocars, Inc.</u>, 654 So. 2d 1158 (1995), was misplaced. For civil actions arising after 1999, Section 768.72(3) codifies and supplements the common law as to theories for establishing corporate liability for punitive damages. <u>See</u>, <u>e.g.</u>, <u>Ranger Construction Industries, Inc. v. Allied World National Ass. Co.</u>, 2019 WL 13090449, 4, 6 (S.D. Fla. 2019) (recognizing that § 768.72 amended "the common law standard of culpability required to hold a defendant liable for punitive damages"); <u>HCA Health Services of Florida, Inc. v. Byers-McPheeters</u>, 201 So. 3d 669, 670 (Fla. 4th DCA 2016) ("Under section 768.72(3), the legislature established a heightened standard for imposing punitive damages on an employer rather than adopting the common law rules of agency and vicarious liability").

Pursuant to § 768.72(3), "[i]n the case of an employer principal, corporation, or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent" constitutes Intentional misconduct or Gross negligence ***and*** 1) the corporation actively and knowingly participated in such conduct; 2) the officers directors or managers of the corporation knowingly condoned, ratified, or consented to such conduct; or 3) the corporation engaged in gross negligence. This standard has been applied by Florida courts to determine the issue of punitive damages. In <u>Melford v. Kahane and Associates</u>, 371 F. Supp. 3d 1116 (S.D. Fla. 2019), for example, an action based on

malicious prosecution, the court, relying on Fla. Stat § 768.72(3), stated that "punitive damages may be imposed on a corporation based on the actions of an employee of the corporation only if that employee was guilty of intentional misconduct or gross negligence *and* one of the following is true (a) the corporation actively and knowingly participated in such conduct; (b) the officers, directors, or managers of the corporation knowingly condoned, ratified, or consented to such conduct; or (c) the corporation engaged in conduct that constituted gross negligence." Id. at 1129 (internal quotations omitted); see also Koutsouradis v. Delta Air Lines, Inc., 427 F.3d 1339, 1344 (11th Cir. 2005) (applying section 768.72 in the context of punitive damages for violation of the Airline Deregulation Act); *When is a Manager a Managing Agent*, Christopher Johnson and Ted Craig, Florida Bar Journal, Vol 75, pg. 62 (2001) (the "direct liability theory approved in Schropp is preserved by § 768.72(3)").

Here, if this standard were to be applied, the Hammocks is not liable for punitive damages.  Even assuming that the conduct of Gallego constituted the intentional misconduct contemplated by the statute, the Debtors cannot demonstrate that the Hammocks either knowingly participated in such conduct or knowingly condoned, ratified, or consented to such conduct. Again, the only "conduct" by the Hammocks was that Gallego happened to be driving a Hammocks vehicle at the time of the incident.  And, while Ms. Gallego was the president of the board of the

42

directors, no evidence exists that she had any policymaking authority on behalf of the Hammocks as relates hereto.

Second, even if the standard in <u>Schropp</u>, 654 So. 2d 1158 (1995), were to apply, the entitlement to punitive damages must be proven by clear and convincing evidence." Fla. Stat. § 768.725.  Pursuant to <u>Schropp</u> and related cases, punitive damages may be awarded for direct liability based on the willful and malicious actions of managing agents of corporations.  <u>Id.</u> at 1159.  The evidence here does not support a finding that the Debtors were entitled to punitive damages against the Hammocks by clear and convincing evidence, nor did the Court so hold.  In fact, it is undisputed that the sole basis for liability for punitive damages (or at all) against Hammocks is that Ms. Gallego was driving a Hammocks vehicle at the time of the Incident.  This is insufficient to form a case of direct liability for punitive damages against Hammocks.[26]

For the same reasons, the Debtors also did not establish by clear and convincing evidence that Gallego[27] was acting as a "managing agent" of Hammocks

---

[26] Unlike here, in all of the cases cited by the court, the courts had found participation by the corporation in imposing punitive damages on the corporation.  <u>See</u>, <u>e.g.</u>, <u>Winn-Dixie Stores, Inc. v. Robinson</u>, 472 So.2d 722 (Fla. 1985) ("it was alleged and proved that the "corporation *itself* . . . acted with 'malice, moral turpitude, wantonness, willfulness or reckless indifference to the rights of others.'"); <u>Bankers Multiple Line Ins. Co. v. Parish</u>, 464 So. 2d 539 (Fla. 1985) (corporation participated in wrongdoing).

[27] That Gallego is the President of the Board of Directors of the Hammocks is not determinative.  "In certain circumstances, a purported agent's status as a company's

at the time of the Incident.  Again, this is insufficient to support a finding of direct liability for punitive damages against the Hammocks here.

<div align="center">

**<ins>CONCLUSION</ins>**

</div>

For the foregoing reasons, this Court should reverse the Sanctions Order of the Bankruptcy Court to find that the Appellants, or either one of them, is not subject to being held in contempt of the Contempt Orders; reverse the Rehearing Order to find that Hammocks is not liable for punitive damages in this case; and remand for the award of attorney's fees and costs in Appellants' favor.

Respectfully submitted,

<div style="margin-left: 40%;">

ACE LAW, P.A.
Counsel for Appellants
14200 S.W. 232nd St.
Miami, Fla. 33170
Tel. No: (305) 542-0544

By:    <ins>/s/ Annette C. Escobar   </ins>
       Annette C. Escobar
       Florida Bar No.: 369380
       aescobar@acelawfirm.com

</div>

---

owner, manager, or president is insufficient to automatically conclude he or she possesses apparent authority." <ins>GolTV Inc. v. Fox Sports Latin America, Ltd.</ins> , 277 F. Supp. 3d 1301, 1317 (2017).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and sent via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case on November 7, 2022.

By: /s/ Annette C. Escobar
Annette C. Escobar

**CERTIFICATE OF COMPLIANCE**

This Initial Brief complies with the type-volume limitation of Rule 8015(a)(7)(B) because it contains 11,340 words, excluding the parts of the brief exempted by Rule 8015(g), and is produced using 14-point Roman type, including footnotes. Counsel relies on the word count of the computer program used to prepare this brief.

By: /s/ Annette C. Escobar
Annette C. Escobar